# Exhibit 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
 2                          TYLER DIVISION

 3    MIRROR WORLDS, LLC           *    Civil Docket No.
                                   *
 4                                 *    6:08-CV-88
      VS.                          *    Tyler, Texas
 5                                 *
                                   *    October 1, 2010
 6    APPLE, INC., ET AL           *    9:00 A.M.

 7
                         TRANSCRIPT OF JURY TRIAL
 8                BEFORE THE HONORABLE LEONARD DAVIS
                    UNITED STATES DISTRICT JUDGE
 9

10    APPEARANCES:

11                        FOR THE PLAINTIFF

12    MR. JOSEPH DIAMANTE
      MR. KENNETH STEIN
13    MR. IAN G. DIBERNARDO
      MR. ALEXANDER SOLO
14    MR. CHARLES E. CANTINE
      STROOCK & STROOCK & LAVAN
15    180 Maiden Ln.
      New York, NY  10038
16
      MR. OTIS CARROLL
17    MR. PATRICK KELLEY
      IRELAND, CARROLL & KELLEY
18    6101 S. Broadway, Ste. 500
      Tyler, TX  75703
19

20    COURT REPORTERS:
      MS. SHEA SLOAN, CSR
21    MS. JUDY WERLINGER, CSR
      Official Court Reporters
22    211 West Ferguson, Third Floor
      Tyler, TX   75702
23    903/590-1171

24    (Proceedings recorded by mechanical stenography,
      transcript produced on CAT system.)
25
```

Page 2

```
 1          FOR THE DEFENDANTS
 2
 3   MR. JEFFREY G. RANDALL
     MR. RAYMOND YU
 4   MS. ERICKA J. SCHULZ
     PAUL HASTINGS
 5   1117 S. California Ave.
     Palo Alto, CA  94304-1106
 6
 7
     MR. ALLAN M. SOOBERT
 8   MR. BROCK WEBER
     MR. KIM MOORE
 9   PAUL HASTINGS
     875 15th St. NW
10   Washington, DC  20005
11
12   MR. S. CHRISTIAN PLATT
     MR. JEFFREY COMEAU
13   PAUL HASTINGS
     4747 Executive Dr.
14   12th Floor
     San Diego, CA  92121
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                   P R O C E E D I N G S
 2              (Jury out.)
 3              THE COURT:  Please be seated.
 4              All right.  The Court has reviewed the
 5   parties' briefing on this issue of Apple's objection to
 6   the claims of the -- let's see, what was it, the '313
 7   and the -- what's the other one?  '313 and the '227 --
 8              MR. RANDALL:  That's correct, Your Honor.
 9              MR. DIBERNARDO:  -- patents should not be
10   included in the Charge.
11              And I guess the question I have for Apple
12   is, was this raised in JMOL when you raised the JMOL
13   with regard to indirect infringement?  Did you raise
14   that that would knock this out --
15              MR. RANDALL:  Well, Your Honor --
16              THE COURT:  -- as well?
17              MR. RANDALL:  It -- we did raise it when
18   we -- should I take the --
19              THE COURT:  Yes, please.  Thank you.
20              MR. RANDALL:  Yes, Your Honor.
21              When we raised JMOL, we identified the
22   grounds.  We identified the indirect infringement.  I
23   don't -- I don't think we specifically identified these
24   claims in this patent, but, nonetheless, we -- it would
25   cover it.  I mean, we didn't identify these specific
```

Page 4

```
 1   claims.
 2              We did --
 3              THE COURT:  Well, I understand you're
 4   arguing as a matter of law it now knocks them out if the
 5   Court has granted JMOL on indirect infringement, right?
 6              MR. RANDALL:  I'm sorry.  I didn't --
 7              THE COURT:  You're arguing now that if --
 8   since the Court granted JMOL on the indirect
 9   infringement, that, as a matter of law, knocks out
10   these -- these two patents?
11              MR. RANDALL:  That's correct, Your Honor.
12              THE COURT:  I'm not sure that's the case.
13   I granted the JMOL with regard to the indirect
14   infringement, because there was no expert testimony that
15   I recall tying up or -- or expressing an opinion about
16   that.
17              Now, in their briefing, the Plaintiffs
18   have raised the issue that there's certain -- that there
19   is evidence of user use of these methods that would
20   provide for direct infringement.
21              That's a very close call, I think, as to
22   whether -- and I'd be glad to hear argument as to
23   whether there can be enough evidence to show that a user
24   used these in order to constitute direct infringement
25   but not enough to constitute indirect infringement.
```

Page 5

```
 1              MR. RANDALL:  Yes, Your Honor.
 2              THE COURT:  Do you care to respond to
 3   that?
 4              MR. RANDALL:  I would, Your Honor.
 5              And here's what we brought up on JMOL,
 6   and it applies equally to this issue.  And that is that
 7   they failed to completely, whether through expert
 8   testimony or factual testimony or documents, to provide
 9   evidence regarding indirect infringement, specifically
10   as to inducement and contributory infringement.
11              So, for instance, on the inducement
12   charge, they have to show that the alleged infringer
13   actively encouraged or instructed another person on how
14   to --
15              THE COURT:  Well, I -- I understand that.
16   But I guess my question is, is the standard -- I
17   understand what the standard is for inducement, but can
18   they -- do they have to prove inducement in order to get
19   direct infringement under these two method claims --
20   claim tests?
21              MR. RANDALL:  Yes, Your Honor.
22              And there are two issues that we're
23   dealing with.  Number one is, did they fail to produce
24   evidence of inducement and contributory such that they
25   can get all of these sales of these products into
```

Page 6

1  evidence, et cetera, and prove infringement that way.
2      And the answer is no.
3      So they clearly didn't show any
4  inducement or encouragement. So that's all out for
5  sure.
6      The second issue I think that you're
7  dealing with is, do the claims really require some other
8  party to participate? They're saying they proved direct
9  infringement only on these very, very narrow
10 circumstances, for instance, when someone was, you know,
11 using the computer on a videotape or something like
12 that.
13     Let me address their evidence on that
14 subject.
15     First of all, they cite about 15 exhibits
16 in this brief. Only one -- only one of those exhibits
17 was PX1676 was a reviewer's guide that shows -- that
18 they rely on. So they rely on that for direct
19 infringement. That's insufficient.
20     The issue that I think you're grappling
21 with is, does it require another person, another entity?
22 And, Your Honor, the claims clearly do. And if we look
23 at the claims --
24     THE COURT: Well, is Apple taking the
25 position, though, that none of these that they sold,

Page 7

1  that no users turned them on?
2      MR. RANDALL: We're taking the position
3  twofold. One, the claims require another entity, a user
4  to do something. And because they didn't provide
5  sufficient evidence on that subject, specifically on
6  inducement and contributory, their entire claims fall,
7  period.
8      If the Court disagrees with that for
9  whatever reason, then the -- the -- the issue is whether
10 or not the -- they have sufficient evidence of direct
11 infringement.
12     So if, for instance, the Court says, no,
13 I don't think these claims require a user -- I think
14 that would be wrong, if you said that -- then their
15 direct infringement claim is limited to some -- you
16 know, limited use of -- of those claims.
17     THE COURT: Well, what if I say they --
18 these direct infringement claims do claim a user; but
19 there is sufficient circumstantial evidence of use,
20 although not enough to rise to the level of inducement
21 but enough to rise to the level of use by Apple?
22     MR. RANDALL: All right. Let me address
23 that specific issue.
24     That's -- that's the one -- the one
25 document that they submitted and only one exhibit out of

Page 8

1  15, which is 1676, a reviewer's guide.
2      And so if you found that, Your Honor, we
3  would ask for an instruction. Number one, we'd ask that
4  the damages be taken away from the jury, because that --
5  that particular act of infringement would not be
6  sufficient to justify damages.
7      But secondly, Your Honor, if you said,
8  no, I think it is, we'd ask for an instruction that
9  Mirror Worlds cannot obtain damages other than for the
10 specific instances of direct infringement by an Apple
11 employee that Mirror Worlds has identified in the
12 record, if any.
13     THE COURT: Okay. Thank you.
14     Let me hear a response.
15     MR. DIBERNARDO: Respectfully, Your
16 Honor, I don't believe counsel addressed the threshold
17 issue, and that is, do -- do we need to show direct
18 infringement by a user for Apple to directly infringe
19 these method claims?
20     And the answer is no, we do not. That's
21 the Elantech case cited in our brief. The capability of
22 the software to perform that method has enough for a
23 finding of direct infringement. It's that capability
24 that's built into the software.
25     With regards to contributory

Page 9

1  infringement --
2      THE COURT: Well, every other case I've
3  ever had like this, they've always had their expert
4  testify or their expert has testified as to inducement,
5  which solved this. But your expert didn't express any
6  opinions on that, did he?
7      MR. DIBERNARDO: He didn't use those
8  words, Your Honor. But as even cited in Apple's brief,
9  he stepped through a user performing functions that did
10 evidence the Apple computer, the Apple software
11 performing the recited method.
12     So with regard to the contributory inducement
13 infringement, there is proof. In fact, Apple just said
14 there is at least one evidence. There is one item, the
15 reviewer's guide. And then to the Lucent standard, that
16 one piece of evidence is enough. It can address it --
17 directly addresses that point.
18     One piece of --
19     THE COURT: So -- and you're asking the
20 Court to reconsider its JMOL on -- on inducement?
21     MR. DIBERNARDO: We are, and
22 contributory. Throughout the case, we've seen
23 contributory --
24     THE COURT: But your expert did not
25 testify as to those, did he?

3 (Pages 6 to 9)

Page 10

1  MR. DIBERNARDO: The proof -- the factual
2  issue as to whether or not a user uses these methods was
3  presented. There are user surveys that go directly to
4  the accused features.
5  In fact, Mr. Bratic, for example, relied
6  on the Spotlight survey out of the -- and this is
7  not to --
8  THE COURT: He may have testified to the
9  facts; but just so I'm clear, did he express any
10 opinions regarding inducement of contributory
11 infringement?
12 MR. DIBERNARDO: He did not use those
13 words; but he did step through how a user, when the
14 machine is turned on, performs this method.
15 THE COURT: Okay. And I understand that,
16 and I don't believe that it's necessary that you have an
17 expert express an opinion, if you've otherwise got the
18 facts and evidence to support a cause of action.
19 But I guess my question is, if the Court
20 were to grant that and reverse its ruling on the JMOL,
21 where does that leave us?
22 Because Defendants already put on its
23 whole case and did not address any of those, because
24 they were no longer in the case.
25 Are we back to reopening evidence and

Page 11

1  trying more infringement and damages and --
2  MR. DIBERNARDO: These claims were still
3  in the case with regard to Apple's direct infringement,
4  so the proof was put on. In fact, that goes back to the
5  threshold issue, to prove Apple's direct infringement
6  under these method claims, is there even a need to get
7  to this secondary -- the indirect liability question to
8  prove the user's direct use.
9  And the answer there is no. It's the
10 capability that's in the software and that --
11 THE COURT: Well, I'm not going to
12 reverse my JMOL rulings on the contributory and
13 inducement. I'm going to stand by those.
14 But I am going to submit the -- the issue
15 of direct infringement, based upon your arguments, as to
16 the '313 and '227. But I think it's a tricky legal
17 issue as to whether you're right that there's enough
18 evidence there to support a direct infringement under
19 those claims, or whether they're right that there has to
20 be -- that there is not enough evidence regarding use of
21 those products.
22 I recall enough circumstantial evidence,
23 I think, in the case, although not rising to the level
24 of inducement or contributory, that it sort of defies
25 logic to me that the users did not turn on these

Page 12

1  features; and that there is enough circumstantial
2  evidence in the case to support the jury verdict on
3  that.
4  But I want to look at it closer
5  post-verdict, when we're not -- you know, it's 9:00
6  o'clock. The jury's in there waiting.
7  So what I'm going to do is I'm going to
8  go ahead and submit it as to those, but I want to parse
9  out the damage questions and will submit separate damage
10 issues as to the '313 as -- the '313 and the '227, and a
11 separate damage issue as to the -- what's the other one,
12 the '427?
13 MR. DIBERNARDO: The '313 and '227 are
14 the method claims.
15 THE COURT: Right. The separate one as
16 to those and then a separate damage question as to the
17 other one.
18 Now, let me hear your arguments as to
19 whether that's a good idea or a bad idea.
20 MR. CARROLL: Your Honor, I'll be doing
21 the argument, and I did the damage for our side. Of
22 course, we based our damage model on the accused
23 features.
24 And I think both sides can argue to the
25 jury what they -- how they suggest the jury apportion

Page 13

1  whatever damages they choose to give, if they choose to
2  give any.
3  THE COURT: Let me ask this, Mr. Carroll:
4  Do you believe that the damages can be apportioned
5  between those two groups of patents?
6  MR. CARROLL: I think -- and I don't want
7  this to sound flip, but I think the jury can do whatever
8  they want.
9  THE COURT: I'm talking about as a matter
10 of law. I know the jury can do whatever they --
11 MR. CARROLL: I don't have a clue, Judge.
12 I mean, all I know is --
13 THE COURT: That's an honest answer.
14 Response?
15 MR. RANDALL: Yeah, Your Honor, two
16 issues.
17 One, on these claims, they simply didn't
18 put in the evidence of direct infringement that each of
19 these elements of these two claims require -- or two
20 patents are part of the method claims, they didn't
21 produce the evidence that suggested that any user on
22 some video practiced each and every element.
23 But in any event --
24 THE COURT: Okay. You may be right. I'm
25 going to go ahead and submit them, so I've got a finding

Page 14

1  on it, and I'll deal with it post-verdict.
2        MR. RANDALL:  With respect to the
3  instruction, Your Honor, they are apparently relying on
4  some unidentified instance of direct infringement, some,
5  you know, user in a video or something.
6        I don't even know what they're relying
7  on, but it's a limited instance of direct infringement.
8  And I said it doesn't show the elements.  But in any
9  event on that issue, Your Honor, Apple requests an
10 instruction that Mirror Worlds cannot obtain damages on
11 those two patents, other than for the specific instances
12 of direct infringement by an Apple employee that Mirror
13 Worlds has identified in the record, if any.
14       Now, if want to argue, and they should,
15 on that subject to the jury, that here's the Apple
16 employee that we've identified and here's the things --
17       THE COURT:  Okay.  Excuse me.  I'm going
18 to deny your request for that instruction.  You can --
19 you're a very capable lawyer.  You can argue that to the
20 jury, and the jury can sort that out.
21       Now, my question is, though -- and I want
22 to give both sides -- you know how I'm going to submit
23 it.  Now, I'm going to give both sides the opportunity
24 for a very brief reopen, if you want to address the
25 apportionment of damages, because we were originally

Page 15

1  going to submit it just as one damage issue, but we're
2  now breaking it out by apportionment.
3        So does Defendant wish to offer any
4  additional evidence with regard to that?
5        MR. RANDALL:  Well, I do object to
6  reopening the record, if we had a chance to do that.
7        But, Your Honor -- no, Your Honor.  We
8  don't -- we don't agree with reopening the record.
9        THE COURT:  The reason I'm doing this,
10 though, is because, if I'm going to have two damage
11 verdicts -- the reason I'm doing that is where if I
12 throw out the '313 and the '227, I've got some damage
13 number to throw out.  Otherwise, the Court's just going
14 to be guessing, if I throw it out, as to how much of the
15 jury's verdict was attributable to the '313 and the '227
16 and how much to the '427.
17       MR. RANDALL:  All right.  And so are you
18 contemplating, Your Honor, just opening up briefly the
19 record to allow them to show what damages they claim for
20 those two method --
21       THE COURT:  Well, I will allow -- I'm
22 contemplating opening it up for both of you for 10 or 15
23 minutes each.  I was going to ask you how long you
24 thought you would need to put on your respective damage
25 people to address if -- since it's going to be submitted

Page 16

1  as separate issues, to address how much should be
2  assessed to each of those separate issues.
3        So my question is, does Defendant wish to
4  do that?  Wish to offer any?  Or you may want to think
5  about it for a few seconds.
6        MR. RANDALL:  Your Honor --
7        THE COURT:  I'll allow up to 15 minutes
8  per side for your expert to address this issue.  Each
9  side will have 15 minutes for direct and
10 cross-examination to either put on your expert or
11 cross-examine their expert.
12       MR. RANDALL:  Right.  And part of that --
13 part of my uncertainty there is, I don't know what
14 evidence they're going to put on.  I haven't seen an --
15 you know, I have no idea what things they're going to
16 claim.
17       THE COURT:  I don't -- let me ask you, do
18 you want to put on any evidence as to that
19 apportionment?
20       MR. DIBERNARDO:  Your Honor, I don't
21 know -- I don't know that we've made a decision.
22       THE COURT:  All right.  The Court is
23 going to take a five-minute recess.
24       MR. RANDALL:  Can I raise one issue, Your
25 Honor?

Page 17

1        And that is that I would like to read
2  into the record the -- Apple's motion for JMOL regarding
3  judgment as a matter of law.
4        It is --
5        THE COURT:  Just a moment.  Are you
6  reading in what -- what the JMOL motion you made the
7  other day?
8        MR. RANDALL:  Well, I'm certainly
9  renewing it, and there's some additional information in
10 here.  And Rule 50(a)(2) says that a motion for JMOL may
11 be made at any time before the case is submitted to the
12 jury.  And I would simply like to put it on the record,
13 Your Honor.
14       THE COURT:  All right.
15       MR. RANDALL:  Thank you, Your Honor, very
16 much.
17       Your Honor, Apple hereby moves for
18 judgment as a matter of law against all of Mirror
19 Worlds' claims and counterclaims and for judgment as a
20 matter of law in favor of Apple's declaratory judgment
21 and counterclaims and defenses.
22       First, Apple renews its former motions
23 for judgment as a matter of law submitted to the Court
24 on September 29 and 30 of 2010.
25       Second, Apple moves for JMOL of

Page 90

1   we should be doing something different, right?  That's
2   what we all got taught.
3          So we know that the level of importance
4   that Apple has attached to this lawsuit.  Because it's
5   important to us, we're here; Mike Satow, our CEO, who
6   used to be the CEO, he came down here.  And we didn't
7   even have to pay him.
8          But Mr. Jobs isn't here.  Mr. Serlet is
9   not here; the other sub-boss is not here.  And what we
10  know, I think, is the reason that Steve Jobs is not
11  here -- and hear me out on this and test it and see if
12  this makes sense to you.
13         You remember all of the videos you saw
14  from Jobs was Jobs bragging about how new and
15  revolutionary the products we have sued are.  You
16  remember that.  And all the clapping and the cheering
17  and the hoorah-ing and strutting around in his black
18  sweater.
19         Now, in Court, they're spinning a
20  different tale.  They brought all of these folks who are
21  still out there -- or most of them are still out there.
22  And none of them were on the e-mail string.
23         Well, Mr. Tiene was.  And they sat up
24  here and said, no, none of this stuff is new; we've been
25  doing it for years.

Page 91

1          So ask yourself, if Jobs had shown up and
2   sat on that witness stand and put his arm up like Dr. G.
3   did and swore to tell the truth, he would have had to
4   answer this one very simple question:
5          Were you telling the truth then, when you
6   spun a yarn that this is brand new so you could make $72
7   billion, or are you spinning the yarn now, when you tell
8   this jury we can't infringe, because what we're doing is
9   not new?
10         I submit to you that's why it's more
11  important that he not be in Tyler, Texas.  And that's
12  why he's not in Tyler, Texas.
13         So let me go over the verdict form with
14  you.  The last thing I'm going to tell you, and I'll
15  talk to you more about it when I have my second chance
16  to talk, is why their invalidity defense is silly and
17  starts with a very simple proposition, and it was
18  confirmed over here by Dr. Tribble.
19         And that is that they cannot lay hands on
20  one piece of paper in their files of 30,000 employees to
21  support the claim that they make in this courtroom
22  before we sued them.  That is, there's not one piece of
23  paper anywhere in their files that contradict what their
24  employees were saying about how important and new and
25  innovative Dr. G.'s products were.  It's not there.

Page 92

1   It was created for the courtroom by folks who are out
2   here still on the clock, who were paid to come and try
3   to kill Dr. G.'s patents.
4          You know, Dr. G.'s ideas attracted that
5   guy who tried to kill him.  Well, it attracted Jobs at
6   Apple, and they are trying to kill his idea.
7          So let me go through the verdict form
8   with you real quick.
9          Is the ELMO on?
10         Okay.  So this is the verdict form.  This
11  is what I think.  What counts is what you think.
12         The first question the Judge wants you to
13  answer is, did they take our property?  Did they
14  infringe Dr. G.'s patent?
15         I think the answers are plainly yes.
16         Was it willful?
17         You've seen the proof of them telling us
18  one thing and doing another thing and telling you
19  something today in this courtroom that plainly is not
20  true.
21         If that's not proof of willful
22  infringement, then there's no willful infringement in
23  the world.
24         Now, this is really why we're here.  They
25  are terrified of Dr. G.'s patents.  They want to kill

Page 93

1   them.  They want them dead.  And they didn't bring the
2   proof to you.
3          The Patent Office said they're good.  Two
4   of the people who showed up to testify in this case
5   about how old news Dr. G.'s patents were have patents
6   that were on the face of his patents and considered by
7   the Patent Office before they said this was new.
8          Why did they do that?  Why did they waste
9   your time that way?
10         Think about that.
11         Now, these are the damage numbers, and
12  I'll talk to you more about these, but you remember the
13  Judge told you that the -- the iPods are out; that's all
14  been resolved.
15         So what that means is that the numbers
16  that Mr. Bratic -- you remember I got him up at the very
17  last and I said, if you take the i's out, what do you
18  have, and he said about 50 percent.
19         These are the allocations that I thought
20  were appropriate based on what I heard Bratic say, but
21  in each instance, it's about 50 percent of that 6-1/4
22  that Bratic told you about during his testimony, and
23  that still means that they're making $25 million every
24  day.
25         MR. RANDALL:  Your Honor, I'm going to

Page 94

1  object. He's inviting error with his comment here. He
2  knows darn well that's not what his expert said. He's
3  inviting error in this Court by doing that.
4          THE COURT: Objection's overruled. The
5  jury will disregard the objection.
6          MR. CARROLL: So -- so you look at these.
7  And, again, you heard the objection. That's what
8  they're worried about. They're worried about their
9  pocketbook. That's what they're squawking about.
10         But this is what they make off these
11 products, and this is less than 1 percent -- less than 1
12 percent. Any one of those numbers, there is a number 99
13 times higher that they get to keep.
14         Now, I'm going to sit down now and let
15 Mr. Randall talk to you. And then I'll have a few
16 minutes left to talk to you afterwards.
17         But think about those things that I
18 suggested to you that you question in your own mind,
19 when he's talking to you.
20         Thank you, Your Honor.
21         THE COURT: All right. Thank you,
22 Mr. Carroll.
23         The Court will now recognize Mr. Randall
24 for purposes of closing argument.
25         MR. RANDALL: Thank you, Your Honor.

Page 95

1          Let me first thank you for your patience
2  in this case, and I know you took time from your lives
3  and your children. And Apple appreciates it, and I
4  appreciate it.
5          I was a former prosecutor for a long
6  time. Like a criminal -- I sat at that table and
7  watched criminal defense attorneys point fingers at you
8  all day long.
9          I have tried a lot of patent cases, but
10 I've never sat through a case like this where there's
11 two fundamentally different cases. There's Mirror
12 Worlds' personal attacks, unnecessary, mean-spirited
13 attacks, and then there's a patent case.
14         Now, we're really here for this patent
15 case. That's what this case is about. The case is
16 about a patent case. Mirror Worlds has patents owned by
17 some hedge funds. David accused Apple of infringement.
18 And the evidence that's relevant to this case and
19 relevant for your consideration is, how do the Apple
20 products operate?
21         Do they infringe?
22         What does the prior art look like?
23         Was he the first inventor?
24         Does he deserve the patents?
25         Does Mirror Worlds deserve these patents,

Page 96

1  or are they invalid?
2          Were they the first to invent this or
3  not?
4          That's the evidence. Mirror Worlds spent
5  that entire time, 30 minutes, railing on Apple and me
6  and others.
7          But the point is, they never mentioned
8  any evidence of infringement, right?
9          They didn't do it. They didn't go
10 through anything. And this case was the same way,
11 right?
12         It was their opportunity to lay out all
13 their evidence about why -- how Apple's products operate
14 specifically, whether they infringe, and whether the
15 patents are valid.
16         Now, we sat there and took it, okay? It
17 wasn't easy. But what we did is we focused on the main
18 issues in this case. And I'm not going to get into a
19 mud-slinging game, and I'm not going to call names.
20         I focused on the evidence, and I'd ask
21 you guys to focus on the evidence. Focus on, how do
22 Apple's products operate?
23         Did they prove infringement?
24         Did they prove every single element?
25         Absolutely not. In fact, we don't have

Page 97

1  to prove anything. But we proved, conclusively and
2  without any possible doubt, that we don't infringe these
3  patents for multiple reasons. And I'm going to get to
4  that in a minute.
5          I want to deal with a couple of these
6  issues that were raised, and they spent so much time on,
7  because I just can't sit there and let it go unanswered.
8          They really focused on four events, and
9  the four events really aren't in dispute, right? Except
10 for the spin that they put on those four events is
11 enormous, right?
12         They say these four events mean some huge
13 conspiracy, some huge plan to steal Mirror Worlds'
14 technology. And it simply doesn't.
15         Let's look at some of those issues.
16         The first event is Steve Jobs saw a press
17 clipping. He saw a press clipping regarding allegedly
18 new software to organize documents, and he wanted
19 someone to check out the software, okay?
20         That's a fact. It's not in dispute.
21 That's what happened. He saw it and he said, okay, go
22 check it out.
23         That's not surprising. All tech --
24 high-tech companies do that. They keep track of
25 technology. Everybody does. And if there's something

Page 122

1  single element of these claims.  Workscape and MEMOIRS
2  and Piles discloses these.
3         And so any combination of these shows all
4  of the components of the inventions, all of them.
5         Let's go to the next slide.
6         All right.  So here is Workscape plus
7  Piles, and you see that each of the components of the
8  claims are shown in -- in the combination of the two
9  references, and that is completely appropriate.
10        That's what happens in the computer
11 industry.  You look at what's out there, and you say:
12 Okay.  I can put this system together.
13        Let's go to the next one.
14        Workscape plus SDMS.  SDMS was the MIT
15 work in '79, plus Dr. Lucas's work at Workscape, showing
16 you the combination of the two.
17        All right.  Now, I just have a few
18 minutes left.  Let me -- let me talk about damages for a
19 minute.
20        They came in here, and they claimed that
21 they're entitled to -- their expert first said they're
22 entitled to $625 million, and then right before the
23 close of the evidence, the expert said:  Well, it's only
24 half of that, okay?
25        Remember?  Because some of the other

Page 123

1  products are not at issue?  So it's only half of that,
2  all right.  So roughly $300 million.
3         And then Mr. Carroll gets up there and
4  says:  Well, no.  Actually, for each one of those
5  patents, it's 322, 336, 320.  How did it go from half to
6  nearly a billion dollars?
7         Also -- let's show 40.
8         Now, you heard from our expert -- and I
9  asked their expert, I said:  Remember the cards?  They
10 first looked like one side were down and one side was
11 up, and I said:  Isn't it true that they're -- both
12 sides are up?  And the answer is yes.
13        So at the hypothetical negotiation, what
14 would occur, both parties have to have their cards up,
15 okay?
16        And what Apple would learn is that they
17 were running out of business.  At the time of the
18 hypothetical negotiation in 1990 -- in 2004 -- 2004,
19 Mirror Worlds was running out of business, and they were
20 going to sell their patents for $200,000, remember?
21        They didn't commercially -- they weren't
22 successful in commercializing.  They didn't achieve any
23 significant licensing partners.  They sold their patents
24 for $210,000.  And they had attempted to contact these
25 folks, Google, AOL, and Yahoo!, for some money or

Page 124

1  licensing deals and were unsuccessful.
2         So they really didn't have much going on,
3  and they ultimately sold their patents for $210,000.
4         Let's go to 33.
5         Now, here's Frank Weil.  He made a sale
6  for $210,000.
7         And here's Plainfield.  They purchased
8  them for $5 million.  And that is during the period of
9  the hypothetical negotiation, right?
10        Between this time or right before this
11 time and this time (indicates), the hypothetical
12 negotiation would have taken place, and what their
13 expert says is it would have been a license.
14        No.  The patents were for sale, lock,
15 stock, and barrel, and they were for sale for 210,000
16 here and 5 million here (indicates), and both experts
17 say the hypothetical negotiation would have taken place.
18        So if there was a hypothetical
19 negotiation, and both sides had their cards up, what
20 would have happened?  And they wanted to strike a deal,
21 which is part of the deal -- part of the rules.
22        The entire patents would have been sold
23 for somewhere between that range likely, okay?
24        Somewhere between that range.  If it was
25 a license, it would be less, right?  Because you're not

Page 125

1  buying everything.
2         Those are the facts.  We don't have to
3  make this up.  They say:  Let's play pretend; let's make
4  it up.  We really don't have to make it up, because it
5  happened.  And it wasn't a license.
6         It would be different -- if it was a
7  license here and a license here (indicates), we'd have a
8  little better facts.  But this is a sale.  So we know
9  it's less than the cost of all the patents, lock, stock,
10 and barrel.
11        So the hypothetical negotiation, you look
12 at this date; you look at that date; you say the
13 hypothetical negotiation would take place in between
14 there; and it would be less than the sale of the whole
15 patents because they say they would have been a lump-sum
16 license, so something less than that.  Those are the
17 facts.
18        THE COURT:  Mr. Randall, you have about
19 five minutes left.
20        MR. RANDALL:  Thank you, Your Honor.
21        Let's go to 41.
22        You remember our expert?  Common sense,
23 right?  He said:  It's like you're buying a house,
24 right?
25        Let's figure this out.  Let's figure out

Page 130

1  And he signs up. Does that make sense?
2 What would be the first question that that guy would
3 ask? What have you found? What's down there? I'll
4 share with you. If it's a little, I get a little, and
5 you get a little. If it's a lot, we both get a lot.
6  That's the damage model we brought to
7 you, 'cause it makes sense. What they're bringing to
8 you makes no sense. Why would a patent owner ever do
9 that? And the answer is, they wouldn't. They wouldn't.
10  You know, their damage man, maybe in one
11 of the best Perry Mason moments of the trial when my
12 friend, Joe Diamante, over here was after him, he said:
13 Under your analysis, it wouldn't matter whether Apple
14 made a dollar or a billion dollars, you'd still give us
15 that same number?
16  And what was his answer? That's right.
17  You know, we all remember that great
18 scene in Wizard of Oz when the little dog pulls the
19 curtain back, and there's the -- turns out the wizard is
20 nobody other than some old guy pulling levers, and he
21 makes the wizard voice say: Pay no attention to the man
22 behind the curtain.
23  That's what they want you to do. They
24 want you to ignore this ton of money they have made
25 selling the patents that we have the ideas behind.

Page 131

1  Let me give you two more points about
2 damages, and then I want to talk a little bit about what
3 Mr. Randall said.
4  And I guess I drew blood. He bowed up
5 pretty good. But, you know, old Harry Truman says: If
6 you can't stand the heat, don't go in the kitchen. And
7 that means don't take other people's stuff and expect
8 them to roll over just because you're who you say you
9 are.
10  Number one, remember the testimony that
11 drew all the objections over here about this company
12 called Intellectual Ventures? You remember that.
13 Intellectual Ventures, it turns out, is a company owned
14 by the big boys on the west coast, Intel, Microsoft, and
15 Apple.
16  And you remember the testimony is that
17 not once, but twice, Intellectual Ventures tried to buy
18 these patents; one time, before the suit, for 7 million
19 bucks, plus 20 percent carried interest; and another
20 time, after the suit, for 30 to $50 million, plus 10
21 percent.
22  They don't want you to remember that.
23 They don't want you to think about that. They want you
24 to think about $200,000, which they spent more during
25 this trial, during this trial than they would pay this

Page 132

1 man for his life's work. That's not right. That's just
2 not right.
3  The second thing is, is that when Yale
4 bought into the little company, Mirror Worlds, you heard
5 Dr. G say, they evaluated the company way back then at
6 50 million bucks.
7  Now, did it make it? No. It failed.
8 But ask yourself this: If Apple hadn't been infringing
9 and, in fact, had done what it should have done and
10 played fair and taken a license, that little company
11 wouldn't have failed. Those people wouldn't have lost
12 their jobs. That's why we're here.
13  ==Okay. So that's -- that's one thing to==
14 ==look at in that Court's Charge, and I think -- and by==
15 ==the way, this whole business about triple dipping, look==
16 ==at Judge Davis's questions that he asked you. These are==
17 ==his questions.==
18  ==You know, if Mr. Randall has a fuss, he==
19 ==ought to take it up with the Judge. These are the==
20 ==Judge's questions. He wants damage numbers for each==
21 ==separate patent. That doesn't mean we're going to get a==
22 ==billion dollars. That just means the Judge wants to==
23 ==know why you believe or if you believe what the value is==
24 ==of the reasonable royalty for each patent.==
25  The reason these numbers made sense to me

Page 133

1 is, they were all infringed at the same time. They
2 would have all been part of the same hypothetical
3 negotiation.
4  The numbers are a little different, based
5 on the different products; but that's up to you. I
6 think they're all around 300, 300-and-a-quarter apiece,
7 if you believe that we were, in fact, the victim of
8 patent infringement.
9  So let me get to a couple of other
10 points.
11  Let's put up No. 1183.
12  Now, one of the things that you know by
13 now about this case is that there were a lot of hired
14 people who testified.
15  Now, blow that up.
16  There are two pieces of evidence in this
17 case that weren't paid for. This is one of them. This
18 is that article that Mike Satow sent his old Chairman of
19 the Board when he saw it in 2007, three years ago, from
20 this Information Week, this business technical
21 publication.
22  Look what it says: It says: Back in
23 2001, noted computer scientist, David Gelernter, started
24 a company called Scopeware that proposed a similar
25 scheme to view files in a timeline. The market wasn't