```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3   MIRROR WORLDS, LLC         *   Civil Docket No.
                                *
 4                              *   6:08-CV-88
     VS.                        *   Tyler, Texas
 5                              *
                                *   September 27, 2010
 6   APPLE, INC., ET AL         *   8:30 A.M.

 7

                      TRANSCRIPT OF JURY TRIAL
 8                        MORNING SESSION
                 BEFORE THE HONORABLE LEONARD DAVIS
 9                 UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11                      FOR THE PLAINTIFF

12   MR. JOSEPH DIAMANTE
     MR. KENNETH STEIN
13   MR. IAN G. DIBERNARDO
     MR. ALEXANDER SOLO
14   MR. CHARLES E. CANTINE
     STROOCK & STROOK & LAVAN
15   180 Maiden Ln.
     New York, TX  10038
16

17   MR. OTIS CARROLL
     MR. PATRICK KELLEY
18   IRELAND, CARROLL & KELLEY
     6101 S. Broadway, Ste. 500
19   Tyler, TX  75703

20
     COURT REPORTERS:
21   MS. SHEA SLOAN, CSR
     MS. JUDY WERLINGER, CSR
22   Official Court Reporters
     211 West Ferguson, Third Floor
23   Tyler, TX   75702
     903/590-1171
24
     (Proceedings recorded by mechanical stenography,
25   transcript produced on CAT system.)
```

1

2

FOR THE DEFENDANTS

3    MR. JEFFREY G. RANDALL
     MR. RAYMOND YU
4    MS. ERICKA J. SCHULZ
     PAUL HASTINGS
5    1117 S. California Ave.
     Palo Alto, CA  94304-1106
6

7

     MR. ALLAN M. SOOBERT
8    MR. BROCK WEBER
     MS. KIM MOORE
9    PAUL HASTINGS
     875 15th St. NW
10   Washington, DC  20005

11

12   MR. S. CHRISTIAN PLATT
     MR. JEFFREY COMEAU
13   PAUL HASTINGS
     4747 Executive Dr.
14   12th Floor
     San Diego, CA  92121
15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                 (Jury out.)
 3                 COURTROOM DEPUTY:  All rise.
 4                 THE COURT:  Please be seated.
 5                 All right.  I understand we have a couple
 6   of pretrial matters the parties would like to take up;
 7   is that correct?
 8                 MR. CARROLL:  If the Court, please, Your
 9   Honor.
10                 THE COURT:  Okay.  Mr. Carroll.
11                 MR. CARROLL:  Good morning, Your Honor.
12   Otis Carroll for the Plaintiffs.  We were unable to
13   resolve a handful of limine issues that we feel like we
14   need to have the Court's help on before we open the
15   case.
16                 THE COURT:  All right.
17                 MR. CARROLL:  And we at least think they
18   are pretty straightforward.  Our friends on the other
19   side don't agree.
20                 And the first and maybe one of the more
21   important ones is Apple wants to talk about what's
22   happening in the Patent Office on re-exam.
23                 THE COURT:  Okay.  All right.  That
24   motion in limine is granted.
25                 What's next?
```

```
 1              MR. CARROLL:  And they've got a 9/20 delop
 2   of opening slides on that, so we know they will take
 3   care of those.
 4              THE COURT:  Did you want to be heard on
 5   that?  I ruled on this previously.  I don't normally
 6   allow that.  If you've got something new you'd like to
 7   add, but...
 8              MR. RANDALL:  Your Honor, may I address
 9   the Court?
10              THE COURT:  Sure.  Uh-huh.
11              MR. RANDALL:  Your Honor, Jeff Randall
12   for Apple.
13              The reason I -- I want to get into that
14   issue is because it relates to damages and the
15   negotiation that would take place, the hypothetical
16   negotiation, regarding damages.  And at that time, if --
17   and their -- their damages experts believes in the book
18   of wisdom that you can look forward; you know everything
19   that's going to go forward.
20              And if the person knew everything going
21   forward, that person, the hypothetical negotiator, would
22   know that these patents have been rejected in re-exam
23   and stand rejected in re-exam.  And that would greatly
24   affect the price of the negotiation for damages.
25              It also affects willfulness, Your Honor,
```

1    and that is they don't want to make a claim for willful

2    infringement.  And the claims, all of them, stand

3    rejected in the Patent Office right now.

4                We believe that the re-exam proceedings

5    and the current rejection of all the claims relates both

6    to damages and to willfulness.

7                THE COURT:  Okay.  Mr. Carroll?

8                MR. CARROLL:  Your Honor, there's no way

9    the jury can hear about the Patent Office and rejection

10   and compartmentalize that.

11               This is the same issue that we had in

12   that Forgent and EchoStar case when all the patents had

13   been killed, and the Court considered even giving an

14   instruction and then realized that it simply would open

15   up a whole new vista of testimony.  And that is, what's

16   happening in the Patent Office, what does it mean,

17   what's left.  And it's -- it's a huge dog fight.

18               THE COURT:  Okay.  Thank you.

19               Motion in Limine No. 1 is granted.

20               Let's --

21               MR. CARROLL:  The second, Your Honor,

22   and, again, we believe this is pretty simple.  They want

23   to talk about their inequitable conduct claim in front

24   of the jury.  We don't think that's proper.

25               It's not a jury issue.  There will be

2                 THE COURT:  Response?

3                 MR. RANDALL:  Your Honor, we believe that

4      the Court both has the -- certainly the authority, and

5      should in this case allow the factual issues that

6      have -- that are common, both the inequitable conduct

7      and to the facts that will go before the jury regarding

8      invalidity, to have those issues tried by a jury.

9                 We believe that the case law is clear

10     that indicates that, for instance, one of the articles

11     written by the inventors, TR-1070, Technical Report

12     1070, was provided to the Patent Office by Mirror

13     Worlds, with the representation attached to it that said

14     this is not public; it's never been public; it's been

15     under lock and key at Yale; and it's never been publicly

16     disclosed.

17                That's false.  And that's an issue that

18     will go to the jury on whether or not that prior art,

19     which we believe is invalidating prior art, was, in

20     fact, publicly available.  That is a big issue that will

21     go to the jury.

22                So there are a host of issues that

23     have -- there are common, number one, that should go to

24     the jury.  Like whether the TR-1070 really was public or

25     not, was it considered or not, given their

1  representation to the Patent Office that it's not

2  public.  That is one discrete issue that is -- has a

3  huge common overlap, and it's a big issue in this case

4  on whether those patents are invalid.

5            THE COURT:  Well, the issue of whether it

6  was public or not, why can't you address that without

7  going into whether that was -- how -- how it was

8  represented to the Patent Office with the jury?

9            MR. RANDALL:  Well, because that's --

10  that's why the -- that's -- at least our contention why

11  the Patent Office didn't consider it, because they

12  represented -- Mirror Worlds --

13            THE COURT:  I know that, but that gets

14  into the inequitable conduct, which is a defense for the

15  Court, not for the jury.

16            MR. RANDALL:  Well, the ultimate

17  decision -- you're right, Your Honor, and I don't

18  disagree with that.

19            The ultimate issue on inequitable conduct

20  is the Court's, but it's the underlying factual issues

21  that are common both to invalidity and to inequitable

22  conduct that should go to the jury, namely, the TR-1070

23  issue of whether it's public or not.

24            THE COURT:  Okay.  Thank you.

25            Motion in Limine No. 2 is granted.

 1

 2            MR. CARROLL:  Thank you, Your Honor.

 3            The third one is the issue of improper

 4  inventorship, our Motion in Limine No. 4.  We believe

 5  that's an inequitable claim.

 6            THE COURT:  All right.  Response?

 7            MR. RANDALL:  Your Honor, the

 8  inventorship issue is not -- I don't intend to present

 9  the inventorship issue per se to the jury, but the issue

10  of whether or not -- when Mr. Gelernter takes the stand

11  and when Mr. Carroll says in opening -- and when Mr.

12  Gelernter takes the stand and says I'm the inventor, he

13  wasn't even listed as an inventor for a long period of

14  time in the Patent Office.  And so I believe that

15  it's -- it's relevant to the witness' testimony and his

16  credibility when he says, I'm the inventor, that he

17  actually didn't step forward ever voluntarily.  And

18  ultimately later, much later in the prosecution, finally

19  stepped forward and said:  Okay, I'll be out as an

20  inventor.

21            So the issue of really who invented it --

22  and there's other inventors also that aren't listed.

23  And so the real issue is:  Who is the inventor?

24  They're going to wrap this patent around Dr. Gelernter.

25  I know they are; we all know they are.  And the issue

1  is shouldn't I be able to cross-examine Dr. Gelernter

2  on the issue of, well, if you invented all of this and

3  knew about these -- this patent process, why weren't you

4  there at the outset saying:  Whoa, whoa, wait a minute,

5  Dr. Freeman.  I'm the inventor.  I should move forward.

6  Either not you or I should join you.

7              THE COURT:  All right.  I agree with you.

8  I will deny Motion in Limine No. 4.

9              What's next?

10             MR. CARROLL:  Your Honor, may I ask for a

11  qualification?

12             I don't have any problem with him going

13  through the cross as he's described as long as he

14  doesn't tie it to any defense, like inventorship,

15  inequitable conduct.

16             THE COURT:  I don't think you intend to

17  do that.

18             MR. RANDALL:  No.

19             MR. CARROLL:  That's fine, Your Honor.

20  Thank you.

21             And then the other one is Motion in

22  Limine No. 6, which is the mention of litigation claims

23  or actions involving Mirror Worlds and its related

24  entities.

25             Apple intends to, for instance, accuse

 1   the present owners of the patent of the income tax fraud.  We

 2   don't know where that has anything to do with the patent

 3   infringement case.

 4                THE RANDALL:  Well, I don't know where

 5   that came from.  I don't intend at all to make any claim

 6   of income tax fraud.  There's only one factual issue

 7   that relates to that, and that is that a owner of the

 8   patent at a certain period of time listed in their tax

 9   return that the assets, all the patents, were worth -- I

10   don't know -- $210,000, something like that.

11                That's it.  I'm not going to say that's

12   fraudulent or anything else.  I think it's probably

13   accurate.

14                THE COURT:  Okay.  Motion in Limine No. 6

15   is denied.

16                What's next?

17                MR. CARROLL:  The other one is the Motion

18   7, Your Honor, and that is, any comment that certain

19   claims of '227 have been previously found by you to be

20   invalid.

21                THE COURT:  Okay.

22                MR. RANDALL:  Your Honor, for the same

23   reason I discussed before, it relates to both a damages

24   and willfulness defense.

25                THE COURT:  Okay.  Motion in Limine No. 7

is granted.

1                MR. CARROLL:  The next one is, Your

2    Honor, that any of their third-party prior art inventors

3    shouldn't be allowed to go outside of the four corners

4    of the reference.

5                And the specific concern we have is that

6    they put up these people to say, well, you know, we

7    could have made it this and we could have made it this,

8    and enlarge what the reference actually says.  That's

9    our only concern.

10               MR. RANDALL:  Your Honor, these -- these

11   are the authors of various publications.  Not only are

12   they authors of the publications that are prior art, but

13   they also have percipient knowledge regarding the

14   operation of the systems.

15               And so we have alleged as prior art not

16   just the articles and the publications but also the

17   operation of the systems and the public nature of the

18   operation of the systems.  And these witnesses are

19   testifying about both.

20               THE COURT:  Okay.  Motion in Limine

21   No. 10 is denied, but it and all of these are simply

22   rulings without prejudice to -- Mr. Carroll, you can

23   state an objection, if you think he's going too far in

24   trying to expand the scope of the prior art beyond --

1   beyond what is our

2                   And same for all these motions in Limine.

3   You know, this is without prejudice to anybody

4   re-raising or arguing or making any offers they wish to

5   at any time.

6                   MR. CARROLL:  Thank you, Your Honor.

7                   THE COURT:  All right.

8                   MR. CARROLL:  We understand.

9   Last one for us is No. 9, and that is -- and maybe it's

10   better if we simply -- for us to request an instruction

11   from the Court that any time -- excuse me -- Apple's

12   talking about other patents, whether it's their

13   counterclaim patent or any patents that might be cited

14   as prior art, that the Court instruct the jury that

15   those patents are not to be considered as a defense to

16   our infringement claim.

17                   MR. RANDALL:  Your Honor, I don't -- I

18   don't quite understand that.

19   I do know that if it's invalid, then there's no

20   infringement.  Invalidity is a defense to infringement,

21   and I probably -- that will probably come out of my

22   mouth at some point that if the patents are --

23                   THE COURT:  I'm not sure what you're

24   asking for.

25                   MR. CARROLL:  I'm asking, Your Honor, at

1   the time that one of these other patents came up.

2               THE COURT:  Other patents, prior art

3   patents?

4               MR. CARROLL:  Prior art patents and their

5   counterclaim patent, that the Court consider giving the

6   jury an instruction that the mere existence of other

7   patents is not a defense to infringement, so that they

8   can't essentially say we're not infringing, because

9   here's our patent.

10              THE COURT:  Well, I'll consider any

11  instruction you wish to propose at any point.  I think

12  something like that would probably be best handled in

13  the Court's Charge at the end, rather than during the

14  course of the trial.  But I'll consider it, if you wish

15  to propose something.

16              MR. CARROLL:  Thank you, Your Honor.

17              THE COURT:  All right.

18              MR. CARROLL:  And, Your Honor, these

19  are -- that's all of our limine issues.  We've got a

20  handful of other quick issues, unless their limine --

21              THE COURT:  Let's hear Apple's limine

22  issues.

23              MR. RANDALL:  I also have a couple of

24  other procedural issues, but on the motions in limine

25  issues, Your Honor --

1            MR. CARROLL:  I don't know that we have

2    any objections to those.

3            MR. RANDALL:  Well, let me just -- Your

4    Honor, may I state the motions in limine that I'd like

5    to address?

6            THE COURT:  Yes.  Uh-huh.

7            MR. RANDALL:  Okay.  Motion in Limine No.

8    1 is to exclude from evidence discussions with

9    Intellectual Ventures regarding purchasing Mirror

10   Worlds' patents.

11           Apparently, they want to introduce

12   multiple levels of hearsay and say that one of their

13   executives at one time had a conversation with

14   Intellectual Ventures, and they offered to purchase

15   these patents for some sum of money.

16           The executives from the entity in

17   question, Mr. Stone, Mr. Weil, and Mr. Wyatt, all said

18   that they don't recall any offer being made.  There's no

19   evidence whatsoever that any such offer was ever made,

20   and it's pure hearsay and it's prejudicial.

21           THE COURT:  Okay.  Response?

22           MR. CARROLL:  Your Honor, there are --

23   first of all, the evidence is in the form of a

24   deposition of one of our people.  And Intellectual

25   Ventures, the evidence is clear -- and their damage man

1   agrees with this. It's a combine on the flash [?] company in

2   which Apple participates, along with some other big

3   companies.  And this combine buys up intellectual

4   property.

5            There is one written offer from this

6   Intellectual Ventures, before we filed the lawsuit, for

7   $7 million and a 10-percent carry on the returns of the

8   patent.  They don't object about that.

9            One of our employees, a Mr. Riach,

10  testified that after the lawsuit, Intellectual Ventures

11  up the ante to a 30- to 50-million-dollar offer.  They

12  say they don't know anything about it, and there's no

13  proof.

14           We've got testimony.  That's a pure fact

15  issue.  Our damage person takes that into consideration.

16  So just because they say they don't think it's true,

17  that doesn't mean that it's not a fact issue.

18           THE COURT:  All right.  Motion in Limine

19  No. 1 is denied.

20           Next?

21           MR. RANDALL:  Motion in Limine No. 2,

22  Your Honor, is to exclude evidence of worldwide sales

23  for products made and sold outside the U.S., and they've

24  got, you know, a host of opening slides that reference

25  all this revenue.

1   They then take that revenue and divide it
2   by day and say that that's how much Apple is making.  It
3   has nothing to do with the damages in this case nor the
4   infringement allegations in this case.  And it shouldn't
5   come in.

6                  THE COURT:  Response?

7                  MR. CARROLL:  Your Honor, we have one
8   slide that refers to worldwide sales and one era and
9   U.S. sales in another area -- era.  And our damage man
10  looks to that under the -- I can't think of the case
11  name now -- Georgia-Pacific; I can't believe I couldn't
12  remember that -- as one of the Georgia-Pacific Factors
13  that indicates the success of the patent.

14                 We have no evidence and will not put on
15  any testimony about any damages that we claim other than
16  from U.S. sales.

17                 Mr. Randall's talking about the fact that
18  we want to talk to the jury about that from U.S. sales
19  alone of infringing products, Apple will make $50
20  million today, U.S. sales, not worldwide sales.

21                 So we don't have any evidence that we're
22  going to use the worldwide sales on to ask the jury for
23  damages.  Our man only is going to use that to say this
24  is an indication as to how successful the accused
25  products in the infringed patents work.

MR. RANDALL:  Your Honor, if --

1    it's been narrowed down, but the point is, is that

2    worldwide sales and whatever activity takes place

3    worldwide is both prejudicial and has no relevance

4    whatsoever to the U.S. domestic allegations of

5    infringement and any damages that are associated with

6    that activity.

7                    THE COURT:  Mr. Carroll, do you have any

8    case that says that under Georgia-Pacific, he can take

9    worldwide sales?

10                   MR. CARROLL:  Not that I know of.  Your

11   Honor, we'll pull that slide.

12                   THE COURT:  Okay.  I think that would be

13   best.

14                   All right.  I'll grant Motion in Limine

15   No. 2.

16                   What's next?

17                   MR. RANDALL:  Motion in Limine No. 5,

18   Your Honor, it's -- that issue involves a -- again,

19   multiple levels of hearsay.

20                   The -- there's a PowerPoint slide that

21   some -- that they believe exists -- Mirror Worlds --

22   where one of their executives, Mr. Satow, apparently was

23   on the phone with an Apple employee, and they say that

24   there was this PowerPoint presentation that was

1    presented during the call, maybe on a web page for a --

2                   And we've asked for that.  We've said,

3    okay, if this exists, produce it.  We'd like to have a

4    copy of it.  So they've said it was destroyed or

5    missing; it doesn't exist.  There is no such thing.

6    They haven't produced it, and yet they want to testify

7    about the contents of what that may have said.  And

8    that's what the motion in limine is directed to.

9                   MR. CARROLL:  Your Honor, Mr. Satow was

10   the -- Mirror Worlds' rep in a teleconference that Apple

11   requested and set up about licensing.  And, in fact, he

12   did have a PowerPoint that he presented to Apple.  In

13   fact, it is gone, and he does want to talk about what he

14   told Apple during this real negotiation.

15                  And I think that goes to the weight.

16                  THE COURT:  All right.  Motion in Limine

17   No. 5 is denied.

18                  All right.  Any further limine matters by

19   Apple?

20                  MR. RANDALL:  No, Your Honor.

21                  THE COURT:  All right.

22                  MR. RANDALL:  Not in limine.

23                  THE COURT:  All right.  Mr. Carroll,

24   other issues?

25                  MR. CARROLL:  Your Honor, just a couple.

1   ...to microprocessor notebooks without seeing...
2   Apple wants prior art.  We don't think that belongs in
3   there.  We think it ought to be the patents-in-suit,
4   theirs and ours, and the Court's claim construction.
5                 THE COURT:  All right.  How much prior
6   art is there that would be included in the notebook?
7                 MR. RANDALL:  Do you mind if I ask my
8   colleague, Your Honor?
9                 THE COURT:  Okay.
10                MR. RANDALL:  Your Honor, I've been told
11  there's about ten references, and that's it.  And we
12  believe that it places unnecessary -- sorry.
13                THE COURT:  And what are the references?
14                MR. RANDALL:  They are the key prior art
15  references that will be utilized in this case, Your
16  Honor.
17                THE COURT:  I know, but what are they?
18  Are they patents, or what are they?
19                MR. RANDALL:  Your Honor, I have the book
20  here.  There are -- there are six patents and three
21  articles, Your Honor.  And the book is right here; it's
22  not huge.
23                THE COURT:  And what is your objection to
24  having the prior art?
25                MR. CARROLL:  It's distractive, Your

1  honor.  And that's -- their invalidity case won't come

2  until the tail end of the case.  And if they want to ask

3  you to insert that stuff in the jurors' notebooks at a

4  time that the jurors will be hearing about it, then we

5  wouldn't have any problem with it, but at the --

6          THE COURT:  Okay.  What we'll do then,

7  I'll allow the jurors to have a notebook with just the

8  patents in it for the case-in-chief.  When you get to

9  your invalidity case, if you want to have just those ten

10  references no thicker than about an inch, and have those

11  ready, we'll pass those out to the jury as well.

12          MR. RANDALL:  Your Honor, we actually --

13  since they're going to put invent -- one or more

14  inventors up to testify, it's likely that we will ask

15  them some questions about this -- this art, which they

16  are fully aware of, and -- and so it would be helpful if

17  the jurors could at least have both.

18          THE COURT:  I don't want these jurors to

19  be burdened down with big -- I mean -- all right.  I'm

20  just going to go with just the patents then, no prior

21  art.

22          MR. RANDALL:  Thank you, Your Honor.

23          THE COURT:  Anything further?

24          MR. CARROLL:  Last issue, Your Honor.

25  We've got -- Mr. Tribble is the Apple corporate rep, and

1     we've had a fight over whether he would be here, whether he

2     wouldn't be here, whether they would or wouldn't give

3     him to us for a deposition.

4               Apparently, he's going to testify.  We've

5     asked for a brief two-hour deposition sometime at night

6     during the trial before they put him on.  They won't let

7     us have him, and we've had this problem.

8               And I think it's brief, correct?  Is that

9     right?

10              The issue over Mr. Tribble and his

11    deposition, is that written -- in writing before the

12    Court?

13              MR. STEIN:  We moved to exclude

14    Mr. Tribble; that was denied.  And in my brief, we

15    requested his deposition.

16              MR. CARROLL:  So that -- and for all the

17    reasons that we had asked you to exclude him, we're now

18    asking that we have a quick crack at him during the

19    trial.

20              THE COURT:  Okay.

21              MR. RANDALL:  Your Honor, you did deny

22    their motion to exclude him, number one.

23              Number two, they've known about him since

24    at least June, and we offered Mr. Tribble, during

25    discovery, as a 30(b)(6) witness on a host of topics,

1    and they declined. They said no, we don't want to take

2    him.

3                    THE COURT:  Are you going to have him

4    testify in trial?

5                    MR. RANDALL:  Yes, Your Honor, briefly.

6                    THE COURT:  All right.  And why didn't

7    you take him during discovery?

8                    MR. CARROLL:  I don't know the answer to

9    that, Your Honor.  We'll do this:  We'll pull that down,

10   unless I can give you a good answer as to why we didn't

11   take his deposition.

12                   MR. STEIN:  He was designated to testify

13   regarding certain e-mails that Mr. Jobs had sent to the

14   executives, and we decided that given the limited scope

15   of what he was designated for that it wasn't required.

16                   THE COURT:  Do you know what he's going

17   to testify to in the trial?

18                   MR. STEIN:  No, we do not.

19                   THE COURT:  What's he going to testify to

20   during the trial?

21                   MR. RANDALL:  General background of Apple

22   and kind of a history of Apple in terms of the

23   development of a few of the accused products but not in

24   detail about the accused products.

25                   We have other witnesses that will talk

 1     about the details of its accused products that they're

 2     proposed.

 3                    THE COURT:  All right.  You can take a

 4     one-hour deposition just to flesh out what he's going to

 5     testify about.

 6                    MR. CARROLL:  Thank you, Your Honor.

 7                    THE COURT:  All right.  Anything further?

 8                    MR. CARROLL:  That's it for us.

 9                    THE COURT:  All right.  Anything further

10     from Apple?

11                    MR. RANDALL:  Yes, Your Honor.

12     First is that we would like to invoke Federal Rule of

13     Evidence 615 to exclude from both the opening and the

14     presentation of evidence the testifying witnesses in

15     this case, aside from the experts.  We're not addressing

16     that rule to the experts.

17                    THE COURT:  Okay.  So you're going to

18     invoke the rule?

19                    MR. RANDALL:  That's right, Your Honor.

20                    THE COURT:  All right.  Any objection to

21     that?

22                    MR. CARROLL:  No, Your Honor.

23                    Dr. Gelernter will be our corporate rep.

24                    THE COURT:  Okay.

25                    MR. RANDALL:  Your Honor?

1          THE COURT:  Okay.  You want him excluded

2    from opening and everything?

3               MR. RANDALL:  Including Dr. Gelernter,

4    yes.  And the reason for that, Your Honor, is that

5    Dr. Gelernter is not a party to this case, and he is not

6    an employee of a party to this case.

7               And, therefore, he doesn't fall within

8    any exception that would allow him to be a corporate

9    representative in this case.

10              MR. CARROLL:  Your Honor, we designated

11   him as our corporate rep when we picked the jury on

12   September the 7th, and they didn't squawk.  And I

13   explained to the jury that he would be our corporate rep

14   and sitting through the whole trial, and they said

15   nothing.

16              THE COURT:  Response to that?

17              MR. RANDALL:  Well, I'm looking at the

18   transcript right now, and he did no such thing, Your

19   Honor.  He did not say that Mr. Gelernter is -- he said

20   Mr. Gelernter is the inventor.

21              And this is a key issue.  He said

22   Mr. Gelernter is the inventor.  He said Mr. Gelernter is

23   a victim of the Unabomber.

24              That is a big issue.  There's no question

25   that Dr. Gelernter is going to take the stand; he's

1    going to testify as a fact witness here's the injury.

2    And there's no question that there are certain

3    extenuating circumstances regarding his testimony,

4    because he's a Unabomber victim.

5              Those are issues that the jury, in

6    selecting a jury, should be aware of, and I should be

7    able to probe and decide whether they're biased in any

8    way on that issue.

9              But they did not designate him as their

10   corporate representative in this case.  And in any

11   event, the trial hasn't started.  The trial starts, you

12   know, today.  And he doesn't -- he doesn't fit within

13   the category of a corporate designee nor should he be.

14             MR. RANDALL:  He's got a 2-percent

15   interest in the outcome of the case.

16             THE COURT:  All right.  The -- he will be

17   designated as your corporate representative then.

18             What else?

19             MR. RANDALL:  Your Honor, there's certain

20   legal issues I would like to --

21             THE COURT:  Counsel, let me just ask, I

22   mean, what is the prejudice to Apple of having

23   Dr. Gelernter as their corporate representative?

24             MR. RANDALL:  Well, it's the same -- it's

25   the same prejudice that any other witness would have.

1    And that is — that — this is — the U.S. Supreme Court has

2    indicated this and numerous circuit courts of appeal

3    have noted this, that the rule is intended to avoid

4    having anybody possibly tailor their testimony, and

5    there is no finding by the Court necessary that --

6                    THE COURT:  Well, you're excluding all

7    the experts, right?

8                    MR. RANDALL:  No, Your Honor, not all the

9    experts.

10                   THE COURT:  I thought you said all the

11   experts were going to be excluded from the rule.  I

12   thought you invoked the rule, except for all experts.

13                   MR. RANDALL:  That's right.

14                   THE COURT:  Okay.

15                   MR. RANDALL:  And there are some cases

16   that say that experts are essential to the presentation

17   of a case.

18                   THE COURT:  Okay.

19                   MR. RANDALL:  And -- and some say yes;

20   some say no.

21                   THE COURT:  So what is Dr. Gelernter's

22   role in the -- in the case?

23                   MR. CARROLL:  He's the fact witness.

24   He's going to tell the invention story.  He's going to

25   be the first witness, so he can't tailor his testimony

 1    to anybody's conduct then he'll be done

 2                    MR. RANDALL:  Then our case on that as

 3    well.  He's not going to be done, because he is subject

 4    to recall and then called in our case-in-chief.

 5                    But the point is, during opening and

 6    during the trial, he is not essential to the

 7    presentation of their case.  He is an inventor, and

 8    that's it.  He's a factual witness.  He's not an

 9    employee.  He's not an officer.  He has no interest in

10    the Plaintiff, no ownership interest in the Plaintiff.

11                    THE COURT:  Is he -- is he your corporate

12    representative or not?

13                    MR. CARROLL:  He is, Your Honor.  And

14    he's got a 2-percent interest in the outcome of the

15    case.  And, you know, I don't understand why Apple can

16    tell us what is and is not essential for the way we put

17    our case on.

18                    THE COURT:  All right.  I stand by my

19    ruling.

20                    Anything further?

21                    MR. RANDALL:  Yes, Your Honor.

22                    THE COURT:  Does Apple have anything

23    further?

24                    MR. RANDALL:  Yes, Your Honor.  I'm

25    sorry.

1         The ___'s given a substantial amount of

2    prior art in this case that was not considered by the

3    Patent Office, but we believe that there should be no

4    presumption of validity that attaches to the

5    patents-in-suit.

6                   We also believe --

7                   THE COURT:  All right.  You know, I'm

8    happy regarding your beliefs, but what are you asking me

9    to do?

10                  It sounds like something that you would

11   be asking for in the jury charge.  Or in the preliminary

12   instructions, are you asking me not to instruct on the

13   presumption of the validity?

14                  MR. RANDALL:  Yes, with respect to un --

15                  THE COURT:  Okay.  That's denied.

16                  What's next?

17                  MR. RANDALL:  The next issue is that

18   Apple contends that the clear-and-convincing-evidence

19   standard to prove invalidity should not attach to the

20   prior art that was not considered by the Patent Office.

21                  THE COURT:  Okay.  That's denied.

22                  Anything further?

23                  MR. RANDALL:  No, Your Honor.  That's it.

24                  THE COURT:  All right.  Very well.

25                  Now, have y'all resolved this issue

1   regarding -- probably covered it regarding the

2   supplemental expert report of Levy?  Apple's motion to

3   strike the untimely supplemental expert rebuttal report

4   of John Levy, Docket No. 389?

5          MR. RANDALL:  No, we have not, Your

6   Honor.

7          THE COURT:  Do you wish to address that?

8          MR. RANDALL:  Yes, Your Honor.  If you

9   would give me one moment.

10          THE COURT:  All right.

11          MR. RANDALL:  Your Honor, that issue is

12   that there was no agreement that would permit Dr. Levy

13   to submit a supplemental expert report.  And he put it

14   in right before the trial.  It's not appropriate, and it

15   shouldn't have been provided.

16          MR. STEIN:  That's not true.  There was

17   an agreement.  Apple produced hundreds of prior art

18   references shortly before the close of discovery.  It

19   was two days before opening expert reports were due, and

20   the parties reached an agreement to try to resolve that

21   issue, and that would permit Dr. Levy to submit a

22   supplemental report.

23          MR. RANDALL:  And, Your Honor, there's

24   no -- there is no agreement that we said he could submit

25   a supplemental report, but even -- and there wasn't.

1   But even if those were submitting it in -- that

2   would be perhaps a different story, but right on the eve

3   of trial, submitting a new expert --

4               THE COURT:  Didn't Apple have something

5   like 4,000 prior art references back in June when his

6   first report was taken?

7               MR. RANDALL:  No, Your Honor.  I don't

8   think it was 4,000.

9               THE COURT:  What was it?  Wasn't it a

10   large -- I mean, in my review of this, it seems like

11   both sides have been shotgunning and not narrowing down.

12   And Apple just got their prior art narrowed down, and

13   then there's this issue of whether Levy -- there was an

14   agreement or not an agreement.

15               I mean, is there something in his

16   supplemental report that's new or surprising to you or

17   that is prejudicial to Apple?

18               MR. RANDALL:  He does address a host of

19   issues regarding prior art that was in our non -- in our

20   invalidity contentions that we provided them back in the

21   summertime.  I think it was in late -- sometime in June,

22   I believe.

23               So we submitted this thing in June, and

24   he doesn't respond to it until the eve of trial.

25               MR. STEIN:  When they submitted their --

1    Dr. Feiner's report which was the report that Dr. Levy

2    was responding to, there were hundreds of prior art

3    references in there, and there were some that were

4    highlighted there, which is what Dr. Levy focused on;

5    and then there were these, you know, a hundred-plus

6    additional references comprising thousands of pages,

7    which in the report -- Dr. Feiner's report itself

8    comprised thousands of pages when you included the

9    claim -- the claim charts he attached to it.

10                   So we did what was reasonable under the

11   circumstances and focused on the prior art that Apple

12   had focused on itself.  And then we have filed a motion

13   to strike the --

14                   THE COURT:  All right.  Motion to strike

15   supplemental report is denied.

16                   Anything further before we bring the jury

17   in?

18                   MR. CARROLL:  Not from the Plaintiff,

19   Your Honor.

20                   MR. RANDALL:  None from the Defendant,

21   Your Honor.

22                   THE COURT:  All right.  Bring the jury

23   in, please.

24                   Hold the jury a second.

25                   COURT SECURITY OFFICER:  All rise for the

 1  jury

 2            THE COURT:  Hold the jury a second.

 3  We're not quite ready.  We have one clerical thing we

 4  have to take care of first.  I apologize.

 5            We'll be in recess for five minutes.

 6  We've got the get the instructions.

 7            (Recess.)

 8            COURT SECURITY OFFICER:  All rise.

 9            (Jury in.)

10            THE COURT:  Please be seated.

11            All right.  Good morning, Ladies and

12  Gentlemen of the Jury.  Thank you for being back here

13  promptly.

14            I really want to apologize to you.  I

15  hate nothing worse than telling the jury to be here at

16  9:00 o'clock in the morning, and then we leave you

17  sitting in there twiddling your thumbs until 9:20.  And

18  I'm going to do my very best to not have that happen

19  again during the course of the trial.

20            As I told you during jury selection,

21  today we're going to start the trial.  I'm going to give

22  you some preliminary instructions, and you can listen to

23  those.  And then the attorneys are going to do their

24  opening statements, and then we'll start into the

25  evidence.

1      instructions.

2              Again, congratulations.  You have now
3      been sworn as the jury who is going to decide and hear
4      this case.  Your role as the jury is going to be to
5      decide all disputed questions of fact.

6              And, on the other hand, it is my role as
7      the Judge to decide all questions of law and procedure;
8      that is, you'll take my instructions on the law and on
9      the procedure; I will rule on what's admissible, what's
10     not admissible; I'll instruct you on what the law is.
11     You're to follow all of those instructions.  But you are
12     the sole judges of the facts to be decided.

13             And at the end of the case, you're going
14     to have some questions to answer, and they're fairly
15     simple questions of -- dealing with infringement,
16     dealing with invalidity, dealing with willfulness, and
17     dealing with damages.  And those are the fact questions
18     that you're going to be deciding.

19             Today we're beginning the trial of the
20     case.  After I have completed my preliminary
21     instructions, you will then hear the attorneys' opening
22     statements.

23             Remember that an opening statement is
24     only an overview, sort of a roadmap, of what each side

1   ~~respectable evidence~~ ~~they~~   ~~But~~ ~~what~~ ~~the~~ ~~attorneys~~

2   say during their opening statement is not evidence.  The

3   witness stand here is where you'll hear the testimony

4   and all the evidence from and the documents that I admit

5   into evidence.

6          After opening statements, the Plaintiff

7   will present its evidence.  Then the Defendant will

8   present its evidence.  And finally, the Plaintiff will

9   present any rebuttal evidence.

10         Once all of the evidence is in, I will

11  give you my final instructions, after which both sides

12  will then present their closing arguments, and finally,

13  you will then retire to the jury room to begin your

14  deliberations and reach your verdict.

15         Again, at that point in time, after all

16  the case is -- evidence is in, the arguments are

17  presented, and my final instructions to you, that's the

18  first time that you'll discuss the case among yourselves

19  and begin your deliberations.

20         During the course of the trial, I want

21  you to keep an open mind until you've heard all of the

22  evidence and my instructions -- my final instructions

23  are what's known as the Court's charge -- and the

24  attorneys closing arguments.

25         Be sure to pay close attention to all of

1   the testimony and evidence.  To help you, you may take

2   notes during the trial, if you wish.  I'm going to ask

3   the Court Security Officer to pass out to you now a

4   juror notebook that is being provided for your

5   convenience.

6            When you get that, on the inside cover,

7   you will find a number of things.  You should find a pen

8   or pencil in there, and I'd like you to take the pen or

9   pencil and then slide that top sheet of your notebook

10   out and write your name on the cover of your notebook so

11   that we will be able to identify whose notebook is

12   whose.

13            It should just slide -- the cover sheet

14   on the front cover of the notebook inside that clear

15   blastic (sic) -- clear plastic sheet, just slide that

16   out, write your name on the top, and then slide it back

17   in.

18            And after you've done that, also write

19   your name on the cover of the stenographic pad that's on

20   the inside.

21            At the end of each day's testimony, you

22   will turn in your notebook, and it will be kept by the

23   Courtroom Deputy Clerk.  Everything you write in it will

24   be confidential; and at the end of the case, it will be

25   shredded.

1   You do not have to take notes; but if you
2   do decide to take notes, don't get so involved in your
3   note-taking that you become distracted and miss part of
4   the testimony.

5           Now, your note-taking, these instructions
6   that I'm giving you now, you're welcome to take notes on
7   them, if you wish.  I will tell that they will be
8   repeated -- all of these instructions will be repeated
9   in greater detail at the end of the case.

10          And, additionally, a typed copy of my
11  final instructions will be provided to you that will
12  contain all of the law and everything that you're to
13  follow in the case.

14          Now, until the trial is over, do not
15  discuss this case with anyone, and do not permit anyone
16  to discuss this case in your presence.  This includes
17  your family, friends, and even your fellow jurors.

18          The very first time you should ever
19  discuss this case is at the end of the case when you and
20  your fellow jurors retire to the jury room to actually
21  begin deliberating on your verdict.

22          If anyone should attempt to discuss this
23  case or to approach you concerning this case during the
24  course of the trial, you should inform me immediately
25  through my court staff.  I do not anticipate that this

1 will happen.

2          During this trial, as I instructed you

3 the other day, you should hold yourself completely apart

4 from the people involved in the case, the parties, the

5 witnesses, the attorneys, and the persons associated

6 with them.

7          It is important not only that you be fair

8 and impartial but also that you appear to be fair and

9 impartial.  That is why you should not have any contact

10 with any of the persons here in the courtroom.

11 And they understand that.  They will recognize your

12 juror badge.  They're not going to be having any

13 conversations with you.  They're not going to have their

14 feelings hurt if you don't have conversations with them.

15 It's okay to nod or say good morning, that type of

16 thing, but just no lengthy conversations.

17          You should not -- also, do not make any

18 independent investigation of any fact or matter in this

19 case.  Do not learn anything about the case from any

20 other outside source.

21          I don't anticipate that there will be

22 anything on television or in the newspaper, but if you

23 should see something, don't read it, or flip the

24 channel.

25          Also, do not use the internet or Google

1    to find out more information about the case, the

2    parties, or the attorneys in the case.

3         For example, if you have a home computer,

4    during the trial of this case, don't go home and get on

5    your home computer and start trying to do research or

6    figuring anything out.

7         The reason for this is very important.

8    Again, you are to follow only the evidence that is

9    admitted here in court and the evidence that all of you

10   as a group hear.

11        If you were to go out and start

12   researching on the internet or some issue or some

13   witness, that would be interjecting something into the

14   case that was not admitted into evidence, that both

15   sides did not have an opportunity to hear and

16   cross-examine and that your fellow jurors did not have

17   the opportunity to hear.

18        So don't do that.  If you should do that,

19   it could put in jeopardy and make -- as you can tell,

20   both sides have gone to a great deal of expense to get

21   this case to this point for y'all to decide the case

22   from the evidence.

23        And if somebody was to go off on a

24   tangent and start doing something like that, it could

25   put this whole process in jeopardy, and it would have to

1    be done all right.

2              So they've got a lot invested; you're

3    going to have a lot invested this week.  So please be

4    very careful and follow my instructions to the letter.

5              Now, let me visit with you about the

6    parties and about the nature of this case.  As you know,

7    this is a patent case.

8              The parties in this case are Mirror

9    Worlds, LLC, or Mirror Worlds and Mirror Worlds

10   Technology, or it will also be referred to as MWT, and

11   Apple Inc., or it will be referred to as Apple.

12             I think generally the parties will be

13   referring to each other as Mirror Worlds and Apple.

14   Mirror Worlds is the Plaintiff.  Apple is the Defendant.

15   The case involves five patents.  Three of the patents,

16   the '227 patent, the '313, and the '427 are owned by

17   Mirror Worlds.  The fourth patent, '101, is owned by

18   Apple.

19             Excuse me.  That was a typo.  I said

20   there were five patents.  There are four patents.  There

21   are three Mirror Worlds patents and one Apple patent.

22   We will also refer to the four (sic) patents owned by

23   Mirror Worlds as the Mirror Worlds patents, and the

24   patent owned by Apple as the Apple patent.

25             Mirror Worlds contends that Apple

1    infringes its patent and that the infringement is willful

2    and that it is entitled to damages for such

3    infringement.

4                    So those, again, are the three questions

5    that you're going -- three of the questions you're going

6    to be presented with at the -- at the conclusion of the

7    case:  Infringement, willfulness, and damages.

8                    Apple denies such infringement and

9    damages and alleges that the patents are invalid.

10   Invalidity is a defense to patent infringement.  So

11   that's the fourth issue that you're going to be asked to

12   decide.

13                   First is infringement.  Second is

14   willfulness.  Was the infringement willful, if there was

15   infringement?  The third is invalidity.  Has Apple met

16   its burden of proving that the patents are invalid?  And

17   the fourth is damages.

18                   Now, that's with regard to the Mirror

19   Worlds patents.  The same thing applies to the Apple

20   patent.

21                   Apple contends that Mirror Worlds

22   infringes its patent and that that infringement is

23   willful and that it is entitled to damages for such

24   infringement.

25                   So with regard to the Apple patent, same

1  three questions, infringement, willfulness, and

2  damages.

3                 Mirror Worlds denies such infringement

4  and denies -- and damages and alleges that the patent is

5  invalid.  So there again is the fourth issue with regard

6  to the Apple patent, and that's the invalidity issue.

7                 You will hear more about the

8  patents-in-suit and the technology during the opening

9  statements of the attorneys.

10                 Now let me visit with you briefly about

11  the patent system and how a patent is obtained.  Some of

12  this you saw on the video; some of it you heard about in

13  voir dire examination.

14                 The United States Constitution empowers

15  the United States Government to enact patent laws and

16  issue patents to protect inventions.  The purposes --

17  purpose of the patent system is to help advance science

18  and technology.

19                 The patent system achieves this purpose

20  by granting to the owner of a patent the right, for the

21  life of the patent, to exclude any other person from

22  making, using, offering for sale, or selling anywhere in

23  the United States the invention covered by the patent.

24                 A patent has a life for a limited number

25  of years, which for the patents involved in this case

1    has not yet ended.

2            Once a patent does expire, the invention

3    becomes part of what is known as the public domain,

4    which means that anyone is free to use it, and the

5    patent owner may no longer exclude anyone from making

6    use of the invention claimed in the patent once the

7    patent has expired.

8            However, during the term of the patent,

9    if another person, without the patent owner's

10   permission, makes, uses, sells, or offers to sell

11   something that is covered by the claims of the patent

12   then that person is said to infringe the patent.

13           The patent owner may enforce a patent

14   against persons or companies believed to be infringers

15   in a lawsuit in a federal court, such as in this case.

16           Everyone, however, has the right to use

17   existing knowledge and principles.  A patent cannot

18   remove from the public the ability to use what was known

19   or obvious before the invention was made or patent

20   protection sought.

21           Thus, to be entitled to patent

22   protection, an invention must be new, useful, and

23   non-obvious.

24           To obtain a patent, the applicant must

25   file a patent application with the United States Patent

1  Office.

2              After the applicant files a patent

3  application, a Patent Examiner examines the application

4  to determine whether the invention described in the

5  patent application meets the requirements of the patent

6  law for patentable inventions.

7              If the Patent Examiner concludes that the

8  legal requirements for a patent have all been satisfied,

9  then the Patent Examiner is said to allow the claims,

10  and the application issues by the U.S. Patent Office as

11  a patent.

12              The process, from the first filing of the

13  patent application up to and including the issuance of

14  the patent, is what's called patent prosecution.  The

15  record of the papers relating to the patent prosecution

16  is referred to as the prosecution history or file

17  history.

18              And this is normally letters and meetings

19  and notes back and forth between the patent applicant

20  and his attorney and the Patent Examiner.  That's what's

21  called the prosecution history.

22              Now, once the U.S. Patent Office grants a

23  patent, that patent -- that carries with it the

24  presumption that the patent is valid.  From the issuance

25  of a patent, it is presumed that its subject matter is

 1   are useful and acceptable at the time of the application

 2   the time the invention was made, obvious to one of

 3   ordinary skill in the art.

 4              However, this presumption of the validity

 5   may be rebutted at trial, and you, the finder of fact,

 6   may find the patent to be invalid.

 7              I'll have more to say about the defense

 8   of invalidity and the elements of infringement and that

 9   type of thing in a little bit, but next I want to visit

10   with you about the parts of a patent.

11              Please look in your notebook, and you'll

12   find the patents that are the subject matter of this

13   suit, and you'll see the '227 patent.  If you will flip

14   to that tab, and you'll identify it by -- up at the

15   upper right-hand corner, it says patent number.

16              There should be a tab that says 227.  If

17   you open that tab, you'll see in the upper right-hand

18   corner -- this is a copy of the patent, and in the upper

19   right-hand corner, it says Patent No. 6,006,227.  That

20   means that that's the 6 millionth, 6,000th, 227th patent

21   issued by the United States Patent Office.

22              Right below that you see the date of the

23   patent.  That's December 1, 1999.  That's the date that

24   the patent issued.

25              You will also see -- on the left-hand

1   side, you'll see the inventors' names.  And they are
2   Eric Freeman and David H. Gelernter.
3                   You'll see the filing date.  It says:
4   Filed:  June 28th, 1996.
5                   You see the assignee.  The assignee was
6   Yale University, New Haven, Connecticut.
7                   And then you'll see a list of references
8   cited.  That's what's called prior art publications.
9   That's other patents or other publications that were
10  considered by the Patent Office when it was deciding
11  whether or not to issue this patent.
12                  In the right-hand column, you will see a
13  paragraph in the lower right-hand side that says:
14  Abstract.  This is a brief statement about the subject
15  matter of the invention.
16                  On the next several pages, you'll see a
17  number of drawings, which appear as Figures 1 through
18  8B.  You can flip through those.  You see all the way
19  over through 8B.  The drawings depict various aspects or
20  features of the invention.  They are described in words
21  later in the patent.
22                  The written description begins next.  If
23  you look right past the drawings, you'll then see a lot
24  of just paragraph after paragraph in two columns.
25                  And if you notice there, the columns are

1   numbered.   There is Column No. 1, No. 2 of the page, and

2   then on the next page, Column 3 and 4 and so forth.

3   This is an easy means of reference that I want to

4   explain to you.

5               If you look at Column 1, you'll also see

6   down the middle of each page, there are a lot of little

7   numbers, 5, 10, 15, 20, and 25.  Those refer to the

8   lines on the page.

9               So if you wanted to find what was at

10  Column 1, Line 20, you would find Column 1, look down

11  the center of the page to where the little 20 is, and

12  you'll see right there in Column 1 on Line 20 is the

13  Background of the Invention.

14              And you'll hear the expert witnesses and

15  the attorneys, during the course of the trial, when they

16  want to cite to a particular part of the patent, they

17  will say Column 1, Line 20, or Column 8, Line 16, and if

18  you have your patent open, you can flip right the where

19  they're reading from, and you can follow along.

20              Now, as you look down through these,

21  you'll see that up at the beginning of Column 1 is a

22  paragraph called Field of the Invention.

23              Then the next section, at Column 1, Line

24  20, is Background of the Invention.

25              Then Column 2, Line 10 is Summary of the

 1        Inventions

 2                  Then over in Column 3, you have a

 3   description of the drawings.

 4                  Then at the bottom of Column 3, you have

 5   a detailed description of the preferred embodiments.

 6                  And those are various ways that the --

 7   the claimed invention can be practiced.  And that

 8   continues over for a number of pages, all the way over

 9   to Column 15.

10                  And you'll see at the beginning of Column

11   15 at Line 8 -- or Line 7 a little sentence there that

12   says:  What is claimed is, colon, and then No. 1, a

13   computer system which organizes each data unit,

14   et cetera.  Then you see No. 2, No. 3 in bold print on

15   down, all the way over to Column 16, and then it

16   continues all the way over through Column 18.

17                  These are what's called the claims of the

18   patent, and I will have more to say about those right

19   now.

20                  The claims of a patent are a main focus

21   of a patent case, because the claims are what define the

22   patent owner's rights under the law; that is, the claims

23   define what the patent owner may exclude others from

24   doing during the term of the patent.

25                  The claims of a patent serve two

 1

 2             First, they set the boundaries of the

 3   invention covered by the patent.

 4             Second, they provide notice to the public

 5   of what those boundaries are.

 6             The claims of the patent are what are

 7   infringed when patent infringement occurs, because the

 8   claims define what the patent is.

 9             Thus, when a product or a method is

10   accused of infringing a patent, the patent claims are

11   compared to the accused product or method to determine

12   whether there is infringement.

13             So when you're deciding infringement, you

14   take the patent claim, and you compare it to the accused

15   invention or method.  And you'll hear experts testifying

16   about this and as to whether each element of the claim

17   is satisfied or not satisfied.

18             The claims are also at issue when the

19   validity of a patent is challenged.  In reaching your

20   determination with respect to infringement and validity,

21   you must consider each claim separately.

22             Now, patent claims may exist in two forms

23   referred to as independent claims and dependent claims.

24   An independent claim does not refer to any other claim

25   of the patent; in other words, it stands alone or it's

1   independent.  Then it's necessary to look at the other

2   claim to determine what it means.

3              For example, in the '227 patent, Claim 1

4   is an independent claim.  It stands alone.

5              A dependent claim refers to at least one

6   other claim in the patent.  A dependent claim includes

7   each of the limitations of the other claim or claims to

8   which it refers, as well as the additional limitations

9   recited in the dependent claim.

10             So if you have a dependent claim that

11  refers say to Claim 1, then all of the elements of

12  Claim 1 have to be satisfied, plus the elements of

13  Claim 2.  It just sort of incorporates it together.

14             Therefore, to determine whether a

15  dependent claim -- what a dependent claim covers, it is

16  necessary to look at both the dependent claim and the

17  other claim or claims to which it refers.

18             For example, Claim 2 of the '227 patent

19  is a dependent claim.  It's down at Column 15, Line 29.

20  And you'll notice the dependent claim says:  The

21  computer system of Claim 1 wherein each timestamp is

22  selected from the group consisting of past, present, and

23  future times.

24             So you would -- to determine what a

25  dependent claim covers, you first look to Claim 1, and

 1   then you look for claim 2

 2                    All right.  Let me visit with you now

 3   about construction of the claims.

 4                    While the claims define the invention,

 5   sometimes there is a disagreement between the parties as

 6   to what certain words or terms in the claim mean.

 7                    When this happens, they ask the Court to

 8   interpret these terms in light of the patent as a whole.

 9   This is to help resolve their disagreement and to give

10   you, the jury, guidance in applying the claims to the

11   facts of the case.

12                    This happened in this case.  And at

13   sometime prior to trial, a number of months ago, both

14   parties met and conferred as to what they agreed on and

15   what they didn't agree on, and what they could not agree

16   on, they then filed papers and briefings and argument

17   with me, and we had a hearing here in court, without a

18   jury, just before me, where they presented their

19   arguments.

20                    Then I hand down what's called a claim

21   construction opinion where I define the meaning of the

22   terms that they have in dispute.  The Court's claim

23   construction of these terms are set forth in the Claim

24   Construction Chart provided in your notebook.

25                    If you'll look over past the patents,

1    there should be a tab that says: Claim Construction

2    Chart.  And there you'll find the definitions for each

3    of the words that were in dispute and the meaning that I

4    have given to you.  You must use these meanings when you

5    decide the issues of infringement and invalidity.

6                   Everybody find the Claim Construction

7    Chart?

8                   Should be under a tab that says:  Claim

9    Construction Chart.  Is it -- is it not?  I don't have a

10   notebook in front of --

11                  JUROR:  Terms?

12                  THE COURT:  Is that correct?

13                  LAW CLERK:  Claim Terms.

14                  THE COURT:  The tab says:  Claim Terms.

15   All right.  And there's the chart.  On the left-hand

16   side, you'll see what was in dispute; on the right-hand

17   side, what the Court's instructions was.

18                  I know this may seem a bit overpowering

19   and confusing looking at the claims and now definitions

20   of the words, but let me just reassure you at the point

21   that the attorneys are going to simplify this for you.

22                  They are both very well qualified, well

23   represented on both sides.  They will have expert

24   witnesses that will simplify it for you.  They'll have

25   claim charts.  And you will -- this will make a lot more

1    sense of your own experience through the case.

2              So if you're feeling a little

3    overwhelmed, don't, okay?

4              I've tried a great many of these cases,

5    and I always ask the jury when it's over with, I say --

6    I just had a trial last week, and I asked them, I said:

7    How many of you felt really confident to decide this

8    case when you were first selected?  I don't think hardly

9    a hand went up.

10             I said:  How many of you felt confident

11   to decide the case after you had heard all of the

12   evidence?  And every hand went up.

13             So -- and I see that repeatedly.  So if

14   I -- if I see a -- if you're looking like a deer in the

15   headlights this morning, I'm not too concerned, and

16   nobody else is either, so -- but this will help give you

17   some context and some -- make all of this a little more

18   meaningful to you for me to go through this now and give

19   you an overview of what you're going to be seeing.

20             Now let's talk about the issues that

21   you're going to be deciding in this case.  There are

22   really four questions or issues.  I've been over those

23   with you.  That's infringement, willfulness, damages,

24   and validity.

25             Mirror Worlds has the burden of proof on

1    the issue of infringement, willfulness, and damages for
2    its patents; and Apple has the burden of proof on the
3    issue of invalidity with regard to Mirror Worlds'
4    patents.
5              Likewise, Apple has the burden of proof
6    on the issues of infringement, willfulness, and damages
7    for its patent, and Mirror Worlds has the burden of
8    proof on the issue of invalidity for the Apple patent.
9              However, there are different burdens of
10   proof you must apply in answering these four questions.
11             In any legal action, facts must be proven
12   to you by a required standard of evidence known as the
13   burden of proof.
14             You've probably heard of the
15   beyond-a-reasonable-doubt standard that applies in
16   criminal cases, and some of you have maybe sat on
17   criminal juries.  And that was the standard of evidence
18   or the burden of proof that was required of the
19   prosecution in order for you to find a verdict of guilty
20   in a criminal case, beyond a reasonable doubt.
21             Beyond a reasonable doubt is the very
22   highest burden of proof.  It's not involved in this
23   case, but two other different burdens of proof are.  And
24   that's what's called the clear-and-convincing-evidence
25   standard and the preponderance-of-the-evidence standard.

1   The preponderance-of-the-evidence burden

2   of proof means that you must be persuaded that what the

3   party seeks to prove is more probably true than not

4   true.

5              Put in another way, if you were to put

6   the evidence for and against the party who must prove

7   the fact on the opposite sides of a scale, the

8   preponderance-of-the-evidence standard requires that the

9   scale tip at least somewhat toward the party that has

10  the burden of proof.

11             That's the preponderance-of-evidence

12  standard.

13             Now, the clear-and-convincing-evidence

14  burden of proof means that the evidence must produce in

15  your minds a firm belief or conviction as to the matters

16  sought to be established.

17             In other words, if you were to put the

18  evidence for and against the party who must prove the

19  fact on the opposite sides of a scale, under the

20  clear-and-convincing-evidence standard, it requires that

21  the scale tip more heavily toward the party who has the

22  burden of proof.

23             In other words, the

24  clear-and-convincing-evidence standard is a higher

25  standard than the preponderance of the evidence.

1
2    burden of proving infringement and damages of its
3    patents, and Apple has the burden of proving its
4    infringement and damages of its patent by the
5    preponderance-of-the-evidence standard.
6              So preponderance of the evidence applies
7    to infringement and to damages; however, the issues of
8    invalidity and willfulness require the higher standard
9    of clear and convincing evidence.
10             So infringement, damages, preponderance
11   of the evidence; willfulness and invalidity by clear and
12   convincing evidence.
13             Now, this just about concludes my opening
14   remarks.  Again, as I said, don't be concerned if you
15   feel a little bit lost at this point.
16             I'll be giving you much more detailed,
17   written, final instructions at the end of the case and
18   will have all of these instructions in much greater
19   detail accompanied by a verdict form in writing for you
20   that the verdict form will ask you the very simple
21   questions dealing with the four issues of infringement,
22   willfulness, invalidity, and damages as to each patent.
23             By the time you get to those questions,
24   you will have a much greater understanding and
25   confidence in answering them.

1   About to reassure your Honor

2   have to be an expert on patent law or the field of the

3   invention.  We have very fine attorneys on both sides

4   who will do a good job of simplifying and explaining all

5   of this to you, and they will carry -- they will call

6   very capable experts who will help you understand the

7   issues and facts of this case.

8                   I have tried many of these cases, and

9   almost always, by the end of the case, the jury feels

10  very comfortable in deciding the issues in the case.

11                  Now it's time for opening statement, and

12  I've allowed each side 30 minutes for opening statement.

13                  Let me ask the members of the jury, does

14  anybody need a break?  We can take about a five-minute

15  break, if you'd like to stretch your legs, use the

16  facilities, before we start opening statements, or we

17  can go straight into them.

18                  Does anybody need a break?

19                  This will apply throughout the case.

20  Sometimes the days get long.  The mornings get long.

21  We've got a lot of testimony to cover.

22                  I have given each side 12 hours for

23  direct and cross-examination.  So that's basically 24

24  hours of testimony.  Hopefully, they'll give a little

25  back to us and won't use it all, but they -- they've

 1  both sets, a lot of respect, so they may take it to

 2                    So to get through this case, we're going

 3  to have to work very hard, and we can, normal day, get

 4  in about six hours a day.  So we're going to be hitting

 5  it pretty hard for the next three or four days and try

 6  to get through with this case this week, if at all

 7  possible.

 8                    So anytime during those long afternoons

 9  that one of you needs to take a break, just get the

10  Court Security Officer's attention or hold up your hand

11  or -- I had a juror last week that just got up and

12  started walking out, and that's okay, too.  If you've

13  got to go, you've got to go, you know.

14                    So does anybody need a break before we

15  begin opening statements?

16                    All right.  The Court will recognize

17  counsel for the Plaintiff for purposes of --

18                    MR. CARROLL:  Thank you.

19                    THE COURT:  -- opening statement.

20                    Mr. Carroll.

21                    MR. CARROLL:  Thank you.  Your Honor, if

22  the Court please, would you give me just about a

23  five-minute warning, please, sir?

24                    THE COURT:  All right.

25                    MR. CARROLL:  Thank you.

1        Ladies and Gentlemen of the Jury, good

2   morning.

3                Twenty days ago, you got picked for this

4   job, and the Judge told you then and we told you a

5   little bit and you've heard more today about the fact

6   that this is a patent case.

7                Now, I want to show you four little

8   cartoons that I think will help you focus on what at

9   least I think are going to be important issues during

10  this lawsuit.

11               So can we have the lights down a little

12  bit, please?

13               Perfect.

14               All right, James.  Put up No. 1.

15               VIDEO TECH:  They have the projector off.

16               MR. CARROLL:  Pardon?

17               VIDEO TECH:  They have the projector off.

18               COURTROOM DEPUTY:  Judge, I hit the wrong

19  button.

20               MR. CARROLL:  Ms. Ferguson hit the wrong

21  button.  You'll have to reboot.  We won't take your time

22  off her time.

23               How long does that take, Ms. Ferguson?

24               COURTROOM DEPUTY:  A couple of minutes.

25               THE COURT:  All right.  Let's take a

 1  recess until 10:00.  LED good.  Everybody gets to stretch

 2  their legs, and we'll come back; and we'll be all booted

 3  up.  Take about five-minute recess.

 4                    COURT SECURITY OFFICER:  All rise.

 5                    THE COURT:  See, I was wanting a recess

 6  all along.

 7                    (Jury out.)

 8                    (Recess.)

 9                    COURT SECURITY OFFICER:  All rise for the

10  jury.

11                    (Jury in.)

12                    COURT SECURITY OFFICER:  All rise.

13                    THE COURT:  Please be seated.

14                    All right.  Mr. Carroll, we begin anew.

15                    MR. CARROLL:  Thank you, Your Honor.

16                    Good morning again.

17                    James, can we have No. 1?

18                    All right.  Twenty days ago, you heard a

19  little bit about patents.  The Judge told you a little

20  bit about patents this morning.  You'll hear a lot about

21  patents during the next week.

22                    And the purpose of this slide -- if you

23  can see it up at the top -- patents are property, just -

24  like my little farmer's plot of land up there.  And just

25  like any property, the owners of a patent have the

 1   right under the law to put up a no trespassing sign,
 2   just like you might have a no trespassing sign in your
 3   place out -- or wherever you live.
 4                    Now, what does that mean?
 5                    That means you alone as the owner have
 6   the right to determine whether you let somebody use your
 7   place.  And that doesn't matter whether you're using it
 8   or not, and I want you to remember that, because that's
 9   going to be a real big flap in this lawsuit.
10                    And that is, Apple is going to want to
11   talk about the use that David Gelernter here and his
12   little company made of the patents, not what they used
13   them for.  And I'll explain to you in a minute why
14   that's important.
15                    Let's go to the next slide.
16                    The unauthorized use of any property is
17   called a trespass, right?  Somebody trespasses on your
18   place.  Call the sheriff, right?
19                    In patent law, there is no patent police;
20   there is no patent sheriff.  We can't call anybody and
21   say:  Apple is trespassing.  Will you come arrest them?
22   We come to court.  You are our patent police.  The
23   Patent Office can't do it; only the jury in the United
24   States Federal Courthouse, just like you-all.
25                    Now, what does it mean to infringe a

1   patent2

2                   Here on my little cartoon, you see that

3   the oil company is fixing to come out and drill on my

4   farmer's place, okay?

5                   And -- and let's go to the next slide.

6                   And he catches them, and he catches them

7   after they have drilled and after they have made a well.

8                   Now, what does that mean?

9                   That means that for the first time, he is

10  calling them to pay up for what they have used his

11  property for.

12                  Now, let me tell you right now where

13  we're going to have a big fight in this lawsuit, and

14  this is the perfect example.

15                  You're going to find out that every day

16  that you and I are in this courtroom, Apple makes 50

17  million American dollars from using our technology.  $50

18  million.  If we're here five days, that will be a

19  quarter of a billion dollars they will make while we're

20  in here trying to protect our claim, prosecute our

21  trespass.

22                  Just like that oil well, if Exxon drilled

23  that oil well and they hit a gusher, the law says that

24  they have to pay for that trespass based upon how much

25  oil they use out from under that man's place.

1    Apple doesn't want it that way.  They're

2    going to try to hide from you the whole trial how much

3    they make, including this $50 million a day.  And

4    they're going to want to talk about how much the farmer

5    may have paid his brother-in-law years ago for that

6    place.

7                    The law says, and Judge Davis, I think,

8    will tell you, that the appropriate measure of damage is

9    how much they use the patented technology.

10                    So watch for that, because that's going

11   to be a smoke screen.  They don't want to talk about

12   that $50 million they're making right now.

13                    Let's go to the last one.

14                    So what has to happen is, the law says

15   that we have to play-like; we have to pretend.  You

16   remember when your kids were little and they had

17   play-like.  We play like that Apple did what they have

18   not done and still won't do, and that is, sit down and

19   fess up and admit that they used our patents, admit that

20   the patents were valid.  They're not even saying that.

21   And then figure out what they would have settled up for.

22                    Just like in my slide with the oil

23   company, the farmer catches them.  What does he want?

24   He wants to know, number one, how much oil did you find?

25   Number two, what would be a fair price -- a share with

63

2                And under the law in this case, in these

3    patent cases, the law says that the patentee -- that's

4    us -- and Apple, the infringer, have this sit-down.  And

5    guess what?  Apple's cards are face up on the table.

6    They can't hide anything.  They have to tell us the

7    straight-up.  They have to tell us how much oil they

8    found, right?

9                So we know what was fairly ours.  And

10   then that is figured on the basis of a percentage of

11   what they used, what they made.

12               They have a patent -- or damage man who's

13   going to talk to you.  He's not even going to go through

14   that formula.  He's not even going to do what the law

15   says that he has to do.

16               Why?

17               Again, they're trying to hide from you

18   how much money they made from our patents.

19               So that's what the case is going to be

20   about from the standpoint of damages.  And I'll just say

21   this one thing about our claim.  It's for a ton of

22   money, but it's based upon the multiple tons of money

23   that they have made with this man right here's (sic)

24   ideas, David Gelernter.

25               We are asking for less than 1 percent of

 1     what they made.

 2               Think about it this way.  Some of you on

 3     the jury have experience in the schoolhouse.  You catch

 4     some kid using somebody else's work.  Typically, what do

 5     they get?

 6               A zero.  In this case, we caught Apple.

 7     They still get a 99.  Think about that.

 8               Okay.  Let's go to what we think at least

 9     the case is about, and let me tell you what I've done.

10     I am going to put up what I think is a pretty good

11     roadmap of the case.

12               First of all, who is David Gelernter?

13               David stand up, please.

14               And I mispronounce the poor man's name

15     every time.  It's Gelernter.

16               So if you hear me say it otherwise,

17     David, I'm sorry.

18               Jane, where are you?  Would you stand up?

19               This is Jane Gelernter.  You met them

20     both 20 days ago.

21               Thank you.

22               They're now from Connecticut where they

23     live.  They've got grown kids, who, at least as of

24     today, were out of the house.

25               Right, David?

1          MR. GELERNTER - SH 9

2          MR. CARROLL:  So they're here, and you're

3  going to hear a lot about who he is, what did he invent,

4  what was Apple's interest in what he invented and how we

5  know that, how is Apple infringing or using his patent

6  without his permission, and what should they pay.

7          What I suggest you watch for are these

8  very two important points right here (indicates), and

9  it's going to make sense to you when you get into the

10  case.

11          Number one, what was Apple saying about

12  the importance of this man's invention before we sued

13  them?  What were they saying about the importance of

14  this man's invention before we sued them?

15          Then, look at what they're saying today.

16  And you're going to be able to tell a whole lot about

17  who to believe in this case.

18          And let me show what you I'm talking

19  about.

20          Let's go to -- well, let me just show it

21  to you right now.  And I am going to get a little bit

22  ahead, and I am going to catch up.  Let me show you this

23  poster right here.

24          You're going to find out that Apple got

25  very excited about David Gelernter's patents, because

1  they were very highly and closely publicized this year.

2  deal.  And the very top man at Apple, a guy you will

3  hear a whole lot about, named Steve Jobs, and that's

4  J-O-B-S, the man himself.  This is not some underling.

5  This is Steve Jobs, the top banana at Apple.

6          He sends an e-mail to a whole bunch of

7  people that says:  Please check out this software -- and

8  it's up there on the screen -- ASAP.  It may be

9  something for our future, and we may want to secure a

10  license.

11          Remember that word license, because

12  that's what you get when you get permission from a

13  patent owner to use that patent owner's property.

14          Now, let me show you what I was talking

15  about in terms of watching out for what they say, the

16  before and after.

17          That e-mail from Mr. Jobs led to a

18  meeting between us and them.  We sat down and told them

19  everything we knew about out invention.  They seemed

20  excited, but then they backed up and said:  Oh, well,

21  forget about it.  We're not interested after all.

22          But look at what they did after they said

23  they were not interested.  Look at all of the times they

24  were looking at our stuff through our website, all of

25  the times they were conferring about how important our

1  stuff was, afterwards, said they weren't interested,

2  culminating in a top-secret meeting of Apple people, a

3  top-secret meeting where the mention was -- look up

4  there -- an off-site meeting -- and the reference was --

5  David Gelernter, Yale professor, new ways of finding

6  information.  New ways.

7              Now, what are they going to tell you?

8  Mr. Randall is going to stand up here in about 15

9  minutes and tell you that what we invented was old

10 stuff.  That sure wasn't the song they were singing

11 there.  New ways.

12             That secret meeting was what led to the

13 development of this (indicates), which accounts for some

14 of that $50 million they will make today.  And it led to

15 the invention of this (indicates), which will also make

16 up some of that $50 million they will make today.  And

17 it's based on this man's ideas.  And we want to be paid

18 for it.

19             Let's go to slide -- that first slide,

20 James, about Dr. Gelernter.

21             Okay.  Real quickly, who is David

22 Gelernter?

23             Well, I told you a little bit 20 days ago

24 that he's an author.  Sure enough, he wrote this book

25 back in '91.  It's a great book.  I have read it and I

```
 1    can understand, and that I'm not a technical guy.

 2              Because what it tells you is exactly what

 3    happened, and that is, one day, today, computers can

 4    become a mirror anywhere in the world we want to be.  We

 5    can see houses; we can see Google Earth's where we live,

 6    if we know how to turn it on, all those kinds of things.

 7    And that was the first big attention that David

 8    Gelernter got.

 9              Let's go to the next one, James.

10              Now, up here, I said that it brought a

11    lot of attention about Dr. Gelernter and his ideas.  New

12    York Times wrote a big article about him.  It also got

13    him targeted by a terrorist called the Unabomber.

14              And in 1993, this Unabomber attempted to

15    murder this man right here.  He sent him a bomb in a

16    box, and he opened it up in his office, and it blew up

17    and he almost died.  He almost bled to death.

18              And let me just say this:  20 days ago

19    when I asked you about this during the voir dire part of

20    the case, Mr. Randall over here got up and he referred

21    to that.  And you may remember this; we sure do.  He

22    referred to that as an accident.

23              Now, I don't know how attempted murder

24    becomes an accident, but I think you'll see that that's

25    the limit -- or the degree to which Apple is going to
```

1   try to trivialize and minimalize events in this case

2   that they say was an accident.  It was an attempted

3   murder.  And he bears the scars of that today.

4               But you know what?  It led to a good

5   thing.  While he was convalescing, he came up with these

6   three patents, the very three patents that we're in

7   court about today, the very three patents that make

8   Apple $50 million a day.

9               Let's go to the next one, James.

10              And, again, I've shown you -- this is

11  this fellow, Steve Jobs, on the right.  That's not him

12  on the left.  That's Steve Jobs.  And he is the big man

13  at Apple, and he's the guy that wrote those e-mails.

14              And you know what?  Pretty interesting,

15  if I can find the deal.

16              He wrote two e-mails.  I showed you the

17  one that led to the meeting.  He wrote one after the

18  meeting, after they had told us they weren't interested,

19  and he said:  It might be worth a look.  That's the top

20  banana at Apple.

21              You're going to hear testimony from a guy

22  who went to the meeting, because Mr. Jobs sent him, that

23  he had never seen that before, that he had never before

24  or since seen a situation like that where the top guy

25  said go check this out.

1              Okay. Let's go to the next one.

2              So Apple wants to meet, and we have the

3  meeting.  There's a guy right there named Mike Satow.

4  Mike is going to testify for you as to what happened at

5  the meeting as to who said what.  Apple was excited; we

6  were excited.  We wanted to partner with them.

7              Let's go to the next one.

8              They weren't interested, and I showed you

9  that one.

10              Let's go to the next one.

11              Showed you that one.

12              Let's go to the next one.

13              Oh, I'm sorry.  Let's go back one, James.

14              This is interesting.  You see this front

15  man?  All these people at Apple were involved in these

16  e-mail traffics about Gelernter's ideas about his

17  patents and how important it is.

18              Guess what?  They've all taken dummy

19  pills.  Nobody can remember a thing.  So think about

20  that when you're trying to decide who to believe.

21              Let's go to the next one.

22              Here's the infringement.  We've got a

23  Ph.D. trained at very important universities on both

24  coasts named John Levy.

25              John, where are you?  Would you stand up?

1       Eberle D. Levy D. Levy used in work

2   for Apple.  He was there when it was a little company,

3   couple of hundred people.

4              Thank you, John.

5              He's going to explain to you why our

6   three patents are infringed by these three products.

7              And let me tell you how important those

8   products are.  Two of them -- two of the three are

9   mentioned on this box that they make 50 million bucks a

10  day for.

11             Okay.  Let's go to the next one.

12             And I told you Apple makes 7 -- has made

13  $72 billion.  $72 billion using our technology.  And,

14  again, they will make a quarter of a billion while we

15  are sitting here in this courtroom trying to get justice

16  from you-all.

17             Let's go to the next one.

18             Now, here's going to be what you hear

19  from Apple.  They're going to say, oh, you know what?

20  That might be new and that might be cool and all that,

21  but, you know, we're happy using the old stuff.

22             That's not what this fellow Jobs says.

23             Turn on that sound, if you would, James.

24             Okay.  We can't get it.

25             Here's what he says:  He says -- he says

1   that it is reengineering and revolutionary and that
2   these features are changing the way people will use a
3   computer.  That's what he tells the world.  But they're
4   going to tell you that they are back using their old
5   way.
6              Here's the point -- here's the point.
7              Let's go down to the bottom.
8              Apple, in fact -- John Levy is going to
9   tell you -- uses our new ideas.  They may still have a
10  piece of the old, but the Judge is going to tell you
11  that that doesn't protect them from infringement.
12             That doesn't protect them from
13  infringement so long as our ideas are in their product.
14  They can put bells and whistles on it, if they want to;
15  but as long as it's our core ideas, they have to pay.
16             Let's go to the next one.
17             Now, this is the issue that you're going
18  to hear most about from Apple, and I want you to think
19  about this.  Apple says we don't do it.  We don't do
20  what you're accusing us of doing, but then they're going
21  to spend a whole lot of time trying to kill our patents
22  and tell you that the Patent Office made a mistake and
23  that what we invented was not new, despite all that
24  evidence you're going to see said.
25             Now, think about it while you're

1  listening to Apple's pretext to kill our patents.  If

2  they are not doing it, why are they afraid of our

3  patents?  If they're not doing it, why do they want to

4  kill our patents?  Think about it.

5           One of the things -- lift out -- lift out

6  that middle bullet on the bottom.

7           You're going to hear that the Gelernter

8  patents have been cited more than 115 times by other

9  inventors.  115 times people have cited his patents as

10  being important, other inventors, the Patent Office.

11          Next bullet.

12          I'm sorry.  The top bullet.

13          You're going to find that there is not

14  one piece of paper that Apple can lay its hands on

15  during the entire time they were looking at Gelernter's

16  patents that say what they're telling you in the

17  courtroom, and that is that these patents are old news;

18  they are no good.

19          Instead, everything that you will see

20  that they were talking about at the time is just the

21  opposite.  This is the guy at the meeting.

22          James, put this up on the board.

23  This is the guy at the meeting that knew, clearly

24  knew -- this is known at the secret meeting -- new ways

25  of finding information.  Killer feature.  We don't want

 1    to miss the boat.

 2                    And yet today, when we caught them,

 3    they're singing a different song.  But you think about

 4    it.  They cannot run from those documents.

 5                    Okay.  Let's go to the next one.

 6                    Let's go to the next one.

 7                    Okay.  And I've gone through that.

 8                    Let's go to the next one.

 9                    Now, this is the last thing I want to

10    talk to you before I talk to you a little bit more about

11    the damages.

12                    They have sued us back.  We sued them,

13    and then they said, well, we're going to sue you.  And

14    they did, and they sued us over a piece of technology

15    that Steve Jobs says is old hat, and that's this Mander

16    Piles patents.  John says it's not especially practical.

17                    I want you to hear me on this very

18    clearly.  They are so burned by what they say we did

19    with this Mander's patent that they're not even going to

20    bring you a damage calculation.  They're not.  And they

21    haven't even bothered to bring a witness to tell you how

22    badly they are hurt, because they're not.

23                    This is a smoke screen to try and divert

24    your attention from the real infringement that's making

25    them $50 million today.

1   What PD's going to find out later that
2   they never, ever, ever got hurt, even if we did
3   infringe, by this Piles patent.  And when you sit down
4   and answer those questions that the Judge is going to
5   have you answer on that counterclaim, you're going to
6   have to answer for damages:  We don't know, because they
7   didn't care enough about it to even bring you a witness.
8   You think about that.  Why are they trying to confuse
9   you with that counterclaim?

10              Again, they're trying to run from the
11   extent of money they have made with this man's ideas.

12              Okay.  Let's go to the next one.

13              Now, this is what I call common sense in
14   the case.  These are the three Apple bigshots, all of
15   whom know about his patents, all of whom were interested
16   in his patents, none of whom are going to bother to come
17   to Tyler, Texas, to deal with this problem.  None of
18   them.

19              Let's go to the next one.

20              This is a shot that shows you kind of the
21   complete circle, 1991, David Gelernter writes about
22   Mirror Worlds.  Turns out gets the attention of Steve
23   Jobs, and really and truly, their situations do mirror
24   one another.  Jobs knows then and he knows now how
25   important these ideas are.

1    Gelernter's ideas are mirrored today.

2    very products that will make Apple $50 million today.

3                    Let's go to the next one.

4                    So what do we want?

5                    We want a chance to explain to you, and

6    we're going to do that this morning, with David

7    Gelernter taking the stand, how he came up with this

8    invention and who he is.

9                    You're going to find out that he was

10   studying at the Jewish seminary.  Before he decided to

11   be a computer scientist, he was a Bible student.  He was

12   going to be a rabbi.  And then he decided he couldn't

13   raise his family on what a preacher gets paid.

14                   So he went into the computer world, and

15   you're going to hear him talk about how hard he worked

16   on these ideas, how important they were, how hard he

17   tried to get the scientific community to appreciate what

18   he had done, and they did.  And then how hard he and his

19   little company worked trying to get some big boy to

20   partner with him, and they didn't.

21                   THE COURT:  Mr. Carroll, you have about

22   five minutes.

23                   MR. CARROLL:  Thank you, Your Honor.

24                   And the reason they didn't partner is

25   they decided to take the whole apple for themselves.

1    All he wanted was a little bite, but instead they took

2    the whole thing.  Didn't even give us the core.

3                    So what has Apple received?

4                    Billions and billions and billions of

5    dollars.

6                    What have we got?  What the little boy

7    shot at?

8                    Zero.

9                    And what do we want?

10                    We want a reasonable royalty.

11                    Now, let me tell what you a reasonable

12    royalty is.

13                    Is Walt Bratic here?

14                    Mr. Bratic, stand up.

15                    This is Walt Bratic.  Walt is a certified

16    public accountant down in Houston.  He's done these

17    cases before.  He's going to sit on that witness stand

18    and tell you everything you want to know and then some,

19    about how Apple has made and will make and continues to

20    make all this money with our man's ideas.  And then

21    he'll tell you how he came up with that reasonable

22    royalty.

23                    And guess what?  Guess what?  That's

24    about two weeks' worth of infringing sales.

25    They can pay us, if you make them, what we're owed.  And

```
 1   is about 13 demonstrations will be done with us. And 12/13
 2   days.
 3                   So we were -- we'll ask you, after you
 4   hear the testimony, to give us a verdict:  Yes, Apple
 5   infringes.  Yes, it's willful.  That means there wasn't
 6   any accident.  And you'll see that.
 7                   No, the Gelernter patents are not
 8   invalid.  They're just as good as the Patent Office said
 9   they were when they were issued.  And they are just as
10   good and exciting as all your people said they were when
11   they were looking at them.
12                   And the damage -- the reasonable royalty
13   is that number (indicates).
14   And then on their counterclaim, tell them no.  Tell them
15   no.  We can see a smoke screen when we see one.  Give
16   them no infringement, no invalidity, no damages, because
17   there won't be any.
18                   This is our day in court.  We've been
19   waiting a long time for it.  We're going to do our best
20   to get the case on to you in a way that we think will
21   maximize your time and ours.
22                   Thank you for helping us out.  Thank you
23   for your consideration.
24                   Thank you, Your Honor.
25                   THE COURT:  Thank you, Mr. Carroll.
```

Mr. Randall

1

2          MR. RANDALL:  May it please the Court.

3          My name is Jeff Randall, and I represent

4  Apple.  And with me are my partners, Christian Platt and

5  Allan Soobert.  And also with me is Apple's corporate

6  representative, Mr. Bud Tribble.

7          First, I'd like to tell you just a little

8  bit about Apple, and then I want to get to the core

9  issues in this case.  And the core issues in this case

10  are not damages, and they're not whether we were

11  aware -- Apple was aware of Mirror Worlds.

12          The core issues in this case are whether

13  there's any evidence on infringement, and I didn't hear

14  much about that, and whether those patents are invalid.

15  Those are the real core issues in this case, and I'll

16  get to that in just one moment.

17          First of all, let me tell you a little

18  bit about Apple.  Apple is, no doubt about it, one of

19  the most successful and respected technology companies

20  in the world.  Apple achieved its success over the years

21  through a long history of hard work and innovation and

22  an unwavering commitment to making the best products for

23  individual consumers.

24          While IBM and other big companies were

25  focused on big companies, Apple has always been focused

1    on the individual consumer, and providing the best
2    products to those consumers.

3                    Apple started in 1970 in a garage in
4    Silicon Valley.  By 1985, Apple was widely recognized as
5    an American success story.

6                    Would you please show Slide 1, please?

7                    This is an article from The New York
8    Times, September 19, 1985, and it quotes President
9    Reagan.

10                   Can you please play Clip 2?  This is
11   President Reagan from May 28th, 1985 address.

12                   (Video clip played.)

13                   MR. RANDALL:  You're going to hear from
14   Apple, and there was a suggestion about employees
15   coming.  You're going to hear from Apple's key
16   executives, Apple's employees, who have worked very hard
17   to develop not only all the features that have made
18   Apple a success but also those core features that are at
19   issue in this case.

20                   And you're going to hear from a number of
21   those Apple witnesses, and they're going to tell you how
22   they, along with the 37,000 other employees at Apple,
23   have earned their success by developing great products.

24                   They've developed computers; they've
25   developed their own software.  The MAC OS, which is the

1   operating systems that run the software programs in

2   computers, music products, mobile phones.  All of

3   Apple's products work together, and it's one package.

4   And they are the only company that does that, and they

5   do it better than any other company.  And there's no

6   question about that either.

7             Now, let me address a few of these

8   issues.  First of all, I will deal with this right

9   upfront.

10             The issue in this case, and I think that

11   this is one of their main contentions, was, did Apple

12   know about Mirror Worlds?

13             Well, sure, they did.  It's not in

14   dispute.  And I think Mr. Carroll mentioned, oh, Mirror

15   Worlds has got all this attention.  Mr. Gelernter got

16   all this attention.

17             Well, he did.  He did.

18             And at the time, over the last several

19   decades, there's only been three operating systems that

20   run computers, three main operating systems.  Microsoft

21   has Windows; been very successful.  They've made a lot

22   of money.  Sun had UNIX, and Apple has its operating

23   system.  Three main operating systems that run the

24   personal computers in the world.

25             And the press and Mirror Worlds and

1  Dr. Gelernter -- Abbott, that he had come up with a

2  whole new operating system, a whole new way of

3  organizing documents, a whole new way of running

4  computers.

5          Now, there's no question that Apple as a

6  leading technology company, along with other companies,

7  keep track of technology.  And if someone comes along

8  and says we have a whole new way of running and

9  operating computers, you don't have to just look at the

10  three -- UNIX, Apple, and Microsoft -- there's a new

11  player.

12          Well, of course, that is -- and it's not

13  going to be surprising that that is going to get some

14  attention from Apple and other companies.

15          But what the evidence is going to show in

16  this case is that when Apple did take a look -- and

17  there was a suggestion that there was a meeting where

18  licensing was discussed and the patents were discussed.

19          That is not true.  This company, Mirror

20  Worlds, never accused Apple of infringement.  They never

21  suggested that they needed to take a license.  They

22  never suggested -- there was never any discussion about

23  taking a license, paying a royalty, any of that.

24          What happened was Mirror Worlds wanted to

25  sell software to Apple as a customer.  Apple saw all

1 this press, and said maybe we should take a look at what

2 this guy has, his software.  And Steve Jobs suggested

3 maybe we should take a look.  And if we need a license,

4 take a license; maybe we should secure a license.

5            That doesn't sound like a thief, does it?

6 It sounds like someone saying, hey, take a look at this.

7 Let's see what they've got.

8            Well, Apple did take a look.  That is the

9 responsible thing to do as a company.  Apple took a look

10 at what Mirror Worlds had; and Apple, along with

11 everybody else that saw what Mirror Worlds had, walked

12 away and said you don't have a whole new operating

13 system.  You don't have software that changes the world,

14 that changes or revolutionizes things that is a new

15 operating system that now competes with all these other

16 operating systems.

17            It wasn't new.  And the evidence will

18 show that.

19            The evidence will show that in a

20 computer -- and one of the issues that Dr. Gelernter was

21 trying to solve was in a computer, one of the issues is,

22 how do you find the information in that computer?

23            I mean, really.  You know, if all these

24 documents are loaded into the computer, how do you find

25 it?

1   And you find it by indexing it, right?

2   When the information goes into the computer, you do an

3   index and then you can find it, just like a library,

4   right?

5            I mean, if you think about it, it's no

6   different than a library index.  And so, for instance,

7   when Apple took a look at the software that Mirror

8   Worlds had, it was an application that allowed for

9   indexing and searching of documents.  And the indexing

10  and searching of documents, their new operating system,

11  they purchased it from another company.  They didn't

12  even develop it themselves.  The other company was

13  called Verity.

14           So they had gone out, taken this other

15  software off the shelf, bought it, put it into their

16  product, and said this is our new revolutionary product.

17  And that's why -- when Mr. Carroll told you about the

18  sales, that's why this great new revolutionary software

19  only sold 50,000 dollars' worth of revenue.  That's it.

20  That's the whole company.

21           That's Mr. Gelernter's idea.  That's his

22  software.  That's everything.

23           What happened was, over the life of that,

24  they sold 50,000 dollars' worth of software.  Now that

25  doesn't sound like a whole new operating system.  That

 1          doesn't sound like math.

 2                     And so when Apple looked at it, which it

 3    did, and when other companies looked at it, the other

 4    companies didn't buy it.  Apple didn't buy it.  Apple

 5    didn't say we don't need that.

 6                     What Apple told them upfront was -- and

 7    you're going to hear evidence on this -- well, we've now

 8    taken a look at this.  You saw all those e-mails.  A lot

 9    of those were just setting up a meeting, right?

10                     And there was a meeting, a telephone

11    conference.  No doubt about it.  And Apple looked at

12    what they had and said, you know, we're going to use our

13    own indexing and search technology.  That's what we're

14    going to use.  That's not -- that's what we'll do.

15                     We'll continue on with our own.  And

16    that's exactly what they did.

17                     Now, I want to spend the remaining

18    portion of my time on the key issues in this case, and I

19    think that Mr. Carroll put the cart before the horse

20    when he starts talking about damages for most of his

21    opening.

22                     They have to prove infringement.  They

23    have to say that we used what's in those patents; and

24    the truth is, we don't.  We have a fundamentally

25    different system.

```
 1                         6:08-LED pull up 16, please?
```

2                    All right.  On the right is their

3   patent -- is the diagram from their patent.  They

4   organize all the documents, all of them, everything in

5   that computer in one big, time-ordered, chronological

6   stream, okay?  That's their -- that's their concept.

7                    Apple uses the traditional way, the

8   folder system.  So Apple has folders.  I don't know if

9   you can see this, because it's a little difficult.  But

10  they have main folders, and then they have subfolders,

11  and then they have sub-subfolders.

12                   That's how Apple does it, and Apple has

13  done it that way all along.  And Microsoft Windows does

14  it, and UNIX does it.  That's how Apple organizes

15  things.

16                   How does Apple find things?

17                   Apple uses its own indexing and search

18  software to index and search for documents on its

19  system.

20                   Now, can you pull up 6, please?

21                   Now, this is very -- this is a library.

22  It's an analogy to show you and demonstrate to you what

23  these patents are about.

24                   This is a -- and you see a reference

25  here; you see recreation here; and you see fiction here.

 1   And there are subcategories:  Mystery, romance, so
 2   forth.

 3                  This is how Apple organizes its data in
 4   its system, by categories or folders and subfolders.  It
 5   always has.

 6                  Go to 7.

 7                  Now, Apple, like other companies,
 8   indexed.  So when a book or when a document -- when a
 9   document or a piece of data comes into a computer, the
10   computer has to keep track of it, index it, right?

11                  When a book comes into a library, you
12   have to index it.  And you index it, and you say where
13   are we going to put it?  We're going to put it in
14   History under American.  So History and American
15   History, that's where we'll put it.

16                  And that's how Apple organizes things.
17   They don't do it by date.  They do it by logical subject
18   matter folders.  They always have.

19                  Let's go to -- now, if you think about
20   it, how do you find the books in this -- in this
21   library, right?

22                  You're going to find the books by looking
23   at an index, figuring out where it is.  Oh, that book
24   right there is under History, under American History,
25   and you're going to go find it.  You're going to look at

1  the index, and then I'm going to go search it.

2  That's how computers operate.  That's how they always

3  have operated.

4           Now, there's another way to do it, right?

5  You can take all those books off the shelf, and you can

6  say we're not going to organize them in a logical way,

7  all right?  We're going to organize them in a

8  chronological way.  We'll put them all in one stream,

9  just line them up chronologically.  That's how we'll do

10 it, irrespective of what subject matter the book is,

11 okay?

12          That's what David Gelernter said.

13          So let's go to -- go one more.  Go to 10.

14 That's his system of organizing them.  Put them all in a

15 stream, and they're all based on time, okay?  Much

16 different, fundamentally different.

17          Now, there are certain requirements in

18 these patents, and you heard the Judge in the

19 pre-instructions say that each element of each of those

20 claims at the back of those patents have to be

21 satisfied.

22          There are certain fundamental elements of

23 that system that you have to have in that system and

24 that the claims, the inventions of Dr. Gelernter's

25 patent, require.

Apple has a fundamentally different way of doing things,
of organizing data on a computer.  And because it has a
fundamentally different way of doing it, it doesn't
satisfy all the specific requirements of these claims.

Let's go to Slide 15.

All right.  One of the requirements in
the claims is that there's a stream.  I just showed you
that stream, right?  This time-ordered sequence of
documents or books in a library, right?  All strung
together in time.

And the Court's going to instruct you
that this stream means a time-ordered sequence of
documents that function as a diary of a person or
entity's electronic life.

Do you see that?

So it's a diary.

And then in the patent, they discuss the
same thing:  Stream, according to the present invention,
is a time-ordered sequence of documents that function as
a diary.

Let's go to 11.

And there you go.  This is the library
example, and these are the index cards.  And down here
shows timestamp for date received, right?

1      you need to have a timestamp set, when the

2   did this -- when did this -- when was this book donated

3   to the library?  Because you're creating a diary for the

4   library.  When -- who donated that book?  When did it

5   come in the library?

6                  Date received.  There's got to be a date

7   and a timestamp that uniquely identifies that book and

8   places it in the correct order of when it was received.

9                  Now, frankly, irrespective of when the

10  book was written, but when was that received by the

11  computer, or when was it received by the library, and

12  put in it that order, right?

13                 It has to have that timestamp.

14                 Let's go to 9.

15                 Apple does things fundamentally

16  differently.  They don't put them in chronological

17  order.  They put them -- these books -- as they get

18  donated to the library, they put them in a -- in a

19  logical folder system, and always have.

20                 Now, let's go to Slide 5.

21                 There was a suggestion that Apple does

22  things the old way.  Of course, they do.  Apple's been

23  in business since 1970.  They have developed a whole

24  host of products, and they have been -- they have

25  constantly, as has everyone else in the industry,

 1    including Google, improved their indexing and searching

 2    for information.

 3              And frankly, in the technology world,

 4    everybody has gotten better at it.  Apple has, too.

 5    Apple has engaged in a long history of improving its

 6    search -- its indexing of information and its search for

 7    that information.

 8              And there were comments earlier about

 9    what Mr. Jobs said.  What they didn't show you was what

10    he said in 2004 at a developers' conference.

11              Can you play Clip 7?

12              And by the way, everybody in the industry

13    understands that there are lots of folders and lots of

14    documents on computer systems, and you've got to get

15    better at indexing that information and searching for

16    it.  Everybody understands that.

17              In fact, we're going to play evidence and

18    there's going to be evidence in this case that's going

19    to suggest that people knew that back in 1980, 16 years

20    before Dr. Gelernter filed his patent.  Back in 1980 at

21    MIT and others, everybody knew this.  And you're going

22    to hear a number of people testify about that.

23              Can you play Clip 7?

24              (Video played.)

25              MR. RANDALL:  All right.  Now, I'm going

1    to go through some additional points.

2                    Slide 19, I'm going to talk to you about

3    the timestamp.  Can you --

4                    Slide 19, what that shows are files in

5    the Apple system all with the exact same date and time,

6    right?

7                    And that's because in today's society

8    when you receive a CD and when you put a compact disk

9    with lots of files on it, maybe photos or something, and

10   you put in it your computer, the computer lifts it up,

11   and the Apple computer just gives it a date, right?

12                    When an e-mail comes across to Apple and

13   there's lots and lots of attachments and those

14   attachments are loaded into your computer, they get the

15   same date.  Apple does not have, nor does it apply, nor

16   is it concerned with applying a unique date and time to

17   each document and thing in its computer system.

18                    And why is that important to their

19   invention, Dr. Gelernter's?

20                    Because you have to put in it order,

21   right?  You have to put in it sequence.  You have to put

22   it in a stream.

23                    Apple doesn't care about the stream.

24   They put it in folders, so it doesn't really matter if

25   there's a host of documents and other items in the

1   systems that have the exact same date and timestamp.

2              Let's go to Slide 20.

3              This is another one of the requirements

4   of these claims, that this stack, this stream -- this is

5   the Mirror Worlds' stream over here on the right from

6   the patent.  That stream, they say in the -- in the

7   invention, they say that's a receding, foreshortened

8   stack, right?  That's what they say it is.

9              What did they tell the Patent Office?

10             When the Patent Office came up with this

11  prior art, you see that?  Sure looks similar, doesn't

12  it?  Looks nearly identical.

13             But they said, oh, no, no.  This

14  Cowart -- orthogonal view of windows; that is, the

15  windows do not get smaller.  See, they say they don't

16  get smaller.  And they say this is an important

17  distinction.  It highlights a key aspect of the present

18  invention.

19             So they're saying that's a key aspect

20  that it doesn't get smaller.

21             Okay.  Let's go to 21.

22             This is what they accuse in Apple -- this

23  is the only visual display that they say is a receding,

24  foreshortened stack.  Receding, goes back onto the

25  screen.  Foreshortened, it gets smaller.  They said

1   that's a key, key --

2              This doesn't even look like their --

3   their invention.  And compare and contrast.  Use your

4   common sense.  They said to the Patent Office that that

5   Cowart reference, that stack of documents, oh, that's

6   not our invention.  This is a key, key point, and that's

7   not our invention.

8              Well, that's not the invention.  This

9   certainly isn't.  And you're going to hear -- you saw

10  the diagram that Mr. Carroll put up with the hood

11  opening and he said, no, they don't want to look under

12  the hood.

13             Apple let Mr. Levy and his colleague look

14  at the source code, which is the underlying code that

15  runs all of our computers, have access to that code for

16  90 days.  Their experts sat there and looked under the

17  hood for 90 days.

18             And what they see is this cover-flow

19  presentation, visual presentation, of like our albums in

20  music.  It doesn't recede into the screen.  It's one

21  plane.  It goes straight across.  It doesn't recede back

22  into the screen, number one.

23             Number two, it's not foreshortened.  Look

24  at these lines.  All of those displays are all the exact

25  same height.  It doesn't get smaller as it goes back,

1    and it doesn't feed back into the stream.

2              Apple simply doesn't infringe.  There's

3    no question about that.

4              Now, let's go to invalidity.  They said,

5    well, why do they want to kill these patents?  Why are

6    they concerned?

7              You know why?  Because they sued us.

8    They sued us, and they brought these patents out.  And

9    there are two issues.  And I feel very, very confident

10   that you're going to say at the end of this case, when

11   you see all the evidence, number one, Apple doesn't

12   infringe for a number of reasons.  They have a

13   fundamentally different system and different concepts,

14   and they don't satisfy those requirements.

15             Number two is that these claims are

16   invalid, okay?  The idea of putting all the documents in

17   a computer system in a chronological stream is not

18   something that's new.

19             Let's go to 25.

20             Now, you're going to hear from the Judge.

21   He's going to instruct you that a black-letter rule in

22   patent law, okay?  Black and white, is if your patent --

23   if the inventions that you claim to be your inventions,

24   if they were publicly disclosed by anyone, including the

25   folks at Yale and working with Dr. Gelernter, it doesn't

1    matter.

2              If they were publicly disclosed more than

3    a year before they filed the patent, which was June of

4    '96 -- so we'll go back to June of '95.  That's a year

5    before they ever filed for their patent application.

6              If their inventions were publicly

7    available and disclosed prior to June of '95, they're

8    invalid, okay?

9              So we're going to put on evidence, and

10   we're going to present evidence from witnesses that

11   developed these systems more than a year before

12   Dr. Gelernter.

13             And you know what?  The Patent Office

14   didn't have them.  The Patent Office never considered

15   these references.  They never considered the testimony

16   of these individuals who we're going to show you, and

17   they're going to testify here today -- in this trial.

18   They never showed you the references.  They never showed

19   you the videos.

20             That information was never provided to

21   the Patent Office, and the Patent Office didn't consider

22   it.

23             So how could the Patent Office possibly

24   say that Dr. Gelernter and his colleagues at Yale were

25   the first ones to develop these concepts, when they

1   didn't have any other — other witnesses and going to/

2   before them?

3              They didn't consider it; they never did.

4   And you folks are the only ones that can do that.

5   That's why we're asking you, and we're going to present

6   this evidence to you and show you that this was done

7   well before.

8              Here we go right here.  Look at that.

9   Doesn't that stream of documents look very familiar?

10  It's Figure 1 from the patent.  It looks just like it,

11  doesn't it?

12             This was 1979 at MIT.

13             1979, 17 years before Dr. Gelernter?

14  17 years.  And that's at MIT.

15             And you've got MEMOIRS.  MEMOIRS is a —

16  is a time-ordered sequence, a diary of everything in a

17  computer, and you're going to hear from Professor

18  Lansdale on that.

19             Why don't we play — I'm going to show

20  you a video clip of Apple's own work, okay?  The Piles

21  System that we think that they infringed, I'm going to

22  show you a short little clip on that.

23             Can you play Clip 11?

24             (Video clip played.)

25             MR. RANDALL:  Stop it.

 1      than four years before he filed his patent application.

 2                   All right.  Go ahead.  And this is --

 3      you're going to hear from her in this trial, and she's

 4      going to testify.

 5                   Go ahead.

 6                   (Video clip played.)

 7                   MR. RANDALL:  Okay.  There are a lot of

 8      things here --

 9                   THE COURT:  You have about five minutes

10      left, Mr. Randall.

11                   MR. RANDALL:  Thank you, Your Honor.

12                   A lot of issues here that invalidate

13      these patents.  You have a stack of documents, date

14      ordered.  You can order them by color as well.  They get

15      darker at the bottom, and all of that will be explained

16      to you not only by the Apple employees but also by the

17      expert.

18                   Can you show Clip 12, please?

19                   And this is -- this is, by the way, other

20      work by Dr. Lucas at MAYA, and you're going to see and

21      hear from him as well.

22                   Can you play this clip?

23                   (Video playing.)

24                   (Video stopped.)

 1           MR. RENDAL:  This work was done years
 2   before the work by Dr. Gelernter, and it shows a whole
 3   range of documents.  It shows them going back into the
 4   depth or back into the stream, receding back, organized
 5   by date, sorting by substreams and so forth.  It
 6   invalidates the patent.
 7           Now, you're going to hear about a host of
 8   other issues in this case, about these patents.
 9   Dr. Gelernter wasn't even listed on the patent as an
10   inventor.  So you're going to hear all this evidence
11   about him being an inventor in this, and he was added
12   later, but he wasn't added for some time.
13           And so all this idea about him coming up
14   with all of these ideas, he wasn't added for some time
15   as an inventor.  And I don't know what happened there.
16   We're going to find out, I suppose.
17           The government funded this.  The
18   government funded the work at Yale, and yet nowhere was
19   that provided to the Patent Office, and it doesn't
20   appear on the patent either that it was government
21   funded, even though that's a requirement.
22           And they even licensed the government.
23   The government has a license to these patents already
24   because they funded it, and then later Mirror Worlds
25   extracted licensing fees from the government.

1                you're going to hear about the value

2   of the patents because it's important.  The issue on the

3   value of the patents is, what would they sell for at a

4   certain time or what could you get a license for at a

5   certain time?

6              And, frankly, you're going to hear

7   evidence that they were transferred for $600,000 on one

8   date -- the whole thing.  Not just a license, but the

9   whole thing.  And then later they were transferred when

10  Mirror Worlds' company failed, because they really

11  didn't have anything new to offer anybody else.

12             Those patents -- not a license to those

13  patents, but the patents were sold, all of them, lock,

14  stock, and barrel, for like $210,000.  That's what they

15  were sold for.

16             So when Mr. Carroll talks about sitting

17  down and negotiating a deal, well, if Apple had sat

18  down -- if Apple had a meeting, to which it didn't.  If

19  it did sit down to take a license to those patents, it

20  would have been something less than 210,000, because it

21  would have been a license.

22             And that's when the negotiation takes

23  place.  The negotiation takes place when they would have

24  accused Apple of infringement, and you sit down and you

25  cut a deal on that date.  You don't wait until Apple is

1

2              But the bigger -- bigger issue in this

3 case, and I think you're going to find after you hear

4 all the evidence, is that Apple simply uses a

5 fundamentally different concept.

6              You saw the library example.  Apple puts

7 all of its documents, using file names, in folders and

8 in subfolders.

9              And how does Apple allow its users to

10 find that information?  By indexing the information and

11 being able to search for the information.  That's how

12 Apple does it.

13              Apple does not do it the fundamentally

14 different way -- and I agree with that; it's

15 fundamentally different -- of taking all the data,

16 taking it all out of the folders, and just putting it

17 all in one stream and never using file names and never

18 using folders.

19              Apple doesn't infringe these patents, and

20 they are invalid.  And I thank you in advance for your

21 time and consideration in this case.

22              THE COURT:  Thank you, Mr. Randall.

23              All right, Ladies and Gentlemen of the

24 Jury, the next thing we're going to do, now that you've

25 heard opening statements, we're about to start the

1    evidence.

2                     But before we do that, I want to swear in

3    all of the witnesses that are going to be testifying.

4    So if you're a witness that's going to be testifying in

5    this case, if you would, please stand.

6                     If you have any witnesses in the hallway

7    that are not in the courtroom, please ask them to come

8    in.

9                     If you're going to be testifying as a

10   witness, please raise your -- please stand.

11                    MR. CARROLL:  We have one that's in the

12   hall, Your Honor.

13                    THE COURT:  All right.

14                    All right.  Let's start here (indicates)

15   and just state your name for the record, please, and

16   work on back.

17                    WITNESS:  David Gelernter.

18                    WITNESS:  Tribble.

19                    WITNESS:  John Levy.

20                    WITNESS:  Walter Bratic.

21                    WITNESS:  Steve Feiner.

22                    WITNESS:  Keith Ugone.

23                    THE COURT:  Okay.  Is that all of them?

24   Did we get the one from the hallway?

25                    MR. CARROLL:  I haven't seen him come in

```
 1   cat. Kong, Jjoyeo.
 2                  THE COURT:  Okay.
 3                  MR. CARROLL:  But I know he's here,
 4   because I ran him out earlier.
 5                  THE COURT:  All right.
 6                  (Pause in proceedings.)
 7                  THE COURT:  All right.  Please raise your
 8   right hand to be sworn.
 9                  (Witnesses sworn.)
10                  THE COURT:  All right.  Thank you.
11                  Now, the Rule has been invoked, which
12   means that if you're a witness in the case, and you're
13   not an expert or you're not a party representative, then
14   you have to remain outside of the courtroom during the
15   course of the trial, and you can't discuss the case with
16   anyone other than the attorneys involved in the case.
17                  So I believe that -- do we have the other
18   witness?
19                  No?  Okay.  No.  All right.
20                  I believe if -- if you're -- if you fall
21   in that category, if you're not an expert or you're not
22   a party representative, then you need to leave the
23   courtroom at this time.  Otherwise, you may be seated.
24                  (Witnesses leave the courtroom.)
25                  THE COURT:  All right.  Very well.
```

1    the beginning of each day, I allow the attorneys -- they

2    meet and confer, and they -- they have their exhibits

3    that they're going to use during that day or that

4    they're going to use during the trial; and if the other

5    party has no objections to them, then I just let them

6    offer those en masse.

7          So does Plaintiff have any exhibits that

8    they wish to offer at this time?

9          MR. CARROLL:  We do, Your Honor.  I'm not

10   sure who's going to handle that for us.

11         Do we have our list of exhibits?

12         We have them, Your Honor.  Nobody wants

13   to admit to having them.

14         Here we go.

15         THE COURT:  All right.  What exhibits

16   does the Plaintiff offer?  And if you have them on a

17   list, you can just tender the list, if you've provided

18   it to the other side.

19         MR. CARROLL:  That's -- may we do that,

20   Your Honor?

21         Do you want me to read them into the

22   record?

23         THE COURT:  Well, you don't need -- if

24   you've got them on a list that you can submit as an

1   exhibit, you can just file the list if they've both reviewed it and they're in agreement with you.

2   reviewed it and they're in agreement with you.

3          MR. CARROLL:  Your Honor, may we give you

4   the list as soon as somebody writes it down?

5          THE COURT:  All right.

6          MR. CARROLL:  I apologize.

7          THE COURT:  Defendants, are you

8   prepared -- do you have -- are you prepared -- do you

9   have your list of exhibits?

10          MR. PLATT:  Yes, Your Honor.

11          THE COURT:  All right.  If you would,

12   bring it up.  And you've exchanged that with counsel?

13          MR. PLATT:  I will get them -- we've

14   talked about those, and I'll get them a copy of that

15   list.

16          THE COURT:  Okay.  Now, here's what needs

17   to happen.  Y'all need to get together before you come

18   in and go over the list, and I'm getting ready to ask

19   Mr. Carroll if they have any objection to your exhibits;

20   and if he hasn't seen the list, I bet his answer is

21   going to be:  I don't know, right?

22          MR. CARROLL:  That's correct, Your Honor.

23          THE COURT:  Okay.  So -- and let's get

24   this straight over the noon hour, and when we come back,

25   we'll take care of that.

MR. PLATT:  Yes, Your Honor.

1

2                    THE COURT:  And this will save us a lot

3    of time, because we'll get these all in rather than

4    offering them one at a time in the trickle effect.

5                    All right.  Plaintiff may call its first

6    witness.

7                    MR. CARROLL:  We call Dr. Gelernter, Your

8    Honor.

9                    THE COURT:  Dr. Gelernter.

10                   How is the jury doing?  Anybody need a

11   break before we start?

12                   Okay.  All right.  We'll go for about 45

13   minutes, until probably about 11:45, and then we'll take

14   our lunch break.

15                   MR. CARROLL:  If the Court please, Your

16   Honor.

17                   THE COURT:  You may proceed.

18                   MR. CARROLL:  Thank you, Your Honor.

19    DAVID GELERNTER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

20                        DIRECT EXAMINATION

21   BY MR. CARROLL:

22       Q    Dr. Gelernter, will you introduce yourself to

23   the jury over here, please?

24       A    I'm David Gelernter.  I'm a professor of

25   computer science at Yale University in Connecticut.

1        I introduced you to the jury a little bit ago,

2   and I also introduced your wife, Jane.  How long have

3   you two been married?

4        A     We've been married 25 -- 26 years.

5        Q     You really need to get that one right.

6        A     I do.  I'm sorry.  I'm sorry.

7        Q     Even professors need to get that one right.

8        A     You have a point.

9        Q     Are there more Gelernters in the household

10  than you and Jane?

11       A     Yeah.  We have two boys.  Daniel is 23, and

12  Josh is 20.

13       Q     Let me ask you this before we get too much

14  further down the road.

15             I wrote down this quote from the screen while

16  Mr. Randall from Apple was talking to the jury, and you

17  heard it, too.  It was Steve Jobs, and the quote I wrote

18  down was:  We've got zillions of file folders, but we

19  can't find anything.

20             Did you hear Mr. Jobs up on the screen saying

21  that?

22       A     Yes, I did.

23       Q     Do you agree with Steve Jobs that one of the

24  problems of computers is that we have zillions of file

25  folders, but we can't find anything?

2     Q     Is that what your invention is all about?

3     A     One of the main things, one of the important

4  things it's all about.

5     Q     Okay.  And when Mr. Jobs said that the

6  solution to that was in this feature that he calls

7  Spotlight, is that what you've sued in this case?

8     A     That's one of the things, right.

9     Q     Okay.  How old a fellow are you?

10    A     55.

11    Q     Can you tell us a little bit about your

12  background, where you grew up, what your folks did, that

13  kind of thing?

14    A     Well, let's see.  I grew up in -- near New

15  York City, in the suburbs around New York City.  My

16  father, a physicist by training, was one of the first

17  computer scientists, one of the inventors of computer

18  science and artificial intelligence.  So I grew up

19  around computers.

20    Q     Let me interrupt you right there.

21          Would you tell the jury what -- in the world

22  of computers, what the term artificial intelligence

23  means?

24    A     Well, artificial intelligence, there's

25  argument about the definition.  It comes down to

1  attempting to make the computer act in such a way that

2  if a person were to do it, you would call it

3  intelligent, as opposed to automatic, routine.

4      Q    Is that the world of -- the part of the

5  computer world that your dad was involved with?

6      A    He was one of the inventors in the late 1950s,

7  right.

8      Q    Dr. Gelernter, did any family member of yours

9  have an experience with computers that kind of drove you

10  in the direction that you went to end up with these

11  three United States patents?

12      A    When I -- when I did finally start -- start --

13  pick out computer science to concentrate on, after I met

14  my wife, Jane, she was a guideline for me from the very

15  beginning.

16          She represents for me the sort of computer

17  user who is a highly intelligent -- highly intelligent

18  person, who doesn't take to computers, who doesn't enjoy

19  playing with them, doesn't have any particular feel for

20  computers, who is intimidated by computers.

21          And it seems to me that my job -- our jobs in

22  general as computer scientists is to make computers

23  easy, pleasant, natural to use for people like Jane,

24  so -- so the burden is not on her to figure out what's

25  going on; the burden is on the computer to make things

1  easy for her and other people who don't have the time,

2  the attention, or the interest to worry about the

3  intricacies of the operation.

4      Q    Well, let me ask you this:  Have you -- have

5  you made any progress with Jane?  Is she any closer to

6  being a computer person than she was when you married

7  her?

8      A    She's no closer to liking computers, but

9  she -- we sure made progress with Lifestreams.

10     Q    Okay.  Good.

11     A    She was always our benchmark.

12     Q    I told the jury you didn't start out being a

13 computer guy or trying to be a computer guy.  Would you

14 tell the jury a little bit about that?

15     A    My background as a college student in the

16 first years of my graduate study were in theology and

17 Bible and Judaism.

18     Q    And where did you do your undergraduate

19 studies?

20     A    At Yale.

21     Q    What caused you to switch gears from being a

22 rabbi or a preacher to become a computer scientist?

23     A    Well, I never entirely switched gears.  I

24 still write about and lecture about the Bible and

25 religion.  It was mainly a practical matter.  A man has

1    responsibilities to support his wife and family and

2    jobs for -- in teaching, in teaching theology and Bible

3    are just hard to find.  They were and are.

4        Q    All right.  Is there any overlap in those two

5    disciplines, as far as you can tell?

6        A    There is kind of an overlap in that anybody

7    who comes out of the world of theology knows

8    something -- you know, also, and you know Jane, which is

9    that finding computers intimidating doesn't mean you're

10   dumb.

11            Finding them difficult to use or a nuisance to

12   use doesn't mean you don't have the intelligence to

13   operate them.  Some of the very smartest and deepest

14   people I know in fields like theology and Bible, like

15   Jane, don't like computers, don't get along with them,

16   find them hard to use.

17            And I, too, often found people in computer

18   science dismissing that whole population as being not

19   smart enough to deal with our software.  It seems -- it

20   seems to me, the problem is with our software, if

21   they're having trouble.

22       Q    So it's not the people who aren't smart enough

23   to work the computer; it's the computer isn't smart

24   enough to adapt to the folks?

25       A    The computer and the -- and the -- and the

1    people who build it aren't smart enough to understand

2    the needs of the users.

3        Q    All right.  The jury saw the cover page of

4    your book Mirror Worlds that you wrote in 1991.  Have

5    you written other books?

6        A    I've written other books, maybe a dozen or so

7    in total.

8        Q    How many of them deal with computers?

9        A    Five -- five, six, depending on how you count.

10       Q    All right.  Do you write textbooks, that sort

11   of thing?

12       A    A couple of textbooks dealing with advanced

13   topics in software.

14       Q    And you write about things other than

15   technical matters, do you not?  You wrote about the 1939

16   New York World's Fair, did you not?

17       A    I wrote about the 1939 New York World's Fair.

18   The last two books I've published were about Americanism

19   and about Judaism.

20       Q    Okay.  Have you written any -- what some folks

21   would call scientific articles?

22       A    Many.  Scientific, not only insofar as they

23   were aimed at scientists but about scientific topics for

24   a broader readership.

25       Q    Have you been asked to write technical

1   articles by regarding editors of magazines that you might

2   recognize?

3       A    Sure.  Time magazine, for example, some years

4   back was doing a series of profiles of leaders of the

5   technology and computing industry, and they asked me to

6   write a piece about Bill Gates, who was -- they had --

7   the head of Microsoft and one of the really prominent

8   people in the field.

9       Q    So Bill Gates is to Microsoft what Steve Jobs

10  is to Apple?

11      A    Fair enough, yes.

12      Q    And you wrote about him?

13      A    I wrote about him.

14      Q    You told us -- or I told the jury, I guess,

15  that you had a Ph.D., a doctorate.  Tell the jury about

16  that.

17      A    Well, a Ph.D. or doctorate is -- is a degree

18  that -- that -- that is a kind of certification that

19  says that the college issuing the degree believes that

20  you are qualified to go out and do research and to teach

21  this field to college students and to graduate students.

22      Q    So -- and by the way, do you mind moving that

23  mic just a tad closer?

24      A    Yeah.  (Complies.)

25      Q    Thank you.

2          Okay.

3     Q    (By Mr. Carroll) All right.  But I got to warn

4  you, don't get too close or you'll buzz.

5     A    Yeah.  Okay.

6     Q    Okay.

7     A    Right.

8     Q    Where did you get your doctorate from?

9     A    From the State University of New York at Stony

10  Brook.

11    Q    Is that a public university?

12    A    It's a public state university, yes.

13    Q    So when did you end up at Yale?

14    A    That's kind of complicated.  I was an

15  undergraduate at Yale.  I began as a graduate student in

16  Bible at Yale.  Then I moved to Stony Brook to study

17  computer science, came back to Yale as a -- as a

18  professor on the faculty in computer science.

19    Q    And -- and that's what you do today.

20    A    That's what I do today.

21    Q    Let me ask you something before I forget about

22  it.  Mr. Randall over here said something about the

23  government, the United States Government, paying you to

24  come up with your inventions; is that true?

25    A    No, that is -- that's false.  The -- the

 1   government -- we did have -- we did have government
 2   research support for certain research projects.  We do a
 3   bunch of different things at Lifestreams, and associate
 4   work is only one of them.  We never got any government
 5   funding to support this Lifestreams research.
 6       Q    He also told the jury that the government has
 7   a license to the three patents that the Patent Office
 8   issued to you and to Dr. Freeman; is that true?
 9       A    Not that I know of.
10       Q    But if they do, that's the same patent that
11   Apple wants to kill if the government, in fact, has a
12   license, correct?
13       A    Right.  Yep.
14       Q    When -- when a person wants to get a Ph.D.,
15   does she or he have to write a paper or do research or
16   do something that's reviewed by the professors?
17       A    Well, in a -- in a scientific field in
18   general, you do -- do you a piece of research that is
19   regarded as original by the faculty, and then you write
20   it up in a -- in a dissertation or something like a
21   thesis, Ph.D. thesis, which may be 100, 150, 200
22   some-odd pages.
23            And then you defend the thesis, in effect,
24   convincing the faculty or the department that your work
25   is new and that your understanding of the field is solid

1   and that you deserve to be granted this degree.

2       Q    That sounds an awful like the patent process

3   to me.

4       A    True.  Yeah.  True enough.  It is in many

5   ways.

6       Q    Did you do one of these dissertations at Stony

7   Brook?

8       A    Yes, I did.  Anybody who has a Ph.D. does.

9       Q    What was your Ph.D. dissertation at Stony

10  Brook about?

11      A    It was on a system that allowed computers to

12  communicate with each other conveniently, computers that

13  were connected in a network, a topic that's called

14  parallel programming or distributed programming or

15  network programming, a system I designed called Linda.

16      Q    Now I'm going to put you on the spot here.

17  Tell the jury in front of your wife who Linda was.

18      A    A girlfriend from --

19      Q    Before you met Jane.

20      A    From before.  From before.

21      Q    All right.

22      A    Long ago.

23      Q    Does -- does Linda -- or did Linda have

24  anything to do with the ideas that became the three

25  patents that we're suing Apple over?

1       The paper didn't -- and the research is separate.

2   It's a separate project.

3       Q    Okay.  But I guess my question is -- I didn't

4   ask it very well -- do -- do -- did the ideas that you

5   came up with and presented in your doctoral thesis that

6   you call Linda, do those ideas have anything to do with

7   the three patents that we're suing Apple over?

8       A    They lead -- they lead into a research project

9   I called Mirror Worlds, and Mirror Worlds leads into

10  Lifestreams.  So these projects flow together into -- in

11  a natural -- in the natural course of work.

12      Q    But they're not the same?

13      A    They're not the -- they're not the same.

14      Q    Okay.  When did you do the research for Linda?

15      A    The research for Linda was while I was a

16  graduate student, toward -- towards the end of that

17  period, which was in the early 1980s, 1980, '81, '82.

18      Q    Okay.  And Apple showed us a clip from

19  President Reagan back in the early '80s.  '80, '81, when

20  you were doing this research to write your paper, was

21  there an internet?

22      A    In -- the internet -- the internet as such was

23  just getting underway in 1982, '83.

24      Q    Was there a worldwide web?

25      A    No.  The worldwide web didn't -- didn't come

1   into existence until the later -- until the 1990s.

2       Q    Were there personal computers like the Macbook

3   Pro?

4       A    Nothing like the Macbook Pro.  We were -- in

5   the early '80s, at the very beginning, the very

6   beginning of the personal computer period, the IBM PC,

7   1981, the Mac, I think, was 1984.  So this was the --

8   the opening -- opening phase.

9       Q    Okay.  Was Linda designed for whatever

10  personal computers which existed at the time, or was it

11  designed for something bigger?

12      A    Linda was really intended for larger

13  computers.  Not for individual users, but for

14  scientists, engineers, researchers, who had the large

15  programming problems.  They needed to run fast.

16      Q    The three patents we're suing Apple over in

17  this case, are they personally designed for personal

18  computers like this one or for the bigger computers like

19  Linda was created for?

20      A    It was aimed at exactly the users and the

21  users of that machine.  Not scientific or technical

22  users, but users like my wife, users who -- everyday

23  users of computers.

24      Q    Did anybody in the world of computers, any of

25  the companies, take interest in Linda?

1   There was a lot of interest in Linda as the

2   1980s went on.  Not -- not immediately, but -- but,

3   yeah, there was considerable interest by the end of the

4   '80s.

5        Q    To the point where anybody used it?

6        A    Linda was widely used.  I would say all over

7   the world, especially in two areas, in certain kinds of

8   scientific computations, particularly molecular

9   dynamics, which had to do with drug design and

10  pharmacology, and was and continues to be widely used in

11  financial-services-type companies.

12       Q    Did you apply for a patent on -- excuse me --

13  on the Linda idea?

14       A    Never occurred to me.

15       Q    Okay.  Dr. Gelernter, would you explain to the

16  jury your philosophy about the relationship that ought

17  to exist between people and machines, such as computers?

18       A    When you deal with a machine, the burden of

19  making your dealings simple, easy, natural should fall

20  on the machine.  It should be up to the machine; to be

21  up to the machine, to be simple to use, natural to use,

22  easy to use.

23       Q    Tell the little -- little -- tell the jury a

24  little about your writing of this Mirror Worlds book.

25       A    My thought in writing Mirror Worlds was that

 1   everybody thought of the entire world, Filed 10/20/10

 2   which we live, the world of institutions that we deal

 3   with, of the companies we work for, the schools we go to

 4   would be mirrored, mirrored in the computers of the

 5   internet the way a small village in New England is

 6   mirrored in the still service of a mill pond.

 7           It would be mirrored in all its action, in all

 8   its liveness, and the software that -- in which it would

 9   be mirrored would be as easy to use as a mirror.  You

10   just look at it, you would look at your computer screen,

11   and you'd see one part of the world there or some part

12   that you needed to deal with or some part that you were

13   interested in.

14       Q   Let me read you this little blurb from the

15   prologue to your book, and I'd ask you to explain to the

16   jury what you were talking about.  And this was back in

17   1991, right?

18       A   Right.

19       Q   That's right after the Berlin Wall fell.

20       A   Yep.  Right.  Right.  Right.

21       Q   That seems like a long time ago, doesn't it?

22       A   Yes.

23       Q   All right.  Let me read this to you and to the

24   jury, and then I want your comments.

25           People are drawn to software gadgets.  When

1    you switch on, and then the world.  Like a 1942
2    sweater, inside out.

3            You stuff the huge multi-institutional rat
4    work that encompasses you, into a genie bottle on your
5    desk.  You can see over it, under it, and through it.
6    You can see deeply into it.

7            A bottled institution cannot intimidate,
8    confound, or ignore its members.  They dominate it.

9            Who's the they?

10   A    Users, citizens.  Users of computers; citizens
11   of the nation.

12   Q    Who's the it?

13   A    It?  The insti -- the -- the bureaucracy, the
14   institutional bureaucracy with which we deal, all the
15   institutions that we deal with in our daily lives.

16           But I feel exactly the same way when it is the
17   computer.  I -- I -- I will not tolerate and I don't
18   think any American should tolerate being dominated or
19   pushed around by the institutions with which I deal in
20   this democracy.  And I don't think a user should be
21   pushed around by the computer he deals with.

22   Q    Did your book get a lot of buzz, a lot of
23   attention?

24   A    It's fair to say, yes, it did.

25   Q    The jury is going to hear a little bit later

1    on the case, about an article that I believe the New

2    York Times wrote about it.  Can you tell the jury about

3    that?

4        A    That was an article by John Markoff, who

5    wasn't -- he was a technology reporter for the New York

6    Times.

7             It was a -- it was a large splashy piece in

8    the Sunday New York Times on the front page of the

9    business section, and John Markoff wrote in that piece

10   about -- about the book Mirror Worlds and the idea and

11   also about our previous work on Linda and computer

12   communication.

13       Q    Was all the attention you got after writing

14   the book a positive?

15       A    Not hardly.

16       Q    Tell the jury about that.

17       A    Well, whereas any book has its -- has its

18   critiques, as well as its admirers, but there was also a

19   terrorist attack that was -- on me that was associated

20   either with the publicity for the book itself or with

21   this very prominent New York Times story that was about

22   the book.

23       Q    And tell the jury a little bit about that.

24       A    A mail bomb was -- was sent to me, and it

25   looked a lot like a Ph.D. dissertation somebody might be

```
 1      pending one.  Opened it up -- It blew up --

 2              Do you -- do you --

 3      Q     Go ahead.

 4      A     I was pretty badly hurt.  There was nobody in

 5      the building because I tended to come to my office

 6      early, which -- which at Yale is a quarter after 8:00.

 7      There was nobody there.

 8      Q     That's early?

 9      A     That's early at Yale University.  I was sort

10      of a weirdo for doing that.

11              There was nobody -- there was nobody else in

12      the building, so I decided I better walk, if I could, to

13      the -- to the health -- to the clinic, which, thank God,

14      was nearby.

15              And -- and -- and I did, arriving, I'm told,

16      with a measured blood pressure of zero.  And from --

17      from there into an ambulance and weeks of surgery that

18      are -- more or less have disappeared from my mind, and

19      the ICU on the critical list and so forth.  And thank

20      God, later in the summer, I started to recover.

21      Q     And that -- and that was June of '93?

22      A     That was June of '93.

23      Q     As a matter of fact, you were one of two

24      victims attacked on the same day, were you not?

25      A     Yes.  There was also a distinguished
```

1    geneticist, at the University of California at San

2    Francisco.

3       Q    Now, you've heard Apple's lawyer, 20 days ago,

4    refer to that as an accident.  Was that an accident?

5       A    That was the farthest thing from an accident I

6    think I've ever encountered.  The guy was trying to kill

7    me, and he came pretty close.

8            The next -- his next target died.  The

9    geneticist and myself were lucky.

10      Q    How long were you recuperating in the hospital

11   after that attempt on your life?

12      A    Oh, I was in the hospital for a good part of

13   the summer.  I guess the bomb was towards the end of

14   June, and I was in the hospital through sometime in

15   August, I think mid-August.

16           You asked about recovery.  Some injuries are

17   permanent and will never be recovered.  Some -- some

18   damage is still under treatment.  But the really

19   difficult period of getting things -- getting myself

20   pieced back together to the extent that was possible

21   took about a year, roughly a year, from June '93 to June

22   '94.

23      Q    Now, I told the jury a little while ago that

24   during this period of recovery, you worked on putting

25   the ideas in that Mirror Worlds book into action in

1    terms of the modern patents, isn't that true?

2      A    Yes, in the sense that Mirror Worlds refers,

3    in a very vague and preliminary way, to the ideas that

4    became -- that were eventually expressed in those

5    patents.

6           But Mirror Worlds is a huge -- a huge, very

7    ambitious project dealing with the whole world, getting

8    the whole world under control, and the way the worldwide

9    web really encompasses the whole world.  And that's why

10   the book is to have forecasted all that.

11          But when somebody tries to kill you and nearly

12   succeeds, it brings you down to earth, or it did me,

13   anyway, and focuses your attention on -- on -- on things

14   that are more local and near to home on -- on -- on the

15   span of a life, on one life span, one lifetime, and this

16   was a period in which Lifestreams -- the idea of

17   Lifestreams emerged as a mirror not of the whole world

18   but of one person's life, short or long.

19          So it was still just preliminary.  I mean, it

20   certainly wasn't the patents or the material in the

21   patent, but this idea of -- of -- of mirroring --

22   mirroring one person's life emerged during this period.

23     Q    All right.  Let me ask you this:  You were

24   sitting right here next to me when you and I and the

25   jury saw some of the slides that Apple put up on their

1       opening and cose of them was the library slide.

2                  Do you remember that one?

3       A       Yes, I do.

4       Q       And do you remember that Mr. Randall, Apple's

5       lawyer, told the jury that one of the things that made

6       your invention special was that it involved or included

7       this Lifestreams concept.

8                  You heard him say that.

9       A       I did.

10      Q       Is that true?

11      A       I can't -- I can't accept the slide as it was

12      explained.

13      Q       Well, I understand that.  But did your concept

14      of Lifestreams involve, just like my life, a past,

15      today, the present, and hopefully, tomorrow, the future?

16      A       Yes, absolutely.

17      Q       Why -- why is that important for the jury to

18      understand that simple concept in trying to understand

19      what your patents are?

20      A       Well, there's several aspects to it.  The --

21      one, and one of the most important, is that when I look

22      in that library, I look at a collection of books, and I

23      ask, where should I look for this book, if everything is

24      in one -- in one stream, that answer always has one

25      question (sic):  It's in the stream.  You don't have to

1   carry about, decide, it's up here or over there, over
2   there.

3              So one aspect of this is just one place to go,
4   one place to turn.

5              The idea of a diary, the idea of a lifestream
6   mirroring a person's experience reflects the fact
7   that -- and this is true for all of us.  We experience
8   life day by day, hour by hour.  That's the way life is
9   arranged.  We flow through time.

10             Life is organized in time.  Everybody knows
11  what a diary is.  Everybody knows what a journal is.
12  When I think about my life, I know what I was doing
13  yesterday and last week.  I know what I'm doing today.
14  I know what appointments I have tomorrow.  I know maybe
15  what I plan to do a week from now.

16             So it -- I wanted software to be simple,
17  intuitive, natural.  I wanted you to be able to
18  understand in 30 seconds how it worked.  I wanted it to
19  use natural human ideas rather than esoteric, technical
20  ideas.

21             Everybody knows -- everybody knows what a
22  diary is, and it's important; it's easy; it's natural.

23     Q    By the way, did you keep a journal while you
24  were in the hospital recovering from your -- the attempt
25  on your life?

1       A     I have difficulty of not being able to write

2  during that period, but I would have.  I would have.

3       Q     I want to go back to the question I asked you

4  about 20 minutes ago, and that is, your agreement with

5  Steve Jobs on the screen that -- and this is in 2004, I

6  believe Mr. Randall said.  How many years after your

7  patents would that have been?

8       A     The patent -- the first patent was filed in

9  '96 and granted in '99.

10      Q     So that would have been at least five years

11  after your patented invention that he said:  We have a

12  zillion file folders, but we can't find anything.

13  And you agreed with him that that was a problem.

14      A     Absolutely.

15      Q     Now, tell the jury why that has -- that

16  problem has nagged at you and led you to invent what you

17  invented, the whole idea.  And start from the premise

18  that not all of us in the courtroom are computer folks,

19  me included.

20      A     I think you're asking two questions about the

21  problem, the nature of the problem, and the particular

22  solution that I had --

23      Q     Let me -- let me -- if I can, let me start by

24  asking one.

25            Tell the jury what the concept of files,

1    Files and folders  F-O-L-D-E-R-S -- just like each
2    juror has a folder in her or his lap.  How does that
3    work in the world of computers?  How do those same
4    folders work in computers?

5        A    Well, it's a little more complicated, as you
6    would expect, because a computer is there to handle
7    enormous amounts of information and doesn't have to play
8    by the rules that govern our use of physical objects.

9             So the world of files and folders is -- is a
10   world of containers within containers within containers.
11   If you picture a mess of Tupperware containers, and
12   you've got big ones, and there are little ones inside
13   those, and there are smaller ones inside those, the
14   world of files and folders is a world -- first of all, I
15   don't have any librarian to arrange it for me.

16            The world of files and folders is a world I,
17   the owner of the computer or the user of the computer,
18   arrange.  I decide, you know, what are the major
19   categories for my information?

20            And there's going to be a box labeled bills,
21   and there's going to be a box labeled medical
22   information, and maybe there's going to be a box labeled
23   Jane's stuff, if she -- if she's not using the computer,
24   and I'm using it for her.

25       Q    Okay.  I want to interrupt you.

couple of demonstratives that I'd like to ask permission

for Dr. Gelernter to come down so he can see them in

front of the jury.

THE COURT:  All right.  And, Mr. Carroll,

we're getting toward the time to break for lunch,

so whenever you --

MR. CARROLL:  This would be a perfect

spot.

THE COURT:  All right.  Well, I think

we'll take our recess at this point then.

Ladies and Gentlemen of the Jury, we're

going to be in recess until 1:00 o'clock, so that will

give you an hour and 15 minutes to sort of learn your

way around town and find where you'd like to eat.

There are several places on the Square.

There's a Subway.  There's a hamburger place, a Mexican

food place.

Please plan to be back and ready to go at

1:00 o'clock.  We'll try to start shortly at 1:00.

Please remember my instructions.  Don't discuss the case

among yourselves or with anyone else during your break.

And we'll take this hour and 15 minutes for lunch.

Tomorrow we'll probably try to do it in

about an hour, so -- but we'll give you a little extra

1    time today.  So we'll recess then until 1:00 o'clock.

2                   COURT SECURITY OFFICER:  All rise.

3                   (Jury out.)

4                   (Lunch recess.)

5                        CERTIFICATION

6

7              I HEREBY CERTIFY that the foregoing is a

8    true and correct transcript from the stenographic notes

9    of the proceedings in the above-entitled matter to the

10   best of our abilities.

11

12

13   /s/_____
     SHEA SLOAN, CSR                    Date
14   Official Court Reporter
     State of Texas No.:  3081
15   Expiration Date:  12/31/10

16

17
     /s/_____
18   JUDITH WERLINGER, CSR              Date
     Deputy Official Court Reporter
19   State of Texas No.:  731
     Expiration Date  12/31/10
20

21

22

23

24

25