1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
2                              TYLER DIVISION

3    MIRROR WORLDS, LLC          *   Civil Docket No.
                                 *
4                                *   6:08-CV-88
     VS.                         *   Tyler, Texas
5                                *
                                 *   September 28, 2010
6    APPLE, INC., ET AL          *   1:30 P.M.

7

                        TRANSCRIPT OF JURY TRIAL
8                           AFTERNOON SESSION
                  BEFORE THE HONORABLE LEONARD DAVIS
9                  UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11                          FOR THE PLAINTIFF

12   MR. JOSEPH DIAMANTE
     MR. KENNETH STEIN
13   MR. IAN G. DIBERNARDO
     MR. ALEXANDER SOLO
14   MR. CHARLES E. CANTINE
     STROOCK & STROOCK & LAVAN
15   180 Maiden Ln.
     New York, NY  10038
16
     MR. OTIS CARROLL
17   MR. PATRICK KELLEY
     IRELAND, CARROLL & KELLEY
18   6101 S. Broadway, Ste. 500
     Tyler, TX  75703
19

20   COURT REPORTERS:
     MS. SHEA SLOAN, CSR
21   MS. JUDY WERLINGER, CSR
     Official Court Reporters
22   211 West Ferguson, Third Floor
     Tyler, TX   75702
23   903/590-1171

24   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
25

1

2

FOR THE DEFENDANTS

3    MR. JEFFREY G. RANDALL
     MR. RAYMOND YU
4    MS. ERICKA J. SCHULZ
     PAUL HASTINGS
5    1117 S. California Ave.
     Palo Alto, CA  94304-1106
6

7
     MR. ALLAN M. SOOBERT
8    MR. BROCK WEBER
     MS. KIM MOORE
9    PAUL HASTINGS
     875 15th St. NW
10   Washington, DC  20005

11

12   MR. S. CHRISTIAN PLATT
     MR. JEFFREY COMEAU
13   PAUL HASTINGS
     4747 Executive Dr.
14   12th Floor
     San Diego, CA  92121
15

16

17

18

19

20

21

22

23

24

25

1       PROCEEDINGS

2                   COURT SECURITY OFFICER:  All rise.

3                   (Jury in.)

4                   THE COURT:  Please be seated.

5                   All right.  Ladies and Gentlemen of the

6       Jury, I apologize for keeping you waiting.  It wasn't

7       any of these attorneys' faults.  I had another case that

8       had to have some attention.  It just went longer than I

9       thought it would.  So I apologize for that.

10                  But we will get started and see what kind

11      of progress we can make.

12                  Mr. Carroll, how did y'all decide you

13      wanted to split that time up?

14                  MR. KELLEY:  Your Honor, I believe that

15      what we're doing is -- they're simply figuring up the

16      number of lines, and it's going to be divided

17      proportionally.  And the people that are working on that

18      will determine the exact percentage and provide it to

19      your staff just like -- if that's okay.

20                  THE COURT:  Okay.  When will you have

21      that?

22                  MR. KELLEY:  We should have it, I would

23      think, sometime the middle of the afternoon.  Probably

24      by the next break.  We'll try.

25                  THE COURT:  All right.  Let me have that.

1    And y'all are charged with 50 minutes so I need to take
2    that off and add it on to them, so let me know, all
3    right?
4                    MR. KELLEY:  Your Honor, I'll be doing
5    the -- the -- reading this part on this deposition
6    for -- because of Mr. Carroll's voice, and Chuck Cantine
7    will be serving as -- reading the part of the witness
8    mainly because the witness is of French extraction, and
9    somebody like me who grew up in Commerce, Texas, should
10   not be pronouncing French words.
11                   THE COURT:  What is the name of the
12   witness?
13                   MR. KELLEY:  The witness is Bertrand
14   Serlet, S-E-R-L-E-T.
15                   THE COURT:  And how much time is this?
16                   MR. KELLEY:  Your Honor?
17                   THE COURT:  How much time is this
18   deposition?
19                   MR. KELLEY:  Probably should be just a
20   few minutes shorter than the last one.
21                   THE COURT:  Okay.  And do you know how
22   you're going to divide that time up yet either?
23                   MR. KELLEY:  We're going to do it the
24   same way, Your Honor.  We're going to do the lines.  We
25   don't have a line count at this time.

1                   THE COURT:  All right.  You may proceed.

2                   MR. KELLEY:  Beginning at -- on Page 5,

3   Line 23:

4                   (Deposition excerpt read.)

5                   QUESTION:  Just so I'm clear, can you

6   tell me all the educational degrees you have?

7                   ANSWER:  So I have a doctorate in

8   computer science from Orsay.  I have a master's in

9   mathematics from Orsay, and a bachelor's in physics from

10  Orsay.

11                  QUESTION:  So all of your degrees are

12  from the University of -- University of Paris in Orsay?

13                  ANSWER:  Yes.

14                  MR. KELLEY:  Going to Page 11:

15                  QUESTION:  Would you please describe for

16  me your professional work experience since receiving

17  your doctorate in computer science?

18                  ANSWER:  Well, as I was receiving my

19  computer science doctorate, I was working with -- at --

20  well, as I was receiving my computer science doctorate,

21  I was working at INRIA, which is a French research

22  institute.

23                  And after that, I left and went to work

24  at Xerox.  And I believe it was from '84 to '88, and

25  after that, at NeXT.  That was -- that was then actually

1    acquired by Appolos.  It's actually very small and

2    concise.

3                  MR. KELLEY:  Going next to Page 79,

4    Line 17.

5                  You there?

6                  MR. CANTINE:  Which page?

7                  MR. KELLEY:  79.  You there?

8                  MR. CANTINE:  Yes.

9                  QUESTION:  Now, we've talked about

10   Spotlight briefly.  What is Spotlight?

11                 MR. RANDALL:  Excuse me for one second.

12                 MR. KELLEY:  I'm sorry.

13                 MR. RANDALL:  Your Honor, for some

14   reason, I thought we were going to Page 26.

15                 MR. KELLEY:  Unless I missed it... oh,

16   actually, I did.  Sorry.

17                 MR. RANDALL:  Okay.

18                 MR. KELLEY:  Hang on just a minute.  I

19   don't -- just a moment, Your Honor.  I don't know that I

20   have -- I don't know that I have the

21   counter-designations of yours.

22                 Do you have one with

23   counter-designations?

24                 Your Honor, it may be at the back bench.

25   May I approach there just for a moment?

```
 1                    MR. RANDALL:  Your Honor, if I may just
 2  provide him a copy of it.  I think we've got an extra
 3  copy.
 4                    THE COURT:  Okay.
 5                    MR. KELLEY:  Does yours have it?
 6                    MR. RANDALL:  I don't think it's the
 7  counter -- I think it's your testimony.
 8                    MR. KELLEY:  I know, but I've got mine.
 9  I just want to make sure I've got your
10  counter-designations on yours.
11                    MS. ELLOUICH:  It should have both.
12                    MR. KELLEY:  Okay.  Go to Page 26,
13  Line 8.
14                    You there?
15                    MR. CANTINE:  Yes.
16                    MR. KELLEY:  Okay.
17                    QUESTION:  When did you say NeXT was
18  required (sic) by Apple again?
19                    ANSWER:  The discussions took place in
20  December '96, and the deal was finalized in the spring
21  of '97.
22                    QUESTION:  What was your first title at
23  Apple that you can remember?
24                    ANSWER:  Well, it was either Vice
25  President or it was Senior Director, and I -- frankly, I
```

1     don't remember what

2                    QUESTION:  Vice President of what?

3                    ANSWER:  I think it was called Platform

4     Technologies at the time.

5                    QUESTION:  Please tell me all the titles

6     that you can remember having at Apple.

7                    ANSWER:  So I think, but I'm not sure,

8     that I was Senior Director for a portion of time and

9     Vice President and Senior Vice President and -- a few

10    years ago.  Probably five years ago.

11                   MR. KELLEY:  Going to Page 31:

12                   QUESTION:  Are you currently a Senior

13    Vice President at Apple?

14                   ANSWER:  Correct.

15                   QUESTION:  Senior Vice President of what

16    group?

17                   ANSWER:  I'm Senior Vice President of

18    Software Engineering.

19                   QUESTION:  And as Senior Vice President

20    of Software Engineering, what are your job duties?

21                   ANSWER:  To make sure that the products

22    that are responsible are shipped and are innovative and

23    to make sure the teams have growth and develop great

24    products.

25                   QUESTION:  What projects are you

1   responsible for?

2                    ANSWER:  I'm primarily responsible for

3   Mac OS X, which is this operating system of the Mac.

4   I'm also responsible for some layers of the OS that go

5   into the iPhone OS, and a number of secondary products,

6   like Mac OS X Server, Apple Remote Desktop, QuickTime,

7   and probably a few others.

8                    QUESTION:  Is it fair to say that your

9   primary -- strike that.

10                   Is it fair to say that the majority of

11  your time currently at Apple is spent on work regarding

12  the Mac OS?

13                   ANSWER:  Correct.

14                   QUESTION:  Mac OS X operating system?

15                   ANSWER:  Correct.

16                   MR. KELLEY:  Going to Page 34:

17                   QUESTION:  Currently, as Senior Vice

18  President, who do you report to?

19                   ANSWER:  I report to Steve Jobs.

20                   QUESTION:  Anybody else?

21                   ANSWER:  No.

22                   QUESTION:  How long have you known Steve

23  Jobs?

24                   ANSWER:  The first time I met him was

25  during my interview for NeXT in September '88 --

```
 1    correct October 18.
 2                 QUESTION:  And do you have people
 3    reporting to you at Apple currently?
 4                 ANSWER:  Yes, I do.
 5                 QUESTION:  Approximately how many?
 6                 ANSWER:  Indirectly, about a thousand.
 7                 QUESTION:  How many Senior Vice
 8    Presidents are at Apple today?
 9                 ANSWER:  I do not know the number.
10                 QUESTION:  Approximately do you know?
11                 ANSWER:  I believe less than ten.
12                 QUESTION:  When you report to Steve Jobs,
13    how is that reporting done:  Verbally, e-mail, phone?
14                 ANSWER:  For clarification, do you mean
15    when I report information or --
16                 QUESTION:  Yes.
17                 ANSWER:  So primarily, the primary means
18    of communication is e-mail, but there's occasional
19    meetings.  And there's regular meetings as well.
20                 QUESTION:  How extensive is your contact
21    with Mr. Jobs?
22                 ANSWER:  It varies.  For the last six
23    months, there has been very little contact, but prior to
24    that, I would see them typically two or three times a
25    week.
```

1        QUESTION:  When you say you would see him

2    two to three times a week, do you mean in person?

3                ANSWER:  Yes.

4                MR. KELLEY:  Now, I believe we go to 79.

5                QUESTION:  Now, we've talked about

6    Spotlight briefly.  What is Spotlight?

7                ANSWER:  Spotlight is a way to search the

8    user's information and to present that to the user.

9                QUESTION:  How does the search work?

10                ANSWER:  That's the back end, which is an

11    engine that has an index which stores the metadata,

12    information like that, information about files, and the

13    engine is exercised from the user interface.

14                And when the user types a query, the

15    engine is exercised and returns a list of results that

16    is presented to the user.

17                QUESTION:  So Spotlight is a search

18    engine; is that accurate?

19                ANSWER:  Search engine is a

20    categorization that includes a number of things.  You

21    know, like Google search engine, the Yahoo! search

22    engine, but, generally speaking, I think that is a

23    correct statement.

24                QUESTION:  How would you describe

25    Spotlight?

1                ANSWER:  Spotlight is both the app and
2    the user interface for it.  It's a set of technologies.
3                QUESTION:  Who came up with the name
4    Spotlight?
5                ANSWER:  I do not recall who came up with
6    the name.
7                QUESTION:  What -- was it originally
8    called Matador?
9                ANSWER:  Matador was a code name for
10   Spotlight before we had a public name.
11               QUESTION:  Spotlight is the public name,
12   correct?
13               ANSWER:  Yes.
14               QUESTION:  Matador is the internal code
15   name?
16               ANSWER:  Yes.
17               QUESTION:  Do you think Spotlight has
18   been well-received by consumers?
19               ANSWER:  That's a highly subjective kind
20   of notion, well-received, but I know that a number of
21   users use that facility, and it's especially useful in
22   mail where you can retrieve a message by just typing a
23   word.
24               QUESTION:  I understand it's a -- I
25   understand it's a subjective inquiry.  I'm asking for

1   your opinion —

2                   Do you think it has been well-received?

3                   ANSWER:  Yes.

4                   QUESTION:  Do you believe Spotlight has a

5   competitive advantage over Windows Explorer?

6                   ANSWER:  That's a very subjective

7   question.

8                   QUESTION:  Go ahead, please.

9                   ANSWER:  So I think Spotlight works well,

10  works fast, has nice user interface, which I'm sure is

11  appreciated by a number of our customers.

12                  QUESTION:  Who would you say was tasked

13  with the primary responsibility of development of

14  Spotlight?

15                  MR. KELLEY:  Oh, excuse me.  I missed

16  one.

17                  On Page 86:

18                  QUESTION:  Were you involved in the

19  development of Spotlight at all?

20                  ANSWER:  Yes.  I was in charge of the

21  team that developed Spotlight and various pieces of

22  Spotlight.

23                  QUESTION:  Who would you say was tasked

24  with the primary responsibility of the development of

25  Spotlight?

1    ANSWER:  Texas

2                 QUESTION:  Who do you think at Apple

3    knows the most about the development of Spotlight?

4                 ANSWER:  There's a number of folks who

5    have knowledge of different pieces.  There's some five

6    system pieces.  There's some index pieces, and you have

7    some UI pieces and some application pieces.

8                 QUESTION:  Is there anyone at Apple who

9    knows all the pieces?

10                ANSWER:  There's probably a number of

11   folks who have varying degrees of knowledge of a number

12   of those pieces, yes.

13                QUESTION:  Would you name those people,

14   please?

15                ANSWER:  I would say for the UI, that's

16   the UI Team, Scott Forstall, Greg Christie.

17                For the file system aspects, there's

18   Dominic Giampaolo.

19                For the frameworks and the indexing,

20   there are people like Yan Arrouye.

21                For the integration in various

22   application as the people in the applications, so

23   e-mails, Brandon Longlar and Pavel Cisler.

24                MR. KELLEY:  Going to Page 93.

25                QUESTION:  I believe Spot -- I believe

```
 1   Spotlight was a feature of Tiger.
 2                  MR. CANTINE:  I'm sorry?
 3                  MR. KELLEY:  Bottom of Page 92.  Excuse
 4   me.
 5                  QUESTION:  When was Spotlight first
 6   incorporated into an Apple product?
 7                  ANSWER:  I believe Spotlight was a
 8   feature of Tiger.
 9                  QUESTION:  Was that the first vision of
10   Mac OS X that had Spotlight?
11                  ANSWER:  It was the first version of Mac
12   OS X that had Spotlight technology.  Of coarse, Mac OS X
13   has had the search capability for a long time.  That's
14   the predecessor technology.
15                  QUESTION:  What was that predecessor
16   search technology called?
17                  ANSWER:  So we had V-Twin AIAT, which
18   kind of was an engine.  So V-Twin was the name of the
19   technology -- search technology.
20                  And for the UI, we had something called
21   Sherlock.  That was able to search all kinds of
22   information, including searching in the file system.
23   And that predates what we've done with Spotlight.
24                  QUESTION:  How do you spell V-Twin?
25                  ANSWER:  Up case V, dash, and up case T,
```

 1    lowercase   V-Twin.

 2                 QUESTION:  Does the V stand for anything

 3    in V-Twin?

 4                 ANSWER:  I have no idea what it stands

 5    for.

 6                 QUESTION:  And Sherlock is spelled --

 7                 ANSWER:  Yes.

 8                 QUESTION:  And those were the predecessor

 9    search technology --

10                 ANSWER:  Yes.

11                 QUESTION:  -- prior to Spotlight?

12                 ANSWER:  Yes.

13                 QUESTION:  Any other predecessor search

14    technology prior to Spotlight at Apple?

15                 ANSWER:  There's been a number of things

16    around these technologies.  I believe we prepared a

17    library code search kit.  So there's been a number of

18    related technologies, and some of them that we still

19    use.  I believe we still use these technologies for

20    searching our help.

21                 QUESTION:  So Spotlight has been on

22    Macintoshes since the introduction of Tiger; is that

23    right?

24                 ANSWER:  Yes.

25                 QUESTION:  On every Macintosh since the

1

2          ANSWER:  Yes.

3          QUESTION:  What are the application

4  programs and other software that uses Spotlight, a

5  complete list as far as you know?

6          ANSWER:  I cannot give you a complete

7  list.  I can just give you a few examples, the ones that

8  come to mind.  And also, we have a public API for

9  Spotlight, which means that there's a number of third

10  parties that could use that.

11          I don't have the list.  I don't think the

12  list exists.

13          QUESTION:  Sure.  So the application

14  programs on other software that uses Spotlight as far as

15  the Apple products go, would you please name them?

16          ANSWER:  Okay.  Mail, Finder, address

17  book, font subsystem, Xcode.  There may be more, but

18  these are the ones I'm remembering.

19          MR. KELLEY:  Going to Page 105:

20          QUESTION:  So as far as you know, Apple

21  has no plans not to include Spotlight in the feature

22  operating systems?

23          ANSWER:  Correct.

24          QUESTION:  Let's ask (sic) about Sherlock

25  and Spotlight.  Tell me the similarities and the

1    differences at a high level.

2                    ANSWER:  So Spotlight lets a user search

3    for his or her files, and Spotlight uses metadata on the

4    file.

5                    Sherlock -- that was the previous

6    technology -- was based primarily in searching for the

7    full text of the file.  Sherlock was not aware of

8    metadata, and that's a big difference.

9                    QUESTION:  Sherlock searched for the full

10   text of the file name or the file content?

11                   ANSWER:  File content.

12                   QUESTION:  Just the file content or could

13   it also search for the file name?

14                   ANSWER:  Yes.  It could also search for

15   the file name.

16                   QUESTION:  So full text contents or the

17   file name?

18                   ANSWER:  Yes.  But the file content is a

19   much more challenging problem than file name, because

20   you have a lot more text than just the name.

21                   QUESTION:  But Sherlock could do that?

22                   ANSWER:  Yes.

23                   QUESTION:  And Spotlight can also do

24   that?

25                   ANSWER:  Yeah.

1    QUESTION:  Spotlight can search for video
2    files, correct?

3                    ANSWER:  Yes.

4                    QUESTION:  Can Sherlock search for video
5    files?

6                    ANSWER:  I don't think so, because there
7    was no -- no importer engine.

8                    QUESTION:  Who, if anyone, was first
9    charged with the development of Spotlight?

10                   ANSWER:  There were a number of people
11   who had different responsibilities for developing
12   Spotlight as kind of a number -- as kind of number of
13   technology.  To get the -- to get the kind of the whole
14   chain working, one of the persons who was probably the
15   most in charge of it was Yan Arrouye.

16                   QUESTION:  Why did Apple first decide --
17   why did Apple first decide to develop Spotlight?

18                   ANSWER:  Apple likes to bring features
19   that offer functionality for its users, and the ability
20   to search a user's file was deemed an important thing to
21   do.  And that's why we developed Sherlock and Spotlight.

22                   QUESTION:  So would you agree that
23   Spotlight is an improvement over Sherlock?

24                   ANSWER:  I think so.  For most people --
25   for most people would perceive that as an improvement.

1      QUESTION:  So when Spotlight was

2      introduced in Tiger, do you believe it was not -- it was

3      a new system at the time?

4                  ANSWER:  The set of functionality offered

5      by Spotlight was indeed new, because you couldn't do

6      that prior to Spotlight.

7                  QUESTION:  And what sort of functionality

8      are you referring to?

9                  ANSWER:  The ability to search a user's

10     file via metadata or full text.

11                 QUESTION:  Can you please mark this as

12     Serlet Exhibit 2?

13                 Have you seen this document before,

14     Mr. Serlet?

15                 ANSWER:  No.

16                 QUESTION:  The first sentence on the

17     third paragraph, quote:  The most revolutionary feature

18     of Tiger, according to Jobs, is a new search tool known

19     as Spotlight.

20                 ANSWER:  I'm sorry.  You're in which

21     paragraph?

22                 QUESTION:  The third paragraph from the

23     top.

24                 ANSWER:  Competitor -- oh, yes.

25                 QUESTION:  The most, quote,

1    revolutionary unassured features of Tiger, according to

2    Jobs, is a new search tool known as Spotlight.

3                ANSWER:  Yes.  I've heard Steve say --

4    obviously, yes, for a number of technologies that it's

5    revolutionary.

6                QUESTION:  What do you mean by

7    revolutionary?

8                ANSWER:  That it changes the way people

9    interact with their computers.

10               QUESTION:  So Spotlight was an innovation

11   at the time it was introduced, correct?

12               ANSWER:  Yes.  Yes.

13               MR. KELLEY:  Going to Page 122:

14               QUESTION:  Mr. Serlet, have you heard of

15   something called Piles?

16               ANSWER:  Yes.

17               QUESTION:  What's your understanding of

18   Piles?

19               ANSWER:  Piles is a metaphor for the user

20   interface and how to manipulate objects in files to kind

21   of put them in space and put them in the virtual world.

22               QUESTION:  When was Piles developed?

23               ANSWER:  I do not know exactly when it

24   was developed, but it was, I believe, in the late '80s

25   or '90s.

1     QUESTION:  But Piles was developed at

2  Apple, correct?

3                  ANSWER:  Yes.

4                  QUESTION:  Can you be more specific about

5  Piles being a metaphor for the user interface and

6  manipulation of objects in files?

7                  ANSWER:  Sure.  Piles are a way to kind

8  of reflect what we do on our desktops.  We have piles of

9  paper that lay around and how we let paper accumulate in

10  piles, and we manipulate and we move the file around and

11  so forth.

12                  QUESTION:  Did Apple ever implement Piles

13  into any of its products?

14                  ANSWER:  No.  I believe no product of

15  Apple's shipped with Piles.

16                  QUESTION:  Do you know why it was never

17  shipped in any -- do you know why it was never in any of

18  the shipped products?

19                  ANSWER:  Ultimately, I think we -- there

20  were some good ideas in Piles, but we haven't yet

21  figured out how to use them for products.

22                  QUESTION:  Can you be more specific?

23  What aspects are you talking about now?

24                  ANSWER:  Oh, I think the metaphor is a

25  very natural and a very intuitive metaphor that can

1    simplify the programming experience.

2                     QUESTION:  But you're saying that that

3    metaphor Apple has not found a way to use in its

4    products yet?

5                     ANSWER:  That's correct.

6                     QUESTION:  Is that -- is Spotlight the

7    same thing as Piles?

8                     ANSWER:  No.

9                     QUESTION:  Essentially, they're different

10   concepts, Piles and Spotlights; is that correct?

11                    ANSWER:  I believe Piles and Spotlight

12   are concepts that are different but that have some

13   relationship.

14                    QUESTION:  Does Spotlight incorporate any

15   of the concepts of Piles?

16                    ANSWER:  I don't think so.

17                    QUESTION:  Are you familiar with the

18   cover -- with the Coverflow review in Spotlight?

19                    ANSWER:  Yes.

20                    QUESTION:  Is that the same thing as

21   Piles?

22                    ANSWER:  It's not the same thing.  Piles

23   is a kind of concept.

24                    QUESTION:  Does Coverflow use any of the

25   concept of Piles?

```
 1              ANSWER:  No, I wouldn't say that.

 2              QUESTION:  Why?

 3              ANSWER:  There's some system

 4   similarities, because in both cases, you are trained to

 5   represent a collection of documents.  But there's

 6   different ways you can represent collections and many,

 7   many ways you can rebuild collections.

 8              But what's important to have a good

 9   design is to have something that just fits right and

10   that's in tune.  And so in Finder, for example, we have

11   several modes, a visualization mode.  We have the

12   Coverflow.  We have icon view.  We have list view.  We

13   have column view.  And they're all kind of visualization

14   modes for representing a collection.

15              QUESTION:  Mr. Serlet, let's talk about

16   the process of how products are launched today.

17              Would you describe for me generally, at a

18   high level first, how that process works?

19              ANSWER:  Okay.  So the team works on a

20   product, and at some point, there's some event that --

21   where there's -- the main features of the product are

22   marketed.  And usually after that event, that's kind of

23   a better program of one form or another, a CD and all

24   that, and after the product is shipped.

25              That's a fairly typical kind of course
```

1    for a lot of 06088 that we've had.

2                QUESTION:  When you say at some point the

3    main features of the product are marketed, to whom are

4    they marketed?

5                ANSWER:  To the press and via the press

6    to the potential customers.

7                QUESTION:  The decision to roll out

8    Spotlight at Apple, was that a major -- was that a major

9    decision at Apple?

10               ANSWER:  Major is subjective, but we

11   definitely had a decision to market that, and the folks

12   that were very involved in that decision, of course, the

13   Marketing Department.  They are the primary

14   decision-makers about what features are marketed and

15   what features are not marketed.

16               There's a lot of features that are

17   underneath the hood that are not easy to market and that

18   are not marketed, yet they are important features that

19   provide for innovation moving forward.

20               QUESTION:  Who was involved in the

21   decision to launch Spotlight?

22               ANSWER:  Pretty much everyone who works

23   in the Marketing Department in the OS and on the

24   engineering side, myself and a number of folks -- my

25   folks.

1          QUESTION:  Were business people involved

2   in the decision to launch Spotlight?

3          ANSWER:  Definite business people -- I'm

4   sorry -- define business people.

5          QUESTION:  Okay.  People from -- people

6   who looked at the commercial potential for Spotlight.

7          ANSWER:  I think the closest for that is

8   marketing folks.  So the answer is, yes, it's marketing

9   folks.

10          QUESTION:  So marketing folks as well as

11   technical people provided input into the decision

12   whether to launch or not Spotlight --

13          ANSWER:  Yes.

14          QUESTION:  -- correct?

15          ANSWER:  Yes.

16          QUESTION:  Steve Jobs, what was his role

17   in the decision to launch Spotlight?

18          ANSWER:  Steve is a contributor in the

19   marketing kind of decision and has opinions that he

20   expresses on things.

21          QUESTION:  Do you remember what opinions

22   he expressed regarding Spotlight before it was launched?

23          ANSWER:  He expressed an opinion that

24   this was one of the features to market.

25          QUESTION:  Well, did he have a positive

1  outlook?

2              ANSWER:  Yes.  Yes.

3              QUESTION:  Would it be accurate to say

4  that the decision to launch a product is a major event

5  in Apple?

6              ANSWER:  Yes, it is.  It's a major event

7  for that project in particular and all the team that

8  works on that.

9              QUESTION:  So the decision to launch a

10  product at Apple is not a decision that Apple takes

11  lightly, correct?

12              ANSWER:  Correct.

13              QUESTION:  So in the decision to launch

14  Spotlight, we've talked about the marketing people and

15  the technical people.

16              Are there any other groups you can think

17  of?

18              ANSWER:  I think those are the primary

19  groups.

20              QUESTION:  Have you heard of the Human

21  Interface Division at Apple?

22              ANSWER:  There is a Human Interface

23  Group.  Usually, it's not referred to as division, but

24  there's a group, yes.

25              QUESTION:  Was the Human Interface Group

1  involved in the decision to launch Spotlight?

2              ANSWER:  Yes.

3              QUESTION:  What is the Human Interface

4  Group?

5              ANSWER:  They are the group who help

6  define the user interface for the products.

7              MR. CANTINE:  I'm sorry.

8              ANSWER:  They are the group who help

9  define the user interface for the products.

10             QUESTION:  For the Mac OS?

11             ANSWER:  For the Mac OS and for some of

12  the other products, like the iPhone and so forth.

13             QUESTION:  So the Human Interface Group

14  was responsible for the user interface in Leopard?

15             MR. KELLEY:  Going to Page 138:

16             QUESTION:  What factors does Apple

17  consider in its decision to launch a product or not?

18             ANSWER:  There are many factors that come

19  into play for launching your product, or there's a

20  feature of a product.

21             QUESTION:  Can you name those features,

22  those factors?

23             ANSWER:  Applicability for the user, ease

24  of understanding feature.  There's a whole set of things

25  there.

1      QUESTION:  Were you consulted in the

2   decision of whether to launch Spotlight?

3                ANSWER:  Yes, I'm sure I was consulted.

4                QUESTION:  How were you consulted?  Via

5   e-mail, phone calls, in person?

6                ANSWER:  I would think that that was kind

7   of an informal conversation that took place before the

8   launch, okay, what other features are we going to talk

9   about.  And Spotlight was one of them.

10               MR. KELLEY:  Going to Page 145:

11               QUESTION:  Apart from communications

12   you've had with counsel, have you ever heard the term

13   Scopeware Vision?

14               ANSWER:  No.

15               QUESTION:  What about the term

16   Lifestreams?

17               ANSWER:  No.

18               QUESTION:  No, as in apart from

19   communication with counsel, you have not heard of the

20   term Lifestreams?

21               ANSWER:  Correct.

22               QUESTION:  Prior to you becoming aware of

23   this lawsuit, you had never heard the word Lifestreams

24   before, correct?

25               ANSWER:  That is how I remember it,

1    correct.

2              QUESTION:  Prior to your first becoming

3    aware of this lawsuit, you had never heard of the word

4    Scopeware either, correct?

5              ANSWER:  Correct.

6              QUESTION:  Have you heard of someone

7    called named David Gelernter?

8              ANSWER:  Yes.

9              QUESTION:  When was the first time you

10   heard of him?

11             ANSWER:  It was in the late 1980s where I

12   read a paper on something called Linda.  I believe he

13   was the author of that.

14             QUESTION:  Who is David Gelernter?

15             ANSWER:  He's a researcher, a scientist.

16             QUESTION:  Have you looked at any of his

17   work?

18             ANSWER:  So I came across Linda, and I

19   would have forgotten it, except that his name was in the

20   news on an entirely different matter a few years after

21   that.

22             QUESTION:  What matter?

23             ANSWER:  That was connected with the

24   Unabomber.  And that's why the name stuck in my mind,

25   because, otherwise, I would have forgotten.

1   QUESTION:  Other than his work on Linda,
2   have you looked at any of his other work?

3                ANSWER:  No.

4                QUESTION:  What do you think of -- well,
5   what's your understanding of Linda?

6                ANSWER:  That was a long time ago, but my
7   high-level recollection of it is that it was kind of a
8   connector language where you can have tasks to do that
9   you put in kind of a global soup of things to do, and
10  they get executed, which I thought was -- at the time
11  was a different way of thinking about computing.

12               QUESTION:  Have you ever met David
13  Gelernter?

14               ANSWER:  No.

15               QUESTION:  Have you ever talked to him?

16               ANSWER:  No.

17               QUESTION:  Or corresponded with him?

18               ANSWER:  No.

19               QUESTION:  What's your opinion of him?

20               ANSWER:  I have no opinion.

21               QUESTION:  Have you ever been involved in
22  the marketing of anything at Apple?

23               ANSWER:  Well, being kind of the leader
24  of some of the Apple projects, like Mac OS technologies,
25  I contribute to marketing the product in a peripheral

1    kind of way.

2              QUESTION:  How so?

3              ANSWER:  Well, for example, presentations

4    at the developers' conference.

5              QUESTION:  Have you ever presented

6    anything related to Spotlight at a developer conference?

7              ANSWER:  Oh, yes, absolutely.

8    No.

9              QUESTION:  Do you know of any other

10   presentations of Spotlight?  Do you know of anyone else

11   who has made presentations to Spotlight besides

12   yourself?

13             ANSWER:  At Macworld and the developers'

14   conference, there's been various presentations of the

15   various versions of the OS where people like Steve Jobs,

16   Phil Schiller, and Scott Forstall have talked about

17   features of the OS.

18             I do not know whether any one of them

19   talked about Spotlight.  I'm sure Steve did.  I don't

20   know about the others.  But in general, some of the

21   features of the OS are presented by those folks.

22             QUESTION:  Do you think that one of the

23   Apple's strengths is an easy user interface?

24             ANSWER:  Yes.

25             QUESTION:  And that's appealing to

```
1   systems--concept?
2                    ANSWER:  Yes.
3                    QUESTION:  Ease of use?
4                    ANSWER:  Yes.
5                    QUESTION:  Is an easy user interface an
6   important consideration for Apple in the development of
7   its products?
8                    ANSWER:  Yes.
9                    QUESTION:  Do you think that Apple's
10  products are easy to use?
11                   ANSWER:  In the -- in the relative terms,
12  relative to the competitors, yes, but we can always do
13  better, and we strive for it.
14                   QUESTION:  Do you think that Spotlight,
15  Coverflow, and Time Machine had easy user interfaces?
16                   ANSWER:  I would repeat my previous
17  statement, which is I think they're easy to use, but we
18  can always strive to do even better.
19                   QUESTION:  And do you think that
20  Spotlight, Coverflow, and Time Machine are important
21  features to consumers?
22                   ANSWER:  Important is a very subjective
23  word, but they are among the many features that we have
24  in the OS, and we have many important features.
25                   QUESTION:  Would you consider Spotlight,
```

1   Coverflow, and Time Machine to be among the most
2   important features of Leopard?

3               ANSWER:  That's becoming very subjective
4   and not very factual, because we don't have a list of
5   all the features in priority, in importance in order.

6               QUESTION:  Right now I'm just asking you
7   for your thoughts on this.

8               ANSWER:  Yes, they are important
9   features.

10              QUESTION:  Have you ever looked at a
11  website with the following address: www.scopeware.com?

12              ANSWER:  I look at tens, if not hundreds
13  of websites each day, so I do not recall looking at
14  specific websites.

15              QUESTION:  Okay.  So you don't remember
16  one way or another whether you looked at it or not?

17              ANSWER:  Right.  Right.

18              QUESTION:  Are you aware of any
19  communications or meeting between Mirror Worlds
20  Technologies and Apple?

21              ANSWER:  No, I'm not aware of any meeting
22  between Mirror Worlds and Apple.

23              QUESTION:  Mark this as the next exhibit,
24  please.

25              MR. KELLEY:  Marking the Deposition

1      Exhibit No. 6

2                    QUESTION:  For the record, this is a

3      document bearing Production Nos. APMW0509264 through

4      -67.

5                    Have you seen this e-mail before,

6      Mr. Serlet?  If you want to take a moment to look

7      through it, obviously.

8                    ANSWER:  The answer is yes, but my memory

9      of it was revised by -- as I was made aware of this

10     litigation.

11                   QUESTION:  So when was the last time you

12     saw this e-mail?

13                   ANSWER:  Yesterday.

14                   QUESTION:  Do you remember receiving this

15     e-mail back on July 2nd, 2001?

16                   ANSWER:  No.

17                   QUESTION:  Let's go through the people

18     who received this e-mail, starting with

19     a-v-i-e@apple.com.  Is that Avie Tevanian?

20                   ANSWER:  Yes.  That was my manager at the

21     time.

22                   QUESTION:  And we spoke about it.

23     Bertrand Serlet and Bereskin.  That's Ken Bereskin?

24                   ANSWER:  That's the guy we connect with

25     the Cheetah name.  That's in the Marketing Department.

1    he was marketing VP -- 35.

2                    QUESTION:  Does he have a technical

3    background?

4                    ANSWER:  Yes, he does.

5                    QUESTION:  But he's me in the marketing

6    group?

7                    ANSWER:  Yeah.  I do not know the extent

8    of his technical background.

9                    QUESTION:  Don Lindsay, what's his title?

10                   ANSWER:  So Don Lindsay is no longer at

11   Apple, but he was the head -- he was the manager of the

12   HI team at the time.

13                   QUESTION:  Bas Ording?

14                   ANSWER:  That's someone who was also

15   working for Don, who is a UI designer.

16                   QUESTION:  And Scott Forstall?

17                   ANSWER:  Scott Forstall was working for

18   me at the time and was in charge of the HI team.

19                   QUESTION:  What is Scott Forstall's

20   current title at Apple?

21                   ANSWER:  He's senior VP of software for

22   the iPhone.

23                   QUESTION:  Did Scott Forstall have any

24   involvement in the development of Mac OS X, the various

25   versions?

1                   ANSWER:  Yes.

2                   QUESTION:  And now he's in charge of the

3  iPhone developments?

4                   ANSWER:  Yes.  He got promoted.

5                   QUESTION:  So Mr. Forstall would be

6  familiar with the features in the various versions of

7  Mac OS X?

8                   ANSWER:  Yes.

9                   QUESTION:  Now the e-mail.  Steve Jobs

10  says, quote, Please check out this software ASAP,

11  period.  It may be something for our feature, and we may

12  want to secure a license ASAP, unquote.

13                   Do you see that?

14                   ANSWER:  Yes.

15                   QUESTION:  Do you have any understanding

16  of what software Steve Jobs is referring to?

17                   ANSWER:  I think it's the software that's

18  mentioned in the article, which is the software from

19  Mirror Worlds Technologies.

20                   QUESTION:  Have you ever had any

21  discussions with Steve Jobs regarding Mirror Worlds?

22                   ANSWER:  No.

23                   QUESTION:  Have you ever had any

24  discussions with Mr. Jobs regarding David Gelernter?

25                   ANSWER:  No.

1       QUESTION:  Lifestreams?

2                  ANSWER:  No.

3                  QUESTION:  Scopeware?

4                  ANSWER:  No.

5                  QUESTION:  Have you ever had any

6   discussions with anyone at Apple, prior to this lawsuit,

7   regarding David Gelernter, Scopeware, Mirror Worlds,

8   Lifestreams?

9                  ANSWER:  Not that I remember.

10                 QUESTION:  So when Steve Jobs says:

11  Please check out the software ASAP, did you check out

12  the software at the time, in 2001, July?

13                 ANSWER:  I do not remember, but what is

14  typical in these cases when there's -- Steve tells us to

15  check out something is that one of us -- when he sends

16  that to a distribution list, one of us picks this up and

17  checks it out and then closes the root or not.

18                 QUESTION:  Okay.  I'm asking you, after

19  Steve Jobs sent this e-mail, do you know who picked up

20  this project?

21                 ANSWER:  I believe it was picked up by

22  Don Lindsay, but I do not remember that fact prior to

23  this lawsuit.

24                 QUESTION:  Did anyone else, other than

25  Don Lindsay, pick this project up?

1                ANSWER:  I do not know.

2                QUESTION:  But after receiving this

3  e-mail, you did not take any actions to look into David

4  Gelernter or Lifestreams or Scopeware --

5                ANSWER:  Correct.

6                QUESTION:  -- is that true?

7                Do you know of anyone else who did look

8  into the software, other than Don Lindsay?

9                ANSWER:  No.

10                QUESTION:  Getting back to the e-mail, it

11  says, quote, It may be something for our future, and we

12  may want to secure a license ASAP, unquote.

13                Do you know if a license was ever

14  secured?

15                ANSWER:  I do not know that.

16                QUESTION:  You don't know one way or

17  another whether it was secured or not?

18                ANSWER:  Well, when Steve says something

19  like that, it means investigate.  And the outcome of the

20  investigation can be that it's not interesting, or we

21  can buy the company that does it, or we license the

22  software, or we license the IP.  It could be multiple

23  outcomes.

24                And I believe the outcome of that was,

25  it's not interesting, but I don't know.

1      QUESTION:  Has Apple ever licensed

2  technology from a third party before?

3              ANSWER:  Yes.

4              QUESTION:  And who determines whether to

5  license something?

6              ANSWER:  It's a combination of -- when

7  it's licensing the technology, it's a combination of the

8  engineering group and the marketing group very often.

9              QUESTION:  All right.  Please mark this

10 as the next exhibit.

11             MR. KELLEY:  That would be Deposition

12 Exhibit No. 7, which was marked for identification.

13             QUESTION:  For the record, this is --

14 this is a document bearing Production No. APMW05597376

15 through -81.

16             Have you seen this document before,

17 Mr. Serlet?

18             ANSWER:  I have no remembrance of this

19 document prior to the litigation.

20             QUESTION:  Do you have any reason to

21 believe that you did not receive this e-mail on

22 September 6th, 2001?

23             ANSWER:  I have no reason to believe I

24 did not receive the e-mail.

25             QUESTION:  Reading from the first

1    proceeds, it, cost us to -- I've arranged for Prof.

2    Prager, CTO of Mirror Worlds Technologies, to give a

3    technology demo by a combination of conference call,

4    plus browser, of their Scopeware product.  This will be

5    next Tuesday at 11:00 a.m.  Place is TBD.  You're

6    welcome to attend if you wish, unquote.

7                    Do you see that?

8                    ANSWER:  Yes, I see that.

9                    QUESTION:  Was the technology demo ever

10   given?

11                   ANSWER:  I do not know that.

12                   QUESTION:  You never attended any

13   technology meeting?

14                   ANSWER:  No.

15                   QUESTION:  Have you ever attended any

16   meeting or conference involving Mirror Worlds

17   Technologies prior to this lawsuit?

18                   ANSWER:  No.

19                   QUESTION:  If you go down -- if you go

20   down more the e-mail, you see a website, quote, You can

21   check out their product at

22   www.decisiontolaunchscopeware.com, end quote.

23                   ANSWER:  Uh-huh.

24                   QUESTION:  Did you check out the website

25   after receiving this e-mail?

```
 1               ANSWER:  I do not recall doing that.

 2               QUESTION:  Reading on, it says, quote, I

 3     also have a transcript of a recent talk of Gelernter's

 4     that explains the concept behind Lifestreams, unquote.

 5               Do you see that?

 6               ANSWER:  Yes.

 7               QUESTION:  Did you ever look at that

 8     transcript?

 9               ANSWER:  No.

10               QUESTION:  Who is -- do you know who Ted

11     Goldstein is?

12               ANSWER:  Yes.

13               QUESTION:  Who is he?

14               ANSWER:  He was one of my staff probably

15     from around 2001, I'd say, until two years ago, and he

16     was in charge of Development Tools, so he was VP of

17     Development Tools.

18               QUESTION:  And who was the head of

19     Development Tools at the time?

20               ANSWER:  He was the head.

21               QUESTION:  He wasn't one of the nine who

22     reported to you, was he?

23               ANSWER:  Say that again.

24               QUESTION:  He wasn't one of the nine

25     people who reported to you.
```

1  ANSWER: He no longer reports to me
2  because he left Apple, but at that time, he was
3  reporting to me.
4          QUESTION:  Directly to you?
5          ANSWER:  Directly, yes.
6          QUESTION:  Who is Tom (sic) Schaff?
7          ANSWER:  Tom (sic) Schaff used to report
8  to me a few years ago and left, I think, about three
9  years ago.
10          MR. KELLEY:  I'm sorry.  That should be
11  Tim Schaff.
12          QUESTION:  What was his position before
13  leaving Apple?
14          ANSWER:  He was the head of IMG.
15          QUESTION:  And who is Kevin Tiene?
16          ANSWER:  Kevin Tiene.  Kevin Tiene works
17  for Craig Federighi, and he's the director of System
18  Maps.
19          QUESTION:  Kevin now works for Craig, the
20  person you hired a few months ago?
21          ANSWER:  Yes.
22          QUESTION:  How long has Kevin been
23  working at Apple?
24          ANSWER:  Oh, a long time.  Probably over
25  15 years.

1   QUESTION:  When you say you have

2   heard of the term Scopeware, Mirror Worlds Technologies,

3   Lifestreams, or David -- I'm sorry -- Scopeware, Mirror

4   Worlds, or Lifestreams prior to the lawsuit, are you

5   saying that you are -- that you don't -- are you saying

6   you don't remember hearing those terms before the

7   lawsuit?

8                    ANSWER:  Yes.

9                    QUESTION:  So you may have heard it, but

10  you just don't remember?

11                   ANSWER:  Right, which I have no reason to

12  doubt these e-mails, so these e-mails -- assuming they

13  are true, but I have no reason to doubt them --

14  establish the fact that -- the name came across my

15  e-mail.

16                   MR. KELLEY:  Going to Page 187.

17                   QUESTION:  And Toby Patterson, who he is?

18                   ANSWER:  Toby Patterson, he's an engineer

19  who's been working in a variety of products.  A few

20  years ago, he was working on sort of syncing technology

21  that syncs information across multiple Macs, and now

22  he's working on the iPhone.

23                   QUESTION:  Did he have any involvement

24  with the development of Coverflow or Time Machine?

25                   ANSWER:  I believe he was manager during

1  Leonard and some of his folks implemented the ability

2  for mail to integrate in Time Machine so that you can

3  navigate your mail in the past and retrieve a message.

4            QUESTION:  You're talking in respect to

5  Time Machine, correct?

6            ANSWER:  Yeah.

7            QUESTION:  What about Coverflow?

8            ANSWER:  I don't think he was involved

9  with Coverflow.

10            MR. KELLEY:  Going to Page 197:

11            QUESTION:  Can you use Spotlight in Time

12  Machine?

13            ANSWER:  Yes.

14            QUESTION:  How does Spotlight work in

15  Time Machine?

16            ANSWER:  We -- Spotlight creates an index

17  that lives where the Time Machine snapshots live that

18  enables you to essentially narrow down for a given

19  search criteria all the snapshots that contain documents

20  that match.

21            MR. KELLEY:  Exhibit No. 11 marked for

22  identification.  That's Deposition Exhibit No. 11.

23            QUESTION:  For the record, this is a

24  document bearing Production No. MW001247 through -58.

25            Have you seen this before, Mr. Serlet?

 1                 ANSWER:  I don't recall seeing that one
 2    no.
 3                 QUESTION:  Do you have any reason to
 4    believe this was not created by Apple?
 5                 ANSWER:  No.
 6                 QUESTION:  So you believe it was created
 7    by Apple?
 8                 ANSWER:  Yeah, I believe that.
 9                 QUESTION:  And you have no reason to
10    believe that anything in here is inaccurate?
11                 ANSWER:  I assume all the facts are
12    correct.
13                 QUESTION:  Do you know what the purpose
14    of this document is?
15                 ANSWER:  Yeah.  It seems to explain the
16    Spotlight technology and how you can use it.
17                 MR. KELLEY:  Go to Page 209:
18                 QUESTION:  Okay.  Well, I thought
19    earlier -- let me just ask you, does Coverflow use the
20    concept of Piles?
21                 ANSWER:  No.  I think we had -- I think
22    that was my answer earlier, and that is still my answer.
23                 QUESTION:  So the Piles metaphor is more
24    what you would see on a tabletop, a stack of paper?
25                 ANSWER:  Yes.

1       QUESTION:  Versus Coverflow who's not
2   the way you would normally see it on a tabletop going
3   horizontally with the stacks?
4               ANSWER:  Correct.
5               QUESTION:  Other than the orientation,
6   what are the other differences?
7               ANSWER:  Well, Coverflow has been
8   implemented in part of the product and has a certain
9   behavior in how it behaves and how you have to click to
10  select.  And those things -- all of these -- all those
11  behaviors is the way it is implemented.
12              Piles, as far as I know, is mostly a
13  research project.  It was not implemented on a product.
14  So it's hard to compare a product that has been
15  implemented with something that was just at the idea
16  level, at the experimentation level.
17              MR. KELLEY:  Your Honor, that ends the
18  presentation of the deposition of the Bertrand Serlet
19  ending at Page 212, Line 7.
20              THE COURT:  All right.  That took 35
21  minutes.  All right.  Very well.
22              All right.  Who will be your next
23  witness?
24              MR. DIBERNARDO:  Your Honor, Mirror
25  Worlds will call Dr. Levy.

1   THE COURT:   Dr. Levy

2                MR. DIBERNARDO:  Your Ho nor, we have some

3   boards to set up.

4                All right.

5                MR. RANDALL:  Your Honor, while he's

6   doing that, may we approach the bench?

7                THE COURT:  Yes, you may.

8                (Bench conference.)

9                MR. RANDALL:  Your Honor, Dr. Levy

10  submitted his infringement report on May 20th, and in

11  his infringement report, he never referenced a source

12  code in this case.  He looked -- his colleague looked at

13  it for 90 days.  He never referenced it in his expert

14  report.

15               MR. CARROLL:  I can show you right now --

16               THE COURT:  Hold on.  Are they putting

17  anything up with source code?

18               MR. CARROLL:  Hey, Kent?  Kent, come here

19  a minute.

20               He's talking about Dr. Levy, whether he

21  has source code references in his report.

22               MR. DIBERNARDO:  And we understood your

23  concern to be that Dr. Levy went beyond the scope of his

24  report, associating certain lines of code with

25  particular limitations.

1  The slides don't do that. We're going to
2  show you a sample of those slides, if you'd like.

3            MR. RANDALL:  My concern is that he
4  doesn't even say that -- the matters he considered.
5  In his report -- and it's right here -- that there's
6  three pages of documents he considered.  There's
7  publications and patents and things like that,
8  documents.  He never mentions source code ever that he
9  considered.

10            He didn't consider it -- I mean, he
11  didn't -- he never referenced it in his report, and what
12  he's going to do on all these boards is he's going to
13  put confirmed by source code.  That's not what he said
14  in his report.  He never put anything in his report that
15  he considered -- and here's the list right here.  It's
16  not in there.

17            MR. DIBERNARDO:  Dr. Levy did indeed
18  review source code.  It is mentioned in the report.
19  There was specific reference -- references in the report
20  to particular items of source code.

21            There's no dispute that he spent 90 days
22  reviewing the source code.  Apple pointed that out in
23  their opening, 90 days reviewing the source code of the
24  two versions.

25            MR. RANDALL:  They cited to us one

1    instances where he uses source code, and this is an

2    it's not source code.  But those items right there, he

3    does not list source code.

4              THE COURT:  Well, was there any question

5    about source code --

6              MR. DIBERNARDO:  Your Honor --

7              THE COURT:  -- in his report about source

8    code?

9              MR. DIBERNARDO:  -- there is indeed.  For

10   example, these items -- if you'll forgive me.  The

11   metadata query referenced it, and that's a specific item

12   of source code.

13             MR. RANDALL:  No.  I just -- it's right

14   here.  They're saying things like this:  Our source

15   code.  It's not source code.  It's document.  And that's

16   why it's listed as document.  And we asked him -- I can

17   show you the testimony, Your Honor, very quickly.

18   Here's the question right down here at the bottom, and

19   the testimony is over on the next page, the highlighted

20   portion.

21             THE COURT:  This is Dr. Levy?  Is that

22   what you're talking about?

23             MR. RANDALL:  If you flip the page and

24   read that answer over here, that one you'll see.

25   So this is Dr. Levy saying:  I -- I -- I relied on the

```
 1      other expert looked at the code.  I didn't have any
```
 1      other expert looked at the code.  I didn't have any

 2      conversations with him that confirmed my opinions.

 3                   In his report -- and he says right up

 4      here in this part, he said:  I list all of the materials

 5      I considered in this report.  And I've highlighted that

 6      part in the first part of his report right here.

 7                   MR. DIBERNARDO:  Your Honor, while you're

 8      looking at that, may I look at Exhibit C to Dr. Levy's

 9      report?

10                   THE COURT:  Uh-huh.

11                   MR. DIBERNARDO:  Thank you.

12                   MR. RANDALL:  And, Your Honor, the -- my

13      problem is this:  When he puts confirmed by source code,

14      it's going to open up a whole new can of worms.  It's

15      going to force me to cross-examine him on what source

16      code are you talking about, and then he's going to

17      unload and say:  Well, it's this pile and this pile and

18      this pile.  And he simply shouldn't be allowed to do

19      that.  It wasn't in his report.

20                   MR. DIBERNARDO:  That's certainly not the

21      case.  He referenced specific items of source code in

22      his report.  These references to metadata items and data

23      queries, those are items in the source code that are

24      referenced.

25                   THE COURT:  You can take him -- you

1  establish a predicate with him where he referred to it

2  in his report or in his deposition, but, otherwise,

3  don't mention anything about source code.

4            MR. DIBERNARDO:  Okay.  And it's -- he

5  said not to reference it.

6            MR. RANDALL:  Right.  You can't reference

7  it.

8            MR. DIBERNARDO:  I apologize.  There

9  won't be specific references to specific code.  There

10  are references on some slide in small print -- and we

11  can show that to you -- that simply says confirmed by

12  source code, PX numbers.

13            MR. RANDALL:  Here's the slide.  There's

14  31 slides; 31 slides say confirmed by source code.  It's

15  just unfair.

16            THE COURT:  All right.  Take it out.

17            (Bench conference concluded.)

18            THE COURT:  Counsel, would it be helpful

19  to take a break?

20            MR. DIBERNARDO:  Perhaps just a minute.

21            THE COURT:  Okay.  All right.  Ladies and

22  Gentlemen of the Jury, we're going to take a 10-minute

23  recess.  Be in recess until 12:20 (sic).

24            COURT SECURITY OFFICER:  All rise.

25            (Jury out.)

```
 1                    (53-LED)
 2                    (Jury out.)

 3                    THE COURT:  Please be seated.

 4                    MR. CARROLL:  Your Honor, may we see you

 5    one second?

 6                    THE COURT:  Yes.

 7                    MR. CARROLL:  Judge, this is Dr. Levy's

 8    expert report.  Section C is the items relied on for

 9    Exhibit C.  Let me show you the page, Exhibit C.

10                    Look at the last page on the tag where he

11    said he relied on the Apple source code.

12                    MR. RANDALL:  Where's that?

13                    MR. CARROLL:  Exhibit C, the last page.

14    Here's the deposition transcript.

15                    MR. RANDALL:  I'm sorry.  I don't have --

16                    MR. CARROLL:  That's his expert report.

17                    MR. RANDALL:  What is the date of the

18    expert report?

19                    MR. STEIN:  The confusion may be that it

20    was the next day we sent a supplement -- or a

21    replacement Exhibit C to --

22                    MR. DIBERNARDO:  That is the marked copy.

23                    MR. CARROLL:  Here's the deposition,

24    Judge.

25                    MR. RANDALL:  Your Honor, I'm more
```

1   concerned about the Edpng. One I have Exhibit 6, I

2   didn't mention it.  And in his report, he doesn't

3   mention it anywhere in his report the reliance or

4   analysis of source code.

5            And in a typical expert report, I would

6   expect an expert to say:  Here's something I relied on,

7   and here is my expert analysis, and here is what it is,

8   instead of just coming to trial and saying:  I'm going

9   to put up source code.

10           MR. CARROLL:  Here's the deposition, Your

11  Honor.  The question about did he look at it and did he

12  consider it, that's their lawyer asking those questions.

13           THE COURT:  Okay.  In your infringement

14  report, Exhibit 4, did you consider any of Apple's

15  source code in making your opinions?

16           Yes.

17           Forming your opinions in Exhibit 4 for

18  infringement, did you review any of the source code?

19           Yes.

20           MR. RANDALL:  He did review it, but he

21  didn't put it anywhere in his report.  That's like

22  saying:  I reviewed a whole bunch -- it's classic

23  ambush, Your Honor.

24           THE COURT:  Well, counsel, you asked him

25  did he consider it, and he said that he used it in

1   forming his opinions.  If you don't follow up in a

2   deposition to find out more about that, you asked the

3   question.

4            You knew he had the source code, did you

5   not?

6            MR. DIBERNARDO:  He certainly did, Your

7   Honor.  He's looked at it, I believe, in 90 days

8   reviewing the source code.

9            MR. RANDALL:  That was his colleague,

10  but...

11           THE COURT:  All right.  I'll reverse the

12  earlier opinion, and he can testify regarding that he

13  reviewed the source code.  It's plainly -- unless you're

14  saying that this Exhibit C -- and this was not on the

15  copy you showed me a moment ago.

16           MR. RANDALL:  No, it was not on that.  I

17  don't know where that came from, Judge.  I don't --

18  because I haven't looked at every single document in

19  this case, and I can't -- I don't know where that came

20  from.

21           THE COURT:  Where did this come from?

22           MR. DIBERNARDO:  It was marked at the

23  deposition.

24           THE COURT:  It was marked at the

25  deposition?

MR. RANDALL: Well, let me speak --

 1  to be clear: Was this -- when was that Exhibit C

 2  provided to us?

 3  MR. STEIN: I just mentioned it was

 4  provided as a substitute Exhibit C, I think the day

 5  after -- or a few hours after -- because it was shown in

 6  the report.

 7  MR. RANDALL: Your Honor, so he didn't

 8  put anywhere in his report an analysis of saying: This

 9  is the code I reviewed. Here's the code I'm relying

10  upon for this opinion or that opinion.

11  Nothing like that. He didn't reference

12  it anywhere in his report. And so to come in here and

13  just say: I'm going to put up source code, it opens up

14  a huge can of worms, you know, perhaps 90 days' worth of

15  code-reading.

16  I don't know what he's relying on. I

17  don't.

18  MR. DIBERNARDO: The cans of worms were

19  opened. We see, for example, referenced at CFUUID,

20  that's in the code. There are also references to the

21  kMDItemSortIdentity Attr. That's certainly code, pieces

22  of code between that and the deposition --

23  THE COURT: All right. He can testify.

24  If you want to stop and take him on voir dire or

1    something you can't -- that looks to me like that he's
2    made reference to it in his report.  You asked him about
3    it in his deposition.  He said it formed the basis.
4              If you didn't follow up with him or
5    request some -- something more specific in his report,
6    there's nothing I can do about that now.
7              All right.  Bring the jury in.
8              MR. CARROLL:  Thank you, Your Honor.
9              THE COURT:  Did y'all get those times
10   straightened out for the depositions yet?
11             MR. DIAMANTE:  Still working on it.
12             (Jury in.)
13             THE COURT:  All right.  Please be seated.
14             All right.  Counsel, you may proceed.
15             MR. DIBERNARDO:  May it please the Court.
16             Is the microphone on?
17             THE WITNESS:  I think so.  Can you hear
18   me?
19   JOHN LEVY, Ph.D., PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
20                  DIRECT EXAMINATION
21   BY MR. DIBERNARDO:
22        Q    Sir, could you please start by stating your
23   name for the record, and your residence?
24        A    Yes.  My name is John Levy.  I live at 61
25   Lower Robert Drive in Inverness, California.

1      Q    Generally, what is your understanding of your

2    role in this case?

3      A    I was engaged by the Plaintiff, Mirror Worlds,

4    as a technical expert to consult and testify on this

5    case.

6      Q    Did you hear Mr. Carroll's opening this

7    morning on behalf of Mirror Worlds?

8      A    Excuse me?

9      Q    Yesterday?

10     A    Yes, I did.

11     Q    And as Mirror Worlds' technical expert in this

12   case, will you address any of the five points

13   Mr. Carroll identified as part of Mirror Worlds' case?

14     A    Yes, I will.  I will address, in part, all of

15   the first four:  Who is Dr. Gelernter, what is

16   Dr. Gelernter's invention, and how -- why Apple was

17   interested in Dr. Gelernter's inventions, and how Apple

18   has and is using Dr. Gelernter's inventions.

19     Q    Thank you.

20          Before we get into that, I'd like to explore

21   your qualifications.  Can you start by explaining your

22   education after high school?

23     A    Yes.  I earned engineering degrees from

24   Cornell University, a bachelor's in engineering physics;

25   a master's degree in electrical engineering from

1   California Institute of Technology which is also known

2   as Cal Tech; and a Ph.D. in computer science from

3   Stanford University.

4       Q    Dr. Levy, what's your current profession?

5       A    I'm a computer scientist and a management

6   consultant.

7       Q    Can you explain for us what a computer

8   scientist does?

9       A    Yes.  The kind of computer scientist that I am

10  is also known as a computer architect.  I'm involved in

11  the design and implementation of computer systems,

12  including computer software and computer hardware.

13      Q    Before you --

14      A    Kind of like a building architect designs the

15  blueprints for a building and someone else builds them.

16      Q    Thank you.

17           Before we move on, can you explain what you

18  mean by computer hardware?

19      A    Yes.  Computer hardware is the stuff you can

20  see and touch, like the screen and the keyboard and the

21  mouse and the touch pad, and the -- it also includes the

22  electronic circuits that are inside the box.

23           And then software is the stuff that makes that

24  all play.  It's the programs that are inside and cause

25  the computer to do something.

1    Q    Dr. Levy, could a computer work without

2  software?

3    A    No, not at all.  Nothing can happen inside the

4  computer until there's software in it and running.

5    Q    As a computer scientist, have you worked with

6  both hardware and software?

7    A    Yes, I have.

8    Q    About how long have you worked in the computer

9  industry?

10   A    I've been in the computer industry for 38

11 years.

12   Q    Could you -- could you please explain your

13 full-time work experience in the computer industry?

14   A    Yes.  I went to work for Digital Equipment

15 Corporation.  I worked there for five years as a

16 computer manufacturer.  I worked for Tandem Computers in

17 California for about a year and a half.  And then I

18 worked for Apple Computer for approximately four years.

19       Then after a period of ten years of

20 consulting, I was employed by Quantum Corporation, who's

21 a maker of hard disk drives, which are storage units for

22 computers.

23   Q    Dr. Levy, you mentioned Apple Computer.  Is

24 that the same company that's the Defendant in this case?

25   A    Yes, it is.  It's changed its name since then

1   to Apple, withone the Computer after it

2       Q      When did you work for Apple?

3       A      I worked for Apple from 1979 through 1982.

4       Q      Was that time relevant to this case?

5       A      No, it was long before.

6       Q      And what did you do when you were there at

7   Apple Computer?

8       A      I was an engineering supervisor on one of the

9   development groups that developed the hardware of the

10  new computer system.

11      Q      And is that computer system you worked on at

12  Apple Computer relevant to this case?

13      A      No, it's not.

14      Q      Why did you leave Apple Computer?

15      A      I decided to start my own business as a

16  consultant, and so I left Apple with a consulting

17  contract from Apple.

18      Q      Did you leave Apple on good terms?

19      A      Definitely.

20      Q      How do you know?

21      A      Well, I had a consulting contract, and I

22  continued to work approximately one day a week with

23  people at Apple for eight or nine months after I left

24  Quantum.

25      Q      Dr. Levy, have you ever taught classes

1      relating to computers.

2      A    Yes, I have.  I taught one course at San

3  Francisco State University on design of computers, and I

4  have been teaching for the last six years, one class or

5  two a year, at the University of San Francisco.

6           These last six years, they are continuing

7  education classes for elders, people over 50.  In fact,

8  my students are an average age of 73.

9           The courses I teach there have to do with

10  what's inside the computer and how it works and also

11  another one called the Digital Revolution in the Home,

12  which is about everything else, the electronic --

13  digital appliances at home that we use.

14      Q    Thank you.

15           In your 38 years in the computer industry,

16  have you ever been named as an inventor on a patent?

17      A    Yes, I have.  I am named as an inventor on

18  seven U.S. patents.

19      Q    Just generally, what technologies do those

20  patents of yours relate to?

21      A    They have to do with the design of computer

22  hardware and interconnections in them.

23      Q    Dr. Levy, have you ever served as the

24  technical expert in a lawsuit before?

25      A    Yes, I have.  I've been engaged as an expert

1    in over 25 cases.

2    Q    What types of technologies were involved with

3    those cases?

4    A    Those cases have involved a wide variety of

5    technologies and computers and software, including

6    operating systems and computer design, and also internet

7    protocols, internet software.

8    Q    Have you ever acted as a technical expert for

9    a district court judge?

10    A    Yes, I have.  I've been engaged three times

11    for two different judges as a neutral technical expert

12    advising the Court.

13    Q    What kind of cases do you work for judges?

14    A    Well, two of those were patent cases, and one

15    was a software copying dispute.

16    Q    What types of technologies were involved in

17    those cases?

18    A    They had to do with -- one with internet

19    software design, and the other one was the hardware

20    interface of a storage unit and how it's used by

21    software.

22    Q    Generally, as an expert to a judge, what do

23    you do in those cases?

24    A    Typically, I was -- would initially give a

25    technology tutorial to the Judge and the law clerk

1    involved, and then I attended some hearings at the

2    request of the Court.

3              I also was asked to sit in on a

4    meet-and-confer between the two parties one time just to

5    keep the technical experts on both sides honest.

6        Q    Thank you, Dr. Levy.

7              Can you explain why you chose to be a

8    technical expert in this case?

9        A    Yes.  There are really two reasons.  One is

10   that my background was appropriate for my experience in

11   operating systems, and also, I knew of Dr. Gelernter and

12   his reputation as a visionary, and welcomed the chance

13   to work with him in this case.

14       Q    Dr. Levy, I would like to show you Trial

15   Exhibit No. 1.

16             MR. DIBERNARDO:  James, if we could,

17   please.

18             There we go.  Thank you.

19             Perhaps, if you went to the next page,

20   please.

21       Q    (By Mr. DiBernardo) Dr. Levy, can you identify

22   what Exhibit 1 is for us?

23       A    Yes.  This is one of the Gelernter patents,

24   No. '227.

25             MR. DIBERNARDO:  If we could have Exhibit

```
 1   11 next.
 2              Perhaps the second page.
 3        Q    (By Mr. DiBernardo) Dr. Levy, can you identify
 4   this Exhibit 11 for us?
 5        A    Yes.  This is the '427 patent.
 6        Q    And then finally, how about Exhibit 6?
 7        A    This is the '313 patent.
 8        Q    Thank you.
 9              Would it be acceptable for us to refer to
10   these three patents as the Gelernter patents?
11        A    Yes, of course.
12        Q    And did you read the Gelernter patents before
13   accepting the role of technical expert in this case?
14        A    Yes, I did.
15        Q    Did you have an initial impression of the
16   Gelernter patents?
17        A    Well, yes.  They appeared to me to be quite
18   significant advances in the computer field, and so I
19   welcomed the chance to work with them.
20        Q    As part of your role as a technical expert,
21   did you form any opinions?
22        A    Yes, I did.
23        Q    And what opinions did you form?
24        A    I formed the opinion that the Apple products
25   that are accused in this case do infringe these patents
```

1    and also that the patents are valid.

2        Q    Dr. Levy, turning first to your opinion of

3    infringement, can you explain the process you used to

4    reach that opinion of infringement?

5        A    Yes.  Generally, I studied the patents to

6    understand what the claims set out, as well as the

7    background of the information in the patents.  And then

8    I studied the Apple products to see how they operated in

9    order to determine whether they met all of the claim

10   limitations in the patents.

11       Q    Is this the same general process that was used

12   in the cases where you served as a technical expert to

13   judges?

14       A    I believe it's the same process used in all

15   patent cases, yes.

16       Q    How long have you been studying the Gelernter

17   patents and Apple products in this case?

18       A    I was engaged on this case in the fall of

19   2008, so I've been studying these things for almost two

20   years.

21       Q    Dr. Levy, do you have a document that

22   identifies materials you analyzed in connection with

23   this case?

24       A    Yes, I do.

25                 THE WITNESS:  If you will show the first

1   Page 61B160

2       A    This is a summary of the items that I've

3   considered in developing my opinions and learning about

4   the various aspects of the products.  That includes the

5   patents, orders from the Court interpreting the terms.

6            I did look at the source code for the

7   operating systems.  I also have quite a bit of

8   experience using Apple products, both as an individual

9   and I've experimented with them specifically for this

10  case.  I've read testimony of the Apple employees,

11  including some of the developers.

12           And then also, books, publications, including

13  from Apple, articles and papers and other testimony of

14  witnesses and, of course, the testimony and reports of

15  Dr. Feiner, who is Apple's expert.

16      Q    Thank you.

17           Dr. Levy, what Apple products did you

18  consider?

19      A    I considered the Apple Leopard -- I'm sorry --

20  Tiger Leopard and Snow Leopard operating systems and the

21  computers that run them, and also the iPhone, iPod, iPad

22  products, which are smaller ones, more things.

23      Q    You mentioned that you reviewed the source

24  code of Apple's operating systems.

25           Can you describe what an operating system is?

1    An operating system is a large

2    collection of programs that is an integral part of

3    running the computer system.  And it's sort of the basis

4    on which everything else in the computer runs, and so

5    it's a lot of software that manages what's going on in

6    the computer, both in terms of time and space and

7    facilities.

8         Q    What's source code?

9         A    What is source code?

10             Source code is the words that are written down

11   by a person who's creating a program for a computer, and

12   then these words are written in an unusual kind of a

13   language called a programming language, which most

14   normal people wouldn't be able to read.

15             And then they're translated into another kind

16   of form, which are used by the computer when it runs.

17        Q    Why did you go to the trouble of reviewing the

18   source code for Apple's operating systems?

19        A    Well, in order to find out exactly how

20   something works in the computer, you have to know how

21   the code works.  And to know how the code works when

22   it's running, you have to see the source code to see

23   exactly how it's structured.

24        Q    Do you have any experience with operating

25   systems?

1   As Xerox before I studied the structure and
2   operation of operating systems during my graduate years
3   at Cal Tech and at Stanford.  Also, while I was a
4   graduate student at Stanford, I was employed by the
5   Stanford Linear Accelerator Center, which is a physics
6   research organization, and there I helped to write code
7   for a real-time operating system for Stanford for SLAC.
8           And I was a supervisor of an operating system
9   development at Digital Equipment Corporation for about a
10  year and a half.  And also during my time at Quantum
11  Corporation, I was involved in disk drive -- drivers,
12  which is a piece of software that manages the moving of
13  data between storage units and the computer.
14      Q   Did you have any assistance in analyzing Apple
15  source code?
16      A   Yes, I did.
17      Q   Who assisted you?
18      A   I was assisted by a man named Dr. Gareth Loy.
19      Q   Who is Dr. Loy?
20      A   Dr. Loy has a doctorate degree from Stanford
21  University, and he has a great deal of experience with
22  software and source code.  And so I enlisted his help.
23      Q   How did he assist you?
24      A   Well, since the programs that were provided to
25  us for inspection for the two operating systems involved

1    more than 5 million lines of source code.  Navigating

2    through all of this code was a serious task, and so I

3    engaged Dr. Loy to help with learning where the various

4    files and source code pieces were.

5            And then when I wanted to study a particular

6    part of the operating system, I would ask Dr. Loy to

7    point out where that part was, so that I could inspect

8    it.

9        Q    What Apple operating systems do you and

10   Dr. Loy analyze?

11       A    We analyzed source code for the Leopard -- I'm

12   sorry -- the Tiger and the Leopard operating systems.

13       Q    You previously mentioned Snow Leopard

14   operation system.  Did you look at the code for Snow

15   Leopard?

16       A    No, we did not.

17       Q    Why not?

18       A    Well, according to the testimony of the Apple

19   employees, there were no significant differences for

20   this -- the purposes of this technology that we're

21   studying between Leopard and Snow Leopard.

22       Q    Are there different versions of the Apple

23   operating systems for different computers?

24       A    Yes, there are.  There's the main versions for

25   the desktop and portable computer systems that

1    individuals would use.  And there's another version

2    called a server version, which runs on a somewhat larger

3    computer system that's known as a server.

4         Q    Did you review both personal computer and the

5    server versions of the operating systems?

6         A    No, we did not.

7         Q    Why not?

8         A    Because, again, the Apple employees testified

9    that the operation of the parts of the system we were

10   interested in were the same substantially between the

11   desktop and the server versions.

12        Q    Dr. Levy, your presentation references that

13   you reviewed the testimony and reports of Dr. Feiner,

14   Apple's expert.

15             Did Dr. Feiner provide any opinions in this

16   case?

17        A    Yes, he did.

18        Q    What are those opinions?

19        A    His opinion, the Apple products do not

20   infringe, and the Patent Office was wrong to issue these

21   patents to Dr. Gelernter and others, because there was

22   nothing new in them.

23        Q    Do you agree with Dr. Feiner that the

24   Gelernter patents are invalid?

25        A    Absolutely not.

1   Q    Do something in the Patent Office made it worthwhile

2   granting the patents?

3   A    No, I do not.

4   Q    Do you agree with Dr. Feiner that the patents

5   are not infringed by Apple?

6   A    No, I don't.

7   Q    Dr. Levy, we will deal with invalidity later.

8        Let's focus first on infringement.

9        Do you have an opinion as to why Dr. Feiner

10  has a different opinion as to whether Apple infringes

11  the Gelernter patents?

12  A    Well, I'll talk about the details of

13  infringement in just a bit.  But I think, in general,

14  Dr. Feiner applied somewhat different meanings of the

15  claim terms that I don't believe were proper for the

16  Court's construction.

17       And also, I think it was because Dr. Feiner

18  didn't really inspect what goes on under the hood, so to

19  speak, in terms of the code.

20       MR. RANDALL:  Your Honor, I think it's

21  appropriate for them to put their case on and perhaps

22  not put a rebuttal case on in the middle of their

23  case-in-chief.  So I'm going to object to the continued

24  references to our opinions, and perhaps they can just

25  put their opinion on the table, and I can cross him.

THE COURT - Response

1
2          MR. DIBERNARDO:  I think it's appropriate

3   to point out to the jury and to the Court where Mr --

4   where Dr. Levy --

5          THE COURT:  At a very high level, but you

6   intend to call him back as a rebuttal witness, do you

7   not?

8          MR. DIBERNARDO:  We do indeed, Your

9   Honor.  We're happy to move on.  We're just setting --

10          THE COURT:  Let's move on to the

11   infringement analysis then.

12          MR. DIBERNARDO:  Certainly.

13     Q    (By Mr. DiBernardo) Dr. Levy, let's turn to

14   the Gelernter patents then.

15          Do you have an opinion as to whether the

16   Gelernter patents address any technological problems?

17     A    Yes.  In general, they address the problem of

18   order -- organizing and then finding your stuff, the

19   files and the documents, on a computer.

20     Q    When they -- when was the earliest of the

21   Gelernter patents filed?

22     A    1996.

23     Q    And was this problem -- why was this a problem

24   when the first of the Gelernter patents were filed in

25   1996?

1   As I told this problem was recognized on
2   larger systems as we've heard testimony about already.
3   But, in fact, in 1996, there wasn't nearly so much being
4   stored on a personal computer as there is now.
5          So in some sense, Dr. Gelernter anticipated
6   the vast expansion of the number of files and folders
7   and things like that on someone's personal computer.
8      Q    Dr. Levy, do you have a document that
9   demonstrates this problem?
10     A    Yes, I have one that I would like to show.
11  This is an example of the files and folders as you might
12  find on a typical computer system that -- when you look
13  at them that way.
14         So over here, we have one of the files -- I
15  mean, folder, and each folder has to have a name.  And
16  then inside a folder like that, there might be literally
17  dozens or even hundreds of files in other folders.  And
18  each one of those has to have a name.
19         And so to navigate through all of this to find
20  what you're looking for can be very difficult.
21     Q    Is this the same problem we heard Apple's CEO,
22  Mr. Jobs, talk about in the video yesterday?
23     A    Yes, it is.  Zillions of files and you can't
24  find anything, I believe he said.
25     Q    Back when the first Gelernter patent was filed

1    back in 1996, wasn't this problem widely recognized?

2    A    No.  Actually, I think on personal computers,

3    as I said, the explosion of the numbers of files you

4    could hold on your computer hadn't really happened yet.

5         So it was really anticipating the growth of

6    storage units and the number of different types of

7    things we might have on our computers.

8    Q    You were here in the courtroom today, were you

9    not?

10   A    Yes, I was.

11   Q    And did you hear the testimony read in of

12   Mr. Lindsay?

13   A    Yes, I did.

14   Q    And do you believe that any part of

15   Mr. Lindsay's testimony relates to this problem?

16   A    Yes.  I'm sorry.  I don't remember which

17   testimony was whose at the moment.

18   Q    Do you recall the testimony today regarding

19   the appreciation of this problem, folders and files and

20   having difficulty finding things?

21   A    Yes.  Absolutely.  I believe that he was

22   naming the same problem.

23   Q    Is it your opinion that no one, other than Dr.

24   Gelernter, was trying to efficiently organize documents

25   on computers back in 1996?

1      A    Oh, sure.  I think that many people were working

2  on that problem, because it's pretty well-known that

3  it's difficult to deal with these things.

4      Q    But you still believe that Dr. Gelernter's

5  patents are valid, correct?

6      A    I do.

7      Q    Why is that?

8      A    Well, because Dr. Gelernter expresses an

9  embodiment of his vision of the streams and a way of

10 thinking about one's files and -- not files but

11 documents and objects that one's dealing with.

12      And that vision, I think, shapes the whole set

13 of technologies that he's espousing, that he's trying to

14 present.  And so the patents then are particular to this

15 vision of streams and the way of presenting them and

16 archiving them and so on.  And they're all kind of an

17 integrated part of -- an integral part of this future

18 vision.

19      Q    Thank you, Dr. Levy.

20      Is it your opinion that the Gelernter patents

21 describe different inventions?

22      A    Yes, it is.

23      Q    What inventions are described in the Gelernter

24 patents?

25      A    Well generally, it describes three major

 1   things:  The concept of streams, the document  ...
 2   that are time-ordered that describes a three-dimensional
 3   user interface; and it describes an aspect called
 4   automatic archiving.
 5       Q    Do you have a document that you'll use that
 6   track these features, these three inventions?
 7       A    Yes, I do.
 8            THE WITNESS:  Actually, if I may, Your
 9   Honor, I'd like to step in front to --
10            THE COURT:  Yes, you may.
11       Q    (By Mr. DiBernardo) So, Dr. Levy, you said
12   there were three different inventions related to the
13   Gelernter patents.
14            Can you identify those for us?
15            THE WITNESS:  Thank you.
16            MR. DIBERNARDO:  Thank you.
17       A    Yes, the three main topics are the
18   time-ordered document stream shown up here, the
19   three-dimensional user interface, and the automatic
20   archiving.
21            And under each one of these, I've named some
22   particular aspects that we will talk about in detail as
23   we go along.
24       Q    (By Mr. DiBernardo) Are those particular
25   aspects under the main headings important to this case?

 1    particular features of the Apple products, which I will

 2    show correlations with in a little while.

 3        Q    Thank you, Dr. Levy.

 4            Let's start with the first time-ordered

 5    document stream.  Do you have an understanding as to why

 6    the Gelernter patents use the term stream?

 7        A    Well, yes.  I think that they use the term

 8    stream as an essential part of the idea that one's --

 9    the diary of one's electronic life is this stream --

10    time-ordered stream of documents, which really can mean

11    lots of different things in that they flow through time

12    forming this stream that one then addresses when you're

13    trying to find something.

14        Q    Under the heading time-ordered document

15    stream, the first entry is mainstream.

16            How do the Gelernter patents describe the

17    mainstream?

18        A    Well, in general, they describe the mainstream

19    as something that contains all of the documents that are

20    relevant or of interest to a user.  And so that's the

21    first item shown up here, each data unit, which is their

22    term for document.

23            It also describes it as an electronic diary.

24    So it's everything related to me or my stuff or somebody

1    that I'm looking at.  And that means that things keep

2    getting added to it and that it can keep growing, among

3    a few other things.

4              It also has past, present, and future portions

5    there.  And it also has this feature called persistence,

6    which means that it can be updated as new things come

7    along.

8              MR. RANDALL:  Your Honor, I'm going to

9    make an objection about this.  That definition of

10   mainstream is inconsistent with Your Honor's claim

11   construction.

12             I don't mind it at high-level discussion

13   about what the patent --

14             THE COURT:  You can cover that on

15   cross-examination.

16             MR. RANDALL:  Okay.

17   Q    (By Mr. DiBernardo) Thank you, Dr. Levy.

18             If we can step back, you mentioned that the

19   stream has a past, present, and future portion.

20             Can you give us an example of those past,

21   present, and future portions?

22   A    Yes.  An example would be, something in the

23   past might be a document I received last week or much

24   longer ago.  Something that would be in the present

25   might be a letter I'm writing right now.  And something

1    in the future possibly would be something like to-do

2    item I put in my calendar for the future.

3        Q    And what's meant in the patents by persistent

4    mainstream?

5        A    Well, as I described, a persistent mainstream

6    we'll get into in detail in a bit, means that things

7    keep getting added to it dynamically as things come

8    along.

9        Q    Do the Gelernter patents use the term

10   substream?

11       A    Yes, they do.

12       Q    How do they use that term?  What does it refer

13   to?

14       A    Well, substream is how Dr. Gelernter explained

15   the example; for example, looking for all the documents

16   related to his wife who's name is Jane and he would type

17   in that name.

18            And so it really means a search or a filter

19   where only the parts that are related to that word or

20   that person come out as the search results.  That's

21   what's meant by a filter on the stream.

22            And it also has the characteristic of being

23   persistent, which we'll talk about later, which means

24   that things are updated as they come along.

25       Q    Can you give us an example of what you mean by

1   persistent substream.

2       A    Yeah.  So if Dr. Gelernter was looking at the

3   substream that was everything related to Jane, then if a

4   new e-mail came in while he was looking at that, he

5   would see the new e-mail arrive and be shown to him

6   automatically as it came in dynamically.

7       Q    Thank you, Dr. Levy.

8            Let's turn to the second aspect of the

9   Gelernter patents, this 3-D user interface.

10           Can you first explain what a user interface

11  is?

12      A    A user interface describes how a person

13  interacts with a computer, and so that means both what's

14  on the screen that I'm looking at as a user and also how

15  I interact with it using a keyboard and a mouse or a

16  touch pad and things like that.

17      Q    What is the user interface described in the

18  Gelernter patents?

19      A    Well, generally speaking, the user interface

20  is that three-dimensional stack of documents that

21  represents the stream or substream.

22      Q    Do you have a document that demonstrates that?

23      A    Yes, I do.  This is Figure 1 from the patent,

24  and this figure shows the stack of documents here.  And

25  there's a pointer back here, which is sometimes called a

1    cursor, which then be passed over the attorney.  And

2    when the cursor touches one of the documents, this

3    glance view pops up so you can see what it is that

4    you're looking for.

5         Q    Dr. Levy, you put a line across that stack of

6    items.

7              Do those items have a name in the context of

8    the Gelernter patents?

9         A    Yes.  These are called document

10   representations in this patent.

11        Q    Dr. Gelernter, your summary board uses the

12   term receding foreshortened stack.

13             Why do you use that term?

14        A    What's that?

15        Q    Why do you use that term, receding

16   foreshortened stack?

17        A    Well, that phrase occurs in the patent claims.

18   It's a very important aspect of the presentation, the

19   view of a stream or substream in the 3-D user interface.

20             And that means that there is an appearance of

21   things moving into the third dimension, or receding; and

22   that there's some kind of use of perspective to give you

23   that view of more prominent things or more recent things

24   being in the front, so they're more prominent, and the

25   less recent things being farther to the back and less

1   prominent.

2        Q    Is this idea of a receding foreshortened stack

3   important to your opinion that Apple infringes the

4   Gelernter patents?

5        A    Yes, it is.

6        Q    And why is that?

7        A    Well, I think I -- I think I explained that

8   with the more prominent things being in front and the

9   less prominent things being in back.  And so that sense

10  of the receding and foreshortening is a key aspect of

11  how that's done.

12       Q    Thank you.

13            Is this display necessary for the creation of

14  the stream you were talking about earlier?

15       A    No, it isn't.  It may be a little bit hard to

16  grasp, but the stream itself is not the display.  The

17  stream is something that's inside the computer that's in

18  something called a data structure.  And I'll be talking

19  about that more in a little bit.

20            So as in -- if you remember Dr. Gelernter's

21  example where he showed all those things coming together

22  to form the stream, and then after a while there was a

23  filter and you saw just the documents you were

24  interested in, the stream that was going along the

25  bottom there is actually something that's entirely in

1   the computer that's shown on the screen.  And so it's not
2   necessary to have a display in order to have the stream.
3       Q    You were here for Apple's opening statement in
4   court, were you not?
5       A    Yes, I was.
6       Q    And did you hear Apple's attorneys explain and
7   point to Figure 1 of the patent and explain that as a
8   stream?
9       A    Yes, I do.
10      Q    Do you agree with that characterization?
11      A    No.  As I just explained, the stream itself is
12   not the display.  And even though occasionally in the
13   patent, the words will use the term stream or substream
14   to describe what's being shown, in fact, the claims
15   definition are entirely related to what's inside the
16   computer.
17      Q    Thank you.  Let's turn back to the patent.
18           Dr. Levy, can you describe how a person
19   interacts with this user interface of the Gelernter
20   patents?
21      A    Yes, I can.
22           THE WITNESS:  Could you show the next
23   page?
24      A    This is an animation showing how as you slide
25   the pointer over the stack, the glance view pops up over

1    here together whole is here.  And that's after 10/20/10

2    described in the patent about how to browse through this

3    stack of documents.

4        Q    And is this feature the way a person interacts

5    with the interfaces reflected on your poster board?

6        A    I'm sorry?

7        Q    I'm sorry.  I'll speak up.

8             Is this the way a person interacts with the

9    interface of the Gelernter patents reflected on your

10   poster board?

11       A    Yes.

12            THE WITNESS:  Could you provide me a copy

13   of the poster board?

14            MR. DIBERNARDO:  Sure.

15            Your Honor, may I hand the witness a copy

16   of his poster boards since he can't see it?

17            THE COURT:  Yes, you may.

18            THE WITNESS:  Thank you.  I can't see

19   them from here.

20       A    So on the board, you'll see the words document

21   representations, which is talking about the squares here

22   in the stack.

23            The glance view, which refers to this thing in

24   the middle; and the receding foreshortened stack, which

25   is the stack on this figure; and sliding the pointer

1   refers to that cabinet, or you just say drop—

2      Q    (By Mr. DiBernardo) Thank you, Dr. Levy.

3           Let's move on to the third invention you

4   identified in the Gelernter's patents, the automatic

5   archiving.

6           Can you first explain what you mean by

7   automatic archiving?

8      A    Yes.  Archiving --

9               THE WITNESS:  I believe the next page

10  will show a figure.

11     A    So archiving is copying or moving a document

12  from the computer to an additional storage -- backup

13  storage somewhere, usually outside the main computer.

14          And so, for example, if I had a bunch of

15  papers in my office and I wanted to make sure I didn't

16  lose an important one, I might have my assistant make a

17  copy of that and put it away in the file cabinet over

18  here on the right.

19          And so archiving is that kind of action.

20  Automatic archiving means doing that in a certain way

21  without my asking it to.

22     Q    (By Mr. DiBernardo) And is automatic archiving

23  an important aspect or --

24     A    Yes.  It's an important aspect of the

25  Gelernter inventions shown under automatic archiving.

1   The archiving refers to automatic backup.

2        Q    Does automatic archiving provide benefits to

3   users of computers?

4        A    Yes, it does.  For one thing, it allows me not

5   to worry about which things I might lose, because I can

6   always go find them in the backup or archive.  And also,

7   if I don't have to say which things to save and it

8   automatically selects things for me, that also saves

9   that amount of time and concern about remembering to do

10  it.

11       Q    Thank you, Dr. Levy.

12            Let's turn to the Apple products now, and

13  perhaps we should take a minute.  We've heard a lot of

14  different terms.

15            Would you refresh our recollection as to what

16  the Apple products are?

17       A    Yes.  You mean the features that we're going

18  to focus on?

19       Q    Please.

20       A    We're going to focus on the three features

21  that you've heard about:  Spotlight and the Coverflow

22  interface and the Time Machine backup facility.

23       Q    We heard earlier today about Scopeware.  Is

24  Scopeware an Apple product?

25       A    I haven't studied the question of Scopeware,

1    as we've not connected with Scanaway as such.

2    Q    Okay.  So it's not an Apple product?

3    A    No, it's not.

4    Q    Just trying to keep things straight.

5    A    Yes, that's important.

6    Q    So, Dr. Levy, based on your analysis of the

7    Apple products, are certain features of the Apple

8    products more relevant than others to your opinion of

9    infringement?

10   A    Yes, it is.

11            THE WITNESS:  And shall I use the board

12   to summarize that or --

13            MR. DIBERNARDO:  Your Honor, may the

14   witness go to the board?

15            THE COURT:  Yes, he may.

16   A    So this summarizes the features of the Apple

17   products:  Spotlight, Coverflow, and Time Machine.  And

18   underneath each of those, I've shown the particular

19   aspects of the features in the Apple products that

20   correspond to the claimed inventions in the Gelernter

21   patents.

22            And so I'll be going through these one by one

23   carefully as we talk about the claims.

24   Q    (By Mr. DiBernardo) Dr. Levy, can you go

25   through them first at a high level one by one?

1   Why is Spotlight relevant to your opinion that

2   Apple infringes?

3       A    That's because Spotlight contains something

4   called the Spotlight Store, which I will show is an

5   implementation of the mainstream and these aspects of

6   it.  The Spotlight search results, when they're

7   obtained, correspond to the substream of the patents.

8            And then, of course, Coverflow implements a

9   3-D user interface.  And I'll show it's related to the

10  invention, and the Time Machine to the automatic

11  archiving.

12      Q    Thank you.

13           Dr. Levy, let's start with the first feature,

14  Spotlight.  Can you generally explain what Spotlight is?

15      A    Yes.  Spotlight is a feature and a facility

16  that actually consists of two major portions.  There's

17  the port -- part that's inside the computer that

18  organizes documents, which I'm going to refer to as the

19  Spotlight Store.

20           And, of course, there's a lot of software

21  programs associated with that that I've heard referred

22  to in the testimony as the Spotlight engine.  I'm

23  actually not going to talk about that so much, just the

24  store.

25           But you'll know when we talk about the

1  Spotlight Store. I'm talking about the software that

2  manages it and the contents as well.  So the Spotlight

3  Store is a key part.

4          And then the Spotlight search results, we're

5  going to talk about how the Spotlight allows someone to

6  search for things or find things and get results back

7  that eventually gets displayed to that.

8      Q    Dr. Levy, do you have an opinion as to whether

9  Spotlight is important to the Apple computers?

10     A    Oh, yes.  I believe it's not only an integral

11  part, but a key feature of the Apple operating systems.

12     Q    Do you have something to show us that

13  demonstrates how a search is performed using Spotlight?

14     A    Yes.  I'd like to show sort of a video clip

15  that demonstrates some of this.

16              (Video playing.)

17              STEVE JOBS:  What I'd like to do now is

18  just show you a little -- this is Spotlight.

19              All right.  I'm going to get the

20  Spotlight here.  Just click up here.  Isn't this great?

21              I've got a 20-inch cinema display every

22  single pixel up there on the screen.  That's fantastic.

23              So I'm going to say, Spotlight, I'm going

24  to look for soccer, and, boom, it finds everything in my

25  system.  I've got about a quarter million files on this

1   systems here -- it's a quarter million files, and it

2   just went through and found them all.

3            And I'm just going to say show all, show

4   the window, and here's all the things it found about

5   soccer.  And I can -- if they're sorted over here by

6   kind.  I can sort them by date, if I want to, so I'll

7   see all the things that I -- I've opened today or last

8   week or last month.  Or I can sort it by people, but I'm

9   going to keep by kind here.

10           And I'm going to go look at, as an

11  example, an equipment price list up here in documents,

12  the first entry.  And it opened an Excel document and

13  found out that the word soccer was inside an Excel

14  document, and, of course, it found it.  Very easy.

15           (End of video clip.)

16      Q    (By Mr. DiBernardo) Dr. Levy, is the operation

17  of Spotlight that we just saw relevant to your opinion

18  that Apple infringes the Gelernter patents?

19      A    Well, yes.  We just saw a demonstration of how

20  Spotlight searches for things in any case.  We'll talk

21  more in detail about how that works.

22      Q    And do you have a document that demonstrates

23  how Spotlight actually works?

24      A    Yes, I do.

25           THE WITNESS:  If you'll go to the next

1    Levy - Direct

2         A    So here, I'm going to describe for you how the

3    Spotlight Store works.  Now, this is the core of how

4    Spotlight keeps track of documents, organizes them, and

5    then answers questions about how to find things.  So I'm

6    using here a simplified diagram that I've taken from one

7    of Apple's own manuals.

8              They use this magnifying glass symbol here to

9    represent Spotlight, and inside the Spotlight Store

10   there are two portions:  The Metadata Store and the

11   content index.

12        Q    Dr. Levy, what's the Metadata Store?

13        A    Well, first, let's say what metadata is.

14             I think you heard the term, but metadata is

15   information about a document rather than the document

16   itself.  And so it might be something about like who

17   wrote the document or what time it was created.

18        Q    Is metadata important to your opinion that

19   Apple infringes the Gelernter patents?

20        A    Yes, it is.  It's a key part of the aspect of

21   keeping track of time and the sequence -- time sequence

22   of documents.

23        Q    And can you describe the content index in the

24   Spotlight Store?

25        A    Yes.  The content index is another kind of

1  storage system that keeps track of all the words inside

2  the document.  So content just means what was written in

3  the document.  So it's kind of like a index in the back

4  of a book where you can look up any of the topics, or in

5  this case, individual words and find out what page that

6  word was on.

7          And the content index it gives you a list of

8  all the documents that have that word for each word

9  that's in it.

10     Q     Thank you for that.

11          Can you describe now how the Spotlight Store

12  is actually used?

13     A     Yes.  I'm going to describe its operation in

14  five steps.

15              THE WITNESS:  So if you'll show the next

16  page, please.

17     A     So in general, a document is either created or

18  received by a computer system, and I'm showing this as

19  documents go in.  Now, they go into the system; and when

20  they do, the Spotlight Store is notified that something

21  new has come in.  So that's Step No. 1.

22          And Step No. 2, information about the

23  document, which is metadata, is stored in the

24  Spotlight -- in the Metadata Store, things like date and

25  time that it was created or the author.

1    And then, third, the words that are indexed, the

2    document are stored in the content index.

3              THE WITNESS:  So if you'll go to the next

4    page, please.

5        A    So then Steps 4 and 5 have to do with how this

6    is used once you've loaded up information into the

7    Spotlight Store.

8              The next one is with this question mark on the

9    right for No. 4 is a request for a search coming in.

10             Now, this is part of something that's called

11   an API, application program interface, which we'll

12   describe a little bit more in a moment.  But all you

13   need to remember now is that it's a way for two pieces

14   of software to talk to each other.

15             So first, the request for a search comes into

16   the Spotlight Store, and then the contents of the

17   metadata are found that match that, and then search

18   results are returned in Step No. 5.

19             And I'm showing that as a bunch of documents,

20   and that's where we're going to see search results and

21   substreams happen.

22        Q    (By Mr. DiBernardo) Dr. Levy, can you explain

23   for us where the search comes from in Step 4 in your

24   diagram?

25        A    Yes.  This search might come from any one of a

1   numbers of applicable programs, in fact, the 10/20

2   called the Finder, which is a very special application

3   program in the Macintosh operating systems.

4           So, for example, it might come from the

5   calendar program to find things related to due dates or

6   on a to-do item, or it might come from an address book

7   application to find a person whose address card is in

8   that or other information, or it might come from the

9   Finder, in which case it's looking for any kind of

10  document based on either its contents or its metadata.

11      Q    Thank you.

12          Do you have a document that demonstrates an

13  example of a document -- of metadata and content going

14  on into the Spotlight Store?

15      A    Yes.  On the next page, I have an example of

16  an e-mail, and by now, actually, you've all seen a lot

17  of e-mails shown to you.

18          This is shown, of course, as if it were on

19  paper, but, in fact, an e-mail is an electronic document

20  that comes in, but it still has all this information in

21  it.

22      Q    Does that e-mail have metadata?

23      A    Yes, it does.

24              THE WITNESS:  If you'll show the next

25  page, please.

1        A    So, an this e-mail, the metadata is a few

2   things, but includes the name of the sender and the date

3   it was sent.  And as you'll see, once that comes in, the

4   metadata is extracted and stored in the Metadata Store.

5        Q    (By Mr. DiBernardo) And does that e-mail have

6   content?

7        A    Yes, it does.

8             On the next page, you'll see the content, and

9   some of it is highlighted.  It's just the words that are

10   written in the document, in the body of the e-mail in

11   this case.

12             And so these words, each one of them, get

13   entered into the context -- content index, and so they

14   can be -- the document can be found based on the words

15   that were in it.  And this shows just a few of the words

16   that were in this document.

17        Q    Thank you, Dr. Levy.

18             Let's turn back to your summary board.  Your

19   summary board shows the Spotlight Store corresponding to

20   the mainstream.

21             What makes the Spotlight Store correspond to

22   the mainstream, in your opinion?

23        A    In my opinion, the Spotlight Store corresponds

24   to the mainstream for several reasons.  Number one, it

25   contains information about all the documents of interest

1   to a user and of all different types from all different

2   sources.

3          Number two, the documents keep being added to

4   this.  And also, because the -- when you request a

5   search and get results back, the results can be given in

6   time-order.  That forms a substream.  And so that tells

7   me that in this Spotlight Store where everything is

8   stored, that's where the mainstream is.

9   Q     Thank you.

10         Dr. Levy, do you have a document that

11  demonstrates the basis for your description of the

12  Spotlight Store?

13  A     Yes.

14         THE WITNESS:  If you'll go to the next

15  page, please.

16  A     These are some notes, then some summary from

17  some of Apple's manuals and some of Apple's software

18  developers.  It repeats what you've already heard.

19  The Spotlight Store holds metadata of the files.  Some

20  of the attributes of the metadata include creation date,

21  modification date, and due date.  That's some of the

22  time-oriented information.

23         These APIs, that's the way of talking to the

24  Spotlight Store, can return documents organized by time.

25  And the MDQuery API, which is the one we were talking

1   about returning search results in time order when

2   content index in Leopard and Snow Leopard sorts the

3   metadata in time order.  And that is also important, as

4   I'll explain in a bit, to confirm that this mainstream

5   is in the Spotlight index.

6       Q    Thank you.

7            Your earlier example used an e-mail.  Are

8   e-mails the only types of documents that are stored in

9   the Spotlight Store?

10      A    No.  Many types of documents are stored in the

11  Spotlight Store, including anything from letters I'm

12  writing to calendar items to photographs and movies and

13  music and many other things.

14      Q    And is this aspect of the Spotlight Store

15  important to your opinion that Apple infringes?

16      A    Yes.  It is certainly part of it because of

17  the various types of documents and coming in various

18  formats.

19      Q    Do you have something to show us that

20  demonstrates these different types of documents in the

21  Spotlight Store?

22      A    Yes.  I'd like to show another short video

23  clip, please.

24            (Video playing.)

25            STEVE JOBS:  So I take a handful of

1    features, but I'd like to show you the Mac OS 10 Tiger,

2    and the first one and the most important one is

3    Spotlight.

4                Spotlight is our search technology that's

5    built right into the core of Mac OS 10 Tiger, and it

6    allows you to find anything on your system:  Documents,

7    images, you know, appointments and calendars, things in

8    PDF files, bookmarks, anything, e-mails, contacts.

9    You name it, and you can find it almost instantly.

10               (End of video clip.)

11       Q    (By Mr. DiBernardo) Dr. Levy, we heard Apple's

12   CEO, Steve Jobs, describe Spotlight as built right into

13   the core.

14               Can you explain what that means?

15       A    Yes.  Spotlight and the Spotlight Store are

16   integrated into the operating system as a major facility

17   that's offered to all of the application programs,

18   including the Finder to use.

19               And not only that, it can be used by programs

20   that are written by people other than Apple so that

21   their applications can use the Spotlight Store to find

22   things.

23               And so it's really an integral part of the

24   operating system.

25       Q    Dr. Levy, do you have any other support for

1    four or five photos, different kinds of documents, are

2    stored in the Spotlight Store?

3         A    Yes.  On the next page, here are a few quotes

4    about Spotlight allowing you to find anything and naming

5    some of the things that it can find.

6              It says it indexes, importing the metadata in

7    all files in your computer.  Spotlight searches

8    everything.

9              And some of the examples down below includes

10   images -- that's like photographs or images -- music,

11   movies, various documents and messages and contacts and

12   many other things.

13             And, in fact, a person writing the application

14   program for use with Apple computers can also create

15   what's called an importer so that new additional types

16   of things can also be put into the Spotlight Store.

17        Q    Dr. Levy, where did these quotes come from?

18        A    These are from Apple's documents or their

19   people who were talking about them.

20        Q    Dr. Levy, does this feature, Spotlight Store,

21   that includes documents of different types correspond to

22   any feature in the Gelernter patents?

23        A    Yes.  It corresponds to the mainstream, the

24   Spotlight Store does, because it contains everything of

25   interest to a user.

1  Dr. Jones, glp the content of the Spotlight

2  Store ever change over time?

3     A    Yes, they do.  They are dynamically updated as

4  new documents or different kinds of files come into the

5  computer system or are created on the computer system.

6     Q    Do you have a document that demonstrates how

7  this is done?

8     A    Yes.

9          THE WITNESS:  If you would go to the next

10  page.

11     A    This is a quote from one of the Apple

12  documents:  As each file is created, copied, updated, or

13  deleted, Spotlight ensures that the entries for that

14  file are updated.

15          So it's not just a static picture of what is

16  in a document or what it's about, but every time it's

17  changed, the Spotlight Store updates the information.

18     Q    (By Mr. DiBernardo) And does this feature of

19  the Spotlight Store correspond to any feature in the

20  Gelernter patents?

21     A    Yes.  This dynamically updating in the

22  Spotlight Store corresponds to the persistent mainstream

23  characteristic that we'll show in the patents.

24     Q    And that's reflected on your poster board?

25     A    Yes, it is.  If you'll look at the last line

1  just above the 3D user interface you'll see how they

2  correspond.

3      Q    Dr. Levy, once a Spotlight search is

4  performed, are the search results ever updated?

5      A    Yes, they are.

6      Q    Can you give us an example of how they might

7  be updated?

8      A    Yes.  As the example I gave before

9  Dr. Gelernter did the search for everything related to

10  Jane, and he's looking at the search results on the

11  screen.

12          And then if a new thing comes in that has Jane

13  in it or is related to her name, that would also show up

14  dynamically right after it came in on his search

15  results.

16      Q    Can you show us something that demonstrates

17  the basis for your opinion?

18      A    Yes.  I'd like to show another short video

19  clip, please.

20              (Video playing.)

21              STEVE JOBS:  But it goes much deeper than

22  that, because, because the OS can let Spotlight know

23  when something changes, it instantly updates when things

24  change.  You don't have to run another search.  You

25  don't have to wait 10 minutes.

1    You used by looking at a search result,
2    will change right in front of you, if the underlying
3    files change, because the OS can notify Spotlight that
4    that's happened instantly.

5                    (End of video clip.)

6         A    So that instant notification is what enables
7    the Spotlight search results to be updated dynamically.

8         Q    (By Mr. DiBernardo) In the video, Mr. Jobs and
9    other people have referenced OS.  Just so we're all on
10   the same page, can you tell us what OS stands for?

11        A    OS just means operating system, so it's
12   referring to these operating systems that we've been
13   describing.

14        Q    Thank you.

15             Do you have any other documents that
16   demonstrate the basis for your opinion that the search
17   results in Spotlight are dynamically updated?

18        A    Yes.  On the next page, I have some quotes
19   from -- the first one from Steve Jobs in -- that you
20   just heard, that the results will change right in front
21   of you.

22             And also a couple of other quotes:  When the
23   file had -- of the computer is changed, Spotlight knows
24   and revises your search results on the fly.

25             And also what Spotlight calls this feature of

1   dynamic databases, live queries, just means that the search

2   results are live and keep being updated as you go, so

3   updating the results.

4       Q    Dr. Levy, do the Tiger, Leopard, and Snow

5   Leopard operating systems include the Spotlight Store

6   that you've just described?

7       A    Yes.

8       Q    Are there any differences between the

9   Spotlight Store in the Tiger, Leopard, and Snow Leopard

10  operating system?

11      A    Yes, there is one difference.

12           In the Leopard and Snow Leopard operating

13  systems, not only is the metadata put into the metadata

14  store, it's also -- the words of the metadata are also

15  entered into the content index.

16      Q    Do you have a document that demonstrates this

17  additional feature of Leopard and Snow Leopard?

18      A    Yes.

19           THE WITNESS:  If you'll show the next

20  page, please.

21      A    Here's the same e-mail that we talked about

22  before, but now instead of the sender and the date sent

23  only being -- showing up in the metadata store, you'll

24  find that those words are also included in the content

25  index.

1                    (By Mr. DiBernardo)  Thank you

2              Okay.  Dr. Levy, let's turn to what you have

3    on the poster board as Coverflow.  Let's start by

4    explaining how Coverflow is relevant to your opinion

5    that Apple infringes.

6         A    Okay.  Well, Coverflow shows a

7    three-dimensional interface that I believe infringes the

8    3-D user interface of the Gelernter patents.

9         Q    Can you show us something that demonstrates

10   what Coverflow is?

11        A    Yes.

12                  THE WITNESS:  Please, the next page.

13                  (Video playing.)

14                  STEVE JOBS:  Well, let me first show you

15   Coverflow.  And here's Coverflow view, and I can just

16   scroll through my documents and see all my documents and

17   find exactly what I'm looking for right here.  It's

18   really simple, and it's really, really helpful.

19                  (End of video clip.)

20        A    So that's a brief vision of how it moves.

21   Anyway, he talks some more.

22        Q    (By Mr. DiBernardo) That was kind of quick.

23   Do you have another document that you can use to explain

24   the different aspects and characteristics of Coverflow?

25        A    Yes.

1   On the next page, here's an example of
2   Coverflow as it appeared on my own system one day with
3   some particular set of documents that were search
4   results.
5           And here you -- let me see if we can get the
6   right color.  We have the center portion that is larger
7   and closer to the viewer, and then we have the stacks
8   going -- the stack to the left and to the right that
9   have document representations stacked up and fading away
10  as they get towards the sides.
11          So as you see, the image -- as the image moves
12  towards the sides, there's an increase in the shadows
13  between them.  There's a fog effect that makes them look
14  farther away.
15          They show perspective in the way that I'm
16  going to show more in a bit, and there's a little bit
17  less of the content shown on each one as you go out.
18  And also the reflections in the tabletop sort of thing
19  there also tend to fade out.
20          So those all give the impression of depth to
21  this display.
22      Q    (By Mr. DiBernardo) Are these characteristics
23  that you just described of the Coverflow view reflected
24  on your summary board?
25      A    Yes.  Under Coverflow, you'll see that there

1   are images of those documents here.  There's a

2   center image.  The images recede to the side with

3   changing perspective.  And as we've seen in the

4   demonstration so far, there's a way of sliding the

5   stack.

6        Q     Let's actually turn to that notion of sliding.

7              Can you give us a better sense as to how a

8   person actually uses Coverflow?

9        A     Yes.

10             THE WITNESS:  If you'll go to the next

11  page, you'll see there's an animation that gives an

12  example.

13             (Animation playing.)

14       A     This is how one would move through the stack

15  of documents using Coverflow.  And as each one is

16  selected, it moves to the center and pops forward.

17       Q     (By Mr. DiBernardo) You can see on the screen,

18  Dr. Levy, there's a little horizontal bar under the

19  document images.  Can you explain what that is?

20       A     Yes.  This thing is called the scroll thumb,

21  and that is one way to cause the stack to move.  If you

22  put your cursor over that and hold the mouse button down

23  and drag it -- that's what they call it, dragging --

24  that will cause the whole stack to move.  And there are

25  other ways to cause that stack to move.

1    Okay. And is this notion of sliding reflected

2  on your poster board?

3        A    Yes, it is.  That's the one that says:

4  Sliding stack.

5        Q    Dr. Levy, does Coverflow provide any benefits

6  to Apple users?

7        A    Yes.  It's a very convenient way for the user

8  to browse through the documents with this glance view

9  popping up in the center as you move through the stack.

10  And so that makes it easy to tell what kind of document

11  it is.

12        Q    Does Coverflow work with the Spotlight search

13  you described?

14        A    Yes.  Yes, it does.  Spotlight search results

15  can be shown in the Coverflow view.

16        Q    Thank you, Dr. Levy.

17             Let's move to the third and final Apple

18  feature, Time Machine.  Can you describe for us what

19  Time Machine is?

20        A    Yes.  Time Machine is an archiving or backup

21  facility.

22             THE WITNESS:  Show the next slide,

23  actually.

24        A    So this is the picture I showed you before

25  about archiving.  And one of the ways you -- one of the

1    kinds of backup storage that there is.  It's a product

2    sold by Apple called Time Capsule, and it's a -- it's a

3    storage unit that you plug into your computer, and

4    that's a place where Time Machine can put these backup

5    copies.

6         Q    (By Mr. DiBernardo) How is Time Machine

7    relevant to your opinion that Apple infringes the

8    Gelernter patents?

9         A    Well, I believe that Time Machine infringes

10   the automatic archiving aspect of the Gelernter

11   inventions.

12        Q    Do you have a document that demonstrates

13   what's archived in Time Machine?

14        A    Yes.

15             (Video playing.)

16             STEVE JOBS:  Time Machine automatically

17   backs up your Mac.  If you change a file, that file is

18   automatically backed up.

19             And we back up everything.  We back up

20   all of your photos, all of your music, all of your

21   documents, all your files, your folders, your

22   applications, your operating system, your software

23   updates, everything.  We back up absolutely everything.

24             (End of video clip.)

25        Q    (By Mr. DiBernardo) Dr. Levy, is this video

1    your end supports [sic] the description of Time Machine?

2    A    No.  I have another document.

3              THE WITNESS:  If you would show the next

4    page, please.

5    A    So here are -- here's an image from Apple's

6    own documents, manuals, and a description of Time

7    Machine and a couple of quotes.

8              Time Machine is an automatic backup, keeps an

9    up-to-date copy of everything.  How you find things is

10   you select a date and let Time Machine find your

11   search -- your results, and you can do a Spotlight

12   search in those results -- in the Time Machine.

13             And the last quote, which is not highlighted

14   here, shows that it doesn't let anything get more than

15   one hour old.  So every hour, it makes another backup so

16   that anything older than that would be archived.

17   Q    (By Mr. DiBernardo) Does Time Machine put

18   anything else, other than documents, in its archive?

19   A    Yes.  In order to be able to do a Spotlight

20   search in the archive, it has to put the metadata there

21   as well.  And so the metadata and the content index are

22   also created in the archive.

23   Q    Does that archive metadata include things like

24   the date an e-mail was sent in the center of that e-mail

25   the way you described earlier?

2    Q    Okay.  Are these features reflected on your

3   poster board, Dr. Levy?

4    A    Yes.  On the last two lines of this board,

5   you'll see Time Machine has automatic backup, which

6   corresponds to the archiving, and the fact that

7   Spotlight search can be done in Time Machine corresponds

8   to the searchable aspect of the automatic archiving.

9    Q    Thank you, Dr. Levy.

10           Now let's turn to your detailed analysis of

11   infringement of the claims of the Gelernter patents.

12           Do you have a document that tracks your

13   opinion that Apple infringes the claims of the Gelernter

14   patent?

15    A    Yes, I do.

16           THE WITNESS:  And with your permission,

17   I'll --

18           MR. DIBERNARDO:  With your permission,

19   Your Honor, we'd like to show a summary board that we

20   can use to keep track of these claims.

21           THE COURT:  All right, as a

22   demonstrative.

23           THE WITNESS:  I don't need a microphone.

24           Can y'all see that?

25           No?  All right.  I'll get another easel.

```
 1              Johnson D'all, see?

 2      Q      (By Mr. DiBernardo) Thank you.

 3      A      So this is a summary chart that shows the

 4  claims that we've asserted against the Apple products

 5  along the top, and then down the side are the products

 6  themselves that we claim infringe these patents.

 7      Q      Dr. Levy, I see that the first line, Tiger OS,

 8  Tiger is listed separately than Leopard and Snow

 9  Leopard.  Can you explain why?

10      A      Yes.  We do not claim infringement by the

11  Tiger operating system for certain claims starting from

12  22 on to the right.  And so that's why those are

13  crosshatched or grayed out.

14      Q      Is there a difference between Tiger on the one

15  hand and Leopard and Snow Leopard on the other?

16      A      Yes.  The Coverflow and Time Machine features

17  were not introduced until the Leopard operating system.

18      Q      And how about the Spotlight feature?

19      A      The Spotlight feature is in both of them.

20      Q      Dr. Levy, the first patent claim in the upper

21  left is '227 patent, Claim 13.  Let's start there.

22              Have you prepared any documents to demonstrate

23  to the jury your opinion that Apple infringes Claim 13

24  of the '227?

25      A      Yes, I have.  And this is the -- Claim 13 of
```

1  the '227.  Now, this has eight parts to it.  Each part
2  is known as a limitation.  And we're going to be going
3  through these one by one, because we have to show how
4  Apple infringes each and every part of it.
5          So don't worry about the fact that this type
6  is a little small.  We'll be repeating them one by one.
7  And then on the right, I have the particular feature of
8  the Apple operating systems, just as a summary, that is
9  related to that particular limitation.
10     Q     Before we get into a detailed analysis,
11  Dr. Levy, can you explain generally what Claim 13
12  covers?
13     A     Generally, Claim 13 has to do with streams and
14  the operation of streams.  And so, therefore, only the
15  Spotlight feature is involved in these aspects.
16     Q     Okay.  You mentioned Claim 13 covers a method.
17          What performs that method?
18     A     Well, the method is performed by the computer
19  and the software in it working in response to something
20  that a user is doing on the computer system.
21     Q     Let's turn to the first limitation, (a).  Do
22  you have an document that explains your opinion on how
23  Apple's Tiger, Leopard, and Snow Leopard operating
24  systems include that limitation (a)?
25     A     Yes.

THE WITNESS:   The next page is 116.

2       A      So here we have Claim 13, and we've numbered

3   these (a) through (h), so -- you may not be able to see

4   that, but this is limitation (a).

5              And it's a method which organizes each data

6   unit received by or generated by a computer system

7   comprising the steps of, and then each of the other

8   limitations are those steps.

9              So this -- yeah.  Go ahead.

10      Q      (By Mr. DiBernardo) Can you first describe

11  just the format, the layout of your page?

12      A      Yes.  For each of these limitations, we're

13  going to have the -- in the upper left, the blue part,

14  the -- the limitation itself exactly as it reads in the

15  patent.

16             And then down below that, we will have a --

17  any terms that are in there that were construed by the

18  Court so that we make sure that we follow those.

19             And then on the right, we'll have either

20  information that helps to show how I determined that

21  they infringe.

22             In this case, we have a diagram of the

23  Spotlight Store, which is a key part of this.

24             Across the top, of course, I also have the

25  theme or the general idea that's expressed in that claim

1   limitation

2       Q    And could you just summarize how Apple meets

3   this limitation (a)?

4       A    Yes.  As I've described already to you, the

5   Spotlight Store organizes the data units that come into

6   the computer or are received -- or are generated by the

7   computer.

8            And so in the way that I've described,

9   everything that's there is in the Spotlight Store, and

10  that's how that meets this claim limitation, which will

11  be shown in more detail as we go through the others.

12      Q    Thank you.

13           Let's the turn to limitation (b).  Do you have

14  a document that explains your opinion that Apple's

15  products include limitation (b)?

16      A    Yes.

17           THE WITNESS:  The next page, please.

18      A    So then the first step is:  Generating a

19  mainstream of data units.  And we'll talk about the

20  substream in a little bit.  That mainstream is for

21  receiving these data units that are received or

22  generated by them.

23           And so that's why I've -- and so mainstream

24  has already -- has been construed by the Court as a

25  stream that's inclusive of every data unit or document

received by or generated by the computer system.

2          Now, remember, the data unit means an item of

3    information of interest to the user that the user

4    considers as a unit.  So this is what that's referring

5    to.

6          And then a stream is used in that definition,

7    and so a stream is a time-ordered sequence of documents

8    that functions as a diary of a person's life and is

9    designed to have three main portions:  Past, present,

10   and future.

11         So the support for this is that the Spotlight

12   indexes everything, all of the files.  The Spotlight

13   Store holds all the metadata attributes.  And as I've

14   already explained, having those time-related metadata

15   attributes and the operation of the search results make

16   the Spotlight Store a mainstream.

17   Q    (By Mr. DiBernardo) Can you remind us, where

18   does that mainstream exist in the Apple's computers?

19   A    It exists inside the Spotlight Store, along

20   with, of course, the underlying files that are stored in

21   the file system.  So those are referred to in the

22   Spotlight Store, so we think of them as being in the

23   Spotlight Store.

24   Q    Dr. Levy, limitation (b) also refers to

25   substreams for containing data units only from the

1   mainstream.  In your opinion that Apple's operating

2   systems include this limitation?

3       A    Yes.  On the next page, we're still looking at

4   claim limitation (b), but now we're focusing on the fact

5   that it generates at least one substream, and the

6   substream is for containing data units only from the

7   mainstream.

8           So as we've seen -- I'm sorry.

9           So the Court's definition of a substream is a

10  stream that is a subset of data units or documents

11  yielded by a filter on the screen and the filter

12  identifying certain documents within the screen.

13          Well, that's just a very good description of a

14  search that we've described that selects certain

15  documents out of that mainstream or out of the full set

16  of all the data units on the computer system.

17          And so the Spotlight search results that are

18  returned over here on the -- here (indicates) are

19  composed of substream that's in a data structure that's

20  returned through the API, and thus, it meets this claim

21  limitation.

22      Q    Thank you.

23          And do you have a document that explains your

24  opinion that the Apple operating systems include

25  limitation (c)?

1      That's on the next page.  So I'm going to
2   actually have an example of the substream, and I'd like
3   to explain this in a way that we can grasp in everyday
4   life.
5           So if you were a schoolteacher and you wanted
6   to organize the students in your class, it would be like
7   an application program that's going to request something
8   from the main office at the school.  Give me a class
9   list.
10          And so this would be an example of a form you
11  might fill out that gave the grade number you're
12  teaching and the teacher's name and said:  I want to --
13  I want to have my students sent back to me that are
14  going to be in this class listed by their birth date.
15          You might be interested in that because you
16  want to order your class by the age of the students.
17  So this form represents the API or the way in which a
18  Spotlight search or a search would be done.  So you
19  would just send this form down to the main office, and
20  then it would get filled out based on the mainstream of
21  information that was stored in the office, which would
22  have all of the students.
23          So on the next page, this is the way it might
24  come back to you with those search results.  So here are
25  the eight students in this case, who are in your class,

1    and these are organized in a time-ordered subgroup by

2    birthday with the oldest first and the youngest last.

3           And so this would be the equivalent -- this is

4    an example of a substream.

5           Now, I want you to notice that this form is

6    not what's necessarily displayed, and so the equivalent

7    for a teacher might be:  I get this form back, and I

8    copy these into my class book and maybe later on assign

9    the seats for the students in my class.

10          So it's not -- it's not necessary to be in the

11   final form in which it's displayed in order to come back

12   as a time-ordered list.

13          So that substream is still in the data

14   structures of this computer.  And there's an example

15   that you might find in -- something like that in

16   everyday life.

17     Q     In your example, Dr. Levy, do the birthdays

18   correspond to anything in the Spotlight Store?

19     A     Yes.  These birthdays correspond to time-based

20   information or related to what we call a timestamp?

21     Q     And is that time-based information stored in

22   the Spotlight Store?

23     A     Yes, it is.

24     Q     Where is it stored?

25     A     It's stored at least in the metadata store and

1   on the demand-paged Inter operating systems also in the

2   content index.

3       Q    Thank you.

4           With that, let's move on to the next

5   limitation, (c).  Do you have a document that explains

6   your opinion regarding limitation (c)?

7       A    Yes.  On the next page, it describes receiving

8   data units from other computer systems.  And remember, a

9   data unit is any item of significance to the user that

10  the user considers as a unit.  And of course, these are

11  things like e-mails or maybe other documents.

12          And ways that the computer system might

13  receive things from outside would be by e-mails coming

14  in, or another way might be over the internet by

15  downloading some file from a website.  Those are just a

16  couple of examples.

17          And so since all Apple computers do that, they

18  do meet this claim limitation.

19      Q    Thank you.

20          Let's move on limitation (d).  Can you explain

21  your opinion as to why Apple's products include this

22  limitation?

23      A    Yes.  This limitation is generating data units

24  in the computer systems.  And so there are many ways to

25  generate a new data unit in your computer system, and

1   some of them would be like writing to e-mail and sending

2   it or writing a letter and saving it in the system or

3   putting something in the calendar.

4           The example shown here is address book card

5   that has a name and an address for Steve Jobs in this

6   case.  That would be an example of a data unit that was

7   created in my computer system.

8           And so this is -- this shows that Apple

9   computers do generate data units and meet this claim

10  limitation.

11      Q    Dr. Levy, where did that example on the right

12  come from?

13      A    That example comes from an Apple document that

14  shows an address book example.

15      Q    Thank you.

16          Let's move on to the next limitation.

17          Can you explain your opinion that Apple's

18  products include this limitation?

19      A    Yes.  This one says:  Selecting a timestamp to

20  identify each data unit.

21          Now, the parties have defined a timestamp to

22  identify as a date and time value that uniquely

23  identifies each document.

24          Now, you're going to hear a lot more about

25  this one, because there's a lot of argument about

1   whether this exists in the computer system.

2           However, I want you to remember that the

3   timestamp to identify is referring to identifying where

4   in the time-ordered stream a document is going to be

5   placed.  So that's the key thing about this.

6           So now, whenever a data unit is created by or

7   received by the computer system, it does select a

8   timestamp to identify the data unit within the stream.

9           What timestamp it chooses is a matter of

10  choice depending on what kind of data unit it is and

11  some decisions they made in the operating system about

12  what should be appropriate for a given document.

13          But it's important to remember that -- and

14  they may have multiple timestamps, like a creation date

15  and a modification date and other possible dates.

16          So this timestamp, as we've -- I've found it

17  in the system is comprised of date and time information,

18  such as one or more of those dates that I just

19  described.

20          Now, in addition, just in case two of those

21  data units have the same date and time information, then

22  there's an additional piece that's used as a tiebreaker;

23  that is, so that when we get the time sequence data

24  units, they always get sorted out in the same order.

25          So that tiebreaker is another little piece

1  that's used inside the time-ordered stream of a

2  timestamp.

3      Q    You mentioned this tiebreaker, Dr. Levy.  What

4  is the tiebreaker in the Apple operating systems?

5      A    In the Apple operating system, there's an

6  identifier known as the CFUUID, which is used as a

7  tiebreaker when the other time and date information

8  happen to be the same.

9      Q    When -- when does this -- you referred to a

10  timestamp Dr. Levy.  When does the Apple computer assign

11  a timestamp?

12      A    Well, it assigns a timestamp when the data

13  unit is either brought in or is created in the computer

14  system, and it may update the timestamp for things like

15  modification date as things happen to that data unit or

16  document.

17      Q    You were here in court today and yesterday,

18  correct?

19      A    Yes, I was.

20      Q    And did you hear Dr. Gelernter's testimony

21  regarding timestamp?

22      A    Yes, I did.

23      Q    And does his testimony relate to what you've

24  been talking about as timestamps?

25      A    Well, in some ways.  I think he was asked

 1    about how you weigh versus timestamps to things that

 2    came in all nearly at the same time, and I believe he

 3    answered that they might be slightly different times.

 4            But even if they were the same time, we would

 5    just -- the stream aspect would use a tiebreaker to

 6    determine the order.

 7            But I also heard Dr. Gelernter talk about a

 8    whole bunch of photographs where you couldn't tell when

 9    they were taken.  But, in fact, these days, with digital

10    photographs, almost all of those photographs come in

11    with a timestamp already with them that tell you when

12    the photo was taken, as well as a lot of other

13    information about each photograph.

14            And so perhaps Dr. Gelernter wasn't thinking

15    about the modern cameras.

16       Q    And do you have an understanding as to whether

17    Dr. Gelernter was describing timestamps in the context

18    of what's described in the body of the Gelernter

19    patents, as opposed to the claims?

20       A    Yes, I think so.  Dr. Gelernter was describing

21    the general idea of timestamps as described in the

22    patent specification.

23       Q    That whole discussion sounds a little

24    complicated.  Can you give us an example of this type of

25    tiebreaker?

 1      A     Yes.

 2              THE WITNESS:  If you'll go to the next

 3   page, please.

 4      A     So here's the class list as it came back, and

 5   I don't know if you noticed this before, but right here

 6   we have two students with the same birthday.

 7              Well, now, I, as the teacher, don't really

 8   care which one comes first, but I do care that every

 9   time I see this time-ordered list, they come out in the

10   same order.

11              And so in this case, a tiebreaker may have

12   been used to make sure they always come out in the same

13   order.  That could have been something like the student

14   ID number, if they had one, and that would be used only

15   when the tiebreaker was needed.

16              And that's very similar to what the Apple

17   systems do.  They use a tiebreaker number only when they

18   need to differentiate two things that seem to have the

19   same time and date value.

20      Q     (By Mr. DiBernardo) That tiebreaker is not

21   shown on that class form, is it?

22      A     No, it's not.

23      Q     And why is that?

24      A     Well, because it's not really important to the

25   person looking at this how it determined which of those

 1  two front feeds, Deplong as they don't keep switching

 2  around, that's fine.

 3      Q    Where does that tiebreaker exist?

 4      A    The tiebreaker exists down in the main office,

 5  right?  And so it gets applied when the office produces

 6  this list so that it always comes out the same way.

 7           So in that sense, it's applied when the

 8  Spotlight search results are composed.

 9      Q    Dr. Levy, is this tiebreaker important to this

10  case?

11      A    Yes.  We'll find that there's a lot of

12  argument about whether there's really a timestamp in the

13  system; but this is how I show that the timestamp, as

14  we've identified it in the Apple system, actually meets

15  the claim limitations.

16      Q    Do you know if Dr. Feiner, Apple's expert,

17  agrees with you that timestamps can include these types

18  of tiebreakers?

19      A    Well, I don't know if he agrees with me on

20  many things, but in his deposition he did give examples

21  of using this kind of another number as a tiebreaker to

22  make a unique time identifier or timestamp.

23      Q    Are these types of tiebreakers well known in

24  the computer industry?

25      A    Yes, they are.  They're common knowledge

1  among to those who knew about timestamps and computer

2  software.

3      Q    Thank you, Dr. Levy.

4           Let's move on to the next limitation.  Do you

5  have a document for the limitation (f)?

6      A    Yes.

7           THE WITNESS:  The next page, please.

8      A    Limitation (f) says:  Associating each data

9  unit with at least one chronological indicator having a

10 respective timestamp.

11          Now, chronological indicator is a data

12 structure containing at least a timestamp.  So you can

13 just think of it as a container that holds that

14 timestamp in it.

15          Now, the Spotlight Store and the Metadata

16 Store has all of the metadata attributes about the

17 files, and so the Spotlight Store, because of that,

18 contains data structures with a timestamp that

19 identifies the data unit within the time-ordered stream.

20 And so, therefore, it meets this claim limitation.

21     Q    (By Mr. DiBernardo) The Court's definition of

22 chronological indicator, it says that it's a data

23 structure containing at least a timestamp.

24          Can you remind us what that data structure is?

25     A    Yes.  That data structure would be the

1   Metadata or Stored itself or perhaps the content information in
2   the case of Leopard, which also contains the timestamp
3   information, together with the information that tells me
4   how to find the file that has that information in it.
5   That would be something called a pointer.

6       Q     A pointer.  Can you describe for us what this
7   pointer is?

8       A     Yeah.  A pointer is just a number or something
9   that tells me how to go get the original document
10  itself.

11      Q     Do you have an example of a pointer like this?
12      A     Yes.

13            THE WITNESS:  If you'll go -- show the
14  next slide.

15      A     Once more with the class list, after the
16  teacher gets the class list back, they might assign
17  seats to the students.

18            Now, this would probably not be on this form
19  but might be in the class book, but that would be a
20  pointer to where the student actually is.  What you have
21  here is not the student, just this information about the
22  student.

23      Q     (By Mr. DiBernardo) Thank you, Dr. Levy.

24            Let's move on to limitation (g).  Would you
25  please explain your opinion as to how the Apple products

1   include limitation (e)?

2       A    Yes.  This one reads:  Including each data

3   unit according to the timestamp in the respective

4   chronological indicator in at least the mainstream.

5            Now, this is just saying that the -- every --

6   each data unit is put into the mainstream according to

7   its timestamp value.

8            And so since the Spotlight Store has the

9   time-related information associated with each document

10  in the Metadata and/or the Content Index Store, and

11  everything's there, the mainstream is in the Spotlight

12  Store, and it's included there, according to its

13  timestamp.

14           Now, you may wonder what that means.

15  According to the timestamp, I believe just means that

16  it's got the timestamp information in there, and

17  whenever you go to get anything out of there, it comes

18  out in time order.

19           And that is the case with the API, the

20  substreams that you pull out.  It's kind of like having

21  a box where you've got everything in there, and every

22  time you reach in to get anything, it comes out in time

23  order.  So that, to me, says it's there, and it's

24  time-ordered, because all that information is there.

25           But in addition, in the Leopard operating

1   system that chronological indicator is also in the

2   content index.  And in the content index, it's actually

3   laid out in time order.  And so there is a literal data

4   structure there, which is time-ordered for the

5   mainstream.

6       Q    Thank you, Dr. Levy.

7            Let's move to limitation (h).  Do you have a

8   document explaining your opinion on that limitation?

9       A    Yes.  This one says:  Maintaining at least the

10  mainstream and the substreams as persistent streams.

11           And here persistent streams means streams that

12  are dynamically updated.

13           So we've talked about what that means, that as

14  new things come in, they are automatically updated.  Not

15  only the contents of the Spotlight Store, but the search

16  results are dynamically updated.

17           And so the system meets this claim limitation.

18      Q    Thank you, Dr. Levy.

19           And with that, the last limitation, is it your

20  opinion that Apple's Tiger, Leopard, and Snow Leopard

21  operating systems infringe Claim 13?

22      A    Yes.  Since we've completed each of the eight

23  claim limitations and found the ways in which the Apple

24  products infringe, that means they infringe Claim 13.

25      Q    You mentioned we'd be using your poster board

1    Can I redo our progress.  Can we do that?

2    A    Yes, please.  If you'll check off Claim 13 for

3    the Tiger and Leopard operating systems.

4              MR. DIBERNARDO:  Your Honor, if I may?

5              THE COURT:  Yes, you may.

6    Q    (By Mr. DiBernardo) Thank you, Dr. Levy.

7              The next claim on your chart is Claim 22 of

8    the '227.  Do you have a document that demonstrates your

9    opinion that this claim is infringed?

10   A    Yes, I do.

11             THE WITNESS:  Can you show the next page?

12   A    Claim 22 is what's called a dependent claim.

13   And I think you heard the Court describe to you what a

14   dependent claim is.  It's a claim that refers to another

15   claim and then adds on something more.

16             So this Claim 22 has to have all of the eight

17   claim limitations of Claim 13, and in addition -- in

18   addition, it has archiving data units having timestamps

19   older than a specified time point.

20             And this is going to refer to Time Machine, as

21   you'll see in a moment.

22             THE WITNESS:  Do we have another document

23   on this?  Yes.  Thank you.

24   Q    (By Mr. DiBernardo) Thank you.

25   A    So I described to you how Time Machine

1   archives data until it's copying them to a separate

2   storage unit.  It does this every hour every day.

3          Incremental backup, that just means another

4   copy is made automatically.

5          So this means that everything that's older

6   than an hour will be backed up automatically, and,

7   therefore, the system does archive data units having

8   timestamps older than a specified time point, mainly an

9   hour older than now.

10     Q    Thank you.

11          So is it your opinion that Apple --

12     A    With that creation, they do that, yes.

13     Q    Thank you.

14          So is it your opinion that Apple infringes

15  Claim 22?

16     A    Yes, it is.

17     Q    And what products infringe?

18     A    That would be the Leopard and Snow Leopard

19  operating systems and the computers that use them.

20     Q    Thank you.

21     A    That's because Time Machine was introduced

22  with the Leopard operating system.

23     Q    And may I reflect that infringement on the

24  board?

25     A    Please.

 1

 2          THE COURT:  Yes, you may.

 3     Q    (By Mr. DiBernardo) Dr. Levy, the next claim

 4  on your board is Claim 1 of the '427 Gelernter patent.

 5          Is it your opinion that Apple infringes Claim

 6  1 of the '427 patent?

 7     A    Yes, it is.

 8     Q    Do you have a document that demonstrates your

 9  opinion?

10     A    Yes.

11          THE WITNESS:  If you'll show the next

12  page, please.

13     A    Now, this is Claim 1 of the '427 patent, and

14  this is, again, something with eight parts, and we're

15  going to go through these one by one.

16          And you'll see on the right that this will

17  involve not only the Mac operating system but Spotlight,

18  Time Machine, and Coverflow.  So it's going to cover all

19  three features.  It's going to be related to all three

20  features.

21     Q    (By Mr. DiBernardo) Let's turn to limitation

22  (a) then.  Can you explain your opinion that the Apple

23  product includes limitation (a)?

24     A    Yes.  Now, this one reads:  A stream-based

25  operating system utilizing subsystems from another

1    system running on a computer, and they start reading before a

2           Now, first of all, a stream-based operating

3    system is an operating system that is based on a

4    time-ordered sequence of documents and so on.  And

5    that's describing the words that make up a stream

6    definition.

7           And so any operating system that has streams

8    implemented in them is a stream-based operating system

9    for the purpose of this claim language.

10          So as we've seen, Spotlight implements a

11   stream; therefore, we're talking about a stream-based

12   operating system.

13          And in addition, this talks about utilizing

14   subsystems from another operating system.

15          Now, here, we have a chart from one of Apple's

16   manuals describing the Mac OS 10 -- I'm sorry; this is

17   the way they pronounce it -- OS 10 operating system, and

18   it says it can be viewed as a set of layers.  And it

19   says, also:  At the lower layers are the fundamental

20   services.

21          Now, the bottom layer is a kernel.  That's the

22   name they use for this bottom layer in general, and it's

23   called Darwin.  It's the main portion of this operating

24   system, and it comes from another operating system.

25          Darwin was originally part of the UNIX

1   operating system. It says here "and it is the lowest
2   layer within the OS 10 operating system.

3           And, therefore, this meets this limitation,
4   because this stream-based operating system, the whole
5   thing utilizes subsystems from this other operating
6   system.

7       Q   Thank you for that explanation.

8           Let's move on to the next limitation,
9   Dr. Levy.  Can you explain your opinion that limitation
10  (b) is included in the Apple products?

11      A   Yes.  Now, this one reads:  A
12  document-organizing facility receiving documents created
13  by diverse applications and diverse formats specific to
14  the respective applications.

15          Now, we've already talked about this.  The
16  applications are these application programs, and the
17  diverse formats just refers to the fact that a letter
18  and an e-mail are in different formats.  They don't look
19  the same.  They're not composed the same.

20          And the Spotlight Store is this
21  document-organizing facility.  And, therefore, as we see
22  here, here's some examples of the diverse formats of
23  documents that are received by and organized by the
24  Spotlight Store, and therefore, it meets this claim
25  limitation.

Theodore E. Levy

1          Let's turn to the next limitation of Claim 1,
2   limitation (c).  Do you have a document that explains
3   your opinion that Apple's Leopard and Snow Leopard
4   operating systems include this limitation?
5       A    Yes.  The next page, it says:  The
6   document-organizing facility automatically associates
7   respective selected indicators with the received
8   documents.
9          Now, selected indicators is defined as data
10  structures that contain information relating to those
11  respective documents.  And so as we've already seen, the
12  metadata is a kind of indicator that has information
13  relating to the document.
14         And so this is referring to metadata, and the
15  Spotlight Store holds all the metadata attributes, and
16  some of those examples are -- that are time related are
17  the creation date, modification date, due date, that
18  I've shown the actual internal names for those metadata
19  items here taken from one of Apple's manuals.
20         And so these are associated with the documents
21  that are received by that way I told you where it has
22  pointers.  It says, if you're looking for this metadata,
23  there's where the document is.
24         And so that meets this claim limitation (c).

 1      Lehoczky                  
 2  explain how Apple's products include this limitation?

 3      A    Yes.  Automatically archiving the documents
 4  and indicators in consistent format for selective
 5  retrieval.  Well, that's a fancy way of saying, once you
 6  store the things away, they're archived with some of the
 7  metadata so that you can get things back by looking at
 8  the metadata.

 9          Now, remember, their archiving is copying or
10  moving documents to a secondary storage medium.  We've
11  described how Time Machine does that.

12          And in addition, not only does it store a copy
13  of everything, as it says here, but it also allows you
14  to do a Spotlight search.  And therefore, we know that
15  the metadata and the content index are created on the
16  Spotlight's Time Machine volume -- backup volume, and
17  you can do a Spotlight search on it.

18          And, therefore, it has archived the documents
19  and the indicators and, therefore, meets this claim
20  limitation.

21      Q    Thank you.

22          Moving to limitation (e), can you explain how
23  the Leopard Tiger and Snow Leopard meet this limitation?

24      A    Yes.  This limitation says:  Creating --
25  automatically creating information specifying respective

1    glance views and said respective document

2    representations of said documents.

3         Now, remember, that the definition of a glance

4    view is an abbreviated presentation of a document.  It's

5    not the whole thing that you get when you retrieve the

6    document.

7         And a document representation is a graphical

8    depiction of a document or data unit.

9         And so here, we now come for the first time to

10   Coverflow, which provides this kind of glance view and

11   document representations as we've already talked about.

12        And so glance -- Coverflow meets this claim

13   limitation by providing glance views and document

14   representations.

15   Q    Thank you, Dr. Levy.

16        Moving on to limitation (f), could you explain

17   your opinion with regard to this limitation?

18   A    Yes.  And you're going to hear a lot about

19   this one, because we argued a lot about it.  What is a

20   receding foreshortened stack?

21        So this says:  A display facility displaying

22   at least selected document representations -- that means

23   some of the images -- as a receding foreshortened stack

24   of partly overlapping document representations, such

25   as -- such that only part of each displayed document,

1    after the first document representation after the

2    first in the stack, is visible to the user.

3           And so as we've seen here in the Coverflow

4    display, we have a receding foreshortened stack that the

5    first document in the stack is the only one that's

6    entirely visible to the user, or in some cases, even

7    that one is not.

8           And as Apple's Mr. Goossens described, the

9    impression to the viewer is that the stack is receding

10   away from the viewer to the left and the right with

11   perspective effects, which are provided by shading,

12   shadowing, and angling of the top edges of the document

13   representations.

14          And so Coverflow display meets this claim

15   limitation.

16      Q    Dr. Levy, is this the only image from

17   Coverflow that satisfies this limitation (f)?

18      A    No.  I'd like to show another one, please.

19          Now, here's an example of photographs that are

20   being shown in Coverflow.  And you'll see as the image

21   here moves off to the side, that the perspective effects

22   on it actually cause the top level -- top edge to change

23   its angle and to get longer.

24          So that's another example of how Coverflow

25   provides perspective effects and moves the documents

1    ~~through~~

2        Q     That went by kind of quickly.  Would you like

3    to explain that again for us?

4        A     Sure.  Would you like to run it once more?

5              So here we're showing how, as the image moves

6    out to the side, it's actually changing its apparent

7    image to the way -- to the viewer of this scene, and the

8    top edge is getting longer, and therefore, the angle is

9    getting shallower.

10             And that's a perspective effect that gives the

11   impression of the thing rotating away from you, which,

12   along with the shading and -- of this and a few other

13   effects, makes it look like it's receding.

14       Q     Is this change in length important to your

15   opinion?

16       A     Yes.  This is a demonstration of the effects

17   of perspective being applied to the document

18   representation.  And that, of course, is happening even

19   in the static image here where the top edge is angled

20   down and the bottom edge is angled up.

21             That's perspective, but in addition, that

22   perspective is changing as it moves out to the side.

23       Q     Does Apple's expert, Dr. Feiner, agree with

24   you, that Coverflow shows a receding foreshortened

25   stack?

1      A     No, I think he's quite opposed to the idea.

2      Q     And do you disagree with Apple's expert?

3      A     I do.

4      Q     Can you summarize why you disagree?

5      A     Well, I think Dr. Feiner, as I recall, refers

6  to the height of the document, and some of the other

7  things that are cited in his reasons why it's not

8  changing or receding has to do with the apparent

9  closeness of the image to the viewer.

10           But, in fact, I've reviewed the testimony

11 of -- I think it's Mr. Goossens, where he says that it

12 passes the descriptions off to a rendering thing called

13 OpenGL, which actually takes into account the fact that

14 it's moving away from the viewer to the side and,

15 therefore, getting farther away and presents it,

16 therefore, in a different angle as it goes.

17     Q     Thank you, Dr. Levy.

18           Let's move on to the next limitation,

19 limitation (g).  Can you first explain what this

20 limitation covers?

21     A     Yes.  Now, this one covers the popping out of

22 the glance view as you the pass the cursor over the

23 stack.

24           So this one reads:  Said display facility

25 further displaying a cursor or pointer and responding to

1   user-controlled sliding without clicking of the cursor

2   over the said displayed stack to display a glance view

3   of a document whose document representation is currently

4   touched by the cursor or pointer.

5           So this one is referring to the fact that when

6   you slide the pointer over the stack, your -- the glance

7   view pops out.

8       Q    Dr. Levy, do you have an understanding of what

9   infringement under the Doctrine of Equivalents is?

10      A    Yes.

11      Q    Can you --

12      A    Yes.  Doctrine of Equivalents is a part of the

13  patent law, as I understand it, which says that if an

14  accused product has an equivalent that the difference is

15  only insubstantially from the claimed invention, then

16  it's also covered by that invention under the Doctrine

17  of Equivalents.

18      Q    Do you have an understanding of the purpose of

19  this Doctrine of Equivalents?

20      A    Yes.  This prevents someone who -- from taking

21  someone's invention by making some very minor change to

22  it that's not really substantial.

23              THE COURT:  Counsel, how long do you

24  anticipate you have to continue on your direct

25  examination?

MR. DIBERNARDO:  Certainly did about

```
 1                     MR. DIBERNARDO:  Certainly did about
 2   till about 5:00.  We'll try and pick it up at least,
 3   but --
 4                     THE COURT:  All right.  How's the jury
 5   doing?  Would you like to take a 10-minute recess to
 6   stretch your legs?
 7                     JUROR:  Yeah.
 8                     THE COURT:  Okay.  We'll take a 10-minute
 9   recess until 4:35.
10                     COURT SECURITY OFFICER:  All rise.
11                     (Jury out.)
12                     (Recess.)
13                     (Jury out.)
14                     THE COURT:  Bring the jury in, please.
15                     Did y'all get your times worked out yet?
16                     MR. CARROLL:  We did, Your Honor.  We're
17   waiting for Apple to bless them.
18                     MR. RANDALL:  I didn't hear.
19                     MR. CARROLL:  We gave those to your folks
20   back there about an hour ago.
21                     MR. RANDALL:  In the middle of
22   examination.
23                     MR. DIAMANTE:  We'll do it very quick.
24                     COURT SECURITY OFFICER:  All rise for the
25   jury.
```

1

2          THE COURT:  All right.  Please be seated.

3          All right.  Counsel, you may proceed.

4          MR. DIBERNARDO:  Thank you.

5     Q    (By Mr. DiBernardo) Dr. Levy, before the

6  break, you were talking about the Doctrine of

7  Equivalents.

8          Is it your opinion that Coverflow meets this

9  limitation?

10    A    Yes, it is.

11    Q    Is it your opinion that Coverflow meets this

12 limitation under the Doctrine of Equivalents?

13    A    Yes, it is.

14    Q    Can you explain for us generally what's shown

15 on the right of your slide?

16    A    Yeah, on the right, I'm showing the schematic,

17 a part of that Figure 1 for the Gelernter patents, which

18 shows the sliding pointer, and the glance view popping

19 out with the stationary stack.

20         And in the bottom, I'm showing Apple's

21 Coverflow view, which essentially has a sliding stack,

22 and it's a glance view that pops out in the center.

23    Q    And what is it in the Coverflow view that you

24 consider to be the equivalent?

25    A    In the Coverflow view, instead of having a

1  moving point and a stationary stack, we have a moving

2  stack and essentially a stationary pointer, because the

3  user knows that he's looking always at the center here.

4       Q    Do you have something to show us that

5  demonstrates why you consider these to be equivalents?

6       A    Yes.  I'd like to show an animation of these

7  two operating together.

8            Here's the Gelernter stack at the top, and the

9  Coverflow view flowing by, popping by, at the bottom.

10  And I believe that these are equivalent.

11       Q    Dr. Levy, does the Coverflow display --

12  display a pointer?

13       A    It does not display a literal pointer, but I

14  believe it has the equivalent, because the user always

15  is looking at the center where the glance view is going

16  to pop up, and that is where the cursor or pointer is by

17  default.

18       Q    Does Apple agree with you?

19       A    No.  I think they're quite -- disagree with

20  that idea.

21       Q    Can you give us an example, Dr. Levy, to

22  further explain your opinion that these are equivalents?

23       A    Yes.  Well, here, we have the sliding cursor,

24  the stationary stack.  And then in Coverflow, we have

25  the stationary pointer with the moving stack.

```
 1           And one example of how that might be shown
 2   in the next slide.
 3       Q     Before we move on --
 4       A     Before we do that --
 5       Q     -- I wanted to ask you one other question.
 6       A     Yes.
 7       Q     The claim limitation refers to sliding without
 8   clicking.
 9             Can you explain how that's met by the
10   Coverflow?
11       A     Yes.  So in the Gelernter patents, one moves
12   the cursor without clicking on each document.  Now
13   clicking means, as I under it, with a mouse would be
14   pressing the button down and letting go.  A click is a
15   down-and-up action.
16             And so you don't have to do that with this
17   cursor on the stationary stack.
18             Likewise, with the Coverflow, you don't have
19   to click on each document in order to get it to move --
20   or pop up to the center.  You can achieve that by moving
21   this scroll bar thumb, by dragging it, or you can use a
22   gesture of two fingers across or down a touch pad, which
23   will cause the stack to move.
24       Q     Can you briefly describe for us what a touch
25   pad is?
```

 1      A     Yeah, a touch pad is a little figure on a
 2 laptop computer that serves the functions of -- several
 3 functions, but one of them is allowing that gesture
 4 which causes the sliding without clicking of this stack.
 5      Q     That gesture is just the user touching that
 6 pad?
 7      A     It's touching it with two fingers, that's
 8 right, and moving the fingers along.
 9      Q     Dr. Levy, can you give us another example to
10 further explain why you consider these to be
11 equivalents?
12      A     Yes.  I'd like to show an example of why I
13 think the moving stack and the stationary stack are
14 equivalent by showing another example that's quite
15 common that we know about, which would be the next
16 slide.
17            Now, here we have a bathroom scales where the
18 pointer moves and the dial stays stationary.  In the
19 other one, the dial moves and the pointer stays
20 stationary.
21            And in my opinion, these are equivalent in the
22 same way that the Coverflow and the Gelernter stack are
23 equivalent.  It really doesn't matter to the person
24 looking at this which one moves.  They really still see
25 the same result, getting the same function with the same

 1    result here.

 2        Q    Thank you, Dr. Levy.

 3             Let's move on to the next limitation,

 4    limitation (h).

 5             Can you explain your opinion with regard to

 6    this limitation?

 7        A    Yes.  Now, this one is about the stream-based

 8    operating system, which we've already described,

 9    utilizing subsystems from this -- another operating

10    system, which I've already described as this lower

11    layer.

12             And it says in particular, there are

13    operations, including writing documents to storage

14    media, interrupt handling, and input/output.  And these

15    are some of the functions that are done in this

16    kernel -- or handled by this kernel, Darwin, at the

17    bottom layer of the Apple operating systems.  And,

18    therefore, it meets this claim limitation.

19        Q    Thank you, Dr. Levy.

20             Having gone through the last limitation,

21    limitation (h), is it your opinion that Apple's Leopard

22    and Snow Leopard operating systems and the computers

23    using them infringe?

24        A    Yes, it is.

25        Q    Can I reflect that opinion on infringement on

1    the board?

2        A    Yes, please do.

3             MR. DIBERNARDO:  Your Honor, may I put

4    that on the board?

5             THE COURT:  Yes, you may.

6        Q    (By Mr. DiBernardo) Dr. Levy, the next claim

7    on your board is Claim 8 of the '427.

8             Do you have a document that summarizes your

9    opinion on Claim 8?

10       A    Yes, I do.

11            THE WITNESS:  The next page, please.

12       A    Now, this Claim 8, again, has eight

13   limitations, but now, since we've already seen a lot of

14   this material and the information included in them, what

15   I'm going to do is compare them to Claim 1 of the '427

16   that we've already been through in detail.

17            THE WITNESS:  I don't know if you want

18   James to expand maybe the --

19       A    Well, first of all, let me summarize.

20            So I'm going to show how claim limitation (a)

21   and (h) have a difference from Claim 1 and then claim

22   (f) has a difference from Claim 1.

23            THE WITNESS:  So if you could maybe

24   expand --

25            MR. DIBERNARDO:  James, can you please

1   expand the -- needed if -- that line3 should make things

2   easier.

3        A     So what's different in claim (a) and in claim

4   (h) -- I mean, limitation (a) and limitation (h) is

5   instead of saying a stream-based operating system, it

6   says a controlling operating system.

7             And we understand a controlling operation --

8   operating system to mean an operating system that

9   utilizes subsystems from another operating system.  And

10  so that's really just another way of saying like the

11  rest of claim limitation (a) says.

12            The fact that it doesn't say stream-based

13  means that at least at this point it doesn't require

14  that it has streams.

15            THE WITNESS:  Okay.  And then if we can

16  expand claim limitation (f).

17       A     In any case, what this says -- it says display

18  facility displaying at least selected runs of

19  subdocument representations, but it doesn't mention the

20  receding foreshortened stack.

21            And so this claim limitation is broader,

22  allows more things to infringe than the one that

23  requires a receding foreshortened stack.

24            Okay.  And so since we've already shown for

25  the -- the Claim 1 all the rest of these, for those

1    reasons the Apple products infringe this Claim 28 as

2    well.

3         Q    (By Mr. DiBernardo) Dr. Levy, let me make sure

4    I understand your description of limitation (f).

5    Limitation (f) of this claim does not include a receding

6    foreshortened stack, correct?

7         A    That's right.

8         Q    And so in that regard, is this claim broader?

9         A    Yes, it's broader.  So even if the jury

10   decides that Apple's products, like Coverflow, do not

11   have a receding foreshortened stack, which I believe

12   they do, then it would still meet this claim limitation

13   that doesn't require a receding foreshortened stack.

14        Q    Thank you, Dr. Levy.

15             So is it your opinion, then, that the Apple

16   Leopard and Snow Leopard operating systems and the

17   computers using them infringe this claim?

18        A    Yes, it is.

19        Q    May I reflect that opinion on your poster

20   board?

21        A    Yes, please.

22        Q    Let's turn to next claim, Dr. Levy, Claim 16

23   of the same patent, '427 patent.

24             Do you have document that explains your

25   opinion?

1     A     Yes.

2            THE WITNESS:  The next slide, please.

3     Q     (By Mr. DiBernardo) Can you explain what this

4     claim covers?

5     A     Yes.  Generally, this claim covers the

6     document organizing facility and the display, which

7     we'll go over here now in more detail.

8            And, again, because this is similar to and

9     related to Claim 1 of the '427 patent, I've just shown

10    the differences schematically here by crossing out the

11    parts that don't show up in this claim or how they're

12    changed.

13           So, first of all, for claim limitation (a) and

14    claim limitation (f), for change of languages, not

15    stream-based but controlling, that's the same as we just

16    saw for claim limitation 8 (sic), and so we don't really

17    need to describe those further.

18           This also in -- claim limitation (b) covers a

19    document organizing facility associating the indicators

20    with received or created documents.  We've already

21    talked about those, but this one leaves out the diverse

22    formats.

23           And so in that sense, it's a broader claim and

24    covers a little bit more.

25           Also, I show in this blank line in the middle

1  that the archiving is not included in this claim, in

2  Claim 1.  And so this claim does not require archiving.

3  And then again in claim limitation (d), we have the fact

4  that receding foreshortened stack does not occur, only

5  the selected document representations.

6        And so this, likewise, is a broader claim than

7  Claim 1.  And for the reasons I've already given for the

8  rest of these, this claim limitation is met by the Apple

9  operating system Spotlight and Coverflow.

10   Q    And by that, you're referring to the

11  right-hand column of your slide?

12   A    Yes, I am, just to show that summary.

13   Q    Thank you.

14        Can I reflect this opinion in your poster

15  board?

16   A    Yes, please.  This is Claim 16.

17   Q    Let's turn to the next claim, Dr. Levy, Claim

18  18 of the same '427 Gelernter patent.

19        Is it your opinion that this claim is also

20  infringed by Leopard and Snow Leopard?

21   A    Yes, it is.

22   Q    Can you explain your opinion?

23   A    Yes.  Now, this Claim 18 is a dependent claim.

24  That means it says the same as Claim 16, except one more

25  limitation.  And this new limitation is limitation (g).

1   No comment, the receding foreshortened stack

2   back in, and so compared to Claim 16, this one adds on a

3   receding foreshortened stack.  And that is, as I've

4   explained before, covered -- infringed by Coverflow and,

5   therefore, the system infringes this claim as well.

6        Q    Thank you, Dr. Levy.

7             Can I reflect this opinion of infringement on

8   your chart?

9        A    Yes, please.  Claim 18.

10       Q    Let's turn to Claim 18 of the '427 patent, the

11  last claim in the '427.

12            So is it your opinion that this claim is also

13  infringed by Leopard and Snow Leopard operating systems?

14       A    Yes, it is.

15       Q    Can you please explain your opinion?

16       A    Yes, I will.

17            Now, in this claim, I'm comparing Claim 25 to

18  Claim 1 again, just to show you the differences and so

19  we can understand them relative to Claim 1, which I've

20  already explained.

21            We have the document stream operating system.

22  We have the document organizing facility.  In here, the

23  word selective is not used, but chronological indicators

24  with documents received from diverse applications and

25  diverse formats.

1      And, again, we know that some of those

2   indicators are the metadata, and some of those metadata

3   is time-based, and, therefore, there are chronological

4   indicators, the data structures that contain timestamps

5   in Spotlight, and, therefore, that claim limitation is

6   met.

7            In addition, the archive part is omitted

8   compared to Claim 1, and so we don't require the Time

9   Machine part to infringe here.

10           And then in the next claim limitation, (c), we

11  have creating information specifying glance views and

12  specifying document representations.  And so in

13  Coverflow, we know that these glance views and document

14  representations are shown.

15           So, of course, there must be information

16  specifying them in the system, and, therefore, this

17  claim limitation is met.

18           So the rest of these claim limitations are the

19  same as Claim 1 and, therefore, they are all met by the

20  Apple systems.

21      Q    Can I reflect your opinion on your poster

22  board, Dr. Levy?

23      A    Yes, please.

24      Q    Let's turn to the next claim, Claim 1 of the

25  '313 patent.

 1     A    No -- this claim -- I'm sorry.  Claim 2 of the

 2    '313 patent.

 3             Now, this one is going to involve Spotlight,

 4    Time Machine, and Coverflow, and so this one we're

 5    actually going to go through each one, because it's a

 6    new claim, and we really need to review each one.

 7             But in general, this is about streams

 8    receiving the documents in diverse formats, associating,

 9    archiving, creating glance views, and so on.  So we've

10    seen these terms, and so we'll review them one by one.

11     Q    Dr. Levy, let's start then with (a) on this

12    page.  Can you explain how limitation (a) is met by the

13    Leopard and Snow Leopard operating systems?

14     A    Yes.  So here -- I don't know if you want to

15    expand it or not, but this is a method now, and so we're

16    talking about a process that uses this facility that we

17    see described in the other claim.

18             And so it's utilizing a document stream

19    operating system, and so we've already talked about how

20    that's met by the operating system that has Spotlight in

21    it and that it utilizes subsystems from at least one

22    other operating system.

23             And we've already talked about how OS 10 uses

24    subsystems from another operating system.  And so that

25    claim limitation is met.

Claim limitation (b): Driever

 2     A    Yes.  Claim limitation (b):  Receiving

 3  documents from diverse applications and formats that are

 4  specific to the respective applications and differ

 5  between some of the applications.

 6          Well, we've already seen how we get different

 7  kinds of documents that are in different formats.

 8  They're all put into the Spotlight Store, and so

 9  Spotlight, in that operating system, receives documents

10  from diverse places.

11          Claim limitation (c):  Associating time-based

12  indicators automatically with those documents.  And that

13  we've seen.  Spotlight does associate time-based

14  indicators, timestamps, with each document.

15          And so that's met.

16          Claim Limitation (d) is the automatically

17  archiving the documents.  That's met by Time Machine, as

18  we talked about.

19          Automatically creating glance views that are

20  abbreviated versions of the respective ones of said

21  documents.  We've seen how Coverflow creates glance

22  views.

23          Claim limitation (f):  Displaying at least

24  some of these documents as a receding foreshortened

25  stack and so on.  And Coverflow meets this limitation,

1      as we've described.

2              Further including displaying, sliding, and so

3      on, we've shown how Coverflow meets this claim

4      limitation under the Doctrine of Equivalents.

5              And then utilizing subsystems, we've explained

6      how this happens with the operating system, and

7      therefore, that claim limitation is met.

8      Q      Thank you, Dr. Levy.

9              And can I reflect this opinion on your poster

10     board?

11     A      Please.  Claim 1 of the '313 of the operating

12     systems.

13     Q      Dr. Levy, the next claim is Claim 2 of the

14     '313.  Is it your opinion that this claim is infringed?

15     A      Yes, it is.

16     Q      Can you explain that opinion, please?

17     A      Yes.  Claim 2 is a dependent claim, and so it

18     has all of the requirements of the method shown in Claim

19     1 that we just went over.

20             And in addition, claim limitation (i) which is

21     storing the documents -- said documents as a mainstream

22     that's time-based and selectively generating a substream

23     that are a subset of the documents in the mainstream

24     matching selected criteria.

25             Now, that's a pretty good description of the

1    Spotlight search capability.  And this is first how

2    we've shown, generates -- I'm sorry.  Mainstream is

3    generated by a -- the Spotlight Store and that it's

4    time-based.

5              And so this claim limitation is met by the

6    Spotlight, and therefore, this claim is infringed.

7         Q    Thank you.

8              I see that you have the terms generating a

9    substream highlighted.  Can you explain how that's met

10   by the Apple operating systems?

11        A    Yes.  The Spotlight search facility, as I

12   explained, when you get a search request, the search

13   results are returned in a time-ordered data structure,

14   and that is the substream, and therefore, this is met.

15        Q    Thank you.

16             And can I reflect this opinion on your poster

17   board, Dr. Levy?

18        A    Yes, please do.

19        Q    Let's turn then to the next claim of the '313

20   Gelernter patent.  Can you describe for us your opinion

21   with regards to this claim?

22        A    Yes.  I believe this is infringed.  This is

23   Claim 3 of the '313 patent, and now we're dependent

24   claim -- it's dependent on Claim 2, which is in turn

25   dependent on Claim 1; and so all of the limitations of

 1  Claims 6 and 2 have to be met, which we've already
 2  talked about.
 3          And then in addition, this one says:  Said
 4  generating a substream -- remember, that was like the
 5  Spotlight search results -- comprises generating a
 6  substream that persists unless selectively destroyed by
 7  a user.
 8          So we're talking about a procedure here now.
 9  And when the Spotlight search results are returned to an
10  application and displayed, then when something new comes
11  in, the Spotlight search results are updated
12  automatically, as I've talked about, and therefore, the
13  substream, that is, that search results, is updated, and
14  it persists; in other words, it's updated automatically.
15          And then unless selectively destroyed by a
16  user, what that means, if you stop looking at the thing
17  that you asked for, close the window and so on, then the
18  search results go away, because you don't need them
19  anymore.
20          And I put in here an extract -- a description
21  of how that works from one of the Apple employees who
22  said that when you close the live query window, it
23  disposes of the query.
24          That just means that you don't need to search
25  anymore, and so it's selectively destroyed by the user

1   da  thetogray

2   Q    Thank you.

3   A    So that meets claim limitation (j).

4   Q    Thank you, Dr. Levy.

5        And should we update your poster board?

6   A    Yes, please.

7   Q    Let's turn then to Claim 9 of the '313 patent.

8        Is it your opinion that Apple's operating

9   systems infringe Claim 9?

10  A    Yes, it is.  Claim 9, again, is a method, and

11  so it talks about the steps of -- that are -- that occur

12  in the system, (a) through (f).  So I'll talk about each

13  of these in turn.

14       The first one is a method of automatically

15  archiving documents received in different formats -- and

16  if I can read -- such that those archived documents can

17  be searched.

18       And so we've seen how that Time Machine not

19  only archives the documents but also the metadata and

20  content information so that you can do a Spotlight

21  search in the archive.

22       And so Time Machine meets this limitation of

23  Claim 9.

24       And then in (b), it's receiving documents in

25  diverse formats.  And as we've seen, Spotlight does

1   that the different formats of documents.

2          Claim limitation (c):  Automatically

3   associating time-based indicators with the documents

4   received.  And we also have seen how that happens with

5   the time-based metadata in Spotlight.

6          Then automatically archiving the received

7   documents, together with said time-based indicators.

8   This just means that the documents get put into the

9   archive, along with the time-based metadata, so you can

10  find them again.

11         That's met by Time Machine.

12         Then the receding foreshortened stack

13  limitation that Coverflow meets by the Doctrine of

14  Equivalents, and -- I'm sorry.  Coverflow meets by its

15  receding foreshortened stack.

16         And then responding to the sliding, and we've

17  described how Coverflow meets that by Doctrine of

18  Equivalents.

19         And so these claim limitations are met by the

20  system, and therefore, that infringes Claim 9.

21     Q    Shall we update your poster board?

22     A    Please.

23     Q    Okay.  Dr. Levy, the last claim with regard to

24  the operating systems.  Let's turn to Claim 11 of the

25  '313 patent.

1        A.     So Claim 11 is shown here.   It's a dependent
2  in Claim 9, so this is a dependent claim.  It has two
3  additional limitations, which I label here (g) and (h).
4              And so on top of Claim 9, (a) through (f), we
5  have selectively searching said archived documents for
6  documents meeting selected criteria.
7              Well, this is the operation of using Spotlight
8  to search in the archive.  And so Time Machine, using
9  Spotlight, meets this claim limitation.
10             And then generating and displaying a substream
11 comprising documents identified in that search -- in
12 said searching, that substream being in time order and
13 comprising documents in different formats matching
14 respective different applications from which the
15 documents originated.
16             Well, as we've seen, we have documents in
17 different formats.  The Spotlight search in the Time
18 Machine gives search results back that are time-ordered
19 and in a substream and then can be displayed, so you can
20 find what you want.
21             And so Time Machine, using Spotlight for the
22 search results, meets this claim limitation, and
23 therefore, this claim is infringed.
24       Q    Dr. Levy, this limitation is a little
25 different than the ones we've seen.  Do you have any

1   documents that demonstrate the basis for your opinion

2   that this is met?

3       A    Yes.  I'd like to show at least one picture of

4   Time Machine search results being shown here, and this

5   is a picture of -- taking a real system that shows Time

6   Machine using Spotlight to find search results.  I guess

7   I can point at it.

8            There's -- there's that -- I put the word

9   agile in the Spotlight search here.  We're in Time

10  Machine looking at one of the backup copies.  It found

11  all the documents that have the word agile in them or

12  related to that, and that shows how this operates with

13  Spotlight in Time Machine.

14      Q    Thank you, Dr. Levy.

15           Can we update your poster board?

16      A    Yes, please.

17      Q    Dr. Levy, the next Apple products referenced

18  on your poster board are the iPhone, iPod Touch, and

19  iPad.  Is your opinion that these products also infringe

20  the Gelernter patents?

21      A    Yes, a couple of them.

22      Q    Which claims of which patent?

23      A    Let's see now.  It's the -- I'm sorry.

24      Q    It's a little difficult to read.

25      A    It's up there, but -- it's the '427 patent,

which is Coverflow and Claims 16 and 18.

2      Q      16 and 18.

3      A      That's right.

4      Q      And we'll address each of those?

5      A      We will.  Bear with us just a few more

6  minutes.

7      Q      Okay.  Well, first, since these are new

8  products, do you have a document that demonstrates what

9  these products are, the iPhone, iPod Touch, and iPad?

10     A      Yes.  I thought you might like to see a photo

11 of each of those products.  Here's some taken from

12 Apple's website or documents.  In the upper left is

13 Apple's iPhone.  In the lower left is an example of

14 Apple's iPod Touch.  And on the right is Apple's iPad, I

15 believe their latest.

16            Those two on the left do fit in a pocket.  The

17 one on the right doesn't.  And these are three -- are

18 the three types of products we're talking about now.

19     Q      Is there a reason why you considered these

20 products together?

21     A      Yes, there is.  It's because the operating

22 system used in these are all from the iPhone operating

23 system, also known as iOS in the Apple documents.

24     Q      Thank you, Dr. Levy.

25            Let's turn now then to Claim 16.  Can you

explain your opinion of how these products meet Claim

2    16?

3        A    Yes.  Now, Claim 16 is, again, talking about a

4    controlling and operating system utilizing subsystems.

5            And in the iPhone iOS, there is a subsystem --

6    let me see, we need to go through these on separate

7    slides, right -- from another operating system, and I'll

8    point that out in the layers in a moment.

9            Anyway, Claims (a) through (f), which we've

10   been through, and we'll show how these apply to each of

11   the iPhone, iPod Touch, and iPad.

12       Q    Thank you for that overview.

13           Let's turn to limitation (a) then.

14       A    Well, here's claim limitation (a):

15   Controlling operating system utilizing subsystems from

16   another operating system.

17           And the iOS operating system also uses

18   something called core OS, and this core OS is also

19   derived from another operating system, just as the

20   Darwin kernel was.

21           That is documented in Apple's own manuals,

22   and, therefore, it is using subsystems from another

23   operating system.

24       Q    Thank you, Dr. Levy.

25           Shall we turn to the next limitation?

1     A     Yeah. Claim limitation (b) is the

2 document-organizing facility associating selected

3 indicators with received or created documents.

4          Now, remember, Witz is a software that

5 organizes documents.  The selected indicators are data

6 structures that contain information that's like metadata

7 and that a document is a data unit.

8          In the -- now, we know that in the iPhone,

9 iPod and -- I'm sorry -- iPod Touch, and iPad, among the

10 many functions that are there is the ability to act as a

11 music library.

12          And at least for that, the iOS provides the

13 iPod library with access to songs, and information about

14 the song can be displayed, like title and artist.  Those

15 are some metadata associated with those documents, which

16 are music tracks.

17          And we know that the information associated

18 with each song is stored as a data structure, which is

19 why the selected indicators, and therefore, these

20 systems meet this claim limitation.

21     Q     Thank you, Dr. Levy.

22          Let's go on to the next one then.

23     A     This one is creating information specifying

24 glance views and document representations.

25          And as you can see in this example of the

Coverflow view of the music track being shown

1   this has a glance view in the center and the document

2   representations to each side, as we've seen before.

3           And, therefore, we know, since you display

4   them, of course, the information about them is in there,

5   and therefore, this is -- this claim limitation is met.

6       Q   Thank you, Dr. Levy.

7           One more question on this slide.  Is that

8   center item just a glance view, or is it also a document

9   representation?

10      A   Well, in this case, it's overlapping both the

11  stack on the left and the stack on the right, and so

12  it's actually part of each stack because of that

13  overlap.  So it's also a document representation.

14      Q   Thank you.

15          Moving on to limitation (d), can you explain

16  your opinion here?

17      A   Yes.  Here we have the display facility

18  displaying at least selected runs of said document

19  representations.

20          We have multiple document representations

21  being shown here, and therefore, this limitation is met.

22      Q   And how about this limitation?

23      A   Claim limitation (e) is:  Displaying a cursor

24  or pointer responding to the user's sliding without

1     clicking

2             Now, we've seen this one before, and I've

3     described before how and why the Coverflow stacked

4     movement is equivalent to the sliding without clicking

5     over the stack in the Gelernter patents, and therefore,

6     under the Doctrine of Equivalents, Coverflow meets this

7     claim limitation.

8        Q    Was this your bathroom scale of earlier?

9        A    Yes.  This is when I showed you the bathroom

10    scales.  That's the kind of equivalence we're talking

11    about.

12       Q    Let's move on then to the next limitation,

13    limitation (f).

14       A    So here controlling operating system using

15    subsystems from another operating system, and it

16    mentions three functions here.  The Core OS is the

17    bottom layer.  It comes from another operating system,

18    and it contains these functions.  So this claim

19    limitation is met.

20       Q    Thank you.

21            Dr. Levy, can we reflect this infringement on

22    your poster board?

23       A    Yes, please.  This will be Claim 16 for the

24    iPhone, et cetera.

25            Only three to go.

 1          Dr. Levy, let's take a minute and look on to

 2    one limitation.

 3              Looking at the interface of the iPhone, iPod

 4    Touch, and the iPad, is that different than the

 5    interface on the Apple computers that you discussed

 6    earlier?

 7       A    Yes, it is.  This interface uses a

 8    touchscreen.  Where I talked to you about a touch-pad on

 9    a computer, this one, the screen itself is the touch

10    sensitive.

11             And so the way you move the stack is by

12    putting your finger on it and dragging it, and that

13    causes the stack to move just by doing that.

14       Q    And when you drag your finger across the

15    screen, is there clicking going on?

16       A    No, there isn't.  So that does meet the

17    sliding-without-clicking limitation.

18       Q    Thank you, Dr. Levy.

19             Let's move then to the next claim, Claim 18.

20       A    Claim 18 is a dependent claim, and it adds the

21    receding foreshortened stack.  We've already talked

22    about how Coverflow meets this limitation, and here's an

23    example.

24             And here, although there's not the shading,

25    there is the same perspective applied, and therefore, I

1    believe this meets this claim limitation, and so I'm

2    is infringed.

3         Q    Okay.  May I reflect that opinion on the

4    board?

5         A    Yes.

6         Q    Dr. Levy, the next one on your poster board is

7    for the Apple iPod Classic and Nano.  Is it your opinion

8    that these products also infringe the Gelernter patents?

9         A    Yes, it is.

10        Q    Is it your opinion that they also infringe

11   Claims 16 and 18 of the '427 patent?

12        A    Yes.

13        Q    Before we get into your detailed analysis, can

14   you describe for us what these products are?

15        A    Yes.  I have a photo of those -- examples of

16   those two products.  These are just examples.  There are

17   various models of each one.  But on the left is the iPod

18   Classic, and on the right is the iPod Nano.

19        Q    Can you explain for us why you grouped these

20   products together and separately?

21        A    Yes.  These both have this thing -- different

22   kind of interface where there's this thing here, which

23   is -- Apple calls a click wheel.  And so that's the part

24   of the user interface for these devices.

25        Q    Dr. Levy, are you aware of any agreement

1    between the parties regarding infringement by the iPod

2    Classic and Nano?

3         A    Yes.  Let me see if we can get this right.

4    I understand that the parties have agreed that if the

5    jury decides that the -- let's see, the

6    sliding-without-clicking limitation is met and that this

7    click wheel motion amounts to the same kind of sliding

8    without clicking, then the -- these will be accepted as

9    also infringing.

10        Q    So you're saying that if the iPod Touch

11   infringes Claims 16 or 18, that for the iPod Classic and

12   Nano to infringe, Mirror Worlds only needs to show that

13   the iPod Classic and Nano include the sliding

14   limitation?

15        A    That's right.

16        Q    And do you have an opinion as the whether the

17   iPod Classic and Nano do indeed include that sliding

18   limitation of Claim 16?

19        A    Yes, I do.  I believe they do.

20        Q    And do you have a document that demonstrates

21   this?

22        A    Yes.

23             THE WITNESS:  If you'll show the next

24   page, please.

25        A    Here is the claim limitation about sliding

1  without clicking, I believe that engineering your thumb or

2  finger around that circle without clicking, amounts to a

3  sliding-without-clicking operation, and therefore, it

4  infringes -- it meets this limitation on the Doctrine of

5  Equivalents, just like the others.

6       Q     (By Mr. DiBernardo) Thank you.

7             Dr. Levy, I have to ask you one more question.

8  You called it a click wheel.  How can that meet the

9  limitation of sliding without clicking then?

10      A     Well, I think they call it a click wheel.  I

11 have to speculate here.  But I believe it's because

12 there are certain places around the circle where if you

13 do click on it, it does another operation.

14            But as far as the sliding goes, if you just

15 press down and move your thumb around it, then that's

16 what causes the sliding.

17      Q     Thank you, Dr. Levy.

18            Can we check off any boxes on your poster

19 board?

20      A     Yes, please, Claim 16.

21      Q     Thank you.

22

23      Q     Dr. Levy, the last unchecked box, Claim 18 of

24 the '427 patent, is it your opinion that this claim is

25 infringed by the iPod Classic and Nano?

1      A      Yes.

2      Q      Would you explain that opinion?

3      A      Yes.  Again, we have here the receding

4  foreshortened stack as the additional claim limitation

5  in a dependent claim.

6             And as I've shown, I believe Coverflow meets

7  this claim limitation in the iPod Classic and Nano, and,

8  therefore, this claim limitation is met.

9      Q      Thank you.

10             And may I check off that last box on the

11  poster board?

12      A      Yes, please.  Thank you for your patience.

13      Q      Okay.  Dr. Levy, let's just switch topics for

14  a couple of minutes.

15             Do you know if Mirror Worlds has a damages

16  expert in this case?

17      A      Yes.

18      Q      And who is Mirror Worlds' damages expert?

19      A      Mr. Bratic.

20      Q      Have you ever spoken with Mr. Bratic?

21      A      Yes, I have.

22      Q      What did the two of you discuss?

23      A      We discussed the -- my opinion of the

24  importance of the Gelernter technology and the patents.

25             And we also discussed whether there was any

1   may for Apple do achieve the same functions without some

2   kind of work-arounds without using the patented

3   technology.

4       Q    What did you tell him about the importance of

5   the Gelernter technology patents?

6       A    I told him that I thought that the Gelernter

7   technology was a paradigm shift, which means that it

8   really will completely change the way people will use

9   their computers.

10      Q    And did you tell Mr. Bratic anything about

11  your opinion about whether or not there were

12  work-arounds?

13      A    Yes, I did.  I told him that I thought that in

14  order to achieve the functionality that was delivered,

15  it would be next to impossible to not use this infringed

16  technology.

17      Q    Is it your opinion that it was impossible as

18  of the time Apple first infringed?

19      A    Yes.  Yes, I do.

20      Q    Is it your opinion that there were no

21  work-arounds, as you call them, when the first Gelernter

22  patent was filed in 1996?

23      A    Yes.

24      Q    And did you convey this opinion to Mr. Bratic?

25      A    I did.

1                 Thank you, Mr. Levy. -- Dr. Levy.

2                 MR. DIBERNARDO:  Your Honor, we have no

3  further questions.

4                 THE COURT:  All right.  Thank you.

5                 All right.  Ladies and Gentlemen of the

6  Jury, I think we're going to call it an afternoon.

7                 Again, I want to thank you for your

8  attention today.  It's been a long day, I know.

9                 We do need to make up some time tomorrow,

10  so I'm going to ask you, would there be anyone that

11  would have a problem with being here and starting at

12  8:30 in the morning?

13                 Okay.  We have one.  9:00 o'clock is as

14  early as you can make it.

15                 JUROR:  I have a son to drop off at

16  school at 8:00.

17                 THE COURT:  All right.  We'll start at

18  9:00 o'clock in the morning, and we'll see where we can

19  get to tomorrow.

20                 And I will advise you that I have three

21  sentencings that I have to do mid-morning tomorrow, and

22  so I'm going to give you -- as quick as I can get

23  through with them, I'll be -- we'll all be working on

24  those while you're breaking, but you may have a little

25  bit longer break in the morning.  Instead of 15 minutes,

1    at max be as much as 30 minutes.

2                    I think we can move through these fairly

3    promptly in the morning, but I just want to make you

4    aware of that.

5                    We'll probably try to work until about

6    5:30 tomorrow.  I will ask the parties to provide lunch

7    for the jury tomorrow.  We'll plan to take a 30-minute

8    lunch hour tomorrow and see if we can make up some time.

9                    So with that, again, please remember my

10   instructions.  Go home; don't think about the case.

11   Clear your head; have a drink; watch TV, whatever you

12   want to do.  Maybe have two drinks depending on what you

13   feel is appropriate.

14                    So y'all have a good evening.  We'll see

15   you in the morning.

16                    COURT SECURITY OFFICER:  All rise for the

17   jury.

18                    (Jury out.)

19                    THE COURT:  All right.  Counsel -- you

20   may be seated.

21                    Do counsel from the time adjustments from

22   those depositions?

23                    MR. KELLEY:  Yes, Your Honor.  You want

24   it in minutes, percentages, or what?

25                    THE COURT:  Percentages.

 1          MR. KELLEY:  Percentages.  As given on
 2    the Lindsay deposition, the exact percentages were 73.67
 3    percent for Mirror Worlds.  That's how it's given to me.
 4    And 26.33 for Apple.
 5                THE COURT:  All right.
 6                MR. KELLEY:  And on the Serlet
 7    deposition, it was 87.54 percent for Mirror Worlds, and
 8    12.46 for Apple.
 9                MR. RANDALL:  I think we've got to round
10    them up and down.
11                MR. KELLEY:  Rounded up and down is fine
12    with me.
13                THE COURT:  All right.  Do you -- now let
14    me have it by minutes.
15                MR. KELLEY:  Your Honor, Lindsay was 50
16    minutes, and rounding it up, that would be 37 minutes
17    for Mirror Worlds and 13 for Apple.
18                THE COURT:  Okay.
19                MR. KELLEY:  And we understand that
20    Serlet was 35 minutes.
21                Is that correct?
22                THE COURT:  Yes.
23                MR. KELLEY:  If that's the case, that's
24    31 minutes for Mirror Worlds, and 4 minutes for Apple,
25    again, rounding up.

1          THE COURT:  Okay.  Are you made up 17

2     minutes, and it cost the Defendants 17 minutes.  So here

3     are your times.

4                    Plaintiff has used 6 hours and 43 minutes

5     and 32 seconds.  And Defendants have used 3 hours and 32

6     minutes of their allotted time.

7                    So we're about -- that's 10 -- we're

8     at -- we should be at 12 hours right now.  We're at --

9     let's see.  We're at about 10 hours and 15 minutes.  So

10    we've got an hour and 45 minutes we need to make up

11    before the end of Thursday, which I think we can do.

12                   And I hope maybe y'all won't take the

13    full amount of time; but if you do, that's the

14    worst-case scenario.  So we'll see where we get

15    tomorrow.

16                   All right.  Anything further before we

17    adjourn for the day?

18                   MR. CARROLL:  Not from the Plaintiff,

19    Judge.

20                   MR. RANDALL:  Your Honor, the motion that

21    we filed I wished to make it clear to the Court that I

22    didn't -- I wasn't suggesting that the Court take it up

23    this morning.  I filed it as soon as we could, the

24    motion.

25                   THE COURT:  This is the waiver?

```
1                 MR. RANDALL:  Yeah, that's right.
2                 THE COURT:  Okay.
3                 MR. RANDALL:  Whenever we can take it up,
4    we'll take it up.
5                 THE COURT:  All right.  Is Plaintiff
6    going to file a response, or do you want to be heard
7    orally on that?
8                 MR. STEIN:  We will file a response.
9                 THE COURT:  All right.  When will you
10   have that filed?  By 8:00 o'clock tonight?
11                MR. STEIN:  Yes.
12                THE COURT:  All right.  8:00 o'clock
13   tonight, and I'll take it up at a break.
14                When will this come up?  During your
15   case-in-chief, I guess?
16                MR. RANDALL:  Yeah.  We're asking for the
17   production of documents and some additional time with --
18   with the witness.
19                THE COURT:  Okay.
20                MR. RANDALL:  And so we just wanted to
21   get it on file as soon as we could.
22                THE COURT:  All right.  Well, we'll get
23   the response and take a look at that.
24                Anything further?
25                MR. RANDALL:  No, Your Honor.
```

```
 1   THE COURT:  All right.  Lead me, Head
 2  and local counsel in chambers, please.
 3                  COURT SECURITY OFFICER:  All rise.
 4                  (Court adjourned.)
 5
 6                       CERTIFICATION
 7
 8                  I HEREBY CERTIFY that the foregoing is a
 9  true and correct transcript from the stenographic notes
10  of the proceedings in the above-entitled matter to the
11  best of our abilities.
12
13
14  /s/_____
    SHEA SLOAN, CSR                    Date
15  Official Court Reporter
    State of Texas No.:  3081
16  Expiration Date:  12/31/10
17
18
    /s/_____
19  JUDITH WERLINGER, CSR              Date
    Deputy Official Court Reporter
20  State of Texas No.:  731
    Expiration Date  12/31/10
21
22
23
24
25
```