```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION

 3   MIRROR WORLDS, LLC        *   Civil Docket No.
                               *
 4                             *   6:08-CV-88
     VS.                       *   Tyler, Texas
 5                             *
                               *   September 29, 2010
 6   APPLE, INC., ET AL        *   9:00 A.M.

 7

                   TRANSCRIPT OF JURY TRIAL
 8                     MORNING SESSION
              BEFORE THE HONORABLE LEONARD DAVIS
 9               UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11                    FOR THE PLAINTIFF

12   MR. JOSEPH DIAMANTE
     MR. KENNETH STEIN
13   MR. IAN G. DIBERNARDO
     MR. ALEXANDER SOLO
14   MR. CHARLES E. CANTINE
     STROOCK & STROOCK & LAVAN
15   180 Maiden Ln.
     New York, NY  10038
16
     MR. OTIS CARROLL
17   MR. PATRICK KELLEY
     IRELAND, CARROLL & KELLEY
18   6101 S. Broadway, Ste. 500
     Tyler, TX  75703
19

20   COURT REPORTERS:
     MS. SHEA SLOAN, CSR
21   MS. JUDY WERLINGER, CSR
     Official Court Reporters
22   211 West Ferguson, Third Floor
     Tyler, TX   75702
23   903/590-1171

24   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
25
```

FOR THE DEFENDANTS

```
 1

 2

 3  MR. JEFFREY G. RANDALL
    MR. RAYMOND YU
 4  MS. ERICKA J. SCHULZ
    PAUL HASTINGS
 5  1117 S. California Ave.
    Palo Alto, CA  94304-1106
 6

 7
    MR. ALLAN M. SOOBERT
 8  MR. BROCK WEBER
    MS. KIM MOORE
 9  PAUL HASTINGS
    875 15th St. NW
10  Washington, DC  20005

11

12  MR. S. CHRISTIAN PLATT
    MR. JEFFREY COMEAU
13  PAUL HASTINGS
    4747 Executive Dr.
14  12th Floor
    San Diego, CA  92121
15

16

17

18

19

20

21

22

23

24

25
```

1

2                COURT SECURITY OFFICER:  All rise.

3                (Jury in.)

4                THE COURT:  Please be seated.

5                All right.  Do Plaintiffs have any

6     exhibits they wish to offer this morning?

7                MR. CARROLL:  We do, Your Honor.

8                And I'm happy to say we have them in the

9     proper form, and that our friends across the way have no

10    objection.

11               THE COURT:  All right.  And what is the

12    title of that document?

13               MR. CARROLL:  The title is Plaintiff's

14    List of Exhibits to be Admitted on September 29th, 2010.

15               THE COURT:  To be admitted.  Now, is that

16    cumulative of Monday -- of Monday and Tuesday's list or

17    not?

18               MR. CARROLL:  Is that cumulative?  Is

19    this it?

20               Together, this is it?

21               It is not, Your Honor, but together it

22    will catch us up.

23               THE COURT:  Okay.  All right.  So you've

24    introduced two exhibit lists then, and combined, they

25    constitute all the exhibits that have been admitted.

1      MR. CARROLL:  That's what I'm told.

2                  THE COURT:  Okay.  So --

3                  MR. CARROLL:  Excuse me for interrupting,

4      Judge, but we have one for the 28th and one for the

5      29th.

6                  THE COURT:  Okay.  All right.  So the one

7      for the 28th will be marked as Plaintiff's Exhibit List

8      No. 2, and the one for the 29th will be Plaintiff's

9      Exhibit List No. --

10                 COURTROOM DEPUTY:  3.

11                 THE COURT:  -- 3.

12                 COURTROOM DEPUTY:  But, Your Honor, the

13     one from the 28th, it's already been admitted yesterday,

14     so...

15                 THE COURT:  Yes.

16                 COURTROOM DEPUTY:  They're admitting it

17     again.

18                 THE COURT:  Is that -- the first one is

19     from the 28th?

20                 MR. CARROLL:  That's what it says.

21                 THE COURT:  Okay.  Well, that was

22     admitted yesterday.

23                 MR. CARROLL:  That's correct.  So this

24     ought to be the --

25                 THE COURT:  Or is that a different one?

1    believe one additional exhibit was added during the

2    course of yesterday.

4              THE COURT:  Okay.  Well, what y'all need

5    to do is, if you'll just give us a cumulative one, then

6    we'll have a nice, clean record.  But we'll admit the

7    28th as Exhibit 2, the 29th as Exhibit 3.

8              And any objection to those exhibits?

9              MR. RANDALL:  Your Honor, no.  They have

10   exchanged that list with us.  We didn't have any

11   objections.  We exchanged lists with them yesterday, so

12   we still have our list, and we're waiting to hear a

13   response.

14             I just want to let you know we have our

15   list as well.  Apparently, it's in the works.

16             THE COURT:  So you have no objections to

17   their offer?

18             MR. RANDALL:  No, Your Honor.

19             THE COURT:  All right.  Be admitted.

20             MR. CARROLL:  Thank you, Your Honor.

21             THE COURT:  All right.  You've given

22   those to Ms. Ferguson?

23             Okay.  She'll mark them.  We'll keep it

24   straight.

25             And, Defendants, you've not heard back

1   from Plaintiff's case regarding your 112, right?

2                    MR. RANDALL:  That's right, Your Honor.

3                    THE COURT:  All right.  Very well.

4                    Mr. Randall, would you like to proceed?

5                    MR. RANDALL:  I would, Your Honor.  Thank

6   you very much.

7   JOHN LEVY, Ph.D., PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

8                        CROSS-EXAMINATION

9   BY MR. RANDALL:

10      Q    Dr. Levy, how are you?

11           My name is Jeff Randall.  I don't think we've

12   met before.

13      A    Good morning, Mr. Randall.

14      Q    Mr. Levy, you recognize that someone hired to

15   testify in patent cases, that the law requires the scope

16   of the claims to be determined without reference to the

17   accused device -- infringement devices, correct?

18      A    Yes.

19      Q    All right.  So, for instance, the scope of the

20   boundaries of the claim really have to be determined,

21   largely by the Court, but they have to be determined

22   without reference to what you're accusing of infringing,

23   right?

24      A    Yes.

25      Q    And that's in order to avoid a situation where

1   a Plaintiff or a patentee may want to stretch the boundaries

2   of something just to encompass some device, right?

3       A   I'll take your word for that.

4       Q   Okay.  You also realize, do you not, sir, that

5   it's Mirror Worlds' burden to show each and every claim

6   limitation of all of the patent claims that you're

7   asserting against Apple, you have to show -- not you --

8   Mirror Worlds has to show each and every element is

9   satisfied, right?

10      A   That is my understanding.

11      Q   All right.  So, for instance, if a claim at

12  the end of these patents has a whole host of

13  requirements, and any one of those is missing, that

14  means there's no infringement, right?

15      A   My understanding is if any claim limitation is

16  missing, then it does not infringe.

17      Q   Right.  And the burden falls with Mirror

18  Worlds to show that every single element is satisfied in

19  every claim that they're asserting, right?

20      A   I believe you said that before, and I

21  understand that.

22      Q   And Apple doesn't have to show anything,

23  right?

24      A   I don't quite understand what you mean by

25  that, but --

1       Q.   We don't have the burden to prove

2  non-infringement, right?

3       A    I guess if that's the way you say it in legal

4  in terms, that's right.

5       Q    Well, I don't want you to guess.  Isn't that

6  what you -- isn't that what you understand?

7       A    I think I've agreed to that, yes, sir.

8       Q    Now, let me focus for a moment -- and so, for

9  instance, we're not going to address each and every

10  element of every claim.

11             If it is sufficient to show non-infringement,

12  if it's shown and the jury believes that just one

13  element is missing from a claim, right?

14       A    I believe that's the same thing you've been

15  telling me, yes.

16       Q    Okay.  Let me focus on Apple's iPhones, iPads,

17  and iPods.

18             MR. RANDALL:  Can you put up LX1, please?

19       Q    (By Mr. Randall) Okay.  Now, you've said in

20  your testimony that Mirror Worlds is accusing Apple

21  iPhones, iPads, and iPods, those devices that you showed

22  on the screen, of infringement, right?

23       A    Yes.

24       Q    All right.  And the infringement claim that

25  Mirror Worlds is making is just two claims, right?  It's

1    just the '427 patent, which is up there at the top.

2    '427, Claims 16 and 18, right?

3         A    That's right.

4         Q    All right.  Now, let's look at this chart for

5    a minute.

6              Up at the top, the top row, it says '227

7    claims, '427 claims, '313 claims.  Do you see that?

8         A    I see that.

9         Q    All right.  So out of all the claims in the

10   patents, those are the ones -- the only ones that Mirror

11   Worlds is asserting in this case, right?

12        A    That is my understanding, yes.

13        Q    Okay.  And with respect to all those claims --

14   there's twelve of them.  With respect to those twelve

15   claims, only two are being asserted by Mirror Worlds

16   against Apple's iPhones, iPads, and iPods, right?

17        A    Yes.

18        Q    Okay.

19             MR. RANDALL:  Can you slide that thing

20   over just a little bit?

21             There we go.

22        Q    (By Mr. Randall) Now, I want to focus on this

23   last element here, displaying glance view in response to

24   sliding cursor over stack without clicking.

25             Do you see that?

```
 1
 2      Q     Okay.  Now that's a summarized or a

 3   paraphrases view of that element -- claim element.

 4            You understand that, right?

 5      A     I do.

 6      Q     Okay.  So that paraphrased claim element is

 7   required by both Claims 16 and 18 as referenced by this

 8   checked box.

 9            Do you see that?

10      A     Yes.

11      Q     Okay.  And you agree with it, right?  The --

12   the displaying glance view in response to sliding a

13   cursor over a stack is required by both Claims 16 and

14   18, right?

15      A     Yes.

16      Q     And so, for instance, if Mirror Worlds does

17   not show that element, if Mirror Worlds does not

18   convince the jury that Apple's iPhones, iPods, and iPads

19   satisfy that one element, there's no infringement of

20   those devices in this case at all, right?

21      A     I believe you've made that perfectly clear --

22      Q     Well, I want to make it clear.

23      A     -- three or four times.

24      Q     Right?

25      A     Yes, sir.
```

1   Q.  So if that element -- if you don't satisfy

2   that element, don't satisfy your burden of proof, then

3   those products, Apple's iPhones, iPods, and iPads, are

4   out of this case, and they don't infringe any claim,

5   right?

6        A    I believe that's the same question and the

7   answer is still yes.

8                  MR. RANDALL:  Now, let's go to LX11,

9   please.

10       Q    (By Mr. Randall) All right.  So this is the

11  element down below here.

12                 MR. RANDALL:  If we can remove the purple

13  stuff.  I don't know what that is.

14                 Oh, Lord.  Okay.  I don't know where that

15  came from.

16       Q    (By Mr. Randall) All right.  This is the

17  element that we're talking about, and it's down below.

18                 It says:  Displaying a cursor or pointer and

19  responding to a user sliding, without clicking, the

20  cursor or pointer over a portion of a displayed document

21  representation to display the glance view of the

22  document whose document representation is touched by the

23  cursor or pointer.

24                 Do you see that?

25       A    I see that.

1  Q     Now, each portion -- every aspect of 12 10/20/10

2  element Mirror Worlds has to show is being practiced by

3  Apple's iPhones, iPods, and iPads, right?

4      A     Well, actually, I've shown this by Doctrine of

5  Equivalents, so it's -- functionally, everything has to

6  be there.

7      Q     Can you just answer my question?

8          Mirror Worlds has the burden to prove each and

9  every aspect of that claim element, right?

10     A     Each aspect has to be met.

11     Q     All right.  So did you just say -- when you

12  said Doctrine of Equivalents, do you admit that Apple's

13  iPhones, iPads, and iPods do not literally infringe any

14  claim in this case?  Yes or no?

15     A     I -- I would say I don't know the legal

16  niceties of Doctrine of Equivalents, but Doctrine of

17  Equivalents is still literal infringement, correct?

18     Q     Do they literally infringe?

19     A     I'm sorry.  I don't know the answer to that

20  legally --

21     Q     You don't know?

22     A     -- if they literally infringe.

23     Q     You don't know?

24     A     But I don't know what that means within the

25  Doctrine of Equivalents.  Perhaps you could clarify that

1    for me.

2        Q      Well, the Judge will clarify it.  You have no

3    idea whether they literally infringe or infringe -- your

4    opinion is they infringe under the Doctrine of

5    Equivalents, right?

6        A      That's correct.

7        Q      You have no opinion whether these products

8    literally infringe; is that right?

9        A      As opposed to what, sir?

10       Q      As opposed to Doctrine of Equivalents.

11       A      I'm sorry.  I don't -- I don't know that I

12   understand --

13       Q      Okay.

14       A      -- whether Doctrine of Equivalents is within

15   the literal infringement or not.

16       Q      Do you know if there's any difference between

17   literal infringement and infringement under the Doctrine

18   of Equivalents?

19       A      I am not sure.

20       Q      Well, what standard did you apply in

21   determining whether, in rendering your opinion, that

22   these products infringed?

23              You didn't apply -- let me just get this

24   clear.  You did not apply, in reaching your conclusion,

25   that these Apple products, iPhones, iPads, and iPods --

1    you did not apply a literal infringement standard to

2    your opinion, did you?

3         A    I didn't say that.

4         Q    Well, tell me what the literal infringement

5    standard is that you applied, if you applied any.

6         A    That each claim element -- each claim

7    limitation must be met by the product.

8         Q    Literally?

9         A    Yes.

10        Q    Okay.  And is that your conclusion, that each

11   claim aspect -- each claim element, including each

12   aspect of this claim element that's listed here, is met

13   literally?  Is that your opinion?

14        A    Yes.

15        Q    Okay.  Let's look at the first aspect of this.

16             It says:  Displaying a cursor or pointer.

17             Do you see that?

18        A    Yes.

19        Q    Okay.  Apple's iPhones, iPads, and iPods do

20   not have a cursor or pointer, correct?

21        A    I disagree.

22        Q    Is there a display -- is there a cursor or

23   pointer that is displayed on the screen of a iPhone,

24   iPad, and iPod?

25        A    Yes.

1    Q   Displayed on the screen?

2    A   Yes, sir.

3    Q   Where?

4    A   That square area in the center functions as

5    the cursor.

6    Q   Well, the cursor is the entire screen; is that

7    what you're saying?

8    A   No, sir.  The area in which the glance view

9    pops up in the center of the screen functions as the

10   cursor.

11   Q   Okay.  Well, you're looking there at the

12   screen.  Just tell me where the cursor or pointer is.

13   A   Right where that big square thing in the

14   center is, that area.

15   Q   Well, the cursor or the pointer, is it over in

16   that corner over there?

17   A   The cursor or pointer functions to designate

18   some portion of the stack within this claim limitation.

19   Q   You're suggesting --

20   A   And that is a function that is met by the

21   square area in the center.  If we could see it sliding,

22   you will see how, in fact, they get selected by moving

23   in underneath that area.

24   Q   I'm just focusing -- I'm just focusing on a

25   cursor or pointer.

1    Do you understand that a cursor is typically --

2    typically an arrow or a small device on the screen --

3                MR. RANDALL:  Can you move the --

4        Q     (By Mr. Randall) See that little pointer up

5    there that's moving around?  Is that a cursor or a

6    pointer?

7        A     That is one kind of cursor or pointer.

8        Q     Right.  And does -- does the Apple iPhone,

9    iPad, and iPod have that?

10       A     They don't have a little arrow like that.

11       Q     And they don't have a little cursor or pointer

12   that moves around the display, correct?

13       A     I'm not -- no, they don't move around the

14   display.

15       Q     They don't have -- Apple's iPhones, iPads, and

16   iPods do not have a visual cursor or pointer that you

17   can manipulate around that screen, right?  Correct?

18       A     There is not that form of a cursor or pointer

19   on these screens.

20       Q     All right.  And so, for instance, displaying a

21   cursor or pointer -- see this -- see this laser beam

22   that's on there right now?

23             I'm sorry.  You probably can't.

24                MR. RANDALL:  Put the cursor or pointer

25   back up.

1    Q   (By Mr. Randall) So you see that a little
2  cursor or pointer, right?

3       A    That is one form of a cursor or pointer.

4       Q    And there is no other small, visual object
5  that is utilized on Apple's iPhones, iPads, and iPods to
6  maneuver around that screen such that you can see it
7  moving around, right?

8       A    You're suggesting that a small, visual object
9  is what the cursor or pointer must be?

10      Q    I'm asking you, if you can just answer my
11 question.

12      A    Well -- sorry -- so you're referring to this
13 little arrow?

14           There is no little arrow on that screen.

15      Q    Right.  There's no arrow; there's no other
16 visual object that is utilized by the user to move
17 around that screen, correct?

18      A    No.  I disagree.  There is a visual object,
19 namely the square in the center, which, when the stack
20 moves, selects the thing that is under it.

21      Q    Can you see -- when you're looking at that
22 right now, can you see where this visual pointer or
23 cursor is on the screen?

24      A    Well, I happen to know it's in the center, and
25 that's the way it functions.

 1          Q    You have it -- it's in the center?

 2          A    Yes.

 3          Q    Does it ever move around?

 4          A    No.  The stack moves under it.

 5          Q    I'm asking you for literally.  Literally, does

 6     this -- I'm not asking you -- your view is that

 7     functionally it's the same, right?

 8               That's your view, right?

 9          A    Well, we should talk about what it is here, to

10     be careful.

11          Q    The cursor or pointer.

12          A    Cursor or pointer is the area in the center of

13     that square which selects what comes under it.

14          Q    Does -- does this -- does the Apple products,

15     iPhones, iPads, and iPods, have a cursor or pointer

16     literally that moves around the screen?

17          A    That moves around the screen?

18          Q    Yes.

19          A    No, sir.

20          Q    All right.  So it says here:  Displaying a

21     cursor or pointer and responding to a user sliding,

22     without clicking, the cursor or pointer over a portion

23     of a displayed document representation.

24               Do you see that?

25          A    I do.

So those Apple products do not have a cursor

 1   
 2   or pointer that slides over a portion of this Coverflow,

 3   right?

 4        A    I disagree.

 5        Q    Slides over it literally?

 6        A    Slides over it as the stack moves.

 7        Q    No.  Your view is that what is underlying

 8   that, the Coverflow slides underneath it, right?

 9        A    Yes.

10        Q    Okay.  I'm asking you if there's a visual

11   object, a cursor or pointer, that you can see that is

12   displayed that slides over this document representation.

13             It doesn't have that, does it?

14        A    As the stack slides, since they slide under

15   it, this cursor is sliding over it.

16        Q    No.  I'm not suggesting the stack is sliding,

17   all right?

18        A    Okay.

19        Q    The stack is staying the same.

20        A    Uh-huh.

21        Q    Does -- do the Apple products, the Apple

22   iPhones, iPads, and iPods, have a visual object that is

23   displayed on the screen that slides over this stack when

24   the stack is not moving?  Yes or no?

25        A    You're -- you're saying sliding when nothing's

 1   moving?

 2      Q    Correct.

 3      A    Well, it's not sliding when nothing's moving,

 4   so...

 5      Q    I'm talking about the visual display, the

 6   cursor or pointer.

 7      A    I understand that.

 8      Q    What's that?

 9      A    I understand that you're talking about the

10   cursor or pointer.

11      Q    Yes.

12      A    So when the stack is moving, it's sliding over

13   the document --

14      Q    I'm not suggesting the stack is moving.  The

15   stack is staying the same.

16           Let's just put it this way:  Is this -- is

17   the -- where exactly is the cursor or pointer?  You said

18   it's in the center?

19      A    Yes.

20      Q    Does it extend all the way out to the edge of

21   the screen?

22      A    No.

23      Q    Really?  Where does it stop?

24      A    It stops at the edges of the stacks on the

25   sides.

1          Q   And if the iPad is smaller, then your
2     pointer gets smaller; is that your suggestion?

3          A   No.  The stacks don't change in that extent in
4     the inner edge -- the edge of the stacks on the inside
5     are -- is always the same.

6          Q   Let me ask you something.  Is there, on these
7     Apple products, a --

8                    MR. RANDALL:  Can we put the pointer up?

9          Q   (By Mr. Randall) You can see that arrow,
10    right?

11         A   I see the arrow.

12         Q   All right.  So does Apple have an object like
13    that -- see that little arrow -- that can maneuver
14    around that screen and slide on that screen?  Yes or no?

15         A   Well, I've already answered that.  It does not
16    have a little arrow that slides around on this screen.

17         Q   And so if the jury --

18         A   Yes.  Sorry.

19         Q   And so if the jury determines that these Apple
20    products do not have that pointer or cursor that's
21    moving around the screen right there, then you would
22    agree that the Apple iPod, iPhone, and iPad do not
23    infringe, right?

24         A   No.  I don't believe the cursor has to look
25    like that little arrow.

1    Q.   If the jury decides that Apple's iPad,
2    iPhones, and iPads do not have a cursor or pointer, you
3    would agree there's no infringement, right?
4    A    I would agree as long as it says the cursor or
5    pointer sliding, as it describes here, is not found,
6    then that limitation is not met.
7    Q    I'm going to make this really simple.
8    A    Uh-huh.
9    Q    The first aspect of this claim element says
10   displaying a cursor or pointer.
11        Do you see that?
12   A    Yes.
13   Q    All right.  So you'd agree, if the jury
14   concludes that Apple on its iPhones, iPads, and iPods do
15   not have a cursor or pointer, that there's no
16   infringement, right?
17   A    All right.
18   Q    Would you agree with that?
19   A    I believe so.
20   Q    Okay.  Would you agree that if the jury finds
21   that Apple does not have a cursor or pointer on these
22   products that a user can slide, without clicking, over a
23   portion of the displayed document representation, that
24   there's no infringement?
25   A    I guess so.  Uh-huh.

1   Q.   What?

2   A    I guess so.

3   Q    I don't want you to guess.

4   A    Okay.

5   Q    Be clear.  There's no infringement then,

6   right?

7   A    As long as -- yes.  All right.

8   Q    You agree with me, don't you?

9   A    Were you reading the language from this claim?

10   Q    Absolutely.

11   A    Okay.  Yes.

12   Q    Now, you would also agree, it says here, the

13   last thing:  To display the glance view of the document

14   whose document representation is touched by the cursor

15   or pointer.

16        Do you see that?

17   A    Yes.

18   Q    Okay.  So the document representation is

19   something different than that cursor or pointer.

20        You agree with that, right?

21   A    Yes.

22   Q    All right.  So if the jury believes that Apple

23   does not have a cursor or pointer that touches this

24   document stream (sic), then there's no infringement of

25   these products, right?

1     A    I'm sorry.  You did say document representation at 4:20 o'clock

2     it's document representation.  You meant to say --

3     Q    All right.  Document representation.

4     A    That's right.

5     Q    Then there's no infringement, right?

6     A    Right.

7     Q    All right.

8          MR. RANDALL:  Can we pull up --

9     Q    (By Mr. Randall) Oh, by the way, you mentioned

10    yesterday -- you talked about that it was impossible for

11    Apple ever to avoid infringement, didn't you?

12    A    I don't think I said that.

13    Q    You said that there was no way Apple could

14    avoid infringement of any of these claims, didn't you?

15    A    I didn't say that literally, I don't believe.

16    I believe I said -- you're talking about what I said to

17    Mr. Bratic?

18    Q    Yes.

19    A    I said I didn't think they could achieve the

20    functions that they chose to put in without infringing

21    these patents.

22    Q    You don't think -- so you drew the conclusion

23    in telling your colleague, who's going to talk about

24    damages -- you drew the conclusion that Apple couldn't

25    possibly make an iPhone, iPad, or iPad (sic) without a

1  display or pointer without displaying a mouse

2  pointer.

3           Is that part of your analysis?

4     A    I -- I don't believe I said that quite that

5  way.

6     Q    Well, that's what I'm asking you.  If -- if

7  Apple does not use a cursor or pointer in these

8  products, then it doesn't infringe, right?

9     A    You've already asked me that and I agreed.

10    Q    All right.  Did you tell that to your damages

11 expert when you told him that there was no way Apple

12 could avoid infringement?

13    A    I did not specifically point that out.

14         MR. RANDALL:  Can you pull up LX1?

15         Actually, pull up LX16.

16         This is '313, Claim 29.  Let me see.

17         No?  This is DX 5, Claim 9.

18    Q    (By Mr. Randall) Okay.  So this is the element

19 that appears in the '313 patent, Claim 9.

20         Do you recognize this, sir?

21    A    Yes.

22    Q    Okay.  Now, this element also has various

23 aspects to it, correct?

24    A    This is the same element, right?

25    Q    Okay.  You believe this is --

 1    A   I'm sorry.  It adds on what the change/view

 2  is.

 3    Q   Okay.  But the question is simply this:  This

 4  element has various aspects, correct?

 5    A   Yes.

 6    Q   Okay.  And so, for instance, does the

 7  Coverflow display change if a user merely runs the

 8  cursor over the album covers?

 9    A   Yes.

10    Q   Okay.  And that's the basis of your

11  infringement opinion with respect to this element,

12  correct?

13    A   Yes.

14    Q   Okay.

15        MR. RANDALL:  Can you put up Clip 6,

16  please?

17    Q   (By Mr. Randall) Now, that's a cursor moving

18  over those album covers, right?  And nothing's

19  happening, right?

20    A   I'm sorry.  What cursor is that?

21        You're talking about the cursor on this

22  screen?

23    Q   I'm going to play this animation again.

24  That black cursor is going over the album covers, and

25  nothing's happening, right?

1    A   Couldn't tell me what that was from. That's

2   from the operating system or device like a --

3    Q   I'm just asking you a question.  That --

4   that -- nothing's happening when that cursor is passing

5   over the album covers, right?

6    A   This little arrow moving back and forth is --

7    Q   See the black cursor?

8    A   -- not -- doesn't seem to be correlated with

9   any action on this scene behind it.  That's correct.

10    Q   Well, that little black thing, that's a

11   cursor, isn't it?

12    A   That is one form of a cursor.

13    Q   And it's passing over the album covers, right?

14    A   Yes.  This white one is there, too, sir.

15    Q   And nothing is --

16            THE COURT:  I'm sorry.  I can't -- I'm

17   not being able to hear you, and y'all are talking over

18   each other and --

19            THE WITNESS:  Can you turn this one up a

20   little bit?

21            THE COURT:  No, you're going to have to

22   turn your voice up a little bit.

23            THE WITNESS:  All right.  I'll do that.

24            THE COURT:  The -- and, Counsel, you need

25   to identify where that's from.  I mean, what is that?

1    Is that from, from an iPod or what?

2                    MR. RANDALL:  That's Apple's operating

3    system.

4                    THE COURT:  From what device?

5                    MR. RANDALL:  The accused operating

6    system in this case.

7    Q    (By Mr. Randall) So were you aware that

8    Apple's operating system operated to allow the cursor to

9    slide over these album covers without any action being

10   taken?

11   A    I'm aware that one can move this little arrow

12   pointer around in the operating system.

13   Q    Okay.  And would you agree that there is no

14   infringement of the claim element that we just looked at

15   with respect to the cursor being moved over the album

16   covers without any glance view being displayed?

17   A    No, I don't agree with regard to the arrow.

18   Q    Okay.  The element that we just looked at

19   said:  Displaying further, including displaying the

20   cursor or pointer, and responding to a user sliding the

21   cursor or pointer over said displayed stack to display

22   glance view of the document in the stack that's

23   currently touched by the cursor or pointer.

24                    Do you see that?

25   A    I do.

1   Q   Okay.  And here the black cursor is being

2   passed over the albums, and no glance view is being

3   displayed when it's touching those document images,

4   correct?

5        A    That's correct.

6        Q    Okay.  And that -- in this instance, there

7   will be no infringement of that element, correct?

8        A    I disagree.

9        Q    Where's the glance view being displayed when

10  that slide -- when that cursor is being passed over the

11  stack?

12       A    Well, there's another cursor on that screen.

13       Q    I'm talking about that black cursor that's

14  going across --

15       A    I know you are, sir, and --

16       Q    Is that --

17       A    -- I'm responding to that question as best as

18  I can.

19       Q    Does that demonstrate infringement right

20  there, that black cursor passing over the stack?

21       A    The black cursor does not.

22       Q    Okay.  Thank you.

23            MR. RANDALL:  Can you pull up LX4,

24  please?

25       Q    (By Mr. Randall) So I want to talk to you

1    about the recedings for shortened stack.

2             That's required by numerous claims, correct?

3    A    Yes.

4    Q    All right.  And here in the Patent Office,

5    during the prosecution of the patent, the inventors and

6    applicants told the Patent Office with respect to this

7    visual display on the left that says prior art, with

8    respect to that item, the applicants told the Patent

9    Office -- and that's called the Cowart reference.

10            You're familiar with that, right?

11   A    Yes, sir.

12   Q    You've read this file history, right?

13   A    Yes, I have.

14   Q    You've seen this before, right?

15   A    I have.

16   Q    Okay.  So the applicants say:  Cowart shows an

17   orthogonal view of windows; that is, the windows do not

18   get smaller toward the bottom of the stack, okay?

19            Now, on the right-hand side of this figure

20   is -- is the representation from the patent, correct?

21   A    From the patent history -- the file history,

22   yes.

23   Q    Well, it's from the patent, right?  It's

24   Figure 1 from the patent, isn't it?

25   A    I'm sorry.  Oh, the figure, yes.

1    Q.  Okay.  So it's Figure 1 from the patent, and

2    in the patent, this document representation, the windows

3    get smaller toward the bottom of the stack, correct?

4         A    Yes.

5         Q    Okay.  And in trying to distinguish the prior

6    art Cowart system, the applicants here, Mirror Worlds'

7    applicants, they told the Patent Office that their

8    invention is different than Cowart, and this visual

9    display is different than Cowart, and their invention is

10   different than Cowart, because this (sic) windows in

11   Cowart do not get smaller towards the bottom of the

12   stack.

13        And the applicants went on to say:  This

14   important distinction highlights a key aspect of the

15   streams of the present invention, right?

16        A    Yes.

17        Q    That's what they told the Patent Office,

18   right?

19        A    (No response.)

20        Q    And so that is a key aspect of the streams of

21   the present invention that the windows do get smaller

22   towards the bottom of the stack, right?  Yes or no?

23        A    I agree with this phrasing, what this said,

24   yes.

25        Q    Okay.

 1      A.  Since you're looking something else, I'd
 2  like to --
 3      Q    No question is pending, sir.
 4      A    I'd like to --
 5      Q    I'm under a time pressure.
 6      A    Okay.
 7      Q    Your lawyer will ask you anything that you
 8  want to talk about, okay?
 9      A    All right.
10          MR. RANDALL:  Can you pull up LX5,
11  please?
12      Q    (By Mr. Randall) Now, this is Coverflow in the
13  Apple operating system, correct?
14      A    It appears to be.
15      Q    All right.  And that shows that these document
16  images across the screen are all the same height, right?
17      A    Not the one in the center.
18      Q    Are you sure about that?
19      A    Well, I've looked at many of them on my system
20  and on other systems, so...
21      Q    Are you suggesting that that -- those lines
22  are not parallel, the red lines?
23      A    No, sir.
24      Q    You're not suggesting that, right?
25      A    No.

1    corners of those document representations, that they are

2    corners of those document representations, that they are

3    all the same height, right?

4         A    We're talking about just the document

5    representations, the things on the side, correct?

6         Q    That's right.

7         A    Yeah, those are -- in the front, they are the

8    same height.

9         Q    All right.  So they don't get smaller right

10   there in the front, do they?

11        A    That's correct.

12        Q    Okay.  And you also -- did you confirm that in

13   the source code?

14        A    Yes, I did.

15        Q    Okay.

16        A    At least from Mr. Goossens' deposition.

17        Q    And these document representations, they also

18   are across the same plane, right, so to speak?  So they

19   could just be right against the back of the wall, right?

20   They're flat, aren't they?

21        A    No.  Actually, they're rotated 60 degrees.

22        Q    The front edge is just flat across, right?

23        A    The line representing the front edge is in the

24   same plane across there, yes.

25        Q    Okay.  All right.  And where's the front of

1   the stack and where's the end of the stack, something
2       A    Well, there's a stack on the left, and so
3   there's a front there, and something back here is the
4   back.
5       Q    I just want to know where the back and front
6   of the stack is.
7       A    I believe I just pointed at them.
8       Q    So you say there's two stacks there?
9       A    Yeah.  Actually, in this one, since the glance
10  view is overlapping the first one in the stack, I
11  believe it's part of that stack as well.  This one
12  (indicates).
13      Q    So it's one stack now?
14      A    There's a stack to the left; there's a stack
15  to the right; and there's a whole stack.
16      Q    So it's three -- is it three stacks, or is it
17  two stacks?
18      A    It's two.
19      Q    Is it one stack?
20      A    When it starts moving, it moves as a single
21  stack.
22      Q    Let's look --
23      A    When it's displayed, it's two stacks.
24      Q    So is it one stack right now?
25      A    It's two.

1    Q   But, I'm sorry, is Figure 10 --

2    A    It moves as one.

3    Q    You have the same -- you said in your report

4 that there were two stacks in Coverflow, right?

5    A    I had said that, and it does appear that way

6 sometimes.

7              MR. RANDALL:  Can you play Clip 4,

8 please?

9              (Video clip playing.)

10             QUESTION:  We've got the iPod --

11             (Video clip stopped.)

12             MR. RANDALL:  I'm sorry.  That's not it.

13             Yes.

14             (Video clip playing.)

15             QUESTION:  There is a receding

16 foreshortened stack to the left and right of the center

17 item.

18             So in that sentence, are you telling us

19 that there are two stacks in the image on Figure 10?

20             ANSWER:  I think, taken together, it is a

21 receding foreshortened stack, and it could also be

22 regarded as a receding foreshortened stack in each half

23 as well.

24             (End of video clip.)

25    Q    (By Mr. Randall) So you're saying it's both

1   there?

2        A     It depends on the positioning of the glance

3   view in the center.

4                  MR. RANDALL:  All right.  Can you

5   play --

6        Q     (By Mr. Randall) Then you revised that

7   opinion, though, didn't you?  Right in the middle of the

8   deposition, didn't you?

9        A     I was --

10       Q     Yes or no?

11       A     -- that afternoon, yes, sir.

12                 MR. RANDALL:  Play Clip 5.

13                 (Video clip playing.)

14                 QUESTION:  And the -- let's look at

15  the -- on either side.  So let's look at the recede --

16  this stack on the left-hand side on the image on

17  Page 43.

18                 What is the -- what is the first in the

19  stack, according to the claim language, for that stack?

20                 ANSWER:  And the claim language you're

21  referring to is --

22                 QUESTION:  The claim language on Page 43,

23  Subheading (d).

24                 ANSWER:  Well, I think I'm going to have

25  to revise what I said about the first in the stack.  I

 1    believe the front of the stack is the center item.

 2                  (End of video clip.)

 3        Q    (By Mr. Randall) Then you changed that

 4    opinion, didn't you, in the same day under oath, didn't

 5    you?

 6        A    Yes, sir.

 7                  MR. RANDALL:  Let's play Clip 8.

 8                  (Video clip playing.)

 9                  QUESTION:  So you mean to say that the

10    reason -- so you mean to say that that image to the

11    left -- the image directly left of the center item in

12    Figure 43, is too small to read, and so, therefore,

13    that's the reason why it's -- only a part of it is

14    visible to the user?

15                  ANSWER:  I think I have to revise that

16    again.  I will say that the first item in the front of

17    each stack -- the left side is the one that is the first

18    in the stack, and, therefore, it's the ones behind it

19    that are obscured.

20                  (End of video clip.)

21        Q    (By Mr. Randall) Now, at the time of this

22    deposition, you had worked as an expert on this case for

23    over a year and a half, hadn't you?

24        A    Yes, sir.

25        Q    All right.  And you opined earlier that you

had worked on a commercial patent case, right?

 1

 2       A     Yes; that's true.

 3       Q     All right.  And the element that you were just

 4  opining on in that deposition, the three different ways,

 5  is an element that is required of Mirror Worlds to prove

 6  infringement, isn't it?

 7       A     Yes.

 8       Q     You have also mentioned in your direct

 9  testimony that lighting has an effect on whether or not

10  something is a foreshortened receding stack, didn't you?

11       A     Yes.

12       Q     All right.  Lighting isn't discussed anywhere

13  in the patent, is it?

14       A     I don't believe so.

15       Q     What?

16       A     No.

17       Q     You also testified that there's this

18  perspective effect, right?

19       A     Yes.

20       Q     Okay.  And you testified that -- and that's

21  not discussed in the patent, is it?

22       A     It's discussed in the file history.

23       Q     Not in the patent, right?

24       A     I don't believe so.

25       Q     All right.  You discussed this item rotation

1    also in your digest.  When you're typing the program that

2    Apple has a foreshortened receding stack, you're

3    discussing item rotation, right?

4         A    Yes.

5         Q    That's not discussed in the patent, is it?

6         A    That's right.

7         Q    And you discussed angling of items in order to

8    show that Apple had a foreshortened receding stack, and

9    that's not mentioned in the patent either, is it?

10        A    Correct.

11        Q    And you discussed text visibility in trying to

12   show that Apple had a foreshortened receding stack, and

13   that's not mentioned in the patent anywhere, is it?

14        A    Actually, it is.

15        Q    Reflections?  You mentioned reflections in

16   your testimony.

17             That's not mentioned in the patent, is it?

18        A    No.

19             MR. RANDALL:  Will you show LX14A,

20   please?

21             Your Honor, one moment, if I may.

22        Q    (By Mr. Randall) All right.  You are aware,

23   Dr. Levy, that the Court has construed this mainstream

24   to mean that a stream that is inclusive of every data

25   unit or document received by or generated by the

1   computer system, right?

2       A    Yes.

3       Q    Okay.  And that as part of that mainstream,

4   the Court defined what stream means as a time-ordered

5   sequence of documents that functions as a diary of a

6   person's or entity's electronic life; and that it is

7   designed to have three main portions:  Past, present,

8   and future, correct?

9       A    Yes.

10      Q    Okay.  And so the mainstream includes that

11  stream definition that I just mentioned, right?

12      A    As you just said it, yes.

13      Q    Right.  All right.

14           Now, for instance, if any data units or

15  documents in the computer are not maintained in this

16  mainstream, as the Court has defined it, then the system

17  does not infringe, right?

18      A    We have to be sure we understand what a data

19  unit is; but if you're looking at the definition of the

20  Court's data unit, that's correct.

21      Q    Well, the -- the definition is every data unit

22  or document received by or generated by the computer,

23  right?

24      A    No.  The definition of a data unit is the item

25  of information of interest to the user.

1        Applying that definition, if any data units or

2    documents in the computer are not maintained in the

3    mainstream, then the system does not infringe, right?

4    A    Yes.

5    Q    Okay.

6            MR. RANDALL:  Can you show LX23, please?

7            Go to -- there you go.

8            In contrast to, see that right there.

9    Yeah, but go down now.  Yeah, go down all the way to

10   invention -- storage backbone of the present invention.

11   Q    (By Mr. Randall) All right.  So this is part

12   of Exhibit 4 at Page 770.  Exhibit 4, 770.

13           It is the inventors, Mirror Worlds, amended

14   the claims in response to an office action.  So the

15   office, PTO, Patent Office, said, no, we're not going to

16   allow these claims.  And there was a amendment to the

17   claims, and this is the amendment, discussing the

18   amendment, right?

19   A    Okay.  Yes.

20   Q    Yeah.  And so here, the applicant said:  The

21   present invention -- in contrast, the present invention,

22   as recited in the amended claims, does not permit data

23   units to be removed from the mainstream and still remain

24   in the computer system, because, as recited in the

1    amended claims as a data unit of the computer's previous
2    be included in the mainstream.

3         The requirement that a data unit be in the
4    mainstream, as recited in the amended claims, results
5    from the inherent structure of the mainstream as the
6    storage backbone of the present invention, right?

7    A    I see that.

8    Q    Okay.  And so if there are data units in the
9    computer that are not included in the mainstream as
10   defined by the Court, then the system does not infringe,
11   correct?

12   A    Right.

13   Q    Then applying that to Apple's operating
14   system, if the -- any data units or documents are not
15   included in the mainstream, as the Court has defined it,
16   then Apple's operating systems do not infringe, right?

17   A    Right.

18   Q    Okay.  And have you investigated whether or
19   not Apple permits the documents to fall out of what you
20   consider to be the mainstream?

21   A    No.

22   Q    You haven't?

23   A    I haven't.

24   Q    Okay.  Tell me exactly what the mainstream is,
25   in your opinion.

1      A   I'm sorry.

2      Q   In Apple's operating system, what is the

3  mainstream?

4      A   It is the contents of the Spotlight Store,

5  together with the files underlying the documents.

6      Q   I'm sorry.  Did you say including the files?

7      A   Including the underlying documents themselves,

8  which I said are referred to by pointers.

9      Q   Well, when you say Spotlight Store, what does

10  consist of?

11      A   Consists of a large complex of data structures

12  which contain metadata and content index and pointers to

13  the underlying data units.

14      Q   So you said there's Metadata Store and the

15  content index, right?

16      A   (No response.)

17      Q   Yes?

18      A   Yes.

19      Q   You said that's -- that's -- that's part of

20  the mainstream --

21      A   That's right.

22      Q   -- in your view?

23      A   And the data structures associated with

24  responding to queries.

25      Q   Anything else?

1      A    The underlying files.

2      Q    And the underlying files?

3      A    Yes, sir.  As I've explained in my report.

4            MR. RANDALL:  Can you pull up LX3 for a

5      minute?  LX3.

6      Q    (By Mr. Randall) All right.  So this is a

7      visual of Apple's system, this hierarchical file system

8      of filenames and directories.  Do you see that on the

9      left-hand side?

10     A    I see a hierarchical window on the left, yes.

11     Q    All right.  So are you including that

12     information, that file directory, and the documents

13     stored in those files in your mainstream?

14     A    I'm sorry.  I'm not quite sure what you're

15     referring to.

16     Q    I'm referring to the file system in the Apple

17     operating system.  Are you including that in your

18     mainstream?  Yes or no.

19     A    The contents of the file system are included

20     by reference from the Spotlight Store, yes.

21     Q    All right.  So the file system is included in

22     your mainstream, right?

23     A    The files in the file system are included.

24     Q    Okay.  So what -- what in the Apple operating

25     system, including their -- so the filenames and the

1    directories remapped, those are included too.

2    your -- in your mainstream?

3        A    To the extent that a directory is a data unit,

4    then it would also be one of those items.

5        Q    So you just include in your mainstream

6    everything in the Apple operating system that is

7    utilized to store documents, even the folders in the

8    file system, right?

9        A    No.  Actually, as far as I -- I didn't

10   investigate this, but as far as I know, the folders are

11   not included in the Spotlight Store.

12       Q    Everything, as it's organized in the folders,

13   is included in your mainstream; is that right?

14       A    All the files or data units that are referred

15   to from the Spotlight Store would be included, and those

16   are in the file system.

17       Q    So you're saying all these documents in these

18   files and folders, you're going to say are included in

19   your mainstream; is that right?

20       A    To the extent that they are in -- that they

21   are printed to from the Spotlight Store, yes.

22       Q    What's excluded from your mainstream in the

23   Apple operating system?

24       A    Well, the Spotlight Store, I believe, does or

25   can exclude system files and hidden files and other

1  things that account of interest to the user.

2      Q    Who makes that determination whether the files

3  are excluded from the mainstream and to the user or not?

4      A    There's a default determination by the

5  operating system, and then the user can further

6  designate files or types of files they wish to exclude.

7      Q    So a user can designate certain files that

8  they are interested in and certain documents that they

9  are interested in the Apple operating system and exclude

10  them from what you consider to be this mainstream,

11  right?

12      A    Actually, just the opposite.  They would

13  designate the ones they are not interested in in that

14  case, and then they would be excluded from the Spotlight

15  Store.

16      Q    No.  Is there any ability within the Apple

17  operating system to exclude documents from Spotlight?

18      A    Yes.

19      Q    And those documents would not be in the

20  mainstream, correct?

21      A    That's right.

22      Q    All right.  And, therefore, if those documents

23  were of interest to the user, for instance, for whatever

24  reason, if a parent or adult wanted to take certain

25  documents and remove them from the mainstream because

1  they wanted to make available their children didn't have

2  access to them for whatever reason, then those documents

3  would not be in the mainstream, right?

4       A    Well, that's an interesting hypothetical.  I

5  believe any document that the user designates that he

6  doesn't wish in the Spotlight Store would fall into the

7  category of not of interest to the user.

8       Q    So you think that if a user --

9                 MR. RANDALL:  Strike that.

10      Q    (By Mr. Randall) The Apple operating system

11 does permit users to determine what documents they want

12 in the Spotlight and what documents they do not want in

13 the Spotlight, correct?

14      A    Not exactly.

15      Q    Well, do they -- does the Apple operating

16 system allow users to specify certain types of documents

17 that will not be stored in what you consider to be the

18 mainstream?

19      A    Yes.

20      Q    All right.  And if those documents are of

21 interest to the user, then you would agree that the

22 Apple operating system does not infringe those claims,

23 right?

24      A    No.  I believe that the definition of interest

25 to the user is determined by how the user designates

1    what doesn't go to a mainstream store.

2    Q    All right.  Let me just make this clear.  The

3    Apple operating system allows for the user to make the

4    determination that certain documents will not be

5    included within what you consider to be the mainstream,

6    right?

7    A    Yes.

8    Q    Okay.  And you would agree that in order to

9    infringe those claims that a -- all documents and data

10   units have to be included in the mainstream, right?

11   A    No, that's not quite what it says.

12   Q    So you don't believe that all documents and

13   data units have to be included in the mainstream in

14   order to satisfy the claim elements?

15   A    All data units, yes.

16        MR. RANDALL:  Pull up LX14, please.

17   Q    (By Mr. Randall) The Court has defined

18   mainstream to mean a stream that is inclusive of every

19   data unit or document received by or generated by the

20   computer system.

21        Do you see that?

22   A    Yes.

23   Q    And so the mainstream has to include every

24   data unit or document received by or generated by the

25   computer, correct?

1   A   Yes.

2       Q   And if it does not, it does not infringe,

3   right?

4       A   Correct.

5       Q   All right.  And Apple's operating system

6   allows a user to define certain documents and data units

7   that the computer receives or is generated by the

8   computer to reside and be maintained outside of what you

9   consider to be the mainstream, right?

10      A   Not exactly.  The operating system allows the

11  user to designate certain documents to not be data units

12  within the meaning of the Court's construction.

13      Q   All right.  And therefore, the system wouldn't

14  infringe, right?

15      A   I'm sorry?

16      Q   Never mind.

17              MR. RANDALL:  Can you pull up LX8,

18  please?

19      Q   (By Mr. Randall) Now, this is the Court's

20  construction of a timestamp to uniquely identify.  And

21  the Court has construed that claim term to mean:  A

22  timestamp to identify means a date and time value that

23  uniquely identifies each document, right?

24      A   I think what -- be careful.  You first said

25  timestamp to uniquely identify.  This is the Court's

 1    construction of this term to identify

 2    Q    Right.  So timestamp to identify means a date

 3    and time value that uniquely identifies each document,

 4    right?

 5    A    That is what it says.

 6    Q    All right.  And the Apple operating system

 7    does not have a date and time value that uniquely

 8    identifies each document, correct?

 9    A    I -- I believe it does.

10    Q    And when it says uniquely identifies each

11    document --

12              MR. RANDALL:  Strike that.

13    Q    (By Mr. Randall) What is the date and time

14    value that you're referring to?

15    A    It's any one of the time-based metadata items,

16    together with the tiebreaker number, because it's

17    identifying the -- the document within the stream, where

18    it goes in the time sequence.

19    Q    So you're saying there's a date and time

20    value.  Could be a range of date and time values.  Is

21    that your opinion?

22    A    No.

23    Q    Is it date and time value, along with other

24    information?

25    A    The timestamp, as I've explained it in my

 1   reports is the date and time value and at least one of

 2   the metadatas, together with a tiebreaker number.

 3           MR. RANDALL:  Would you pull up LX9,

 4   please?

 5       Q    (By Mr. Randall) All right.  So this is

 6   Apple's -- a representation of Apple's operating system,

 7   correct?

 8       A    (No response.)

 9       Q    Yes?

10       A    I'm sorry.  Are you referring to this whole

11   window here?

12       Q    Yes, this window here.  Do you see it?

13       A    This looks like a Finder window, yes.

14       Q    All right.  And you see these dates and times

15   associated with these documents and files.  They are all

16   the same, right?

17       A    The display does show a time and date value in

18   the display that is the same, yes.

19       Q    All right.  And so which -- which time value

20   uniquely identifies each of those documents?

21       A    It would be the underlying date and time

22   value, together with the tiebreaker number.

23       Q    So, for instance, to draw an analogy, we all

24   have -- if -- if Social Security numbers are assigned to

25   everybody here, that would uniquely identify each person

1   here in the conference, right?

2        A    That is one way to do that.

3        Q    All right.  Right.

4             But if we all -- if a number of us have the

5   same birthday, that wouldn't uniquely identify each

6   individual, would it?

7        A    That's correct.

8        Q    All right.  And so in that analogy, the birth

9   date would not uniquely identify each individual, right?

10       A    That's right.

11       Q    You'd have to add the Social Security number,

12   right?

13       A    Right.

14       Q    All right.

15       A    Just like the students on the list.

16       Q    And so Apple doesn't -- in its operating

17   system, does not have a date and time value that

18   uniquely identifies each document, right?  You have to

19   add something else, like the Social Security number,

20   right?

21       A    For the most part, it does uniquely place it

22   in the time stream, but the tiebreaker value is needed

23   to uniquely identify it in the time sequence.

24       Q    I'm not talking for the most part.  It --

25   Apple's operating system does not have a date and time

1   value, like a timestamp, that uniquely identifies each

2   document in the system, right?  You and your opinion

3   relies on adding something else, like a Social Security

4   number, right?

5        A    My -- in my opinion, I add the tiebreaker

6   number, because I know it's -- a person of ordinary

7   skill in the art would understand that a timestamp

8   always has this tiebreaker available.

9        Q    Well, the tiebreaker number is the number that

10  is distinguishing these documents, not the date and time

11  value, right?

12       A    Not at all.  They're in the sequence of the

13  time value; and then when they're equal, there is a

14  tiebreaker to place uniquely in that sequence.

15       Q    Does -- I'm asking you just exclusively, a

16  date and timestamp -- does Apple's operating system have

17  a date and timestamp, without adding the Social Security

18  number or whatever this other number is, to uniquely

19  identify each document in the system?

20       A    Yes, it has a timestamp that uniquely

21  identifies it in this time sequence.

22       Q    Each document in the system from each other?

23       A    Yes.

24       Q    Okay.  Well, here, none of these timestamps

25  uniquely identify -- would you agree that none of these

1   timestamps, alone uniquely identify these documents from

2   the other documents?

3       A    These are not the timestamps.

4       Q    Do any of these timestamps uniquely identify

5   the document from the others?

6       A    These are not the timestamps.  What's shown

7   here is not the timestamps.

8       Q    Your opinion -- in rendering your infringement

9   opinion, you have to rely on this other number to add to

10  the time, correct?

11      A    I rely on my understanding of what a timestamp

12  is, and that's what it is.

13      Q    No.  You're adding this other number to it,

14  right?

15      A    No.  I'm including that other number as is

16  normally the case in the computer science usage of

17  timestamps.

18      Q    I'm not talking about the normal computer

19  science; I'm asking about the claim language.  You

20  realize that, right?

21      A    Yes.

22      Q    So the claim language and -- as the Court has

23  defined it, requires that a date and timestamp uniquely

24  identify each document, the date and timestamp.

25           You realize that, right?

1    ~~I think you've misspoken; you mean~~

2    date and time value, right?

3        Q    Date and time value, right.

4        A    The timestamp I have looked at in the Apple

5    system, it does uniquely identify this in the time

6    sequence.

7        Q    That's not what I'm asking.

8        A    And they always come out in the same order.

9        Q    That's not what I'm asking you.  I'm asking

10   you, if the date -- I'm saying -- just apply the claim

11   language and just apply the Court's instruction, all

12   right?

13            A date and time value that uniquely identifies

14   each document in the system, you have to include this

15   other number in order to uniquely identify each

16   document, right?

17       A    To compose a timestamp that uniquely

18   identifies, that's correct.

19       Q    All right.

20            MR. RANDALL:  No further questions.

21            MR. DIBERNARDO:  Your Honor, we have no

22   questions for Dr. Levy.

23            THE COURT:  Thank you.  You may step

24   down.

25            All right.  Who will be your next

 1   witness.

 2                MR. CARROLL:  Dr. Bud Tribble under the

 3   adverse party rule, Your Honor.

 4                THE COURT:  All right.  Dr. Tribble.

 5                MR. RANDALL:  Your Honor, may we approach

 6   the bench?

 7                THE COURT:  Yes, you may.

 8                (Bench conference.)

 9                MR. RANDALL:  Judge, this witness is not

10   on their witness list.  He never was on their witness

11   list.  He was never on their witness list ever.  In

12   fact, when we disclosed him during discovery and offered

13   him for deposition, they passed and said:  No, we don't

14   want to take his deposition.

15                When we added him to our witness list in

16   this case, they said:  We want to exclude him from the

17   trial all together.

18                And then we said:  We're going to call

19   him in our case-in-chief.

20                And they said:  Well, we want that

21   deposition now, and the Court was courteous enough to

22   give them that deposition.

23                But now we want to put him on in our

24   case, and they -- there's no reason why they should be

25   able to put him in their case, because he's never been

 1    on the witness—list.  And they're just diarizing our

 2    case.

 3                     It's the same -- tantamount to us

 4    bringing a corporate representative, wanting to

 5    introduce our company, and they say:  Oh, great.  At the

 6    last minute, we'll put him on our witness list and cross

 7    him before you put him on.

 8                     And we think it's unfair.

 9                     THE COURT:  Okay.  You're going to put

10    him on as a witness, right?

11                     MR. RANDALL:  Yeah, we are.

12                     THE COURT:  And they want to call him as

13    an adverse witness.  So what's the -- it's just a timing

14    issue, as far as you're concerned?

15                     MR. RANDALL:  Well, it is.  But also they

16    would -- it's a notice issue, too.  They notified us

17    late last night that they wanted to add him to the

18    witness list late last night.  They've had two years.

19                     MR. CARROLL:  Your Honor, that's not

20    true.  We put on the pretrial order that we were going

21    to call their -- whoever they designated as their

22    corporate representative as an adverse witness.  That's

23    who they chose.

24                     And we asked you if we could depose him,

25    and sure enough, when we deposed him, he had an e-mail

1   about Dr. Gelernter and he talked to him about that.

2                   THE COURT:  Okay.  That's fine.

3                   Objection is overruled.

4                   MR. RANDALL:  Okay.

5                   (Bench conference concluded.)

6                   MR. CARROLL:  Call Dr. Tribble, Your

7    Honor, under the adverse party rule.

8                   THE COURT:  Yes.

9                   Have you been sworn?

10                  THE WITNESS:  As part of this --

11                  THE COURT:  Were you sworn the first day?

12                  THE WITNESS:  Yeah.

13                  THE COURT:  Okay.  That's fine.  Take

14   your seat.  They last more than 24 hours.

15                  MR. CARROLL:  If the Court please, Your

16   Honor.

17                  May I, Your Honor?

18                  THE COURT:  Yes, you may.

19                  MR. CARROLL:  Thank you, Your Honor.

20      GUY LESLIE "BUD" TRIBBLE, M.D., Ph.D., PLAINTIFF'S

21                  WITNESS, PREVIOUSLY SWORN

22                     DIRECT EXAMINATION

23   BY MR. CARROLL:

24       Q    Dr. Tribble, good morning.

25       A    Good morning.

 1      Q   You could take a couple of days more to
 2  got it right, your name is Bud Tribble, correct?

 3      A   Bud is my nickname.  My legal name is Guy
 4  Leslie Tribble.

 5      Q   All right.  And if I got it right, you are
 6  both a medical doctor and a Ph.D., correct?

 7      A   That's correct.

 8      Q   And if I got it right, you have been an
 9  employee of Apple on and off since 1980, correct?

10      A   That's correct.

11      Q   And you've been with them continually -- or
12  continuously, whichever is right -- since 2001?

13      A   That's correct.  The most recent, yeah.

14      Q   I beg your pardon?

15      A   Yes.  That's the most recent time I joined
16  Apple.

17      Q   And if I got it right, you are a computer
18  scientist.

19      A   Well, I'm not formally -- my degree is not in
20  computer science.  My degree is in physics and
21  neurophysiology, but I practice computer science as part
22  of my job at Apple.

23      Q   That's certainly what they pay you to do.

24      A   It sure is.

25      Q   And if I got it right, you are two levels down

 1    from Steve Jobs.

 2    A    That's correct.  The person that I report to

 3  reports to Steve Jobs.

 4    Q    And that person is the fellow we've heard

 5  about with -- from one of the depositions, Mr. Serlet.

 6    A    That's correct, Bertrand Serlet.

 7    Q    Bertrand Serlet.

 8        And if I got it right, you, in Apple speak,

 9  are considered an executive, correct?

10    A    Yes.  I'm a vice president of Apple.

11    Q    And Mr. Serlet is considered a senior

12  executive, correct?

13    A    That's correct.

14    Q    Okay.  And, of course, at the top of the

15  pyramid would be Mr. Jobs.

16    A    That's true.  He's the Chief Executive Officer

17  of Apple.

18    Q    And he is a personal friend of yours,

19  Mr. Jobs, is he not?

20    A    Yes.  I've known him since around 1979 or

21  1980.

22    Q    And you -- you speak with him occasionally

23  about work, do you not?

24    A    I do.

25    Q    And you, for the purpose of this trial, are

1    Apple - correct?

2         A    I am representing Apple.

3         Q    Dr. Tribble, we've heard a lot about e-mails

4    that were generated by Steve Jobs and by others in

5    connection with the ultimate issue that the jury has to

6    decide; and that is, did Apple or did not Apple take

7    Dr. G's intellectual property?  You've been through the

8    opening statements and the trial on that, correct?

9         A    That's correct.

10        Q    And one of the jobs that you have in this case

11   is to come to the -- to the courtroom and talk to the

12   jury about those e-mails, if you're asked, correct?

13        A    Correct.

14        Q    And one of the things that we know happened is

15   that you actually spoke to Mr. Jobs, your friend, about

16   these e-mails before you came to Tyler, Texas; isn't

17   that true?

18        A    That's correct.

19             MR. CARROLL:  And let's put the July 2nd

20   Jobs e-mail up there, please.

21        Q    (By Mr. Carroll) And if I got it right,

22   Dr. Tribble, you talked to your friend, Mr. Jobs, about

23   this, and he told you that he couldn't remember a thing

24   about this, correct?

25        A    Yes.  He has no recollection of this e-mail.

1      Q    And he knew that you were coming to Tyler, Texas,

2    did he not?

3      A    I believe he knew I was going to be

4    representing Apple.

5      Q    And for whatever reason, he's not coming, is

6    he?

7      A    No, he's not present here.

8      Q    Well, I mean, he's not coming, is he?

9      A    Not that I know of.

10      Q    Okay.  I mean, you didn't see him out there in

11    the hall, did you?

12      A    No, I didn't.

13      Q    Because I didn't.

14            So for whatever reason, this case isn't

15    important enough for Steve Jobs to come to Tyler; isn't

16    that true?

17      A    Well, we believe this case is very important.

18      Q    But not important enough for Steve Jobs to

19    come.

20      A    He's not here, but we have several top

21    executives and managers here.

22      Q    I understand that, but wouldn't you agree with

23    me that this one e-mail is a significant piece of

24    evidence for the jury to consider?

25      A    I think it's one of a lot of pieces of

1   evidence for character consider.

2       Q    Okay.  But my -- my question -- and if you

3   disagree, just tell me, because we disagree, apparently,

4   about a lot of things.  And when I say we, the company

5   and Mirror Worlds.

6            But my question is:  Wouldn't you agree that

7   this e-mail from the top guy at Apple regarding our

8   company is a very significant piece of evidence for the

9   jury to consider?

10      A    It's a piece of evidence.  What -- one thing

11  he told me is that he sends e-mails like this all the

12  time, asking people to look into things and to follow up

13  on things.

14      Q    Okay.  You were in court yesterday when I did

15  a very poor job of reading questions to my law partner

16  from the deposition of Mr. Lindsay.

17           You remember when I was coughing all the time?

18      A    I do.

19      Q    And I'm sorry about that.  I hope that -- I'm

20  armed with -- my daughter bought me cough drops today,

21  so I'm hoping I won't have that again today.

22           Did you -- there I go again.

23           But did you hear when Mr. Lindsay said that

24  this was the first and the only time that Steve Jobs had

25  ever made the request that he made of Mr. Lindsay in

1   that e-mail?

2           Did you hear that?

3       A   I did.

4       Q   You did not?

5       A   I did.

6       Q   Oh, you did.

7           So that, at least for Mr. Lindsay, who does

8   give testimony in this case under oath, is different

9   from what Mr. Jobs told you about his practice, correct?

10      A   Well, Mr. Lindsay is one of 30,000 people at

11  Apple, and I'm not -- I'm not sure Steve sends e-mails

12  like this to all 30,000 of them.

13      Q   Right.  But the one person that we know of

14  from the company, Apple, who responded to this

15  direction, this please check out this software ASAP, was

16  Mr. Lindsay.  You heard that testimony.

17      A   Yes, I did.

18      Q   Because nobody else on that e-mail string,

19  Mr. Serlet or Mr. Ording or Mr. Forstall, nobody else on

20  that e-mail string did what the boss said to do; isn't

21  that true?

22      A   That's true.  Maybe that's because they get

23  e-mails like that quite often from Steve.

24      Q   Well, I don't know whether that's so or not;

25  but the truth, the facts that are in front of this jury

1   are that he only person to follow the boss's

2   orders was this man, Lindsay, correct?

3       A    Correct.

4       Q    That's all the jury's heard, correct?

5       A    Correct.

6       Q    Okay.  And the only thing the jury knows from

7   this man, Lindsay, who followed the boss's orders, was

8   that this was the first and the only time he had gotten

9   an instruction from the boss just like that; isn't that

10  true?

11      A    In his case, this seems to be the only time

12  Steve sent an e-mail like -- like this.

13      Q    That's what Mr. Lindsay said.

14      A    That's what he said.

15      Q    Okay.  Now, you understand that there has

16  been -- you've been here through the jury pick -- well,

17  you weren't here for the jury pick.

18      A    I was not here for the jury selection.

19      Q    But you've been here since the case opened on

20  Monday.

21      A    Yes.

22      Q    And you understand that your company, through

23  your lawyer, takes the position that it's an open

24  question with the jury as to whether Mr. Jobs knew and

25  Mr. Lindsay knew, when he met with our people a month

1    after this language and patents

2       A    Well, can you -- can you --

3       Q    Yeah.  Here's my point.

4       A    -- say the question --

5       Q    Is Apple taking the position that as of the

6    date that Steve Jobs sent that e-mail, which Mr. Lindsay

7    acted on -- is it Apple's position that Apple didn't

8    know that Micro -- I mean, that Mirror Worlds had

9    patents?

10      A    Well, as this case came up, one of the things

11   I did is talk to several of the managers, Bertrand

12   Serlet and then others that have been mentioned, and I

13   asked them if -- if they were aware of any patents or

14   had seen any patents or read any patents, and their

15   answer to me was, no, they had not.

16      Q    Okay.  And again, are any of those folks out

17   in the hall where we can question them about those

18   answers they gave to you out in California?

19      A    I believe some of them are -- are here and

20   will be testifying.

21      Q    Let's look at your boss's e-mail.  He says:

22   Please check out this software ASAP.  It may be

23   something for our future, and we may want to secure a

24   what?

25      A    A license.

1   Q   You're not telling the jury, are you,

2   Dr. Tribble, that the word license in that e-mail means

3   anything other than a license for patented technology,

4   are you?

5       A   Well, it -- it may.  I can't tell from the

6   e-mail whether it means a license for the patent or a

7   license for the software.  But, yeah, it refers to

8   license, and it's not unusual for us to look into

9   licensing software that we -- or patents, either one.

10      Q   It certainly doesn't mean that he wanted to

11  check out if he needed a hunting license, right?

12      A   No.  I think it says license for software or

13  for patents.  I agree, you know, it could have -- it

14  could have been either one.

15      Q   Okay.  So what the boss told his people,

16  including Mr. Lindsay, was to find out if we -- if we

17  may want to secure a license.

18          Now, logically, logically -- you're a

19  scientist, correct?

20      A   Sure.

21      Q   And logically, as a scientist, if you were

22  looking at that e-mail, wouldn't you conclude that the

23  first thing that any of those men would do is to find

24  out if there's anything to license?

25          That makes sense, doesn't it?

1       As Suzanne and them could be lots of things of the

2       license.

3       Q    And they would want to know if there were lots

4       of things to license, if they were going to do what the

5       boss said to do, correct?

6       A    Well, I think, logically, the first thing you

7       would do is -- is see if there was anything that was of

8       value there to Apple to take the time to investigate.

9       Q    Okay.  But one thing that we know for sure --

10      actually two things that we know for sure from this

11      e-mail from the boss, is that he is in a rush for an

12      answer, correct?  Because he uses the initials ASAP not

13      once but twice, correct?

14      A    Well, I would say Steve is always in a rush

15      for an answer.

16      Q    Well, and it's borne out in this e-mail, is it

17      not?

18      A    Sure.

19      Q    He wanted action, and he wanted action so much

20      that in a two-line e-mail, he used ASAP in both lines,

21      didn't he?

22      A    I would say that's pretty typical for Steve.

23      Q    Okay.  And people know that if it's typical

24      for Steve, they better do what Steve wants, correct?

25      A    Yes.

1    Q   And one of the things that Steve wants in a

2    report if we -- whether we may want to secure a license.

3         So isn't it logical, from the evidence that

4    the jury has in front of it, that somebody in your

5    organization would figure out what there was there to

6    license and then decide if you wanted to license?

7         That makes sense, doesn't it?

8    A    Well, I mean, yeah.  Following in order, the

9    first thing you'd do is check out the software.

10        The second thing you'd do is see if it may be

11   something for our future.

12        And then the third thing you'd do is see if we

13   may want to secure a license.

14   Q    Okay.  And one of the answers -- questions and

15   answers that I read to the jury from Mr. Lindsay's

16   deposition -- on Page 72, here was his answer:  My

17   recommendation was to not pursue licensing of Mirror

18   Worlds' technology.

19        Did you hear that yesterday?

20   A    Yes, I did.

21   Q    So wouldn't you agree as a scientist that,

22   logically, the only evidence that the jury has in front

23   of it is that Mr. Lindsay, who's following the boss's

24   orders, figured out that Mirror Worlds had patents to

25   license and said:  In my recommendation, we don't want

1    to pursue the licensing of this technology.

2       A    Well, no.  I mean, it's -- if Steve -- you

3    know, when Steve sends me e-mails like this, the first

4    thing I do is look at the technology and see if it is of

5    interest to Apple or of value to Apple before I even

6    look into whether there are licensing terms or software

7    licensing or patent licensing or technology licensing

8    terms.

9            Sometimes it is of interest, and we do license

10   it, and we pay money for it; sometimes it's not of

11   interest, and we walk away.

12      Q    Okay.  Let me try it again.

13           Here's my question:  On Line 24 of Page 72,

14   the deposition that -- of Mr. Lindsay, who went to the

15   meeting, was instructed to do this from the boss, here's

16   what he told the jury:  My recommendation was to not

17   pursue licensing of Mirror Worlds' technology.

18           And are you telling the jury that that does

19   not mean, logically, that Mr. Lindsay figured out that

20   we had patents?

21      A    I can't tell from that statement whether he

22   knew we had -- they had patents or not.  It could have

23   been the software.

24      Q    Okay.

25      A    But I agree, it could -- it could have been

1    the patent.

2       Q    Okay.  So if I get it right, Dr. Tribble, you

3    checked out with a number of folks at Apple, whose names

4    the jury have heard about, who were included on these

5    e-mails, who looked at -- at Mirror Worlds' website, and

6    nobody remembers a thing; is that true?

7       A    They didn't -- what I asked them about

8    specifically is if they knew about any patents or had

9    seen any patents or read any patents to deal with Mirror

10   Worlds, and the answer was no.

11      Q    So the answer to my question is:  Nobody

12   remembers a thing, correct?

13      A    Nobody remembered a thing in my discussions

14   with them with respect to patents.

15      Q    Okay.  So taking that as true, the only

16   evidence the jury has in front of it is the evidence

17   that you heard yesterday from Mr. Satow, and you heard

18   the day before from Dr. G, that the issue -- that the

19   issue of patents was all over that meeting, right?

20             MR. RANDALL:  Object, Your Honor.  That

21   misstates the testimony.  I don't think Mr. Gelernter

22   testified that he was at the meeting.

23             THE COURT:  Overruled.  The jury will

24   recall the testimony.

25      Q    (By Mr. Carroll) You want me to repeat the

 1   questions or do you remember it?

 2       A    Can you -- can you please repeat the question?

 3   Yeah.

 4       Q    Sure.  Sure.

 5            MR. CARROLL:  Where -- where is the pen?

 6       Q    (By Mr. Carroll) You ever play dominoes?

 7       A    Sure.

 8       Q    Do you?

 9       A    I have played, yeah.  I have kids, and they

10   like to play.

11       Q    You know how you keep score?  I don't know how

12   y'all do it in California, but this is how we do it

13   here.  We have us and them.  Have you ever put it that

14   way?  It really is easy to keep up with.

15            Can you see that?

16            MR. CARROLL:  May I come over here?

17       Q    (By Mr. Carroll) So on the -- on the them

18   side, and that's going to be you or your company --

19            MR. CARROLL:  I was trying to figure out

20   who you were.

21   [Laughter]

22            MR. CARROLL:  I thought I was being

23   attacked.  Thank you, though.

24            Okay.  Here we go.

25       Q    (By Mr. Carroll) And so the question is:  The

1  evidence of whether our company knew about our patents
2  when you went into this meeting, and we have Satow, who
3  said yes; we have Dr. G, who says yes; we have the
4  e-mail from your boss, Mr. Jobs, who refers to
5  licensing; we have the testimony from Mr. Lindsay, who
6  went to the meeting and did what the boss said to do,
7  saying that my recommendation is no to pursuing
8  licensing; and we have testimony that Mr. Lindsay looked
9  on our website -- you heard that, did you not?

10      A     Yes.

11      Q     And we have testimony from Dr. G and Mr. Satow
12  that on our website, it mentioned our patents.

13            Remember that?

14      A     Yes.

15      Q     And on your side, we have people who don't
16  remember, correct?

17      A     Correct.

18      Q     So that's at least the scorecard as of now for
19  the jury, is it not, on that issue?

20      A     This is the first trial I've been in, and, you
21  know, it seems to me that our side hasn't had a chance
22  to go yet.

23      Q     Well, I'm asking you.  You are your side, and
24  you, in fact, have a chance, and you told the jury, if I
25  got it right -- and if I don't -- if I don't, tell me,

1    but if I get straight on one of the things you do know, or

2    the last couple of months is try to get to the bottom of

3    this question, and that is, did we or didn't we know

4    what these e-mails suggest?

5            And if I got it right, your answer was, nobody

6    remembers; is that true?

7        A    That's -- that's pretty close to true.  It --

8    that -- that's what people told me, that they had no

9    recollection of any patents or discussion of patents.

10       Q    So one of the things the Judge has told the

11   jury -- and they've heard this before -- and that is,

12   that -- under the rules of the law is that we have to

13   tip the scales to carry the burden of infringement, and

14   that is proof that more likely than not, what we say is

15   so.

16           You've heard him tell the jury that, correct?

17       A    Yes.

18       Q    And so right now, on your side, we've got

19   everybody who doesn't remember, and on our side, we've

20   got all this stuff, so would you agree with me that

21   we've at least tipped the scales?

22               MR. RANDALL:  Your Honor, I'm going to

23   object.  That's argumentative.  It has nothing to do

24   with infringement.  There's no claims elements, nothing.

25               THE COURT:  Restate your question,

 1   Counsel.

 2                MR. CARROLL:  I'll move on, Your Honor.

 3        Q    (By Mr. Carroll) One of the things that came

 4   up in Mr. Satow's testimony yesterday --

 5                MR. CARROLL:  Would you put up

 6   Exhibit 1183, James?  (Coughing.)  Excuse me.

 7                And lift out the -- the reference -- lift

 8   out that reference to the noted scientist, David

 9   Gelernter.

10        Q    (By Mr. Carroll) You were in the courtroom

11   yesterday when Mr. Satow testified about this e-mail

12   that he sent to Frank Weil, who used to be the chairman

13   of Mirror Worlds.

14                Remember that?

15        A    Yes.

16        Q    Okay.  And you'll remember, along with the

17   jury, that the reason Satow sent this e-mail is that in

18   2007, he became aware of this article from this magazine

19   or paper called Information Week.

20                Do you remember that?

21        A    Yes.

22        Q    Do you know of that paper?

23        A    Yeah.  I've seen that -- that.  It's sort of

24   like a weekly magazine.

25        Q    I mean, is it -- is it a rag, or do they know

1   what they're talking about?

2       A    I think it would be known as a trade rag.

3       Q    A trade rag?

4       A    A trade rag.

5       Q    Okay.  And when you say trade rag, is it

6   something, you know, like you see at the grocery store

7   when it talks about, you know, a bodiless head living

8   for six days, or is it better than that?

9       A    It's sort of the equivalent for our industry.

10  It's sometimes got the computer equivalent of a bodiless

11  head, but it's also got interesting, you know, news

12  wires and things like that.

13      Q    Okay.  Well, let's pick up the second page

14  from this report.  I mean, do you read the thing?

15      A    Occasionally.

16      Q    Okay.

17           MR. CARROLL:  See if you can lift that

18  out.

19      Q    (By Mr. Carroll) Here's what it said:  The

20  upcoming Leopard version of Apple's Mac OS X operating

21  system includes some 300 new features, according to the

22  company.  Among them are a few notable omissions, minor

23  disappointments, and hidden gems.

24           Then it says:  Back in 2001, noted computer

25  scientist, David Gelernter, started a company called

1    Scopeware that proposed a similar scheme to view files

2    in a timeline.

3              The market wasn't ready to rethink the desktop

4    back then.  Jobs and his team have refined Gelernter's

5    vision, and this time it looks more promising.

6              You see that, do you not?

7    A    I do.

8    Q    Do you -- is that true, what they -- what the

9    magazine is saying?

10   A    Well, I think it's that particular

11   journalist's opinion, and he's --

12   Q    Well, I'm asking for your opinion.  Is it true

13   that what happened was that:  Back in 2001, noted

14   computer scientist, David Gelernter, started a company

15   called Scopeware that proposed a similar scheme to view

16   files in a timeline; that the market wasn't ready to

17   rethink desktop back then; and that Jobs and his team

18   had refined Gelernter's vision.

19             Is that true?

20   A    No, I don't think that's true.

21   Q    What part of it is not true?

22             Back in 2001, we know Dr. G started a company,

23   it says, called Scopeware.

24   A    That part of it is true.

25   Q    That part's true.

1    And that -- proposed is a word for which

2    similar.  I understand you disagree with that, but he

3    proposed a scheme to view files in a timeline, did he

4    not?

5         A    Yeah.  I was disagreeing with the word

6    similar.

7         Q    Sure.  Because if you agreed with that, we

8    could quit right now, couldn't we, right?

9         A    Maybe.

10        Q    Okay.  And the next comment is:  The market

11   wasn't ready to rethink the desktop.

12             Is that true or false?

13        A    Well, I -- you know, the market's a broad

14   thing, and it's hard to say what they were and weren't

15   ready to do.  There could be a lot of reasons why

16   Scopeware wasn't successful.  I don't know if it was

17   because the market wasn't ready or not.

18        Q    I'm not even -- I'm not even asking you to go

19   that far.  I'm just asking you to accept, reject, or say

20   you don't have an opinion about the assertion that the

21   market wasn't ready to rethink the desktop in 2001.

22        A    I don't have an opinion about that, I guess.

23        Q    So -- so you just -- you don't know about that

24   point.

25        A    Well, in my -- in my experience, the market's

1    always ready for something new, as long as it's good.

2        Q    So you do have an opinion.

3        A    Okay.  I do have that opinion, yeah.

4        Q    Okay.  And that's fine, whatever it is.

5             And then I know you disagree with the comment

6    that Jobs and his team have refined Gelernter's vision,

7    correct?

8        A    Correct.

9        Q    You disagree.

10       A    I disagree with that.

11       Q    Okay.  Now, what we know about this e-mail and

12   this reference to this magazine is that this came out in

13   the deposition that your lawyers took of Mike Satow -- I

14   think it was last spring.

15            Did you know that?

16       A    I didn't know that until -- until now.

17       Q    Do you know whether Apple has taken issue with

18   the magazine and told them that they better retract that

19   story; that it's not true; that it accuses them of

20   something they didn't do?

21       A    I don't know that -- you know, magazines

22   publish all sorts of stuff about Apple.  If we tried to

23   get them to retract everything we didn't think was true,

24   it would be a -- more than a full-time job.

25       Q    Okay.  But would you agree with me that a fair

1   reading of that page, the article is just that. That you
2   guys, by refining something that Gelernter had in 2001,
3   are building on what he did?
4           And I understand you disagree with that.
5       A   Yeah.  That's -- that's what the article is
6   saying.
7       Q   Right.  And one of the things that we know --
8   I say we know.  There's no mention in there in that
9   article, obviously, as to whether there was, for
10  instance, a license between Gelernter and Apple, is
11  there?
12      A   No.
13      Q   No mention.
14          And if, in fact, that technology of Dr. G's
15  had been licensed, then it would be absolutely okay for
16  Apple to refine it, if that's what they wanted to do;
17  isn't that true?
18      A   Can -- can you state that --
19      Q   Yes, sir.
20      A   -- question again?
21      Q   If, in fact, Apple had a license from Mirror
22  Worlds, then it, in fact, would have the legal right to
23  refine that idea and do anything it wanted with it,
24  correct?
25      A   A license to Gelernter's vision?

1

2      A    To patents.

3      Q    Yeah.  If you had a patent license, you could

4  refine it and -- and use it, could you not?

5      A    Well, we -- we license patents; and depending

6  on the terms that we license them under, we're allowed

7  to do things and not do other things.

8           So it depends -- it would depend on the terms

9  of how we license those -- any particular patent.

10     Q    Okay.

11              THE COURT:  Mr. Carroll, whenever you get

12  to a stopping point --

13              MR. CARROLL:  Well, this is great, Your

14  Honor.

15              THE COURT:  All right.  We're going to

16  take our morning recess at this time.

17              Ladies and Gentlemen of the Jury, I have

18  some criminal matters I need to take up.  I anticipate

19  this will probably take anywhere from 15 to 30 minutes.

20              So enjoy your morning recess, and we'll

21  be in recess until probably 11:00 or 11:15, somewhere in

22  there.  We'll let you know.

23              I'll -- we'll take a very short recess so

24  that the attorneys in the patent case can just kind of

25  stack their stuff up.  It will be fine on the tables but

 1   make way for the pavers in the original images.

 2              And as soon as everybody's ready on that,

 3   Ms. Ferguson, let me know, and we'll start.

 4              COURTROOM DEPUTY:  Yes, Your Honor.

 5              THE COURT:  Be in recess.

 6              COURT SECURITY OFFICER:  All rise.

 7              (Jury out.)

 8              (Recess.)

 9              COURT SECURITY OFFICER:  All rise.  All

10   rise for the jury.

11              (Jury in.)

12              THE COURT:  Please be seated.

13              All right.  Mr. Carroll, were you through

14   with this witness?

15              MR. CARROLL:  Nope, not yet, Your Honor.

16              THE COURT:  All right.

17              MR. CARROLL:  If the Court please.

18       Q    (By Mr. Carroll) Dr. Tribble, first things

19   first.  All my minders told me I've got the domino cards

20   reversed.

21              So this is actually you-all with the don't

22   remember, correct?

23              I want to be accurate.

24       A    That's up to you, yeah.

25       Q    I mean, that's your testimony.  Y'all are

 1    the s r you remember we went through this.

 2         A    Yes.

 3         Q    I don't want to plow old ground, but here's

 4    the stuff that we brought, and thus far, you-all don't

 5    remember?

 6         A    Well, yeah, but I'm not sure how Lindsay not

 7    remembering is on your side of the board versus art.

 8    I'm not sure that --

 9         Q    Well, what Lindsay said -- you remember we

10    talked about this before the break -- what Lindsay said

11    was he used the term:  I didn't think we should pursue

12    licensing.

13         A    Correct, yes.

14         Q    But I didn't mean to suggest to you that

15    Lindsay remembered.

16         A    Okay.

17         Q    But what Lindsay said was he -- his

18    recommendation was not to pursue licensing.

19         A    Correct.

20         Q    That's what he said?

21         A    That's right.

22         Q    Okay.  Thank you for pointing that out.

23              Let me ask you this:  You know that the trial

24    is over three features of Apple products, correct?

25         A    Correct.

1    Q.  And that's software for the consumer?

2              MR. CARROLL:  Give me -- where's my list?

3    Q    (By Mr. Carroll) Time Machine, right?

4    A    Correct.

5    Q    Spotlight?

6    A    Correct.

7    Q    And Coverflow?

8    A    Yes.

9    Q    Okay.  Now, I understand that you weren't

10   involved hands-on in developing any of those products,

11   correct?

12   A    That's correct.  I didn't write the code for

13   those products.

14   Q    Okay.  And again, going back to generally what

15   time period we're talking about, you know from the

16   testimony that the jury heard yesterday that there was a

17   meeting between Mr. Lindsay -- a telephone WebEx meeting

18   the jury heard about yesterday with Mr. Lindsay and

19   maybe other folks on behalf of Apple and some of our

20   folks from Mirror Worlds.

21             And according to the testimony, that meeting

22   was September the 27th of 2001.

23   A    Yes.

24   Q    You heard all of that just like the jury heard

25   it?

2      Q      And so -- and we learned yesterday that at

3    least one of the features that Apple had in its

4    machinery at that time was a feature called Sherlock?

5      A      Yes.

6      Q      Like Sherlock Holmes?

7      A      That's right.

8      Q      Now, am I right in understanding that

9    Spotlight, the feature that we've heard Mr. Jobs talk

10   about on the spots, replaced Sherlock?

11     A      Well, ultimately, Sherlock was removed from

12   the product.  I'm not sure the exact timing of whether

13   it was removed exactly when Spotlight came in or a

14   little bit off that.

15     Q      Okay.  But is it accurate for the jury to

16   understand that after this September 27th, 2001 meeting,

17   Apple introduced Spotlight, Time Machine, and Coverflow?

18     A      I think all three of those were introduced at

19   various times after that point --

20     Q      Right.

21     A      -- in time, yes.

22     Q      And again, I don't mean to beat a dead horse,

23   but all of those three products that we accuse of

24   infringing our patents, sure enough were developed after

25   this meeting?

1  think some of the development of --

2

3     Q    That's fair criticism.

4     A    -- those may have been going on prior to that.

5     Q    Fair criticism.

6          Let me -- let me say it -- ask it this way:

7  All three were introduced after the meeting?

8     A    I think that's correct.

9     Q    Okay.  So here's my question:  Were those

10  three products new, from Apple's standpoint?

11    A    Well, they were features that were part of --

12    Q    Features, I accept that.

13         Were those three features new from Apple's

14  standpoint?

15    A    They were three new features, correct.

16    Q    Okay.  You've heard testimony or you've seen

17  references to e-mails from various of your colleagues at

18  Apple talking about Dr. G.'s ideas.

19         Do you agree that Dr. G.'s ideas that you've

20  heard discussed here in the courtroom were new?

21    A    I don't think all of them were new.  Some of

22  them may have been new.

23    Q    You -- you were here on opening statements on

24  Monday morning, right?

25    A    Yes.

1    Q.   Okay.  And you heard me tell the jury that

2    Apple had produced not one piece of paper to us which

3    was in existence before we sued your company, which

4    suggested that anything that Dr. G. had done was old

5    news.

6         You heard me say that?

7    A    Well, I'm not sure I remember that, but I'll

8    take your word for it.  Yeah.

9    Q    So my point is, isn't it a fact that

10   everything that we have seen in this courtroom produced

11   by Apple, before they got sued, are comments reflective

12   of Dr. G.'s ideas being new?

13              MR. RANDALL:  Your Honor, I object.  It's

14   unclear -- if he means in the production process before

15   we were sued, there's no obligation to produce documents

16   to them if they -- if they just filed a complaint

17   without notice.

18              So I'm not sure I understand what -- what

19   the question is.

20              MR. CARROLL:  The question is whether the

21   witness understands it, Your Honor.

22   Q    (By Mr. Carroll) Do you understand the

23   question?

24   A    I'm not sure.  Are you -- are you asking me

25   whether I think Dr. Gelernter's ideas were new?

1  Q    I've asked you that, and you said some of them

2  were.

3       A    Yes.

4       Q    Okay.  My second question is, isn't it a fact

5  that there's nothing in the files of Apple, which have

6  been given to us before the lawsuit, where Apple says

7  that Dr. G.'s ideas were not new?

8            Have you seen anything?

9       A    I haven't seen --

10      Q    Okay.  Let -- let me ask you to do --

11           MR. CARROLL:  Your Honor, may I get over

12  here by the witness so I can show him this poster?

13           THE COURT:  Yes, you may.

14           MR. CARROLL:  Thank you.

15      Q    (By Mr. Carroll) This is -- Dr. Tribble, this

16  is a poster that the jury saw on opening statement, and

17  I want to put it up so you can see.  And it -- it's

18  little excerpts from some of the e-mails that the jury

19  has heard about and likely will see.  I think it's up on

20  the chart.

21           And we know who Don Lindsay was.  We talked

22  about that.  He testified by deposition yesterday,

23  right?

24      A    Yes.

25      Q    Now, he's not with Apple anymore, correct?

```
 1                That Lost Script
 2    Q    And he has this comment:  Scopeware was

 3    clearly new -- Scopeware, of course, was a Mirror

 4    Worlds' product, correct?

 5    A    Yes.

 6    Q    I believe it to be a new solution.

 7         You heard that testimony?

 8    A    Yes.

 9    Q    Who is Mike Morton?

10    A    I'm not sure who Mike Morton is.

11    Q    Okay.  I will represent to you that there's an

12    e-mail from Mike Morton as an Apple employee who makes a

13    comment:  I've often wanted this and --

14              MR. RANDALL:  Your Honor, I'm going to

15    object.  Unless there's evidence of this or a witness

16    has testified to this, having Mr. Carroll just testify

17    about -- making representations about this, it's not

18    evidence yet.  It's improper.

19              MR. CARROLL:  Your Honor, all these

20    e-mails are in evidence.  They're business records of

21    Apple's.

22              THE COURT:  They have been admitted?

23              MR. CARROLL:  They have.

24              THE COURT:  All right.  Objection's

25    overruled.
```

1          MR. RENDALL:  Okay.

2     Q     (By Mr. Carroll) And, of course, we know the

3  first e-mail that we heard about yesterday -- or this

4  morning from Mr. Jobs, your boss.  It says:  Check out

5  the software; it may be something for our future.

6          We talked about that one.

7     A     Yeah, I don't think that says whether it's new

8  or not.

9     Q     I understand.

10         Do you know who Blaine Garst is?

11    A     He's an engineer at Apple.

12    Q     Do you know him personally?

13    A     I do, yes.

14    Q     Have you seen the e-mail --

15         MR. CARROLL:  Let's find the Garst

16  e-mail.  Can we pull up the entire e-mail?

17         Let me go get it.  Can we find the Garst

18  e-mail?

19         Here, I'll find it.

20         Give me one second.  Let's look at

21  Exhibit 220 -- I'm sorry -- 387, and blow that up, if

22  you would, please.

23         There we go.

24    Q     (By Mr. Carroll) And the subject here is

25  Mirror Worlds, right?

1    A    Yes.

2    Q    See that?

3    A    I see that.

4    Q    Okay.  And the date is 15 August, 2000,

5    correct?

6    A    Correct.

7    Q    Now, that's one year before the meeting

8    between your company and our company, correct?

9    A    Correct.

10    Q    And it's from Blaine Garst to Toby Paterson.

11         Who is Toby Paterson?

12    A    I think he was an Apple employee at one point.

13    I'm not positive about that.  I don't know him.

14    Q    All right.  And the very first line says:

15    Just got back from a week's vacation.

16         And then under it, it says:  This is

17    interesting, depressing to read about, quote, patents,

18    unquote, on this stuff.

19         That's what it says, correct?

20    A    That's correct.

21         MR. CARROLL:  And go down to the -- under

22    the signature line, Blaine, if you will, James.

23    Q    (By Mr. Carroll) And Blaine is where Mr. Garst

24    is signing off, and it's in reply to an e-mail that

25    Mr. Paterson had written.

And thereby, This is the company I'm/in

1

2   telling you about at dinner the other day.  The short

3   gist is they let you organize your information when you

4   need to look for something rather than when you receive

5   the information.

6          And under -- understanding that e-mails are

7   read from bottom to top, that was what prompted the

8   reply from Mr. Garst that it was depressing to read

9   about patents on this stuff, correct?

10     A     It looks like that, uh-huh.

11     Q     So, again, isn't a fair reading of this by the

12  jury that in 2000 these Apple employees were discussing

13  Mirror Worlds, and one of them commented that it was

14  depressing to read about the fact that Mirror Worlds had

15  a patent on this stuff?

16          That's a fair reading of that e-mail string,

17  is it not?

18     A     Well, actually, I'm -- my understanding is

19  that this was a personal conversation.  I'm not sure

20  that Toby was even an employee of Apple at the time, and

21  that makes sense, because Blaine Garst works in an area

22  that has nothing to do with our consumer products,

23  nothing to do with Time Machine, nothing to do with

24  Spotlight, nothing to do with any of the features under

25  discussion.

1  think this was a personal conversation between these two

2  guys, you know, like you say, about a year before the

3  meeting happened between Apple and Mirror Worlds.

4

5       Q    You understand we got this from your company?

6       A    Yes, sure.  Yes.  That doesn't mean it's not a

7  personal e-mail.

8       Q    Okay.  Do you know or are you in a position to

9  dispute the fact that Toby Paterson worked on the

10  accused features?

11      A    Yeah.  I -- actually, I don't know.  I'm

12  not -- I don't dispute that.

13      Q    Okay.  So if the evidence for the jury is, is

14  that this fellow, Toby Paterson, in fact, was involved

15  in inventing or -- or making the accused features, if

16  that's true, then as early as 2000, he knew about Mirror

17  Worlds and he knew basically that they had patents,

18  based on what the e-mail string says, correct?

19      A    It's not clear to me -- excuse me.  It's not

20  clear to me from the e-mail whether Toby Paterson knew

21  about the patents, although Blaine mentions patents in

22  his reply.

23      Q    Okay.  You -- if I got it right, Dr. Tribble,

24  you talked to Bertrand Serlet, Scott Forstall, Kevin --

25  is it Tiene or Tiene (pronouncing)?

1      ~~Kevin Fiene~~

2      Q      Tiene, Dominic Giampaolo, Yan Arrouye, and

3   Pavel Cister (sic) about e-mails which they had either

4   sent or received about Mirror Worlds, correct?

5      A      Pablo Cisler, yes.

6      Q      Pablo --

7      A      Pablo Cisler.

8      Q      Pablo Cisler.  I'm sorry.

9      A      He's Czechoslovakian.

10     Q      I got you.

11            And you talked to all those folks about

12   e-mails which the jury can see, and they're among the

13   ones who couldn't remember anything, correct?

14     A      That's correct.

15     Q      Okay.  And we learned that you generated or

16   you were involved in an e-mail exchange concerning, or

17   at least referencing, Dr. G., correct?

18     A      I didn't generate an e-mail.  I think in 2004,

19   I received an e-mail from the -- one of the professors

20   at the Naval post -- U.S. Naval post-graduate school

21   that mentioned Dr. Gelernter.

22            MR. CARROLL:  Okay.  Let's put up 1995,

23   James.

24     Q      (By Mr. Carroll) And this is the e-mail you're

25   referring to, the one entitled Bud, correct?

1        That's correct

2    Q    And this is August of 2004, correct?

3    A    Correct.

4    Q    That would have been three years after the

5    meeting that we're talking about, correct?

6    A    Right.

7    Q    And it's from a fellow named Peter Denning,

8    and I believe you identified him as maybe the head

9    person at the Navy's computer school in San Diego?

10   A    In Monterrey.

11   Q    In Monterrey.

12   A    Yeah.

13   Q    Which is up north, I guess.

14   A    That's correct.

15   Q    Okay.  But that -- that's what he does, right?

16   A    Yes.

17   Q    And I believe you've characterized this Navy

18   computer school as being a fairly important place in

19   terms of the -- of what they do?

20   A    Well, sure.  They train graduate students who

21   are typically naval officers.

22   Q    Right.  And the point of this e-mail, and the

23   jury can sure read it, is that Peter Denning is glad to

24   welcome you to a group of speakers who are looking at

25   the next 50 years of DoD.

```
 1              Is that Department of Defense?

 2      A    That is, yes.

 3      Q    Computing in a symposium, right?

 4      A    Right.

 5      Q    So -- and he tells you a little bit about what

 6  is expected of you; that you have 20 minutes in the

 7  schedule, including his introduction, your presentation,

 8  and a Q and A.  And he wants you to talk for 10 to 12

 9  minutes, right?

10      A    Yes.

11      Q    And then down in the -- in the next sentence,

12  he said --

13              MR. CARROLL:  And, James, if you would

14  highlight beginning will.

15              The second paragraph, please.

16      Q    (By Mr. Carroll) And is Denning a naval

17  officer, by the way?

18      A    I don't know.  I don't believe he is.

19      Q    Okay.  But he's a computer scientist, right?

20      A    He is a computer scientist certainly.

21      Q    Okay.  And Mr. Denning says:  Will you have

22  anything to say about the, quote, desktop metaphor

23  debate, which is looking for the, quote, next HCI --

24  what does that mean?

25      A    Human computer interface.
```

```
 1           Q.  Beyond the current office desktop?
 2               David Gelernter argues it's dead and proposes
 3  Lifestreams instead.
 4               Is this a good proposal?
 5               Are there others -- are -- it says:  Are the
 6  others.  I guess it means are there others, right?
 7       A    Probably, yes.
 8       Q    That's what you understood?
 9       A    That's right, yeah.
10       Q    Better?  In what ways does this matter to DoD
11  and Homeland Security people?
12               That's what he asked you to consider?
13       A    Correct.
14       Q    But if I got it right in your deposition, you
15  don't remember whether you talked about any of that
16  stuff at all, correct?
17       A    No.  In fact, I didn't -- I didn't remember
18  this e-mail that was sent to me until it was pointed out
19  to me -- I think it was this -- this last Monday
20  evening.
21       Q    Okay.
22       A    But not -- you know, now that I see it,
23  obviously, I received this e-mail from Dr. Denning
24  suggesting a topic for my -- for my talk that he
25  thought -- or, you know, that he thought would be
```

1    prospective client, looking for controversial ideas.

2        Q    And he talks about the, quote, desktop

3    metaphor debate.  That was the same reference that was

4    used in that New York Times article back in July of 2001

5    which Mr. Jobs attached to the e-mail that said:  Check

6    this out ASAP, correct?

7        A    I don't recall exactly, but, you know, it

8    was -- if it was in the article from the New York Times,

9    then it was.

10       Q    But that was the debate, right?

11       A    Well, the debate -- I mean, in an e-mail,

12   there's always lots of debates about whether something

13   is good.

14            I think that Dr. Denning is pointing out, hey,

15   this is a controversial topic whether this stuff is any

16   good or not; why don't you bring it up for the talk.

17       Q    Okay.  But the desk -- just so the jury will

18   understand it -- and by the way, you tell me if I'm

19   wrong, because I am not a computer scientist.

20            But it's my understanding that the -- that the

21   desktop metaphor debate was this business about files in

22   folders on the one hand or another idea, such as the

23   stream, on the other hand.

24            Is that true?

25       A    Well, I mean, really since the -- the desktop

1  metaphors referred to either on Mac or Windows, and you know
2  you've got this thing that represents a desktop and
3  files and folders that you move around with the mouse.
4          Ever since that was introduced in 1984,
5  there's been a debate about it, as to whether that's the
6  best metaphor or whether something else, other than a
7  desktop, would be the best metaphor.
8      Q    And the something else includes the suggestion
9  by Dr. G that's in his computers, correct?
10     A    Correct, yes.
11     Q    So that we -- the one thing we can agree on is
12 that Gelernter is not about files and folders, correct?
13     A    Correct.
14     Q    Okay.  I saw you raise your eyebrows.
15     A    Well --
16     Q    Okay.  No, I'm not fussing at you.  But I'm
17 glad we agree on that.
18          Okay.  So here's my question:  I understand
19 from what Apple's lawyer has been telling the jury since
20 opening, is that you still use files and folders.
21     A    Yes, we do.
22     Q    Okay.  So a natural response, if that's so,
23 would have been for you to say:  Peter, I will be glad
24 to show you why we still use the old desktop metaphor.
25 That would have been a logical answer by you, correct?

1   the hereof at Apple.

2       A    Well, not necessarily.  I mean, Apple

3   actually, probably since 1984, has been looking into

4   alternative metaphors.  We're -- we sort of invented the

5   desktop metaphor more or less, but we're not opposed to

6   doing something new, and we eventually did with the

7   iPhone and the iPad.

8       Q    So I want to ask you two more questions about

9   this, and then we'll move on, and I'll be pretty close

10  to being done.

11           The first question is this:  Dr. Denning says:

12  Is this a good proposal, or are there others better?  In

13  what way does this matter?

14           And my question to you is:  You don't remember

15  how you answered or if you answered any of those

16  questions, correct?

17      A    Yeah, I don't -- I do not recall.

18      Q    Okay.  Because in 2004, Apple had Spotlight,

19  correct?

20      A    I -- I'm -- don't recall the exact timing of

21  that, but --

22      Q    Time Machine, Coverflow?

23      A    Like I say, I don't recall the exact timing,

24  but, yeah, in that timeframe.

25      Q    You -- Second question is:  You just told the

1   jury that -- I didn't -- I heard you say this earlier, but that

2   you do now is not the desktop metaphor, not files and

3   folders.  Did I hear that right?

4       A    No.  I said that we introduced -- or I meant

5   to say we introduced an additional metaphor that's

6   different than the desktop with the iPhone and the iPad

7   and the iPod Touch.  There's no desktop metaphor in

8   those devices.  There's a new metaphor.

9       Q    Okay.  But would -- would you agree with me --

10      A    But we still -- we still ship, you know, the

11  Mac OS 10, which contains the desktop metaphor.

12      Q    Okay.

13           MR. CARROLL:  Again, Your Honor, may I

14  walk over here by the witness?

15           THE COURT:  Yes, you may.

16           MR. CARROLL:  Thank you.

17      Q    (By Mr. Carroll) And this is going to be for

18  you, because I think the jury can see it up here,

19  Dr. Tribble.  And you probably saw this poster board on

20  our opening --

21      A    Yes --

22      Q    -- right?

23      A    -- I did.

24      Q    And the point is pretty obvious, and that is,

25  that there were a number of instances where we can

1   documents that Apple was continuing to pay attention to

2   Dr. G and his patents after Mr. Lindsay said your

3   company was not interested.  You understand that's our

4   argument.

5        A    I understand that's your argument.  I'm not

6   sure the evidence shows we were paying attention to any

7   patents.

8        Q    Okay.  But you would agree with me that there

9   were a number of instances, every time we have something

10  marked up there, where there was either an e-mail that

11  referred to Scopeware or Mirror Worlds or Gelernter or a

12  visit to the website.  You understand that's what all

13  that means.

14       A    Yes.

15       Q    Okay.  And your -- I guess your comment to the

16  jury is that there's no proof there that we were

17  checking out the patents in particular.

18            Is that what you're saying?

19       A    That's -- yeah, that's one thing I'm saying.

20       Q    Okay.  And we've been through the discussion

21  as to whether you did or didn't already know about the

22  patents, and you've got your position, and we've got

23  ours, right?

24       A    Yes.

25       Q    And the jury's got the scorecard, and maybe

1   you can add books when it comes your future phone.

2       A    Okay.

3       Q    All right.  Now, one thing we know is that --

4            MR. CARROLL:  And if you could lift out

5   that last piece, James, that -- there we go -- that

6   offsite meeting.

7       Q    (By Mr. Carroll) We heard that there were code

8   names in Apple about some of your products, like code

9   names for when you were developing a product; is that

10  true?

11      A    Yes.

12      Q    Okay.  And you had offsite meetings, just like

13  this has suggested, correct?

14      A    Correct.

15      Q    And that means that you weren't on the campus

16  of Apple, but you were somewhere off.

17      A    Right.

18      Q    And these were confidential meetings, were

19  they not?

20      A    Yeah, like most Apple -- internal meetings,

21  they're confidential.

22      Q    Okay.  And the meeting that I want to talk to

23  you about was a meeting that this refers to, and that's

24  December the 5th of 2003.  And the code name for this

25  project was called Merlot, M-E-R-L-O-T.

1      You don't want that is

2      A    Yes.

3      Q    And what was Merlot?  What -- what was it for?

4      A    It -- I believe it was the code name for one

5  of the versions of Mac OS 10 that was being worked on at

6  that time.

7      Q    And Mac OS 10 includes some, if not all, of

8  the features that we're accusing, correct?

9      A    Yes.

10      Q    And now, when the jury looks at it, if they

11  want to call for Exhibit -- Plaintiff's Exhibit 110 when

12  they get back there in the jury room and start

13  deliberating, they will be able to see the notes from

14  that meeting, will they not?

15      A    Yes.

16           MR. CARROLL:  And let's call that up,

17  James, at 110.  And I want to -- yeah, I want to look

18  at -- first of all, lift that title out just -- if you

19  could.

20           There we go.

21           Okay.  Is that as close as we can get it?

22           All right.  There we go.

23      Q    (By Mr. Carroll) Merlot offsite, and then it

24  that has the themes critical, medium, low, and then it's

25  got a whole bunch of folks, including Yan Arrouye,

1    eight?

2         A    Correct.

3         Q    And he's one of the fellows you talked before

4    you came to Tyler, right?

5         A    Yes.

6         Q    Who couldn't remember anything about the

7    e-mails.

8         A    Correct.

9         Q    Okay.  And then we know that one of the -- in

10   this document, it says:  Suggested at the offsite.  That

11   means somebody made a proposal at the offsite about Yale

12   Professor David Gelernter's new ways of finding info.

13              That's what that says, correct?

14        A    Correct.

15        Q    And when it says:  Suggested at the offsite,

16   that means that somebody from the Apple group, who was

17   participating in this meeting, planning the development

18   of the product that includes the features we're suing

19   over, suggested that Dr. Gelernter's new ways of finding

20   info be considered; isn't that true?

21        A    Yeah.  Either that or -- or maybe the

22   suggestion was that we should go talk to Dr. Gelernter

23   about it.

24        Q    But -- but the plain takeaway from this is

25   that two years after Mr. Lindsay told us, thanks, but no

1   thanks while your think tank was deciding exactly how

2   to go to the products we're suing over, Gelernter's name

3   comes up as a possible solution.

4               That's the takeaway, is it not?

5        A    Well, it's -- I mean, you know, David

6   Gelernter was in the press and pretty visible in the

7   technical community, so I'm not surprised it came up in

8   the meeting.

9        Q    Okay.  So in the takeaway that your group was

10  trying to figure out the absolute best way to put into

11  the software the package that now is -- and the hardware

12  that is now what we've sued over, and one of the

13  considerations was how Dr. G suggested that you find

14  information in a new way.

15              That's what that means, correct?

16       A    It probably means someone -- someone brought

17  that up in the meeting.

18       Q    Now, there's nothing in that document that the

19  jury's going to be able to see, or at least there's

20  nothing that I saw, where there is a comment that

21  repudiates that statement, that says:  Don't worry about

22  Gelernter.  We've looked at his stuff.  It's old news.

23  It's not new.  It won't work for us.

24              There's nothing in that document that says any

25  of those four things that I saw; is that correct?

```
 1      A      Nobody at HP did -- no.
```

 2      Q      Okay.  And what we know that happened after

 3   that document is that that -- what do you call it?  OS X

 4   10?

 5      A      OS 10.

 6      Q      -- was released to the world sometime in '04.

 7      A      Yes.

 8      Q      Okay.  And that's all of the -- and this is my

 9   word; I don't mean anything bad by it, but this is all

10   of the after hullabaloo that we saw on the screen

11   yesterday with Mr. Jobs describing Spotlight and these

12   other features?

13      A      Yes.  I mean --

14      Q      That's what he was talking about.

15      A      That's -- he was talking about --

16      Q      Yeah.

17      A      -- the release of Mac OS.

18      Q      And that --

19      A      That version of Mac OS 10, yeah.

20      Q      And how revolutionary it was.

21      A      Yes.

22      Q      And you -- and again, I saw your eyebrows go

23   up, because you told us on your deposition that he

24   claims a lot of things are revolutionary.

25      A      Well, that's -- that's a fact, yeah.

```
 1           I mean, there's what you said, right?

 2     A     Yeah.  Yes.

 3     Q     So is this puff talk, or is this the truth?

 4     A     If -- if Steve thinks something is

 5  revolutionary, he'll say -- he'll call it revolutionary.

 6     Q     I mean, is he a scientist or a salesman?

 7     A     He's hard to categorize, I would say.

 8     Q     Well, he's successful whatever he is, right?

 9     A     He is, yeah.

10     Q     Okay.  Well, I'm tipping my hat to him.

11           Do you think it's revolutionary, Spotlight?

12     A     I think that there are some things about it

13  that are -- are new and some things about it that have

14  been around for a long time.

15     Q     As a matter of fact, you told us Monday night,

16  if I got it right, that you believe that the real

17  selling point of Spotlight is that it looks an awful

18  like -- a lot like the search mechanism that Google

19  uses, correct?

20     A     What I said is that, you know, people were

21  used to searching -- being able to search for things on

22  the web with the Google search field and that the fact

23  that Spotlight has a search field where you can type

24  things into it, people might feel familiar with that

25  because of their -- the high use of Google that people
```

```
 1   Cave
 2        Q    Yeah.  What you said was:  People got used to
 3   using search fields with Google, and so if something
 4   looks like a search field in Google, they're likely to
 5   try it out.
 6             That's what you said.
 7        A    That's correct.
 8        Q    So -- and again, is the takeaway from that
 9   that Spotlight was designed to look a lot like Google?
10        A    Well, the -- the search field was designed to
11   be familiar to people who had used Google and to operate
12   in a similar way to Google, but to find stuff on your
13   desktop rather than finding files on the web.
14        Q    Okay.  A couple more.
15             Do you agree or disagree with the
16   characterization that the jury's heard that Dr. G is an
17   important figure in the world of computer science?
18        A    I -- I agree he's one of many important
19   figures in computer science.
20        Q    Right.  I mean, I'm sure everybody's list is
21   different, depending on whose mamma you talk to, right?
22        A    That's true.
23        Q    Okay.  But, I mean, you -- you respect him as
24   a scientist, do you not?
25        A    Yes.  I was mostly familiar with him from his
```

2    Q    In fact, when you were at Sun.

3    A    I was at Sun Microsystems, and it was on the

4   subject of Linda, and Dr. Gelernter's work on Linda had

5   come up.

6    Q    And your boss at Sun was a big fan of Linda

7   and Dr. G, wasn't he?

8    A    Well, not my boss.

9    Q    The owner of Sun.

10    A    One of the owners, Bill Joy, in particular,

11   seemed to be a fan of Linda.

12    Q    Okay.  Let me ask you a couple more, and then

13   I'll be done.

14        The jury is going to hear and has heard the

15   reference to a company called Intellectual Ventures.

16   You know what that is, do you not?

17    A    I believe it's a company that deals in

18   intellectual property.

19    Q    Buys and sells patents.

20    A    (Nods head.)

21    Q    And Dr. Ugone, who's out here in the back, you

22   know he's your damage expert in this case, do you not?

23    A    I -- I assume so.

24    Q    You just recognize him.

25        He's testified and will testify in the

1  courthouse here during that Apple is a co-owner.

2              MR. RANDALL:  Your Honor, objection.  May

3  we approach the bench?

4              THE COURT:  Yes, you may.

5              (Bench conference.)

6              MR. RANDALL:  This is the subject of a

7  motion in limine, and he's about to blurt out that Apple

8  is a co-owner of Intellectual Ventures, and it's simply

9  not true.  And there's no evidence --

10              MR. CARROLL:  I want to know what his

11  expert says.

12              MR. RANDALL:  There's no evidence of

13  that.

14              MR. CARROLL:  May I show you the

15  Intellectual Ventures --

16              (Bench conference concluded.)

17              THE COURT:  Ladies and Gentlemen of the

18  Jury, I think we'll go ahead and take our lunch break at

19  this time.  We're going to be in recess until 12:30.

20  Please enjoy your lunch.

21              COURT SECURITY OFFICER:  All rise for the

22  jury.

23              (Jury out.)

24              THE COURT:  Mr. Carroll, approach.

25              (Bench conference.)

MR. CARROLL:   This is another colloquy here

 1
 2    Your Honor.  This was Dr. Ugone, their damage expert.

 3    And there's one written offer by Intellectual Ventures

 4    for these patents that they don't dispute, and then

 5    there's an argument as to whether there was an oral

 6    offer after the lawsuit.

 7                  THE COURT:  Well, he -- he says:  I think

 8    so.  So why don't you just go into it with him.

 9                  MR. CARROLL:  I will.  I will.

10                  THE COURT:  And then, Mr. Carroll, I

11    mean, you're down to under four hours --

12                  MR. CARROLL:  I know.

13                  THE COURT:  -- now.

14                  MR. CARROLL:  I'm about done.

15                  THE COURT:  Okay.

16                  MR. CARROLL:  Thank you, Your Honor.

17                  (Bench conference concluded.)

18                  THE COURT:  All right.  Be in recess.

19                  COURT SECURITY OFFICER:  All rise.

20                  (Lunch recess.)

21

22

23

24

25

CERTIFICATION

1

2

3          I HEREBY CERTIFY that the foregoing is a

4   true and correct transcript from the stenographic notes

5   of the proceedings in the above-entitled matter to the

6   best of our abilities.

7

8

9   /s/_____
    SHEA SLOAN, CSR                    Date
10  Official Court Reporter
    State of Texas No.:  3081
11  Expiration Date:  12/31/10

12

13  /s/_____
    JUDITH WERLINGER, CSR             Date
14  Deputy Official Court Reporter
    State of Texas No.:  731
15  Expiration Date  12/31/10

16

17

18

19

20

21

22

23

24

25