```
                  IN THE UNITED STATES DISTRICT COURT
2                  FOR THE EASTERN DISTRICT OF TEXAS
                             TYLER DIVISION

3  MIRROR WORLDS, LLC           *   Civil Docket No.
                                *
4                               *   6:08-CV-88
   VS.                          *   Tyler, Texas
5                               *
                                *   September 29, 2010
6  APPLE, INC., ET AL           *   12:30 P.M.

7

                      TRANSCRIPT OF JURY TRIAL
8                        AFTERNOON SESSION
                 BEFORE THE HONORABLE LEONARD DAVIS
9                   UNITED STATES DISTRICT JUDGE

10 APPEARANCES:

11                       FOR THE PLAINTIFF

12 MR. JOSEPH DIAMANTE
   MR. KENNETH STEIN
13 MR. IAN G. DIBERNARDO
   MR. ALEXANDER SOLO
14 MR. CHARLES E. CANTINE
   STROOCK & STROOCK & LAVAN
15 180 Maiden Ln.
   New York, NY  10038
16
   MR. OTIS CARROLL
17 MR. PATRICK KELLEY
   IRELAND, CARROLL & KELLEY
18 6101 S. Broadway, Ste. 500
   Tyler, TX  75703
19

20 COURT REPORTERS:
   MS. SHEA SLOAN, CSR
21 MS. JUDY WERLINGER, CSR
   Official Court Reporters
22 211 West Ferguson, Third Floor
   Tyler, TX   75702
23 903/590-1171

24 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)
25
```

```
 2

 3   MR. JEFFREY G. RANDALL
     MR. RAYMOND YU
 4   MS. ERICKA J. SCHULZ
     PAUL HASTINGS
 5   1117 S. California Ave.
     Palo Alto, CA  94304-1106
 6

 7
     MR. ALLAN M. SOOBERT
 8   MR. BROCK WEBER
     MS. KIM MOORE
 9   PAUL HASTINGS
     875 15th St. NW
10   Washington, DC  20005

11

12   MR. S. CHRISTIAN PLATT
     MR. JEFFREY COMEAU
13   PAUL HASTINGS
     4747 Executive Dr.
14   12th Floor
     San Diego, CA  92121
15

16

17

18

19

20

21

22

23

24

25
```

```
 2                    COURT SECURITY OFFICER:  All rise.

 3                    (Jury in.)

 4                    THE COURT:  All right.  Please be seated.

 5              All right.  I hope you had a good lunch,

 6   although hurried.

 7                    JUROR:  Great.  Thank you.

 8                    THE COURT:  All right.  You may proceed.

 9                    MR. CARROLL:  Thank you, Your Honor.

10       GUY LESLIE "BUD" TRIBBLE, M.D., Ph.D., PLAINTIFF'S

11                    WITNESS, PREVIOUSLY SWORN

12                    DIRECT EXAMINATION (CONTINUED)

13   BY MR. CARROLL:

14       Q    Dr. Tribble, if I've got it right, you're here

15   to tell the jury about your company, Apple?

16       A    That's correct, yes.

17       Q    Okay.  And it's true, is it not, that Apple --

18   excuse me -- was founded by three fellows:  Mr. Jobs,

19   whom we've heard about; Mr. Wozniak -- is that how you

20   pronounce it?

21       A    Wozniak, or people call him Woz.

22       Q    Woz.  And there was a third founder, a guy

23   named Ron Wayne; not John Wayne, but Ron Wayne, correct?

24       A    I'm not real familiar with that.  That was

25   prior to 1980 when I joined the company.
```

2    He was the older of the -- the oldest of the three, and

3    right after he founded the company with Woz and Jobs, he

4    got cold feet and sold his 10 percent of Apple for less

5    than $3,000.

6              You know that story, do you not?

7    A    I actually don't.

8    Q    Really?

9    A    No.

10   Q    Well, the point is, that today, that's -- that

11   interest in Apple --

12             MR. RANDALL:  I'm going to object, Your

13   Honor.  There's no foundation for this, and it's just

14   testimony.

15             THE COURT:  Sustained.

16   Q    (By Mr. Carroll) Do you own interest in Apple

17   shares?

18             I say own it; you own Apple shares, correct?

19   A    Yes, I do.

20   Q    Okay.  So in that regard, you have an interest

21   in the outcome of this case, do you not?

22   A    Sure.

23   Q    To the effect that -- or to the point that it

24   may affect share prices?

25   A    To the point it may affect the share price,

2       Q     Right.  And, of course, you are still an

3    employee drawing a salary?

4       A     That's correct.

5                 MR. CARROLL:  Pass the witness.

6                 THE COURT:  All right.

7                 MR. RANDALL:  No questions, Your Honor.

8                 THE COURT:  All right.  You may step

9    down.

10                Who will be your next witness?

11                MR. CARROLL:  Walt -- Walt Bratic, Your

12   Honor.

13                THE COURT:  Mr. Bratic.

14                COURT SECURITY OFFICER:  Were you sworn?

15                THE WITNESS:  Yes, sir, I was sworn.

16                May I be seated, Your Honor?

17                THE COURT:  Yes, you may.

18                MR. CARROLL:  If the Court please, Your

19   Honor.

20                THE COURT:  You may proceed.

21     WALTER BRATIC, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

22                      DIRECT EXAMINATION

23   BY MR. CARROLL:

24      Q     Mr. Bratic, would you give the jury your name

25   and where you live and what you do, please?

2    Houston, Texas.  I'm a certified public accountant.  I

3    have some other credentials and degrees, and I am

4    basically a financial and economic analyst.  And I work

5    with a lot of statistical, accounting, economic, and

6    financial data.

7        Q    Tell the jury, please, what your job in this

8    case is.

9        A    My job in this case was to determine the

10   amount of royalties, the amount of damages that are due

11   and owing to Mirror Worlds, assuming that Apple has

12   infringed the three patents-in-suit.

13       Q    Look --

14            MR. CARROLL:  Can we put up the first

15   Bratic slide, James, with Mr. Bratic's qualifications

16   and experience -- or education?

17       Q    (By Mr. Carroll) Tell the jury pretty quickly,

18   Mr. Bratic, what this slide is telling us, other than

19   just reading it?

20       A    Well, sure.  It's just got highlights of some

21   things I've done.

22            For example, I've been a certified public

23   accountant here in Texas for almost 30 years now.  I'm

24   also a certified licensing professional.  What that

25   means is that I've been -- received the qualification

2   professional, because I've been doing licensing work for

3   clients for 30 years now -- actually, 35 years, if you

4   go back to the very first time I executed a license.

5          I also have an undergraduate degree and an MBA

6   from the Wharton School of Business at the University of

7   Pennsylvania.  I speak a lot on the subject of

8   intellectual property, including patents.

9          I've spoken at many conferences in the United

10  States and overseas as far away as South Africa.

11         I teach on the subject of intellectual

12  property as well every year.  I teach classes at the

13  University of Houston Law School in the fall and in the

14  spring on intellectual property subject matter.

15         I'm also sitting on the editorial board of a

16  publication called Managing Intellectual Property.  Now,

17  that's a publication that's written for lawyers and

18  business people about intellectual property issues.  And

19  it's published around the world, and I sit on the

20  editorial board.

21         And what it means -- being on the editorial

22  board, it means when people want to submit articles for

23  publication in that journal, I have to go in -- one of

24  my jobs is to review those articles to see if they meet

25  our standards and if they would teach somebody something

2      Q      Now, my note says that you are presently the

3  Managing Director of OverMont Consulting, LLC; is that

4  true?

5      A      Yes.

6      Q      And what's the specialty of OverMont

7  Consulting, LLC?

8      A      Well, we work on a variety of financial,

9  economic, accounting, and statistical issues, so we

10  delve into a lot of data and pour through data and

11  analyze data and try to figure out what it means.

12             We do a lot of licensing work for clients.  We

13  value business assets, whether they're software,

14  computers, companies that make these.  Any type of

15  business assets, we actually also place a value on.

16             And then from time to time, and quite often, I

17  end up serving as an expert witness in matters like the

18  one before us today.

19      Q      Excuse me.  Going back to your work

20  background, have you been involved with intellectual

21  property as an accountant back when you practiced?

22      A      Oh, yes.

23      Q      Tell the jury about that.

24      A      Well, part of my work there was I was doing

25  licensing work and I was doing tax returns.  I was doing

2    Q   Let me ask you this at this point, Mr. Bratic:

3    There's been some suggestion that tax returns reflect

4    the value of an asset.  You're a CPA.

5         Is that true or false?

6    A   No, that's not true at all.

7    Q   Tell the jury why.

8    A   Well, because companies are required to put

9    their assets on the balance sheet, and what they are

10   required to report to the IRS is what they paid for an

11   asset.  And that's what recognition interface did, is

12   they reported to the IRS, the Internal Revenue Service,

13   that they paid $218,000 approximately, to acquire the

14   assets of Mirror Worlds.

15       Now, that is different than the issue of what

16   is the value of those patents and other assets that were

17   acquired.

18       For example, you look at Apple's balance sheet

19   today, Apple, on its books, is worth about $43 billion.

20   That's billion.  Yet the value of Apple is about $265

21   billion, based on the stock price back this past Monday.

22       So here you have Apple that's worth six times

23   more than what its books show it's worth.  And that's

24   why valuation doesn't necessarily have to do with what a

25   company reports that it paid for acquiring certain

2     Q    Okay.  Now -- thank you.

3          You told the jury -- excuse me -- a second ago

4 that you have a lot of experience in calculating

5 economic damages in patent disputes.

6          What does that mean?

7     A    Sorry.  I'm destroying federal property.  I

8 lost the cap to this, but I guess I'll find it later.

9          Okay, I'm sorry.  Would you repeat?

10     Q    You want me to ask the question again?

11     A    Please.

12     Q    Tell the jury what it means to calculate

13 economic damages in patent disputes.

14     A    Well, the idea of determining economic damages

15 in a patent dispute is find out what is the technology

16 worth to those who use the technology.

17          In this case, I am required to assume, for the

18 purpose of my analysis, that the three patents that are

19 in litigation in this court are valid patents and that

20 Apple has infringed them.

21          Apple's damages expert, Dr. Ugone, has to make

22 that same assumption.  So the issue is, what is the

23 value of using that property or that asset, because

24 intellectual property is just like real estate.  Like

25 the Farmer Brown example you gave, it's real estate;

2          And you have rights associated with the

3    property.  You can sell it; you can license that real

4    estate; you can charge rent for the use of that real

5    estate or what's underneath, like the minerals.

6          And that's no different than patents.

7    Q    Now, have you testified before as an expert on

8    the issue of economic damages in a patent infringement

9    lawsuit?

10   A    Yes, I have, on numerous occasions.

11   Q    Have you testified in this very courtroom in

12   front of this very Judge?

13   A    I have on several occasions.

14   Q    Have you worked for me?

15   A    Yes, I have.

16   Q    Have you worked against me?

17   A    Yes, I have.

18   Q    In this very courtroom?

19   A    Yes, in this very courtroom.

20   Q    And have you worked for the law firm that

21   Apple is using?

22   A    Yes, I have.

23   Q    Okay.  Tell the jury what -- have you ever

24   been hired or appointed by a court to serve as an expert

25   or an Examiner?

2      Q     Tell the jury about that.

3      A     Well, I've been hired by federal -- I mean --

4  excuse me -- I've been hired by a federal court to be a

5  court-appointed expert where I consulted with the Court

6  on a patent infringement matter on the economic issues.

7  And both parties agreed to pay my expenses for me to

8  basically educate the judge about various economic

9  issues, not the law, of course.

10          And then I've also been hired by various state

11  judges here in Texas, in Dallas and in Houston, as a

12  court-appointed expert, and that's where I get hired by

13  the Court.  I prepare a report for the Court.  And when

14  the Court adopts my findings, then they are binding on

15  all the parties.

16          And so I've done that on several occasions.

17      Q     Okay.

18              MR. CARROLL:  James, let's put up

19  Slide 3, please.

20      Q     (By Mr. Carroll) What's the slide telling the

21  jury, Mr. Bratic?

22      A     Well, this is kind of a roadmap to what I did

23  to investigate the issue of patent damages in this case.

24  So there are a number of things I did.

25          And not to read everything for you, but

2    patents, but I'm not a lawyer; I'm not a technical

3    expert.  But I obviously wanted to learn something about

4    the patents, so I read them before I interviewed the

5    technical expert in this case, Dr. Levy.

6            Then I interviewed a number of people in this

7    matter, including Dr. Gelernter.  I also interviewed Dr.

8    Levy on several occasions.  I interviewed Frank Weil,

9    Dr. Levy's colleague, Dr. Loy, and I interviewed Robert

10   Raich, as an example.

11           I also read a number of deposition transcripts

12   of various people who were deposed, such as, for

13   example, Mr. Lindsay and Mr. Serlet.

14           I also reviewed a number of business records.

15   Apple has produced a lot of business records regarding

16   their sales of various products, so I reviewed and

17   analyzed all those to find and figure out, one, how much

18   money Apple has generated; how much sales has it had of

19   these accused products in the last five-and-a-half years

20   of infringement; and, second, how much profits they've

21   made on those infringing sales.

22           So that's an example of some of the work I

23   did.

24           I also did independent research going out on

25   the internet looking up references made to Apple,

2   literature.

3       Q    Now, the last bullet point on this slide says

4   that you filed two expert reports.

5            Are those voluminous?

6       A    Yes.  Well, the first one is.  The first one

7   is short of 200 pages.

8       Q    All right.

9       A    And the second one is thinner, because it's a

10  narrower subject matter.

11      Q    And approximately, how long have you worked on

12  this engagement?

13      A    Well, over a year, but really it picked up

14  this spring when we started getting documents.  So I

15  would say six months.

16      Q    All right.  And obviously, you're being paid?

17      A    Yes.

18      Q    Or your company's being paid?

19      A    Correct.

20      Q    What's the rate that you're being paid?

21      A    Well, my billing rate is $580 an hour.

22      Q    Do you have an estimate of how much your

23  company's charged Mirror Worlds for this engagement?

24      A    Yes.  For our investigation, we've billed

25  about $400,000.

2          MR. CARROLL:  Now, let's go to Slide 4.

3      Q     (By Mr. Carroll) What does Slide 4 tell us?

4      A     Oh, this is just a patent statute.  Patent

5   statute says, basically, that a patentee is entitled to

6   compensation for damages, and it says in no event less

7   than a reasonable royalty.

8          So because Mirror Worlds doesn't compete with

9   Apple, Mirror Worlds doesn't make products that compete

10   with Apple, Mirror Worlds would only be seeking a

11   reasonable royalty, like the rent for the use of

12   somebody's land.

13      Q     Let's --

14          MR. CARROLL:  Let's go to Slide 5, James.

15      Q     (By Mr. Carroll) What is Slide 5 telling the

16   jury?

17      A     Slide 5 is my conclusion regarding the amount

18   of reasonable royalties that are due and owing Mirror

19   Worlds, assuming the patents-in-suit are valid and have

20   been infringed by Apple.  And that number is $625

21   million.

22      Q     Now, that's a lot of money.

23      A     Well, it is, but you have to put it all in

24   perspective.

25      Q     How much did Apple sell of the products that

2       A       Apple has sold over 72 billion dollars' worth

3   of product.  So this $625 million represents less than

4   one penny on every dollar of sales.

5       Q       Is that what this slide is telling us?

6       A       Yeah, this is exactly what this is showing.

7               So here I've got an example.  I've got Apple

8   selling $72 billion of infringing sales going back to

9   the spring of 2005, when the Tiger OS operating system

10  upgrade was first sold.

11              And then the royalty of $625 million is just

12  less -- it's .8 percent, so it's just under a penny.

13  That's why the penny is sliced off at the top, because

14  the royalty is less than a penny.

15      Q       You heard -- you've been in the courtroom

16  during the whole trial, have you not?

17      A       I've been here, yes.

18      Q       You heard me tell the jury on opening

19  statement that Apple was making $50 million today for

20  selling the products that have the accused features.

21              Is that true?

22      A       Correct.

23      Q       And they made it yesterday and they'll make it

24  tomorrow?

25      A       Correct.

2    take for Apple to recoup the money that we're asking the

3    jury to give us for patent infringement?

4        A    About 13 days.

5        Q    And they would have completely been

6    reimbursed?

7        A    Yes.

8        Q    Mr. Bratic, do you believe that there are

9    factors that you've seen and considered in this patent

10   infringement case that are special?

11       A    Yes.

12       Q    Can you tell the jury about that?

13       A    Well, I've been involved in a number of patent

14   cases over the years, and this one is very unique in

15   several respects, based on my analysis.

16            And that is that we have Dr. Gelernter, who's

17   considered a visionary and pioneer in his field.  We

18   have Steve Jobs, the CEO of Apple, who claimed that --

19   who made the statement that Spotlight, one of the

20   accused features, was a revolutionary product.

21            We also have then -- so he's the CEO of the

22   company.  And not only does he say the product is

23   revolutionary, but then he becomes a spokesman for the

24   product, and he's telling everybody how wonderful the

25   product is at two conferences.  So he becomes very

2          And he also went so far as to be the person

3  who named that product Spotlight.  So he was very

4  intimately involved.

5          And you don't see that -- I have not seen that

6  in other cases where the CEO of a company basically

7  embraces the technology and becomes really a champion

8  for it.  I've never seen that before in a patent case.

9      Q    Now, you were in the courtroom when the jury

10  heard evidence about the -- what Dr. Tribble referred to

11  as senior executives took an interest in the Mirror

12  Worlds technology.

13          Is that significant?

14      A    Yes.  I mean, that's -- that's an example of

15  how the top brass at Apple took a very serious interest

16  in this technology.

17          And I shouldn't say just a serious, one-time

18  interest.  It was an ongoing interest, going all the way

19  back to when that first e-mail was released by Mr. Jobs

20  saying take a look at this and let's see about securing

21  a license ASAP.

22          This one from -- this is from 2001, all the

23  way to very recently.

24      Q    All right.

25          MR. CARROLL:  Let's go to Slide No. 8.

2    the jury, Mr. Bratic?

3        A    Are we on 8 or -- 8 we just saw.  That was the

4    one about seeking a license.

5                   MR. CARROLL:  I want the patent damage

6    terms.

7                   There we go.

8        A    This one?

9        Q    (By Mr. Carroll) Yeah.

10            What's this designed to help the jury with?

11       A    Well, there's some terms I'm going to be using

12   during my testimony, and I just thought I'd summarize

13   these terms for the jury.  When they hear them, they'll

14   know what I'm referring to.

15            So, for example, when I talk about Apple's

16   infringing software products, that would be this little

17   box that's got the software -- the Leopard software in

18   it.

19            When I talk about Apple's infringing hardware

20   products, I'm talking about the PC, as an example,

21   that's in this box.

22            So I'm going to set this aside for a second.

23            So this is the infringing hardware.

24            Now, the royalty base is the infringing sales.

25   How much accused product has been sold of these type

2      Q     Let me interrupt you.  Is that the $72

3   billion?

4      A     Yes, that's the $72 billion.  That's the

5   royalty base.  It's part of a formula I'm going to show

6   you in a minute.

7            The other part of the formula is the royalty

8   rate.  What amount of rent or royalties do you charge

9   Apple for the right to include the patented features in

10  these products?

11     Q     Let me stop you right there.

12               MR. CARROLL:  Put up Farmer Brown 3.

13               Here we go.

14     Q     (By Mr. Carroll) Some people in East Texas are

15  fortunate enough to have oil or gas under the minerals

16  that -- that they own.

17     A     Correct.

18     Q     And those folks may have an oil and gas lease.

19     A     Correct.

20     Q     And that lease may call for a percentage of

21  the production that comes from Apple -- from under their

22  ground.

23     A     Yes.

24     Q     You know all about that?

25     A     Yes.

```
 2      A     I am not.  That's why I am here working today.

 3      Q     But let's assume that Farmer Brown and the oil

 4 company here have an oil and gas lease, and that Farmer

 5 Brown's lease, let's say, is 1/8, 12-1/2 percent.

 6            What would that mean --

 7      A     That would be --

 8      Q     -- by an example?

 9      A     That would be the royalty rate that he would

10 be charging --

11      Q     Let's assume -- I'm sorry.  Go ahead.

12      A     That he would be charging the oil company for

13 the oil it pumps out of his ground.

14      Q     And let's assume -- so for -- let's assume

15 that's an oil well.  Maybe that's over in New London or

16 Kilgore or somewhere; and that for every hundred barrels

17 that comes out of that well, the farmer would get what?

18      A     He would get $8.

19      Q     For 12-1/2 barrels?

20      A     I'm sorry?

21      Q     If it's --

22      A     A hundred barrels, yeah, he'd get 12-1/2

23 barrels.

24      Q     He would get 12-1/2 barrels?

25      A     Yes, 8 percent of that.
```

2          A    Or an eighth.

3          Q    Okay.  Now, if the -- and, again, the math is

4    the math, but the fact of the matter is that what the

5    farmer gets would be based upon what, Mr. Bratic?

6          A    What's called throughput, volume, the amount

7    of oil produced.  And that's -- the analogy I gave you

8    earlier in your Farmer Brown analogy is the royalty that

9    we're talking about is applied to the amount of oil that

10   comes out of the ground.

11              And that's very much like the formula that I

12   have here for patent damages in this case.  We have a

13   royalty rate that I've explained, times a royalty base,

14   which is the $72 billion of infringing product that have

15   been sold in the last five-and-a-half years.

16         Q    So the more the oil, the better for both,

17   right?

18         A    Correct.

19         Q    The more the sales, the better for both,

20   correct?

21         A    That's right.

22         Q    Is that the formula that you understand the

23   law favors?

24         A    Yes.

25         Q    Now, the Apple folks have a damage expert, Dr.

```
 2      A     Correct.

 3      Q     And you've looked at his work?

 4      A     Correct.

 5      Q     He doesn't use this formula, does he?

 6      A     No, he doesn't.

 7      Q     And as a matter of fact, he focuses on a sale

 8 of the intellectual property that the jury has heard

 9 people talk about, correct?

10      A     Correct.

11      Q     And you were in the courtroom yesterday when

12 Mike Satow used the words, not an arm's length sale, to

13 describe that sale.

14            You were here, were you not?

15      A     Correct.

16      Q     What does that mean to you as an accountant?

17      A     Well, what it means is it doesn't reflect the

18 value of the intellectual property or assets that were

19 sold.  If it's not an arm's length transaction, that

20 does not reflect the value.  It's your brother-in-law

21 transaction you talked about in opening in trial.

22      Q     So that if -- if the oil company has a lease,

23 in my example up here, where they're supposed to pay

24 Farmer Brown an eighth of what they get, under that

25 deal, can they tell the farmer, no, we're not going to
```

2    just found out that you bought your brother-in-law's

3    piece of this property for a thousand dollars?

4         A    Right.  Well, that would make no sense,

5    because it doesn't reflect the value that the oil

6    company's getting off that land.

7         Q    And is that what you understand that the law

8    requires you as a patent -- or as a patent damage

9    evaluator to look to, among other things?

10        A    Yes.

11        Q    The value that the infringer made of the

12   product?

13        A    Yes.  The benefits.

14        Q    Is that right?

15        A    The extent of the use of the patented

16   technology by the infringer and the benefits enjoyed by

17   the infringer.

18        Q    And just so the jury will have it plain in its

19   mind where the battle lines are, did Mr. Ugone back here

20   pay any attention to the $72 billion of infringing sales

21   that Apple has made in this lawsuit?

22        A    No.  Excuse me.  No.

23        Q    Or the $50 million in infringing sales that

24   they will make this very day?

25        A    No, he did not.

 2                    THE WITNESS:  By the way, can I trouble

 3   somebody for some water?  I've got allergies.

 4                    MR. CARROLL:  I bet we can.  You want one

 5   of my pills?

 6                    THE WITNESS:  No.

 7                    MR. CARROLL:  I will share.

 8                    MR. RANDALL:  Your Honor, may I approach

 9   the bench briefly?

10                    THE COURT:  Pardon?

11                    MR. RANDALL:  May I approach the bench

12   briefly?

13                    THE COURT:  You may.

14                    (Bench conference.)

15                    MR. RANDALL:  Your Honor, we moved in

16   limine, Motion in Limine No. 15, to exclude from

17   admittance the underlying surveys that this witness is

18   relying on, because they're unreliable and not the type

19   of documents that an expert should rely on.

20                    That ruling -- that motion has not been

21   ruled on.  I want to make sure that I preserve my

22   objection to the attempt to admit both; the documents

23   underlying his opinions into evidence, but also his

24   opinion based on those defective surveys.

25                    THE COURT:  What exhibits are these?

2   surveys that we talked about in the motion in limine.

3                   We did argue it, Your Honor.  We argued

4   it on the record sometime ago, I realize that.

5                   But we argued it because he took one

6   marketing survey, I believe, of only ten features.  He

7   took a very, very small sample based on that survey, and

8   then he extrapolated it across both software and

9   hardware and came up with this huge damage number.  And

10  it's not the type of documents that a witness -- that an

11  expert should rely on.

12                  MR. CARROLL:  These are Apple surveys

13  that they paid $20 million for.

14                  THE COURT:  You can handle it on

15  cross-examination.  Your objection's overruled.

16                  MR. RANDALL:  Thank you, Your Honor.

17                  (Bench conference concluded.)

18      Q    (By Mr. Carroll) Okay.  Mr. Bratic, you ready

19  to go?

20      A    Yes, sir.

21      Q    Now, you've told us about what you believe is

22  significant in this case fact-wise.  You've told us

23  about what the royalty base means and what you believe

24  it is.

25                  MR. CARROLL:  Leave that up, please.

2  believe that would be appropriate.  Then you have a

3  name, Georgia-Pacific Factors.

4            What does that mean?

5       A    Well, what it means is there was a case, a

6  well-known patent case from the very early 1970s, in

7  federal court called Georgia-Pacific versus U.S.

8  Plywood.  It involved a patent lawsuit over plywood.

9            Anyway, in that case, the Court set down 15

10 factors, a checklist, that said here are guidelines for

11 you to look at as damages experts to help you determine

12 what a reasonable royalty would be in a patent case.

13 And so that's come down through the ages to be known as

14 the Georgia-Pacific Factors.

15      Q    All right.

16      A    And there's 15 of them, and I have a list I'll

17 show you shortly.

18      Q    Let's go ahead.

19            MR. CARROLL:  Can we find the list?  Do

20 you have the Georgia-Pacific list while we're talking

21 about it?

22            There we go.

23      Q    (By Mr. Carroll) All right.  Now, these are

24 the 15 factors that this court suggested be considered?

25      A    Yes.

2      involved in, Mr. Bratic, have you made use of all or

3      some of these factors in one way or the other?

4          A    Yes, absolutely.

5          Q    Do you understand that's what ought to be

6      done?

7          A    Right.  In fact, my expert report, one of the

8      reasons it's pretty long is because I go through a

9      detailed discussion of each of these 15 factors.

10         Q    Now, going back to the discussion you and I

11     had about the cartoon with the oil company on the

12     farmer's land, look at Factor No. 11.

13              MR. CARROLL:  Blow that out, would you,

14     James?

15         Q    (By Mr. Carroll) And while we're waiting --

16     everybody can see it -- it says extent of infringer's

17     use.

18              Do you see that?

19         A    Yes, I do.

20         Q    Did you consider the extent of the use that

21     the Apple folks made of Dr. G.'s patents?

22         A    Yes, I did.  That's the $72 billion in sales.

23         Q    And, again, is that something that Mr. Ugone

24     out here in the back paid any attention to?

25         A    No.

2   approach and his approach?

3        A    That's one of the key differences between his

4   approach and my approach.  He ignored the accused sales.

5        Q    While we have the screen -- the slide up here,

6   are there any other of these factors that the law

7   commends to your attention that you think are

8   significant to point out to the jury at this time?

9        A    Well, sure.  For example, look at Factor 8,

10  the established profitability and the commercial

11  success.

12            These products that include the patented

13  features have been very successful to the tune of 72

14  billion in sales for the last five years.

15            The utility and advantages of the invention,

16  my understanding is that these inventions are very, very

17  important, based on my discussions with Dr. Levy.  And

18  even in the documents I've seen, they've called them --

19  they've been called paradigm shift.  They've been called

20  revolutionary, changing, game changing, changing the way

21  people use computers.  So that's the information I

22  considered.

23            Also, you know -- and so that ties to Factor 9

24  and 10.  And so those are the more important ones; but

25  then also is the opinion of experts, because I did rely

2       Q     All right.  Let me ask you a couple of

3   questions before we get off this slide.

4             Question No. 3 -- excuse me -- Point No. 3

5   says nature and scope of license.

6             What does that mean?

7       A     That means that -- and I should --

8       Q     Answer that one first.

9       A     Yeah.  Nature and scope of the license would

10  be what kind of license would Apple get from Mirror

11  Worlds?

12            Apple would get a non-exclusive patent

13  right -- a patent license for the three patents-in-suit.

14  So they would be able to go out and practice them as

15  they wish or not, but they have a license.  And so they

16  would be free from any threat of litigation.

17      Q     And what's the difference between -- and

18  everybody in the courtroom probably knows this -- but

19  just so we'll be sure, what's the difference between a

20  non-exclusive and an exclusive?

21      A     Well, an exclusive license would be if

22  Apple -- excuse me -- if Mirror Worlds licensed Apple,

23  then Mirror Worlds could not turn around and license

24  anybody else, like Apple's competitors, like Google you

25  heard about this morning, or Microsoft.

2    would not be able to license anybody else, because the

3    folks at Apple would have an exclusive license.  It

4    would be all theirs.

5         Q    And, again, this is kind of an elemental -- or

6    elementary, I guess, question; but would a person in

7    your experience pay more or less for a non-exclusive

8    license?

9         A    You would pay less for a non-exclusive

10   license.

11        Q    So when you made your calculations and gave

12   the jury your opinion, was it based upon the assumption

13   that Apple would negotiate and pay for an exclusive

14   license or the less expensive non-exclusive?

15        A    It would be for the less expensive

16   non-exclusive license.

17        Q    All right.  And then the other two questions

18   or other two bullet points I wanted to ask you about are

19   the -- the 1 and 2.

20             Did you consider any comparable licenses out

21   there in arriving at your opinion?

22        A    Well, first of all, Mirror Worlds did not

23   license these patents to anyone else, so there were no

24   licenses to look at under Georgia-Pacific Factor 1.

25             Under Georgia-Pacific Factor No. 2, based on

2  found no other licenses that were involving the same

3  comparable technology.

4       Q    Now, we all know the tales of the East Texas

5  oilfield and the Lou Della Crim and the great gushers in

6  history down to the ones that I'm personally familiar

7  with where they don't pay for themselves.

8            And is it true that royalty rates depend upon

9  how hot a deal you're presented with?

10      A    Yes.

11      Q    Well, based on everything you know, when the

12 parties sat down to negotiate, if they really had, would

13 this have been a hot deal, a lukewarm deal, or an

14 ice-cold deal?

15      A    This would have been a hot deal.

16      Q    Now, let's go down to No. 15, and I want to

17 talk about that.  That's hypothetical negotiations.

18           You were in the courtroom when I described to

19 the jury on the opening statement that the law requires

20 a play-like deal where we assume that everybody had

21 played nice and fair and sat down and tried to work a

22 deal out?

23      A    That's correct.

24      Q    All right.

25           MR. CARROLL:  Put that up Farmer Brown

2     Q     (By Mr. Carroll) Okay.  Now, the caption of

3  this says the law requires the trespasser or the

4  infringer -- in this case, we say it's Apple -- to

5  negotiate a license with his cards face up.  Patent is

6  valid, infringed, and a royalty is owed.

7             Tell the jury what that means.

8     A     Well, just like you talked about, it's the

9  play-like scenario.  We know that Mirror Worlds and

10  Apple never sat down and completed a license, and

11  they're in litigation now over those patents.

12            So the law requires this hypothetical

13  negotiation that didn't ever happen, and we're supposed

14  to pretend it did happen.

15            So you have the representation here in this

16  cartoon of the oil company and Farmer Brown sitting down

17  and negotiate a license for them to be able to take oil

18  off his land.

19            And likewise, the key thing here is we assume

20  that Farmer Brown owns the property; it's his.  There's

21  no question about he's the sole and lawful owner of that

22  land, and the oil company has to go to him and him only

23  to get a license and permission to extract oil off his

24  land.

25            And then the other thing is, you would know,

2          And what I mean by that is, for example, in

3    our hypothetical negotiation between Mirror Worlds --

4    I'm pointing at this table and Apple at that table --

5    what we know, for example, in the hypothetical

6    negotiation is both parties would know, and Apple would

7    be forced to share information with Mirror Worlds in

8    recognition interface, such that, one, for example, they

9    would know about Steve Jobs' e-mail from back in 2001,

10   still talking about looking into this ASAP.

11          They would know that Steve Jobs made a comment

12   to the Worldwide Developers Conference in 2004 that

13   Spotlight was revolutionary.

14          They would also know that he had made a

15   statement to the Mac World Conference in 2005, before

16   the hypothetical negotiation, that the -- that these

17   patents were game-changing and change the way people use

18   computers.

19          So all of those facts would have been known to

20   both parties.

21     Q    Okay.  Another question that may be pretty

22   obvious, but based on what the law says at this

23   hypothetical negotiation, who's got the whip in hand?

24     A    Well, it's clearly Mirror Worlds as a

25   recognition interface.

2  invalidity.

3          Is that something that would even come up in

4  this hypothetical negotiation?

5      A    No, it would it not, because you're supposed

6  to assume -- both parties are supposed to assume that

7  the Mirror Worlds patents are valid and that Apple has

8  infringed them.

9          So that's not even an issue that would ever

10 come up in the hypothetical negotiation.

11     Q    We've heard a lot already and I expect we'll

12 hear a lot more about why Apple doesn't infringe our

13 patent.

14         Would that even come up at this play-like

15 negotiation?

16     A    No, it would not.

17     Q    And is that what the law says?

18     A    Yes.

19     Q    Okay.  Let's go on.

20         When -- when would the date of this

21 hypothetical negotiation take place?

22     A    It would take place on or about April 2005,

23 and that's when Apple released what was called the Tiger

24 OS operating system.  Now, this is not the Tiger.  This

25 is a later version, Leopard.

2    Apple formally released the Tiger OS X operating system.

3         So that's when the parties would have sat down

4    and negotiated this hypothetical license.

5    Q    Have you got two dates for this hypothetical

6    negotiation?

7    A    I do.

8    Q    And why is that?

9    A    Well, because the first date I just mentioned

10   to you, April 2005, that relates to, if you assume that

11   Apple infringed, first began infringing the '227 patent.

12        If the jury decides that the '227 patent is

13   either invalid or has not been infringed, then we have

14   to consider the '313 patent and '427 patents.  And if

15   they are determined to be valid patents and infringed,

16   then there would have been a separate -- a different

17   hypothetical negotiation about a year later, in

18   September 2006.

19        And the facts would have been a little

20   different, but you would carry all of that knowledge

21   with you from the earlier hypothetical negotiation in

22   2005 to the one in 2006.

23   Q    Okay.  Mr. Bratic, your opinion to the jury

24   that you just showed them of $620 --

25   A    5 million.

2    infringement or the newer date of infringement?

3        A    The earlier date of infringement.

4        Q    The earlier?

5        A    Right.

6        Q    Now, if the jury, for whatever reason, chooses

7    the later date and rules -- believes that Apple hasn't

8    infringed that long, does the damage number go up or

9    down?

10       A    It actually goes up.

11       Q    Why -- why in the world would that be?

12       A    It goes up, because some of the factors that

13   come into play at that time are different than the

14   earlier hypothetical negotiation.

15            And by that time, Apple gets a license for all

16   three products.  In other words, all three products are

17   already out and in the works.

18            What I mean by products, I mean the accused

19   features:  Spotlight, Coverflow, Time Machine.

20       Q    Okay.  Did you consider --

21            MR. CARROLL:  First of all, let's find

22   the formula, James, the rate-time-base formula.

23            THE WITNESS:  That's Slide 12.

24            MR. CARROLL:  Slide what?

25            THE WITNESS:  12.

```
2                    THE WITNESS:  Right.

3                    MR. CARROLL:  Yeah.

4        Q    (By Mr. Carroll) Okay.  And, again, the bottom

5   of that says Dr. Ugone did not use this formula.

6                    Is that true?

7        A    That's true.

8        Q    Now, you've told us the royalty base.  Is that

9   the $72 billion?

10       A    Yes.

11                   THE WITNESS:  If you look at the next

12  slide.  Nope, sorry.  I thought it was the next slide.

13  It's Slide -- Slide 15.

14                   MR. CARROLL:  There we go.

15       A    Right.  So there's your royalty base of 72

16  billion.

17       Q    (By Mr. Carroll) Okay.  Let me interrupt you

18  there.

19                   That's $72 billion under royalty base; is that

20  a fact or an opinion for the hypothetical negotiation?

21       A    Well, that's a fact.

22       Q    And how do you know that?

23       A    Well, because Apple has produced the

24  information, the records, for me to determine how much

25  product they've sold.
```

2    between you and the Apple man over that

3    72-billion-dollar historical number?

4        A    No.

5        Q    Now, the royalty rate is where the fuss comes

6    in, correct?

7        A    Well, as well as whether to use the formula or

8    not.

9        Q    Okay.  Because he doesn't even use the

10   formula?

11       A    Correct.

12       Q    All right.  So your opinion comes into play in

13   calculating what a fair rate would be, just like if

14   Farmer Brown was negotiating with that oil company?

15       A    Correct.

16       Q    Whether it's a third or a quarter or 25

17   percent or whatever it is, right?

18       A    That's correct.

19       Q    And what number did you come up with?

20       A    Well, I came up with two numbers for the

21   hypothetical negotiation April 2005.

22            For these standalone sales of these software

23   products just by themselves, infringing software, the

24   royalty is 8.8 percent of every box sold.

25            When a larger device, like a PC and iPod and

2    less than 1 cent; it's .8 percent, .81 percent.

3              And the reason that there's such a big

4    difference in a royalty rate, this royalty rate is 10

5    times higher than this one, is because I have to

6    recognize there are a lot of features in this product

7    that aren't infringing.  And I have to give Apple full

8    credit for that, as I did also in the 8-percent royalty

9    in here (indicates).

10        Q    All right.  Now, in deciding what you believe

11   to be a reasonable royalty rate, did you calculate that

12   with an eye toward leaving some of the meat on the bone

13   for Apple?

14        A    Well, I calculated with the view to leaving a

15   lot of meat on the bone for Apple.

16        Q    Did you consider, among other things, whether

17   there had been any offers to buy these patents?

18        A    Yes, I did.

19        Q    Have you ever heard of a company called

20   Intellectual Ventures?

21        A    I have.

22        Q    What is Intellectual Ventures?

23        A    Intellectual Ventures is a company that was

24   formed out in California, and it was formed by a lot of

25   high-tech companies.  And one of its owners is Apple,

2    patents from companies like Mirror Worlds and other

3    companies.

4        Q    Did you see written evidence of an offer by

5    Intellectual Ventures, this company you just described,

6    to buy Dr. G.'s intellectual property?

7        A    Yes.

8        Q    Tell the jury about that.

9        A    Well, that was an offer that was made before

10   the filing of the lawsuit, and it was in the order of $7

11   million plus a percentage participation.  In other

12   words, they got an interest in future revenues.

13       Q    Do you remember what that piece was?

14       A    I'm going by recollection.  Maybe 19 percent.

15       Q    Okay.  So did you consider that in your

16   calculation of this less-than-1-percent royalty rate?

17       A    Yes.

18       Q    Did you consider any other discussions between

19   Intellectual Ventures and the Mirror Worlds folks?

20       A    Yes.

21       Q    What were those?

22            MR. RANDALL:  Your Honor, I'm going to

23   object.  This is hearsay and irrelevant.  It's also

24   subject to the motion in limine as improper.

25            THE COURT:  Overruled.

2    Mr. Bratic.

3         A    After the filing of this lawsuit, Intellectual

4    Ventures contacted Mirror Worlds and sought to buy --

5    discussed buying the Mirror Worlds' patents in the range

6    of 30 to $50 million, plus Mirror Worlds would end up

7    with 10 percent of any revenue stream that Apple --

8    that -- excuse me -- that Intellectual Ventures received

9    when they went out to license the patents.

10        Q    So Intellectual Ventures would get the patents

11   and carry a 10-percent piece for Mirror Worlds?

12        A    Correct.

13        Q    And now, how do you know that's so?

14        A    Well, because I've interviewed Frank Weil.

15   I've interviewed Mr. Raich.  I've also read Mr. Weil's,

16   Mr. Raich's, and other depositions on that topic.

17        Q    Who are the other, to your understanding,

18   participants or co-owners in this Intellectual Ventures

19   combine?

20        A    They include --

21             MR. RANDALL:  Objection, Your Honor.

22   Lack of foundation.

23             THE COURT:  Overruled.

24        A    They include companies like Microsoft, Intel,

25   big, high-technology companies.

2    thanks, but no thanks?

3        A    Correct.

4        Q    So did you consider this piece of evidence in

5    coming up with a -- the royalty rate of less than

6    1 percent?

7        A    I considered that information as one of many

8    different pieces of information I considered.

9        Q    I want to talk to you a little bit about the

10   features of the products that we've focused on, the

11   Coverflow --

12       A    Right.

13       Q    -- the Time Machine, and the Spotlight.

14            Pick up that box in front of you.

15       A    Okay.

16       Q    Can you find any one of those names on the

17   back of that box:  Spotlight, Time Machine, Coverflow?

18       A    Well, you'll find Time Machine on here, and

19   the Finder, which includes Coverflow.  So you'll find

20   Coverflow and Time Machine on this document.

21            Now, on this document -- and let me tell you

22   what this is.  This is the -- it says Everything Mac.

23   This is the owner's manual for this Apple computer, Mac

24   Pro computer, that I purchased a few weeks ago.

25            If you would open the inside cover -- it's on

2               THE WITNESS:  And I have a slide, too,

3   that just blows this up.  Let me see what the slide

4   number is real quick.  Let me see if I can find it.

5       Q    Are you looking for the owner's manual?

6       A    Here it is, 43.

7               THE WITNESS:  So if you would go to

8   Slide 43.

9       A    Okay.  This is a copy of -- what you see on

10  the screen is a copy of this page.  The only difference

11  is the red boxes.  I asked James to put the red boxes

12  around those three.

13          You will see finally with Spotlight -- I mean,

14  finally with Coverflow, Time Machine, and Spotlight,

15  these -- this page is the only page that discusses any

16  of the hundreds, maybe thousands of features in this

17  machine.

18          And so to this day, these are very important

19  features.

20      Q    (By Mr. Carroll) Now, Mr. Bratic, in coming up

21  with your royalty rate, did you use the sales price of

22  the little box?

23      A    In part.

24      Q    Did you use the sales price of the computer?

25      A    I did.

2      A    Well, for the price, yes.

3      Q    Well, in other words, are you giving Mirror

4  Worlds, under your negotiation, .8 percent of the

5  purchase price of the software box?

6      A    No.  It's 8 percent, 8.8 percent of the

7  software box.

8      Q    Are you giving them 8.8 percent of what I

9  would pay at Best Buy to buy that?

10     A    Right.  It's 8.8 percent of $129.  That's what

11  this thing sells for.  So that's a royalty of $11.36 on

12  this box.

13     Q    Okay.  How about on the -- on the hardware?

14     A    It's less than 1 percent.

15     Q    What does that thing sell for?

16     A    This thing sold for about $1200.

17     Q    Okay.  Why is the royalty rate on the machine

18  less than the royalty rate on the software?

19     A    Well, because I have to recognize that what

20  Apple did is, they took the software and they put it in

21  the hardware; and when they did that, this, obviously,

22  has more features and functionality than does this

23  (indicates).

24          But as Dr. Levy also said, this machine would

25  not work without software.  Software is the -- is the

2    otherwise, it's just a machine.

3         It's like having a car without an engine.

4    It's not going to go very far.  In fact, it's not going

5    to go anywhere unless you push it.  So that's the point.

6    Q    Mr. Bratic, to your knowledge, based on what

7    you saw of the records that Apple produced, did Apple

8    conduct surveys of its customers to determine whether

9    these products we've sued and these features we've

10   accused were a big deal?

11   A    Yes.

12   Q    Tell the jury about that.

13   A    Well, Apple routinely conducts consumer

14   surveys.  They want to find out what is on the

15   consumer's mind, and they spend over $20 million a year

16   to find that out.  They spend $5.5 million every three

17   months.  That's according to Mr. Serlet's testimony.

18        So that's $22 million a year to find out what

19   this --

20   Q    By the way, I believe that's Serlet

21   (pronouncing).

22   A    Serlet?  Excuse me.

23   Q    That's what I was told.

24   A    Okay.  Serlet.  I'll drop the T.

25        So they spend that kind of money because they

2  customers about their features or products, what they

3  want, what they like, what they don't like, because

4  Apple has to stay competitive.

5       And so they do surveys to make sure that

6  they're offering products that people want and features

7  within those products.

8       MR. CARROLL:  James, let's pull up 731,

9  please.

10   Q    (By Mr. Carroll) What's --

11       MR. CARROLL:  Yeah, 731.

12       THE WITNESS:  Can I get some more water?

13       Thank you very much.

14   Q    (By Mr. Carroll) What -- what's this document

15  telling the jury, Mr. Bratic?

16   A    This is Apple's website.  This is an Apple

17  document, and it is talking about The Tiger Roars, which

18  is when Tiger came out.  They made a big splash about

19  Tiger, the operating system.

20       And if you'll look in here -- it's hard to see

21  on this version, but I had it blown up -- that they

22  mention that one of the newspapers in Chicago called

23  Spotlight revolutionary, and they said:  Revolutionary,

24  with a capital R.

25       MR. CARROLL:  Let's look at the second --

2        A      Right.

3        Q      (By Mr. Carroll) Jubilant and Successful.

4        A      Right.  Now -- so what it -- what it is here

5   is, see, you have on the left a New York Times article,

6   and it says:  Selling a vision of the future beyond

7   folder.  That's getting away from the clutter of files

8   and folders.

9               And the author here is talking about a person

10  that's already been talked about in court here, George

11  Gilder, who's an analyst for the New York Times, a

12  technology guy, and he says:  To try the Gelernter

13  system is to fall in love with it, and it will prevail.

14  It is elegant, easy, natural, beautiful, and it will

15  prevail.

16              Now, when you jump down here and look under

17  Spotlight in Apple's website, they mirror those

18  comments.  They say:  Calling Spotlight more elegant and

19  easier to use.

20       Q      Now, are these --

21       A      Oh, and by the way, that's the capital R,

22  Revolutionary, right under jubilant and successful.

23              So that's the Chicago Sun Times technology

24  analyst saying --

25       Q      And -- I'm sorry.  Go ahead.

2    with a capital R.

3         Q    Okay.  So the jury is clear, what is Tiger?

4         A    Tiger -- Tiger is the predecessor to Leopard.

5    It was -- it was the first software released by Apple

6    that had the first accused feature in it, which was

7    Spotlight.

8         Q    And we -- so that's Tiger, and we know about

9    Leopard.

10        A    Yes.

11        Q    And we've heard about something called Snow

12   Leopard.

13        A    Right.

14        Q    So do all three of those animals have the

15   accused features in them?

16        A    Yes.

17        Q    Are there any other -- is the zoo bigger than

18   those three?

19        A    Not for the software --

20        Q    Okay.

21        A    -- sold by itself.

22        Q    Okay.  So we're talking about the -- the --

23   the big cat cage --

24        A    Right.

25        Q    -- right?  Tiger, Leopard, Snow Leopard.

2      Q    And that catches the three features.

3      A    The three software features when sold by

4   themselves.

5           Now, what they did is, then they took those

6   software products, and they put them in the hardware.

7   They -- they bolted them in or they, you know, installed

8   them in the software.  So when -- the hardware.

9           So when you go to the store and you buy this,

10   you plug it in, it comes ready to play, and the software

11   is there to operate the machine.  And without the

12   software, the machine wouldn't work.

13      Q    So if I understand all of that right, if I had

14   14 -- how much did that -- the --

15      A    This cost $1200.

16      Q    So if I had 1200 bucks, I could buy it loaded?

17      A    Yes.

18      Q    But if I didn't and wanted to soup up my

19   machine, I could buy one of the big cats.

20      A    For $129.

21      Q    Okay.

22      A    If you had an older version of Apple -- of the

23   Apple PC, and you wanted it upgraded without going out

24   and buying a brand new PC.

25      Q    And did you run your numbers on all three --

2      A      Yes.

3      Q      And I say all four.

4      A      Yes.

5      Q      Yeah, all four ways.

6      A      All four ways.

7      Q      And that's what you came up to, the $72

8 billion worth.

9      A      That's correct.

10      Q      Okay.  Did you do any kind of adjustments to

11 try to take into account the fact that there were other

12 features that folks might buy one or the other for,

13 either the software alone or the hardware with the

14 software in it?

15      A      Yes.

16      Q      Tell the jury what you did.

17      A      Well, the Apple doesn't separately place a

18 value on Spotlight, Coverflow, and Time Machine, whether

19 it's either in this product or whether it's in the

20 machine.  Apple doesn't do that.  The witnesses

21 testified they don't do that for any of their features.

22            So what I had do is, I figured out what was

23 the value of the three accused features in either this

24 product, when sold like this in a box, or when the

25 accused features are found in the PC.

2   apportionment or an allocation of the value and the

3   profits attributed to Spotlight, as an example, compared

4   to everything else that Apple does and has contributed

5   to the sale of these products.

6        Q    Can you give the jury a breakdown as to how

7   you crunched the numbers?

8        A    Sure.

9             THE WITNESS:  First of all, if you will

10  go to Slide -- let me pull this for you.  If you will go

11  to Slide -- I'm just about there -- Slide 28 -- 27.  I'm

12  sorry.

13       A    All right.  This is a page out of one of the

14  Apple customer surveys that was done.

15            THE WITNESS:  And then if you'll go to

16  the next slide, please.

17       Q    (By Mr. Carroll) Well, let me interrupt you.

18       A    Sure.

19       Q    Did you see any evidence in the Apple records

20  as to what kind of annual budget they spent on those --

21  or they have for those surveys?

22       A    Yes.  They spend $22 million a year.

23       Q    Every year?

24       A    Every year.

25       Q    To find out what the customer wants.

2      Q      Okay.

3      A      Now -- okay.  So what I've showed you is, the

4  slide that we just looked at, which is on the right here

5  on the screen, over here (indicates) -- all right.  That

6  was taken from -- that's just a copy of the last slide

7  we saw.

8             Now, this lists these 10 features, and Apple

9  said these are the most beneficial Tiger features.

10  Apple wanted to know about these 10 features from their

11  customers.  And what I'm doing is, here, this is another

12  internal Apple e-mail where Apple is identifying what

13  they consider to be key features.

14             And if you'll see, it says:  Key features

15  colon, and it says:  Spotlight Dashboard, et cetera.

16  They're the exact same 10 features in this circle here

17  that you find right here (indicates).

18             So Apple -- and by the way, there are other

19  internal e-mails, there's Apple press releases that also

20  focus on what are the key features in Tiger.  Because

21  Tiger had over 200 features when it came out.  It wasn't

22  just these 10 features.  But these are the 10 they

23  wanted customers to tell them about.

24      Q      How do you know that?

25      A      Well, because I've got these documents that

2    this survey said -- one of the objectives of this

3    particular survey was to find out, what are the factors

4    that drive customer purchasing behavior?

5        Q    Mr. Bratic, is it -- so that you did that same

6    kind of an analysis for all three accused features in

7    all three of the big cats:  Tiger, Leopard, Snow

8    Leopard, and the hardware?

9        A    Well, I applied this methodology to them, yes.

10       Q    Okay.  So did you end up reducing or

11   apportioning the individual sales prices for the

12   software and the hardware to reflect what you believed

13   to be a fair value that these accused features brought

14   to that product?

15       A    Yes.

16            THE WITNESS:  Go to the next slide,

17   please, and I'll give you an...

18       A    So what I did is, I took that survey -- now,

19   that survey we looked at on the previous page had three

20   bars for every product, so the Spotlight had three bars.

21            They asked three different types of customers,

22   consumers, which were the most beneficial features.  And

23   so that's how these products ranked.

24            So all I did was, I figured out what the

25   responses were from these survey participants, and I

2   because now, again, I'm trying to find out, what is the

3   value that should be associated with the $129 sales

4   price of this particular product when sold like this.

5           So I determined that 23 percent of the sales

6   price would be attributed to Spotlight based on how

7   consumers responded as to how they found these -- this

8   to be the most beneficial feature.

9       Q    (By Mr. Carroll) And you did that with all the

10  other products?

11      A    Right.  So --

12      Q    I'm sorry.  Go ahead.

13      A    No.  I was just going to say, the next slide

14  focuses this issue.

15      Q    Let me interrupt you.

16          So the orange highlight --

17      A    Yeah.

18      Q    -- is where some -- this is some consumer,

19  right?

20      A    Correct.

21      Q    Some consumer that Apple wanted to hear from

22  says:  I think Spotlight alone is worth the upgrade

23  price.

24          What's the upgrade price?

25      A    $129.

2       to get Spotlight.

3              But I didn't do that.  I said you should only

4       take 23 percent of the price of Spotlight, and then I

5       have to make a further adjustment for the costs and the

6       profits.

7              But the other thing is, if you'll look here --

8                   THE WITNESS:  Oops.  Sorry.  I just --

9       how do I clear that?  How do I turn it off?  I did it.

10                  Okay.  There we go.

11      A    If you look here, there was another survey

12      they did that said 24 percent.

13             Survey respondents seem to agree 24 percent

14      cited the new searching technology as Tiger's most

15      important new feature.

16             That's Spotlight.  So that's consistent with

17      the 23 percent from the other survey you just saw.

18      Q    All right.  And again -- and I know the jury

19      gets this, I think -- all of this information is the

20      information Apple pays 22 million bucks a year to get.

21      A    Correct.

22      Q    And you did this same analysis for all the

23      products and all the features?

24      A    Yes.

25      Q    Can you run through, in summary form, what

2   is for each of the applicable products?

3                    THE WITNESS:  If you will go to Slide 32.

4                    Oh, and by the way, could I get my water

5   back?

6                    MR. DIAMANTE:  Sorry.  I didn't drink it.

7                    THE WITNESS:  Thanks.  I'm getting kind

8   of thirsty.  Thank you very much.

9        Q    (By Mr. Carroll) Okay.  What do you want --

10   there we go.

11       A    Okay.  There's -- this is the math.

12            So what I did is, I -- I knew that the selling

13   price of this product of $129.  The profit margin on

14   this -- software enjoys very high profit margins.

15   There's a lot of thinking that goes into it, and they

16   get to sell it for a higher price.

17            So Apple generates about 76 percent profit on

18   each box sold like this.  That gives me profits of $98.

19   You see the $98 there?

20            Then -- oh, I'm not very good with this.  Let

21   me turn it back.  Whoops.  Okay.  Well, there it goes.

22            What I then did is, I took that 23 percent

23   from the survey results where people said Spotlight was

24   the most important feature in that survey among those

25   others products considered, those features; and then I

2  me that the profits attributed to Spotlight are now

3  $22.71.

4          So I took a big haircut here, because I'm only

5  using 23 percent of the profits, not a hundred percent

6  of the profits, like that customer said that they'd be

7  willing to pay.

8          Now the issue becomes how do Apple and Mirror

9  Worlds agree, in a hypothetical negotiation, to share in

10  this $22.71 of profit?

11      Q    And so what's your opinion as to how that

12  would have come out?

13      A    Well, there are some significant dynamics to

14  the hypothetical negotiation, which, in my view, would

15  have put a significant amount of bargaining power in

16  Mirror Worlds' hands at that hypothetical negotiation,

17  meaning they would have -- like you used the word

18  whipping hand, so --

19      Q    Starting with Apple was infringing.

20      A    Correct.

21      Q    Patent's valid.

22      A    Correct.

23      Q    What else?

24      A    Well, according to Dr. -- according to

25  Dr. Levy, based on my interviews with him, there's no

2    was a work-around or a design-around regarding these

3    patents.

4             In other words, there's no other way for Apple

5    to provide these features to its customers that have the

6    same features and functionalities and do it in a

7    non-infringing way.

8             And so that means Apple either has to take a

9    license, or they have to give their customers back $72

10   billion of product, because they're not allowed to sell

11   it.

12            So that's an example of the significant

13   bargaining power in Apple's hands.

14            And of course, these products, these patented

15   features, are universal because they're in 70 percent of

16   all Apple products sold since infringement first began.

17   I mean, Apple has sold over 124 million units.  What I

18   mean, individual pieces like this or like this computer

19   (indicates).  That's 124 million of them have been sold.

20   That's a lot.  And they all have the patented feature.

21       Q    So if that were to happen, they would go from

22   a big shiny red Macintosh to a crabapple?

23       A    Something like that.

24       Q    Okay.  All right.  To wind this up then, if I

25   get this right, for each one of these products, you

2    consumer demand for the -- for the features --

3         A    Correct.

4         Q    -- and then you figured out what the parties

5    would have split at the negotiation based on all the

6    hypothetical assumptions that the law tells you to use

7    and the ones you thought would come into play --

8         A    Right.

9         Q    -- and you came up with a split for all the

10   products.

11        A    Right.

12        Q    Okay.

13        A    And so what I did is, I did the split 50/50.

14   So I gave another haircut to Apple.  On top of the

15   23-percent haircut here to Apple, Apple took -- I mean,

16   Mirror Worlds -- Mirror Worlds takes yet another haircut

17   of 50 percent.

18             So now the royalty here -- you see it says

19   Recognition Interface, all of this?  Their royalty is

20   only $11.36.

21        Q    Okay.  And that's --

22        A    And Apple keeps the profit of 30 -- $11.36

23   attributed to Spotlight as well.  Plus, they keep the

24   profits on the rest of the product, too.

25        Q    So they get -- but when they walk away, it's

2      A    Oh, no.  It's only a 50/50 split of the

3   incremental benefit associated with Spotlight.

4           As to -- as to Apple, Apple keeps -- you know,

5   they keep, for every dollar -- this whole thing sold for

6   $129.  So Apple keeps about a hundred and -- $118, Apple

7   keeps to pay all its bills and to pay itself profits.

8      Q    They keep 92 cents out of every buck.

9      A    Correct.

10     Q    Okay.

11          MR. CARROLL:  Let's go to Slide 47.

12     A    That's only on the software.  When it's on the

13  machine, they keep 99 cents.

14     Q    (By Mr. Carroll) They keep 99 cents on the

15  machine?

16     A    Correct.

17     Q    Okay.

18          MR. CARROLL:  Let's go to Slide 47 of

19  Bratic's opinion.

20          James, I'm looking for a chart.  Oh,

21  okay.

22     Q    (By Mr. Carroll) What's -- before we get off

23  this one, what's this telling us?

24     A    Well, this is just saying that if you assume

25  the '227 patent is a valid patent and has been

2   HN, hypothetical negotiation, occurs in April 2005, and

3   the damages of 625 million in royalties.

4           If you assume that the '227 patent is not a

5   valid patent or has not been infringed, and we're only

6   dealing with the '313 patent and the '427 patent, then

7   we have to have a separate hypothetical negotiation

8   September 2006 using the same methodology I just walked

9   through with you but different royalty rates, and you

10  end up with a -- royalties due of $748 million.

11      Q   And again, it's more because why?

12      A   Well, because some of the facts changed at the

13  time of the -- this hypothetical negotiation about the

14  products' profitability and the like, as well as the

15  survey results they were using September of 2006 for

16  Leopard are different survey results than the ones for

17  Spotlight, because we're dealing with a different

18  product.

19      Q   Okay, Mr. Bratic.  So if the jury believes,

20  after hearing everything in evidence, that all of the --

21  our patents are valid and all of them have been

22  infringed, in your opinion, which number should they

23  apply the law-required reasonable royalty?

24      A   Well, it would be $625 million, assuming that

25  all three patents have been infringed.  And if the '227

2    million.

3        Q    So if for whatever reason, they believe that

4    we didn't prove infringement of that first '227, the

5    price gets steeper for Apple --

6        A    That's correct.

7        Q    -- because of the more infringing feature.

8        A    Right.  And the survey results.

9        Q    All right.

10       A    It was a different survey that was done.

11            MR. CARROLL:  Can you find that one?

12            THE WITNESS:  It's No. 33.

13            MR. CARROLL:  No. 33.

14       Q    (By Mr. Carroll) What's this slide telling the

15   jury?

16       A    This is looking at an example of -- I'm trying

17   to put this in perspective.

18            We have the 129-dollar sales price for this

19   product; we have operating profits of $98; and all I'm

20   showing is that 11.36 percent -- $11.36 royalty on this

21   particular software, the Tiger, Leopard, for example,

22            Apple still keeps the lion's share -- no pun

23   intended -- keeps the lion's share of its profits.  They

24   keep 88 -- 88 percent of their profits.

25            So if you look, that's that difference between

2    that Apple keeps when it sells this product.

3              So I'm only asking for 1/9 of the profits on

4    this product, and 1/20 or 5 percent of the profits when

5    these products are sold with --

6        Q    And so -- I'm sorry.  Go ahead.

7        A    No.  And I'm just saying, Apple keeps the vast

8    majority of its profit.

9        Q    And that's to distribute to its good

10   shareholders, like Dr. Tribble over here?

11       A    Correct.

12       Q    All right.

13             MR. CARROLL:  Pass the witness.

14             THE COURT:  All right.

15             Cross-examination.

16             MR. RANDALL:  Thank you, Your Honor.

17                 CROSS-EXAMINATION

18   BY MR. RANDALL:

19       Q    Mr. Bratic, my name is Jeff Randall.  We

20   haven't met before, have we?

21       A    I don't believe so.

22       Q    Okay.

23       A    Nice to meet you.

24       Q    It's nice to meet you.

25             Mr. Bratic, you've been an expert opining on

2       A    That's correct.

3       Q    All right.  And during some of those -- that

4   work that you've engaged to obtain your experience, you

5   have opined in IP cases, right?

6       A    I'm not sure what's your question.

7       Q    Intellectual property cases.  You've worked on

8   intellectual property cases?

9       A    Yes.

10      Q    Okay.

11      A    Patent cases are a type of intellectual

12  property.

13      Q    Including software cases?

14      A    Oh, yes.

15      Q    All right.  Software cases involving trade

16  secrets, misappropriation?

17      A    Some.

18           In other words, the trade secrets cases that

19  I've been involved in have involved a variety of topics,

20  everywhere from software to drilling bit technology to

21  manufacturing processes.

22      Q    All right.  Have you ever analyzed any license

23  agreements for technology, as opposed to patent license

24  agreements?

25      A    Yes.

2      A      In fact, I've negotiated them.

3      Q      Okay.  So you've analyzed and you've opined on

4   the value of technology license agreements that do not

5   involve patents, correct?

6      A      Yes.

7      Q      All right.  And you're familiar with those,

8   right?

9      A      Yes.

10     Q      Okay.  And so a party doesn't need to take a

11   license to technology only if there is patents involved,

12   correct?

13     A      I'm not sure what the question is.

14     Q      All right.  Did you involve -- did you analyze

15   any technology license agreements in this case in

16   forming your opinions?

17     A      Yes.  Apple executed a number of license

18   agreements they produced in this case.

19     Q      All right.

20     A      I've studied them.

21     Q      You've studied the license agreement --

22     A      They're all mentioned in my report.

23     Q      Excuse me.  You've studied the license

24   agreement that Apple entered into to purchase a license

25   to Coverflow that we've been talking about in this case,

```
 2      A    I believe -- I'm trying to remember which one

 3 that was.

 4      Q    Let me refresh your recollection.

 5           Apple took -- investigated a technology, the

 6 Coverflow technology.  They investigated it; they looked

 7 at it; they negotiated a technology license agreement

 8 for that; and they purchased a technology license

 9 agreement for Coverflow for $70,000, didn't they?

10      A    You'll have to remind me which license

11 agreement that was, because there were a lot of them.

12      Q    You're not familiar --

13               MR. RANDALL:  Strike that.

14      Q    (By Mr. Randall) Did you consider, in forming

15 your opinions in this case that you provided to the

16 jury, that Apple negotiated a license agreement and

17 entered into a technology license agreement to obtain a

18 technology license to utilize Coverflow in its products

19 for $70,000?

20      A    What I recall is that Apple executed a license

21 agreement for some technology associated with Coverflow,

22 but it certainly wasn't the Gelernter technology.

23 Gelernter (pronouncing).  Sorry.

24      Q    Did you -- did you draw any distinctions at

25 all between the Coverflow technology that Apple licensed
```

2        A    Yes, I did.

3        Q    You made the distinctions?

4        A    I made the distinction based on my interviews

5   of Dr. Levy.

6        Q    All right.  So the Coverflow technology that

7   Apple licensed for $70,000 is different in your view

8   than Gelernter's inventions; is that right?

9        A    Yes.

10       Q    Thank you.

11       A    That's absolutely correct.

12       Q    Thank you.

13            And you understand that the Coverflow

14  technology that Apple licensed for $70,000 did not

15  involve any patents, right?

16       A    That's correct.

17       Q    Okay.

18       A    That's my recollection, not having the

19  document in front of me.

20       Q    Now, in reaching -- in reaching your opinions

21  in this case, you attempted to determine what the

22  parties would negotiate a license for, correct?

23       A    Yes.

24       Q    All right.  And so it's a hypothetical

25  negotiation, right?

2      Q    All right.  Now, who were the two parties that

3   would have engaged in this hypothetical negotiation?

4      A    It would have been Recognition Interface and

5   Apple.

6      Q    Okay.  And as the core of your evaluation of

7   what these parties would have arrived at in terms of a

8   royalty figure, you have to determine what both sides

9   would agree on, correct?

10      A    Correct.

11      Q    Okay.  And so you go back in time, and under

12   your opinion, you go back to April of 2005, and you

13   determine, if Recognition Interface were sitting down at

14   the table, and Apple were sitting down at the table, and

15   they were negotiating for a license on these patents

16   what would they end up paying for that license, right?

17      A    Well, they would agree to the royalty rate,

18   what structure for the royalty.

19      Q    Well, they would agree what the royalty was;

20   whether it's a rate or whatever, they would agree what

21   the payment was, right?

22      A    That's part of it they would agree to.

23      Q    Okay.  All right.  Now, in that negotiation, I

24   think Mirror Worlds -- the demonstrative they put up,

25   only one side, Apple, had their cards turned up on that

```
 2              Could you see that?

 3        A     That's right.

 4        Q     Yeah.

 5        A     But the cards are up for both parties.

 6        Q     That's right, right?

 7        A     Sure.

 8        Q     So both parties flip their cards up, and both

 9   parties say you can know everything I know, and both

10   sides know everything about each other, right?

11        A     That's absolutely correct.  It's an open book.

12        Q     Okay.  Great.

13              And so back in --

14                MR. RANDALL:  Would you pull up DX -- I'm

15   sorry -- B5?

16        Q     (By Mr. Randall) All right.  Now, this is a

17   timeline.  I just want to ask you a few questions about

18   this timeline.

19        A     Boy, it's busy.

20        Q     You understand that starting with Gelernter --

21   see the box that says Gelernter on the left-hand side?

22        A     Dr. Gelernter (pronouncing).

23        Q     Yes.  I'm sorry.  We'll just say Dr. G.

24        A     Let's just call him Dr. G.

25        Q     There we go.  All right.
```

2      Q      So G transfers these patent rights -- assigns

3   them to Yale, correct?

4      A      Way back when, yes.

5      Q      Yes, in '96.

6      A      Correct.

7      Q      Freeman transfers them to Lifestreams, and

8   then Lifestreams transfers them to Yale, right?

9      A      Well, we're going a little fast.  I'm sorry.

10     Q      I know.  I'm on a time clock.  I'm trying

11  to --

12     A      I understand, but I'm trying -- I've got a

13  moving screen and a -- and a -- and a moving mouth.  I'm

14  trying to sync those.

15     Q      All right.

16     A      So help me out here and just put that -- when

17  you're talking about it, have the screen in front of you

18  where you want it.

19     Q      Mr. Bratic, in '96 --

20     A      Yes.

21     Q      -- Freeman transfers these patent rights to

22  Lifestreams, and then in July of '97, they go to Yale,

23  right?

24     A      Yes.

25     Q      All right.  So in July of '97, Yale has these

2      A    Yes.

3      Q    All right.  Now, that deal between Gelernter

4  or Dr. G and Yale where he transferred his patent

5  rights, he did that under his own contract with Yale,

6  didn't he?

7      A    That's what I -- that's my recollection.

8      Q    Right.  That wasn't a related transaction or

9  anything; it was just a -- it was a contract for

10  employment.  He was an employee at Yale; he was a

11  professor.  He agreed to be a professor and get paid for

12  that, and in return, he agreed to assign all of his

13  inventions to Yale, right?

14      A    Right.  That's why it's -- it's -- it's a

15  related-party transaction.

16      Q    Well, he's a smart guy.  He agreed to that on

17  his own, didn't he?

18      A    Yes, but he agreed because he knew, when he

19  came to Yale, that's the terms of his employment.

20      Q    Okay.  That's fine.  That's all I want to

21  know.

22      A    So it's not like him not being part of Yale

23  and selling his patents to Yale.

24      Q    We'll just take it a step at a time.

25      A    Sure.

2      A    Right.

3      Q    -- when they end up -- Yale ends up

4   transferring them to Mirror Worlds Technology in

5   December 21 of '99, right?

6      A    Well, I'll take your word on the date.  It was

7   in that timeframe.

8      Q    Okay.  And Yale transferred these patents to

9   Mirror Worlds Technology for $598,000 in December of

10   '99, right?

11      A    Correct.

12      Q    Okay.  And out of that deal, out of that

13   transaction, pursuant to Dr. Gelernter's deal with Yale,

14   he got $50,000, didn't he, approximately?

15      A    I -- I think that's my recollection.

16      Q    All right.  And then Yale transfers the

17   patents to Mirror Worlds Technologies.  So Mirror Worlds

18   Technologies, as of December of '99, they have the

19   patents, right?

20      A    Yes.  I'll take your word on these precise

21   dates --

22      Q    All right.

23      A    -- because I don't have the documents in front

24   of me.

25      Q    Okay.  And then you know -- you've heard this

2    Mirror Worlds Technology received approximately $9

3    million in investment from Abacus, which is Mr. Weil's

4    family company; and another $9 million from other

5    inventors, right -- other investors, correct?

6         A    Yes.  And the testimony, I believe, was closer

7    to $20 million in total.

8         Q    All right.  So Mr. Weil and his family had

9    approximately half the investment in Mirror Worlds, and

10   these other investors had the other half, approximately,

11   right?

12        A    Well, I don't know.  I don't -- I don't recall

13   specifically --

14        Q    All right.

15        A    -- what their percentages were.

16        Q    So then in June -- in June, June 18, 2004,

17   Mirror Worlds sells these patents to Recognition

18   Interface for $210,000, right?

19        A    Correct.

20        Q    Okay.  And you realize, because you've studied

21   this case, that in June of 2004, right about that same

22   time, right about the same time that Mirror Worlds sells

23   these patents to Recognition Interface for $210,000,

24   Apple publicly displays its operating system at WWDC

25   2004, right?

2    What they did is, they -- Steve Jobs -- that's where he

3    talked about Spotlight being revolutionary.  That's the

4    conference where he was talking about what was at that

5    time an complete product.

6        Q    Sir, at that conference in June of 2004, Apple

7    handed out 3,000 copies of the accused infringing

8    software, correct?

9        A    No, that's not true at all.

10       Q    That's software wasn't infringing?

11       A    It was not.

12       Q    Okay.  Do you --

13       A    There's no evidence in this case that the

14   3,000 preview copies that Apple passed out at that

15   Worldwide Development Conference was infringing, because

16   if you go to Dr. Feiner's report, he says it's his

17   understanding that it was a complete product, and he got

18   that understanding from Apple.

19            Nobody analyzed that product to figure out if

20   it was infringing or not.

21            And at my deposition --

22       Q    I'm sorry.

23       A    -- I provided a list of all the different

24   aspects of the code, some of which, as of December 2004,

25   had zero percent completion.

2    to the public.  It just couldn't.

3        Q    Do you -- do you establish your date of the

4    hypothetical negotiation at the time a party either

5    makes or sells something that is accused to infringe?

6        A    I based my --

7        Q    Is that a yes or a no?

8        A    Well, repeat your question, please.

9        Q    Do you base -- one of the factors in

10   determining when a hypothetical negotiation would take

11   place between parties is when one of the parties makes

12   or sells an accused infringing product, correct?

13       A    Well, no.  That's not the whole story.  It's

14   make, use, offer for sale, or sell.

15       Q    I didn't say it's the whole story; I said

16   that's part of the factor, right?

17       A    It's part of the factor, right.

18       Q    Okay.  So --

19       A    And the only evidence of an infringing product

20   is the product that was released to the public in April

21   2005.

22       Q    All right.  Assume for a moment that the

23   product that Apple distributed 3,000 copies of in June

24   of 2004, assume for a moment that that was the

25   infringing copy, okay?

2    facts, making that hypothetical?

3         Q    I want you to assume that for a moment.

4         A    Okay.

5         Q    Would that be the time of the hypothetical

6    negotiation --

7         A    Yes.

8         Q    -- June -- okay.

9              And you realize that under your view, the

10   hypothetical negotiation took place slightly later, in

11   April of 2005, correct?

12        A    Correct.

13        Q    Okay.  Fine.

14        A    I'm sorry.  Yes, that's true.

15        Q    And so in this presentation that I've got in

16   front of you, the hypothetical negotiation under your

17   opinion would occur when Recognition Interface owned --

18   owned the patents, right?

19        A    Correct.

20        Q    All right.  So at that time in the timeline in

21   the life of these patents, under your view, Mirror

22   Worlds had sold the patents to Recognition Interface for

23   $210,000 in June of 2004; and then slightly thereafter,

24   in April of 2005, this hypothetical negotiation would

25   take place, right?

2      Q      Okay.

3      A      And based on the evidence as I've seen it.

4      Q      All right.  So at that hypothetical

5  negotiation, Apple would know that Mirror Worlds had

6  just sold several months prior, the patents for

7  $210,000, right?

8      A      Right.  They would know that was a

9  related-party transaction, too, because all the cards

10  are up.

11      Q      They would know that, right?

12      A      Yes, they would.  They would know it's a

13  related-party transaction.

14      Q      And they would also know --

15      A      Yes.

16      Q      -- that Mirror Worlds was about to, at the end

17  of 2007, sell the patents for $5 million to Plainfield,

18  plus a 19-percent retainer, right?

19      A      No, that's not correct.  You mentioned Mirror

20  Worlds; it's Recognition Interface.

21      Q      Okay.  I apologize for that.

22              So they would know that.  Apple would know

23  that Recognition Interface, sometime down the road, was

24  going to sell those patents for 5 million, right?

25      A      Yes.

2  take place between a sale of the patents for $210,000

3  and a subsequent sale of the patents for $5 million,

4  right?

5      A    Correct.

6      Q    Okay.

7      A    Knowing that in those two transactions there

8  was no evidence that the patents were valid and had been

9  infringed by anybody, and there was no issue about

10 design-around alternatives.

11     Q    But at that -- that -- that --

12     A    Because those companies weren't in the

13 business of selling a product.

14     Q    But at the hypothetical negotiation, you said

15 that the parties know everything.  They know --

16     A    That's right.

17     Q    -- there's infringement.  They know -- Apple

18 knows that the -- that the patents were just sold for

19 210,000.  They know that they're going to be, in the

20 future, sold for 5 million.  Apple knows that when

21 they're negotiating, right?

22     A    Yes.  And Apple also knows --

23     Q    I'm sorry.  Just say yes.  Yes.

24     A    That's only part of what they know.

25     Q    I don't want to argue.  I just want an answer

2       A    I'm just saying that's an incomplete --

3       Q    Okay.

4       A    -- thought.

5       Q    And --

6       A    That's all.

7       Q    -- during that time period, a -- that was for

8    the purchase of all the patents.  I mean, not a license,

9    right?  The license would be less than that, right?

10      A    Well, it depends on the circumstances.

11      Q    But that was for a sale of all of it,

12   everything.  Not just a license --

13      A    A transfer of ownership.

14      Q    Of ownership.

15      A    Correct.

16      Q    Right.

17      A    That's right.

18      Q    Okay.

19      A    That is correct.

20      Q    Now I want to ask you a couple of questions

21   about the parties to this suit.

22           MR. RANDALL:  Can you put up 001?  Maybe

23   it's 01.  There we go.

24      Q    (By Mr. Randall) Okay.  So you followed the

25   transfer of these patents, correct?

2    that were on the timeline you had.

3         Q    So you understand that this Plainfield group

4    of hedge fund companies owns 74 percent of these

5    patents, correct?

6         A    Well, I don't recall that I knew the exact

7    percentage until I saw this slide yesterday and assuming

8    this is correct.

9         Q    Well, you've analyzed the sales of these

10   patents, right?

11        A    Yeah, right.

12        Q    And then pursuant to the terms of the sales of

13   these patents and the sale from Recognition Interface to

14   Plainfield, this hedge fund, Plainfield owns 74 percent

15   of the patents, right?

16        A    Something like that.

17        Q    All right.  So 74 cents of every dollar that

18   you have opined that Apple owes goes to Ed Stone and his

19   colleagues at this hedge fund, right?

20        A    Well, that's the facts.

21        Q    Is that a yes?  Yes?

22        A    Yes.

23        Q    Okay.

24        A    They're the ones who own the patents.

25        Q    And Recognition Interface, this gentleman,

2      A     Net of taxes.

3      Q     Have you seen Frank Weil here in the

4   courthouse anywhere?

5      A     No.  No.

6      Q     Do you know why he's not here?

7      A     No, I don't.

8      Q     Do you know why this Ed Stone or anyone from

9   Plainfield Holdings, the hedge fund, isn't here?

10     A     I assume it's because they're represented by

11  counsel.  I don't know.

12     Q     Okay.  All right.  And then the law firm gets

13  5 percent, right?

14     A     I believe that's right.

15     Q     All right.  Do you agree with Mr. Satow when

16  he said that Frank Weil, as Chairman of the Board of

17  Mirror Worlds Technologies, when he sold the patents for

18  $210,000, committed -- he breached his fiduciary duty to

19  those other shareholders that invested $9 million in the

20  company?

21     A     I don't have an opinion on that.

22     Q     Okay.

23     A     It sounds like a legal question.  Mr. Satow is

24  a lawyer.

25     Q     He's a securities lawyer, right?

2          Q    Yeah.

3               Now, would you agree that one of the key

4    differences between your opinion regarding damages in

5    this case --

6                    MR. RANDALL:  Can we go back to the

7    previous slide?  It is B5.

8          Q    (By Mr. Randall) Would you agree that one of

9    the key differences between your opinion in this case

10   and the opinion of Apple's damages expert in this case

11   is how much weight you attribute to the actual sales of

12   the patents -- not just a license, but the actual sales

13   of the patents that occurred right before the

14   hypothetical negotiation date and a couple of years

15   after?

16              And that would be $210,000 and 5 million.

17   Would you agree that that's one of the most significant

18   differences between your opinions?

19         A    That's one of them.

20         Q    Okay.

21         A    The other one is he ignored the 72 billion in

22   sales.

23         Q    Right.  But that's -- that -- under this

24   circumstance, why wouldn't Apple just have sat down at

25   this hypothetical negotiation knowing that Mirror Worlds

2    for 5 million and just bought them for 5 million?

3         A    Well, because these transactions were with

4    companies that weren't in the business of making

5    products.  They're in a very different situation than

6    Apple that actually sells products.

7              So if Apple were sitting down there and

8    wanting to buy them for 5 million, they wouldn't have

9    sold it for 5 million, because the same shareholders

10   who -- most of the same shareholders that were

11   shareholders in Mirror Worlds became shareholders in

12   Recognition Interface, and they got an opportunity to

13   participate in profits from licensing.

14             Their program was not to sell product.  Their

15   objective was to license technology or partner with

16   technology companies, which is a very different

17   transaction than Apple coming in and saying:  We're

18   Apple.  We want to put this in 124 million individual

19   infringing products and distribute it all over the

20   country for the next five-and-a-half years.

21        Q    Okay.  Let me --

22        A    That's a very different model.

23        Q    Okay.  So, in your opinion, though, you

24   believe Apple began infringing and you assume Apple

25   began infringing in April of 2005, right?

2    Q    Okay.

3    A    But nobody knew that at that time.

4    Q    Excuse me.  Can we just...

5         So April of 2005, you believe and you assume

6    that Apple is infringing, right?

7    A    For the hypothetical negotiation --

8    Q    Okay.

9    A    -- yes.

10   Q    And then you are also assuming that when

11   Recognition Interface sold the patents to Plainfield in

12   December of 2007, some two-and-a-half years later --

13   two-and-a-half years later, you're assuming that they

14   didn't know that anyone was -- out there was infringing,

15   right?

16   A    Well, they would not have known the extent of

17   any infringement, if there was infringement.

18   Q    But -- but you -- you're assuming that Apple

19   had been infringing for two-and-a-half years, right?

20   A    In the hypothetical negotiation.  We're

21   sitting here at the time of trial looking back and

22   getting an accounting for those infringing sales.

23        There's no evidence that I've seen that either

24   Apple -- excuse me -- Mirror Worlds -- in fact, when

25   Mirror Worlds transferred -- according to what's on the

2   Interface, Apple hadn't even started selling any

3   infringing products.

4           Fast-forward to 2007, I've seen no evidence in

5   this case that Recognition Interface had any information

6   from Apple, at that time they made that transaction, as

7   to how much product Apple was selling.

8   Q    You're guessing that Recognition -- you're

9   guessing that Recognition Interface did not know that

10  Apple was engaged in selling all these products for

11  two-and-a-half years?

12  A    No, I didn't say that.

13  Q    Okay.  Let me ask you another question.

14  A    I didn't say that at all.

15  Q    Let me ask you another question.

16       Frank Weil --

17  A    Yes.

18  Q    -- made quite a return on his investment,

19  didn't he, from -- when he purchased the patents for

20  Recognition Interface right around the time of at least

21  Apple's damages expert's hypothetical negotiation in

22  June of 2004, when Frank Weil bought the patents for

23  $210,000 for Recognition Interface in 2004, in June, and

24  then he sells them in December of 2007 for 5 million, he

25  made quite a return, didn't he?

 2      Q      Sure.  Okay.

 3                    MR. RANDALL:  No further --

 4      A      Not just him.

 5                    MR. RANDALL:  No further questions, Your

 6  Honor.

 7                    THE COURT:  All right.  Redirect?

 8                    MR. CARROLL:  No, Your Honor.  We reserve

 9  the right to re-call Mr. Bratic in our rebuttal case.

10                    THE COURT:  All right.  Very well.  You

11  may step down.

12                    THE WITNESS:  Thank you, Your Honor.

13                    THE COURT:  All right.  Who will be your

14  next witness?

15                    MR. CARROLL:  I think we're done.  Let me

16  confer.

17                    We rest.

18                    THE COURT:  All right.  Very well.

19                    All right.

20                    MR. RANDALL:  We have a motion to bring.

21                    THE COURT:  Excuse me?

22                    MR. RANDALL:  We have a motion to bring.

23                    THE COURT:  Let's see.  We've been going

24  for an hour-and-a-half.  All right.  We'll take a

25  15-minute -- yeah.  Let's call it a -- yeah -- 15-minute

2    15 minutes.

3                    And Ladies and Gentlemen of the Jury,

4    just so you know, the Plaintiff has rested their case,

5    and when we come back, then we'll begin hearing evidence

6    from the Defendants' case.

7                    So we'll be in recess until 2:25.

8                    COURT SECURITY OFFICER:  All rise for the

9    jury.

10                    (Jury out.)

11                    THE COURT:  Please be seated.

12                    All right.  Does the Defendant have a

13   motion it wishes to make?

14                    MR. RANDALL:  Yes, Your Honor.

15                    Apple moves for judgment as a matter of

16   law, pursuant to Federal Rule of Civil Procedure 50(a),

17   on all of Mirror Worlds' claims and Apple's

18   counterclaims.

19                    I can, Your Honor, if you'd like,

20   summarize that motion orally, or we can submit a written

21   motion later tonight, if the Court would prefer to do it

22   that way.

23                    THE COURT:  Go ahead.

24                    MR. RANDALL:  Okay.  First, Your Honor,

25   Mirror Worlds has failed to establish literal

2  because the accused products do not implement one,

3  streams; two, a timestamp to identify; three, a receding

4  foreshortened stack; four, two operating systems; nor

5  five, sliding without clicking to display a glance view.

6                For example, Dr. Levy did not offer any

7  testimony regarding literal infringement and instead

8  only discussed infringement under the Doctrine of

9  Equivalents.

10                Judgment as a matter of law of

11  non-infringement should, therefore, be granted for all

12  claims.

13                Second, Mirror Worlds has failed to

14  establish any infringement under the Doctrine of

15  Equivalents, because there is no evidence for a

16  reasonable jury to find that the differences between the

17  accused products and Mirror Worlds' patents-in-suit are

18  insubstantial.

19                The accused products are fundamentally

20  different from Mirror Worlds' patents and do not

21  implement streams, stream-based operating systems, or

22  any other time-based storage, indexing, and searching

23  systems.

24                Judgment as a matter of law on

25  non-infringement under the Doctrine of Equivalents

2                Also, Your Honor, Mr. Levy clearly did

3        not ever apply an appropriate literal infringement

4        standard in his opinions.

5                He also did not understand nor apply an

6        appropriate Doctrine of Equivalents standard in reaching

7        his opinions.

8                Third, Your Honor, Mirror Worlds has

9        presented no evidence or testimony of induced

10       infringement, because no evidence exists for the

11       following required elements:

12               The accused infringer actively encouraged

13       or instructed another person on how to use a product or

14       perform a process in the way that infringes at least one

15       patent claim;

16               The accused infringer knew of the patent

17       at that time;

18               The accused infringer knew or should have

19       known that the encouragement or instructions would

20       result in infringement of at least one patent claim;

21               The accused infringer had a specific

22       intent to induce the infringement;

23               Or the other person infringed at least

24       one patent claim.

25               Mirror Worlds has failed to offer

2  matter of law of no induced infringement should be

3  granted.

4           In fact, I don't think they ever even

5  mentioned indirect infringement; I don't think they ever

6  mentioned inducement to infringe or contributory

7  infringement, Your Honor.

8           Fourth, Mirror Worlds has offered no

9  evidence of -- there we go -- contributory infringement,

10 because no evidence exists for the following required

11 elements:

12          The accused infringer, with knowledge of

13 the patents, supplies a part or a component to another

14 for use in a product, machine, or process that infringes

15 a patent claim;

16          The one who received the component

17 infringes a patent claim;

18          The component is a significant part of

19 the invention;

20          A component is especially made or adapted

21 for use in a way that infringes at least one claim of

22 one of the patents-in-suit, and the accused infringer

23 knew that the component was especially made for that

24 use;

25          Or the component does not have a

2               Mirror Worlds has failed to offer

3  evidence for any of these elements, and judgment as a

4  matter of law of no contributory infringement should be

5  granted.

6               Fifth, Mirror Worlds has offered no

7  evidence of infringement under Section 271(f), because

8  no evidence exists for the following required elements:

9               A product or method exists as it is

10 intended to be assembled or used outside the United

11 States that includes all limitations of at least one of

12 the asserted claims;

13              The accused infringer supplied or caused

14 to be supplied in or from the United States or all -- a

15 substantial portion of the components of a patented

16 invention;

17              Or the accused infringer specifically

18 intended to induce the combination of the components

19 into a product and/or use of the components in a way

20 that would infringe the patents-in-suit, if the

21 components had been combined in the United States.

22              In addition, the Court granted Apple's

23 Motion in Limine No. 2 to exclude all evidence and

24 argument regarding worldwide sales for products made and

25 sold outside of the United States.

2  that we have no evidence and will put on -- and will not

3  put on any testimony about any damages that we claim

4  other than from U.S. sales.

5              Judgment as a matter of law of no

6  infringement under Section 271(f) should, therefore, be

7  granted.

8              Sixth, Mirror Worlds has offered no

9  evidence of willful infringement or that Apple acted

10  despite an objectively high likelihood that its actions

11  constituted infringement of the patents-in-suit.

12              Both at the time of the alleged

13  infringement and from the record developed in the

14  infringement proceeding, Apple had reasonable and

15  legitimate defenses, including but not limited to

16  non-infringement, invalidity by anticipation,

17  obviousness, and indefiniteness, unenforceability by

18  inequitable conduct, rejection of substantially all

19  claims during re-examination of the patents-in-suit.

20              In addition, no evidentiary basis exists

21  for a reasonable jury to find that Apple knew or should

22  have known that its actions constitute alleged

23  infringement of the patents-in-suit, because Mirror

24  Worlds Technologies failed to mark substantially all of

25  its Scopeware products.

2   otherwise disclose the patents-in-suit to Apple.  The

3   patents-in-suit did not appear on the Mirror Worlds

4   Technology's or Scopeware websites, and none of the

5   Apple employees were ever aware of the patents-in-suit.

6           Judgment as a matter of law of no willful

7   infringement should, therefore, be granted.

8           Seventh, Mirror Worlds did not meet its

9   burden to prove any damages with reasonable certainty

10   and failed to establish that the requested damages

11   constitute a reasonable royalty for all the following

12   reasons:

13           Mirror Worlds' expert improperly applied

14   the entire market value rule;

15           Mirror Worlds' expert applied the

16   incorrect hypothetical negotiation date;

17           Mirror Worlds' expert improperly relied

18   upon consumer surveys that lack any foundational basis

19   from a qualified expert;

20           Mirror Worlds Technologies failed to

21   properly mark substantially all of its Scopeware

22   products;

23           Mirror Worlds bears the burden of proving

24   compliance with 35 U.S.C. Section 287 in order to obtain

25   damages prior to filing suit;

2  any damages prior to the filing date of this case, March

3  14, 2008;

4  Mirror Worlds failed to account for

5  non-infringing, commercially acceptable alternatives

6  that were available to Apple at the time of the

7  hypothetical negotiation;

8  Mirror Worlds has also failed to prove

9  that it is entitled to either a lump sum, paid-up

10 royalty, or running royalty;

11 Mirror Worlds' damages request does not

12 reflect the appropriate portion of the royalty base that

13 reflects the value of the patented invention or

14 apportionment;

15 And Mirror Worlds' damages request is

16 punitive and speculative.

17 Accordingly, Mirror Worlds is not

18 entitled to any damages based on its failure of proof.

19 In the alternative, Mirror Worlds cannot

20 recover more than $210,000, the established reasonable

21 royalty, for the rights to the patents-in-suit in June

22 of 2004.

23 In the alternative, Mirror Worlds cannot

24 recover more than $598,482.50, which is the established

25 reasonable royalty for the rights to the patents-in-suit

2                    In the alterative, Mirror Worlds cannot

3    recover more than 4 million based on Apple's licenses of

4    comparable and more important technology.

5                    In the alternative, Mirror Worlds cannot

6    recover damages based on Apple's sales of its products,

7    other than the Mac OS 10.

8                    For all these reasons, judgment as a

9    matter of law should be granted against each of Mirror

10   Worlds' claims and counterclaims.

11                   And, Your Honor, we can provide more

12   detail to this later through a written motion, if you'd

13   like.

14                   THE COURT:  Okay.  Does that cover all of

15   your motions that you're going to file in writing?

16                   MR. RANDALL:  Yes, Your Honor.

17                   THE COURT:  Okay.  Thank you.

18                   Response?

19                   MR. STEIN:  I'm not a great note-taker.

20   There was a lot of information right there, but I think

21   we did establish our burden of proof on all counts.  I

22   could try -- I could try to sift through this, but I --

23                   THE COURT:  Well, let me see if I can

24   simplify it for you.

25                   The Court's going to grant the directed

2   contributory infringement.

3              I am -- I would like to hear your

4   argument with regard to the '427 patent, Claims 16 and

5   18, with regard to the display of a cursor.

6              MR. STEIN:  The argument is that that

7   limitation is made under the Doctrine of Equivalents,

8   that that --

9              THE COURT:  Okay.  So you're not

10  claiming -- claiming literal infringement then --

11             MR. STEIN:  That --

12             THE COURT:  -- as to the '427, Claims 16

13  and 18?

14             MR. STEIN:  No.

15             THE COURT:  All right.  It's granted as

16  to literal infringement of the '427, Claims 16 and 18.

17             And let me hear your argument as to why

18  you've made out a Doctrine of Equivalents case under

19  that provision.

20             MR. STEIN:  I think Dr. Levy clearly

21  explained how sliding the -- a cursor over a stack is

22  equivalent to sliding a stack, basically, under a

23  cursor; and I think the evidence there was compelling.

24             THE COURT:  Okay.  Response?

25             MR. RANDALL:  Your Honor, they are

2    on the screen and not displaying a cursor on the screen,

3    that's one -- one -- and there were multiple aspects of

4    that element that I was focusing on with Dr. Levy.

5                    Number one, he didn't apply the

6    appropriate standard for Doctrine of Equivalents.

7                    Number two, even if we get at the

8    foundational level of whether he could possibly have

9    said it, it simply doesn't have a cursor.  It doesn't

10   have any -- any mechanism to display on the screen.

11                   And that's what the claim -- that's what

12   the claim element requires.  The cursor or pointer has

13   to be displayed on the screen, number one.

14                   Number two, it has to move on the screen.

15                   Number three, it has to move on the

16   screen across the stack of documents -- across -- it

17   says over, over the -- over the documents.

18                   And then number four, it has to touch one

19   of the documents in the stream to display a glance view.

20                   And he did not provide any testimony

21   whatsoever that some rectangular device that appears

22   under the screen has any of the attributes of a cursor,

23   such as being able to see the cursor move anywhere

24   around on the screen so you can see it.

25                   And that claim element specifically

2    displaying it on the screen, moving it on the screen,

3    moving it over the stack, touching a document.

4              None of that is apparent from a fixed set

5    of -- of information underneath the screen.  It simply

6    doesn't satisfy Doctrine of Equivalents.  It can't

7    satisfy it.  But certainly this witness didn't provide

8    the right standard nor the right evidence.

9              MR. STEIN:  I don't think that accurately

10    describes what the Doctrine of Equivalents requires.

11              If each and every specific term in the

12    claim was met in the -- in that display, then we would

13    be arguing literal infringement, not infringement under

14    the Doctrine of Equivalents.

15              I think Dr. Levy --

16              THE COURT:  No.  But your expert has a

17    burden to explain that, and I heard him testify in

18    rather conclusory terms, but I didn't really hear any

19    explanation.

20              Can you refresh my memory about that?

21              MR. STEIN:  I think he did give an

22    explanation as to how one skilled in the art would view

23    that -- that -- that term -- that process as being just

24    an insignificant change.  He described it as an

25    insubstantial difference.

2  the scale example, is that one way, you have the pointer

3  moving, and the other way, you have the dial moving.

4  And he -- he explained that one skilled in the art would

5  recognize that.

6              Keeping that pointer -- you know, sliding

7  it over and having the glance view pop up or keeping it

8  in the center and moving the stack over it, would be

9  considered insubstantial differences to those skilled in

10 the art.

11             THE COURT:  Okay.  Let me ask both sides

12 this:  If the '427, Claims 16 and 18 go out of the case

13 entirely, what does -- what does that do to the case?

14             MR. RANDALL:  It removes from the case

15 entirely all of the accused iPhones, iPads, and iPods.

16             MR. STEIN:  That's correct.

17             THE COURT:  Okay.  And what does that do

18 to your damage model?

19             MR. STEIN:  It would reduce it.  I don't

20 know the figure off the top of my head.

21             THE COURT:  Okay.  I'm going to take the

22 equivalents under advisement.  I'd like written briefing

23 on it filed by 8:00 p.m. tonight, and in all other

24 respects, Defendants' motion for directed verdict is

25 denied.

```
2                    COURT SECURITY OFFICER:  All rise.

3                    (Recess taken.)

4                    COURT SECURITY OFFICER:  All rise.

5                    (Jury in.)

6                    THE COURT:  Please be seated.

7                    All right.  Mr. Randall, who will your

8   first witness be?

9                    MR. RANDALL:  Thank you, Your Honor.

10  Apple's first witness is Mr. Bud Tribble, Your Honor.

11                   THE COURT:  Okay.  Mr. Tribble.

12     GUY LESLIE "BUD" TRIBBLE, M.D., Ph.D., DEFENDANTS'

13                   WITNESS, PREVIOUSLY SWORN

14                      DIRECT EXAMINATION

15  BY MR. RANDALL:

16     Q    Can you please state your full name for the

17  record.

18     A    Guy Leslie Tribble.

19     Q    And what's your current occupation?

20     A    I am currently Vice President of Software

21  Technology for Apple, Incorporated.

22     Q    Can you give us a general idea of where that

23  puts you in the company?

24     A    Sure.  The person I report to reports to Steve

25  Jobs.
```

 2  Apple; is that right?

 3       A    He's the Chairman and CEO of Apple, yes.

 4       Q    Okay.  When did you start at Apple?

 5       A    I first started at Apple in 1980.

 6       Q    And how long did you work there?

 7       A    I worked at Apple until approximately 1983, at

 8  which time I went back to medical school and graduate

 9  school to complete my education.  Came back to Apple in

10  1984.  Stayed through 1985 when Steve Jobs left.

11  I left with Steve to form a company called NeXT,

12  Incorporated.

13       Q    And what was the business of NeXT,

14  Incorporated, that Mr. Jobs and other colleagues started

15  in 1985?

16       A    NeXT was building high-end personal computers

17  or personal workstations, very powerful computers based

18  on the UNIX operating system.

19       Q    UNIX operating system was utilized by Sun; is

20  that right?

21       A    Yes.  Sun Microsystems also used the UNIX

22  operating system.

23       Q    Did NeXT have what was referred to as a

24  Digital Librarian in the early 1990s?

25       A    Yes.  NeXT developed, as part of its NeXT step

2    which was a facility to do full-text indexing and

3    retrieval as part of the operating system, which NeXT

4    offered and sold as part of its computer.

5        Q    Okay.  And can you describe just generally

6    what full-text indexing and searching is?

7        A    Sure.  Basically, you would designate a folder

8    or a set of folders on the computer and tell the

9    computer:  This is a set of files or documents that I

10   would like to be able to search instantly.

11            It would then go and look at all the text that

12   occurred in those documents, and it gave a facility for

13   the user to go to a search field and type in any text

14   they wanted.

15            And the computer would immediately tell them:

16   These 10 files or these 200 files are the files that

17   matched; in other words, that have that text in it.  And

18   it was a way for the user to deal with the fact that

19   even at that time, there was this problem of zillions of

20   files and not being able to find any of them.

21       Q    And when did NeXT ship its operating -- ship,

22   meaning sold to customers --

23       A    Yes.

24       Q    -- its operating system that had this Digital

25   Librarian with this full-text indexing and searching

2     A     It was certainly shipping by 1993.  I believe

3  it was shipping even prior to that.  I don't recall

4  exactly which version it showed up in, but certainly it

5  was shipping by NeXT Step 3.0, which was shipping in --

6  in 1993.

7     Q     All right.  And you heard -- and you heard

8  Mr. Satow testify earlier in the trial that these

9  indexing and search engine software was a commodity, I

10  think is what he said; is that right?

11     A     That's correct.

12     Q     So other companies had this full-text indexing

13  and searching capability in the early '90s, correct?

14     A     That's correct.

15     Q     All right.  Now, have you -- you are here

16  today and been here for the whole trial as Apple's

17  corporate representative; is that right?

18     A     That's correct.

19     Q     And have you ever been asked to speak about

20  Apple's company history before?

21     A     Sure.  I have spoken about Apple's history

22  occasionally at, for example, colleges and universities.

23  I think we discussed the Naval post-graduate school talk

24  I gave earlier in this trial.

25            I've also more recently been called to

2  Committee of the U.S. Senate.  At that, when I testified

3  there, along with Google and Facebook and others, one of

4  the things I talked about was explaining Apple's history

5  and who we were.

6      Q    And so how many times have you testified in

7  front of a jury or in court?

8      A    This is the first time I've ever testified in

9  front of a jury or court.

10     Q    You had no idea what you were in for, did you?

11     A    Not really.

12     Q    And are you familiar with Apple's history?

13     A    Yes, I am.

14     Q    Okay.  Could you just summarize Apple's

15 history, let's say, starting in approximately 1977 with

16 the introduction of the Apple II?

17     A    Sure.  I mean, Apple is well-known for

18 introducing the idea of a personal computer to the

19 world.  The Apple II was the first computer that was

20 thought of being a personal computer, and Apple was

21 invented by Steve Jobs and Steve Wozniak, as is

22 well-known.

23          As mentioned, I joined Apple in 1980.  My job

24 was the -- to be the manager of the very first Mac OS

25 software, and the Macintosh shipped in 1984.  It was a

2    time that consumers had ever seen a mouse, what's called

3    a GUI, graphical user interface, windows, and folders

4    and desktop metaphor on the screen.

5                More recently, Apple has expanded beyond being

6    just a computer company; and in this decade has shipped

7    things like iPods and selling music, selling iPhones,

8    small devices, as well as selling music online through

9    something called iTunes.

10               Also more recently, sort of a big deal for

11   Apple is the fact that we've opened retail stores

12   throughout the U.S. and, in fact, worldwide and, you

13   know, did that over the last 10 years.  And we're quite

14   proud of that.

15       Q    Okay.  Let me back up for a moment.

16               Did -- at some point, did Steve Jobs come back

17   to Apple from NeXT?

18       A    Yes.  He returned to Apple from NeXT in, I

19   believe, it was 1997.

20       Q    And did you come with him or shortly

21   thereafter?

22       A    I came -- I joined after that.  I was not -- I

23   was actually not at NeXT at that time.  I was at Sun

24   Microsystems.  I joined Apple in 2001.

25       Q    Okay.  And did Apple, after Mr. Jobs rejoined

2      A    Yes.  Apple -- Apple purchased NeXT,

3  Incorporated.

4      Q    And did it acquire all of the operating system

5  technology that NeXT had been developing over the years

6  with Mr. Jobs?

7      A    Yes.  It acquired NeXT Step, which was the

8  NeXT operating system.  In fact, that operating system,

9  which was UNIX-based, became -- became the basis

10  actually for Mac OS 10 and all of the versions of Mac

11  OS 10.

12     Q    And approximately when did Apple introduce Mac

13  OS -- Mac OS means the operating system, right?

14     A    Mac operating system, yes.

15     Q    So when approximately did Apple introduce Mac

16  OS 10?

17     A    It was either 2000 or 2001.  I don't remember

18  precisely.

19     Q    And do you know approximately how many years

20  of research and development went into the development of

21  Mac OS 10?

22     A    Well, certainly you have to account in that

23  the technology that was acquired from NeXT,

24  Incorporated, because that was a large basis of Mac

25  OS 10.  And that development actually started in 1986.

2    development that was done after Steve returned and NeXT

3    was purchased in 1997 through 2000 or 2001.

4        Q    Okay.  Was there anything particularly special

5    about Mac OS 10?

6        A    Well, it was the first time there was a

7    successful consumer product that was based on UNIX.

8    UNIX is a very unique.  UNIX is a very powerful

9    operating system that prior to the introduction of Mac

10   OS 10 had only been used in engineering workstations,

11   things that engineers and scientists would use.

12            Those workstations were sold by a company like

13   Sun Microsystems.  Apple took that powerful engine, like

14   a V-8 engine, and put it into a consumer product in the

15   form of the Macintosh running Mac OS 10.

16       Q    And you mentioned a retail store.

17            Approximately when did Apple decide to start

18   opening its retail stores?

19       A    That was in around 2001.  It was an

20   interesting process, because the economy was -- was --

21   the tech bubble had happened and imploded.  The economy

22   was not doing too well, and yet Apple decided to go

23   ahead and invest a lot of money and people in building

24   these retail stores.

25            It kind of went against the grain of what the

2    and invested through that time in the stores, and it

3    actually turned out okay.

4        Q    Okay.  Part of the reason I'm asking you some

5    of these questions is because I'm really trying to get

6    at least the tip of the iceberg as to why some of these

7    consumers and customers buy Apple products, perhaps not

8    just because of some of these features we've been

9    talking about.

10              MR. RANDALL:  Let's play the clip,

11    DX130A.

12              (Video clip playing.)

13              UNIDENTIFIED MALE:  Would you want to

14    check out our latest products like Mac, iPod, and

15    iPhone?

16              The Apple retail store is the only place

17    you'll find everything Apple, on display and ready for

18    you to get your hands on.

19              Just come into the store.  Do some

20    test-driving and have all your questions answered by a

21    specialist, someone who knows our hardware and software

22    inside and out.

23              To get the most out of your Apple

24    products, we offer one-to-one personal training,

25    face-to-face, hour-long sessions with your very own

2    environment and meeting others with similar interests,

3    try a free workshop.

4                 And when you're needing some free

5    hands-on technical support or to have a repair done,

6    just step up to the genius bar, and a genius will take

7    care of you.

8                 (End of video clip.)

9        Q    (By Mr. Randall) Now, do you understand that

10   other Apple witnesses are going to come in here and

11   testify about some of these other features, including

12   the success in marketing of Apple products?

13       A    Yes, I do.

14       Q    Did -- was Apple coming out with new products

15   around 2001 after this tech -- tech crash?

16       A    Yes.  In fact, that's when we started coming

17   out with Mac OS 10.  And also, when Apple introduced the

18   very -- the first iPods right around that time, the

19   ability to have a thousand songs and carry it around in

20   your pocket.

21       Q    And the iPod has been accused of infringement,

22   so I'd like to see a video clip of DX131A.

23                 (Video clip playing.)

24                 UNIDENTIFIED MALE:  There's something

25   really cool happening where music in this whole digital

2    new digital music world, Apple has had lot of technology

3    to bring to the party.

4              We know how to make really cool, small

5    devices.  We know how to make them beautiful and fun.  I

6    call it an amazing new device that fits in your pocket,

7    and it carries over a thousand songs.  So now you can

8    take your entire music library with you wherever you go.

9              This is a total solution.  Your iPod,

10   Firewire, iTunes with all your music in it, it all works

11   together seamlessly.  And only Apple can do that,

12   because we make the hardware, the software, all the

13   technology that allows us to solve problems for people

14   that no one else would dare take on.

15             (End of video clip.)

16       Q    (By Mr. Randall) Is that one -- kind of a

17   video summary of the iPod?

18       A    Yeah, it's pretty close.

19       Q    Okay.  Has Apple continued to improve its

20   iPod?

21       A    Yes.  We've come out with several versions of

22   the iPod since then, and we like to think that each one

23   is getting better and easier for the customers.

24       Q    All right.  And was Apple the very first

25   digital music player ever to come on the market?

2    players prior to Apple.  But the one thing Apple does

3    differently than some other companies is that, even

4    starting back in 1984, we used to ask each other, well,

5    could my mom use it?

6            And making things really easy to use and

7    having that, you know, could my mom use it, persists

8    even -- even through today.

9            So the iPods that Apple came out with were --

10   they were digital music players, but they were really

11   easy to use.

12       Q    Okay.  And what was the next milestone product

13   at Apple?

14       A    I think I would say that the iPhone, which I

15   believe we came out with in 2007 was the next big thing.

16                MR. RANDALL:  Can you play DX152A,

17   please?

18                (Video clip playing.)

19                STEVE JOBS:  Today, we're introducing

20   three revolutionary products in this class.

21                The first one is a wide-screen iPod with

22   touch controls.

23                The second is a revolutionary mobile

24   phone.  That's what it had up on the screen.

25                And the third -- and the third is a

2                      So three things:  A wide-screen iPod with

3       touch controls, a revolutionary mobile phone, and a

4       breakthrough internet communications device.

5                      An iPod, a phone, and an internet

6       communicator.

7                      An iPod, a phone -- are you getting that?

8                      These are not three separate devices.

9                      This is one device, and we are calling it

10      iPhone.

11                     Today -- today, Apple is going to

12      reinvent the phone.

13                     (End of video clip.)

14      Q    (By Mr. Randall) Now, there were mobile phones

15      before this, right?

16      A    Well, sure.  Yes.

17      Q    All right.  Now, Apple spends a lot of time,

18      money, and effort to make its products better than its

19      competitors', right?

20      A    We definitely try to do that, yes.

21      Q    All right.  And do you and your colleagues at

22      Apple take pride, including at the level of CEO, in your

23      products?

24      A    Absolutely.  We're -- we're all very proud of

25      our products, and, you know, we know they're not

2    think we do pretty well.

3        Q    All right.  That came through on the clip.

4    Can you -- did Macintosh -- did Apple come out with a

5    MacBook Air also, which is a computer of some kind?

6        A    Yes, we did.

7        Q    Approximately when?

8        A    You know, it was probably in the 2006, '07

9    timeframe, but I don't remember exactly.

10              MR. RANDALL:  Let's play Video Clip

11   DX153.

12              (Video clip playing.)

13              STEVE JOBS:  And you're going to get your

14   copy today, and you're going to get to develop a copy

15   later on today with all the SDKs in it and all the code.

16   This is the new MacBook Air, and you can get a feel for

17   how thin it is.

18              Yeah.  There it is.

19              All right.  An amazing product here.

20              Full-size keyboard, full-size display.

21   And this is what it looks like.

22              Isn't that amazing?

23              (End of video clip.)

24       Q    (By Mr. Randall) All right.  Now, one more

25   issue.

2    approve user interface experience?

3        A    Yes.  We're continually working to improve our

4    user interface experience.

5        Q    All right.  Since 1984 when Apple came out

6    with its first Macintosh and going forward in time until

7    today, does Apple continuously work on trying to make

8    its computer easier to use?

9        A    Yes.  That's just a common theme throughout

10   the history of the company.

11               MR. RANDALL:  All right.  Let's play

12   DX152.

13               (Video clip playing.)

14               STEVE JOBS:  We've been very lucky to

15   have brought a few revolutionary user interfaces to the

16   market in our time.

17               First was the mouse.  The second was the

18   click wheel, and now we're going to bring multi-touch to

19   the market.  And each one of these revolutionary user

20   interfaces has made possible a revolutionary product,

21   the Mac, the iPod, and now the iPhone.

22               (End of video clip.)

23       Q    (By Mr. Randall) Now, I understand a few

24   months ago, Apple came out with a new product; is that

25   right?

2    Q    A lot of them.  iPad?

3    A    Oh, yes.  Yes, the iPad.

4    Q    Can you describe and tell me what that is?

5    A    So the iPad is actually a new category of

6  product.  It's smaller than a laptop but bigger than a

7  phone.  It's uses the touch-user interface, so it's not

8  the desktop metaphor of files and folders we were

9  talking about before.

10           It uses the same touch technology that is in

11  the phone, but it's a nice, big screen.  You can watch

12  videos on it.  It's about a 7-or-so-inch screen.

13    Q    Okay.  Now, you've sat through the trial so

14  far, and you've heard a lot about Apple using a

15  traditional conventional hierarchical file system to

16  store its documents and organize its documents; is that

17  right?

18    A    Yes.

19    Q    All right.  And how long has Apple used that

20  type of file system?

21    A    We've used that since 1984 at least and

22  probably a little before that.

23    Q    And does it still use it today?

24    A    Yes.  That's still used today as part of our

25  Macintosh products.

2  efforts to allow users to find documents and files in

3  its system over the years?

4      A     Sure.  The -- in probably around the area of

5  late 1990s, 2000, Apple had a product called Sherlock,

6  named after Sherlock Holmes for finding things.  It was

7  a product that let you type in words or file names and

8  find those files.

9          I should mention even before that, Apple had a

10 product called HyperCard.  Part of HyperCard was

11 actually search as well.  You could search by typing in

12 the name of a card; and it would pull up that card,

13 which was essentially a document.

14         More recently, of course, as we've discussed,

15 Apple has the Spotlight feature.  Spotlight is a search

16 field you can type into, and it will bring up files and

17 documents that have that text in them.

18     Q     All right.  And earlier, I know there was some

19 testimony about -- from their expert that this Spotlight

20 feature was the mainstream, and I was asking their

21 witness about whether or not there's an ability in the

22 Apple operating system to store files and documents.

23         And I think I used the Court's construction of

24 data units and documents.

25         But is there a capability in Mac OS 10 that's

2    outside of Spotlight, meaning outside of this mainstream

3    as they call it?

4        A    Sure.  Although --

5        Q    Can you describe that?

6        A    Yeah.  Although Spotlight is set up initially

7    to index all of your documents and retrieve all your

8    documents, it is possible to identify documents or sets

9    of documents that you want to be outside that, that you

10   don't want to show up in the search results at all.

11            And reasons for doing that might be that, you

12   know, if someone else is using the machine and they do a

13   search, they might run across documents that are, you

14   know, you want to keep private and not have them find as

15   part of Spotlight.

16            Personally, that's one of the things I do is I

17   have a special place I put documents where they're

18   not -- they're not backed up.  They're not searched by

19   Spotlight.

20            There might be other reasons customers don't

21   want documents to show up in Spotlight, and there is a

22   facility to do that in Mac OS 10.

23       Q    All right.  For instance, if you share a

24   computer with others at work or for whatever reason, you

25   could put your financial documents or your personal

2    operating system that is not searchable by everybody

3    else in the Spotlight feature; is that right?

4        A    That's correct.

5        Q    Okay.  Now, do you realize that there are

6    other Apple executives here that are going to testify in

7    front of the jury in this case?

8        A    Yes, I do.

9        Q    And what's generally the level of those Apple

10   employees within the Apple organization?

11       A    They're executives and senior managers, key

12   people involved in the development of Apple products and

13   the marketing of Apple products.

14       Q    There was a suggestion, maybe more than one,

15   that Apple doesn't care about this case; Apple does not

16   care about this case.

17            How do you feel about that?

18       A    Well, Apple cares a lot about this case.

19   We're here to defend ourselves; and as I mentioned, we

20   have -- we have key people here to help us do that and

21   get across our points.

22       Q    Okay.  Thank you.

23            MR. RANDALL:  No further questions, Your

24   Honor.

25            THE COURT:  All right.  Cross-exam?

2              THE COURT:  All right.  Thank you.  You

3  may step down.

4              All right.  Who will be your next

5  witness?

6              MR. RANDALL:  Gitta Salomon, Your Honor.

7              Your Honor, my partner, Mr. Soobert, will

8  present this witness.

9              COURTROOM DEPUTY:  Judge, I don't think

10  she's been sworn.

11             THE COURT:  I don't believe she's been

12  sworn, has she?

13             MR. SOOBERT:  No, she hasn't, Your Honor.

14             THE COURT:  If you will raise your right

15  hand, please, ma'am, Ms. Ferguson will swear you.

16             (Witness sworn.)

17             THE COURT:  Take a seat right there.

18             Thank you.

19      GITTA SALOMON, DEFENDANTS' WITNESS, SWORN

20                  DIRECT EXAMINATION

21  BY MR. SOOBERT:

22      Q    Good afternoon, Ms. Salomon.

23      A    Good afternoon.

24      Q    Would you state your full name for the record,

25  please?

2        Q    And where are you from?

3        A    San Francisco.

4        Q    California?

5        A    Yes.

6        Q    Okay.  Are you married?

7        A    I am.

8        Q    Uh-huh.  And do you have kids?

9        A    I do.  I have two boys, seven and nine years

10   old.

11       Q    Terrific.  You've got your hands full, I take

12   it?

13       A    Yes.

14       Q    Well, thanks for coming.  We appreciate it.

15       A    My pleasure.

16       Q    Can you tell us a little bit about your

17   background, since you graduated high school?

18       A    Sure.  After I graduated high school, I went

19   to UCLA and studied mathematics.  And after that --

20   excuse me -- I went to the Massachusetts Institute of

21   Technology and got a master's degree in media

22   technology.

23       Q    Okay.  While you were at MIT, Massachusetts

24   Institute of Technology, did you work with or work in

25   the media lab?

2    Q    Did you happen to know Chris Schmandt?

3    A    Yes, I did work some with Chris Schmandt on

4    some speech work.

5    Q    Now, who's Chris Schmandt, just so we know?

6    A    He was a research associate at that time.  I'm

7    not sure of his title now.  I know he's still there at

8    the lab.

9    Q    Terrific.  Well, we'll hear more from Chris

10   Schmandt a little later in this case.

11        Now, after graduation from those schools, what

12   did you do next?

13   A    For the first year after I graduated, I stayed

14   at MIT and I helped people learn how to use the computer

15   as part of the campus-wide computing network.  And I did

16   a little bit of consulting.  And then a year later, I

17   went to Apple in California, and I worked there for six

18   years.

19   Q    Okay.  Ms. Salomon, why did you choose Apple?

20   A    You know, at the time even back then -- it was

21   '87 -- Apple was really at the forefront of doing

22   easy-to-use interfaces, and I was very interested in

23   that.  That's mostly what I focused on in my master's

24   degree.

25   Q    Okay.  Just what is a user interface?

```
 2    computer that people see and interact with.  So it's the

 3    things you see on the screen, and it's what you can

 4    point out with the mouse and click and the various

 5    screens that you move through.

 6             So it is the part a user interacts with.

 7      Q    And you really were interested in that,

 8    focused your work on it?

 9      A    Yes, I did.

10      Q    Okay.  And what did you do when you got to

11    Apple?

12      A    You know, for the first year, I was -- I came

13    into the Human Interface Group, which was a group

14    focused on specifically dealing with user interface.

15             For the first year, we worked in product

16    development and we helped with some of the products that

17    were shipping.

18             After that, we moved into Advanced Technology,

19    which was the research group at Apple, and we got to

20    determine what kinds of projects we wanted to work on,

21    what were the types of problems real people were having,

22    and what were the technologies that would help solve

23    those problems.

24             So we really had a lot of free reign to do

25    some very creative and interesting work.
```

2    Group or ATG?

3        A    Yes.  ATG was what it was know as, yes.

4        Q    What year, roughly, was that and what

5    timeframe?

6        A    So I got there first in '87, so it was

7    probably '88, then we went to ATG.  And I was at Apple

8    until '93.

9        Q    Okay.  You worked in the ATG group the whole

10   time?

11       A    Yes, I did.

12       Q    Okay.  What kinds of things did you work on

13   there?

14       A    You know, our group was very

15   interdisciplinary.  We had people with a lot of

16   different skills; and I tended to focus on things that

17   had to do with information retrieval, things that were

18   looking into how to make it easier for people to search

19   for information, find things on their desktop.

20            It was right around the time that there was a

21   lot more multimedia on the computer, and there was

22   starting to be a lot more files.  So it was -- it was

23   mostly my interest to work on making finding things

24   easier for folks.

25       Q    Okay.  Information retrieval, is that like

2      A      Yes, that has to do with search engines,

3    search technology, indexing, being able to both find

4    things that you've created, find things that other

5    people have created, and put things away on your

6    computer.

7      Q      Okay.  What kinds of information and data

8    would you be indexing and searching for?

9      A      All kinds of information.  You know, at that

10   point, Apple was just starting to get involved with

11   multimedia, so we were looking at regular documents that

12   had text in them, but also documents with images in

13   them, sound and video.

14            We were trying to look at all the types of

15   data that people would work with.

16     Q      Okay.  What about metadata, this so-called

17   metadata?

18     A      Yes.  Metadata was included.

19            So should I talk about what metadata is?

20     Q      That would be helpful.  I'd like to know what

21   metadata is.

22     A      Okay.  When I first got to Apple, I didn't

23   know what metadata was either.

24            Metadata is, for example, if you have a book,

25   the content of the book is -- the actual text in the

2  book; so, for example, the author and the title and how

3  many pages it has, what color the cover might be, all

4  the things that describe the book but are not the actual

5  content of the book.

6       Q    So did Apple at that time have technology that

7  could pull up documents, for example, based on date or

8  author, you know, the metadata and then also content as

9  well?

10      A    Absolutely.  Yes.

11      Q    And at some point, did you start working on a

12  project called Piles?  Does that ring a bell?

13      A    Yes, it does ring a bell.

14           I led up a team effort to look at the future

15  of the desktop interface and what types of new things we

16  could do as the Advanced Research Group.

17           And one of the things we focused on was an

18  idea of giving people piles on their desktop, in

19  addition to file folders and documents that they already

20  had.

21           And that was driven by, one, observing users

22  and what they were trying to do, and then also

23  understanding what the Information Retrieval Group that

24  was developing the search engines, what kind of

25  technology they could provide.

2    place where we were deciding this is the best way to

3    represent this to people and give them the power of this

4    capability.

5        Q    And were you trying to solve some particular

6    problems with the Piles project?

7        A    We were.  We were trying to give people a

8    looser organizational scheme, something that's not as

9    rigid as a folder that you have to go put away in a

10   filing cabinet.

11            We wanted to have a nice way to portray -- if

12   you looked for something and the results came back as a

13   pile, that was a kind of friendly representation that

14   made a lot of sense that people used a lot in their real

15   offices.

16            So it seemed like something smart to leverage

17   on the computer interface as well.

18       Q    Did that Piles project have any indexing or

19   searching capability as well?

20       A    Yes, it did.  So the idea behind Piles was

21   that all of your documents would be indexed, and you

22   would be able to search on either the metadata, things

23   about the files, or the full content of those files.

24       Q    Okay.  Now, are you a named inventor on any

25   patents?

2      Q     Did any of those patents come out of your

3   Piles work?

4      A     Yes.  Yes, some did.

5              MR. SOOBERT:  Diane, could you put up

6   DX201?

7      Q     (By Mr. Soobert) Ms. Salomon, do you recognize

8   this patent?

9      A     Yes, I do.

10     Q     Is this one of your Piles patents?

11     A     Yes, it is.

12     Q     And this -- this one issued from an

13   application that was filed originally in April of 1992;

14   is that right?

15     A     I believe so, yes.

16     Q     Does Apple own this patent now?

17     A     Yes.

18     Q     So you transferred it over to Apple as part of

19   your employment arrangement?

20     A     Yes, exactly.  As an employee, all the work I

21   did at Apple is owned by Apple.

22     Q     Okay.  And you're no longer with Apple, are

23   you?

24     A     No.  In '93 I left.

25     Q     And what do you do now?

2    Francisco.  It's been 14 years now that -- we work for

3    clients like Gap, Inc.  I do online e-commerce and also

4    for a subsidiary of Boeing.

5        Q    Okay.  Why did you move from Apple to Lab

6    Enterprise?

7        A    You know, that's a good question.  I had been

8    on the research side at Apple my whole career pretty

9    much, and I decided to get very hands-on and very

10   tangible and ship some very specific products.

11            So with own consultancy, we're a little closer

12   to actually, you know, being there and creating things

13   that are on the product side.

14       Q    Okay.  Let's take a look at another patent.

15            MR. SOOBERT:  DX1, please.

16            Can you zoom in on the top, Diane?

17            Thank you.

18       Q    (By Mr. Soobert) And, Ms. Salomon, is this

19   another patent you recognize?

20       A    Yeah.  I believe this is a continuation of the

21   other patent.  This -- this happened after I left Apple.

22       Q    Okay.  And this is another patent related to

23   Piles that you are a named inventor on?

24       A    Yes.

25       Q    Continues from the original application that

2      A     Uh-huh.

3      Q     All right.  And the original application,

4  again, was filed in April of 1992?

5      A     Correct.

6      Q     Okay.  Now, aside -- let me ask you this:  Do

7  these -- do these patents generally describe features

8  and other aspects of the Piles project that you had

9  worked on and developed through the ATG group?

10     A     Yes.

11     Q     Now, aside from these patents, did you also

12 publish your work?

13     A     Yes, I did.

14     Q     Can you give me some examples of how you did

15 that?

16     A     Sure, yeah.  Probably the most known

17 publication was in May of 1992.  I presented the Piles

18 work at the CHI Conference.  It was in the form of both

19 a written paper and a public presentation that involved

20 some video demonstration as well as me explaining the

21 project.

22     Q     Okay.

23            MR. SOOBERT:  Diane, can you give me

24 DX356?

25            Zoom in on the top there.

2    Ms. Salomon?

3         A    Yes.  This would be the paper that was

4    published in the conference proceedings at CHI '92.

5         Q    Okay.  Now, CHI '92, can you tell us a little

6    bit more about that conference?

7         A    Sure.

8         Q    Is that a well-attended conference?

9         A    It is a well-attended conference, especially

10   at that time.  It's the -- CHI stands for Computer Human

11   Interaction.  And this is a special conference focused

12   on user interface design.

13             All of the people working very closely in this

14   field would attend this conference.  So at the point at

15   which I presented this paper, you know, the people doing

16   this similar work in user interface were there and were

17   recipients of the compendium, if they weren't there.  So

18   they would have received the paper.

19        Q    So if I'm working in this field, for example,

20   I would know about this conference, right?

21        A    Yes.  Yes.  This really -- at that time, this

22   was the main conference to go to for user interface.

23        Q    Now, this article here about Piles, can you

24   just generally describe just at a high level what this

25   was about?

2    first part was talking about the process we used.  So as

3    I said earlier, we always liked to talk to real people

4    and understand what their needs are.  So it talks about

5    the observations we did and the ideas we derived from

6    those observations.

7              Then it goes on to explain the Piles concept,

8    how we refined the idea, what were the design ideas in

9    there.

10             And then in the last part, it talks some about

11   how we were working closely with the Information

12   Retrieval Group that was developing the search engine

13   technology to build the technology to support all of the

14   Piles design that we had devised.

15        Q    And now the top here, it's got Richard Mander,

16   your name, Gitta Salomon, and Yin Yin Wong.

17        A    Right.

18        Q    Who are these other folks listed with you as

19   authors?

20        A    Yes.  So Richard and Yin Yin and I were a

21   team.  I was the team leader.  And being the fair person

22   that I am, I put our names in alphabetical order,

23   because we all contributed equally to this project.

24             So we were really the core team that worked on

25   this project.

2                MR. SOOBERT:  Diane, can I have DX355,

3   please?

4        Q     (By Mr. Soobert) Now, do you recognize this

5   article?

6        A     Yes, I do.

7        Q     And what's this one?

8        A     This article was -- the primary author was

9   Daniel Rose, and Dan was our counterpart in the

10  Information Retrieval Group.  He was working on

11  developing the search technology and collaborated very

12  closely with us.

13             This particular article was sort of the

14  complement to the one you saw just a minute ago.  And it

15  covered the information retrieval techniques that he had

16  developed and how they served to support the design we

17  showed in the other paper.

18             And this was presented at SIGIR, which is the

19  information retrieval conference, so it was kind of the

20  complementary conference that this material was

21  appropriate for.

22       Q     And when was that, in 1993?

23       A     Yes.  That was the following year.

24       Q     Now, in addition to all these publications --

25  excuse me -- all these publications and patents --

2      Q      -- that were publicly available, did -- were

3  there any other vehicles in which you demonstrated the

4  Piles technology, maybe videos and what-not?

5      A      Sure, yes.  My manager was always adamant that

6  we made video demonstrations of all the work that we

7  did, and so we had a video that we created.  I showed

8  some video at the conference when I presented, and then

9  also my manager would go out -- she would speak

10  worldwide, and she would show the work at various

11  conferences.  She was at -- as well as we used the

12  videotape internally to share information with other

13  groups at Apple.  So there is a video, yeah.

14      Q      Okay.

15              MR. SOOBERT:  Diane, let's take a look at

16  a little bit of that video.  Clip 1, please.

17              And this is DX291.

18              (Video clip playing.)

19              MS. SALOMON:  Hi, I'm Gitta Salomon from

20  the Human Interface Group at ATG.  I lead a project that

21  is looking at high-end computing interfaces for future

22  machines.

23              We're not looking at any particular piece

24  of hardware, but instead looking at ways to extend our

25  current metaphor so that it supports the types of tasks

2                    One thing we've done recently is looked

3       at how people work in their current offices.  Richard

4       Mander and Yin Yin Wong went out and talked to 13 Apple

5       employees about how they organized their information.

6                    People don't sit in their offices and put

7       everything away in a single file folder and then arrange

8       those in a hierarchy.  Instead, what they do, as you see

9       here, is create number of piles of information, and

10      that's the way they tend to work with casual information

11      in their offices.

12                   What I'm going to show you now is a

13      demonstration that we created that shows how people

14      might work with file folders as well as piles of

15      information on the desktop of the future.

16                   In this first part of the demonstration,

17      I'll show you how you would most basically work with a

18      pile on your desktop.  Here is the high-end computing

19      desktop of the future.  As you can see, there are a

20      number of piles on it, and there's an adaptation over

21      here on the right-hand side.

22                   What I want to do first is add this

23      document to the pile in the center.  So I'm just going

24      to drag it over.  The Pile highlights.  I drop it on

25      top, and it falls into that pile.

2    mouse and look at small versions of each of the

3    documents.  If I think this is the document I want to

4    extract from the pile, I can flip through its pages by

5    using the cursor keys.

6                    At this point, I might recognize, oh,

7    yeah, this is the third page; this is the document I

8    want.  I click down and remove it from the pile.

9                    This is a very literal interpretation of

10   how you might work with piles on your desktop, but we

11   wanted to go beyond that and get the users a way to use

12   the power of their systems to help them work with Piles.

13                   So in this next part, I'm going to roll

14   over the mail drawer, and what you see here are two

15   piles that have been created by the system.  And I know

16   they're created by the system, because they're neat and

17   orderly in appearance.

18                   These piles actually have rules behind

19   them that I've given them so that they organize my mail

20   into an important pile and an unimportant pile.

21                   We also wanted to give people another way

22   to browse through the information.  Some people like to

23   look through things in order.  Others like to spread

24   everything out in parallel and look at things

25   side-by-side.

2   pile opens up, and I can very quickly see this is the

3   audio note that I was waiting for in my in-box.

4                   So how would a user go about scripting a

5   pile or giving it a set of rules to maintain itself?

6                   We didn't want people to have to learn an

7   elaborate scripting language from the beginning.  So,

8   for example, let's say that some things are showing up

9   in my unimportant pile that I would much prefer to show

10  in my important pile.

11                  What I'm going to do is browse through

12  this pile, and then you can see I have a different

13  representation.  Instead of the small miniatures, I'm

14  actually getting an extraction of the data inside that

15  mail document.  It wouldn't be useful to me to have a

16  miniature representation at this point.

17                  So I can quickly see that this second

18  document about the design competition is the type of

19  thing I'd much prefer to have in my important pile.

20                  When I click down, it comes out of that

21  pile, and I can drag it over to the important pile.

22                  You can see now that it falls on top of

23  that pile, and the system recognizes that that document

24  doesn't, in fact, match its current script.  It asks me

25  if I want to just add this item or if I actually want to

2                     If I choose to modify the script, it can

3    analyze that document and give me a large number of

4    criteria to choose from.  So I don't have to know how to

5    write a scripting language.  I just have to pick and

6    choose amongst the criteria.

7                     So I'm going to choose the subject line

8    of design competition update; tell it to add that to the

9    script; and then I'll say okay.

10                    When I do this, it updates the script for

11   that pile, and now you see several documents move

12   across.  And the idea here is that your system is always

13   active.  It's always maintaining things for you and

14   taking care of organizational problems.

15                    (End of video clip.)

16        Q    (By Mr. Soobert) Ms. Salomon, let me ask you a

17   couple of questions about that.

18                    When was that video created?

19        A    That would have been in the spring of '92.

20        Q    1992?

21        A    Yes.

22        Q    And was that publicly displayed at the CHI

23   Conference?

24        A    Yes.  Yes.

25        Q    And that was in 199 --

2    Q    Okay.  And -- now, let me ask you a couple of

3    other things about that.

4         It mentions scripting --

5    A    Uh-huh.

6    Q    -- or script.  And what is scripting?

7    A    Yeah.  Basically, scripting is creating a set

8    of rules.  So what we were allowing users to do there is

9    give the computer rules to collect documents into piles.

10        So, for example, I could say a rule is

11   anything that comes from Richard Mander, please put that

12   in a pile for me, or anything that has these kind of

13   content terms in it, please put that in a pile for me,

14   or I could mix and match those criteria as well.

15        So scripting is kind of a fancy way of saying

16   a set of rules that will gather these things.

17   Q    Okay.  Is -- is searching a type of scripting

18   or scripting a type of searching?  Can you explain that?

19   A    You could write a script to do a search for

20   you.  So like when you go to Google today, you're

21   effectively putting in a one-time question.  But if you

22   had the same question many days in a row, you might want

23   to write a script for that and have it gather the same

24   information every day for you.

25        For example, I always look up the weather, and

2    information on.

3         Q    And I also noticed that in the piles that were

4    shown there on the desktop, you were doing a

5    demonstration of taking your mouse -- mouse pointer or

6    cursor -- and rolling it over, kind of sliding it over

7    that stack of documents, right?

8         A    Right.  The idea behind that, when we observed

9    people in their offices and they had piles of things on

10   their desk, a lot of people would go like this

11   (indicates) to see what's in there.  That's a very

12   natural thing to do.

13             So this was translating that natural behavior

14   to something on screen.  So as you're rolling your mouse

15   over, you would see the various documents that were in

16   there.  And then if you were looking for something in

17   particular that you had seen before, you might recognize

18   it and say, oh, it has a picture in the upper right-hand

19   corner.  Yes, that's the one.  Or it has a purple cover.

20             Those types of things would jump out at you in

21   the same way they do when you have a physical pile.

22        Q    Okay.  So when you're just rolling your cursor

23   or mouse pointer over the pile --

24        A    Yes.

25        Q    -- just sliding it, you didn't have to click?

2      Q    So you slide it with no clicking?

3      A    Right.

4      Q    Okay.  And it shows that preview or kind of

5  glance view of the document?

6      A    Right.  Yes.

7      Q    Okay.  And then if I clicked on the pile or

8  one of those particular document representations, what

9  would come on?

10     A    So if you click on a document, it would come

11 out of the pile.  So let's say you were looking for

12 something; you browse through; you see the one you want;

13 you click; and you can pull it out of the pile.

14     Q    Let me ask you about the documents in the

15 pile.  That's a form of indexing and searching for

16 documents.

17          Is that fair or not?

18     A    To say that the pile contains that?

19     Q    Yes.

20     A    Yes.  When you have a scripted pile or --

21 there's some other aspects of the prototype as well that

22 I think we might see today -- that allowed you to

23 effectively do a search and say here are the results.

24          The results are presented to you in a pile.

25     Q    Okay.  Let's say I'm not that organized, and I

2   documents up?

3        A     You could do that.  Our basic notion, which

4   was very much in keeping with the way the Apple desktop

5   was, users can do what they want to do.  And we would

6   provide tools that would allow them to do helpful

7   things, things that would help them organize their

8   desktop.

9              But if they didn't want to organize it or it

10  wasn't useful to them, they could decide how to use

11  these tools.  It was very much in their user control.

12       Q     Okay.  So I could take all the documents in

13  the system, all the documents that were generated and

14  received by that system and put them in one single pile

15  on a desktop, if I wanted to?

16       A     If you wanted to, yeah.  Yeah.

17       Q     And then what if I wanted to put them in a

18  date order so I could know, you know, the most recent

19  stuff towards the top of the pile and the real old stuff

20  at the back that I'm kind of not too concerned about

21  right now?

22       A     Definitely.  That was one of the things we

23  observed when we went out to see users.  Lots of people

24  had piles where the oldest stuff was on the bottom, and

25  as things came in, they kept putting it on top.

2  system as well, that you could have things date-ordered

3  and you might remember, oh, it was from two weeks ago or

4  two months ago, and that would give you a sense of where

5  it was in the pile.

6      Q    All right.  Now, that video, that's an

7  accurate representation of a Piles system --

8      A    Yes.

9      Q    -- from back in the day, right?

10     A    Yeah.  Yeah.

11     Q    And that's you in the video?

12     A    That is me, yes, 20 years ago.

13     Q    Little like Groundhog Day, right?

14     A    It's a little scary, yes.

15     Q    Okay.

16          MR. SOOBERT:  Well, let's run the next

17  clip.

18          (Video clip playing.)

19          MS. SALOMON:  In this last section, I

20  want to show you how you work with a very large pile of

21  information and have your system help you suggest ways

22  of dealing with it.

23          As you see, here's a very large pile on

24  my desktop.  What I want to do is have the system

25  suggest ways that I can break this down into more

2                 So I'm going to roll over to my tools

3     drawer; and when I do that, a number of tools become

4     available to me.  I'm going to select the view tool, and

5     when I click on the pile, it will put in it a

6     visualization window.

7                 What I can see immediately is that it's

8     currently ordering by date.  If I want to enforce that

9     with color, I can choose color by date, and I can

10    quickly see that the oldest documents are in brown, and

11    they're at the bottom of the pile.

12                One thing that we're really excited about

13    is having the system suggest ways to create subpiles

14    based on the content of the documents.

15                So, for example, I could ask the system

16    to pile by content.  It could analyze the full text of

17    these documents and split them into various piles, also

18    suggesting names for me.

19                So, for example, it's called out these

20    documents, because they have to do with interface and

21    metaphor.  These documents are maybe about art and

22    design.

23                As you can see, these piles are now very

24    organized in their appearance, which means that the rule

25    behind them will help maintain them over time.  So, in

2                    I can drag it out onto my desktop, and

3      then I can revert the rest of the information, because I

4      don't really care about the other suborganization.

5                    So now what I've got on my desktop is a

6      pile that will maintain itself and deal with particular

7      topics that I'm interested in.

8                    (End of video clip.)

9           Q    (By Mr. Soobert) Okay.  A couple more

10     questions about what we just saw in there.  I noticed

11     that you mentioned in the video that there was some

12     intershading.  Looked like the pile was getting

13     yellower.

14                   What was that showing?

15          A    You know, the idea there was, in the real

16     world, documents yellow over time, and so we were using

17     the same kind of idea.  If you wanted to see how old

18     things were, you might color them by date, and then the

19     yellower or more brownish items would be at the bottom,

20     and the fresher, newer ones would -- in that case, you

21     saw on the top, they were the more crisp white.

22          Q    Okay.  So when I -- when I was talking about I

23     wanted to pull all my piles into a huge stack and

24     display them in that kind of time-order and then I just

25     finally decide, you know what, I've got to get

2      A     Uh-huh.

3      Q     -- and break them into subfiles, that's what

4  those subpiles do?

5      A     Right.  The basic idea there was, a lot of

6  people do this.  You make an enormous pile of things and

7  then some day it gets big and you say I need to deal

8  with it now.

9            And what we wanted to do was let the computer

10  help you deal with it.  So what the video showed there

11  was you could feed this large pile to the computer and

12  say help me understand what's in here.  And that's when

13  it broke it into the separate piles and even gave

14  suggested names to them.

15           So it would help me as a user be able to clean

16  up and make sense of the things that I had not organized

17  myself.

18     Q     Okay.  And so let's say I broke out my pile

19  into these subfiles, and finally got it kind of

20  organized the way I want, and then I start generating

21  new documents or folks are sending me new documents,

22  okay?

23           What -- do I have to remember where I'm

24  putting these things or -- or could the system handle

25  that for me?

2    that anymore.  So if a document came in and it matched

3    the criteria like we had that one pile I dragged out

4    onto the desktop and said, okay, this one is about these

5    things, that pile now had an underlying script or

6    underlying rules associated with it.

7              And so as new documents came in and matched

8    that same set of rules, those documents will be put in

9    that pile.  So this would help you maintain your

10   organization better.  So it's really about the computer

11   working in concert with you to help you keep things

12   organized in a way where you could find things.

13        Q    Okay.  Let's go back to the patent real quick.

14             MR. SOOBERT:  DX201, Diane, Page 5.  And

15   just focus in on that Figure 4F.

16        Q    (By Mr. Soobert) Now, this kind of looks like

17   the drawing that we saw animated in the video.

18        A    Uh-huh.

19        Q    Is this the same pile, the sliding without

20   clicking, and, you know, with a mouse over showing --

21   showing the preview or glance view of the documents?

22        A    Right.  We had two ideas for the preview or

23   glance view.  One was like you saw earlier in the video,

24   which showed you a little visual representation of the

25   document where you could see, oh, it was green in color,

2          Here's another idea that we were working with,

3    which was to pull out the key metadata about the file,

4    for example, the date, and these were e-mails, so who it

5    was from, what was the subject of the e-mail, and then

6    also a kind of summary of what was the contents.

7          So those words design, competition, interface,

8    children, those would give you a quick sense of that's

9    what this document is about.  Because all my e-mails

10   could look the same.  This kind of summary would be more

11   useful to me to find something.

12      Q    Okay.

13          MR. SOOBERT:  Diane, let's go to Page 6,

14   please, and focusing on 4C.

15      Q    (By Mr. Soobert) This looks like a companion

16   to that drawing where we click on Piles.  Is that what's

17   being shown here?

18      A    Uh-huh.

19          So this is this other example where you're

20   seeing a visual representation of the document as you

21   roll over it; and then when you click, the document

22   would come out.

23      Q    Okay.  Let's -- let's go back real quickly

24   on -- on -- when I have this stack of all my

25   documents --

2       Q       -- I mean, is there anything in the system

3    that was, you know, making that stack bounded, or was

4    the screen bounded or anything like that?

5       A       No, not necessarily, no.

6       Q       So I wasn't bounded by the system to be able

7    to --

8       A       No.

9       Q       In any way?

10      A       No.

11      Q       Okay.  All right.

12      A       It's the user's prerogative to make the piles

13   however they want.

14      Q       So there's a lot of good work here.  Did you

15   get any feedback or any positive, you know, reports or

16   accolades or anything like that on this?

17      A       You know, I have to say, this is the work I'm

18   most proud of in my whole life, and at that conference,

19   when I presented in '92, so many people that I

20   considered luminaries in the industry came up to us and

21   said:  You know, this is really good work.

22              And even for years after that, I would get

23   phone calls from reporters or students that were doing

24   their dissertations saying, you know:  What's happened

25   to this work?  Is it going to be a product?

2    inside of Apple anymore, so I never really knew, but I

3    kept hoping that, you know, it would manifest itself

4    completely, because we were -- at that time, we were so

5    excited to have been able to do something like this.

6         Q    All right.  And I know you don't work with

7    Apple or work for Apple anymore, but do you still use

8    Apple products today?

9         A    I do use Apple products.

10        Q    Right.  And I -- and I can't help but ask, do

11   you see, you know, any -- I know you haven't been in the

12   design process recently, but do you see any influences

13   from Piles and aspects of the things you worked on in

14   the products we have out today?

15        A    I do see some.  You know, I like to look at

16   the new products when they come out and say -- a lot of

17   times, I see something that I feel like we really

18   influenced.

19             For example, there was a little thing in a doc

20   a few years ago that shipped in OS 10 where the

21   documents came out in a kind of fan, and it was very

22   similar to some of the ideas we had here.

23             And then the iPad, when it shipped recently,

24   in the photo album, you can spread out your photos.  And

25   when I saw that, I just felt like, wow, we -- we did

2    day, and they felt some influence there.  It affected

3    them.

4         Q    Thank you, Ms. Salomon.

5              MR. SOOBERT:  Pass the witness.

6              THE COURT:  All right.

7              Cross-examination.

8                   CROSS-EXAMINATION

9    BY MR. STEIN:

10        Q    Good afternoon, Ms. Salomon.

11        A    Good afternoon.

12        Q    You said you started working at Apple in 1987;

13   is that correct?

14        A    That's correct.

15        Q    And you left in 1993 --

16        A    I did.

17        Q    -- is that right?

18             And you left then long before Tiger or Leopard

19   and Snow Leopard came out, right?

20        A    Right.  Yes.

21        Q    And you were not involved in the development

22   of Tiger, Leopard, Snow Leopard, were you?

23        A    No.  I didn't -- no.

24        Q    And you were not involved in the development

25   of Spotlight, were you?

2   evolved from some of the Apple search work that I was

3   doing.

4           So prior to this Piles project, there was

5   another project code named Rosebud, and there was -- we

6   did a number of projects with the Information Retrieval

7   Group.  It was like a nice collaboration between the

8   Human Interface Group and the Information Retrieval

9   guys.

10          And we did a lot of search explorations and

11  ideas for search interfaces that I know went into Apple

12  search, which was the precursor to several products that

13  then eventually led to Spotlight.

14      Q   You don't know if any of that work was

15  directly in Spotlight, do you?

16      A   I don't know personally.  I know that some of

17  the information retrieval people did go on, they stayed

18  at Apple, and I have a feeling that that stuff is

19  manifest in there.

20      Q   You weren't involved in the development of

21  Coverflow, were you?

22      A   No, I wasn't.

23      Q   And you weren't involved in the development of

24  Time Machine, were you?

25      A   No.

2    about 20 years ago, right?

3         A    Yes.

4         Q    And when -- when you were there, you tried to

5    get Apple to make a product with Piles; isn't that

6    correct?

7         A    You know, what ended up happening is, after we

8    did this work, we did a lot of presentations.  I

9    personally did a lot of presentations internally to

10   various different groups at Apple.

11             Our Human Interface Group would also have an

12   open house where we would always present to the whole

13   company, also.

14             And we did some work looking specifically if

15   Piles could be put on in OS 7 at that point.  So we

16   worked very closely with the Finder team doing some

17   exploration of what it would mean to migrate this work

18   from the research group to the near-term operating

19   system.

20        Q    So it sounds like you talked to a lot of

21   people there trying --

22        A    Yeah.

23        Q    -- to get it into a product, right?

24        A    Right.  Or to influence products.

25             I have to say, you know, sometimes -- because

2    would go complete and become a product.  It was more

3    that the migration of the ideas would find their ways

4    into a whole host of products.

5          So that's part of the reason for doing the

6    videos and for traveling around the company and

7    disseminating these ideas so that they could influence a

8    wide range of products.

9    Q    Apple never included Piles in the form that

10   was just shown in the product, right?

11   A    There's not a hundred percent implementation

12   of what you just saw up there.  But as I said before,

13   there have been little things that have happened that I

14   feel like we did have influence.

15   Q    There was no product that really had Piles

16   where people were dragging documents into piles, for

17   example, where the system was creating a pile, right?

18   A    Oh, there was nothing in the doc that was a --

19   like an aggregation of things in a folder that would

20   come out like a pile, so -- you know, it's all a matter

21   of degree, I guess I would say, because there were

22   definitely things that felt like they were influenced by

23   this.

24   Q    Didn't you try for a while to -- as you just

25   described, get various groups at Apple to implement

2       A    Well, you know, we were very realistic in the

3    Advanced Technology Group.  Again, we weren't thinking

4    that anybody was going to wholly embrace the totality of

5    it but that they would take pieces of it and incorporate

6    those pieces.

7            So our point of view was that we're going to

8    influence the things that are going on.  That was our

9    role as Advanced Technology.

10      Q    If there was a time that you just described

11   where you were actively going around Apple trying to

12   pitch it to be included in a product --

13      A    Yeah.  Make sure that the ideas were well

14   known and that, you know, people understood that this

15   work had been done, because it's kind of like crossing a

16   bridge.  The people doing the products needed to see

17   where this was relevant.

18           And we could supply the ideas and say here are

19   various different uses we see for it, but we need to

20   find that meeting place.

21      Q    You weren't just trying to get your ideas

22   incorporated; you were pitching various groups at Apple

23   to try to get a product out the door based on Piles,

24   weren't you?

25      A    Well, again, we were looking at how could our

2    development efforts that were going on.  I don't know

3    that I ever thought that this would be wholly

4    implemented as we designed it.

5              MR. STEIN:  James, can you put up PX21?

6        Q    (By Mr. Stein) That's the -- if you see it

7    there, that's the '101 patent that Mr. Soobert showed

8    you earlier.

9        A    Uh-huh.

10       Q    You understand, when I say '101, I'm just

11   referring to the last three numbers of the patent.

12       A    Uh-huh.

13       Q    And again, you're one of the named inventors

14   on that, right?

15       A    Right.

16       Q    And you understand that this patent was

17   directed to your work in Piles?

18       A    Yes.

19             MR. STEIN:  James, if you pull up PX37.

20       Q    (By Mr. Stein) This is a document that was

21   prepared by Apple earlier in the litigation, and it's a

22   document in which Apple answered written questions,

23   which Mirrors provided to it.

24             MR. STEIN:  If you could turn to Page 14.

25             And if you could blow up -- I think it's

2      Q    (By Mr. Stein) Now, in that paragraph, we

3  asked Apple whether Apple ever has made any -- made,

4  sold, or offered for sale any product that falls within

5  this scope of the claims of the '101 patent.

6           Do you see that there?

7      A    Uh-huh.

8           MR. STEIN:  James, if you could put up

9  Page 16.

10     Q    (By Mr. Stein) And on Page 16, you see Apple's

11  response to that question.  It says -- in the middle

12  there, it says:  Apple further responds that it does not

13  currently contend that it has sold or offered for sale

14  any product that falls within the scope of any claims of

15  the '101 patent.

16          Did Apple answer that question correctly, to

17  your knowledge?

18     A    You know, Apple would know better than me if

19  they felt that the claims of the patent were in any

20  product.

21          All I can tell you is, when I see certain

22  things, it makes me feel like we maybe had some

23  influence, but I have no way of knowing if we really

24  did.

25     Q    Now, you're familiar with Coverflow, right?

2       Q    Now, you don't think that Coverflow includes

3  any of the concepts you developed in connection with

4  your Piles project, do you?

5       A    I've never thought that Coverflow was

6  something that came from our project.

7       Q    And Piles are not the same as Coverflow, is

8  it?

9       A    I hadn't really thought of it that way, no.

10      Q    Now, earlier you mentioned Piles, that could

11 be a pile of everything --

12      A    Uh-huh.

13      Q    -- you said, and that they're not bounded.

14           Would Piles, displayed in their entirety on

15 the screen -- it's just one unit stacked up of the

16 stacked documents?

17      A    Right.  But a pile -- in the same way that you

18 can open a folder today and open a window, send, and

19 have it go off your screen, the pile could potentially

20 go off what's visible as well.

21      Q    Well, wasn't that an open issue at the time

22 you were developing Piles, how to handle piles that got

23 too big?

24      A    We didn't -- I don't know that -- I don't

25 remember anymore, but I don't believe that we literally

2    that said we needed to constrain the extent of a pile.

3              MR. STEIN:  If you could pull up

4    Exhibit PT11.

5              If you could go to the second page.

6      Q    (By Mr. Stein) That's -- what's shown there is

7    a copy of one of the patents that's at issue in this

8    lawsuit.  It's one of the Dr. Gelernter's patents.

9      A    Okay.

10             MR. STEIN:  If you -- sorry.  If you can

11   go where you zoomed in.  No.  The -- there.

12     Q    (By Mr. Stein) Do you see that patent at the

13   bottom?  It says 6,243,724 --

14     A    Uh-huh.

15     Q    -- Mander, et al.  That was another one of the

16   patents that Mr. Soobert showed you earlier, correct?

17     A    I'm not sure that -- there was one from 2003,

18   I think.  I'm not sure of the dates.  The Mander, et al,

19   that could very well be the patent that we looked at

20   earlier, but I'm not sure.

21     Q    Okay.  Well, I believe it was.

22     A    Okay.  Yeah.

23     Q    And that patent -- your patent is cited --

24   it's in --

25             MR. STEIN:  If you could pull out a

2       Q      (By Mr. Stein) It's under the section,

3   References Cited, on the patents-in-suit.

4       A      Okay.

5       Q      Do you know that that means that the Patent

6   Office can consider that patent during prosecution?

7       A      I guess.  I'm not that familiar with all

8   aspects of this process, but I would assume that's what

9   that means.

10      Q      Yeah.  You have a couple of patents.

11      A      Right.

12      Q      And so you've been through it, right?

13      A      Right.  But more on the -- you know, on the --

14  supplying the information for the patents.

15      Q      And the Patent Office issued Dr. Gelernter's

16  patents even after having reviewed your patent, right?

17             The numbers on your patent -- the number of

18  your patent is on his, right?

19      A      It looks that way, the best I can tell here.

20      Q      Do you know if the New York Times ever wrote

21  an article about Piles?

22      A      I don't know.  Yeah.  There were some -- you

23  know, there -- well, no, I don't actually know.  There

24  was some articles about our work over the years, but I

25  don't remember specifically if they did write about

2                    MR. STEIN:  Thank you.

3                    MR. SOOBERT:  No further questions.

4                    THE COURT:  All right.  Thank you.

5                    MR. RANDALL:  Your Honor, our next

6    witness is Brian Croll.

7                    THE COURT:  Brian Croll.  Okay.

8                    MR. RANDALL:  Your Honor, may I approach

9    the bench briefly?

10                   THE COURT:  I'm sorry?

11                   MR. RANDALL:  May I approach the bench?

12                   THE COURT:  Yes, you may.

13                   (Bench conference.)

14                   MR. RANDALL:  I spoke with counsel

15   before -- I spoke with counsel before about this.  He

16   has a computer that he wants to just run through a

17   couple of features on.  He's a marketing guy, and he

18   just wants to run through a couple of features.

19                   It has too much high resolution, so it

20   can't fit -- plug into the system.  We will place it on

21   that table in a way that everybody can see.  You,

22   unfortunately, are going to be a little bit blocked.

23   We're going to point it towards the jury about like

24   that, at that angle.

25                   Is that okay, Your Honor?

2                    MR. RANDALL:  Okay.  Thank you.

3                    MR. CARROLL:  Judge, two or three of the

4    jurors are really coughing.  Can the Marshal --

5                    THE COURT:  What?

6                    MR. CARROLL:  Coughing.  The Marshal is

7    welcome to get my cough drops and give them to them.  I

8    just, obviously, don't want to do it.

9                    MR. RANDALL:  And one other issue.  It's

10   a legal issue.  And that is, I would like to renew my

11   request to get into the re-exam material, because they,

12   again, are bringing up the fact that their patent is

13   issuing over and has been considered by -- over the

14   Piles patent; and that was just another reference to it

15   again, Your Honor, when, in fact, that patent that he

16   just referred to, as it stands, was rejected in re-exam

17   over the Piles patent.

18                   THE COURT:  Denied.

19                   MR. RANDALL:  Okay.

20                   THE COURT:  How long are you going to go

21   with this witness?

22                   MR. RANDALL:  I think about -- I think 20

23   minutes, but it could go 25-ish.

24                   THE COURT:  Okay.

25                   (Bench conference concluded.)

2  right hand.

3                    (Witness sworn.)

4                    THE COURT:  Is the jury all right for

5  about another 30 minutes before we break?

6                    You'll hang in there?  Okay.

7                    MR. RANDALL:  Your Honor, my partner, Mr.

8  Platt, will present Mr. Croll.

9                    THE COURT:  All right.

10                   MR. PLATT:  May it please the Court.

11  Richard Platt on behalf of Apple.

12              BRIAN CROLL, DEFENDANTS' WITNESS, SWORN

13                       DIRECT EXAMINATION

14  BY MR. PLATT:

15      Q    Good afternoon, Mr. Croll.

16      A    Good afternoon.

17      Q    Could you introduce yourself to the jury and

18  identify your position with Apple?

19      A    Yes.  I'm Brian Croll.  I'm the Vice President

20  of Product Marketing for Mac OS 10 software.

21      Q    And when did you start at Apple?

22      A    I started at Apple in the summer of 2001.

23      Q    And can you give us a general understanding of

24  your job responsibilities at Apple?

25      A    Yeah.  I'm in product marketing, and that's

2   product, taking technology and making it a commercially

3   viable product at the end of the day.

4           So I work with -- I work with an engineering

5   team kind of hand in hand.  They worry about the

6   technology, and then I worry about whether this is

7   actually going to be something that someone really wants

8   at the end of the day.

9           So I work with my engineering partner, a guy

10  named Bertrand Serlet.

11      Q    Now, you said you're Vice President of Product

12  Marketing.  Is that like the typical kind of marketing

13  or sales that we think of when we think of marketing?

14      A    No, no.  It's not -- it's not, you know,

15  marketing communications and doing advertising and

16  things like that.  This is really about building a

17  product and making sure that that product is going to

18  sell.

19          So that's the main focus, is that active

20  building a product with our engineering team.

21      Q    Now, Mr. Croll, do you have an understanding

22  as to why consumers buy Apple's Mac products?

23      A    Yeah, I do.  You know, I've been at Apple for

24  a long time, and I've gotten a really good sense of what

25  it is that they like in a Mac, and -- you know, and it

2   been there.

3       Q   And what's some of the information that you
4   gather on how -- how -- how folks buy Macs?

5       A   Yeah.  I -- in order to really determine why
6   they buy a Mac, information comes from all sorts of
7   different areas, you know, from -- we get a lot of
8   e-mails from customers, from people looking at
9   computers, asking questions, and, you know, giving us
10  feedback on the product.

11          We also, you know, hear a lot from journalists
12  who review the product, and they give us a lot of
13  information as to what they like or don't like with the
14  product.

15          You know, and also friends and family.  You
16  know, you go talk to people, your own friends, and see
17  what they like or don't like in a product.  My mom is a
18  great source for me to find out what we should be
19  building or not.

20      Q   Now, Mr. Croll, there's been a suggestion that
21  the reason why people buy Macs is because they include
22  Spotlight, Coverflow, and Time Machine.

23          Do you agree with that?

24      A   No, I don't think that's why they buy a Mac.

25      Q   And why not?

2    has to do with a lot of other factors, actually.  When

3    they're buying a computer, I think the thing that they

4    really worry about the most is the design.

5              So we -- we take a lot of time and effort and

6    a lot of engineers to make sure that the computer looks

7    great in your house.  Because when you want to bring it

8    home, you put it in your Kitchen or in your family room

9    or wherever, you want it to look good with all the rest

10   of your furniture.

11             So we've really concentrated on building an

12   extraordinarily attractive design with very few cables,

13   you know, an all-in-one computer.  So that's one of the

14   main reasons.

15       Q    Mr. Croll, we brought an iMac here with us

16   today.

17             MR. PLATT:  With the Court's permission,

18   could we have Mr. Croll demonstrate some of the features

19   in the iMac?

20             THE COURT:  Yes, you may.

21             MR. PLATT:  Okay.  Come over here.

22             THE WITNESS:  So is this -- yeah, it's

23   all there.

24             All right.  Thank you very much.

25       A    So as I mentioned, the first thing that people

2    we pay a lot of attention to the materials on -- on the

3    actual computer.

4              So if you look, you have the, you know, really

5    nice mold -- aluminum.  You know, it's a beautiful --

6    beautiful finish.  The glass is really special glass

7    that makes the monitor look really bright and

8    attractive.

9              It's also really nicely glued on to the sides,

10   so it's super smooth.  So you don't see any really ugly

11   seams in the design.  So the design is real important.

12             And one of the other really amazing things

13   about a Mac is, when you look at it, this is a whole

14   computer.  This is the monitor; the computer is in here;

15   the disk drives; all the memory; the graphics;

16   everything is just here.

17             So, you know, a lot of computers, they have

18   it, and it's on the ground, and it has a lot of cables

19   and stuff going up into it.  We got rid of that, so it's

20   more attractive in your house.

21        Q    (By Mr. Platt) Now, Mr. Croll, where do you

22   put the -- can you show us where you put the CD in

23   and --

24        A    Yeah.  It's on the other side.  You have to

25   rotate it around.

2      just a slot where you can put a DVD or a CD in.

3              Also, over here, if you want to put a little

4      card in from a camera, just stick it right there.  And

5      it's really sleek and real attractive.

6              And also, you'll notice there's only one power

7      cable, just like a toaster.  You know, just make it

8      really simple.  Not a lot of different cables, you know,

9      going everywhere in your house.

10             The keyboard itself is wireless, so there's

11     no -- again, no cable there.  And also the mouse down

12     here, you know, you look at this.  It's just a nice, you

13     know, pointing devices, and it's really beautifully, you

14     know, crafted.  It's like a little work of art itself.

15             So we take a lot of time to build -- you know,

16     to build a computer that's attractive that you want in

17     your house.

18         Q    All right.  Is there a camera as well on it?

19         A    Yeah.  The camera is up here.  So every one of

20     our systems ships with a camera, so you can do video

21     conferencing to friends and family, which is another

22     really important thing that people love to do.

23         Q    Now, we've talked about the hardware, so what

24     else is great about the Mac?

25         A    Well, in addition to the hardware, right,

2    a lot of software that comes with it.  And we bundle in

3    all sorts of software, so you don't have to go buy extra

4    through applications, you know, after you buy the Mac.

5              So if I could just slip over here and show you

6    some of the --

7       Q    Can you show us some of those applications,

8    Mr. Croll?

9       A    Sure.

10             You know, the first one I'm going to show you

11   is one called Dashboard.  And it's kind of neat, because

12   we can do it with one click, and you're going to see all

13   of these little dinky applications come up.

14             And the idea here is, there are certain things

15   you just want to see in a flash, in an instant, like the

16   time somewhere, you know, some weather, and so forth.

17             And I can just click and, you know, make it go

18   away.

19             So just a quick look at what time is it right

20   now or what's the date.  So that's one of the features.

21             We have another application called the Finder,

22   and what this is all about is having a bunch of folders

23   that allow you to kind of -- just like a file cabinet,

24   you know, except it's an electronic version.  We can go

25   through and see where all the files that you've kept,

2        The other thing is, we have a -- and there it

3    is.  We have another thing that -- an address book, you

4    know, a real simple application, really powerful.  This

5    is just like the little calendar, you know, date address

6    book that you carry around, and it has all of your

7    friends and families and their addresses and contact

8    information.

9        Additionally, you know, just -- we have --

10    just like you might put on your fridge where you have a

11    little paper calendar, we have an electronic version of

12    that with all of your, you know, appointments you have

13    in a day.

14        Mail comes with it as well.  And mail is just

15    for sending and receiving messages.  Very simple.

16    Simple but power concept.

17        We also have the Safari browser.  And this is

18    the software used to go to websites and browse around

19    the internet.  And you can see here that you have a lot

20    of little thumbnails of your favorite sites to see what

21    it looks like, and you can just click on and go to the

22    different websites you like.

23        And then finally, the one I want to show you

24    last here is something called iPhoto.  And iPhoto is

25    like the shoebox for your -- all your pictures that you

2    pictures, and you dump them in a shoebox.

3            Well, this is an electronic version of that

4    because now we're, you know, in a world where it's all

5    digital photography.

6            So this is like your digital shoebox where you

7    can put all of your pictures in there, and then if you

8    want to take a look at a picture close up, you can do

9    that and look at it, you know, scroll through all the

10   pictures.  So, you know, that's iPhoto.

11           And then the last thing just real quick that I

12   want to show you that's really, really cool, people love

13   this, is I put a bunch of folders up there.  I have an

14   address book, I have Safari, the browser, and, you know,

15   iPhoto.

16           So what I want to do is do something called

17   Expose.  And you click on the button, and what it does

18   is, it just fans out and shows you all the windows.

19           So if I want to then take a look at my

20   calendar, I just click there.  If I want to go back, you

21   know, I get a bird's-eye view of all my windows.  I can

22   then just, let's say, choose my photos again and come

23   back there.

24           So it's really a nice and convenient set of

25   features that -- people really like all the software.

2  great features in Mac?

3      A    Actually, there's quite a few other ones.  You

4  know, if I wanted to look at some other applications,

5  for instance, if I go down here, I can click on this

6  folder -- this is what we call a stack -- and all of

7  these other different applications are there; and you

8  can choose from there as well, if you wanted to see

9  something else that's not here along the bottom where

10  the other applications are.

11      Q    Now, Mr. Croll, what if you wanted to find

12  like your dictionary application?  Can you show how you

13  can find it?

14      A    Yeah.  Yeah.

15          So if -- there's another feature called

16  Spotlight, and Spotlight allows me to find things really

17  quickly.

18          So if I go up here on the upper right -- I

19  made it kind of visible for people to see -- I can click

20  on this little magnifying glass.  It's kind of like

21  looking at something, and I can click here, and I get a

22  place to type.

23          So I'm going to just type in, you know, a

24  dictionary.  And one of the things that's amazing, I

25  just typed in D, and right from there -- it's really

2        And if I just type a little more, I can do

3   this.  And this is the way a lot of people like to find

4   their applications.  It would be here.  Dictionary,

5   dictionary comes up.  And then, for instance, if I

6   wanted to type apple, I can do that, hit return, and

7   then I get dictionary lookup for the word apple.

8        So it's a nice thing to have an online

9   dictionary, to get at it really fast through Spotlight.

10   Q    Can you do other things with Spotlight besides

11   searching?

12   A    Yeah.  It's kind of a nice handy thing.  What

13   I could also have done is, if I typed in apple up

14   here -- excuse me for showing you my back here.  Let me

15   turn around here.

16        So if I type in apple right into the

17   Spotlight, I can do down and take a look.  It says

18   definition, and it has a little definition right in the

19   line.  If I want more, I hit return, and it goes

20   straight to apple and shows me the definition there.

21        So -- and I can just, you know, have a

22   dictionary right at the touch of my fingers here.  So

23   it's really, really easy to do that.

24   Q    Now, Mr. Croll, we've been talking about Mac

25   systems.  And sitting there is a -- is a software

2      A      Uh-huh.

3      Q      Are you familiar with that?

4      A      Yes, I am.  Yeah.

5      Q      Can you explain what the difference is between

6   a software upgrade and the Mac system?

7      A      Yes.

8             So when you're going to buy a computer, you go

9   into the store, and you buy the Mac, which is all the

10  hardware here; it's the mouse; it's the keyboard.

11            That's the hardware, and that's the system.

12            It comes to shipping with an operating system

13  running on it, and the operating system is responsible

14  for drawing all the stuff you see on the screen.

15            Then a lot of times after the fact, after

16  you've bought a Mac, later we'll come out with an

17  upgrade.  We make some innovations.  We do some new

18  things, have a new version of the operating system.

19            And we will sell this box.  Essentially, you

20  put it into the DVD slot, and then you can upgrade and

21  get the new features that weren't there when you first

22  bought your Mac.

23     Q      Now, what's the difference between the market

24  for hardware and the market for the software?

25     A      Let's see.  We sell about -- the total out of

2    the software upgrades.

3             So the vast majority that we sell are the

4    actual systems, which makes sense.  That's what we sell,

5    is Macs.

6        Q    Now -- thank you, Mr. Croll.  You can return

7    to your seat.

8        A    Okay.  (Complies.)

9        Q    Now, Apple conducts surveys regarding its

10   products; is that right?

11       A    Yes, that's correct.

12       Q    And some of those surveys relate to software

13   upgrades; is that right?

14       A    Yes, that's true.

15       Q    Okay.

16            THE COURT:  Just a minute.  We're going

17   to mark that as Court's Exhibit No. 5 now, and

18   Ms. Ferguson's going to take custody of it.

19   [Laughter]

20            THE COURT:  Don't put it up.  No.  I'm

21   kidding.

22            Go ahead.

23       Q    (By Mr. Platt) Now, Apple's -- Apple's (sic)

24   perform surveys with respect to its software upgrades;

25   is that correct?

2     Q    Do those surveys tell you why people purchase

3 Mac systems?

4     A    No.  They're not for that.

5     Q    And why is that?

6     A    So those surveys tell us how people actually

7 use the features in our operating systems, and

8 specifically, you know, why would they upgrade their

9 computer.

10     So it's really mostly about the upgrade sale,

11 and it's specifically what they used when they bought

12 the upgrade.

13     Q    Now, what are some of the other reasons why

14 people buy Mac computers?

15     A    Right.  So in addition to the -- the actual

16 design, which is, you know, really important and also

17 the software, the other really key thing is, they're

18 super reliable systems.

19     And if you've used computers in the past, you

20 know it goes -- you know, you get a blue screen, things

21 crash, and it always seems to do it right when you don't

22 want it to do that.

23     And we've worked really hard -- we have a

24 technology at the core of Mac OS 10 called units, which

25 is a technical thing, but it's extremely reliable.  So

2      Q    And are there -- are there other reasons why

3  people buy products from Apple?

4      A    So the reliability is important, as well as

5  also security.

6           So, you know, if it hasn't happened to you,

7  you read about people getting these viruses on their

8  computer off the internet, and, you know, they can be

9  really bad for your computer, and they can get -- you

10 know, take personal information.  It's kind of a

11 dangerous world out there on the internet.

12          And one of the great things about Mac OS 10

13 is, we don't get those PC viruses.  So people have a

14 real safe experience with the Mac, and I think that's

15 really important for them so that they don't have to

16 worry about all of those viruses as well.

17     Q    And Apple has a number of retail stores across

18 the country; is that right?

19     A    Yes, that's true.  We have about 200 in the

20 U.S., somewhere around 15 in Texas, and I think -- I

21 think one of our early ones was in Plano.  It was the

22 No. 3, if I remember correctly.

23     Q    You know, can you tell us some of the things

24 that -- that, you know, Mac consumers look to from the

25 Apple retail stores?

2            So a lot of times -- the technology behind a

3   personal computer is really pretty complex, and you need

4   someone to really help you figure out, first of all,

5   which one is the right one that you want, and then after

6   you've bought it, you know, help people figure out how

7   to use it.

8            So we have a whole set of retail stores that

9   are really focused in on having great sales associates

10  that can come in and really help people out and

11  understand it.  Not everybody understands all the

12  details on technology, so they can -- people really love

13  those retail stores.

14     Q    And do the Apple retail stores offer them, for

15  example, like one-on-one tutoring?

16     A    Yeah.

17            So -- so one of the things -- if you buy a

18  Mac, one of the things we'll offer you is the ability to

19  buy lessons.  So you can take a year's worth of lessons

20  every -- once a week, go in and talk to someone, and

21  they'll, you know, show you how to use -- how to use the

22  system, get more out of it.

23     Q    And can you tell us about sort of the Apple

24  geniuses, I guess I'll call them?

25     A    Oh, yes, Apple geniuses.

2    people that we train, and we call them geniuses.  And

3    the reason we call them geniuses is they know everything

4    about the system.

5            So when you have a problem with your computer,

6    you -- there's somewhere -- somewhere to go and someone

7    to talk to to help you figure out what's going on with

8    the system and fix it.

9            And they can oftentimes even fix it right

10   there in the store for you, so you don't have to send it

11   off to somewhere else to get it fixed.

12   Q    So, Mr. Croll, thank -- thank you for

13   explaining about the Apple Mac.

14           You know, I have one more question for you.

15   Before this case, had you ever heard of Mirror Worlds or

16   Dr. Gelernter?

17   A    No, I hadn't.

18           MR. PLATT:  No further questions.  Pass

19   the witness.

20           THE COURT:  Cross-exam.

21           CROSS-EXAMINATION

22   BY MR. DIAMANTE:

23   Q    Hi, Mr. Croll.

24   A    Hi.

25   Q    My name is Joe Diamante.  I'm from the south,

2    okay, if I get going.

3           So that was a nice -- that was a nice little

4    demonstration you showed us, and I took a couple of

5    notes, and I saw that you looked at about 10 features or

6    so?

7      A    Yeah.  Well, what was on the doc.

8      Q    And do you know how many of those features

9    Steve Jobs called revolutionary?

10     A    Well, I think probably all of them at some

11   point, because --

12     Q    Do you recall -- do you recall what he said in

13   the conference about Tiger -- excuse me -- Spotlight and

14   Tiger?

15     A    Not specifically.

16     Q    Well, do you recall him saying that it was the

17   most revolutionary feature in Tiger?

18     A    I don't necessarily remember that, but we

19   oftentimes call our features revolutionary.

20              MR. DIAMANTE:  Can you turn -- can you

21   put up PX338?

22              Turn to the second paragraph, I believe.

23     Q    (By Mr. Diamante) Can you read that, sir?

24     A    Yes, I can.

25     Q    It talks about the conference in 2004,

2   of Tiger, according to Jobs, is a new search tool known

3   as Spotlight, correct?

4        A    That wasn't what was -- okay.

5        Q    All right.  By the way, were you at the

6   conference?

7        A    Yes, I was.

8        Q    Okay.  And I think you called Spotlight

9   amazing; am I correct?  It's kind of late, and I haven't

10  had much coffee today.  Did you say --

11       A    Yes, it is amazing.

12       Q    And you're not trying to tell us all here that

13  the three accused features, Spotlight, Coverflow, and

14  Time Machine are not important to consumers, are you?

15       A    They're actually not very important to people

16  who are buying Macs.

17       Q    Okay.  Is that your personal feeling?

18       A    Yeah.

19       Q    Did you say you -- you're in marketing, aren't

20  you?

21       A    Yes, I am.

22       Q    Did you ever tell the country, all these

23  people here, that those three features are not

24  important?

25       A    No.  What we do is we talk about the important

2  design, you know, the reliability of the software, the

3  amount of software we have.  All those things are the

4  things that people really worry about when they're

5  buying a Mac.

6     Q    That's a very pretty machine, but would

7  anybody buy it if it didn't have good search capability?

8     A    Yes.

9     Q    Okay.  Thank you, sir.

10         Now, I think you said you came onboard in the

11 summer of 2001?

12    A    August of 2001.

13    Q    And that's perfect timing.

14         MR. DIAMANTE:  Can I see -- can I see --

15 see, it's a favorite here.  Can I see PX193?

16    Q    (By Mr. Diamante) This is a -- one of the

17 favorite e-mails of this case.  This is from Steve Jobs.

18         So you see that, sir?

19    A    Yes, now I do.

20    Q    Have you seen it before you came to court

21 today?

22    A    No, I have not.

23    Q    You see that Mr. Jobs -- I'm not going to go

24 through it, because I think everyone is sort of tired of

25 it, but there's a couple of people copied, and I see

2      A      Uh-huh.

3      Q      And you just told us that's what -- that's

4  someone you report to, correct?

5      A      No, I don't report to him.

6      Q      You work with him, right?

7      A      I work with him.

8      Q      And this guy -- excuse me -- a Mr. Bereskin?

9      A      Ken Bereskin (pronouncing).

10     Q      Yeah.  He -- did he work for you at that time?

11     A      He did work for me at that time.

12     Q      Do you know if they had any contact with

13  Dr. Gelernter or Mirrors World?

14     A      No, I do not.

15     Q      Okay.  You don't know that, right?

16            And of course, you were not -- Apple is all

17  about innovations, correct?

18     A      Yes.

19     Q      And you don't want to spread the word about

20  other people's innovations, correct?  Because that would

21  be wrong, right?

22     A      (No response.)

23     Q      Correct?

24     A      That's not something we were concerned with --

25     Q      You don't -- of course not.

```
 2      Q    Of course not.

 3                 MR. DIAMANTE:  Can we turn to PX193?

 4      Q    (By Mr. Diamante) This is another e-mail about

 5  Dr. Gelernter's company, you see?  It's dated September

 6  6th, 2001.  You see this Mr. Serlet, Mr. Bereskin on

 7  this.

 8            Do you see that?

 9      A    Yes, I do now.

10      Q    And by the way, Mr. Serlet is a senior vice

11  president, correct?

12      A    I believe so, yes.

13      Q    And there's also --

14                 MR. DIAMANTE:  Go back to the CC list?

15      Q    (By Mr. Diamante) -- is also Mr. Forstall.

16                 MR. DIAMANTE:  Just say 1 -- 191.  Well,

17  we lost it.

18      Q    (By Mr. Diamante) Mr. Forstall, is he an

19  executive vice president at your company?

20      A    I don't -- I don't believe he's an executive

21  vice president.

22      Q    Do you know that -- don't you know he's in

23  charge of the iPhones?

24      A    He -- he's in charge of the software.

25      Q    Okay.  Mr. Croll, you just told us a few
```

```
 2  correct --

 3       A    That is correct.

 4       Q    -- before this lawsuit?  Okay.

 5            MR. DIAMANTE:  Can I -- can you show me

 6  PX391?

 7            And can you turn -- let me see.  Turn to

 8  the first page, please.

 9       Q    (By Mr. Diamante) This is another favorite

10  here that's -- see the top?  It says: Merlot planning

11  offsite.  Do you see that?

12       A    Yes.

13       Q    December 6th, 2003.  Do you see that, sir?

14       A    Yes, I do.

15            MR. DIAMANTE:  Can you turn to the last

16  page, please, of this document.  I think it's Page 86,

17  the last two digits.

18       Q    (By Mr. Diamante) You see the list of

19  attendees, sir?

20            MR. DIAMANTE:  What happened?  That's

21  Page 557986, Exhibit 391.

22            James, you'd lose your job.  You got it?

23       Q    (By Mr. Diamante) Do you see your name on

24  there?

25       A    (No response.)
```

2      A     I'm sorry?

3      Q     Do you see your name on the list of the

4  attendees?

5      A     My name?  Oh, I'm sorry.  I didn't understand.

6  Yes, I do.

7      Q     You went to this, didn't you?

8      A     I believe so.

9      Q     And you see also Ken Bereskin, and he worked

10  for you, didn't he?

11     A     That's correct.

12     Q     And there's a couple of other people there I

13  think you know.

14           You know Chris Bourdon, is it?

15     A     Yes, I do.

16     Q     He worked for you, didn't he?

17     A     Yes, he does.

18     Q     And can you tell us what all he did for you?

19     A     He is a -- was a product line manager.

20     Q     And specifically, sir, didn't he market

21  Spotlight, Coverflow, and Time Machine?

22     A     He -- he marketed definitely the -- the

23  software features for upgrades but did not market it in

24  relationship to the Mac.  It would always just be for

25  the software upgrades.

```
 2   managing group that marketed Spotlight, Coverflow, and

 3   Time Machine?  Is that your testimony?

 4        A    He marketed it for Mac OS 10 upgrade

 5   software --

 6        Q    Is that a yes?

 7        A    -- but not for the Mac.

 8        Q    Is that a yes?

 9        A    It's a yes with qualifications that he did it

10   for the Mac OS 10, not for the Mac.  They're very

11   different things.

12        Q    And you see, sir, also in this is a Scott

13   Forstall.  We just talked about him a few minutes ago.

14   He was on a couple of Jobs' e-mails.

15             Do you see that?

16        A    Yep.

17        Q    He's up there, too, right?

18        A    Uh-huh.

19        Q    So he was there, too.

20             Anybody else that you know?

21        A    I knew most of the people in this.

22        Q    Oh, you do.  Okay.

23             And -- but the ones in your department was

24   Chris and Ken, correct?

25        A    That is correct.
```

```
2      A    That's correct?

3      Q    Is that true?

4           They were in your specific marketing

5  department?

6      A    Yes, they are.

7      Q    Thank you.

8      A    They were.

9      Q    And let's -- before we get off Scott

10  Forstall --

11           MR. DIAMANTE:  Can I show --

12      Q    (By Mr. Diamante) Just keep this in your brain

13  for a second.

14           MR. DIAMANTE:  Can I have PX14?

15      Q    (By Mr. Diamante) Here's an e-mail -- e-mail

16  from Steve Jobs to Scott Forstall, and here's Mr. Jobs

17  talking about the Scopeware website again, see?

18           That's the only thing that's on this web -- in

19  this e-mail, correct?

20           Do you see that?

21      A    Apparently.

22      Q    And there's Scott -- cc:  Scott Forstall who

23  we spoke about.  And who's B-A-S?  Do you know who that

24  is?

25      A    A guy named Bas.
```

```
 2    A    I don't know if Bas was involved.

 3    Q    You don't know.  Okay, sir.

 4         Scott Forstall was, wasn't he?

 5    A    I believe so, yes.

 6    Q    Okay.

 7              MR. DIAMANTE:  And can we go back -- I'm

 8    sorry.  Can we go to PX110?

 9    Q    (By Mr. Diamante) These are the notes from the

10    Merlot offsite, sir, which you attended, correct?

11    A    I don't remember the notes, but --

12    Q    But you attended the meeting, correct?

13    A    I attended the meeting, but I don't recognize

14    the notes.

15              MR. DIAMANTE:  And can we look at the

16    first page?

17    Q    (By Mr. Diamante) There's a reference to

18    something called Panther.  Do you see that?

19         I think it's -- do you see that, about

20    three-quarters of the way?  If so, how should it differ

21    from what we did for Panther?  You see that's a

22    question?

23    A    Okay.  I see it.

24    Q    You see that, right?

25    A    Yeah.
```

2  existed before Tiger, correct?

3      A    Yes, it was.

4      Q    And it had some type of searching technology,

5  correct?

6      A    Yes, I believe Panther had some searching.

7      Q    And didn't the Spotlight technology, which

8  came out later on -- was much faster than the search

9  technology in Panther, correct?

10     A    Yes, it was.

11          MR. DIAMANTE:  Now let's go to the third

12  page of this.  It's 1067950.

13     Q    (By Mr. Diamante) You see, sir, it says:

14  Suggested at the offsite, Yale professor, David

15  Gelernter -- excuse me -- David G, new ways of finding

16  info.

17          Do you see that, sir?

18     A    Yes, I do.

19     Q    And do you know who David Gelernter is, sir?

20     A    No, I don't.

21     Q    You don't know who he is?

22     A    I, just in the prep for this case, have

23  heard --

24     Q    These notes indicate, sir, that this was a

25  topic spoken at this -- at this offsite, correct, sir?

```
 2      Q      Really?  Okay, sir.

 3             Do you see, sir, that Dr. Gelernter's

 4      technology, just like Spotlight, allows for rapid

 5      searching of data?  Do you know that, sir?

 6      A      No.

 7      Q      But you were at this meeting, correct?

 8      A      I was at that meeting.

 9      Q      Great.  Thank you.

10             All right.  Let's talk a little bit about

11      Spotlight.  Didn't you ever call Spotlight an

12      innovation?

13      A      Yeah, it was very innovative.

14      Q      Okay.  You remember saying that, correct?

15      A      I could easily have said it, because it is

16      very innovative.

17      Q      And do you know Steve Jobs?

18      A      I've worked with him.

19      Q      He knows you; waves to you in the hall?

20             Do you know that --

21      A      He knows my name.

22      Q      Do you know that Steve had a personal interest

23      in this Spotlight project?

24      A      Not -- not particularly.

25      Q      Do you know -- do you know he went so far as
```

2    that?

3         A    I think he participated in the process.

4              MR. DIAMANTE:  Can I show you PX893?

5         Q    (By Mr. Diamante) See that, sir?

6              MR. DIAMANTE:  Can you make that a little

7    larger?

8         A    Uh-huh.

9         Q    (By Mr. Diamante) Want to read that for us,

10   sir?

11        A    It says:  The best think so far...drum roll:

12   Spotlight.

13        Q    Did you have discussions with -- because

14   you're marketing, ever discuss that Steve was helping to

15   name the feature?

16        A    So the way it works is, my team, we come up

17   with a lot of different names.  And we, you know, had

18   a -- I think Searchlight was one of the names and a

19   bunch of different names.

20             And so what we'll do is, we make a

21   recommendation, and like, you know, most CEOs, he would

22   say:  Yeah, this is the one I like.  Let's go with that

23   one.

24        Q    And he personally decided it should be

25   Spotlight, didn't he, sir?  Right?

2    Q    Have you ever seen an e-mail where Steve Jobs

3    named any of the other projects, any features?

4    A    I'm sorry.  What --

5    Q    Did Steve help -- did you ever see any e-mails

6    or documents indicating that Steve Jobs named any other

7    features you showed us today?

8    A    I don't know if there was e-mails, but he

9    certainly was involved in the naming of almost every

10   name we've talked about.

11   Q    Did he say:  Drum roll...Dashboard?

12   A    He could easily have said that.

13   Q    Do you have any documents?

14   A    No.

15   Q    Okay.

16   A    But I was there.

17   Q    Now, you didn't speak about a couple of other

18   features that are accused here.

19        You heard of something called Time Machine,

20   correct?

21   A    Yes.

22   Q    Didn't you once call it a wow feature.

23   A    It is a wow feature, yes.

24   Q    Okay.  What do you mean by wow feature?

25   A    When you look at it or when you hear what it

 2   it.

 3        Q    And does Steve --

 4        A    Those features are really wow features.

 5        Q    Did Steve --

 6        A    We don't make features that aren't wow

 7   features.  That's what we do.

 8        Q    Do you think these wow features are important

 9   to consumers or just important to you?

10        A    I think they're important to me, because they

11   make me go wow, and the thing is that they're going to

12   be important to other people as well.

13        Q    It doesn't make anybody else go wow?

14        A    Pardon me?

15        Q    Does it make anybody else -- anybody else go

16   wow besides you?

17        A    Like I said, it's also important to other

18   people as well as me.

19        Q    And Apple has something called a COO, correct?

20        A    Yes.

21        Q    That's the Chief Operating Officer, right?

22        A    That's correct.

23        Q    And he's -- what does he do there?

24        A    He's the Chief Operating Officer.  He manages

25   a very large chunk of Apple.

2    of command, correct?

3        A    Yes.

4        Q    Senior executive almost to Jobs but not quite.

5        A    Right.  Usually, the COO in a company reports

6    in to the President or the CEO.

7        Q    And I assume, sir, when you provide

8    information -- by the way, this man's name is Mr. Cook,

9    correct?

10       A    Yes, Tim Cook.

11       Q    I assume, when you give information, you try

12   to give as accurate information as possible, correct?

13       A    That's true.

14               MR. DIAMANTE:  Can I see Plaintiff's

15   Exhibit 161?

16       Q    (By Mr. Diamante) Did you write -- do you see

17   this e-mail, sir?

18       A    Yes, I do.

19       Q    Do you recall it?

20       A    Not specifically, but it seems familiar.

21       Q    How did you refer to Time Machine here, sir?

22       A    Let's see here.  It says it's with

23   ground-breaking new features, including Time Machine.

24               MR. DIAMANTE:  No further questions.

25               Thank you.

2                    MR. PLATT:  We have no further questions.

3                    THE COURT:  All right.  You may step

4    down.

5                    All right, Ladies and Gentlemen of the

6    Jury, we're going to take about a 10-minute break, give

7    you a chance to stretch your legs and use the

8    facilities, and we're going to come back and go till

9    about 11:30.  We'll be in recess -- I'm sorry.  Not

10   11:30.  That would be cruel and unusual punishment.

11   [Laughter]

12                    THE COURT:  We'll go until 5:30.  And so

13   we'll come back at 4:30.  That will give you just a

14   little less than 15 minutes to stretch your legs and get

15   refreshed.

16                    All right.  Be in recess.

17                    COURT SECURITY OFFICER:  All rise.

18                    (Jury out.)

19                    (Recess.)

20                    COURT SECURITY OFFICER:  All rise.

21                    (Jury in.)

22                    THE COURT:  Please be seated.

23                    All right.  Who will be your next

24   witness?

25                    MR. RANDALL:  Your Honor, Apple's next

2                    THE COURT:  Okay.  Has he been sworn?

3                    MR. RANDALL:  He has not.

4                    THE COURT:  If you would please raise

5    your right hand.

6                    (Witness sworn.)

7                    THE COURT:  All right.  Have a seat right

8    there.

9             GREG JOSWIAK, DEFENDANTS' WITNESS, SWORN

10                       DIRECT EXAMINATION

11   BY MR. PLATT:

12        Q    Good afternoon, Mr. Joswiak.

13             Could you introduce yourself to the jury and

14   tell them what your position is at Apple?

15        A    My name is Greg Joswiak.  People call me Jos.

16   I'm the Vice President of iPod and iPhone Product

17   Marketing.

18        Q    Can you give us a general description of your

19   job responsibilities in that role?

20        A    Yes.  What we do is we work with our executive

21   team and our engineers on defining the products, what

22   are the features going to be, what are the products that

23   we're going to create, what are we going to sell them

24   for, you know, what makes up an Apple product.

25             And for me that's iPods and iPhones.

2    team -- would go out and tell people about what we do

3    with the products, create kind of the basic positioning

4    of the products, go out and talk to the journalists, go

5    talk to analysts, key people.

6            And so in that first phase, we're kind of, you

7    know, the customer's voice to Apple.  And in that second

8    phase, we're Apple's voice to the customer.

9       Q    Can you briefly describe your history with

10   Apple as a company?

11      A    Yeah.  I've been with Apple for over 24 years.

12   So I came there right out of college.  Really started

13   very near the bottom and have worked my way up.

14           So I started off in computer support in 1986.

15   Did that for a few years.  I moved over the what's

16   called our Developer Relations Team.  Those are the

17   people that write programs for our computers and was

18   responsible for technical marketing communication to

19   them.

20           Then in the mid-'90s, I moved into Product

21   Marketing and started doing the function that I talked

22   about, but originally for our desktops for our computers

23   like you see there for consumers and education.

24           Eventually, I got promoted to lead that

25   function for all of our portable computers, and then

2    Mac, and then these products that we created, like the

3    iPod.

4              Eventually, the iPod and the Mac were both so

5    big that we split them up.  So in 2004, I stuck with the

6    iPod and gave up my Mac responsibilities.  And then the

7    iPod kind of begat the iPhone, if you will, and I had

8    responsibility for the iPod and the iPhone.

9         Q    So you were with the company back in 2001 and

10   2002; is that right?

11        A    That's correct.

12        Q    Can you tell us a little bit about that time

13   in the industry and through how Apple handled that as a

14   company?

15        A    Yeah.  That is probably one of the most

16   important times in our history, because what had

17   happened in 2000, you probably heard about the internet

18   bubble burst.  You know, high-tech went into just a

19   tailspin with companies that start -- you know, business

20   wasn't so good.

21             So what most companies did was start laying

22   off employees, do massive layoffs.  And Apple took a

23   very different route.  We said very publicly that we

24   were going to innovate our way out of it.  We weren't

25   going to lay off our employees.  We weren't going to cut

2    down the road.

3         So we actually in 2000 and 2001 started on a
4    course of investing in our technology, our products, and
5    our employees to a greater extent than we ever had in
6    our history of our company.  And I think, you know, for
7    those reasons, the success we're having today relate
8    back to those days.

9    Q    Can you tell us about some of the products and
10   innovations that Apple came up with in that time when it
11   reinvested in itself?

12   A    Yeah, absolutely.

13        So in 2000/2001, again we started on a course
14   of all kinds of investments.  So obviously people
15   expected us to reinvest in creating new computers like
16   the iMac, but we also overinvested in portable
17   computers, because at that time, portable computers were
18   a very small part of our sales, but we didn't have -- we
19   didn't see any reason, if we did them right, they
20   couldn't be the majority of our sales.  And that
21   actually is true today.

22        We invested in a big OS transition, OS 10,
23   which I believe you saw a little bit earlier today.  We
24   created an entire retail strategy, Apple retail stores,
25   which today, there's 300 retail stores.  And at the time

2    crazy in opening up a computer retail store; but it

3    turned out to be a big part of the success the company's

4    having.

5              We also credited a whole Applications

6    Division.  Some of the software you see running on that

7    computer is created by an applications vision of a

8    thousand engineers that we were hearing during tough

9    times to create applications that would run better on

10   the Mac than it would on other computers, like on

11   Windows computers.

12             And that's also the times we created products

13   like iTunes and the iPod.  And, again, each time we did

14   those things, people kind of thought we were nuts and we

15   were going to be spending our money and going out of

16   business, but it became a very important part of our

17   success.

18        Q    Now, you mentioned iTunes.

19             Can you tell us about what iTunes is?

20        A    Yeah.   iTunes is a software application that

21   we introduced in January of 2001, and it's like a

22   digital jukebox, because what was going on in the

23   industry is people were -- instead of listening to music

24   on tapes and CDs, they were putting the music onto their

25   computer, which allowed them to listen to their music in

2    pressing it out to a CD and listening to it in a CD

3    player in the order they wanted it.

4            Well, we created iTunes, because it was still

5    kind of hard for people to do that.  It was kind of

6    geeky, and we created a real easy way for people to take

7    their music that was on their CDs, convert it onto their

8    computers, listen to it on their computers, or, again,

9    burn it out onto a CD, create a CD of their own.

10           Or once we created the iPod, be able to put

11   that music easily onto an iPod.

12       Q    Now, you mentioned the iPod.  Let me take a

13   look at this video, DX131 from back in 2001.

14               (Video clip playing.)

15               UNIDENTIFIED MALE:  There's something

16   really cool happening where music in this whole digital

17   world we live in started to come together, and in this

18   new digital music world, Apple has had lot of technology

19   to bring to the party.

20           We know how to make really cool small

21   devices.  We know how to make them beautiful and fun.  I

22   call it an amazing new device that fits in your pocket,

23   and it carries over a thousand songs.  So now you can

24   take your entire music library with you wherever you go.

25           This is a total solution.  Your iPod,

2    together seamlessly.  And only Apple can do that,

3    because we make the hardware, the software, all the

4    technology that allows us to solve problems for people

5    that no one else would dare take on.

6                   (End of video clip.)

7        Q    (By Mr. Platt) Sir, can you tell us about what

8    that video showed?

9        A    That's my boss, for one.  And what we were

10   showing there, and I think one of the key points that

11   Phil is making in describing the first iPod was, again,

12   what we try to do when we bring the solution to market,

13   which is, we do the whole thing, right?

14             We do the hardware, the part that you hold,

15   the software, which is what runs on that hardware and

16   makes it so easy to use.  And when we can, we actually

17   even the services.  That way everything just works

18   together and works in a -- in a fun and easy way for our

19   customers.

20       Q    Can you walk us through the various -- you

21   know, at a high level some of the releases, the

22   different versions of the iPod since 2001 up to today?

23       A    Yeah.  We've done a lot of them, so I'll just

24   maybe hit some of the highlights.

25             So in 2001, we brought out the first iPod, and

2   only was the industry in a funk, we introduced the first

3   iPod six weeks after 9/11.  And, again, most people were

4   not introducing new products as the economy was pretty

5   bad.

6           We brought out a second generation of the iPod

7   in 2002 that ran on Mac's MPCs.  But, truthfully, 2002

8   was kind of a lean year for us.  We didn't sell many

9   iPods.  It wasn't until 2003, when we created the third

10  generation of the iPod, which we like to say was thinner

11  than two CDs, really kind of a sleek little -- little

12  iPod.

13          And at the same time, we introduced the iTunes

14  music store.  So I told you how iTunes could manage your

15  music and put it onto your iPod.  Well, iTunes music

16  store allowed you to actually buy music legally for only

17  99 cents a song, and people loved that.  So that kind of

18  took this iPod business and it's when it really started

19  to spike up in 2003.

20          And then in 2004, we added the first new type

21  of iPod.  We added the iPod Mini, which was smaller,

22  more colorful.

23          And then in 2005, we brought in iPod Shuffle,

24  which is a really small device that you could wear and

25  listen to your music in kind of a random order which

2          And then in late 2005, we brought out two

3   important products:  The iPod Nano, which replaced the

4   iPod Mini; a really, really small player, really, really

5   thinner than a pencil.  And we brought out the video

6   capabilities into the bigger iPod, the fifth generation,

7   iPod Classic.

8          Another significant iPod we did was in 2007.

9   We did the iPod Touch.  And in each year, what we try to

10  do is really enhance all the -- re-do the iPods every

11  year, and that's worked out pretty well for us.

12     Q    In terms of sales of iPods and iTunes, you

13  understand Coverflow was introduced in the iPod in 2007?

14     A    Yeah, late 2007.

15     Q    And can you tell us sort of what happened with

16  Apple's sales once -- sort of how the sales have

17  transgressed since then?

18     A    Yeah.   iPod was already a giant success by

19  2007.  I think it was about somewhere in 2005 that our

20  market share in the U.S. was over 70 percent, 7-0, 70

21  percent of the digital music player market.

22          So we were already well on our way and

23  selling, you know, certainly by 2006 maybe to 2007, you

24  know, a lot -- lots and lots of iPods.

25          And really, after 2007, our sales kind of

2    bit because we had gotten to such a big number.

3        Q    Now, you mentioned the iTunes music store.

4    That allows you to get content for both music and video;

5    is that right?

6        A    That's right.

7        Q    Okay.  Let's take a look at --

8             MR. PLATT:  Could we go to this video,

9    DX159A?

10            (Video clip playing.)

11            UNIDENTIFIED MALE:  Last week -- last

12   week for the first time, we added some sports.  And in

13   partnership with ABC and ESPN, we put up the ballgames.

14   And it was really fantastic.

15            Here's a little sampling.

16            Hello, everybody, and welcome to

17   Pasadena, California.  Tonight, the 2006 Rose Bowl Game

18   presented by Citi.

19            I'm Keith Jackson, and in the

20   unprecedented partnership between ABC Sports and Apple

21   iTunes, you're about to see a bold blast.  The 15-minute

22   condensed version of the National Championship Game

23   between the top-ranked USC Trojans and the No. 2 Texas

24   Longhorns.

25            All the key moments from this contest are

2          (End of video clip.)

3     Q    (By Mr. Platt) Now, other than being the

4 greatest football game in history --

5     A    I think that worked out pretty well for Texas.

6     Q    Yeah.  Why -- why was content so important to

7 the iTunes and to Apple?

8     A    Well, as I mentioned, we like to try to do the

9 whole solution for the customer.  That way we're

10 guaranteed that it all works and everything the customer

11 needs is there.

12         And I said that's hardware and that's

13 software, but sometimes that's content or services.  So

14 we created licensing deals with all the major record

15 labels, all the independent record labels, you know, the

16 people who own video content.

17         Once we added video, you could get TV shows,

18 sports, et cetera.  So you could buy those legally so

19 you didn't have to be a thief, because we figured most

20 of our customers weren't thieves, if we offered them an

21 affordable and easy way to buy the content.

22         And so they could just download it right there

23 on their computer, bring it into iTunes, and easily

24 transfer it over to the iPod, and watch anywhere they

25 were -- anywhere they went.

2    Exhibit 616, Page 127, which is a April 2008 customer

3    research survey.

4         Q    (By Mr. Platt) Do you recognize this?

5         A    Now, I do.  Yes, I do.

6         Q    And can you tell us about the methods that

7    people use to access their music on the iPod?

8         A    Yeah.  We give lots of ways to allow people to

9    figure out what song they want to listen to and to get

10   to that song.

11             And what this shows is we asked people what's

12   their favorite way to get to their music on their iPod.

13   And no surprise that number one is playlist, which is

14   that ability I told you about where people could put the

15   music in the order they wanted to listen to it and hear

16   it that way.

17             Another popular way is just finding the

18   artist.  Let's say you wanted to find the Rolling Stones

19   and listen to their music.  That's very popular.

20             And what it shows is actually Coverflow is not

21   so popular.  It's only 5 or 6 percent of customers say

22   that's how they like to access their music.

23        Q    Now, you're familiar with iPad as well?

24        A    I am.

25        Q    And what is the iPad?

2   computer, which is a computer that's really just a

3   display on the front, and it runs the same operating

4   system, what we call iOS that we run on the iPhone or

5   the iPad Touch.

6       Q    And was the iPad the first tablet computer on

7   the market?

8       A    It was not.  Tablet computers have existed for

9   many years.  I think it's just the first tablet computer

10  people seemed to like.

11      Q    Why do you think that is?

12      A    Well, it's been a big hit.  We introduced it

13  earlier this year, and we still are not able to keep up

14  with the demand.  We haven't been able to make enough.

15      Q    And what is -- you mentioned the iPhone.

16           Could you explain what the iPhone is?

17      A    Uh-huh.  Yes.  The iPhone is a product that we

18  introduced in 2007, and it was the idea of taking phones

19  to another level, both in what they could do and how

20  easy it was to use it.

21           And we -- we actually kind of positioned the

22  iPhone as three products in one.  Number one, it's a

23  breakthrough phone; easy to find numbers of people you

24  want to call and call them.

25           Number two, it was a great wide-screen iPod,

2    your videos.

3            And three, it was a device that put the

4    internet in your pocket.  So it allowed you to do your

5    e-mail on the go, go to the web, see videos from the

6    internet, et cetera.

7            So those are really three products in one.

8        Q    Was the iPhone the first smartphone that was

9    out there?

10       A    No.  There have been smartphones before on the

11   market.

12       Q    Do you know why Apple has been successful with

13   the iPhone?

14       A    Well, again, I think in an Apple kind of way,

15   by bringing the hardware and the software together, and

16   for the hardware, that meant we had multi-touch display

17   and just a new way to interact with it.  We just made it

18   so much more easy and fun to discover the features of

19   the product, use the features.

20           And a lot of these prior products existed only

21   to kind of really technical people; you know,

22   alpha-geeks you might call them.

23           We try to make products that appeal to

24   everyone, and they are easy and fun.

25       Q    Okay.

2   Page 26.

3        Q     (By Mr. Platt) And this is iPhone Final Report

4   from November 2007.

5              Can you tell us what this shows?

6        A     Yeah.  We asked people why did they buy the

7   iPhone, and I think no surprise again.  What I said is

8   that the number one reason by far, 44 percent, says they

9   wanted a phone that combined music, so that's the iPod,

10  with their e-mail and web capabilities.  So that's the

11  internet in their pocket, which is just how we thought

12  customers would like the iPhone.

13             Number two and kind of distant number two, but

14  number two is they're just a fan of our products.  They

15  know that we try to create products, again, that are fun

16  and easy to use; and they're going to know how to use

17  them, and they're going to work for them.

18             And three kind of relates to number one, which

19  is they want the best mobile phone on the market, and

20  that's just right behind number two at 18 percent.

21             So it kind of ties into that breakthrough

22  phone that we talked about.

23       Q     Now, can you explain for us your experience

24  regarding the introduction or launch of the iPhone?

25       A     I can.  As I said, I've been at Apple a long

2    day that we launched the first iPhone, you know, as

3    really one of my best days as an employee.

4            And it really started six months before that,

5    because we introduced it publicly in January of 2007.

6    Steve Jobs stood on stage and told people what the

7    iPhone was.  And we had to do it ahead of time, because

8    we had to go through regulatory approvals and things

9    like that; and we figured it would leak, and we wanted

10   to be the ones who introduced it to the world, not

11   having leaks do it.

12           And Steve showed these three products in one,

13   showed how easy it was, showed the multi-touch, and

14   people went nuts.  They just fell in love with the idea

15   of it.

16           And what's interesting is we didn't really say

17   anything for the next six months, except for one teaser

18   campaign of say hello to iPhone.  Other than that, we

19   didn't really say anything.

20           But it was the anticipation and the excitement

21   of the iPhone just continued to grow and grow and grow

22   to that day that we introduced it by shipping it in late

23   June of 2007.

24           And those of us who are key people on the

25   product team kind of dispersed to different stores,

2    Angeles and the Grove, and I arrived before dawn.

3              Remember, the product wasn't going to go on

4    sale until 6:00 p.m. that evening.  And before dawn,

5    there were already hundreds of people in line at that

6    store.  And what was cool about that is they were just

7    regular people.  They weren't like computer-nerdy kind

8    of people, you know, like me.  They were just real

9    average people who were in line, excited to get such an

10   amazing invention that first day it was available.

11             And then the excitement of when the doors

12   finally opened at 6:00 p.m. and people rushing in and

13   the energy and excitement and applause and cheering and

14   how excited people were when they came out.

15             It was, again, very rewarding for those of us

16   that spent a long time working on that product.

17        Q    Now, there's been a suggestion that the reason

18   why people buy iPods, iPhones, and iPads is because they

19   include Coverflow.

20             Do you agree with that?

21        A    I have never heard anybody even suggest that,

22   nor do I have any data that would ever even suggest

23   that.

24        Q    Why do you say that?

25        A    I do a fairly thorough job of surveying our

2    doesn't come up.

3        Q    Now, before this case, had you ever heard of

4    Mirror Worlds or Dr. Gelernter?

5        A    I had not.

6             MR. PLATT:  Pass the witness, Your Honor.

7             CROSS-EXAMINATION

8    BY MR. CANTINE:

9        Q    Good afternoon, Mr. Joswiak -- right?

10       A    Good afternoon.

11       Q    We've never met.  My name is Chuck Cantine.

12       A    You can call me Jos.

13       Q    Jos?  Okay.  Thank you.

14            Now, you've been at Apple, I believe you said,

15   24 years, right?

16       A    That's right.

17       Q    And you are currently the Vice President of

18   Product Marketing for both the iPad and the iPhone; is

19   that right?

20       A    That's correct.

21       Q    And you report to Mr. Schiller, right?  We saw

22   that in the video?  We saw him?

23       A    That's correct.  That's my boss.

24       Q    Did he tell you that he had received a number

25   of e-mails about Dr. Gelernter over the years?

2      Q    He didn't share that with you?

3      A    He did not.

4      Q    Okay.  Did he tell you whether he ever went to

5  the Scopeware website?

6      A    I'm sorry?

7      Q    Did he ever tell you whether he went to the

8  Scopeware website?

9      A    He did not.

10     Q    Okay.  Now, you've been Vice President of

11  Product Marketing for the iPod since 2003, right?

12     A    That's correct.

13     Q    And for the iPhone since 2007?

14     A    Well, no.  That's when we publicly announced

15  the iPhone.  I was actually working on the iPhone since

16  its inception as well.

17     Q    Okay.  And marketing, that's another word for

18  promoting, right?

19     A    Well, product marketing is different than

20  outbound marketing.  So product marketing, as I said, is

21  actually more involved in the definition of the product,

22  creating the products, and then creating the basic

23  positioning of the products to our general marketing

24  teams, which are advertising, marketing communications,

25  PR, et cetera.

2   product marketing.

3        Q    Well, product marketing in the end, does that

4   help sell the products?

5        A    Product Marketing's number one goal is to help

6   to find great products.  And then two, we want to make

7   sure people understand why do we think they were great

8   products, and we will then feed the marketing team so we

9   create great advertisements, hopefully, to help share

10  that.

11       Q    So, again, does promoting help sell the

12  products and what you do help sell the products at the

13  end of the day?

14       A    I don't consider what I do promoting or

15  selling.

16       Q    You just consider it marketing?

17       A    I consider it product marketing; that's

18  correct.

19       Q    And it's your testimony that doesn't help sell

20  the products?

21       A    Again, I hope if we create a great product,

22  the product is going to help certainly sell itself.  And

23  if I create great positioning for our marketing teams,

24  they'll create great marketing which would generate

25  demand; and, hopefully, our sales teams will be able to

2      Q    I'm not really sure what you answered there,

3  but let's move on.

4           Now, before Apple began promoting its

5  products, it tries to identify the key features, right?

6      A    I'm sorry?

7      Q    You try to identify the key features you want

8  to market before you start marketing those products,

9  right?

10     A    Yeah.  Oftentimes, we create tent poles, for

11  example.

12     Q    Okay.  And you've done that for the iPhone,

13  right?

14     A    Yeah.  The iPhone, as I said, the tent poles

15  are breakthrough phone, great wide-screen iPod, and puts

16  the internet in your pocket.

17     Q    And by the great wide-screen iPod, what do you

18  mean?

19     A    It means that it's an easy way to take your

20  music and your video with you.  Obviously, that was an

21  important part of our -- our assets that we could bring

22  into this, because iPods themselves had become so

23  popular, we knew people wanted to take their music with

24  them everywhere we go.

25           Certainly, they would want to do that on their

2      Q    So the music was an important part of both the

3    iPhone and the iPod, right?

4      A    That's correct.

5      Q    And, in fact, I think the graphic you just

6    showed us showed that 44 percent of the people chose the

7    iPhone, at least in part, because of the music

8    capability, right?

9      A    Because of the combination of the phone, the

10    music, and the internet capability.

11      Q    Well, in fact, in the graphic you showed us,

12    you listed music first, didn't you?

13      A    No.  It's the combination.

14          The question is asked and the answer is in

15    combination.  That's a very important aspect of the

16    iPhone.

17      Q    And music was one of those pieces, right?

18      A    Music actually did not come up as a solo

19    answer that high.  It actually was offered in the

20    choices and would not have come up that high by itself.

21      Q    I'm sorry.  I thought I took good notes when

22    you had that graphic up there before and it said about

23    the iPhone success, 44 percent of the people chose the

24    iPhone because of the music, e-mail, and the internet.

25      A    Correct.  The combination of those things.

2      A     It had nothing to do with what's first.  It's

3  the combination of those.

4      Q     Okay.  But Apple has emphasized music in

5  promoting the iPod Touch and the iPhone, right?

6      A     Well, for the iPod Touch, that becomes even

7  more important, because iPod's music is certainly a big

8  part of it.

9            For iPhones, it's, again, the combination of

10 the fact that they are the breakthrough phone, a great

11 iPod, and puts the internet in your pocket.

12           And then we later added to that.  When we

13 created applications in the App Store, we have now over

14 250,000 apps that are available for it as well.

15     Q     Now, you didn't show the jury a video of the

16 Coverflow feature, did you in your little presentation

17 here?

18     A     There was none.

19     Q     Okay.  Now, let's talk about the iPhone for a

20 second, okay?

21     A     Okay.

22     Q     And if you hold the iPhone up and you're going

23 to -- let's say you're playing music, right?  And you're

24 holding it straight up like you're making a phone call,

25 and then you might put it sideways in what they call the

2          You've heard those terms?

3     A    I'm aware, yes.

4     Q    Okay.  What happens when you turn your iPhone

5  from vertical to the horizontal when you're playing

6  music?

7     A    If you're in the iPod application, and that's

8  an important distinction, it doesn't happen anytime.  If

9  you're in the iPod application, then it will switch over

10 to Coverflow.

11    Q    Automatically switches to Coverflow?

12    A    That is correct.

13    Q    That's built right in?

14    A    That is correct.

15    Q    So every time one of those users does that,

16 it's going into Coverflow, right?

17    A    If the iPad -- if the iPod application is

18 active.

19    Q    Okay.  And when that's active and you go from

20 vertical to horizontal, it automatically switches into

21 Coverflow mode, right?

22    A    That is correct.

23    Q    And that's both for the iPhone and iPod Touch;

24 is that right?

25    A    That is correct.

2    please?

3           Why don't we go to the first page just so we

4    can get a -- if you would.

5       Q    (By Mr. Cantine) Okay.  Do you recognize

6    that -- this document, Mr. Joswiak?

7       A    I do.

8       Q    And what is that?

9       A    This is a reviewer's guide.  One of the things

10   I talked about in my job function is going off and

11   talking to journalists or analysts about our products.

12          This is a supplement, if you will, to our

13   visit, which tries to capture a number of the things we

14   would have said publicly and tries to put them in one

15   spot to allow the reviewer to come up to speed quickly

16   on the capabilities of the product.

17      Q    So this would be an example of your product

18   marketing; is that right?

19      A    This -- this would be part of that.

20      Q    Okay.  Thank you.

21          MR. CANTINE:  Let's turn to that page you

22   had up James, please, 367, I think.

23          And can we zoom in on the Coverflow part?

24      Q    (By Mr. Cantine) Do you see where it says

25   Coverflow there, sir?

2      Q     Okay.  Then let me read you what it says.

3            It says:  Another great way to look at your

4   music library is with Coverflow.  Just like in iTunes,

5   Coverflow lets you enjoy your entire music library using

6   the album and cover art.

7            Do you see that?

8      A     I do.

9      Q     Did I read that correctly?

10     A     It looks like you did.

11     Q     Okay.  Thanks.

12           And this is an example of Apple's marketing

13  materials for its iPhone where it's promoting the use of

14  Coverflow.

15           Would you agree with that?

16     A     This, again, was for reviewers to come up to

17  speed quickly on the capabilities of the product.  It

18  wasn't distributed publicly.

19     Q     Well, I thought you said you gave this to

20  journalists and press people and others, right?

21     A     Correct.  Individual journalists.  This wasn't

22  something available, for example, on our website.

23     Q     Well, we can debate whether that's public

24  distribution.  But you gave it to these people that were

25  going to review your products so they could write about

2      A      Correct.

3      Q      And you included Coverflow in that

4  description, right?

5      A      We did.

6      Q      Okay.  And then let's look at what else it

7  says.

8              It says:  To use Coverflow, all you have to do

9  is rotate the iPhone into the landscape orientation.

10  The iPhone's Accelerometer senses the change and

11  automatically switches into Coverflow.

12              Did I read that correctly?

13      A      You did.

14      Q      Okay.  And that's what we were just

15  discussing, right, when you were holding your iPhone up?

16      A      Exactly.

17      Q      If you're in the music mode, if you're

18  navigating music, listening to music, it automatically

19  switches in to Coverflow, right?

20      A      When you moved it into landscape mode.

21      Q      And that's what that graphic is depicting

22  there, right?

23      A      That's correct.

24      Q      Okay.  Now, at the bottom, it says:  Now just

25  flick your finger left or right to find the album you

2    listen to.

3            I guess there's a typo there.

4            iPhone allows you to touch your music in a way

5    you never imagined on a phone.

6            Do you see that?

7        A    I do.

8        Q    Okay.  So, again, this represents an example

9    of Apple marketing the use of Coverflow in connection

10   with the iPhone, right?

11       A    Again, it's to bring reviewers up to speed

12   quickly on the capabilities of the product.

13       Q    And you wanted them to write favorable pieces

14   about the iPhone for their magazines and publications,

15   right?

16       A    Absolutely.

17       Q    And you included this Coverflow feature as one

18   of the things, right?

19       A    Absolutely.

20       Q    Okay.  And you did that with the iPod Touch,

21   too, didn't you?

22       A    I imagine we did, but I would --

23       Q    You want me to show it to you?

24       A    I would believe you.

25       Q    Okay.  In fact, it's pretty much the same

2      A    We might have copied and pasted it.

3      Q    Okay.  And using Coverflow in the iPhone and

4   the iPad, it's easy, right?

5      A    It is.  Again, you just turn it to the

6   landscape position, and it comes on.  Unfortunately, I

7   guess customers didn't find it that easy, because

8   they're not using it to the extent --

9      Q    And we'll talk about that in a minute, okay?

10          Now, when the iPhone is in the Coverflow view,

11   the album is being played in the center; is that right?

12      A    That's right.

13      Q    Okay.  When the iPad Touch is in the Coverflow

14   view, the album being played is also shown in the

15   center, right?

16      A    That's correct.

17      Q    Okay.  In fact, in all of Apple's products

18   that include Coverflow, the album being played is always

19   shown in the center, isn't it?

20      A    That's correct.

21      Q    Okay.  Let's talk about the operating system

22   for a moment on the iPhone.

23          Are you familiar with the operating system on

24   the iPhone?

25      A    I am.

2    Is that right?

3        A    That's correct.

4        Q    Okay.  And is that -- iOS, is that based on

5    the Mac OS?

6        A    At its fundamental levels, absolutely.

7        Q    Okay.  And is that both for the iPod -- I'm

8    sorry -- the iPod Touch and the iPhone; they're both

9    based on the Mac OS?

10       A    That is correct.

11       Q    Okay.  Thank you.

12            Have you ever heard of the term hero shot?

13       A    I'm very familiar with that term.

14       Q    Would you tell the jury what you understand

15   the term hero shot is as used in product marketing?

16       A    A hero shot is kind of like a beauty shot of a

17   product.  You want to try to have -- if something is

18   visually interesting about your products, you want to

19   just show something that's going to capture somebody's

20   interest to look at your products.

21       Q    And isn't it true that Apple considered the

22   Coverflow view on the iPod as its hero shot when

23   promoting the iPods?

24       A    Not all iPods, but some iPods and on occasion.

25       Q    So on occasion, you'd use the Coverflow view

2      A      Because it's a great way to show album art,

3   which is a great way to have people understand it plays

4   music.  It's very visually interesting.

5      Q      So that was a yes at the end?

6      A      That is a yes.

7      Q      Thank you.

8             And it was -- this hero shot, that's what

9   Apple wanted its customers to see, right, in connection

10  with promoting these products in those instances assess

11  where you used it?

12     A      Any instances where we used it; that's

13  correct.

14     Q      And those advertisements are meant to get

15  customers to buy the iPhones and the iPods, right?

16     A      It would be, again, to capture customers'

17  interest, ultimately in the hope that they would buy the

18  product.

19     Q      Okay.  Now, you testified earlier and you

20  brought up independently here a moment ago the fact that

21  you don't think Coverflow is all that popular, right?

22     A      That's correct.

23     Q      Did you ever consider telling your customers

24  that Coverflow is not popular?

25     A      We don't spend too much time telling people

```
 2       Q    You talked to the press, right?  And that's

 3  part of your job.  You're out trying to market things

 4  with the press and journalists, right?  You testified

 5  about that, right?

 6       A    We do.  We try to --

 7       Q    Did you tell them that Coverflow is not

 8  important?

 9       A    That would not be part of my presentation.

10       Q    Okay.  Did you ever tell your customers or

11  anybody in the press that Coverflow is unnecessary?

12       A    Not to my knowledge.

13       Q    Did you ever tell upper management that Apple

14  should stop using Coverflow?

15       A    We, for instance, in the latest iPod Nano

16  don't use Coverflow.

17       Q    Okay.  But you're still using the iPhone,

18  right?

19       A    We do.

20       Q    And you're still using the iPod Touch, right?

21       A    We do.

22       Q    And does the company have any plans to stop

23  using it in those products?

24       A    Nothing public.

25            MR. CANTINE:  Nothing further.
```

```
 2                    THE COURT:  Redirect?

 3                    MR. PLATT:  No redirect.

 4                    THE COURT:  All right.  You may step

 5   down.

 6                    Who will be your next witness?

 7                    MR. RANDALL:  Your Honor, we have three

 8   short videos.  I understand you want to get out of here

 9   about 5:30.

10                    The first one will be about 15-and-a-half

11   minutes.  That's Ed Stone.  He was the Plainfield

12   corporate designee deponent.

13                    And this depo is 10 minutes, 32 seconds;

14   and 9 minutes, 11 seconds for Apple, and 1 minute, 21

15   seconds for Plaintiff.

16                    (Video playing.)

17                    QUESTION:  Could you to please state your

18   full name and business address for the record?

19                    ANSWER:  Full name is Edward, middle

20   initial, S, Stone.

21                    My current business address is 77 Hobson

22   Street, Stanford, Connecticut.

23                    QUESTION:  Do you continue to provide

24   consulting services to Plainfield Asset Management

25   regarding monetization of IP?
```

2               QUESTION:  Now, Plainfield Specialty

3  Holdings I --

4               ANSWER:  Yes.

5               QUESTION:  -- is that one of Plainfield's

6  portfolio companies?

7               ANSWER:  My understanding is that

8  Plainfield Specialty Holdings I is a wholly-owned

9  subsidiary of Plainfield Acceptance, which is a

10  wholly-owned subsidiary of Plainfield Special Situations

11  Master Fund.

12               QUESTION:  All right.  Let's break that

13  down a little bit.

14               Okay.  Plainfield Specialty Holdings I,

15  you said, is a wholly-owned subsidiary of Plainfield

16  Acceptance?

17               ANSWER:  Correct.

18               QUESTION:  And who owns Plainfield

19  Special Situations Master Fund?

20               ANSWER:  Investors.

21               QUESTION:  Who owns Mirror Worlds, LLC?

22               ANSWER:  Plainfield Specialty Holdings.

23               QUESTION:  Is Mirror Worlds, LLC, a

24  wholly-owned subsidiary of Plainfield Specialty

25  Holdings I?

2              QUESTION:  Okay.  And if you trace it all

3      the way back through the corporate chain, Mirror Worlds,

4      LLC, is a wholly-owned subsidiary of the Plainfield

5      Special Situations Master Fund?

6              ANSWER:  I don't think that's right.

7      Mirror Worlds, LLC, is a wholly-owned subsidiary of

8      Plainfield Specialty Holdings I.

9              QUESTION:  Okay.  And Plainfield

10     Specialty Holdings I is a wholly-owned subsidiary of

11     Plainfield Acceptance?

12             ANSWER:  Correct.

13             QUESTION:  Where is Mirror Worlds, LLC's

14     principal place of business?

15             ANSWER:  It's in Texas.

16             QUESTION:  Where in Texas?

17             ANSWER:  I believe it's Tyler, Texas.

18     I'm not sure of the exact --

19             QUESTION:  And do you know how many

20     transactions involving intellectual property assets

21     Plainfield has been involved in?

22             ANSWER:  I don't know the exact number.

23             QUESTION:  What's your best estimate?

24             ANSWER:  To the extent you want me to

25     guess, I would say -- let me ask you to clarify.

2    forms.  Plainfield is a hedge fund.  We invest in

3    assets.  We invest in companies.  Sometimes the

4    companies have intellectual property assets.  Am I --

5    it's hard for me to guess.

6              So if I look at a company to purchase, a

7    company may have intellectual property, which we look at

8    as a component of an acquisition.

9              QUESTION:  Now, you understand that

10   you've been designated to testify today on behalf of

11   Plainfield Specialty Holdings, Inc., correct?

12             ANSWER:  Yes.

13             QUESTION:  I'm going to step back a

14   little bit and talk about how it is that you first

15   came -- you being Plainfield, to be clear -- how it is

16   that Plainfield first came into contact with Recognition

17   Interface.

18             ANSWER:  Okay.  I believe Frank Weil

19   contacted me.

20             QUESTION:  Okay.  And when was this?

21             ANSWER:  I don't know the exact date, but

22   it would have been in 2007.

23             QUESTION:  It's fair to say, though, that

24   your understanding was that he wanted to sell the

25   patents to Plainfield so that Plainfield could generate

2                  ANSWER:  It was fairly clear to me that

3        there was a potential transaction whereby Plainfield

4        could acquire the rights to the patents from them.

5                  QUESTION:  You said you were going to

6        create a new entity.  Why was that?

7                  ANSWER:  I think we can.

8                  You create an entity to hold the patents.

9                  QUESTION:  And that entity was Mirror

10       Worlds, LLC?

11                 ANSWER:  Correct.

12                 QUESTION:  Mr. Stone, could you tell me

13       what this document is?

14                 ANSWER:  This looks like a certificate of

15       formation for Mirror Worlds, LLC.

16                 QUESTION:  So when you said that

17       Plainfield was going to create a new company to hold the

18       Mirror Worlds patents, you were referring to Mirror

19       Worlds, LLC, as referenced in Stone Exhibit 5, correct?

20                 ANSWER:  I don't know if the decision was

21       made at that point as to what company, but there would

22       be an entity, that this is the ultimate entity.

23                 QUESTION:  Okay.  And this is a

24       certificate of formation for Mirror Worlds, LLC, as a

25       limited liability company in Texas, correct?

2                    QUESTION:  And you're listed here as the

3    managing member, correct?

4                    ANSWER:  Correct.

5                    QUESTION:  Okay.  Why did Plainfield

6    choose to create an entity to hold the patents in Texas?

7                    ANSWER:  It was on advice of counsel.

8                    QUESTION:  Do you have an understanding

9    as to why the name Mirror Worlds, LLC, was reserved in

10   Texas and then transferred to the Mirror Worlds, LLC,

11   company?

12                   ANSWER:  I think I can answer that one.

13                   You know, Mirror Worlds really was a

14   tribute to the inventors, particularly David Gelernter.

15                   QUESTION:  Why do you say that?

16                   ANSWER:  Why do I say that?  Because

17   that's what I thought.  He wrote a book called Mirror

18   Worlds and is a pretty well-known computer scientist and

19   forward-thinker, and, you know, that's why -- part of

20   the reason we felt it was important technology.

21                   QUESTION:  Now, the Mirror Worlds, LLC,

22   holding company that holds the patents does not have any

23   employees, correct?

24                   ANSWER:  Right.  That is my

25   understanding.

2    and directors?

3                   ANSWER:  I believe it does.

4                   QUESTION:  And who are the officers and

5    directors?

6                   ANSWER:  I believe there are a number of

7    officers.  I don't know if they're -- I -- I forget,

8    with the LLC, whether it's officers or directors, but I

9    believe it's -- you know, Max Holmes, Karen Dykstra, Tom

10   Fritch, other folks at Plainfield Asset Management.

11                  QUESTION:  Other than people from

12   Plainfield Asset Management, are there any officers and

13   directors in Mirror Worlds, LLC?

14                  ANSWER:  At this point, I don't believe

15   so.

16                  QUESTION:  So from your perspective,

17   Mirror Worlds, LLC, is basically acting as a holding

18   company on behalf of Plainfield Asset Management.

19                  ANSWER:  Yeah.  I would say it's the

20   opposite.  Plainfield Asset Management manages Mirror

21   Worlds, LLC, on behalf of Plainfield Specialty

22   Holdings I.

23                  QUESTION:  Okay.  Who pays Mirror Worlds,

24   LLC's taxes?

25                  ANSWER:  My understanding is that

2                    QUESTION:  Who maintains the financial

3    records for Mirror Worlds, LLC?

4                    ANSWER:  Plainfield Treasury Department.

5                    QUESTION:  To the best of your knowledge,

6    each member identified as the management of Mirror

7    Worlds, LLC, is an employee of Plainfield Asset

8    Management, correct?

9                    ANSWER:  Yes, to the best of my

10   knowledge.

11                   QUESTION:  In the case of the Mirror

12   Worlds patent acquisition, did you or anyone working on

13   behalf of Plainfield talk to Dr. Gelernter before you

14   decided to invest in the patents?

15                   ANSWER:  I did not.

16                   QUESTION:  Do you know if anyone else

17   did?

18                   ANSWER:  I don't believe anybody else at

19   Plainfield did.

20                   QUESTION:  What about Mr. Eric Freeman or

21   Dr. Freeman?

22                   ANSWER:  Not prior to investing in the

23   patents.

24                   QUESTION:  Was it your understanding that

25   the agreement between Plainfield and Recognition

2   a way to distribute revenues generated from the Mirror

3   Worlds patents?

4             ANSWER:  Yes.

5             QUESTION:  And Paragraph 2.2 on Page 2 of

6   Stone Exhibit 7 outlines the distribution of revenues

7   generated from the Mirror Worlds patents, correct?

8             ANSWER:  It outlines the distribution of

9   the proceeds received from various different types of

10  contingent payments.

11            QUESTION:  Now, Paragraph 2.2A states

12  that in the event of contingent payments on the Mirror

13  Worlds patents, or in other words, in the event that

14  revenue is generated from the patents, the first $5

15  million is paid to Plainfield, correct?

16            ANSWER:  Correct.

17            QUESTION:  And then following the $5

18  million, plus expenses, plus interest, $2.5 million

19  would get paid to Recognition Interface.

20            ANSWER:  Correct.

21            QUESTION:  In other words, as part of the

22  agreement, if Plaintiff is successful in generating

23  revenues from the patents, Recognition Interface would

24  make some additional money.

25            ANSWER:  Yes.

2      million to Recognition Interface and interest, the next

3      $5 million of any revenues generated from the patents

4      would come again to Plainfield Specially Holdings,

5      correct?

6                     ANSWER:  Correct.

7                     QUESTION:  Okay.  And then after that,

8      any additional revenues are distributed according to

9      Paragraph 2.2D.

10                    Do you see that?

11                    ANSWER:  Yes, I see that.

12                    QUESTION:  And of those additional

13     revenues, 74 percent would go to Plainfield, correct?

14                    ANSWER:  Correct.

15                    QUESTION:  And 19 percent would go back

16     to Recognition Interface?

17                    ANSWER:  Correct.

18                    QUESTION:  2 percent would go to

19     Mr. Gelernter, Dr. Gelernter?

20                    ANSWER:  Correct.

21                    QUESTION:  And Jenner & Block, the law

22     firm, would receive 5 percent?

23                    ANSWER:  That's what it says in this

24     agreement.

25                    QUESTION:  Why do you say it like that?

2   counsel.

3                    (End of video clip.)

4                    MR. RANDALL:  Your Honor, the next

5   witness is also by videotape.  It's Mr. Frank Weil from

6   Recognition Interface.  It's a 12-minute tape; 7 minutes

7   32 seconds for Apple, and 4 minutes, 28 seconds for

8   Mirror Worlds.

9                    THE COURT:  Okay.  Thank you.

10                   (Video playing.)

11                   QUESTION:  Good morning, Mr. Weil.

12                   ANSWER:  Good morning.

13                   QUESTION:  When did you first become

14  aware of the company called Mirror Worlds Technology?

15                   ANSWER:  I think it was in late 1996.

16                   QUESTION:  Did there come a time when you

17  considered investing in Mirror Worlds?

18                   ANSWER:  Yes.

19                   QUESTION:  Okay.  And at this time, in

20  1997, were you affiliated with an entity called Abacus,

21  LLC?

22                   ANSWER:  Yes.

23                   QUESTION:  Were there other investments

24  that were made that you were involved with through other

25  mechanisms, other entities and so forth?

2                    QUESTION:  Investments by you -- by you

3  or your family.

4                    ANSWER:  My investments all were part of

5  that $9 million.

6                    QUESTION:  Okay.

7                    ANSWER:  But other people invested over

8  the full length of that time, including people who got

9  there before I was.  It was a company called Richo which

10  invested before I invested.

11                    The total investment of all the other

12  investors through approximately 2004 was approximately

13  $18 million.

14                    QUESTION:  You testified you were on the

15  board.  Were you Chairman of the Board?

16                    ANSWER:  I think I became Chairman of the

17  Board, yes.

18                    QUESTION:  And were you on the board

19  through the end of Mirror Worlds Technologies?

20                    ANSWER:  Well, it never really ended.

21                    QUESTION:  Are you still on the board of

22  Mirror Worlds Technologies?

23                    ANSWER:  No.  I am a managing member of a

24  partnership, a limited liability entity, which now holds

25  the intellectual -- held the intellectual property that

2                    QUESTION:  What's the name of that

3  limited liability entity?

4                    ANSWER:  Recognition Interface, LLC.  I

5  believe that's the name of it.

6                    QUESTION:  And 2000 -- in approximately

7  the 2004 timeframe, Abacus had invested about $9 million

8  in Mirror Worlds, correct?

9                    ANSWER:  Yes.

10                    QUESTION:  What percentage of the --

11  roughly, of the assets under management by Abacus did

12  that investment represent?

13                    ANSWER:  2-1/2 percent.  Now I'm going to

14  have to shoot you all.

15                    QUESTION:  Wait until the deposition is

16  over.

17                    So the Mirror Worlds patents were

18  transferred from Mirror Worlds Technologies to

19  Recognition Interface, correct?

20                    ANSWER:  Correct.

21                    QUESTION:  And what was the approximate

22  amount of those funds that were provided from

23  Recognition Interface to Mirror Worlds?

24                    ANSWER:  Well, first of all, I'm not sure

25  it was ever provided to Mirror Worlds.  It may have gone

```
 2                QUESTION:  Okay.

 3                ANSWER:  But it was on the order of

 4  magnitude of 250 to $300,000.

 5                QUESTION:  What is the business of

 6  Recognition Interface today?

 7                ANSWER:  Recognition Interface today is

 8  a -- holds the residual interest of the intellectual

 9  property that resulted from the transaction with

10  Plainfield.

11                QUESTION:  Going back to Mirror Worlds

12  Technologies, what was the largest annual revenues,

13  approximately, for the company?

14                ANSWER:  I don't remember.

15                QUESTION:  Was it ever over $1 million a

16  year?

17                ANSWER:  I don't think so.

18                QUESTION:  You would agree it was never a

19  commercial success such that it could support the

20  company -- the Mirror Worlds company's ongoing

21  operation, right?

22                ANSWER:  That is correct.

23                QUESTION:  Now, you said -- you testified

24  that the Scope -- Scopeware product overcame many

25  obstacles.  What obstacles are you referring to?
```

2    marketplace, among -- among them, the famous defensive

3    mechanism that large companies in the software business

4    utilize, which is referred to often as vaporware.  A lot

5    of companies said:  Don't worry about those upstarts.

6    We've got something coming better.

7                    QUESTION:  So would you name some of the

8    companies that created obstacles?

9                    ANSWER:  Microsoft, Apple, Google, X1.

10   It's a long list.

11                   QUESTION:  Mr. Weil, do you recognize

12   Exhibit Raich 23?

13                   ANSWER:  I do, but I don't recollect the

14   name Azure at all.

15                   QUESTION:  There's a table at the bottom

16   of the page, Financial Snapshot, and it shows revenues

17   and gross profits for 2001 and 2002E and 2003E.

18                   I'll just draw your attention to -- on

19   the first page of the document, this is dated April

20   18th, 2002.  So do you understand the numbers for 2002

21   and 2003 to be estimates?

22                   ANSWER:  I think that's what E means.

23                   QUESTION:  And in 2001, it shows $475,000

24   in revenue for Mirror Worlds Technologies, correct?

25                   ANSWER:  Correct.

2  estimate for 2002, based on your testimony earlier that

3  the revenue never exceeded $1 million, that -- that

4  never happened, did it?

5            ANSWER:  No.

6            QUESTION:  Okay.  And the 20.5 million

7  for 2003, that never happened, did it?

8            ANSWER:  No.

9            QUESTION:  What is your understanding, as

10  an investor and member of the board of Mirror Worlds, of

11  why those estimates were never met?

12            ANSWER:  Because the team that Satow

13  brought and led with the general purpose of trying to

14  market the product didn't succeed.

15            QUESTION:  And what were the reasons that

16  you are aware of for their failure to succeed in

17  marketing the product?

18            ANSWER:  Some of the reasons we've

19  discussed, which was increasing awareness in the

20  marketplace that the major companies were -- would be

21  coming with major products and perhaps some inadequacies

22  in the abilities of the people who were doing the job

23  for the company.

24            QUESTION:  Let's mark as Exhibit Weil 6,

25  a document with Production No. RI-005254.

2    from Michael Satow to you?

3                    ANSWER:  Uh-huh.

4                    QUESTION:  Sorry.  That's a yes?

5                    ANSWER:  Yes.  I'm sorry.

6                    QUESTION:  That's okay.

7                    And is -- Mr. Satow is bringing your

8    attention to a new Apple product; is that right?

9                    ANSWER:  Yes.  That's what it seems to

10   say.

11                   QUESTION:  You don't recall ever

12   personally contacting Apple at all, right?

13                   ANSWER:  Never, to my -- the best of my

14   knowledge or recollection, ever had any contact with

15   Apple at all.

16                   QUESTION:  Okay.  So why is it that you

17   contacted Microsoft and Google, and you had your -- and

18   Yahoo!, and you had your son contact AOL, but you never

19   contacted Apple?

20                   ANSWER:  Good question.  I don't have an

21   answer.

22                   QUESTION:  Now, the -- focusing on the

23   Plainfield deal, the -- there was a -- as you testified,

24   a purchase price component and a -- which you referred

25   to as a residual component, correct?

2    specified in Section 2 of Exhibit Raich 12, right?

3                    ANSWER:  Right.

4                    QUESTION:  Of $5 million dollars?

5                    ANSWER:  Right.

6                    QUESTION:  Before we go there, the

7    5-million-dollar purchase price, that was -- was that

8    the result of an arm's-length negotiation between

9    Recognition Interface and Plainfield?

10                   ANSWER:  Yes.

11                   QUESTION:  And was Recognition Interface

12   at some point demand -- or seeking more than a

13   5-million-dollar purchase price?

14                   ANSWER:  Oh, the conversation began at

15   much lower levels.

16                   QUESTION:  When you say both, you're

17   referring to Plainfield and Intellectual Ventures?

18                   ANSWER:  As I said earlier, we were

19   having parallel conversations.

20                   QUESTION:  The residual arrangement --

21   you mentioned earlier that Recognition Interface would

22   receive a 19-percent residual.  So that's really after

23   some --

24                   ANSWER:  Yes.  I said residual.  That

25   means the end, yes.

2    what -- after the first $7.5 million that's received in

3    a settlement, correct?

4              ANSWER:  However we get it, yes.

5              QUESTION:  And David Gelernter receives 2

6    percent, right?

7              ANSWER:  Yes.

8              QUESTION:  Why did David Gelernter get 2

9    percent?

10             ANSWER:  Because he had a relatively

11   small residual interest after all the financing in

12   Mirror Worlds -- or what was Recognition Interface --

13   everybody agreed, as the inventor -- the original

14   inventor, he deserved to be cut into this.

15             QUESTION:  By the way, was that you that

16   pushed for Dr. Gelernter to get some of the residual?

17             ANSWER:  No.  I think it was originally

18   pushed for by Plainfield, and I think correctly so, and

19   I concurred in it.  And in fact, if I remember

20   correctly, originally, we were to get 20 percent, and we

21   pitched in 1 percent to make it 2.

22             QUESTION:  Is the agreement beginning --

23   the 2000 purchase agreement beginning at Plainfield

24   000084 the purchase agreement for the rights to the --

25   Dr. Gelernter's patent application and related

2                    ANSWER:  What's the question?

3                    QUESTION:  Yeah.  In this agreement, the

4   agreement by which Mirror Worlds acquired --

5                    ANSWER:  Appears to be.

6                    QUESTION:  -- the patent rights from --

7                    ANSWER:  Correct.

8                    QUESTION:  I had a question for you this

9   morning about the cost to Mirror Worlds for acquiring

10  those patent rights.  And if you'd turn to Page 2 of

11  that agreement, it's 000085, the purchase price is

12  specified as $598,482.50; is that right?

13                   ANSWER:  Yes.

14                   QUESTION:  Okay.  And that was the --

15  the -- for that purchase price, Mirror Worlds acquired

16  the entire rights, except for a license back to Yale for

17  the Mirror Worlds patents, correct?

18                   ANSWER:  Correct.

19                   QUESTION:  And those are the patent

20  rights that you now say are potentially worth millions

21  of dollars --

22                   ANSWER:  Yes.

23                   QUESTION:  -- correct?

24                   ANSWER:  Yes.  That was in 1999.

25                   QUESTION:  Yes, that Mirror Worlds

2    now say are worth millions of dollars for $600,000 in

3    1999.

4                    ANSWER:  Yes, I stand on it.

5                    QUESTION:  Okay.  Let's --

6                    ANSWER:  That was then.  Now is now.

7                    (End of video clip.)

8                    MR. RANDALL:  Your Honor, I don't know if

9    you want to push on.  We have an 8-minute tape, one

10   8-minute tape right now.

11                   THE COURT:  No.  I believe we'll recess

12   for the evening.

13                   MR. RANDALL:  Okay.

14                   THE COURT:  Ladies and Gentlemen of the

15   Jury, thank you again for your hard work today and

16   attention.  I know it's been another long day.

17                   The good news is that I think we're

18   fairly on track to finish the testimony tomorrow, but we

19   will start at 9:00, and we'll do a short lunch tomorrow,

20   and then we'll let you go as soon as we finish the

21   evidence tomorrow.

22                   And hopefully, we'll be able to get you

23   out of here a little earlier tomorrow afternoon.  And

24   then we'll come back on Friday for the closing arguments

25   and the jury deliberations.

2   excused.  Please remember my instructions.  Don't

3   discuss the case among yourselves or with anyone else.

4   And come Friday, you'll be able to do that, okay?

5   All right.

6                   COURT SECURITY OFFICER:  All rise for the

7   jury.

8                   THE COURT:  The jury is excused.

9                   (Jury out.)

10                  THE COURT:  Please be seated.

11                  All right.  The parties have any matters

12  to take up outside the presence of the jury?

13                  Anything from the Plaintiff?

14                  MR. CARROLL:  No, Your Honor.

15                  THE COURT:  Anything from the Defendant?

16                  MR. RANDALL:  We do want -- need to get

17  whatever -- the objections, if any, they've got to our

18  exhibits.  We've exchanged an exhibit list with them

19  yesterday morning and haven't got a response back.

20                  THE COURT:  When are they going to have

21  that, Mr. Carroll?

22                  MR. CARROLL:  We'll get it to them by

23  tonight, 7:00 o'clock.

24                  MR. STEIN:  7:00 o'clock.

25                  MR. DIAMANTE:  7:00 o'clock.

2   been in by this morning, so...

3                    MR. CARROLL:  My apologies to you and our

4   friends, Your Honor.

5                    THE COURT:  All right.

6                    MR. STEIN:  They gave us a substitute

7   list yesterday.

8                    THE COURT:  They what?

9                    MR. STEIN:  They gave us a substitute

10  shorter list yesterday, so there was a little confusion,

11  and that's why it was --

12                   THE COURT:  Okay.  Well, let's get the

13  confusion resolved and get those in.

14                   Anything further from the Defendant?

15                   MR. RANDALL:  The only issue that's

16  pending is that privilege waiver issue, Your Honor,

17  that's been fully briefed now, and I don't know when

18  you'd like to --

19                   THE COURT:  I'll rule on that in the

20  morning.

21                   Okay.  Anything further?

22                   MR. RANDALL:  No, Your Honor.

23                   THE COURT:  Okay.  All right.  Let me see

24  in chambers lead counsel for each side, decision-maker

25  for each side, and Mr. Patterson.

2                    COURT SECURITY OFFICER:  All rise.

3                    (Court adjourned.)

4

5

6                              CERTIFICATION

7

8                    I HEREBY CERTIFY that the foregoing is a

9   true and correct transcript from the stenographic notes

10  of the proceedings in the above-entitled matter to the

11  best of our abilities.

12

13

14  /s/_____
    SHEA SLOAN, CSR                       Date
15  Official Court Reporter
    State of Texas No.:  3081
16  Expiration Date:  12/31/10

17

18  /s/_____
    JUDITH WERLINGER, CSR                 Date
19  Deputy Official Court Reporter
    State of Texas No.:  731
20  Expiration Date  12/31/10

21

22

23

24

25