```
                IN THE UNITED STATES DISTRICT COURT
  2             FOR THE EASTERN DISTRICT OF TEXAS
                         TYLER DIVISION

  3  MIRROR WORLDS, LLC         *   Civil Docket No.
                                *
  4                             *   6:08-CV-88
     VS.                        *   Tyler, Texas
  5                             *
                                *   September 30, 2010
  6  APPLE, INC., ET AL         *   9:00 A.M.

  7

                 TRANSCRIPT OF JURY TRIAL
  8                  MORNING SESSION
            BEFORE THE HONORABLE LEONARD DAVIS
  9            UNITED STATES DISTRICT JUDGE

 10  APPEARANCES:

 11                   FOR THE PLAINTIFF

 12  MR. JOSEPH DIAMANTE
     MR. KENNETH STEIN
 13  MR. IAN G. DIBERNARDO
     MR. ALEXANDER SOLO
 14  MR. CHARLES E. CANTINE
     STROOCK & STROOCK & LAVAN
 15  180 Maiden Ln.
     New York, NY  10038
 16
     MR. OTIS CARROLL
 17  MR. PATRICK KELLEY
     IRELAND, CARROLL & KELLEY
 18  6101 S. Broadway, Ste. 500
     Tyler, TX  75703
 19

 20  COURT REPORTERS:
     MS. SHEA SLOAN, CSR
 21  MS. JUDY WERLINGER, CSR
     Official Court Reporters
 22  211 West Ferguson, Third Floor
     Tyler, TX   75702
 23  903/590-1171

 24  (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
 25
```

```
 2

 3   MR. JEFFREY G. RANDALL
     MR. RAYMOND YU
 4   MS. ERICKA J. SCHULZ
     PAUL HASTINGS
 5   1117 S. California Ave.
     Palo Alto, CA  94304-1106
 6

 7
     MR. ALLAN M. SOOBERT
 8   MR. BROCK WEBER
     MS. KIM MOORE
 9   PAUL HASTINGS
     875 15th St. NW
10   Washington, DC  20005

11

12   MR. S. CHRISTIAN PLATT
     MR. JEFFREY COMEAU
13   PAUL HASTINGS
     4747 Executive Dr.
14   12th Floor
     San Diego, CA  92121
15

16

17

18

19

20

21

22

23

24

25
```

2                    COURT SECURITY OFFICER: All rise.

3                    (Jury in.)

4                    THE COURT:  Please be seated.

5                    All right.  Good morning, Ladies and

6    Gentlemen of the Jury.  Welcome back.

7                    This is our last day of testimony.  We

8    should finish, if everything goes according to plan.

9                    So with that, we will proceed,

10   Mr. Randall, with your next witness.

11                   MR. RANDALL:  Your Honor, Apple's next

12   witness is Mr. Nitin Ganatra.

13                   THE COURT:  Okay.

14                   MR. CARROLL:  Your Honor, could we have

15   our time before we get to cranking this morning?

16                   THE COURT:  I thought I had given that to

17   y'all yesterday.

18                   MR. CARROLL:  I don't know if we --

19                   THE COURT:  All right.  It's Plaintiff

20   has used 9 hours and 50 minutes, and Defendant has used

21   just short of 8 hours -- 7 hours and 56 minutes.

22                   MR. CARROLL:  50 or 9/15.

23                   THE COURT:  9/50.

24                   COURTROOM DEPUTY:  Please raise your

25   right hand to be sworn.

2          NITIN GANATRA, DEFENDANTS' WITNESS, SWORN

3                         DIRECT EXAMINATION

4    BY MR. RANDALL:

5          Q     Can you tell us your name for the record,

6    please.

7          A     My name is Nitin Ganatra.

8          Q     Where do you live?

9          A     San Jose, California.

10         Q     And what is your current occupation?

11         A     I'm the Director of Engineering on the iPhone

12   operating system at Apple.

13         Q     Can you provide some of your background,

14   including when you started at Apple?

15         A     I started at Apple in January -- in April of

16   1993.  I -- I initially started in -- in Developer

17   Technical Support and moved into Engineering two years

18   later -- Software Engineering two years later.

19         Q     As the manager of iPhone applications team, do

20   you have knowledge of the implementation of Coverflow in

21   iPhone and iPod Touch?

22         A     Yes, I do.

23         Q     Do you have knowledge of the implementation of

24   Coverflow in the iPod Touch, iPod Nano, and iPod

25   Classic?

2       Q     And I want to ask you some questions.  This --

3    this -- one of the allegations by Plaintiff is that

4    Apple has this receding foreshortened stack.

5             And I want to ask you, are you knowledgeable

6    about the source code for Coverflow in these products

7    that we just mentioned?

8       A     Yes, I am.

9       Q     So you know how Coverflow works kind of under

10   the hood, so to speak, in these products?

11      A     That's correct.

12      Q     All right.

13      A     Yes, I do.

14      Q     Are you aware that Plaintiff has accused

15   Coverflow in Apple's iPhone, iPod Touch, and other iPods

16   of infringing its patents?

17      A     Yes.

18             MR. RANDALL:  Can you pull up NG1,

19   please?

20      Q     (By Mr. Randall) All right.  What does this

21   slide reflect, sir?

22      A     So this slide shows an iPhone tipped on its

23   side, and in -- in view on the screen is the Coverflow

24   user interface.

25             In addition, there are two parallel lines, two

2    line along the bottom edge of the albums.

3        Q    Do -- the album covers that are displayed here

4    in Coverflow, do they get shorter as they get closer to

5    the sides of the view?

6        A    No, they do not.  And -- and you can see that

7    by looking on the -- the left side of the screen.  It's

8    easiest to see where the -- the white tips of the albums

9    are sticking up over the red line, the same distance

10   that the tips of the albums that are closer to the

11   center are sticking up.

12       Q    Okay.

13       A    I'm sorry.  That's the left edge.  I think I

14   said right.

15       Q    Now, do the album covers that are displayed

16   here in cover -- Coverflow, do they get further away

17   from the screen as they get closer to the sides of the

18   display?

19       A    No, they do not.

20       Q    How do you know that?

21       A    I know that from looking at the source code.

22       Q    All right.  You've reviewed the source code

23   and confirmed that?

24       A    Yes, I have.

25       Q    Is -- the position of the album cover in

```
 2     A    No, it does not.

 3               MR. RANDALL:  Can you pull up DX1017 at

 4  Page 620 and 621?

 5               Can you go to Page 620 and go down to the

 6  bottom at Line 1529?

 7     Q    (By Mr. Randall) Do you recognize this as

 8  source code, sir --

 9     A    Yes.

10     Q    -- for those products?

11     A    Yes, I do.

12     Q    And I want to direct your attention to

13  Line 1529.

14               What does that do?

15     A    So that is the declaration for a -- a

16  routine -- for a piece of code that -- that sets the --

17  it sets the Coverflow view so that you're viewing the

18  album that is at a particular index.  That's indicated

19  by the number.

20               So you'll see the words, set new selected

21  index, and right after that, you see new index, which is

22  a number.  And that number indicates which album within

23  the series of albums should be the one that's in the

24  center of the display.

25     Q    All right.  And is this source code among the
```

2   that you've reached that you've already testified to?

3       A    Yes, it is.

4       Q    All right.

5            MR. RANDALL:  Let's go to the next page.

6            And, Diane, if you can highlight these

7   lines of code, 1559, 1563, 1557, and 1590.

8            If you could span that slightly so we can

9   at least have a chance of seeing it, including -- okay.

10      Q    (By Mr. Randall) So I realize that you

11  reviewed more code than this, but I'm asking you

12  specifically with respect to this code, what does this

13  code show?

14      A    So what this code shows is the -- you'll

15  notice that there is a -- a dot Z right after the -- the

16  word covers.  And then there are the open brackets with

17  an I.  There's a dot Z there, and then after the equals,

18  there's a covers, open bracket, a gold Z.  The most

19  important part of both of those is that -- is that Z is

20  the -- the axis that's being set in this -- in that

21  particular line.

22           And that Z axis is always set to 0.  That's --

23  it's always set to -- in 1559, it's always set to 0.

24  It's -- the same thing happens in Line 1567.  It's

25  always set to 0.  The Z axis is set.

2    being set for the selected cover, but there's -- it's a

3    constant value that's used for -- to assign the covers

4    to that -- to assign the Z axis to those covers.

5        Q    Okay.  Now, with respect to the positioning

6    and sizing of the album covers in Coverflow that you

7    just testified to, is Coverflow the same for iPhone,

8    iPod Touch, and other iPods?

9        A    Yes, it is.

10       Q    All right.

11           MR. RANDALL:  Go back to NG1, please.

12       Q    (By Mr. Randall) So the code that we looked at

13   and the code you also looked at previously, in addition

14   to those specific lines we just went through, what does

15   that tell you with respect to the positioning of these

16   album covers?

17       A    What that -- what that tells me is that the --

18   the albums are all on the same Z axis.  They're all on

19   the same plane, and -- but specifically by plane, what I

20   mean -- the easiest way to think of -- of a plane is to

21   think of it as a -- as a flat, smooth -- completely

22   smooth wall.

23           And it's not necessarily drawn, but it is, for

24   the purposes of geometry, a -- a flat, smooth wall.  And

25   by -- by setting those values of those -- of those

2    all attached to the wall in the same -- in the same

3    position.  So they're all attached to the same -- in the

4    same way to this flat wall.

5              And because of that, what that means is that

6    the albums do not recede into the distance as you move

7    away from the center.  They're always on the same --

8    they're always on the same axis.  They're on that same

9    plane, that same wall, and so, therefore, they don't

10   recede.

11       Q    Okay.  And do -- the iPhone, iPod Touch, and

12   other iPods, do they utilize a cursor or pointer?

13       A    No, they do not.

14       Q    Do they show a glance view as required --

15            MR. RANDALL:  Strike that.

16       Q    (By Mr. Randall) Do they show a glance view?

17       A    No, it does not.

18       Q    And how does the user interact with the

19   devices, then, if they don't use a cursor or pointer

20   that moves around?

21       A    So instead of using a cursor or pointer or

22   something like that, it's -- you use direct

23   manipulation.  You use your finger, and you're actually

24   touching the screen.

25            So where a cursor or a pointer is -- is -- is

2    normally sets alongside of a computer, and the cursor

3    is -- is the little arrow that moves around.

4           There's no such thing on the iPhone.  It's

5    just -- you just use your finger.  It's a very direct

6    form of -- of changing your view.

7       Q    Okay.

8           MR. RANDALL:  Can you play Clip 51A,

9    please?  It's DX51A.

10                (Video clip playing.)

11                (Video stopped.)

12      Q    (By Mr. Randall) All right.  And what does the

13   video we just saw, DX51A, demonstrate?

14      A    So what that showed was an iPhone, again

15   tipped on its side, which brought up the Coverflow view.

16           And in order to change what album you were

17   viewing on that -- on that -- that shelf of albums, you

18   use your finger to directly change what -- what albums

19   are -- what album is actually in the center.

20           And you could see that by swiping your finger

21   in either direction, the albums swipe back and forth to

22   follow your finger.

23      Q    Now, does the -- do -- any of those products

24   that we just mentioned, do they ever display a glance

25   view when the Coverflow changes?

2      Q     Before this case, Mr. Ganatra, were you ever

3  aware of a product called Scopeware or Lifestreams?

4      A     No, I was not.

5      Q     Before this case, were you aware of

6  Dr. Gelernter?

7      A     No, I was not.

8      Q     Before this case, were you aware of Mirror

9  Worlds Technologies?

10      A     No.

11      Q     Before this case, were you aware of any of

12  Mirror Worlds' patents?

13      A     No, I was not.

14              MR. RANDALL:  No further questions, Your

15  Honor.

16              THE COURT:  All right.  Cross-exam.

17              CROSS-EXAMINATION

18  BY MR. STEIN:

19      Q     Good morning, Mr. Ganatra.

20      A     Good morning.

21      Q     The term, receding foreshortened stack, isn't

22  a technical term in computers, is it?

23      A     Not to my knowledge.

24      Q     It's a visual effect, correct?

25      A     It's -- it's hard for me to say.  I mean,

2   some items.

3        Q    It's a description of something being

4   displayed, right?

5        A    Yes.

6        Q    And the jury here can assess that effect by

7   looking at the image being displayed, right?

8        A    Yes.

9        Q    There are -- there's -- there's software on

10  the iPhone that doesn't cause images to be displayed,

11  correct?

12       A    I'm -- I'm sorry.  Can --

13       Q    There's other software on the -- on the iPhone

14  that doesn't cause an image to be displayed, correct?

15       A    There is -- I -- I apologize.  You're saying

16  there is other software --

17       Q    Let me restate it.

18       A    Sorry.

19       Q    There's some software that causes that image

20  to be displayed, right?

21       A    There is other software that causes the --

22       Q    Let's start again.  Sorry.

23            You pointed to some software that displayed

24  the -- that was displaying the image of Coverflow on the

25  iPhone, right?

2      Q      And that -- that software causes an image to

3   be displayed, right?

4      A      Sure.  Yes.

5      Q      And there's other software on the iPhone that

6   performs other functions on the iPhone, which would not

7   cause an image to be displayed, right?

8      A      Yes.  There is lot -- there is quite a bit of

9   software that runs on the iPhone, yes.

10     Q      And in order to understand really what that

11  software is doing, you need to look at -- to understand

12  the functionality of that software, you need to look at

13  the source code, correct?

14     A      Yes.

15     Q      But here we're looking at a visual effect,

16  which you can determine by looking at the display on the

17  screen, right?

18     A      That's correct.  We also did look at source

19  code.

20     Q      Right.

21            Again, in this particular instance, the jury

22  can assess for itself whether the image on the screen is

23  a receding foreshortened stack without looking at that

24  source code, right?

25     A      I -- I believe they can.

 2   saw, the center -- the image in the center is larger

 3   than the images to the sides of the center, correct?

 4        A     The -- the one image that is in the center

 5   is -- is larger than all the other images, but the other

 6   images are all the same size.

 7        Q     All right.  And as you move out from the

 8   center to the side, the angle of the top edge is

 9   decreasing, correct?

10        A     The angle of the top edge?

11        Q     Of each -- of each image in the stack is

12   becoming shallower, correct?

13        A     It would be hard for me to say.  We would have

14   to go look at the source code to -- to confirm that.

15        Q     But if you can see it with your eyes, then the

16   answer would be -- if the jury looks at it and sees it

17   with their own eyes --

18        A     Uh-huh.

19        Q     -- then they can trust their eyes.  If it's

20   getting shallower, then they don't need to look at the

21   source code to figure out that it's getting shallower,

22   right?

23        A     That's true.  That's true.

24        Q     Now, you used the term glance view a moment

25   ago.  Glance view is a term that's in the claims of the

2    here.

3            Are you aware of that?

4    A    I am, yes.

5    Q    Have you studied those patents?

6    A    No, I haven't studied them.  No.

7    Q    Do you know what the Court's -- the Court in

8    this case had construed those terms.

9            Do you know what the Court's construction of

10   the term glance view is?

11   A    I -- I believe that the -- the -- not -- not

12   exactly.  I mean, I could -- I could guess, but probably

13   not exactly.

14   Q    Thank you.

15            THE COURT:  Redirect?

16            MR. RANDALL:  No questions.

17            THE COURT:  All right.  You may step

18   down.

19            All right.  Who will be your next

20   witness?

21            MR. PLATT:  Apple calls John Hornkvist.

22            THE COURT:  John who?

23            MR. SOOBERT:  Hornkvist,

24   H-O-R-N-K-V-I-S-T.

25            COURTROOM DEPUTY:  Please raise your

```
 2                    (Witness sworn.)

 3      JOHN MARTIN HORNKVIST, DEFENDANTS' WITNESS, SWORN

 4                    DIRECT EXAMINATION

 5  BY MR. SOOBERT:

 6      Q    Good morning, Mr. Hornkvist.

 7      A    Good morning.

 8      Q    Could you state your name for the record,

 9  please.

10      A    John Martin Hornkvist.

11      Q    And where are you from?

12      A    I'm from Gothenburg, Sweden.

13      Q    And where do you live now?

14      A    At Cupertino, California.

15      Q    And can you just briefly describe your

16  educational background?

17      A    I have a master's of science in computer

18  engineering from Chalmers University of Technology.

19      Q    And what -- are you working at Apple now?  Are

20  you employed?

21      A    I'm an employee of Apple.

22      Q    When did you start working at Apple?

23      A    I started in 2003, in August.

24      Q    Are you familiar with Spotlight?

25      A    I am.  I am the manager Of the Spotlight Team.
```

2  Performance Team and the Spotlight Team.

3       Q    Can you pull the microphone down a little bit

4  and speak into it so we can hear you?  Thank you.

5            And what do you do in that role of

6  responsibilities?

7       A    I write a lot of the Spotlight code.  I lead

8  the other engineers that are working on Spotlight in

9  their jobs.  I deal with other teams, coordinate and

10  prioritize work.

11      Q    Okay.  And so you said you write code, and

12  you're familiar with the code?

13      A    I am very familiar, yes.  Before I was manager

14  of the team, I was technical lead, which meant that I

15  was in charge of basically most of the technical

16  decisions about how the system works.

17      Q    All right.  And so the code defines how

18  Spotlight operates?

19      A    The code is how Spotlight works.

20      Q    All right.

21           MR. SOOBERT:  Diane, can you bring up

22  JH1?

23      Q    (By Mr. Soobert) Mr. Hornkvist, can you just

24  briefly tell me what's shown here?

25      A    Sure.  So we are seeing a high-level

2    hierarchical folder system, which is just part of Mac OS

3    10.  And we have the Spotlight Store, which is a content

4    index and a Metadata Store.  And then we have a search

5    interface.

6        Q    Okay.  So Apple uses a hierarchical file and

7    folder system that's shown there in the upper left-hand

8    corner?

9        A    Yeah, we do.

10       Q    Okay.  How long have they used that?

11       A    Since the Macintosh first came out, probably

12   1984.

13       Q    For decades?

14       A    For decades, yes.

15       Q    Okay.  And the Spotlight Store that's at issue

16   in this case is -- is on the bottom part of that screen,

17   right?

18       A    Right.  Yes.  That's the content index in the

19   Metadata Store.

20       Q    Okay.  And if I wanted to sort of look under

21   the hood, so to speak, of the computer and understand

22   how it operates, I'd like at the source code, right?

23       A    Yes, absolutely.

24       Q    Okay.  Before we -- before we do that, let's

25   talk just briefly about the architecture of the

2  with.

3          Can you just describe what's -- what's in that

4  store?

5      A    Yeah.  So the -- the Spotlight Store contains

6  metadata, that is, data about files, things like the

7  author of a document and other sort of descriptive data

8  about the things that you have in your system.

9          And then the content index is a way of -- by

10  terms in your documents, by words in your document,

11  locating them.

12          So if you -- you were looking for, you know,

13  your tax return, or hopefully in that document you have

14  the word tax return -- or the words tax return, so you

15  give that to Spotlight, and we locate your tax return

16  for you.

17      Q    Okay.  Now, does Spotlight Store any documents

18  itself?

19      A    No.  Spotlight is not responsible for storing

20  documents.  The file system does that.

21      Q    Okay.  So even though it says Spotlight Store,

22  that's -- it's not a place where documents are stored?

23      A    No, no.  No, it's not.  It's -- we store data

24  about documents.  We don't store documents.

25      Q    And that data is reflected in one, the content

2       A    It's reflected in the Metadata Store.  That's

3    where we keep it, and we -- we index some of that

4    metadata in the content index.

5       Q    Okay.

6            MR. SOOBERT:  Diane, can we go to JH2,

7    please?

8       Q    (By Mr. Soobert) Okay.  Could you just briefly

9    tell us what this shows?

10      A    Yes.  So what shows here is, we have a system

11   that has two separate hard drives.  One -- so Folder

12   System 1 is the built-in hard drive in your Macintosh.

13           And Folder System 2 is an external drive

14   you've connected.

15           And what we see is that they're actually two

16   separate Spotlight Stores, one for the integrated drive

17   and one for the external drive.

18           And then the search interface will coalesce

19   and show the results together.

20      Q    Okay.  So in this example, one -- one of those

21   Spotlight Stores would have some of the documents

22   indexed that would be accessible by the system, and the

23   other Spotlight Store would have whatever documents

24   could be accessible through a separate volume drive on

25   the computer; is that correct?

2    the document, as I said before.  We have the data about

3    the document.

4         Q    Right.

5              Okay.  And this slide -- in this next slide in

6    this series of slides we're looking at, are these

7    accurate representations of how Spotlight operates?

8         A    These are accurate at a very high level.

9         Q    Okay.  And we'll go drill down in just a

10   second.

11             And these are consistent, the architecture and

12   the operation we're discussing today, with how Spotlight

13   is actually reflected and runs in the code, right?

14        A    That is correct.

15        Q    Okay.

16             MR. SOOBERT:  Let's go to JH3.

17        Q    (By Mr. Soobert) Okay.  Now, this is just

18   highlighting the Spotlight Store, and we've seen that

19   there's -- there's the index and the Metadata Store?

20        A    Correct.

21        Q    Okay.

22             MR. SOOBERT:  Let's go to JH4.

23        Q    (By Mr. Soobert) Now, so I want to focus on

24   the aspect of the Spotlight Store right now on the

25   Metadata Store in this so-called database.

2  next slide, 5.

3      Q    (By Mr. Soobert) And describe here for me, if

4  you would, what is being shown.

5      A    Okay.  So what we see here is, we have a

6  database.  In that database, we have pages.  The data is

7  separated onto pages.  So -- and on each page objects

8  are -- we have database objects, which represent -- each

9  represents a file in your file system.

10          And Object ID 1 here is a file called

11  Football.pdf, and that's on Page 1.  Then you see on

12  Page 2 we're starting with OB number 5.  Page 3 happens

13  to start with Object ID number 9.

14          And as you can tell, we have some metadata on

15  here.  We have the size; we have the date.  And you can

16  also see that there's no -- the order is simply by

17  object ID here.

18      Q    Okay.  Does this demonstrate that the -- the

19  Spotlight Metadata Store is organized by object ID and

20  not time?

21      A    Yes, it does.

22      Q    Okay.  And you understand Mirror Worlds is

23  contending that the Spotlight Metadata Store maintains

24  documents in a chronological order?

25      A    That's not correct.

2        A      Because it's ordered by the object identifier,

3    which is a number the file system assigns to the files,

4    and that number increases each time a file is added, but

5    it has nothing to do with the date on the files.

6               And once you have used up all available

7    numbers, it starts over from the bottom of the number.

8    It starts over at 1 and tries to look for the next

9    unused file ID.

10       Q      Okay.  So Apple, through the Spotlight Store,

11   tracks it by object ID --

12       A      By object ID.

13       Q      -- which is not tied to time?

14       A      That's correct.  It's not tied to time.

15       Q      Okay.  And then -- how do you know that again?

16              Is that in the source code?

17       A      That is in the source code, right.

18       Q      Okay.

19              MR. SOOBERT:  Diane, let's go to DX1017,

20   please, and go to the second page, please.

21              And this is tough to read.  Let's go to

22   the next page, please, Line 4178 at the bottom.

23              Just highlight that, please.

24       Q      (By Mr. Soobert) And this -- this is actual

25   source code, the computer instructions taken from the

 2      A    Yes.  This is from the Spotlight project.

 3      Q    Okay.  Can you describe what's shown there?  I

 4  mean, this looks pretty technical, but can you sort of

 5  try to explain this to me?

 6      A    Sure.  So this is a function in the source

 7  code that inserts a new database object -- that's what's

 8  called the ndbo for new database object -- into the

 9  DataStore.

10          On the page which has the page number here

11  with PG -- yeah, this is -- this is the top of that

12  function.

13              MR. SOOBERT:  So let's go to the next

14  page of this, Diane, Lines 4218, please.

15              4218, 4219.  We'll look at 4224 in a

16  second.

17      Q    (By Mr. Soobert) And what does this tell us

18  right here?

19      A    Okay.  So what we're looking at here is the

20  section of the code that finds the right spot in the

21  database page to insert a new database object.  So that

22  would be the ndbo.

23          And it does that by the object identifier,

24  which we have shortened to OID.  And this is -- this is

25  what we call a loop.  It starts by comparing, to make

2  then it compares the object we're currently looking at.

3  That would be the dbo to the new one we want to insert.

4          And if the object identifier of the new object

5  is greater than the object identifier of the object in

6  this spot on the page, we call this thing the next dbo

7  that gets -- that basically calculates where the next

8  database object on the page is.

9          We move forward to that object, and then we

10  compare the -- that object to the new dbo.  And then we

11  proceed like that until we find the right slot -- the

12  right spot on the page to insert the object.

13          It's basically like trying to put a book in a

14  bookshelf.  If you have your books sorted by author, you

15  start at one end and you browse through them until you

16  get to the proper letter, and then you insert the book.

17      Q    Right.  And then in that analogy, those books

18  are arranged by object ID?

19      A    Right.

20      Q    That's how they are tracked, and those aren't,

21  again, in any kind of time-ordered sequence; is that

22  right?

23      A    Right.

24              MR. SOOBERT:  Let's go to JH6, please.

25              Oh, I'm sorry.  Can we go back to that

2              Okay.  Go back to that third page,

3   please, and that one line, 4224.

4        Q    (By Mr. Soobert) And what is -- what does this

5   part of the code tell us?

6        A    So this is a comment that the developer who

7   wrote this inserted, saying that we should check that

8   the object isn't already existing.  And if it already

9   exists, we'll return with an error so that we don't

10  accidentally insert the same thing twice.

11       Q    Now, is there any kind of time mechanism -- I

12  mean, tiebreaker mechanism in here?

13       A    In here?

14            It's only the object identifier, no tiebreaker

15  is needed.  Object identifiers uniquely identify one

16  file in the file system.

17       Q    Right.  So Spotlight uniquely identifies

18  each -- each document based on that object identifier,

19  and it doesn't need to look to any other data to break

20  any kind of tie, because there are no ties, right?

21       A    There cannot be a tie on a single file system.

22       Q    Okay.

23            MR. SOOBERT:  Diane, can you bring up

24  JH -- JH6, please?

25       Q    (By Mr. Soobert) Now, I just want to briefly

2  that was relevant to the Spotlight Store.

3          MR. SOOBERT:  Can we go to the next

4  slide?

5      Q    (By Mr. Soobert) And -- and what does this

6  tell us and show?

7      A    So this shows how data is organized in the

8  term index, and you will have -- you have terms, and for

9  each term, there is a -- there's -- basically, there's a

10 circle in this tree corresponding to a term.

11     Q    Okay.  So this is the part of the code that

12 actually, as I start typing into the Spotlight window,

13 starts pulling up the words.  This is how it does it

14 through this tree structure?

15     A    Yeah.

16     Q    And this part of Spotlight or the content

17 index is likewise not ordered by time.  It's simply this

18 data tree structure?

19     A    Yeah.  This is stored in an order that would

20 be alphabetical.

21     Q    Okay.  So it's alphabetical and not by time?

22     A    Yeah.

23     Q    Okay.  There's no time-ordering to it at all,

24 right?

25     A    To this, there is no time-order.

2    DX290, please, Page 3.

3        Q    (By Mr. Soobert) Now, do you understand that

4    Apple's search technology provided the bases and

5    framework of the content index we just looked at for

6    Spotlight?

7        A    Yeah; that's correct.  In Mac and Tiger, we

8    used the SearchKit, which was an evolution of something

9    called Twin that was developed by Apple's Advanced

10   Technology Group sometime in the early '90s.

11       Q    Okay.  In that first paragraph there under

12   these figures --

13              MR. SOOBERT:  Can you blow that up,

14   Diane?  It starts with the content index.

15       Q    (By Mr. Soobert) And that statement there

16   essentially -- I'm paraphrasing -- reflects that the

17   content index is built using an evolved and optimized

18   version of SearchKit, which is that preexisting

19   technology you discussed?

20       A    Yeah, that's correct.

21              SearchKit was introduced as a developer API in

22   Panther, but had existed and was -- had been used

23   internally at Apple for many years before that.

24       Q    Okay.  And this document, this is the Apple

25   document that Apple provides to software developers?

2      Q      Okay.  So they can understand how -- how the

3   source code operates and what-not?

4      A      Yeah.

5      Q      Okay.

6      A      That's -- this is for them to understand how

7   to write their programs.

8      Q      Okay.  Now, let me ask you a couple of

9   specific questions about the operation of Spotlight.

10             Now, does Spotlight -- does the Spotlight

11   index index everything?

12      A      No.  The Spotlight index avoids indexing

13   things we don't think will be useful for the user,

14   because there's quite a significant cost in indexing.

15      Q      All right.  And what kinds of things are

16   excluded from the index?

17      A      The first thing is temporary files, files that

18   just come and go.  Then there are files that we regard

19   that are private to a program that users are not really

20   intended to deal with.

21             You might have -- I guess a good example would

22   be any application that deals with a collection of files

23   but provides like a unified interface to them.

24             For that, we wouldn't let you find those --

25   those -- that collection of files.  We would only let

2      Q      Okay.  Now, the types of those documents that
3   are excluded from the Spotlight index that aren't -- you
4   know, there's some subset of documents, are there some
5   pretty significant documents that might be excluded,
6   like privacy-related documents or something?
7      A      Yes.  We have a feature that lets you exclude
8   files that you don't want people to find on your
9   computer.  We call that Privacy.
10      Q      Okay.  So if I have like tax returns and my
11   billing statements and documents that have my Social
12   Security number, these are like my most important and
13   sensitive documents?
14      A      Yeah.  So it's very common that you would add
15   those to Privacy to keep someone from accidentally
16   bumping into them or someone that just gets -- happens
17   to gain access to your machine to quickly find them.
18      Q      Okay.  Then those documents wouldn't be
19   indexed by Spotlight nor, by definition, returned in any
20   kind of Spotlight search results?
21      A      Yes.  In fact, we actually actively remove
22   them from our index, if they were already were indexed
23   and you were to add them to the Privacy setting.
24      Q      Okay.
25              MR. SOOBERT:  Can you move to show JH8?

2    reflect this Privacy exclusion that keeps the private

3    documents out of Spotlight?

4        A    Yeah, that's correct.

5        Q    Okay.  All right.  Let's talk for a second

6    about potentially future documents.

7             Does the Spotlight Store include any -- store

8    documents by future date?

9        A    No.  We don't have any understanding of the

10   data that we store really.  We just store what we're

11   told by applications to put in there, and we order it by

12   the object identifier.

13       Q    Okay.  And so if I run the Spotlight search

14   and then I want to sort the results by date, can I sort

15   those results by future dates, some date out in the

16   future?

17       A    To my knowledge, in the user interface we

18   provide, there's no way of doing that.

19       Q    Okay.  So just as an example, if I have

20   something on my calendar in that iCal application, okay,

21   that's out on my computer and I put I'm going to

22   vacation in a week, that's a future reminder or just an

23   object that I put into my system, right?

24       A    Yeah.

25       Q    Okay.  And I run a Spotlight search and I just

2    pop up?

3          A    That object will show up, yes.

4          Q    Yes.  And will that date, that date in the

5    future, show up in the -- or be able to be

6    searched on -- sorted on in the search results?

7          A    You're talking about the Finder here or --

8          Q    Yeah.  I'm talking about the general file --

9    Spotlight operation.

10         A    Oh, no.  As far as I know, there's no way of

11   sorting on that.

12         Q    So there's no way of sorting on a future date

13   in Spotlight; is that right?

14         A    That is my understanding, yes.

15         Q    Okay.  And what are the dates in Spotlight

16   that could be, you know, sorted on or the date created,

17   last opened, and date modified; is that right?

18         A    That is correct, yes.

19         Q    Okay.  So now let's talk real briefly about

20   this CFUUID.

21              Do you know what that is?

22         A    CFUUID is essentially a 16-character --

23   16-letter -- I guess we can call it a 16-letter word

24   that lets you uniquely identify something.

25         Q    Okay.  And you understand Mirror Worlds

2   between two documents in a -- in the same volume on the

3   computer.

4           Is that -- is that true?

5       A   For this same volume, the object identifier is

6   always enough to break the tie.

7       Q   Okay.  And that's in the source code, right?

8       A   That's in the source code, yes.

9       Q   Okay.  And you just can't look at the screen

10  and look at Spotlight from the user perspective and

11  figure out how that operates, right?

12      A   We try very hard to hide how it works under

13  the cover.

14      Q   Right.  So the user doesn't have to worry

15  about what's underneath the hood, and that's how --

16  that's how the source code in Spotlight operates, right?

17      A   Yeah.  The source code is what defines how it

18  works, and the user interface is often entirely removed

19  from that operation.

20      Q   Okay.  Now, if Mirror Worlds has questions

21  about that and they want to ask somebody about how that

22  source code operates, you're one of the very best people

23  to ask that, right?

24      A   Yeah, I would be the person to ask about that.

25      Q   All right.  Well, let's see hear what they

2                    MR. SOOBERT:  Pass the witness.

3                    CROSS-EXAMINATION

4  BY MR. STEIN:

5       Q    Good morning, Mr. Hornkvist.

6       A    Good morning.

7       Q    You've testified that the files are not stored

8  in the Spotlight Store; is that correct?

9       A    That is correct.

10      Q    But there's information in the Spotlight Store

11  that would enable you to find the corresponding file for

12  the metadata that's in the Spotlight Store; isn't that

13  true?

14      A    The object identifier will let you find the

15  corresponding item in the file system.

16      Q    So you can go from the information in the

17  Spotlight Store to the corresponding file in the file

18  system, right?

19      A    Normally that is true.

20      Q    And you -- as you said, you do that just

21  through that object identifier, right?

22      A    Right.

23      Q    When a typical customer buys a Mac computer,

24  how many disk drives does it have in it?

25      A    Typically, it has one disk drive, though it's

2   the Time Machine feature.

3        Q    The Time Machine feature is an external disk

4   drive.  It requires an external disk drive, correct?

5        A    Internal or external.

6        Q    It's still typically is -- the Mac computers

7   are sold with one disk drive, correct?

8        A    It's my understanding that most Macintoshes

9   are sold with one disk drive, though I don't work in

10  marketing, so I don't actually have sales figures.

11       Q    And it would be one Spotlight Store for that

12  one disk drive, correct?

13       A    That depends on whether the user has asked for

14  one or more stores.  So it's very, very common for our

15  users to have -- to use partitioning, which allows you

16  to divide the drive up into multiple pieces.  And then

17  there would then be one Spotlight Store for each of

18  those pieces of the hard drive.

19       Q    Out of the -- out of the box, the -- the disk

20  drive on the Mac would have one partition, right?

21       A    I believe it comes with one partition called

22  Macintosh HD.

23       Q    Thank you.

24            I think Mr. Soobert asked you if it was your

25  understanding that it's Mirror Worlds' position that the

2    that right?

3          A    That --

4          Q    I'm just asking you if Mr. Soobert asked you

5    that question, if it was your understanding that it is

6    Mirror Worlds' position that the Metadata Store in

7    Spotlight is arranged in chronological order.

8          A    I don't think he asked me that question.

9          Q    Do you know what Mirror Worlds' position is

10   with respect to infringement by Spotlight in this

11   litigation?

12         A    Not in detail, no.

13         Q    And the Metadata Store is just one component

14   of the Spotlight Store, right?

15         A    It's one of the two major components.

16         Q    And there's something called the Spotlight

17   server in Spotlight.  Are you familiar with the term

18   Spotlight Server?

19         A    I -- there are a couple of things you might be

20   referring to.  One is the Spotlight server process.

21              Is that what we're talking about?

22         Q    Yes.

23         A    Okay.

24         Q    And the Spotlight server process -- by the

25   way, before I ask that question, are you familiar with

2      A    It's one of many descriptions that people use

3  about Spotlight.

4      Q    And that would include this Spotlight Server

5  process, correct?

6      A    It might, yes.  It's not a clear term in that

7  sense.

8      Q    And the Spotlight server process controls

9  access to the information within the Spotlight Store,

10  correct?

11      A    The Spotlight server process is the component

12  that essentially uses the Metadata Store and the content

13  index and controls access to it, makes sure that other

14  users can't see documents that belong to you and so

15  forth.

16      Q    So this Spotlight server process is the way in

17  which other programs within Apple's operating system

18  gets access to the Spotlight Store, correct?

19      A    Yes.  In the sense that they use a programming

20  interface that we call metadata framework, which takes

21  the program's request and sends it on to the server.

22  But that's entirely hidden from the user or from the

23  software developer.

24      Q    The -- the -- right.  Thank you.

25           And the -- you mentioned the application

2    interact -- get their programs to interact with this

3    Spotlight Store, correct?

4        A    That is correct.

5        Q    So the programmers don't need to know what's

6    going on inside the Spotlight Store; they interact with

7    it through this API, application program interface,

8    right?

9        A    That's correct.

10           We recommend certain ways of using it to

11   improve performance; but beyond that, they don't need to

12   know much to make it work correctly.

13       Q    Now, you're aware that in Leopard, metadata

14   was added to the content index, correct?

15       A    Yes.  I did a large part of that work.

16       Q    And that metadata includes time-based

17   metadata, correct?

18       A    That includes -- yeah.  That included numbers,

19   dates, strengths, and true/false values.

20       Q    And the reason it was added was so that this

21   time-based metadata could be -- before I ask that, and

22   that time-based metadata includes things like content,

23   last updated, timestamp, type-in, you know, information

24   like --

25       A    It -- as far as I recall, it contains very

2   system itself has things like the creation date, the

3   date the content was modified and so forth.

4       Q    It did include the time-based metadata from

5   the metadata that was stored in the Spotlight Store,

6   correct?

7       A    Yes.

8       Q    And the reason for doing that was so that that

9   information could be accessed more quickly, correct?

10      A    No.  The reason for doing that was so that you

11  could query on it, so that you could search for things

12  based on the date information.

13      Q    So if you wanted to search for documents that

14  were between -- in that date range, it would be easier

15  to find the documents within that date range, correct?

16      A    Yeah.  It would be quicker, correct.

17      Q    And let me see if I heard you properly.

18           You said the Spotlight Store does not index

19  things that -- and I think you said, quote, are not

20  useful to the user; is that correct?

21      A    Could you repeat that?  I didn't hear.

22      Q    You stated earlier that the Spotlight Store

23  does not index things that are not useful to the user;

24  is that --

25      A    We try to avoid that.  It's a very, very

2   might be useful to you; what is useful to me as a

3   software developer might not at all be useful to you.

4            So we have some -- we have some heuristics for

5   locations that we regard as unlikely to be useful for

6   most users.  And if some users are then disappointed

7   because they can't find it, we would rather take that

8   than confuse most users with files that are not useful

9   to them.

10       Q    All right.  You also mentioned a privacy

11  feature, and you said that users can use that to exclude

12  documents, right?

13       A    That is correct.

14       Q    Users don't have to use that privacy feature,

15  correct?

16       A    It's up to the user whether they want to use

17  that or not.

18       Q    And I think I saw, when Mr. Soobert put up the

19  slide, that in order to reset the -- the privacy

20  feature, you had to go through the -- was that the

21  system's preferences menu?

22       A    That is the system preferences, yes.

23       Q    So the user would have to pull up that

24  system's preferences menu and then make some kind of

25  adjustment within there, correct?

 2   search menu, which is our primary user interface.  As

 3   soon -- whenever you have search results up in the

 4   Spotlight search menu, you also see a field that you can

 5   click, to go to this panel.

 6       Q     You also talked a little bit about the future

 7   times.  One of the items of metadata items is the --

 8   something called the due date; isn't that right?

 9       A     That's quite possible, yeah.  We have a -- we

10   have a very large schema, which contains essentially

11   everything we could think of that might be useful to --

12   to have in the DataStore.

13       Q     And -- and in Leopard, that due date also was

14   one of the pieces of metadata that would have been put

15   into the Content Store, too, correct?

16       A     That would have been indexed.

17       Q     You started working on Spotlight after --

18   after the release of Tiger; is that right?

19       A     No.  I started working on Spotlight probably

20   sometime during 2004 in my role as an engineer on the

21   Mac OS 10 performance team; and I joined the Spotlight

22   team full time, I believe in January of or February

23   2005, which would have been a couple of months before

24   Tiger shipped.

25              If I -- if I have my timeline correct, Tiger

2       Q    Thank you.

3                   MR. STEIN:  No further questions.

4                   THE COURT:  Redirect?

5                   MR. SOOBERT:  None here, Your Honor.

6                   THE COURT:  All right.  You may step

7  down.

8                   Who will be your next witness?

9                   MR. RANDALL:  Mr. Pavel Cisler, Your

10 Honor.

11                  THE COURT:  Mister who?

12                  MR. RANDALL:  Pavel Cisler.

13                  COURTROOM DEPUTY:  Please raise your

14 right hand to be sworn.

15                  (Witness sworn.)

16          PAVEL CISLER, DEFENDANTS' WITNESS, SWORN

17                     DIRECT EXAMINATION

18 BY MR. RANDALL:

19      Q    Can you please state your name for the record?

20      A    My name is Pavel Cisler.

21      Q    Okay.  And I have to lean into this

22 microphone, so -- unfortunately, everybody does.  This

23 stem is a little bit short.

24                  Can you describe your educational history

25 after high school?

2  engineering from the Czech Technical University in

3  Prague.

4      Q    Do you also have a master's degree?

5      A    Sorry.  Yeah.  I have a master's in electrical

6  engineering, yes.

7      Q    And what did you do after you got your

8  master's degree?

9      A    I had a brief period of working as an

10  electrical engineer.  Then I started a software company

11  in the Czech Republic.  We worked on Macintosh software.

12          After that, in '94, I moved to the Silicon

13  Valley, and I worked at three startups:  General Magic,

14  B Incorporated, and Easel.

15          And after that, in 2001, I started at Apple

16  Computer.

17      Q    Okay.  And we all have to -- you'll have to

18  lean into the microphone just a little bit, so we can

19  all hear.

20      A    Okay.

21      Q    What's your current position at Apple?

22      A    At Apple, I managed the Finder and the Time

23  Machine teams.

24      Q    And is the Finder, is that really a window

25  that displays the results of searches of Spotlight?

2    that lets you open folders and examine files, and it

3    also lets you do searches, among other things.

4        Q    All right.  And what other positions have you

5    held at Apple?

6        A    When I first started in 2001, I was a software

7    engineer on the Finder team.  Eventually -- I believe

8    after two years, I became the tech lead of the Finder.

9             And then later, I started managing the team.

10            And around the beginning of the Leopard

11   project, I assembled a team that started developing Time

12   Machine.  And since that time, I have managed both the

13   Finder and the Time Machine teams.

14       Q    Is there -- are you familiar with a -- what's

15   called a -- kind of a Coverflow view of information in

16   the Finder?

17       A    Yes, I am.

18       Q    Okay.  Do you understand that Apple obtained a

19   technology license from a company called Steel Skies in

20   May of 2006 for $70,000 to this Coverflow technology?

21       A    Yes, that's my understanding.

22            MR. RANDALL:  Let's go to DX636 at

23   Page 1.

24            And if you can just highlight that

25   section there (indicates).

2  agreement between Apple and Andrew Coulter Enright, and

3  Jonathan del Strother, and it's dated May 15, 2006.

4              MR. RANDALL:  Down at Section 2.1, if you

5  can scroll down, is the assignment to Coverflow art,

6  which is about the fourth line from the bottom.

7              And then if we can flip, Diane, to the

8  next page, which is 4.1, Section 4.1.  And, again, this

9  is Exhibit 636.

10     Q    (By Mr. Randall) The consideration is $70,000.

11             MR. RANDALL:  And then if we can go to

12  Page 7 of this document, it's the technology description

13  at Exhibit A.

14     Q    (By Mr. Randall) And the first paragraph up

15  there says:  Software for album browsing that enables

16  the users to browse and launch digitally stored albums

17  by viewing and flipping through the album art as

18  described in the following websites hereinafter referred

19  to as Coverflow software.

20             And then a few lines down, it says:  Copies of

21  these webpages are attached hereto.

22             Is it your understanding, sir, that Apple

23  licensed, for $70,000, a technology license from Steel

24  Skies for the Coverflow view that is utilized in various

25  products at Apple?

2      Q    Thank you.

3            MR. RANDALL:  No further questions, Your

4  Honor.

5            THE COURT:  All right.  Cross-exam.

6                  CROSS-EXAMINATION

7  BY MR. STEIN:

8      Q    Good morning, Mr. Cisler.

9            The Steel Skies license that Mr. Randall was

10  just mentioning, that wasn't a patent license, was it?

11     A    I believe it was a license to acquire the

12  technology.

13     Q    But there were no patents involved in that

14  license, was there?

15     A    I'm not sure.

16     Q    You don't know, right?

17     A    No.

18     Q    It had just been a copyright license, for

19  example, right?

20     A    I'm -- I'm -- I'm -- I don't know.

21     Q    And didn't Apple already implement internally

22  its own version of Coverflow before it signed that

23  license with Steel Skies?

24     A    I don't believe that's the case.

25     Q    Do you know that Apple was working on

2    was signed?

3         A    I don't believe -- I'm not aware of Apple

4    working on a version of Coverflow before that license.

5         Q    Do -- do you know one way or another if Apple

6    was working on that?

7         A    As far as I know, Apple wasn't working on it.

8         Q    Do you know who implemented the first version

9    of Coverflow at Apple?

10        A    I believe the technology was licensed, and

11   then it was -- after it was licensed, it was added to

12   iTunes, to the iTunes application by the iTunes team.

13        Q    I asked you if you knew who created the code

14   for Coverflow, the original version of the code at

15   Coverflow for Apple.

16        A    Well, I believe it's -- it's the gentleman

17   that we licensed the technology from.

18        Q    You don't know that Apple completely rewrote

19   the code on its own and did not use any of the code from

20   the people they licensed Coverflow from?

21        A    Well, the -- it depends on which

22   implementation of Coverflow.  There's a version of

23   Coverflow that's used in the Finder.

24             And that version, to my knowledge, was

25   reimplemented by the Image Kit team in Paris, and the

2    named -- I know him.  His name is Thomas Goossens.

3          Q    Do you know a gentleman named Mr. Heller?

4          A    Yes, I do.

5          Q    Do you know that he was designated by Apple

6    early in this case to speak on behalf of Apple regarding

7    this agreement that we've been talking about in the

8    development of Coverflow?

9          A    Yes, I do.

10         Q    Well, during his deposition, he said that when

11   I asked him if Apple used any of the source code

12   provided by Mr. Enright and Mr. del Strother, who are

13   the people Apple licensed that technology from -- if

14   Apple used any of the source code provided by them in

15   the implementation of Coverflow and iTunes, he said:  In

16   the end, we did not use any of their source code.

17              Do you have any reason to disagree with that?

18         A    I don't.  I'm sure that's correct.  Mr. Heller

19   was closer to that work than I was.

20         Q    And he also made it clear that Apple was

21   developing that source code before that license was even

22   signed.  Are you aware of that?

23         A    I'm not aware of that.

24         Q    Do you have any reason to disagree with that?

25         A    I -- if that's what Mr. Heller said, then I'm

2                    MR. STEIN:  All right.  James, could you

3    bring up Plaintiff's Exhibit 130?

4                    And blow up the top, please.

5        Q    (By Mr. Stein) This is an e-mail sent by Gene

6    Ragan to Peter, but also copied the Finder team, the

7    finderteam@group.apple.com.  It's dated October 10,

8    2002.

9                    You were a member of the Finder team in 2002,

10   correct?

11       A    That's correct, yes.

12       Q    And you would have received this e-mail,

13   correct?

14       A    Yes, that's -- that's very likely.

15       Q    And this e-mail is basically just a -- sending

16   the Scopeware website around to the Finder team,

17   correct?

18       A    That's correct.

19       Q    Thank you.

20                    MR. STEIN:  No further questions.

21                    THE COURT:  All right.  Redirect?

22                        REDIRECT EXAMINATION

23   BY MR. RANDALL:

24       Q    Do you understand that a technology license to

25   Coverflow from Steel Skies for album-flipping art and

2  Apple can implement that type of displays and that type

3  of technology in any way it specifically chose?

4      A    That's my understanding.

5      Q    All right.  And you didn't -- Apple did not

6  lift quantities of source code and just plug it in;

7  Apple implemented it in different products in different

8  ways by writing this code, right?

9      A    That's -- according -- yes, that's correct.

10     Q    Thank you.

11              MR. RANDALL:  No further questions.

12              THE COURT:  Any further recross?

13              MR. STEIN:  No.

14              THE COURT:  All right.  Thank you.  You

15 may step down.

16              Who will be Defendants' next witness?

17              MR. RANDALL:  Mr. Kevin Tiene, Your

18 Honor.

19              THE COURT:  All right.  Has this witness

20 been sworn?

21              MR. SOOBERT:  No, he has not, Your Honor.

22              THE COURT:  If you would raise your right

23 hand and be sworn.

24              (Witness sworn.)

25         KEVIN TIENE, DEFENDANTS' WITNESS, SWORN

2    BY MR. SOOBERT:

3        Q    Good morning, Mr. Tiene.

4        A    Good morning.

5        Q    Can you state your name for the record,

6   please?

7        A    My name is Kevin Tiene.

8        Q    Okay.  Where do you live?

9        A    I live in Cupertino in California.

10       Q    Okay.  And can you just describe your

11  educational history since high school?

12       A    Sure.  I went to school in Upstate New York

13  for a few years at a college called Oneanta.  And then I

14  transferred to George Mason University in Virginia, and

15  that's where I got my Bachelor of Science and Computer

16  Science.

17       Q    Okay.  So you have a computer science degree?

18       A    Correct.

19       Q    Okay.  And then sometime after college, you

20  joined Apple, right?

21       A    Yes.  I joined Apple in 1988.

22       Q    Okay.  And you're currently employed there at

23  Apple still?

24       A    Yes.

25       Q    Okay.  So you've been there since 1988?

2      Q     Okay.  And what was your role in sort of the

3  late '80s and early '90s?

4      A     In the late '80s and early '90s, I was in a

5  group at Apple called the Advanced Technology Group,

6  also referred to as ATG.

7             And there, we did a bunch of research into

8  information, access, search, indexing, those kinds of

9  technologies, and also human interfaces to those -- to

10  those search engines.

11      Q     Okay.  Did you work with Gitta Salomon?

12      A     Yes, I did.  I worked with Gitta during those

13  years in ATG.

14      Q     Okay.  And you said you're familiar with

15  indexing and searching technology from back in those

16  days?

17      A     Correct.

18      Q     Okay.  And then have you sort of tracked the

19  development of that over the years, Apple's evolution of

20  indexing and searching technology?

21      A     Yes, I have.  And in some ways, my career at

22  Apple has sort of followed it as well.

23             MR. SOOBERT:  Okay, Diane, can I have

24  KT002?  I'm sorry.  Next slide.

25      Q     (By Mr. Soobert) Okay.  Mr. Tiene, this is a

2  Apple.  Can you just briefly walk us through this

3  timeline just generally summarizing what's shown here?

4      A    Sure.  So the first item there, number one, is

5  when ATG was formed.  I joined ATG in late 1988 or early

6  '89.

7           During that time period, I worked on a number

8  of search and retrieval kinds of projects.  I was

9  peripherally involved in the Piles project.  Some of the

10  people that I -- that I worked with there were key

11  people working on the Piles project, and I worked a bit

12  with Gitta on that project as well.

13           Around 1994 -- up to that time, we had been

14  using kind of off-the-shelf search engines to do our

15  experiments, and in 1994, we decided that it made sense

16  for us to develop our own search engine.

17           And so we had that developed, an engine that

18  we called V-Twin, and it allowed us to -- our hope for

19  that was that we would be able to use it for research,

20  but also that we would write that engine to be product

21  quality such that we hoped that it could be used in

22  Apple products along the way.

23           In Bullet No. 4 there, you can see that that

24  is referring to a product that we actually did release

25  called Sherlock that was part of the operating system,

2    its -- as its indexing and -- and searching engine.

3              Subsequent to that, we took that V-Twin

4    engine; and as Apple moved to Mac OS 10, we repackaged

5    that engine and started calling it SearchKit, and that

6    engine was -- was made available not only to Apple but

7    also to third-party developers.

8              And it was also the engine that was used as

9    the basis of Spotlight when Spotlight was -- Spotlight

10   was released in -- it looks like 2004.  The V-Twin

11   engine was the engine that was used to do content

12   indexing and retrieval for the users' files on their

13   hard drive.

14   Q    Okay.  Thank you.

15             And all of these technologies use some form of

16   indexing and searching technology, right?

17   A    Correct.

18   Q    Okay.

19             MR. SOOBERT:  Diane, can you give me

20   DX1019, please?

21   Q    (By Mr. Soobert) Mr. Tiene, do you recognize

22   this document?

23   A    Yes.  This is a document that is from a Text

24   Retrieval Conference, and I believe this is -- the

25   conference is called TREC.  And I believe that this is

2   the papers having to do with V-Twin engine to the

3   conference.

4       Q    Okay.

5            MR. SOOBERT:  Can we go to Page 6,

6   please?

7       Q    (By Mr. Soobert) This is the front page of

8   that article from the conference.  You're familiar with

9   this article, right?

10      A    Yes.

11      Q    This paper.  And this accurately describes the

12  V-Twin preexisting searching and indexing technology; is

13  that right?

14      A    Correct.

15      Q    And this is from the mid-'90s, this paper.

16  This particular paper was published in 1997, right?

17      A    Yes.

18      Q    But this technology existed, you know, well

19  before 1996 as well, right?

20      A    Correct.

21      Q    Okay.  All right.  Let's shift gears and focus

22  in on 2003.  Do you recall a Merlot offsite meeting?

23      A    Yes.

24      Q    And what was the focus of that meeting?

25      A    So Merlot at that time was the name that we

2      and every time that we start a new, big project like

3      that, we go do an offsite meeting.

4              And the purpose of that is to get everybody

5      who are the key players in deciding what's going to be

6      part of that next release, get them off to a location

7      where there aren't distractions, their phones aren't

8      ringing, and spend a day focusing on -- on what we

9      should be building for the next -- for the next OS

10     release.

11     Q     Okay.  Was that -- was that some sort of super

12     secret meeting to get together and discuss ideas and

13     concepts from Dr. Gelernter or Mirror Worlds or

14     Scopeware or the like?

15     A     Absolutely not.

16     Q     Okay.  And how -- and you remember that?

17     A     I don't remember all of the details, but

18     those -- those offsites covered quite a wide variety of

19     topics.  And given my history in -- in being involved in

20     text retrieval, I certainly would remember if there

21     was -- if there was any significant discussion of such

22     things.

23     Q     Okay.  Let's try to refresh your recollection

24     just a bit.

25              MR. SOOBERT:  Can we go to Plaintiff's

2      Q     (By Mr. Soobert) Mr. Tiene, this was an e-mail

3    marked during your deposition earlier in this case that

4    looks like an e-mail that you sent to yourself, and I

5    think you describe it as notes that you had, you know,

6    jotted down and kind of summarized in this e-mail from

7    that Merlot offsite in 2003, right?

8      A     Exactly, yes.  It appears as though -- as I

9    looked through the documents, there were several

10   timestamps throughout the day of this document as the

11   meeting progressed.

12          And this was an e-mail that I was simply

13   capturing the notes of the -- of the meeting, as much as

14   anything to make sure I was staying awake and paying

15   attention to what was going on.

16          And in some cases, I made little annotations.

17   You can see here that I put three stars next to install

18   performance, because my group was responsible for the

19   installer, and I wanted to make sure to dig into that.

20     Q     Okay.

21          MR. SOOBERT:  Diane, let's go to Page 2

22   at the top.

23     Q     (By Mr. Soobert) And you see there you typed a

24   reference:  Scopeware, question mark, Yale, ask Ted.

25          Do you see that?

2       Q    It doesn't mention anything about

3   Dr. Gelernter there or Mirror Worlds, does it?

4       A    No.

5       Q    Okay.  Do you -- does this jog your memory

6   whether Dr. Gelernter's name even came up at the

7   meeting?

8       A    I don't know if his name came up.  My

9   understanding of -- of this, you know, looking through

10  the document, this is -- happened at the -- during the

11  tail end of one of the presentations, and people were

12  asking questions.

13          And to the best of my ability, my

14  understanding about what happened here is that a

15  gentleman by the name of Ted Goldstein must have said:

16  Hey, you know, someone -- maybe we should look at this

17  thing called Scopeware.  I saw, you know, some article

18  or news about it or whatever.  Just came up as a

19  comment.

20          I clearly wrote:  Scopeware, question mark,

21  because I didn't know what it was.  Yale, because I

22  think he had mentioned that the gentleman was from Yale,

23  and I just wrote a note saying, Ask Ted, meaning, I

24  don't know what this is.  Ask Ted, if you want to know

25  what it is.

2  that?  Did you ask Ted or, you know, perhaps submitted

3  these notes to someone who was maintaining the minutes?

4       A    So I believe that Ted proactively sent an

5  e-mail to -- to myself.  I think he just happened to be

6  sitting close to me and saw that I was taking notes.

7  He sent an e-mail to Tim Shaw, who I believe was

8  collecting the notes, and myself just saying:  Hey,

9  here's what I meant by that, and I think he sent -- the

10  text of the e-mail had references to some web URLs.  And

11  I think -- I think that's what happened.

12       Q    Okay.  But as far as you recall, you

13  specifically recall, you don't remember Dr. Gelernter's

14  name being mentioned at the meeting; is that right?

15       A    I do not remember his name being mentioned.

16       Q    All right.  So let me ask you this:  You know,

17  based on your understanding and your work at -- at

18  Apple, can you tell me and tell the jury whether your

19  understanding is, did Scopeware or Dr. Gelernter or any

20  of Mirror Worlds' ideas or patented technology or

21  products influence Apple's product development in any

22  way?

23       A    Not in any way that I am aware of whatsoever.

24       Q    Okay.  Thank you.

25            MR. SOOBERT:  Pass the witness.

2                          CROSS-EXAMINATION

3    BY MR. DIAMANTE:

4         Q    Good morning, sir.

5         A    Hi.

6         Q    I've been requested to speed up and slow down,

7    and we have not much time, but -- I speak quickly, but

8    I'll try to get through this.

9              Now -- so you weren't -- weren't you

10   appointed, selected -- hand selected by Apple to

11   investigate Apple's employees?

12        A    I was appointed to act as a 30(b)(6)

13   representative for a series of e-mails.

14        Q    And in common language, you have -- you-all

15   spoke to some people about e-mails, about Scopeware or

16   Dr. Gelernter, correct?

17        A    That's correct.

18        Q    And let me guess:  No one remembered anything,

19   correct?

20        A    For the most part, that is absolutely true.

21   No one remembered -- remembered any part of it.

22        Q    So you're like -- so this is Apple

23   investigating Apple, correct?

24        A    (No response.)

25        Q    Is that true?

2      Q      And, sir, how many years have you been at

3    Apple?

4      A      22.

5      Q      And I saw that pretty little timeline you

6    showed before with V -- is it V-Twin?  I think you

7    forgot to mention something.

8              MR. DIAMANTE:  Can we turn --

9      Q      (By Mr. Diamante) Did you get an e-mail about

10   a demonstration, about Scopeware?

11     A      I did, yes.

12             MR. DIAMANTE:  Can I see PTX191, James?

13     Q      (By Mr. Diamante) This talks about the

14   prospective demonstration, about Scopeware.  Do you see

15   that, with Don Lindsay?

16     A      Correct.

17     Q      And, sir, weren't you at that demonstration?

18     A      I'm not sure.  So this came -- we discussed

19   this in my deposition.  I have a vague recollection of

20   perhaps being in the room.  I don't really remember the

21   presentation.

22             I kind of remember that it was odd in that

23   someone was doing the presentation via a website but

24   talking on the phone.  It didn't -- it didn't make much

25   of an impression.

2  a Bertrand Serlet.  Do you see that, sir?

3      A    Yes.

4      Q    And Scott Forstall?

5      A    Correct.

6      Q    They're top people at Apple, aren't they?

7      A    Sure.

8      Q    You didn't talk to them about whether --

9  anything about Scopeware or Dr. Gelernter, did you?

10     A    I did not.  My understanding was, they were

11 being deposed, so I didn't talk about it.

12     Q    So when he -- when Counsel asked you a

13 question about whether there was any copying of this

14 man's ideas, you never spoke to the top guys, did you?

15     A    I did not speak to them because I didn't feel

16 that I had to in that case.  I don't believe that

17 Bertrand or Scott participated in that demonstration

18 whatsoever.

19     Q    I didn't ask that question.  I asked whether

20 they knew about Scopeware and Dr. Gelernter.

21          You never asked them.  You never asked those

22 gentlemen, did you?

23     A    I did not.

24     Q    And, sir, this gentleman who had the demo, Don

25 Lindsay, wasn't -- didn't he work for you?

2      Q    And you still don't remember anything about

3  this, do you?

4      A    No.  I -- as I say, the only thing I remember

5  is that Don set up some sort of demonstration.  I don't

6  remember it being noteworthy, and there was no followup

7  whatsoever, in terms of e-mail, other than Don thanking

8  for the -- I think the gentleman's name was Randy Prager

9  that set it up, and thanking him for the presentation.

10      Q    And let's -- let's go back.  You mentioned the

11  Merlot meeting.

12            MR. DIAMANTE:  Can we go back to your

13  notes at PTX391?

14            I'm sorry.  That's not -- I'm sorry.

15  Your -- the notes are not -- I don't even need to see

16  them.  I think it's PTX -- there's too many PTXs here.

17      Q    (By Mr. Diamante) On your -- on your

18  handwritten notes, why aren't those notes -- didn't

19  you -- didn't you previously testify that those notes

20  were major points discussed at that -- at your meeting?

21      A    Those notes were capturing what was going on

22  in terms of the presentation.  So if you look through

23  those notes, it's about, I would say, five pages' worth

24  of notes on topics being discussed.

25      Q    Not to cut you off, sir, but didn't you

2    at that meeting?  Yes or no.

3         A    I was capturing the main bullet points and the

4    questions that came up as a result of that.

5         Q    So Scopeware, Yale, ask Ted was a major bullet

6    point, correct, sir?

7         A    No, it was not a major bullet point.  It was a

8    comment that was made after the presentation was over.

9              MR. DIAMANTE:  Can I see his deposition

10   at Page 114, please?

11             You know something?  Don't even bother.

12   We'll move on.  Let me move on.

13        Q    (By Mr. Diamante) Now, this gentleman, who you

14   told us was ask Ted, is Ted Goldstein?

15        A    I believe so.

16        Q    Well, did he -- was he a bright man?

17        A    Yes.

18        Q    Knowledgeable?

19        A    He's a smart individual.

20        Q    Is he -- he worked -- he worked on some of the

21   accused products, didn't he?

22        A    Excuse me?

23        Q    He worked -- he worked on Spotlight?

24        A    No, he did not.

25        Q    What products did he work on?

2      Q    Okay.

3      A    -- so he -- he developed the tools that we

4    used to build our system, but he had nothing to do with

5    Spotlight.

6      Q    But he relayed -- he's the one that relayed

7    this information, correct, at the meeting?

8      A    Yes.  It was something that he had seen either

9    in the news or -- I'm not -- I'm not sure where.  He was

10   the only one in the room that knew what it meant.

11     Q    And these -- in your meeting, though, it found

12   its way to the final notes at Merlot, didn't it?

13   Your -- didn't it, sir?

14               MR. DIAMANTE:  Could I see -- can I see

15   PTX110 at Page 3?

16     Q    (By Mr. Diamante) These are the final notes,

17   correct, sir?

18     A    These are the final notes.

19     Q    And did you receive a copy of these notes?

20     A    I probably did.

21     Q    And it says:  Yale professor, David Gelernter,

22   new ways of finding information, correct?

23     A    Yes.  And that came from an e-mail that Ted

24   sent outside of the meeting to -- to Tim Schaaff, who

25   collected these notes.  And instead of having a question

2    substituted in the information that Ted had sent him in

3    an e-mail.

4         Q    I get that.

5              And do you know your -- your -- your company's

6    trying to cancel this man's rights?  You know that.  You

7    understand that, don't you, sir?  Do you have that

8    understanding?

9         A    I don't know actually what you mean by that.

10        Q    Right.  And you see the V-Twin there that you

11   spoke about in that pretty chart, that happened before

12   2003, correct?

13        A    Way before.

14        Q    And that says:  New -- this is 2003.

15             It says:  New ways of finding info.  How come

16   you're not talking about V-Twin in this memo?

17        A    (No response.)

18             MR. DIAMANTE:  I have no further

19   questions.

20             MR. SOOBERT:  None here, Your Honor.

21             THE COURT:  All right.  Thank you.  You

22   may step down.

23             Who will be your next witness?

24             MR. RANDALL:  Your Honor, Apple's next

25   witness is Randy Prager played by videotape.  He was the

2          And the time breakdown on that is Apple,

3  20 minutes and 29 seconds, and Mirror Worlds 3 minutes

4  and 21 seconds.

5          THE COURT:  Okay.  I tell you what, I

6  think we'll go ahead and take our morning break at this

7  time.  I have two criminal matters I need to take up at

8  10:30.

9          So, Ladies and Gentlemen of the Jury,

10  we'll be in recess until 10:45, maybe a little longer

11  than that, but shouldn't be much.  So enjoy a nice break

12  this morning, and we'll see you back here at 10:45.

13          We'll be in recess until the lawyers can

14  switch out and get set up.

15          COURT SECURITY OFFICER:  All rise.

16          (Jury out.)

17          (Recess.)

18          (Jury out.)

19          COURT SECURITY OFFICER:  All rise.

20          THE COURT:  Please be seated.

21          All right.  Before we bring the jury in,

22  I understand there's some question about the time.

23          MR. RANDALL:  Yes, Your Honor.

24          We had for our time yesterday, the total

25  time that we had used, somewhere -- I think we had 6

2    side-bar time was being charged to us.

3                      THE COURT:  That you had only used 6

4    hours, 43 minutes?

5                      MR. RANDALL:  What's that?

6                      THE COURT:  That you had only used 6

7    hours and 43 minutes --

8                      MR. RANDALL:  Yes, Your Honor.

9                      THE COURT:  -- at the end of yesterday?

10                     MR. RANDALL:  Yes, Your Honor.

11                     THE COURT:  Okay.  And is Plaintiff's

12   right?

13                     MR. CARROLL:  You're keeping the time,

14   Your Honor, and we're not about to say no.

15                     THE COURT:  All right.  And I had you

16   down for having used, I think, 7 hours and 50 minutes,

17   right?

18                     MR. RANDALL:  Right.  So about, roughly,

19   an hour off.

20                     THE COURT:  Okay.  Let me -- I keep some

21   notes here.  I will go back and look at it, but I see

22   that you've still got three hours.

23                     How much do you need?

24                     MR. RANDALL:  I do need the time.  I

25   really do.  And I've planned accordingly.

2    me look back.  We did have those sentencings yesterday.

3    I've been known to let -- forget to turn the clock off,

4    and that may have happened.  But I think I can

5    reconstruct it from my notes here and get a good idea.

6              MR. RANDALL:  Thank you very much, Your

7    Honor.

8              THE COURT:  All right.  Thank you.

9              All right.  Bring the jury in, please.

10             COURT SECURITY OFFICER:  All rise for the

11    jury.

12              (Jury in.)

13              THE COURT:  Please be seated.

14              All right.  Who will be your next

15    witness?

16              MR. RANDALL:  Your Honor, this is going

17    to be a videotaped deposition of Mr. Randy Prager who

18    was Mirror Worlds' Chief Technology Officer, and I gave

19    you the time breakdown previously.

20              (Video clip playing.)

21              QUESTION:  Would you state your full

22    name, please?

23              ANSWER:  Randy Lee Prager.

24              QUESTION:  What role did you assume when

25    you joined Mirror Worlds?

2   technology, Technology Team, managing the Technology

3   Team, being able to talk about technology during sales,

4   that kind of thing.

5              QUESTION:  Do you have any arrangements

6   with your lawyers to be paid for time spent on this

7   case?

8              ANSWER:  I did -- I did -- I did do some

9   consulting work for -- for them in '09 for a couple of

10  months.

11             QUESTION:  And how much money did you --

12  did you receive?

13             ANSWER:  I think roughly -- roughly

14  30,000 over the course of a couple of months.

15             QUESTION:  And the Mirror Worlds'

16  Lifestreams product utilized the Verity software for

17  indexing and searching data, correct?

18             ANSWER:  I -- I -- I think we used -- to

19  my recollection, I think we used Verity.  I'm not sure

20  we used it for indexing per se.  I think we may have

21  used it for some of their ability to open documents of

22  various types.

23             I think we used Lucene, which was an open

24  source indexing technology to do the actual indexing.

25  At least that's my recollection.

2  UNIX operating systems?

3                    ANSWER:  I believe we did, yes.

4                    QUESTION:  All right.  The second

5  paragraph says:  The original business plan was to

6  reduce the concept to practice.

7                    And they are referring there to David

8  Gelernter's --

9                    ANSWER:  I read it, okay.

10                   QUESTION:  -- right?

11                   ANSWER:  Yeah.  Sure.

12                   QUESTION:  Do you believe that Mirror

13  Worlds did reduce Mr. Gelernter's concept to practice?

14                   ANSWER:  I believe we came very close.

15                   QUESTION:  And ultimately,

16  Mr. Gelernter's concept as reduced to practice in

17  Lifestreams in streams and Scopeware was not successful,

18  correct?

19                   ANSWER:  I think it's fair to say it was

20  not commercially successful.

21                   QUESTION:  With respect specifically to

22  the technology, what's your understanding, if any, as to

23  why that Mr. Gelernter's concept, as implemented in

24  Scopeware, was not accepted by the marketplace?

25                   ANSWER:  I think -- here's my feeling on

2    compelling, was very good.

3                    I think we were, in many respects, kind

4    of ahead of the curve a little, but I think a lot of

5    David's ideas and our products really foretold kind of a

6    social networking phenomena that we've all seen in the

7    past five years.  I just think we were a little too

8    early for the concept -- the concepts to really take

9    off.  That's my belief.

10                   QUESTION:  Well, with respect to

11   Scopeware's use of third-party software to index and

12   search --

13                   ANSWER:  Yeah.

14                   QUESTION:  -- for documents, that

15   capability --

16                   ANSWER:  Uh-huh.

17                   QUESTION:  -- existed in competing

18   products, correct?

19                   ANSWER:  Yes.  I believe -- I believe

20   indexing technology existed in other places.  That's

21   absolutely true.

22                   QUESTION:  And so did search technology,

23   right?

24                   ANSWER:  Yes.

25                   QUESTION:  So in the 2000 timeframe and

2   had indexing and search capabilities that they were

3   utilizing, correct?

4             ANSWER:  Uh-huh.  That's correct.

5             QUESTION:  What added benefit, if any,

6   did Scopeware provide specifically to the existing

7   indexing and search capabilities that existed in the

8   marketplace in 2000 and beyond?

9             ANSWER:  Again, my personal belief is

10   that one of Scopeware's main goals was to kind of change

11   the paradigm with respect to having these files in

12   folders and categories to store information; that you

13   could store information freed from those predefined

14   categorizations.

15             And when you needed to retrieve a

16   specific piece of information, based on any kind of

17   criteria, it could be made immediately available to you

18   in a way that was intuitive, easy access, easy to

19   understand, so -- and the various things like indexing

20   and thumbnails and icons and all those other things were

21   just tools that we would use to accomplish that ultimate

22   goal.

23             QUESTION:  Well, in operation, the

24   Scopeware application utilized the Microsoft operating

25   system, correct?

2  systems we used, yes; that's correct.

3          QUESTION:  And Scope -- just the simple

4  use of the Scopeware application did not ensure that the

5  users would not store and save their documents in the

6  traditional hierarchy system of files and folders in the

7  Microsoft operating system, correct?

8          ANSWER:  That is correct.  That's

9  correct.  The users could save things as they had before

10  and after the use of Scopeware.  We do not force them

11  not to do that.

12          QUESTION:  And when you mentioned that

13  the Scopeware product allowed for certain searching --

14          ANSWER:  Uh-huh.

15          QUESTION:  -- and retrieving of

16  documents, you -- Scopeware could only do so if those

17  documents were indexed utilizing the third-party

18  software that was included within Scopeware, correct?

19          ANSWER:  That's right.

20          QUESTION:  So all of the documents that

21  existed on a computer or that were created on other

22  computers and sent to a computer --

23          ANSWER:  Uh-huh.

24          QUESTION:  -- if they weren't indexed at

25  some point utilizing the third-party software that

2  would have no ability to search for those documents,

3  right?

4           ANSWER:  That is correct.

5           QUESTION:  Let me direct your attention

6  to the top of Page 2 of Mr. Weil's obituary memorandum.

7           And it states:  In short, after six years

8  and close to 20 million in funding, the ideas advanced

9  by Mirror Worlds have failed to gain any significant

10  attraction in the marketplace either through

11  partnerships or direct distribution.

12           Do you see that?

13           ANSWER:  Yes, sir.

14           QUESTION:  There's nothing in there that

15  you disagree with, correct?

16           ANSWER:  No.

17           QUESTION:  So you specifically recall at

18  one of these meetings involving Apple, being in Mike's

19  office -- Mike Satow's office --

20           ANSWER:  Yes.

21           QUESTION:  -- using WebEx, providing a

22  PowerPoint presentation, and then doing a demo of the

23  product, right?

24           ANSWER:  Yes.

25           QUESTION:  How many slides were in the

2                      ANSWER:  I don't remember.

3                      QUESTION:  10, 20, 30, 50?

4                      ANSWER:  You know, I would suspect it's

5    like 10.

6                      QUESTION:  But you're guessing?

7                      ANSWER:  I'm guessing.  I know it was not

8    long, you know.

9                      QUESTION:  How long was the entire

10   conference call?

11                     ANSWER:  I don't remember.

12                     QUESTION:  You never met with anyone at

13   Apple in person, correct?

14                     ANSWER:  No.

15                     QUESTION:  To your knowledge, neither you

16   nor anyone else at Mirror Worlds ever met in person with

17   anybody from Apple to discuss anything to do with Mirror

18   Worlds, correct?

19                     ANSWER:  That's correct.

20                     QUESTION:  How long did this conference

21   call last?

22                     ANSWER:  I -- I don't remember.

23                     QUESTION:  Who else was present in that

24   office with you and Mr. Satow?

25                     ANSWER:  I don't -- I don't remember if

2                     QUESTION:  You don't remember the

3     features of the product that were demoed?

4                     ANSWER:  Not specifically, but I can

5     talk, if you want, about how we generally would do

6     demos.

7                     QUESTION:  No.  I'm just interested in

8     your specific recollection of this meeting.

9                     Who was on the conference call from

10    Apple?

11                    ANSWER:  I don't remember the -- the

12    names from the other side.

13                    QUESTION:  How many people spoke on the

14    Apple side during the meeting?

15                    ANSWER:  I -- I don't -- I don't remember

16    how many.

17                    QUESTION:  Did you take any notes of the

18    meeting?

19                    ANSWER:  I don't remember.  It's

20    possible.

21                    QUESTION:  Did Mike take any notes of the

22    meeting?

23                    ANSWER:  Again, I don't know.

24                    QUESTION:  What questions, if any, did

25    Apple ask?

2                QUESTION:  I was just asking about do you

3    have any specific recollection of any questions that

4    they asked?

5                ANSWER:  No.

6                QUESTION:  Do you have any specific

7    recollection of any questions that you or Mike asked to

8    Apple?

9                ANSWER:  No.

10               QUESTION:  Do you have any specific

11   recollection of whether the term patent or patents was

12   even mentioned during this meeting?

13               ANSWER:  I have a specific recollection

14   that we, in the context of all these kinds of meetings,

15   would reference that we had a patent on what we were

16   doing.

17               QUESTION:  Again, I am not interested in

18   what you generally would do.  I'm interested in your

19   specific recollection of this meeting, and that's what

20   I'm entitled to here.

21               Do you specifically recall one way or the

22   other whether the words patent or patents were mentioned

23   or to the effect were mentioned during this meeting?

24               ANSWER:  I would -- I would say -- I

25   would say --

2          ANSWER:  I would say yes.

3          QUESTION:  When you say I would say yes,

4  you are assuming that that was mentioned, correct?

5          ANSWER:  I'm telling you my specific

6  recollection is that at that meeting, we would -- we did

7  everything we normally do at those kinds of meetings,

8  and part of that was talking about our patent.

9          QUESTION:  Sir, I'm not asking you what

10  you normally did and that you assume that you followed

11  normal procedure.  I'm not asking that.

12          ANSWER:  Yes.

13          QUESTION:  I don't want -- I don't want

14  you to tell me who it would have been.  Did you -- did

15  you --

16          ANSWER:  I -- I do not remember uttering

17  the word patent.

18          QUESTION:  Okay.  And you don't

19  specifically recall Mr. Satow mentioning patents either,

20  do you?

21          ANSWER:  No.

22          QUESTION:  Okay.  So you don't

23  specifically recall either yourself or Mr. Satow

24  mentioning Mirror Worlds' patents, right?

25          ANSWER:  No.

2  recollection sitting here today of the -- of the words

3  patents or to those -- to that effect, listed in the

4  PowerPoint, correct?

5              ANSWER:  The PowerPoints we give at those

6  meetings always said patent.  That's my recollection,

7  you know.

8              QUESTION:  Again, I'm not -- I'm not

9  interested in what you usually did and whether you --

10  you think you may have followed that procedure in this

11  instance.

12              I asked you earlier if you could recall

13  how many pages were in the PowerPoint, and you couldn't,

14  correct?

15              ANSWER:  Correct.

16              QUESTION:  And you're not going to tell

17  me that now under oath that you can specifically recall

18  that PowerPoint that was displayed to Apple --

19              ANSWER:  Right.

20              QUESTION:  -- mentioning patents, right?

21              ANSWER:  Right.  Correct.

22              QUESTION:  Mr. Prager, when was this

23  conference call with Apple?

24              ANSWER:  I believe it was like either

25  September -- it was in the fall, maybe September,

2             QUESTION:  What year?

3             ANSWER:  I -- I don't remember exactly.

4    Maybe 2000, 2001, or 2002.  I don't remember.  I do

5    remember it was the fall.

6             QUESTION:  You worked at Mirror Worlds

7    from 2000 to 2002.

8             ANSWER:  Right.

9             QUESTION:  Can you give me any better

10   timeframe than that?

11            ANSWER:  I -- I -- it was 2 -- I don't

12   remember.  I'm sorry.

13            QUESTION:  All right.

14            ANSWER:  I don't remember.

15            QUESTION:  That's fine.

16            Do you recall during the meeting Apple

17   mentioning that they had existing indexing and search

18   capability?

19            ANSWER:  I don't recall that.  I don't

20   recall that.

21            QUESTION:  Was there any purpose that you

22   can recall --

23            ANSWER:  Uh-huh.

24            QUESTION:  -- to this call with Apple,

25   other than to try to attempt to sell them Lifestreams

2                     ANSWER:  No.  We were just trying to sell

3    our technology.

4                     QUESTION:  All right.  That was the sole

5    and exclusive purpose of the call?

6                     ANSWER:  Yeah, yeah.  We wanted to do a

7    deal with as many people as we could and get money out

8    of the company, yeah.

9                     QUESTION:  You mentioned another meeting

10   with Apple wherein Mirror Worlds attempted to sell

11   Lifestreams to Apple, correct?  You said there were two

12   meetings?

13                    ANSWER:  Yeah.  Yeah.  I think there

14   is -- again, my recollection is there was a second

15   meeting where it was, I believe, just me on the phone

16   with one or more of folks at Apple.  I don't remember

17   specifics other than I believe it was just about more

18   along technology lines.

19                    QUESTION:  So when you say that there

20   were two meetings, there were actually two conference

21   calls, right?

22                    ANSWER:  Yes, right.  Yeah, sure.

23                    QUESTION:  Okay.  So you've described the

24   first conference call.  When -- when in relation to the

25   first conference call did the second conference call

2                    ANSWER:  I believe it was a couple of

3      weeks after.

4                    QUESTION:  How long did this second

5      conference call last?

6                    ANSWER:  I don't remember.  I don't

7      remember it being long.

8                    QUESTION:  Who was on it from Mirror

9      Worlds' side?

10                   ANSWER:  I believe it was just me.

11                   QUESTION:  And that was a follow-up to

12     Mirror Worlds' efforts to sell Lifestreams applications

13     to Apple?  Yes?

14                   ANSWER:  It was a follow-up to the

15     original meeting.

16                   QUESTION:  Where were you physically when

17     you had that call?

18                   ANSWER:  In my office.

19                   QUESTION:  Did you make the call, or did

20     you receive the call?

21                   ANSWER:  I don't remember.

22                   QUESTION:  Do you recall, during this

23     second conference call, that Mr. Lindsay explained that

24     Apple had existing indexing and search capabilities?

25                   ANSWER:  I -- I don't -- I don't recall

2                QUESTION:  Prior to Mirror Worlds'

3   efforts to sell Apple Lifestreams applications, what

4   efforts, if any, did Mirror Worlds undertake to learn

5   what existing indexing and search capabilities Apple's

6   operating system or other applications already had?

7                ANSWER:  My -- my focus and a lot of what

8   we would do in prep for these meetings had less to

9   do with -- to be honest, I didn't care whether or not

10  they had index and search.

11               To me, that was not a core component.  It

12  was necessary, but for me, the real important stuff was

13  like the visual interface and stream concept.

14               So I often didn't focus that much on

15  whether or not those systems had indexing and search.

16  I -- I remember when Microsoft came out, I think it was

17  in -- in Windows 2000, a later operating system, they

18  did have indexing.  It was good news for me.  I liked

19  it.  We didn't have to bundle in a third-party product

20  at that point.

21               QUESTION:  What specifically did you say

22  during this second call with Mr. Lindsay?

23               ANSWER:  I -- I can't recall

24  specifically.

25               QUESTION:  What specifically did

2          ANSWER:  I can't recall specifically.

3          QUESTION:  What generally did you say and

4  what generally did Mr. Lindsay say, if you can recall?

5          ANSWER:  Yeah.  You mean generally?

6          QUESTION:  I don't want you guess or

7  speculate or assume.  I want you to do it based on

8  your -- on your independent and specific recollection.

9          ANSWER:  Specifically, I don't recall

10  anything.

11          QUESTION:  Do you recall generally what

12  you said and what he said?

13          ANSWER:  Other than generally, the call

14  was about technology.  That would -- that would be it.

15          QUESTION:  Okay.

16          ANSWER:  I definitely remember that they

17  did not move ahead with us.  I'm not sure why or -- you

18  know.

19          MR. RANDALL:  I'll mark for

20  identification as Exhibit 14 an e-mail exchange between

21  Mr. Lindsay and Mr. Prager, dated October 24, 2001, and

22  Mr. Prager's response on the same date.

23          QUESTION:  I'm showing you an e-mail

24  string between you and Mr. Lindsay, Mr. Prager.

25          ANSWER:  Okay.

2  bottom of the first page?

3              ANSWER:  Yep.

4              QUESTION:  It is from Mr. Lindsay to you,

5  dated October 24, 2001.  And it's regarding Mirror

6  Worlds' follow-up.

7              Do you see that?

8              ANSWER:  Yes, I've got it.

9              QUESTION:  Did you receive this e-mail

10 from Mr. Lindsay on or about October 24, 2001?

11             ANSWER:  Yes.

12             QUESTION:  And he states -- Mr. Lindsay

13 states to you:  Hi, Randy.  After some discussion, we

14 have decided to not pursue this further.  We are going

15 to continue to refine our existing index and file

16 searching technologies.

17             Do you see that?

18             ANSWER:  Yep, I've got it.

19             QUESTION:  Does that refresh your

20 recollection that, in fact, Apple did inform Mirror

21 Worlds that one of the reasons why it was not going to

22 pursue the discussions with Mirror Worlds any further

23 regarding Lifestreams was because Apple was going to

24 continue to refine their existing indexing and file

25 searching technologies?

2          QUESTION:  And you wrote back on the same

3    day, shortly thereafter to Mr. Lindsay and said:  Sounds

4    good.  If there's anything you wish to inquire about the

5    future, please don't hesitate to call.

6          Right?

7          ANSWER:  Yes.

8          QUESTION:  Other than these two calls

9    that you've already described and this e-mail exchange,

10   do you recall any other communications between Apple and

11   Mirror Worlds?

12         ANSWER:  No.

13         QUESTION:  And other than what you've

14   testified, is there any other information relating to

15   those calls or any communications between Apple and

16   Mirror Worlds that you haven't already provided

17   testimony on?

18         ANSWER:  No.

19         QUESTION:  Or described?

20         ANSWER:  No.

21         QUESTION:  Have we exhausted your memory

22   with respect to these communications, sir?

23         ANSWER:  Yes, sir.

24         MR. RANDALL:  I'll mark for

25   identification as Exhibit 16 an e-mail string consisting

2   starting at 8615.

3             QUESTION:  Third paragraph, Mr. Gelernter

4   discusses the slide show problem.

5             Do you see that?

6             ANSWER:  Yes.

7             QUESTION:  And he states:  I want the

8   slides laid out in a stream for the usual reasons.

9   Foreshortened display is a natural visual shorthand.

10   Lets me see a lot in a little space.  Browse works

11   right.  Search lets me find what I want, but in the

12   mainstream, slides are mixed up in random order.  I may

13   develop Slide 1 last, Slide 50 first.

14             Do you see that?

15             ANSWER:  Yes, got it.  Yes.

16             QUESTION:  And then he goes on to state

17   two paragraphs down from there:  This is the way to

18   store online portions in stream format.  A course,

19   series of lectures, assignments, et cetera wants to be a

20   stream but a logical and not chronological one.  Huge

21   topic.

22             You see that?

23             ANSWER:  Yep.

24             QUESTION:  What's the problem with the

25   implementation of the mainstream that Mr. Gelernter's

 2                    ANSWER:  It -- it seems to me he's

 3    contemplating the problem of showing the stream in a

 4    time -- time series.

 5                    QUESTION:  And specifically, what he's

 6    referring to is that if you create a set of slides out

 7    of order --

 8                    ANSWER:  Uh-huh.

 9                    QUESTION:  -- that they're going to be

10    stored out of order in the mainstream, right?

11                    ANSWER:  Yeah.

12                    QUESTION:  And that if you have a slide

13    show or a series of lectures, assignments, expense

14    reports that are created in a different order --

15                    ANSWER:  Uh-huh.

16                    QUESTION:  -- then that's going to appear

17    in the mainstream.  It will not be a logical

18    representation of the documents, correct?

19                    ANSWER:  Yeah.

20                    QUESTION:  And he says that's a huge

21    problem, right?

22                    ANSWER:  Yeah.

23                    QUESTION:  It's the last thing he says.

24                    ANSWER:  Yes.

25                    QUESTION:  He says:  It could be a very

2    problems?

3                    ANSWER:  Uh-huh.

4                    QUESTION:  Do you see that?

5                    ANSWER:  Yeah, I see that.

6                    QUESTION:  He's trying the solve a lot of

7    problems that are created by storing documents in a

8    chronological rather than logical way, correct?

9                    ANSWER:  Right.

10                   QUESTION:  And that is a function of

11   utilizing Gelernter's mainstream concept, correct?

12                   ANSWER:  Uh-huh.

13                   QUESTION:  Is that a yes?

14                   ANSWER:  Yes.  Yes.  Sorry.

15                   QUESTION:  Directing your attention to

16   the next e-mail, this is also from Mr. Gelernter, dated

17   March 26, 2001.  The subject is designer streams.

18                   Do you see that?

19                   ANSWER:  Yes.

20                   QUESTION:  He says:  Let's say you have a

21   logical instead of chronological collection; for

22   example, an address book, help system, jukebox.  You

23   want the separate elements to be members of the stream.

24   No elements of a multi-part document.

25                   Do you see that?

2          QUESTION:  Then it goes on to state, two

3  paragraphs down, in the last sentence:

4          ANSWER:  Uh-huh.

5          QUESTION:  We'd solve the travel form

6  problem and the business plan problem and lots of other

7  problems, too; e.g., the jukebox, slide show, brochure,

8  and book problems.

9          Do you see that?

10          ANSWER:  Yes.

11          QUESTION:  He's identifying lots of

12  problems that are created by the use of his mainstream

13  concept, correct?

14          ANSWER:  Yes.

15          (End of video clip.)

16          THE COURT:  All right.  I did not get

17  your time on that.  What was the total time and how was

18  it split for Mr. Prager?

19          Excuse me?

20          MR. RANDALL:  Mr. Prager -- again,

21  Mr. Prager was 23 minutes -- total time, 23 minutes, 50

22  seconds, and split up by Apple, 20 minutes, 29 seconds;

23  and Mirror Worlds, 3 minutes, 21 seconds.

24          THE COURT:  All right.  Very well.

25          All right.  Who will your next witness

2          MR. RANDALL:  Our next witness, Your

3   Honor, is Mr. Peter Lucas.

4          THE COURT:  Okay.  Counsel, if you will

5   approach, please.

6          (Bench conference off the record.)

7          THE COURT:  I did detect an error on my

8   time for you.  I'm going to put 45 minutes back on.

9          MR. RANDALL:  Okay.  Thank you, Your

10  Honor.

11         (Bench conference concluded.)

12         THE COURT:  Has this witness been sworn?

13         MR. SOOBERT:  No, he hasn't, Your Honor.

14         THE COURT:  All right.  Please raise your

15  right hand and repeat after me.

16         (Witness sworn.)

17         THE COURT:  All right.  Thank you.  Be

18  seated.

19         MR. STEIN:  Your Honor, we have an

20  objection to some of his testimony.

21         May I approach?

22         THE COURT:  All right.

23         (Bench conference.)

24         MR. STEIN:  Your Honor, Mr. Lucas will be

25  testifying to things that are outside the four corners

2    think that's inappropriate.

3                    In addition, he was deposed after Apple's

4    expert submitted his report in this matter, and,

5    therefore, Apple's expert has now relied on the

6    testimony of -- has not relied on the testimony of

7    Mr. Lucas in his report.

8                    So our request is that, you know, if

9    he -- if he goes beyond the four corners of the

10   references, that if he's going to be discussing that, it

11   should be excluded, and Apple's counsel should be

12   limited to that.

13                   MR. SOOBERT:  Your Honor, we disagree

14   with that.  His testimony is relevant to a number of

15   issues.  He's going to speak to the system that's in

16   public use, not just printed publications and articles.

17                   It's relevant to non-infringing

18   alternatives, the scope and content of the prior art,

19   obviousness, and the like.  And so he can testify -- it

20   doesn't -- we disagree with the characterization of our

21   expert's report.  He certainly addresses the printed

22   publications and articles.

23                   THE COURT:  The objection's overruled.

24                   (End of bench conference.)

25                   THE COURT:  Counsel approach, please.

```
 2                    THE COURT:  I am making it without

 3   prejudice to you raising your objection during any

 4   objection in the course of his testimony, but your

 5   objection is so general there's no way that I can rule

 6   on it.  And I think, generally, it's not well-taken, but

 7   if you want to raise it on a particular item that you --

 8   it's without prejudice to you doing that.

 9                    MR. STEIN:  Thank you.

10                    (Bench conference concluded.)

11    PETER ANTHONY LUCAS, Ph.D., DEFENDANTS' WITNESS, SWORN

12                       DIRECT EXAMINATION

13   BY MR. SOOBERT:

14        Q    Good morning, Dr. Lucas.

15        A    Good morning.

16        Q    Can you state your full name for the record,

17   please?

18        A    Peter Anthony Lucas.

19        Q    Okay.  And where do you live?

20        A    I live this Pittsburgh, Pennsylvania.

21        Q    And could you just describe your educational

22   background since high school briefly?

23        A    Yeah.  I'm an educational psychologist by

24   background.  I went to Penn State University as an

25   undergraduate, and I also got a master's degree there,
```

2      Q      Okay.  And where do you work now?

3      A      At my design company --

4      Q      When --

5      A      -- that I co-founded in Pittsburgh.

6      Q      I'm sorry.  When did you found that company?

7      A      Late 1989.

8      Q      1989?  And you've worked there continuously

9  since that timeframe?

10      A      That's correct.

11      Q      Okay.  And when you were working at MAYA

12  Design, were you -- what were some of the first early

13  projects you worked on, perhaps the first one?

14      A      Well, we founded the company on the basis of a

15  large contract that we were fortunate enough to get from

16  a company called Digital Equipment Corporation, which at

17  the time was a very large computer company.

18             And the project was called Workscape, and it

19  was in the space of office document management systems.

20      Q      Okay.  And was one of the goals of that

21  project to deal with vast amounts of information on a

22  computer, you know, where users might be able to search

23  for and locate, find documents; if they have a problem,

24  where's my stuff on the computer?  Is that one of the

25  focuses and goals of Workscape?

2              The -- the -- when we did our initial research

3    for Digital -- and this was at a time when people were

4    just starting to -- to figure out how to use computers

5    productively in the office.

6              And we -- we studied a lot of offices, and we

7    discovered that people were having a real -- real

8    problem organizing information, because it was coming in

9    in many different forms.  There were faxes; there were

10   spreadsheets; there were e-mails; there were scanned

11   documents.

12             And the goal of Workscape was to design a

13   single user interface that would allow ordinary office

14   workers to -- to find what they were looking for in all

15   of this mess in an efficient way.

16        Q    Okay.  Now, did you publicly display or

17   present any papers, articles, videos about that system

18   in that timeframe, roughly?

19        A    Well, at first, we couldn't, because it was

20   proprietary.  But then in late 1993, we were given

21   permission by -- by our client to write several papers

22   and to -- to present them at a large industry conference

23   called CHI, which stands for -- C-H-I.  It stands for

24   Computer Human Interaction.

25        Q    Okay.  And that was in 1994?

2     Q    Okay.  And is that a well-attended conference?

3          Is it popular with your colleagues and other

4     folks working in the field?

5     A    Very much so.  At least at the time, it was

6     clearly the premiere conference.  It attracted people

7     from both industry and the academic world.

8          And pretty much anybody who was doing serious

9     work in that area would -- would attend or at least pay

10    attention to the -- to the proceedings of that

11    conference.

12    Q    Okay.  Now, did you also apply for and

13    describe and you actually obtained a patent on the

14    features that were in the Workscape system?

15    A    A number of patents.  In fact, I think

16    ultimately eleven were issued about the Workscape work.

17         MR. SOOBERT:  Diane, can you bring up

18    DX175, please?  Just blow up that top there.

19    Q    (By Mr. Soobert) Is this one of your patents,

20    Dr. Lucas, one of the eleven you mentioned?

21    A    Yes, it is.

22    Q    Okay.  And this patent right here is known as

23    the '330 patent, the last three digits of the patent?

24    A    Yes.  Yes.

25    Q    Okay.  And it was filed in September of 1993?

2      Q    Okay.  And issued in 1996, March of 1996,

3  right?

4      A    Yep.

5      Q    All right.  Let's go back to the -- this --

6  you know, the early 1990 timeframe when you were working

7  on this patent application and presenting these papers

8  publicly about the Workscape system.

9           I want to focus on some of the videos that

10  were displayed in that time.

11               MR. SOOBERT:  Diane, can you play Clip

12  DX135?

13               (Video playing.)

14               (Video stopped.)

15      Q    (By Mr. Soobert) Okay.  Now, Dr. Lucas, is

16  that one of the videos that was publicly displayed at

17  the CHI '94 conference in 1994?

18      A    It was a section, an excerpt from one of

19  those -- from that video, yes.

20      Q    Okay.  So there's a -- this is an excerpt of a

21  much longer video that includes additional features

22  about the system as well?

23      A    That's correct.

24      Q    Okay.  And now, we saw on that video the -- a

25  number of demonstrations of features, including these

2    on the -- on the screen; is that right?

3         A    Correct.

4         Q    Okay.  Now, those document representations,

5    those -- those appeared to me to be receding into the

6    screen and actually foreshortened in the sense that

7    they're getting smaller; is that correct?

8         A    Yes.  The -- one of -- one of the main ideas

9    of Workscape was to use the third dimension of the

10   screen as a place so that we could locate and visualize

11   larger numbers of documents.

12        Q    Okay.  And so you had an expertise in MAYA --

13   in the MAYA group and this project of, you know,

14   creating these types of 3-D images in piles like that;

15   is that right?

16        A    That's correct.

17        Q    Okay.  And could I put these document

18   representations, all the documents in the system, if I

19   wanted to, in a single, you know, stack or stream on the

20   screen?

21        A    Yes, you can.

22        Q    And was it possible to put that stack of all

23   of my documents in the system in a time-ordered stream,

24   presenting them with perhaps the oldest ones in the far

25   back that are fading way into the screen and then the

2   yet to be coming from the future in the front?

3        A    Yes.  That was a very typical thing to do.

4        Q    Okay.  And is that how that system operated,

5   actually?

6        A    Yes.

7        Q    Okay.  And when was that software -- I know

8   the video was displayed at the conference in 1994, but

9   the software itself that's in there was before that,

10  right?

11       A    This particular demonstration that you just

12  saw was written in 1990.  In fact, I specifically

13  remember I was working on it over the 4th of July

14  weekend, so it was July 1990.

15       Q    All right.  And when I said all documents and

16  document representations, I mean, I was talking about

17  things like, you know, faxes and letters and various

18  document -- document types that are handled by the

19  system, like any type of diverse document.  It could do

20  that, right?

21       A    Correct.

22       Q    Okay.  All right.

23            MR. SOOBERT:  Diane, let's play the CHI

24  video, DX922.

25            (Video playing.)

2      Q     (By Mr. Soobert) Okay.  Dr. Lucas, can you

3   just explain for us again what that find tool is and

4   what it does?

5      A     The idea of tools in Workscape was that

6   different capabilities would be packaged in -- in -- in

7   objects on the screen that would perform different

8   functions.

9            The purpose of the find tool was to go out to

10  a data repository where the -- where the documents

11  themselves were stored, search by a criterion or

12  bring -- the criterion could be everything or a subset

13  of the documents, and to bring those documents in and

14  then stack them in some order, typically, but not

15  necessarily by date.

16     Q     Okay.  And was one of the aspects of this

17  technology to kind of get rid of files and folders or at

18  least put them under the surface so the user didn't have

19  to worry about them and could find these things in a

20  really easy and intuitive way?

21     A     Yeah.  That was a big part of the initial goal

22  that I described.  We wanted to not bother the user with

23  all of these distinctions between file types and how

24  they were stored.  Everything was presented to the user

25  just in the form of -- of a document, and it didn't

2      Q     Okay.  Now, let's say some of those documents,

3  or all of them, for that matter, are stored in a

4  repository, you know, some other system or a server,

5  something that stores documents, okay?

6           Are you following me?

7      A     Yes.

8      Q     Okay.  Is there a possible -- was it possible

9  in Workscape to do a search of all those documents and

10  actually retrieve those documents and present them to

11  the users so I could see the entire set of documents

12  that were on that repository?

13      A     Yes.

14      Q     Okay.  And how might I do that with the

15  Workscape system?

16      A     Well, that's exactly what the -- what the find

17  tool did.  You could search by any criterion, including

18  what's called the wild card search, that basically is a

19  search that matched anything.

20           So if you did a wild card search on the

21  documents in a repository, you would basically get them

22  all.

23      Q     Okay.  And now, let's say I returned or I

24  retrieved all those documents using the wild card

25  search, but I said, oh, gosh, I've got a lot of

2    and filter them perhaps, you know, based on any number

3    of criteria, like somebody who authored the document,

4    something in the content.

5            Could I create a sub sort of stream of those

6    document representations?

7        A    Yes.  There was a tool -- in fact, it was

8    the -- the capability that was prototyped in the first

9    video that you showed where there was a date slider

10   where you -- where the user would be able to slide in

11   two little pointers to specify a period of time.

12           And what that would do is, it would

13   temporarily hide or move the subset of the documents

14   that aren't between those two dates.

15           So it made it very easy -- if the user had a

16   rough idea of when a document was created, it made it

17   very easy for the user to focus his or her

18   attention on -- on just that range of dates.

19       Q    Okay.  And let's say I've created those --

20   those substreams or strands, I believe they say in your

21   patent, or stacks -- those are all the same terminology,

22   right?

23       A    Yes.

24       Q    All right.  And let's say I've created those,

25   and I don't want to now start remembering where to put

2          Could the system automatically update those

3    stacks as new documents are generated or received?

4      A    Yeah.  There were a couple of ways to do that.

5    The find tool had a feature that would cause it to

6    basically do its search continuously.

7          So if a new document appeared in the

8    repository, it would automatically come in, and it would

9    be inserted in its appropriate place in the strand,

10   pushing back the other documents to make room.

11         It was also possible to write a script.

12   Workscape had a scripting language, much the way a

13   spreadsheet does, that allows the user to customize the

14   behavior.  So it would be very easy to make a script

15   that would perform functions like that automatically.

16     Q    Okay.  And the technical term or one way to

17   say that in a technical term is that those searches and

18   sub-searches were persistent?

19     A    That's right.

20     Q    Okay.  All right.  Now, just a couple of other

21   questions.

22         Now, could I copy a document from one

23   repository to another through the Workscape system?

24     A    Yes.  There was another one of these tools

25   that I've been describing that was called the copy tool.

2    document and drop it on the copy tool, it would make a

3    copy, another instance of that document.

4          And one of the features of the -- of the copy

5    tool was that you could -- the user could specify which

6    repository that copy was to be moved to.  So,

7    effectively, you could take a document, drop it on the

8    find tool, and make a backup or archival copy of it in

9    another repository.

10   Q    Okay.  So if I had a large stack or stream of

11   these documents, and I say:  Okay, I want to -- from a

12   date backward, I want to archive those and automatically

13   archive them, I could do this through this process?

14   A    Sure.

15   Q    Okay.  So Workscape, in that timeframe in 1994

16   and earlier in these publications, the patent and the

17   articles, could do automatic archiving, right?

18   A    Yes.

19   Q    All right.  And -- and was the Workscape

20   project well known?  I mean, was it -- did you receive

21   any accolades or press or commentary about it?

22   A    Well, after we published it at the CHI

23   conference, it was cited in a number of -- of other

24   important papers.

25          And one particular one that comes to mind was

2    lab at the time, cited Workscape and described it as the

3    first example of -- of a three-dimensional interface

4    under -- under direct user control.

5              So we were kind of proud of that.

6         Q    And it -- and it had time-ordered sequences

7    and chronological ordering of all those documents in

8    that system?

9         A    Yes.

10        Q    Okay.

11                  MR. SOOBERT:  Pass the witness.

12                  THE COURT:  All right.

13                  Cross-examination.

14                       CROSS-EXAMINATION

15   BY MR. STEIN:

16        Q    Good morning, Dr. Lucas.

17        A    Good morning.

18        Q    You mentioned earlier that -- in response to

19   Mr. Soobert's questions, that it was possible to do

20   various things in Workscape.  Workscape was a general

21   scripting tool, correct?

22        A    It was a visualization tool.  It contained a

23   scripting component.

24        Q    And it was possible to do all sorts of things

25   with that visual -- visualization tool, correct?

2      Q     It was meant to be general so that people

3  could take it and, you know, creatively figure out what

4  they wanted to -- what functionality they wanted and use

5  the system to create that display and functionality,

6  right?

7      A     I think a better way to say it is that it was

8  extensible; that is, it did -- had -- had a core vision,

9  this -- this arranging documents in three-dimensional

10  space, according to various criteria.

11           But we -- we were -- we knew that we didn't

12  think of everything that the user would want to do, so

13  we made it -- made it as easy as possible for the users

14  to modify the -- the -- the system for their own

15  purposes.

16      Q     So just because the tool was capable of

17  creating something doesn't mean that anybody actually

18  used the tool to create that thing, correct?

19      A     I guess that statement's true.

20      Q     And that was part of the purpose of the tool,

21  is to enable people to make different things.

22      A     If you're asking if there are -- if there are

23  things that the tool could do that no one has ever done,

24  the answer is yes.

25      Q     So when Mr. Soobert asked you if the cool

2    do this and Workscape could do that, it doesn't

3    necessarily mean that someone actually did those things

4    with Workscape, correct?

5        A   Not necessarily, but it's fair to say that

6    there were certain uses that were very central to the

7    core vision of Workscape, and so very likely, it would

8    have been used.  And many of them we did in our

9    demonstrations.

10       Q   You were contacted earlier in the year by

11   Apple, correct?

12      A   Yes.

13      Q   And they asked for your help in this case,

14   right?

15      A   Correct.

16      Q   And Apple's paying you to help them in this

17   case?

18      A   They're paying my company, my normal

19   consulting rate.

20      Q   And what --

21      A   It's not going directly to me.

22      Q   And what is that rate?

23      A   I, frankly, don't know.

24      Q   Is it hundreds of dollars an hour?

25      A   Hundreds of dollars an hour, yes.

2    weren't you, that Apple was seeking to invalidate

3    Dr. Gelernter's patents, right?

4        A    I became aware of it in the course of the

5    conversation.

6        Q    Now, isn't it true that in Workscape, that the

7    document you see on the screen is in some ways the

8    actual document?

9        A    Well, technically, it's a proxy for the

10   document.  The thing on the screen is just a picture.

11   The document itself is in the repository.

12       Q    That it's -- it's basically -- if it was a

13   Word document, it would be basically Word -- Word would

14   be opened in that little proxy; and if you brought it

15   up, you would see the document in Word, you know, to

16   give an example; is that right?

17       A    Not necessarily.  That would be one way you

18   could implement it, but you could also interpret the

19   Word file yourself and render it -- and Workscape could

20   render it on its own.  That's really an implementation

21   detail.

22            But -- but our goal -- and I want to make this

23   clear.  Our goal was to keep those details as far from

24   the user's mind as possible.  We wanted the user to

25   think of that document as if it was -- as if it was the

2          So if that's what you mean, the answer is yes.

3     Q     And a document only appeared once in a

4 Workspace viewer; is -- isn't that right?

5     A     Within a single workspace, that's correct, but

6 it was possible to have more than one workspace open at

7 the same time. So -- so it's yes and no.

8     Q     So within that one Workscape, it would --

9 Workspace wouldn't have the document and then another

10 visual representation of that same document, would it?

11     A     Not in the same window, but in separate

12 windows, it could.

13     Q     And one of the possibilities that Mr. Soobert

14 mentioned for Workscape was doing some type of

15 archiving. That wasn't described in any of your

16 publications, was it?

17     A     Well, certainly, I -- the -- the feature that

18 permitted you to connect simultaneously to multiple

19 repositories was -- was very key, and we talked about

20 that -- that very, very frequently, whether -- and --

21 and to me, I'm not sure what you mean by the term

22 archiving; but if it means moving an instance of a

23 document from one repository to another, then, yeah, I

24 think it was.

25     Q     When customers -- typically, users have an

2  you know, personal computer.  That's not the type of

3  thing you were just talking about there, is it?

4       A    I'm not sure I see what the difference is.

5  And sometimes I think this is a kind of a philosophical

6  question, because -- and I don't mean to be repetitive,

7  but we really wanted to let our users -- to stop

8  thinking about all this nonsense about the machinery of

9  how the computer works and to just let them deal with

10  their documents.

11           But this function was the same.  It was -- if

12  you want -- the reason you would want to move something

13  from one repository to another would be presumably

14  because you think it's safer that way, and you wanted to

15  make a backup.

16           So I'm not sure what distinction you're --

17       Q    There -- there was nothing described in those

18  papers as an archiving tool in that sentence, right?

19       A    I -- we probably did not use that word.

20           MR. STEIN:  James, could you put up

21  PTX437?

22       Q    (By Mr. Stein) That's a copy of the patent

23  that Mr. Soobert showed you earlier, right?

24       A    Yes, it is.

25       Q    And -- and that's a patent relating to your

2    A    Correct.

3            MR. STEIN:  And could you go to Figure 5

4    of that patent?  It's probably down a few pages.

5    Q    (By Mr. Stein) Now, up in the top, there's

6    something called a corkscrew pile.  Do you see that?

7    A    Yes.

8    Q    Okay.

9            MR. STEIN:  James, could you show

10   PTX1812?  And could you go to -- before you go there --

11   Q    (By Mr. Stein) Up in the corner, that's --

12   that's another one of your patents, right, even though

13   your name is misspelled, correct?

14   A    Yes, it is.

15   Q    And it's another patent on your Workscape

16   work?

17   A    Yes.

18           MR. STEIN:  James, can you go to Figure 5

19   of this patent?

20   Q    (By Mr. Stein) And it has that same Figure 5.

21   See that?

22   A    Yes.

23   Q    In fact, all the figures -- I don't know if

24   you remember these patents, but all the figures in this

25   patent are the same as the figures in the '330 patent.

2  description.  Do you recall that?  Do you recall filing

3  patents with the same written description?

4      A    I -- this was many years ago.  I don't

5  remember the details.  Certainly, a lot of the

6  background text is the same, because it's describing the

7  same underlying system.  But the patents, as I

8  understand it, describe different aspects -- protect

9  different aspects of -- of -- of the system.

10      Q    It could be possible that the patents have the

11  same description, but the claims at the end were

12  different, right?

13      A    The extent I understand patent law, yes.

14      Q    Okay.

15          MR. STEIN:  James, could you put up

16  PTX11?

17          Well, actually, if you would go back to

18  that one for one second.

19      Q    (By Mr. Stein) So with this patent, you know,

20  the patent number is in the upper right.  It ends in

21  '134.  Do you see that?

22      A    Yes.

23          MR. STEIN:  Okay, James.  Could you go to

24  PTX11?  And could you blow up like the top half?

25      Q    (By Mr. Stein) And do you see that the patent

2   '427 patent.  It's one of Dr. Gelernter's patents that

3   are at issue in this case.

4           Do you see in the middle of the column on the

5   right, the patent that's highlighted there?

6       A   Yes.

7       Q   And that, actually, is a patent number of the

8   one we were just looking at.  And you see it's cited on

9   the face of Dr. Gelernter's patent, right?

10      A   I can't keep these numbers in my head, but I

11  assume so.

12      Q   And that means the Patent Office considered

13  that patent in granting Dr. Gelernter's patent, right?

14      A   I really have no expertise in how the Patent

15  Office works.

16      Q   Okay.

17              MR. STEIN:  No further questions.

18              THE COURT:  All right.  Redirect?

19              MR. SOOBERT:  Just one brief question,

20  Your Honor.

21                  REDIRECT EXAMINATION

22  BY MR. SOOBERT:

23      Q   Mr. Stein just showed you a patent at issue in

24  the case citing one of your patents.  You had a number

25  of other articles and publications that were presented

2    here were filed, right?

3         A    Yes.

4         Q    Okay.  And none of those were cited or

5    considered by the Patent Office by anything you saw from

6    Mr. Stein; is that right?

7         A    As far as I know.

8              MR. SOOBERT:  Nothing further.

9              THE COURT:  All right.  Thank you.

10             All right.  You may step down.

11             All right, Ladies and Gentlemen of the

12   Jury, we're going to take our noon recess at this time.

13   We're going to be in recess until 12:30.  I think the

14   parties have arranged some good sandwiches for you in

15   there.

16             So enjoy your lunch break.  Please

17   remember my instructions, and we'll reconvene at 12:30.

18             We'll be in recess.

19             COURT SECURITY OFFICER:  All rise for the

20   jury.

21             (Jury out.)

22             (Lunch recess.)

23

24

25

2

3          I HEREBY CERTIFY that the foregoing is a

4    true and correct transcript from the stenographic notes

5    of the proceedings in the above-entitled matter to the

6    best of our abilities.

7

8

9    /s/_____
     SHEA SLOAN, CSR              Date
10   Official Court Reporter
     State of Texas No.:  3081
11   Expiration Date:  12/31/10

12

13
     /s/_____
14   JUDITH WERLINGER, CSR         Date
     Deputy Official Court Reporter
15   State of Texas No.:  731
     Expiration Date  12/31/10
16

17

18

19

20

21

22

23

24

25