```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION

 3   MIRROR WORLDS, LLC        *   Civil Docket No.
                               *
 4                            *   6:08-CV-88
     VS.                       *   Tyler, Texas
 5                            *
                               *   October 1, 2010
 6   APPLE, INC., ET AL        *   9:00 A.M.

 7

 8               TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE LEONARD DAVIS
             UNITED STATES DISTRICT JUDGE
 9

10   APPEARANCES:

11                    FOR THE PLAINTIFF

12   MR. JOSEPH DIAMANTE
     MR. KENNETH STEIN
13   MR. IAN G. DIBERNARDO
     MR. ALEXANDER SOLO
14   MR. CHARLES E. CANTINE
     STROOCK & STROOCK & LAVAN
15   180 Maiden Ln.
     New York, NY  10038
16
     MR. OTIS CARROLL
17   MR. PATRICK KELLEY
     IRELAND, CARROLL & KELLEY
18   6101 S. Broadway, Ste. 500
     Tyler, TX  75703
19

20   COURT REPORTERS:
     MS. SHEA SLOAN, CSR
21   MS. JUDY WERLINGER, CSR
     Official Court Reporters
22   211 West Ferguson, Third Floor
     Tyler, TX   75702
23   903/590-1171

24   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
25
```

1

2

FOR THE DEFENDANTS:

3 MR. JEFFREY G. RANDALL
MR. RAYMOND YU
4 MS. ERICKA J. SCHULZ
PAUL HASTINGS
5 1117 S. California Ave.
Palo Alto, CA 94304-1106
6

7
MR. ALLAN M. SOOBERT
8 MR. BROCK WEBER
MR. KIM MOORE
9 PAUL HASTINGS
875 15th St. NW
10 Washington, DC 20005

11

12 MR. S. CHRISTIAN PLATT
MR. JEFFREY COMEAU
13 PAUL HASTINGS
4747 Executive Dr.
14 12th Floor
San Diego, CA 92121
15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (Jury out.)
 3              THE COURT:  Please be seated.
 4              All right.  The Court has reviewed the
 5   parties' briefing on this issue of Apple's objection to
 6   the claims of the -- let's see, what was it, the '313
 7   and the -- what's the other one?  '313 and the '227 --
 8              MR. RANDALL:  That's correct, Your Honor.
 9              MR. DIBERNARDO:  -- patents should not be
10   included in the Charge.
11              And I guess the question I have for Apple
12   is, was this raised in JMOL when you raised the JMOL
13   with regard to indirect infringement?  Did you raise
14   that that would knock this out --
15              MR. RANDALL:  Well, Your Honor --
16              THE COURT:  -- as well?
17              MR. RANDALL:  It -- we did raise it when
18   we -- should I take the --
19              THE COURT:  Yes, please.  Thank you.
20              MR. RANDALL:  Yes, Your Honor.
21              When we raised JMOL, we identified the
22   grounds.  We identified the indirect infringement.  I
23   don't -- I don't think we specifically identified these
24   claims in this patent, but, nonetheless, we -- it would
25   cover it.  I mean, we didn't identify these specific
```

claims

 1

 2              We did --

 3              THE COURT:  Well, I understand you're

 4  arguing as a matter of law it now knocks them out if the

 5  Court has granted JMOL on indirect infringement, right?

 6              MR. RANDALL:  I'm sorry.  I didn't --

 7              THE COURT:  You're arguing now that if --

 8  since the Court granted JMOL on the indirect

 9  infringement, that, as a matter of law, knocks out

10  these -- these two patents?

11              MR. RANDALL:  That's correct, Your Honor.

12              THE COURT:  I'm not sure that's the case.

13  I granted the JMOL with regard to the indirect

14  infringement, because there was no expert testimony that

15  I recall tying up or -- or expressing an opinion about

16  that.

17              Now, in their briefing, the Plaintiffs

18  have raised the issue that there's certain -- that there

19  is evidence of user use of these methods that would

20  provide for direct infringement.

21              That's a very close call, I think, as to

22  whether -- and I'd be glad to hear argument as to

23  whether there can be enough evidence to show that a user

24  used these in order to constitute direct infringement

25  but not enough to constitute indirect infringement.

1       MR. RANDALL:  Yes, Your Honor.

2                   THE COURT:  Do you care to respond to

3       that?

4                   MR. RANDALL:  I would, Your Honor.

5                   And here's what we brought up on JMOL,

6       and it applies equally to this issue.  And that is that

7       they failed to completely, whether through expert

8       testimony or factual testimony or documents, to provide

9       evidence regarding indirect infringement, specifically

10      as to inducement and contributory infringement.

11                  So, for instance, on the inducement

12      charge, they have to show that the alleged infringer

13      actively encouraged or instructed another person on how

14      to --

15                  THE COURT:  Well, I -- I understand that.

16      But I guess my question is, is the standard -- I

17      understand what the standard is for inducement, but can

18      they -- do they have to prove inducement in order to get

19      direct infringement under these two method claims --

20      claim tests?

21                  MR. RANDALL:  Yes, Your Honor.

22                  And there are two issues that we're

23      dealing with.  Number one is, did they fail to produce

24      evidence of inducement and contributory such that they

25      can get all of these sales of these products into

1    evidence set before and prove infringement, but they

2    And the answer is no.

3    So they clearly didn't show any

4    inducement or encouragement.  So that's all out for

5    sure.

6    The second issue I think that you're

7    dealing with is, do the claims really require some other

8    party to participate?  They're saying they proved direct

9    infringement only on these very, very narrow

10   circumstances, for instance, when someone was, you know,

11   using the computer on a videotape or something like

12   that.

13   Let me address their evidence on that

14   subject.

15   First of all, they cite about 15 exhibits

16   in this brief.  Only one -- only one of those exhibits

17   was PX1676 was a reviewer's guide that shows -- that

18   they rely on.  So they rely on that for direct

19   infringement.  That's insufficient.

20   The issue that I think you're grappling

21   with is, does it require another person, another entity?

22   And, Your Honor, the claims clearly do.  And if we look

23   at the claims --

24   THE COURT:  Well, is Apple taking the

25   position, though, that none of these that they sold,

1    that no users dorsed them on?

2                    MR. RANDALL:  We're taking the position

3    twofold.  One, the claims require another entity, a user

4    to do something.  And because they didn't provide

5    sufficient evidence on that subject, specifically on

6    inducement and contributory, their entire claims fall,

7    period.

8                    If the Court disagrees with that for

9    whatever reason, then the -- the -- the issue is whether

10   or not the -- they have sufficient evidence of direct

11   infringement.

12                   So if, for instance, the Court says, no,

13   I don't think these claims require a user -- I think

14   that would be wrong, if you said that -- then their

15   direct infringement claim is limited to some -- you

16   know, limited use of -- of those claims.

17                   THE COURT:  Well, what if I say they --

18   these direct infringement claims do claim a user; but

19   there is sufficient circumstantial evidence of use,

20   although not enough to rise to the level of inducement

21   but enough to rise to the level of use by Apple?

22                   MR. RANDALL:  All right.  Let me address

23   that specific issue.

24                   That's -- that's the one -- the one

25   document that they submitted and only one exhibit out of

15 which is 1676 a reviewer's guide

2                  And so if you found that, Your Honor, we

3     would ask for an instruction.  Number one, we'd ask that

4     the damages be taken away from the jury, because that --

5     that particular act of infringement would not be

6     sufficient to justify damages.

7                  But secondly, Your Honor, if you said,

8     no, I think it is, we'd ask for an instruction that

9     Mirror Worlds cannot obtain damages other than for the

10    specific instances of direct infringement by an Apple

11    employee that Mirror Worlds has identified in the

12    record, if any.

13                  THE COURT:  Okay.  Thank you.

14                  Let me hear a response.

15                  MR. DIBERNARDO:  Respectfully, Your

16    Honor, I don't believe counsel addressed the threshold

17    issue, and that is, do -- do we need to show direct

18    infringement by a user for Apple to directly infringe

19    these method claims?

20                  And the answer is no, we do not.  That's

21    the Elantech case cited in our brief.  The capability of

22    the software to perform that method has enough for a

23    finding of direct infringement.  It's that capability

24    that's built into the software.

25                  With regards to contributory

1    infringement.

2                THE COURT:  Well, every other case I've

3    ever had like this, they've always had their expert

4    testify or their expert has testified as to inducement,

5    which solved this.  But your expert didn't express any

6    opinions on that, did he?

7                MR. DIBERNARDO:  He didn't use those

8    words, Your Honor.  But as even cited in Apple's brief,

9    he stepped through a user performing functions that did

10   evidence the Apple computer, the Apple software

11   performing the recited method.

12               So with regard to the contributory inducement

13   infringement, there is proof.  In fact, Apple just said

14   there is at least one evidence.  There is one item, the

15   reviewer's guide.  And then to the Lucent standard, that

16   one piece of evidence is enough.  It can address it --

17   directly addresses that point.

18               One piece of --

19               THE COURT:  So -- and you're asking the

20   Court to reconsider its JMOL on -- on inducement?

21               MR. DIBERNARDO:  We are, and

22   contributory.  Throughout the case, we've seen

23   contributory --

24               THE COURT:  But your expert did not

25   testify as to those, did he?

MR. DIBERNARDO:  The proof is the factual

1     

2     issue as to whether or not a user uses these methods was

3     presented.  There are user surveys that go directly to

4     the accused features.

5               In fact, Mr. Bratic, for example, relied

6     on the Spotlight survey out of the -- and this is

7     not to --

8               THE COURT:  He may have testified to the

9     facts; but just so I'm clear, did he express any

10    opinions regarding inducement of contributory

11    infringement?

12              MR. DIBERNARDO:  He did not use those

13    words; but he did step through how a user, when the

14    machine is turned on, performs this method.

15              THE COURT:  Okay.  And I understand that,

16    and I don't believe that it's necessary that you have an

17    expert express an opinion, if you've otherwise got the

18    facts and evidence to support a cause of action.

19              But I guess my question is, if the Court

20    were to grant that and reverse its ruling on the JMOL,

21    where does that leave us?

22              Because Defendants already put on its

23    whole case and did not address any of those, because

24    they were no longer in the case.

25              Are we back to reopening evidence and

1   ~~trying mere infringement and damages and~~

2              MR. DIBERNARDO:  These claims were still

3   in the case with regard to Apple's direct infringement,

4   so the proof was put on.  In fact, that goes back to the

5   threshold issue, to prove Apple's direct infringement

6   under these method claims, is there even a need to get

7   to this secondary -- the indirect liability question to

8   prove the user's direct use.

9              And the answer there is no.  It's the

10  capability that's in the software and that --

11             THE COURT:  Well, I'm not going to

12  reverse my JMOL rulings on the contributory and

13  inducement.  I'm going to stand by those.

14             But I am going to submit the -- the issue

15  of direct infringement, based upon your arguments, as to

16  the '313 and '227.  But I think it's a tricky legal

17  issue as to whether you're right that there's enough

18  evidence there to support a direct infringement under

19  those claims, or whether they're right that there has to

20  be -- that there is not enough evidence regarding use of

21  those products.

22             I recall enough circumstantial evidence,

23  I think, in the case, although not rising to the level

24  of inducement or contributory, that it sort of defies

25  logic to me that the users did not turn on these

1   features, and that there is enough circumstantial

2   evidence in the case to support the jury verdict on

3   that.

4            But I want to look at it closer

5   post-verdict, when we're not -- you know, it's 9:00

6   o'clock.  The jury's in there waiting.

7            So what I'm going to do is I'm going to

8   go ahead and submit it as to those, but I want to parse

9   out the damage questions and will submit separate damage

10  issues as to the '313 as -- the '313 and the '227, and a

11  separate damage issue as to the -- what's the other one,

12  the '427?

13           MR. DIBERNARDO:  The '313 and '227 are

14  the method claims.

15           THE COURT:  Right.  The separate one as

16  to those and then a separate damage question as to the

17  other one.

18           Now, let me hear your arguments as to

19  whether that's a good idea or a bad idea.

20           MR. CARROLL:  Your Honor, I'll be doing

21  the argument, and I did the damage for our side.  Of

22  course, we based our damage model on the accused

23  features.

24           And I think both sides can argue to the

25  jury what they -- how they suggest the jury apportion

1   whatever damages they chose to give, if they want to

2   give any.

3              THE COURT:  Let me ask this, Mr. Carroll:

4   Do you believe that the damages can be apportioned

5   between those two groups of patents?

6              MR. CARROLL:  I think -- and I don't want

7   this to sound flip, but I think the jury can do whatever

8   they want.

9              THE COURT:  I'm talking about as a matter

10  of law.  I know the jury can do whatever they --

11             MR. CARROLL:  I don't have a clue, Judge.

12  I mean, all I know is --

13             THE COURT:  That's an honest answer.

14             Response?

15             MR. RANDALL:  Yeah, Your Honor, two

16  issues.

17             One, on these claims, they simply didn't

18  put in the evidence of direct infringement that each of

19  these elements of these two claims require -- or two

20  patents are part of the method claims, they didn't

21  produce the evidence that suggested that any user on

22  some video practiced each and every element.

23             But in any event --

24             THE COURT:  Okay.  You may be right.  I'm

25  going to go ahead and submit them, so I've got a finding

                    MR. RANDALL:  With respect to the

instruction, Your Honor, they are apparently relying on

some unidentified instance of direct infringement, some,

you know, user in a video or something.

                    I don't even know what they're relying

on, but it's a limited instance of direct infringement.

And I said it doesn't show the elements.  But in any

event on that issue, Your Honor, Apple requests an

instruction that Mirror Worlds cannot obtain damages on

those two patents, other than for the specific instances

of direct infringement by an Apple employee that Mirror

Worlds has identified in the record, if any.

                    Now, if want to argue, and they should,

on that subject to the jury, that here's the Apple

employee that we've identified and here's the things --

                    THE COURT:  Okay.  Excuse me.  I'm going

to deny your request for that instruction.  You can --

you're a very capable lawyer.  You can argue that to the

jury, and the jury can sort that out.

                    Now, my question is, though -- and I want

to give both sides -- you know how I'm going to submit

it.  Now, I'm going to give both sides the opportunity

for a very brief reopen, if you want to address the

apportionment of damages, because we were originally

1   going to submit to both of them a one damage issue but you're

2   now breaking it out by apportionment.

3                    So does Defendant wish to offer any

4   additional evidence with regard to that?

5                    MR. RANDALL:  Well, I do object to

6   reopening the record, if we had a chance to do that.

7                    But, Your Honor -- no, Your Honor.  We

8   don't -- we don't agree with reopening the record.

9                    THE COURT:  The reason I'm doing this,

10  though, is because, if I'm going to have two damage

11  verdicts -- the reason I'm doing that is where if I

12  throw out the '313 and the '227, I've got some damage

13  number to throw out.  Otherwise, the Court's just going

14  to be guessing, if I throw it out, as to how much of the

15  jury's verdict was attributable to the '313 and the '227

16  and how much to the '427.

17                   MR. RANDALL:  All right.  And so are you

18  contemplating, Your Honor, just opening up briefly the

19  record to allow them to show what damages they claim for

20  those two method --

21                   THE COURT:  Well, I will allow -- I'm

22  contemplating opening it up for both of you for 10 or 15

23  minutes each.  I was going to ask you how long you

24  thought you would need to put on your respective damage

25  people to address if -- since it's going to be submitted

1    a separate issue to address how much should be

2    assessed to each of those separate issues.

3              So my question is, does Defendant wish to

4    do that?  Wish to offer any?  Or you may want to think

5    about it for a few seconds.

6              MR. RANDALL:  Your Honor --

7              THE COURT:  I'll allow up to 15 minutes

8    per side for your expert to address this issue.  Each

9    side will have 15 minutes for direct and

10   cross-examination to either put on your expert or

11   cross-examine their expert.

12             MR. RANDALL:  Right.  And part of that --

13   part of my uncertainty there is, I don't know what

14   evidence they're going to put on.  I haven't seen an --

15   you know, I have no idea what things they're going to

16   claim.

17             THE COURT:  I don't -- let me ask you, do

18   you want to put on any evidence as to that

19   apportionment?

20             MR. DIBERNARDO:  Your Honor, I don't

21   know -- I don't know that we've made a decision.

22             THE COURT:  All right.  The Court is

23   going to take a five-minute recess.

24             MR. RANDALL:  Can I raise one issue, Your

25   Honor?

1   and — is that I would like to read

2   into the record the — Apple's motion for JMOL regarding

3   judgment as a matter of law.

4          It is —

5          THE COURT:  Just a moment.  Are you

6   reading in what — what the JMOL motion you made the

7   other day?

8          MR. RANDALL:  Well, I'm certainly

9   renewing it, and there's some additional information in

10  here.  And Rule 50(a)(2) says that a motion for JMOL may

11  be made at any time before the case is submitted to the

12  jury.  And I would simply like to put it on the record,

13  Your Honor.

14         THE COURT:  All right.

15         MR. RANDALL:  Thank you, Your Honor, very

16  much.

17         Your Honor, Apple hereby moves for

18  judgment as a matter of law against all of Mirror

19  Worlds' claims and counterclaims and for judgment as a

20  matter of law in favor of Apple's declaratory judgment

21  and counterclaims and defenses.

22         First, Apple renews its former motions

23  for judgment as a matter of law submitted to the Court

24  on September 29 and 30 of 2010.

25         Second, Apple moves for JMOL of

1   non-infringement for the following additional reasons:

2   The accused products do not implement a mainstream.

3   Their claims that require a mainstream, Mirror Worlds

4   accuses the Spotlight Store of meeting the Court's

5   construction of a mainstream, which is a stream that is

6   inclusive of every data unit or document received by or

7   generated by the computer system.

8              However, the parties in this case have

9   presented uncontroverted and undisputed evidence that

10  the users can adjust their Privacy settings to exclude

11  private documents from the Spotlight Store.  In this

12  manner, the store is not inclusive of every data unit

13  received or generated by the computer and cannot

14  constitute a mainstream.

15             Judgment as a matter of law of

16  non-infringement should, therefore, be granted as to

17  Claims 13 and 22 of the '227 patent and Claim 2 of the

18  '313 patent.

19             Third, Apple moves for JMOL against

20  Mirror Worlds' willful infringement claim on the

21  following additional bases:

22             The claims of the '227 and '313 should be

23  dismissed with prejudice as method claims for which

24  there can be no direct infringement by Apple.  The sole

25  remaining patent in this case would then be the '427

1   patent, which issued on April 20, 2004.

2              However, all of Mirror Worlds' evidence

3   regarding knowledge of Mirror Worlds and Scopeware

4   products dates to December 2003 and before.  During that

5   time, it would have been impossible for Apple to have

6   known about the '427 patent.

7              Apple, therefore, moves for judgment as a

8   matter of law of no willful infringement.

9              Fourth, Apple moves for judgment as a

10  matter of law of non-infringement on the system claims

11  of the '427 patent, because they specifically require a

12  user sliding, without clicking, the cursor or pointer to

13  display glance views.

14             Apple's customers are the users of the

15  accused products, not Apple.  Mirror Worlds has failed

16  to offer any evidence or testimony regarding users of

17  the accused products.

18             Judgment as a matter of law on

19  non-infringement should be granted for Claims 1, 8, 16,

20  18, and 25 of the '427 patent.

21             Fifth, Apple has offered clear and

22  convincing evidence that all claims of the

23  patents-in-suit are anticipated as publicly used, known,

24  or previously published in the prior art, because each

25  claim element exists or is necessarily implied in the

1    prior art, which includes but is not limited to, MAYA,
2    Design Workscape System, Apple's Piles System, Dantz
3    Development Corporation's Retrospect System, Lotus
4    Development's Lotus Magellan System, the Spatial Data
5    Management System, the Lifestreams System, the MEMOIRS
6    System, On Technologies, On Location System, U.S. Patent
7    No. 5,621,906, and the English translation of Japanese
8    Patent No. --
9                THE COURT:  Counsel, how much more do you
10   have on that?
11               MR. RANDALL:  Just -- I think it's two
12   pages, Your Honor.
13               THE COURT:  All right.
14               MR. RANDALL:  Japanese Patent
15   No. 6-180661, a file search method, dated 1992.
16   Mirror Worlds has failed to rebut Apple's clear and
17   convincing evidence of anticipation.  Judgment as a
18   matter of law of invalidity of the patents-in-suit
19   should, therefore, be granted.
20               Sixth, Apple has offered clear and
21   convincing evidence that all claims of the
22   patents-in-suit are anticipated by the statutory bars
23   under 35 U.S.C. Section 102, which include but are not
24   limited to:
25               The claimed invention was already

1   patented or described in printed publication anywhere

2   in the world more than one year before the filing date

3   of the patent application.

4           The claimed invention was already being

5   publicly or commercially used in the United States more

6   than a year before the filing date of the application

7   and was not primarily in experimental use whether the

8   invention worked as intended purpose.

9           Mirror Worlds has failed to rebut Apple's

10  clear and convincing evidence of anticipation by

11  statutory bars.  Judgment as a matter of law of

12  invalidity of the patents-in-suit should, therefore, be

13  granted.

14          Seventh, Apple has offered clear and

15  convincing evidence that all claims of the

16  patents-in-suit are invalid as obvious to one of

17  ordinary skill in the art at the time the patent

18  application was filed.

19          One of ordinary skill in the art would

20  have been motivated to combine the prior art relied upon

21  in this case, because all publicly known document

22  management systems, many of which were presented at

23  Computer-Human Interface Interaction conferences.

24          All claims of the patents-in-suit are

25  rendered obvious for at least the following

1  combinations; Workscape in view of Piles; Workspace in

2  view of MEMOIRS and Piles; Workscape in view of SDMS;

3  and TR-1070 in view of Workscape and Piles.

4  Secondary considerations also suggest

5  that the patents-in-suit are obvious; that the claimed

6  invention failed to meet a long-felt need.  The

7  invention and its commercialization were not successful

8  in the marketplace.

9  There's no evidence that other copied --

10  others copied or claimed the invention.  The invention

11  did not receive significant praise and recognition in

12  the industry and did not delivered unexpected results.

13  Mirror Worlds has failed to rebut Apple's

14  clear and convincing evidence of obviousness.  Judgment

15  as a matter of law of invalidity of the patents-in-suit

16  should, therefore, be granted.

17  Eighth -- I'm half a page away, Your

18  Honor -- Apple moves for judgment as a matter of law

19  that the patents-in-suit are invalid for improper

20  inventorship.  Persons may be inventors even if they do

21  not make the same type or amount of contribution or

22  contribute to the subject matter of every claim of the

23  patent.

24  The patents-in-suit fail to disclose the

25  actual inventors and only the actual inventors.

1    additional inventors include, but are not limited to,

2    Nicholas Carriero, Scott Fertig, both of whom are not

3    named in Mirror Worlds' patents.

4              Mirror Worlds has failed to rebut Apple's

5    claim by clear and convincing evidence of improper

6    inventorship.

7              Judgment as a matter of law of invalidity

8    of the patents-in-suit should, therefore, be granted.

9              For these reasons, judgment as a matter

10   of law should be granted against each of Mirror Worlds'

11   claims and counterclaims.  And judgment as a matter of

12   law should be granted in favor of Apple's declaratory

13   judgment counterclaims and defenses.

14             Your Honor, thank you.

15             THE COURT:  Thank you, counsel.  The

16   motion is denied.

17             All right.  Did the parties have an

18   opportunity to decide whether you wish to have -- to

19   present any additional testimony?

20             MR. DIBERNARDO:  We don't believe it's

21   necessary, Your Honor.

22             THE COURT:  Okay.

23             MR. RANDALL:  We don't believe the record

24   should be open, so we're --

25             THE COURT:  All right.  Then we're going

1  to take about a five minute recess while we get
2  maybe ten until we get the Charge in final form, and
3  then we'll come back in and proceed with charging the
4  jury and closing arguments.
5              We'll be in recess.
6              COURT SECURITY OFFICER:  All rise.
7              (Recess.)
8              COURT SECURITY OFFICER:  All rise.
9              (Jury in.)
10             THE COURT:  Please be seated.
11             All right.  Good morning, Ladies and
12  Gentlemen of the Jury.  Sorry to keep you waiting.  We
13  had a few more issues that we had to deal with before I
14  give you your final instructions.
15             You are near the end of your journey.  As
16  you will recall when the jury was picked:  We've now
17  been through opening statements.  You've heard all the
18  evidence.  You're about to hear the Court's final charge
19  to you, which will be given to you orally, but a written
20  copy will be provided for you when you go to the jury
21  room.  And then you're going to hear closing arguments
22  by each side.
23             And then, hopefully around noon, you will
24  retire to the jury room to select your foreperson, have
25  some lunch, and begin your deliberations.

 1    you the Court's Charge.

 2            Ladies and Gentlemen of the Jury:

 3            You have now heard the evidence in this

 4    case.  I will now instruct you on the law that you must

 5    apply.  It is your duty to follow the law as I give it

 6    to you.  On the other hand, you, the jury, are the

 7    judges of the facts.

 8            Do not consider any statement that I may

 9    have made during the course of the trial or in these

10    instructions as any indication whatsoever that I have an

11    opinion about the facts of this case.  Again, that is

12    your sole province.  Just as I am the Judge of the law,

13    you are the judge of the facts.

14            After I instruct you on the law, the

15    attorneys for both sides will have an opportunity to

16    make their closing arguments.  Again, their statements

17    and arguments are not evidence and are not instructions

18    on the law.  They are intended only to assist you in

19    understanding the evidence and the parties' contentions

20    and what they believe that the evidence has shown and

21    what they believe your verdict should be.

22            You should answer each question from the

23    facts as you find them.  Do not decide who you think

24    should win and then answer the questions accordingly.

1   Your answers and your verdict must be unanimous.

2            In determining whether any fact has been

3   proved in this case, you may, unless otherwise

4   instructed, consider the testimony of all witnesses,

5   regardless of who may have called them, and all exhibits

6   received in evidence, regardless of who may have

7   produced them.

8            I'm going to have the Court Security

9   Officer pass out to you now a copy of the verdict form

10  that you will be answering in the jury room.  Just to

11  give you a little overview -- we'll kind of skip to the

12  end here at the beginning, so that you'll know what

13  questions you're going to be asked.

14           And I'll go over this in a little bit

15  more detail with you in these instructions, but first,

16  you'll notice there are two pages.

17           On the first page, are Questions 1(a) and

18  1(b) that deal with the issue of infringement, and

19  you'll see there's -- Question 1(a) deals with

20  infringement; 1(b) deals with whether or not such

21  infringement was willful.

22           Then you'll see a place where you are to

23  answer, for each patent, the '427, the 227, and the

24  '313, in a column there relating to 1(a) and 1(b).  1(a)

25  is where you'll answer with regard to infringement, and

1   (b) is, is there any liability with regard to willful

2   infringement.

3              Now, you may notice in -- in here that

4   there are the -- on the next page, you'll notice is the

5   issue dealing with invalidity, and this question asks

6   whether you find -- whether -- did Apple prove by clear

7   and convincing evidence that all of the infringed

8   claims, if any, of each of Mirror Worlds' patents

9   identified below are invalid.  And, again, there's a

10  space for you to answer yes or no in response to that

11  question.

12             And then the third question deals with

13  damages, and there's a conditional question in there, or

14  instruction in there; but then you would answer the

15  third question as to the amount of damages for each

16  patent, if any.

17             So that's just an overview to give you an

18  idea of what questions you're going to be answering.

19             Now let me go back and give you some

20  further instructions.

21             First, regarding how to consider witness

22  testimony.  Again, you, the jurors, are the sole judges

23  of the credibility of all witnesses and the weight and

24  effect of all evidence.

25             By the Court allowing testimony or other

1   evidence to be introduced over the objection of the

2   other side, the Court did not indicate any opinion as to

3   the weight or effect of such evidence.

4            When the Court did sustain an objection

5   to a question addressed to a witness, you must disregard

6   the question entirely and may draw no inference from the

7   wording of it or speculate as to what the witness would

8   have testified to, if he or she had been permitted to

9   answer the question.

10            At times during the trial, it was

11   necessary for the Court to talk with the attorneys here

12   at the bench out of your hearing or by calling a recess.

13            We met because often during the trial,

14   something comes up that does not involve the jury.  You

15   should not speculate on what was discussed during such

16   times.

17            In determining the weight to give to the

18   testimony of a witness, you should ask yourself whether

19   there was evidence tending to prove that the witness

20   testified falsely concerning some important fact or

21   whether there was evidence that at some other time the

22   witness said or did something or failed to say or do

23   something that was different from the testimony the

24   witness gave before you during the trial.

25            You should keep in mind, of course, that

1   a simple mistake by a witness does not necessarily mean

2   that the witness was not telling the truth as he or she

3   remembers it, because people sometimes forget some

4   things or remember other things inaccurately.

5           So if a witness has made a misstatement,

6   you need to consider whether the misstatement was an

7   intentional falsehood or simply an innocent lapse of

8   memory.  And the significance of that may depend on

9   whether it has to do with an important fact or only with

10  some unimportant detail.

11          Now, with regard to examining the

12  evidence.  Certain testimony in this case has been

13  presented to you through a deposition.  I've gone over

14  with you what a deposition is, and you should consider

15  deposition testimony just as you would testimony here in

16  court.

17          While you should consider only the

18  evidence in the case, you are permitted to draw

19  reasonable inferences from the testimony and exhibits as

20  you feel are justified in light of common experience.

21          In other words, you may make deductions

22  and reach conclusions that reason and common sense lead

23  you to draw from the facts that have been established by

24  the testimony and evidence in this case.

25          Unless you are instructed otherwise, the

1   testimony of a single witness may be sufficient to prove

2   any fact even if a greater number of witnesses may have

3   testified to the contrary, if, after considering all the

4   other evidence, you believe that single witness.

5            Now, there are two types of evidence that

6   you may consider in properly finding the truth as to the

7   facts.  One is direct evidence, such as the testimony of

8   an eyewitness.  The other is indirect or circumstantial

9   evidence; that is, the proof of a chain of circumstances

10  that indicates the existence or non-existence of certain

11  other facts.

12           As a general rule, the law makes no

13  distinction between direct and circumstantial evidence,

14  but simply requires that you find the facts from a

15  preponderance of all the evidence, including both direct

16  and circumstantial.

17           Now, you've also heard expert witnesses

18  testify in this case.  Sometimes when the knowledge of a

19  technical subject matter may be helpful to the jury, a

20  person who has special training or experience in that

21  technical field is called as an expert witness and is

22  permitted to state his or her opinion on those technical

23  matters.

24           However, you are not required to accept

25  that opinion.  As with any other witness, it is up to

1   you to decide whether to rely upon it or not. In

2   deciding whether to accept or rely upon the opinion of

3   an expert witness, you may consider any bias of the

4   witness, including any bias you may infer from evidence

5   that the expert witness has been or will be paid for

6   reviewing the case and testifying, or from evidence that

7   he or she testifies regularly as an expert witness and

8   that income from such testimony represents a significant

9   portion of the expert's income.

10              Now, let me go -- move from witnesses'

11  testimony to the contentions of the parties.  And the

12  contentions in this case have narrowed somewhat from

13  when the case started.

14              Sometimes during the course of the trial,

15  the issues and the disputes get narrowed.  That has

16  happened in this case, and there are two issues that are

17  no longer in the case.

18              The first is whether or not Mirror Worlds

19  infringes Apple's patent.  That's no longer in the case.

20  The other issue is whether Apple's iPhone, iPad, and

21  iPod infringe Mirror Worlds' patents.  That's also no

22  longer in the case.

23              So that will not be argued to you, and

24  you won't have to decide anything about that.

25              But what is in the case and that you will

1   by deciding, and based on these contentions.

2                     Mirror Worlds contends that Apple has in

3   the past and/or continues to make, use, offer to sell,

4   sell, or import products or methods that infringe at

5   least one of Claims 13 and 22 of the '227 patent; and

6   Claims 1, 8, 16, 18, 25 of the '427 patent; and

7   Claims 1, 2, 3, and 9 and 11 of the '313 patent.

8                     And the attorneys all have more to say

9   about that in their closing arguments and help you focus

10  in on those claims that are in the case.

11                    Apple denies the allegations that it has

12  infringed any claim of the Mirror Worlds patents.

13                    Apple also contends that the '227 patent,

14  the '313 patent, and the '427 patent are invalid,

15  because they are not new over the prior art; they would

16  have been obvious in view of the prior art; and they

17  fail to satisfy the written description and enablement

18  requirements.

19                    Your job is to decide whether the

20  asserted claims of the '227, '313 patent, and '427

21  patent have been infringed.  That's Question No. 1(a).

22  And whether any of those -- if you do find infringement,

23  whether any of that is -- was willful.  And that's in

24  Question 1(b).

25                    And then to decide whether any of the

1  asserted claims of those three patents are invalid.

2  That's in Question 2.  And invalidity is a defense to

3  infringement.

4              Therefore, even though the United States

5  Patent & Trademark Office or the Patent Office Examiner

6  has allowed claims to the three patents, you, the jury,

7  must decide whether the claims of the patent are

8  invalid.

9              If you decide that any claim of a patent

10  has been infringed and that claim is not invalid, then

11  you will need to decide any money damages to be awarded

12  to Mirror Worlds as compensation for the infringement.

13              And that's Question 3.

14              So really, there are three groups of

15  questions that you will be deciding.

16              Now, with regard to burdens of proof.

17  There are different burdens of proof, as I told you in

18  the beginning instructions, that apply to each of those

19  questions, and they are set out in the questions.

20              There are two burdens of proof:

21  Preponderance of the evidence and the clear and

22  convincing evidence standard.

23              Preponderance of the evidence means that

24  the evidence persuades you that a claim is more likely

25  true than not true.

1      The clear and convincing evidence

2   standard means the evidence produces in your mind a firm

3   belief or conviction as to the matter at issue.  The

4   clear and convincing evidence standard requires greater

5   proof than is necessary for the preponderance of the

6   evidence standard.

7            Mirror Worlds has the burden of proving

8   infringement by a preponderance of the evidence.  In

9   determining whether any fact has been proved by a

10   preponderance of the evidence, you may, unless otherwise

11   instructed, consider the stipulations or testimony of

12   all witnesses, regardless of who may have called them,

13   and all exhibits received in evidence, regardless of who

14   may have produced them.

15            If the proof establishes that all

16   essential parts of Mirror Worlds' infringement claim are

17   more likely true than not true, then you should find for

18   Mirror Worlds as to that claim.

19            If you find that Apple infringed one or

20   more of the asserted claims, then that party has the

21   burden of proving its additional contention that the

22   infringement was willful by clear and convincing

23   evidence.

24            The clear and convincing evidence

25   standard requires a greater degree of proof than is

1   necessary for the preponderance of the evidence

2   standard.

3            The proof must establish a firm belief or

4   conviction in your mind that infringement was willful

5   for you to find for Mirror Worlds as to the infringement

6   issue.

7            So, again, if you look back at your

8   verdict form, Questions 1(a) and 1(b) deal with that.

9   And as you'll notice, 1(a) has the preponderance of the

10  evidence standard in it.  That's with regard to

11  infringement.  And 1(b) has the clear and convincing

12  evidence standard in it, and that is in -- related to

13  whether such infringement was willful.

14           So you have those two different burdens

15  of proof on those two -- two questions in Question

16  No. 1.

17           As issued United States patents, Mirror

18  Worlds' patents are presumed to be valid.  Apple has the

19  burden of overcoming that presumption and proving

20  invalidity of the Mirror Worlds patents by the clear and

21  convincing evidence standard.

22           And if you'll look over at Question

23  No. 2, you'll notice that it asks:  Did Apple prove by

24  clear and convincing evidence that all of the infringed

25  claims of each of the patents as stated below are

1     invalid?

2                    So, again, that's the clear and

3     convincing evidence standard as related to invalidity.

4                    And, again, in determining whether any

5     fact has been proved by clear and convincing evidence,

6     you may, unless otherwise instructed, consider any

7     stipulations, the testimony of all witnesses and all

8     exhibits introduced into evidence, regardless of who may

9     have produced them or called them.

10                    The clear and convincing evidence

11     standard, again, requires a greater degree of proof than

12     is necessary for the preponderance of the evidence

13     standard.

14                    The proof must establish a firm belief or

15     conviction in your mind that the invalidity claims are

16     correct in order for you to find that the Mirror Worlds

17     patents are invalid.

18                    All right.  That covers the questions and

19     the burdens of proof.  You will notice the damage issue,

20     No. 3; again, that's the preponderance of the evidence

21     standard.

22                    Now let me visit with you about the

23     patents and the patent claims.

24                    At the beginning of the trial, I gave you

25     some general information about patents and the patent

1  systems and a brief overview of the patent laws relevant

2  to this case.  I will now give you more detailed

3  instructions about the patent laws that specifically

4  relate to this case.

5            If you would like to review my

6  instructions at any time during your deliberations, they

7  will be available for you in the jury room when you are

8  deliberating your verdict.

9            The claims of a patent are the numbered

10 sentences at the ends of the patent.  The claims

11 describe the invention made by the inventor and describe

12 what the patent owner owns and what the patent owner may

13 prevent others from doing.

14            Claims may describe methods, products,

15 such as machines or chemical compounds, or processes for

16 making or using a product.  In this case, Mirror Worlds

17 has asserted product and method claims from the Mirror

18 Worlds patents.

19            Claims are usually divided into parts or

20 steps called limitations or elements.  For example, a

21 claim that covers the invention of a table may recite

22 the table top, four legs, and the glue that secures the

23 legs to the tabletop.  In this example, the tabletop,

24 legs, and glue is each a separate limitation of the

25 claim.

method or product infringes the patent, the first step is to understand the meaning of the words used in the patent.

Again, it is my job as Judge to determine what the patent claims mean and to instruct you about that meaning. You must accept the meanings I give you and use those meanings when you decide whether or not the patent claims are infringed and whether or not they are invalid.

I have interpreted the meaning of some of the language in the patent claims involved in this case. My interpretation of those claims appears in Appendix A to the charge.

The claim language I have not interpreted for you in Appendix A is to be given its ordinary and accustomed meaning as understood by one of ordinary skill in the art.

Now, with regard to what's called comprising claims. The beginning or preamble of certain claims uses the word comprising. Comprising means including or containing but not limited to; that is, if you decide that an accused product or the use of an accused product includes all of the requirements or steps in that claim, the claim is infringed.

includes components or steps in addition to those

requirements.

        For example, a claim to a table

comprising a table top, legs, and glue would be

infringed by a table that includes a table top, legs,

and glue, even if the table also includes wheels on each

of the table legs.

        Now, there are two types of claims:

Independent claims and dependent claims.

        A dependent claim refers to another claim

called a base claim, while an independent claim does not

refer to any other claim.  The base claim from which a

dependent claim depends may be an independent -- an

independent claim or another dependent claim.

        The dependent claim includes or

incorporates each of the requirements of the base claim

and one or more additional requirements.

        In order to find infringement of each of

the dependent claims of the patents-in-suit, you must

first determine whether the base claim from which it

depends has been infringed.  If you decide that the base

claim has been infringed, then the dependent claim

cannot have been infringed.

        If you decide that the base claim has

1  been infringed, you must then separately determine
2  whether each additional requirement of the dependent
3  claim has also been included in the accused product or
4  use of the accused product.
5           If each additional requirement has been
6  included, then the dependent claim is said to have been
7  infringed.
8           Mirror Worlds must prove by a
9  preponderance of the evidence that a patent claim has
10  been infringed.
11          Now, a patent claim may be directly
12  infringed in two ways:  A claim may be literally
13  infringed, or it may be infringed under what's called
14  the Doctrine of Equivalents.
15          I will now instruct you on rules you must
16  follow to determine whether Mirror Worlds has proven
17  that Apple has infringed one or more claims of its
18  patents.
19          First, direct infringement or what's
20  called literal infringement.  You must decide whether
21  Apple has made, used, sold, or offered for sale within
22  the United States or imported into the United States a
23  product or method covered by one or more of the
24  Claims 13 and 22 of the '227; Claims 1, 8, 16, 18, or 25
25  of the '427; and Claims 1, 2, 3, 9, or 11 of the '313

1    patent.

2              You must compare each claim to the

3    Apple's product or method to determine whether every

4    requirement of the claim is included in the accused

5    product or method.

6              To prove literal infringement, Mirror

7    Worlds must prove by a preponderance of the evidence

8    that Apple's accused product or use of an accused

9    product includes every requirement or step in a single

10   claim of its patents-in-suit.

11             If an accused product or use of an

12   accused product omits any requirement or step recited in

13   a claim of Mirror Worlds' patents, Apple does not

14   infringe that claim.

15             In making your determination, you must

16   consider each claim separately and each accused product

17   separately.

18             For literal infringement, Mirror Worlds

19   is not required to prove that Apple intended to infringe

20   or knew of the patent.

21             Now, direct infringement under the

22   Doctrine of Equivalents.  Mirror Worlds also alleges

23   that even if there is no literal infringement, then the

24   asserted claims of the Mirror Worlds patents have been

25   infringed under what's called the Doctrine of

1    Equivalents.

2              To prevail on its allegation of

3    infringement, Mirror Worlds must prove by a

4    preponderance of the evidence that the accused product

5    or use of the accused product contains requirements

6    identical or equivalent to each claim requirement or

7    step of the patented invention.

8              You must proceed on a

9    requirement-by-requirement or step-by-step basis.

10   Mirror Worlds must establish that each requirement in

11   the claim is present in the accused product either

12   literally or under the Doctrine of Equivalents.

13             A claim requirement is present in an

14   accused product or method under the Doctrine of

15   Equivalents if the difference between the claim

16   requirement and a corresponding aspect of the accused

17   product or method is insubstantial.

18             In making this determination, you may

19   consider whether the corresponding aspect or step

20   performs substantially the same function in

21   substantially the same way to achieve substantially the

22   same result as the requirement in the claim.

23             You may also consider whether people of

24   ordinary skill in the art believe that the corresponding

25   aspect or step of the accused product or method and the

1    requirement recited in the patent claim must be

2    interchangeable at the time of the alleged infringement.

3                The proper time for evaluating

4    equivalency and thus knowledge of interchangeability

5    between requirements is the time of the infringement,

6    not the time the patent was issued.

7                Under the Doctrine of Equivalents, those

8    of ordinary skill in the art do not have to know of the

9    equivalent when the patent application was filed or when

10   the patent was issued.  Thus, the inventor need not have

11   foreseen and the patent need not describe all potential

12   equivalents to the invention covered by the claims.

13               Also, changes in technique or

14   improvements made possible by technology developed after

15   the patent application is filed, may still be equivalent

16   for the purposes of the Doctrine of Equivalents.

17               Now, that covers direct infringement and

18   infringement under the Doctrine of Equivalents.

19               The next is willful infringement.  In

20   this case, Mirror Worlds contends that not only did

21   Apple infringe its patents but that it did so willfully.

22               If you find that Apple has infringed one

23   or more claims of the Mirror Worlds patents, then you

24   must determine whether that infringement was willful.

25               Again, that's Question 1(b).

 1       Willful infringement must the proven by

 2  clear and convincing evidence, which is the higher

 3  burden of proof than for infringement.

 4              The issue of willful infringement relates

 5  to the amount of damages Mirror Worlds is entitled to

 6  recover in this lawsuit.  If you decide that Apple

 7  willfully infringed one or more claims of Mirror Worlds'

 8  patents, then it will be my job to decide whether or not

 9  to award increased damages.

10              You should not take this factor into

11  account in assessing damages, if any, to be awarded to

12  Mirror Worlds.  In other words, if you make a finding of

13  willful infringement, that's something I, as the Judge,

14  will take up later.  And you need not be concerned about

15  it.

16              To prove willful infringement, Mirror

17  Worlds must persuade you with clear and convincing

18  evidence that before March 14, 2008, Apple acted with

19  reckless disregard of the claims of the Mirror Worlds

20  patents.

21              Recklessness regard (sic) requires two

22  parts.  The first concerns Apple's conduct, and the

23  second concerns Apple's state of mind.

24              When considering the -- Apple's conduct,

25  you must decide whether Mirror Worlds has -- whether

1   Mirror Worlds whether Mirror Worlds has proven to a highly

2   probable that Apple's conduct was reckless.  That is,

3   that Apple proceeded with the allegedly infringing

4   conduct with knowledge of the patent, and in the face

5   and of an objectively high likelihood that it was

6   infringing the claims of a valid and enforceable patent.

7               Because this is an objective issue, the

8   state of mind of Apple is not relevant.  Legitimate or

9   credible defenses to infringement, even if ultimately

10  not successful, demonstrate a lack of recklessness.

11              If you conclude that Mirror Worlds has

12  proven that Apple's conduct was reckless, then you need

13  to consider the second part of the test.

14              You must determine whether Mirror Worlds

15  proved it is highly probable that the unjustifiably high

16  risk of infringement was known or so obvious that it

17  should have been known to Apple.

18              In deciding whether Apple satisfied the

19  state-of-mind part of the test, you should consider all

20  facts surrounding the alleged infringement, including

21  but not limited to the following:

22              (1) Whether Apple acted in a manner

23  consistent with the standards of commerce for its

24  industry;

25              (2) Whether Apple intentionally copied,

1   without a reasonable basis -- a product or method of

2   Mirror Worlds' patents as distinguished from trying to

3   design around the patent by designing a product or

4   method that Apple believed did not infringe those

5   claims;

6            And (3) Whether Apple had a reasonable

7   basis to believe that it did not infringe or had a

8   reasonable defense to infringement such as that -- such

9   as that the patent was invalid.

10           All right.  That deals with infringement

11  and willful infringement.  Next is validity or

12  invalidity.

13           Patent invalidity is a defense to patent

14  infringement.  Even though the Patent Office Examiner

15  has allowed the claims of a patent, you have the

16  ultimate responsibility for deciding whether the claims

17  of the patent are valid.

18           The issuance of a patent by the Patent

19  Office provides a presumption that the patent is valid.

20  From the issuance of the patent, it is presumed that a

21  claimed invention -- excuse me.

22           From the issuance of the patent, it is

23  presumed that a claimed invention is novel, useful, not

24  obvious, and satisfies the other legal requirements for

25  a valid U.S. patent.

a rule of evidence that places the burden upon the party disputing the validity of a patented claim to come up with clear and convincing evidence that the Patent Office acted erroneously in issuing the patent.

Each claim of a patent is presumed valid independently of the validity of the other claims.

Accordingly, the party challenging the validity bears the burden of proving invalidity of each claim with facts supported by clear and convincing evidence.

In making your determination as to whether a patent claim is valid or invalid, you must consider each patent and each of the claims of the patent separately and individually as you did when you considered whether the claim was infringed or not.

If the evidence is clear and convincing that a claim in a given patent fails to meet the essential requirements of the patent laws, then that patent is invalid.

However, if you find that one or more claims of a patent fail to meet the essential requirement of the patents, it does not necessarily mean that the remaining claims of that patent are also deficient or invalid.

1    likewise, if you find that one of more

2    claims of one patent are invalid, that does not

3    necessarily mean that any claim of any other patent is

4    also invalid.

5              The presumption of validity remains

6    intact and the burden of proof remains on the party

7    challenging the patent's validity throughout this

8    litigation.

9              In other words, the clear and convincing

10   evidence standard does not weaken and the burden of

11   proof never shifts to the patent owner to prove that its

12   patents are valid.

13             I will now instruct you on the invalidity

14   issues you should consider.  As you consider these

15   issues, remember that Apple bears the burden of proving

16   with clear and convincing evidence that the claims are

17   invalid.

18             The first invalidity issue of the defense

19   is what's called anticipation.  That means publicly used

20   or known or previously published.

21             Apple contends that the asserted claims

22   of the Mirror Worlds' patents are invalid because the

23   claimed invention was not new.

24             For a claim to be invalid because it was

25   not new, all of the requirements must have existed in a

1  single device or patent that predates the claimed

2  invention or must have been described in a single

3  previous publication or a patent that predates the

4  claimed invention.

5              In patent law, such previous device,

6  method, publication, or patent is called a prior art

7  reference.  If a patent claim is not new, we say it is

8  anticipated by a prior art reference.  Apple must prove

9  with clear and convincing evidence that the claim was

10  anticipated.

11             The disclosure in the prior art reference

12  does not have to be in the same words as the claim, but

13  all of the requirements of the claim must be there,

14  either stated or necessarily implied, so that someone of

15  ordinary skill in the field of the computers, looking at

16  that one prior art reference, would be able to make and

17  use at least one embodiment of the claimed invention.

18             Anticipation also occurs when the claimed

19  invention inherently, necessarily, that is, results from

20  practice of what is disclosed within the written

21  reference, even if the inherent disclosure was

22  unrecognized or unappreciated by one of ordinary skill

23  in the field of the invention.

24             Generally, an alleged infringer can show

25  that a patent owner's patent was not new:

1   if the claimed invention was already

2   publicly known or publicly used by others in the United

3   States before the date of the invention;

4           Or if the claimed invention was already

5   patented or described in a printed publication anywhere

6   in the world before the date of the invention;

7           To qualify as a prior art reference, a

8   printed publication must be at least reasonably

9   accessible to those interested in the field, even if it

10  is difficult to find;

11          An electronic publication, including an

12  online or internet publication, is a printed publication

13  if at least reasonably accessible to those interested in

14  the field, even if it was difficult to find;

15          Or if the claimed invention was already

16  described in another published U.S. Patent application

17  or issued U.S. patent that was based on a patent

18  application filed before the date of invention of the

19  asserted patent.

20          If a patent claim is not new as explained

21  above, you must find that claim invalid.

22          Now, anticipation by statutory bars.

23          Apple may prove that the patents-in-suit

24  are invalid by showing with clear and convincing

25  evidence that each such claim failed to meet one of

1   several statutory provisions in the patent law. These

2   provisions are called statutory bar.

3                   For a patent claim to be invalid because

4   of a statutory bar, all of its requirements must have

5   been present in one prior art reference dated more than

6   one year before the effective filing date of the patent

7   application.

8                   Here is a list of ways Apple can show

9   that the patent application was not timely filed, that

10  is, filed one year -- within one year of the occurrence

11  of any of the following events:

12                  First, if the claimed invention was

13  already patented or described in a printed publication

14  anywhere in the world more than one year before the

15  effective filing date of the patent application.

16                  A reference is a printed publication if

17  it is reasonably accessible to those interested in the

18  field, even if it is difficult to find.

19                  And again, an electronic publication,

20  including an online or internet publication is a printed

21  publication if it is at least reasonably accessible to

22  those interested in the field even it is difficult to

23  find;

24                  Now, the second way is if the claimed

25  invention was already being publicly or commercially

1  used in the United States more than one year before the
2  effective filing date of the patent application and that
3  use was not primarily an experimental use controlled by
4  the inventor to test whether the invention worked for
5  its intended purpose.
6           For a claim to be invalid because of
7  after statutory bar, all of the claimed requirements
8  must have been either:
9           (1) disclosed in a single prior art
10  reference;
11           Or (2) implicitly disclosed in a single
12  prior art reference as viewed by one of ordinary skill
13  in the field of the invention.
14           The disclosure in a reference does not
15  have to be in the same words as the claim, but all of
16  the requirements of the claim must be described in
17  enough detail or necessarily implied by or inherent in
18  the reference to enable someone of ordinary skill in the
19  field of the invention, looking at the reference, to
20  make and to use at least one embodiment of the claimed
21  invention disclosed.
22           A prior art reference also invalidates a
23  patent when the claimed invention necessarily results
24  from practice of the subject of the prior art reference,
25  even if the result was unrecognized and unappreciated by

1    one of ordinary skill in the field of the invention.

2              If you find a patent claim failed to meet

3    a statutory bar, then you must find the patent claim

4    invalid.

5              Next is obviousness.

6              In this case, Apple claims that the

7    asserted claims of the Mirror Worlds' patents are

8    invalid as obvious.

9              A patent claim is invalid if the claimed

10   invention would have been obvious to a person of

11   ordinary skill in the field of the invention at the time

12   the patent application was filed.

13             This means that even if all the

14   requirements of the claim cannot be found in a single

15   prior art reference that would anticipate the claim or

16   constitute a statutory bar to that claim, a person of

17   ordinary skill in the field of the invention who knew

18   about all the prior art would have nevertheless come up

19   with the claimed invention.

20             A patent claim composed of several

21   requirements is not proved obvious merely by

22   demonstrating that each of its requirements was

23   independently known in the prior art.

24             Although common sense directs one to look

25   with care at a patent application that claims as

1  innovation, the combination of known requirements

2  according to their established functions to produce a

3  predictable result, it can be important to identify a

4  reason that would have prompted a person of ordinary

5  skill in the relevant field to combine the requirements

6  in the way the claimed new invention combines them.

7            This is so, because inventions in most,

8  if not all instances, rely upon building blocks long

9  since uncovered.  And claimed discoveries, almost of

10 necessity, will be combinations of what, in some sense,

11 is already known.

12           Accordingly, you may evaluate whether

13 there was some teaching, suggestion, or motivation to

14 arrive at the claimed invention before the time of the

15 claimed invention, although proof of this is not a

16 requirement to prove obviousness.

17           Teachings, suggestions, and motivations

18 may be found in written references, including the prior

19 art itself; however, teachings, suggestions, and

20 motivations may also be found within the knowledge of a

21 person of ordinary skill in the art including inferences

22 and creating steps that a person of ordinary skill in

23 the art would employ.

24           Additionally, teachings, suggestions, and

25 motivations may be found in the nature of the problem

1    solved by the claimed invention or any need or problem

2    known in the field of the invention at the time of and

3    addressed by the invention.

4              Therefore, in evaluating whether such a

5    claimed invention would have been obvious, you should

6    consider a variety of factors:

7              (1) whether Apple has identified a reason

8    that would have prompted a person of ordinary skill in

9    the field of the invention to combine the requirements

10   or combinations from the prior art in the same way as in

11   the claimed invention.

12             There is no single way to define the line

13   between true inventiveness on the one hand (which is

14   patentable) and the application of common sense and

15   ordinary skill to solve a problem on the other hand

16   (which is not patentable).

17             For example, market forces or other

18   design incentives may be what produced a change rather

19   than true inventiveness.

20             (2) whether the claimed invention applies

21   a known technique that has been used to improve a

22   similar device or method in a similar way;

23             (3) whether the claimed invention would

24   have been obvious to try, meaning that the claimed

25   innovation was one of relatively small number of

1 possible approaches to the problem with a reasonable

2 expectation of success by those skilled in the art.

3          But you must be careful not to determine

4 obviousness using hindsight.  Many true inventions can

5 seem obvious after the fact.  You should put yourself in

6 the position of a person of ordinary skill in the field

7 of the invention at the time the claimed invention was

8 made, and you should not consider what is known today or

9 what is learned from the teaching of the patent.

10          The ultimate conclusion of whether a

11 claim is obvious should be based on your determination

12 of several factual issues:

13          (1) You must decide the level of ordinary

14 skill in the field of the invention that someone would

15 have had at the time the claimed invention was made;

16          (2) You must decide the scope and content

17 of the prior art.  In determining the scope and content

18 of the prior art, you must decide whether a reference is

19 pertinent or analogous or -- to the claimed invention.

20          Pertinent or analogous prior art includes

21 prior art in the same field of endeavor as the claimed

22 invention, regardless of the problems addressed by the

23 reference and prior art from different fields reasonably

24 pertinent to the particular problem with which the

25 claimed invention is concerned.

1   Remember that prior art is not limited to

2   patents and published materials, but includes the

3   general knowledge that would have been available to one

4   of ordinary skill in the field of the invention.

5              (3) You must decide what difference, if

6   any, existed between the claimed invention and the prior

7   art.

8              Finally, you should consider any of the

9   following factors that you find have been shown by the

10  evidence:

11             (A) Factors tending to show

12  non-obviousness include:

13             (1) commercial success of a product due

14  to the merits of the claimed invention;

15             (2) a long felt, but unresolved need for

16  the solution provided by the claimed invention;

17             (3) unsuccessful attempts by others to

18  find the solution provided by the claimed invention;

19             (4) copying of the claimed invention by

20  others;

21             (5) unexpected and superior results from

22  the claimed invention;

23             (6) acceptance by others of the claimed

24  invention as shown by praise from others in the field of

25  the invention or from the licensing of the claimed

1    inventions.

2                    And (7) disclosures in the prior art that

3    criticize, discredit, or otherwise discourage the

4    claimed invention and would therefore tend to show that

5    the invention was not obvious.

6                    You may consider the presence of any of

7    these factors just listed as an indication that the

8    claimed invention would not have been obvious at the

9    time the invention was made.

10                   Now (B) factors tending to show

11   obviousness include:

12                   (1) independent invention of the claimed

13   invention by others before or at about the same time as

14   the named inventor thought of it.  And you may consider

15   the presence of this factor as an indication that the

16   claimed invention would have been obvious at such time.

17                   Although you should consider any evidence

18   of these factors, the relevance and importance of any of

19   them to your decision on whether the claimed invention

20   would have been obvious is up to you.

21                   Apple must prove with clear and

22   convincing evidence that a claimed invention was

23   obvious.  If you find that a claimed invention was

24   obvious, as explained above, you must find that claim

25   invalid.

1    Now, with regard to the sense in which a reference
2    of the prior art, to qualify as prior art relevant to
3    the patents-in-suit, a reference must be reasonably
4    related to the claimed invention of that patent.

5           A reference is reasonably related if it
6    is in the same field as the claimed invention or is from
7    another field to which a person of ordinary skill in the
8    field would look to solve their own problem.

9           Remember that prior art is not limited to
10   patents and published materials but also includes the
11   general knowledge that would have been available to one
12   of ordinary skill in the field of the invention.

13          Now, differences over the prior art.

14          In reaching your conclusion about whether
15   or not claims of the patents-in-suit would have been
16   obvious at the time the claimed invention was made, you
17   should consider any evidence or differences between the
18   prior art and the claim requirements.

19          Next is level of ordinary skill.

20          Several times in my instructions I have
21   referred to a person of ordinary skill in the field of
22   the invention.  It is up to you to decide the level of
23   ordinary skill in the field of the invention.

24          You should consider all of the evidence
25   introduced at trial in making this decision, including:

1                    (1)  the  levels  of  education  and

2    experience of persons working in the field;

3                    (2)  the  types  of  problems  encountered  in

4    the field;

5                    And (3) the sophistication of the

6    technology.

7                    Mirror  Worlds  contends  that  the  ordinary

8    skill in the field of invention was someone who had a

9    bachelor's degree in computer science, computer

10   engineering, or the equivalent and three to five years

11   in the field of computer operating systems, or a

12   postgraduate degree in computer science, computer

13   engineering, or the equivalent, and one to two years of

14   experience in the field of computing systems.

15                   Apple  contends  that  the  level  of  ordinary

16   skill in the field in the invention was someone who had

17   a Ph.D. in computer science or other combination of

18   education and experience that provided sufficient

19   confidence in the appropriate aspects of computer

20   science, such as graphical user interface design and

21   some knowledge of document processing software design

22   and development, data structures, operating systems,

23   backup and archiving systems and client server

24   computing.

25                   Written description.

1    Apple contends that Claims 13 and 20 of
2    the '227 patent; and Claims 1, 8, 16, 18, and 25 of the
3    '427 patent; and Claims 1, 2, 3, 9, and 11 of the '313
4    patent are invalid for failure of the patents to provide
5    an adequate written description of the claimed
6    inventions.
7               Apple must prove with clear and
8    convincing evidence that these claims lack an adequate
9    written description.
10              The written description requirement is
11   satisfied if a person of ordinary skill in the field,
12   reading the patent application as originally filed,
13   would recognize that the patent application described
14   the invention of these claims, even though the
15   description might not use the exact words found in the
16   claim.
17              The written description is adequate if it
18   shows that the inventor was in possession of each claim
19   of the invention at the time the application for the
20   patent was filed, even though the claim may have been
21   changed or new claims added during the prosecution of
22   the application.
23              It is not necessary that each and every
24   aspect of the claim be explicitly discussed, as long as
25   a person of ordinary skill would understand that any

1   aspects not expressly discussed in the patent

2   application as originally filed.

3                If you find that one or more of the

4   claims challenged by Apple lack an adequate written

5   description, you must find each claim invalid -- each

6   such claim invalid.

7                Next is enablement.

8                Apple contends that Claims 13 and 22 of

9   the '227 patent; and Claims 1, 8, 16, 18, and 25 of the

10  '427 patent; and Claims 1, 2, 3, 9, and 11 of the '313

11  patent are invalid because the patents do not disclose

12  sufficient information to enable one skilled in the

13  field of the invention, at the time the application was

14  filed or its effective filing date, to make and use the

15  claimed invention.

16               This requirement is known as the

17  enablement requirement.  If a patent claim is not

18  enabled, it is invalid.  Each claim must be analyzed for

19  compliance with the enablement requirement, and Apple

20  must prove with clear and convincing evidence that the

21  claim was not enabled.

22               In considering whether a patent claim

23  satisfies the enablement requirement, you must keep in

24  mind that patents are written for persons of skill in

25  the field of the invention.

1   That a patent need not emphasize ...

2   information that skilled persons would be likely to know

3   or could obtain.

4           Apple bears the burden of establishing

5   lack of enablement by proving with clear and convincing

6   evidence that a person skilled in the art, upon reading

7   the patent document, would not be able to make the

8   invention work without undue experimentation.

9           The fact that some experimentation may be

10   required for a skilled person to make or use the claimed

11   invention does not mean that a patent's written

12   description fails to meet the enablement requirement.

13           Factors you may consider in determining

14   whether making the invention would require undue

15   experimentation include:

16           (1) the quantity of experimentation

17   necessary;

18           (2) the amount of direction or guidance

19   disclosed in the patent;

20           (3) presence or absence of working

21   examples of the patent;

22           (4) nature of the invention;

23           (5) state of the prior art;

24           (6) relative skill of those in the art;

25           (7) predictability of the art;

1                    64 (On the breadth of the claim)

2                    If you find that one or more of these

3    claims did not comply with the enablement requirement,

4    you must find each such claim invalid.

5                    That concludes the invalidity

6    instruction.

7                    Finally are the damage instructions,

8    generally speaking.

9                    If you find that Apple has infringed one

10   or more valid claims of the Mirror Worlds' patents, you

11   must determine the amount of damages to which Mirror

12   Worlds is entitled.

13                   Each of these determinations must be

14   determined separately and individually, as you did when

15   you considered whether the patents were infringed or

16   invalid.

17                   By instructing you on damages, I do not

18   suggest that one or the other party should prevail on

19   the issues of infringement or invalidity.

20                   These instructions are provided to guide

21   you on the calculation of damages in the event you find

22   infringement of a valid patent and thus must address the

23   damage issue.

24                   The amount of damages must be adequate to

25   compensate Mirror Worlds for the infringement, but in no

1   event that the damages awarded be less than a reasonable

2   royalty.

3          At the same time, your damages

4   determination must not include additional sums to punish

5   either Apple or to set an example.  You may award

6   compensatory damages only for the loss that Mirror

7   Worlds proves was more likely than not caused by Apple's

8   infringement.

9          Now, with regards to the burden of proof,

10  and again, the standard is preponderance of the evidence

11  with regard to damages.

12         Mirror Worlds must prove the amount of

13  damages by the preponderance of the evidence standard.

14         It must prove the amount of damages with

15  reasonable certainty but need not prove the amount of

16  damages with mathematical precision.

17         However, Mirror Worlds is not entitled to

18  damages that are remote or speculative.

19         Now, with regard to when damages begin,

20  the amount of damages Mirror Worlds can recover is

21  limited to those acts of infringement that occurred

22  after Mirror Worlds gave Apple notice that it infringed

23  the patent.

24         Notice of infringement can be actual or

25  constructive, and I'll explain in a moment what that

1    66&#58;23

2                    Actual notice means that Mirror Worlds

3    communicated to Apple a specific charge of infringement

4    of the patent by the accused products.  This notice is

5    effective as of the date given.

6                    The filing of a complaint or infringement

7    counterclaim qualifies as -- or excuse me.  The filing

8    of a complaint qualifies as actual notice.

9                    Mirror Worlds filed a complaint against

10   Apple on March 14th, 2008, and bears the burden of

11   establishing it is more probable than not that it

12   notified Apple of the alleged infringement on an earlier

13   date.

14                   Constructive notice means that Mirror

15   Worlds complied with the marking requirement of the

16   patent law.

17                   Marking means that substantially all of

18   the products made, offered for sale, or sold under the

19   patent are marked to display the word patent or the

20   abbreviation pat, P-A-T, together with the number of the

21   patent.

22                   Mirror Worlds has the burden of

23   establishing substantial compliance with the marking

24   requirement.  To do so, Mirror Worlds must show it is

25   more probable than not that substantially all the

1   product or method offered for sale or sold under the

2   product (sic) were marked and that Mirror Worlds made

3   reasonable efforts to ensure that its licensees who

4   made, offered for sale, or sold the products under the

5   patent marked substantially all of their products.

6            Your job is to calculate damages from the

7   date that Apple received either actual or constructive

8   notice, whichever was first.  You should not award

9   damages for any infringement occurring before Apple

10   first received either actual or constructive notice.

11            Now, reasonable royalty.

12            A royalty is a payment made to a patent

13   holder in exchange for the rights to make, use, or sell

14   the claimed invention.

15            A reasonable royalty is the patent -- is

16   the payment that would have resulted from a negotiation

17   between a patent holder and Apple taking place just

18   better the time when the infringement began.

19            It may be a running, lump sum, or

20   combination of the two.  It may be a running royalty,

21   lump sum, or a combination of the two.

22            In considering the nature of this

23   negotiation, the focus is on what the expectations of

24   Mirror Worlds and Apple would have been had they entered

25   into an agreement at the time and acted reasonably in

1    their negotiations.

2              However, you must assume that both

3    parties believed the patent was valid and infringed.

4    In addition, you must assume that Mirror Worlds and

5    Apple were willing to enter into an agreement.

6              Your role is to determine what that

7    agreement would have been.  The test for damages is what

8    royalty would have resulted from the hypothetical

9    negotiations and not simply what either party would have

10   preferred.

11             In determining royalty that would have

12   resulted from the hypothetical negotiation, you may

13   consider real world facts, including the following to

14   the extent they are helpful to you:

15             (1) licenses or offers to license the

16   patent at issue in this case;

17             (2) licenses involving comparable

18   patents;

19             (3) licensing history of the parties;

20             (4) licensing practices in the relevant

21   industry;

22             (5) whether Mirror Worlds had an

23   established policy of refusing to license the patent at

24   issue;

25             (6) the relationship between Mirror

1    worlds and Apple including whether or not they are
2    competitors;

3              (7) the significance of the patented
4    technology in promoting sales of the Apple products and
5    earning it profit;

6              (8) alternatives to the patented
7    technology and advantages provided by the patented
8    technology relative to those alternatives;

9              (9) the portion of Apple's profits that
10   should be credited to the invention by distinguished --
11   as distinguished from non-patented features,
12   improvements, or contributions;

13             And (10) any other economic factor that a
14   normally prudent business person would, under similar
15   circumstances, take into consideration in negotiating
16   the hypothetical license.

17             You must also bear in mind that the
18   hypothetical negotiation is deemed to be an arm's-length
19   transaction and any prior royalty arrangements between
20   the patent owner and a related entity or non-competitor
21   is not determinative when analyzing the hypothetical
22   negotiation.

23             All right.  Now, finally, instructions
24   for your deliberations.

25             You must perform your duties as jurors

1   without bias or prejudice as to any party.

2          The law does not permit you to be

3   controlled by sympathy, prejudice, or public opinion.

4          All parties expect that you will

5   carefully and impartially consider all the evidence,

6   follow the law, as it is now being given to you, and

7   reach a just verdict, regardless of the consequences.

8          It is your sworn duty as jurors to

9   discuss the case with one another in an effort to reach

10   agreement, if you can do so.  Each of you must decide

11   the case for yourself, but only after full consideration

12   of the evidence with the other members of the jury.

13          While you are discussing the case, do not

14   hesitate to re-examine your own opinion and to change

15   your own mind if you become convinced that you are

16   wrong.

17          However, do not give up your honest

18   beliefs solely because the others think differently or

19   merely to finish the case.

20          Remember that in a very real way, you are

21   the judges, judges of the facts.  Your only interest is

22   to seek the truth from the evidence in the case.

23          You should consider and decide the

24   case -- this case as a dispute between persons of equal

25   standing in the community, of equal wealth, and holding

 1    the same or similar situations in life.

 2              A corporation is entitled to the same

 3    fair trial as a private individual.

 4              All persons, including corporations and

 5    other organizations, stand equal before the law,

 6    regardless of size or who owns them, and are to be

 7    treated as equals.

 8              When you retire to the jury room to

 9    deliberate your verdict, you may take this charge with

10    you, as well as all the exhibits which the Court has

11    admitted into evidence.

12              You should first select your foreperson

13    and then begin conducting your deliberations.

14              In this case, since we're going to be

15    giving this to you around lunchtime, one of your first

16    decisions should be:  Do we want to eat lunch first and

17    then start deliberating, or do we want to eat lunch and

18    begin our deliberations during lunch?

19              So that will just be something that

20    you'll have to decide.

21              If, during your deliberations, you decide

22    that you'd like to recess, follow all of the

23    instructions the Court has given to you about your

24    conduct during the trial.

25              If you wish to take a break, maybe just

1  get out of the room and stretch your legs, please send a

2  note to me first to let me know that you're about to

3  take a break.  Then I'll be sure that there aren't a lot

4  of people in the hallway and that type of thing.

5          After you have reached your unanimous

6  verdict, your foreperson is to fill in on the form your

7  answers to the questions and sign and date it.  Do not

8  reveal your answers until such time as you are

9  discharged, unless otherwise directed by me.

10          You must never disclose to anyone, not

11  even to me, your numerical division on any questions

12  during your deliberations.

13          Any notes that you have taken during this

14  trial are only aids to your memory.  If your memory

15  should differ from your notes, then you should rely on

16  your memory and not on your notes.  Again, the notes are

17  not evidence.

18          A juror who has not taken any notes

19  should rely on his or her independent recollection of

20  the evidence and should not be unduly influenced by the

21  notes of others, although you can consider the other

22  jurors' opinions.

23          The point is, notes are not entitled to

24  any greater weight than the recollection or impression

25  of the jurors about the testimony.

1  if you want to communicate with me at any

2  time, please give a written message or question to the

3  bailiff, who will bring it to me.  I will then respond

4  as promptly as possible either in writing or by having

5  you brought into the courtroom so that I can address you

6  orally.

7          I will always first disclose to the

8  attorneys your question and my response before I answer

9  your question.

10          After you have reached a verdict, you are

11  not required to talk with anyone about the case unless

12  the Court orders otherwise.

13          At this time, that concludes my

14  instructions.  You will be provided with a copy of

15  these.  In fact, we'll pass a copy out to you as you

16  leave the courtroom for your break.

17          I'm going to give you a 15-minute break,

18  allow you to clear your head after listening to me drum

19  on and on for an hour.  And it's about as hard to go

20  that long as it is to listen to, but thank you for your

21  attention.

22          So we're going to take a 15-minute

23  recess, and so we're going to come back at 10:45, at

24  which time we will begin hearing closing arguments,

25  which should put us through about 12:15.

1   instructions.  Don't discuss this case, even yet among

2   yourselves.  The first time you'll do that will be at

3   lunchtime today after you've heard the closing

4   arguments.

5                    So we'll be in recess until 10:45.

6                    COURT SECURITY OFFICER:  All rise.

7                    (Jury out.)

8                    (Recess.)

9                    COURT SECURITY OFFICER:  All rise.

10                   (Jury in.)

11                   THE COURT:  Please be seated.

12                   All right.  Ladies and Gentlemen of the

13  Jury, it's now time for closing arguments.

14                   And the Court will recognize Mr. Carroll

15  on behalf of Plaintiffs for purposes of closing

16  argument.

17                   MR. CARROLL:  If the Court please, Your

18  Honor.

19                   Ladies and Gentlemen of the Jury, first,

20  and maybe most importantly, thanks to each and every one

21  of you for your hard work and your attention on behalf

22  of everybody on our side, most particularly Dr. G. here

23  and Jane, who's got her coat on so she won't get cold in

24  the courtroom.

1  One of the things I remember, we've had
2  about last Monday -- it seems like a lot longer than
3  that -- but one of the things I hope I told you, because
4  I want to remind you of something that's important to
5  me.

6            We talked a lot about patents being the
7  creation of the United States Constitution.  Well -- and
8  you probably know this -- but there's another very
9  important part of the Constitution that you're
10  fulfilling today, and you have been fulfilling since
11  September the 7th.

12            And that is what's called the Seventh
13  Amendment to the Constitution.  Here's what that says.
14  That says that in a civil case, not a criminal case, but
15  in a civil case where somebody's got a grievance and
16  needs to go to the courthouse, we are guaranteed, as
17  American citizens, the right to try our civil grievance
18  in front of a jury of our peers.

19            Now just think about that.  We're the
20  only country in the world, the only one that has that
21  right.  Great Britain doesn't have it.  Canada doesn't
22  have it.  None of our sister countries that we kind of
23  derive our law from has it.

24            And why is that important?

25            And I think you see it during this case,

1   is that it means that we trust the most important

2   decisions we have to our neighbors.  Because I don't

3   know if y'all remember, on the -- on the 7th day of

4   September, when y'all were sitting here and some of you

5   were sitting out here, I don't know if you remember, but

6   one lady raised her hand and she says:  I just don't

7   think we ought to do this, because it's too technical.

8                  Do you remember that?

9                  And she said:  I just don't know that I

10  can do it.

11                 Well, I hope you've seen now why it's so

12  important that we not trust these kinds of decisions to

13  a bunch of propeller heads.  And I use that term to

14  describe people who are so technical and so special and

15  so self-absorbed with their own little niche that they

16  don't have common sense.

17                 Because we believe that -- and we believe

18  this very strongly on this table -- that we'll take our

19  chances with people who have common sense every day,

20  particularly under these facts.

21                 So with that, I want to first remind you

22  of what I showed you last Monday.  And you may remember,

23  this is what I told you I thought the case would be

24  about.

25                 Now, let me tell you just a little bit

1    about dog this thing I'm going to work.

2                    Since we have the burden on infringement,

3    I'm going to start and I'm going to talk to you for

4    about 25 minutes.  And then I'm going to sit down, and

5    then the Apple folks will get to do their thing.  And

6    then when they're done, I will get to finish with it.

7                    But I want to go through all of the

8    questions that I posed to you last Monday, starting with

9    who is David G.?

10                   Number two, what did he invent and why?

11                   Number three -- and we'll spend some time

12   on this one -- what was Apple's interest in Dr. G.'s

13   invention?

14                   Number four, how did and how does Apple

15   use Dr. G's invention?

16                   And, number five, what should they pay

17   for trespassing on his property?

18                   And then I'm going to talk to you about

19   these two points, because that gets back to the common

20   sense.

21                   What did Apple say about Dr. G. and his

22   invention before we caught them and brought them to this

23   courthouse and what do they say?

24                   And I think when you look at those

25   distinctions, you will be able to do the first job that

 1  the Judge told you they're supposed to do and 10/20/10

 2  decide who to believe.  Because once you look at that

 3  contrast, that will tell you everything you need to

 4  know.

 5              And you-all saw it as early as the first

 6  day of this trial.  Let me tell you what I mean by that.

 7  Let's -- let's put up the first slide, if you would,

 8  James.

 9              Now, who is David Gelernter --

10  Gelernter -- Gelernter (pronouncing) -- excuse me, Doc.

11  Well, you know who he is.  He -- according to The New

12  York Times, he's the rock star.  And I promised Jane I

13  wouldn't do this, but I'm going to do it anyway.  And

14  that is, I'm going to refer to the comment that The New

15  York Times made about him where they said -- and I'll

16  find in it a second -- but where they described him as

17  looking like a lost graduate student trying to find the

18  pretzel stand.

19              But then it went on to say that he is not

20  only the rock star of computing, but that he is a

21  revolutionary.

22              Now, you've heard that term a lot in this

23  courtroom.  A lot in this courtroom.  And he got the

24  world's attention as early as 1991, when he wrote this

25  book right here, Mirror Worlds (indicates).

1   that prologue, you'll know that this man right over

2   here, who's chewing on his thumb, was looking down the

3   road 20-plus years ago, and he saw Google.

4

5                Read that.  You'll see what I'm saying.

6                You will look into a computer screen and

7   see reality.  Some part of your world, the town you live

8   in, the company you work for, your school system, the

9   city hospital will hang there in a sharp color image,

10  abstract but recognizable.

11               You know, this lawsuit is about the power

12  of ideas, and ideas are powerful.  We send children --

13  not children but young people, young women and young men

14  overseas every day to stand up in the most dramatic way

15  for ideas that are important to us.

16               And ideas can be -- can attract

17  attention, like moths to a flame, and it can be good

18  attention, and it can be bad attention.

19               And you know from the evidence in this

20  case that both happened to Dr. G. here because of the

21  attention he got from a New York Times article that came

22  out when he previewed the inventions that are at issue

23  in this lawsuit today.

24               So let's go, James, to paragraph -- I'm

25  sorry -- to the second slide, the where-is-Scott slide.

1 Now, let me tell you what I mean to those

2 are three men who are at the very pyramid of Apple:

3 Steve Jobs -- you've seen him on all the videotapes --

4 Scott Forstall and Bertrand Serlet; you remember the

5 French fellow.  They were attracted to David's ideas

6 after Jobs read The New York Times e-mail (sic).

7              Now, let me tell you why I think that's

8 important.

9              The New York Times e-mail (sic) from

10 Steve Jobs -- I'm sorry -- the e-mail that was prompted

11 by The New York Times article came out.  Jobs sent it on

12 the very day he read the article, the very day, and he

13 sent it to Serlet.  He sent it to Bas Ording.  And he

14 sent it to Bereskin.  And he sent it to Scott Forstall.

15 And he sent it to Don Lindsay.

16              And he even put in the subject a line the

17 name of the article.

18              Now, this e-mail is Plaintiff's Exhibit

19 No. 193.  And I suggest that you -- when you get back in

20 the jury room, you find it and read it, because attached

21 to it is that New York Times article.

22              In that New York Times article, when you

23 lay it down next to the stuff that you've heard Steve

24 Jobs saying about his products, which came out years

25 later, is almost identical.

 1                                                                       excited by this man and his inventions and the publicity

 2   excited by this man and his inventions and the publicity

 3   it gives.  And the first thing he does is he sends his

 4   top lieutenants, these three guys that were on the --

 5   here we go -- these three guys who are on the screen, he

 6   sends them an instruction.

 7                    And what does he say?

 8                    Check out this software ASAP.  It may be

 9   something for our future, and we may want to secure a

10   license ASAP.

11                    You remember when Dr. Tribble and I were

12   talking on Wednesday, I believe it was, and we talked

13   about the fact that Steve Jobs, in a two-sentence

14   e-mail, used the term ASAP twice.  Twice.  And we talked

15   about the significance of the fact that Jobs said we may

16   want to secure a license.

17                    Now, let me tell you where we are in this

18   case, because I think it's a very important point for

19   you-all to consider.

20                    On Monday, when we opened this case,

21   here's what Apple's lawyer said to you he thought would

22   be important in this case.  And I pulled the page right

23   out of the official transcript.

24                    He says:  But what the evidence is going

25   to show in this case is that when Apple did take a

1   book -- and he's talking about that meeting that they had

2   with the Apple people -- and there was a suggestion that

3   there was a meeting where licensing was discussed and

4   the patents were discussed.  That is not true.

5                    That's what he said.  That is not true.

6                    Now, let me tell you where that leads us,

7   and I think it makes your job, in deciding who to

8   believe in this case, exceptionally easy, because they

9   staked out a radical and extreme position by saying

10  that, well, licensing was never discussed; that the

11  patents were never talked about.

12                    And the very first piece of evidence we

13  have in this case is the top man at Apple talking about

14  wanting to secure a license.

15                    Now, where in the world do they get off

16  betting their credibility that all of us in this

17  courtroom are too dumb to realize that that exhibit in

18  and of itself makes a lie to what they say?

19                    Because that's what it does.

20                    Okay.  So we know that that set in motion

21  a number of inquiries.  Well, actually one inquiry, and

22  that was by Mr. Lindsay.

23                    And let's go to the book of Lindsay

24  exhibit.  You got that, James?

25                    Okay.  Let me tell you what this is.  We

1   what is in the record, and we pulled out all of our

2   testimony -- you remember that day I was coughing so bad

3   and trying to read that crazy deposition.

4            Well, we pulled all that stuff out, and

5   there it is, and that's what this Mr. Lindsay -- you

6   remember I talked to Dr. Tribble about the fact that

7   even though the big boss had instructed the underbosses

8   to check this out, Lindsay was the only one who did what

9   he was told evidently.

10           And this is what Lindsay said.  Lindsay

11   said, first of all, his initial reaction was he was

12   surprised, because Jobs had never given him a specific

13   assignment like that before and never has since.

14           Number two, he said that he thought

15   Scopeware -- look at his answer down there on Page 119:

16   Scopeware was clearly new.

17           Now remember, Scopeware is the commercial

18   embodiment of some of Dr. G.'s patents.  Not all but

19   some.

20           You remember my explanation with Dr. G.

21   about the Farmer Brown picture and the silo being part

22   of the property but not all of the property?

23           Scopeware is the silo.  It's not the

24   whole farm, but it's part of it.  And this man, Lindsay,

25   had looked at it, and he had looked at the website, and

 1   he knew two things -- he knew it was new, had he knew he

 2   looked at the website, he knew it was licensed -- I

 3   mean -- excuse me -- patented.

 4              And look what else he says.  He says that

 5   he looked at the website.  And remember, there was

 6   testimony from our side, and nothing from the other

 7   side, that our website -- website had patent references

 8   all over it.

 9              And then the last point was, did you

10   think it was a good idea, and he said he thought it was

11   an interesting solution to a problem where people needed

12   to move a lot of information.

13              That's what the man said.

14              Let's go to the next one, please.

15              But what do we know about everybody else?

16              Well -- James, let's put up this collage.

17              And this is an important collage.  These

18   are all Apple people talking about Dr. G. and his

19   invention.  Let me repeat this.  These are all Apple

20   people talking about Dr. G. and his invention:  Don

21   Lindsay, Mike Morton, Blaine Garst, Toby Paterson -- the

22   killer feature.

23              Now, you see this Blaine Garst?

24              Go up -- there we go.

25              Blaine Garst was the chief architect on

1    Spotlight, one of the three accused features -- look what

2    he said:  It's depressing to read about patents on this

3    stuff.

4              And yet they're going to stand up here in

5    a little bit and tell you they didn't know anything

6    about the patents.  I guess that's what they're going to

7    say.  They are pretty well stuck with that.  Can't back

8    up now, I wouldn't think.

9              But see what they do.  And when they

10   stand up there and start spinning the yarn to you about

11   how they didn't know about any of this stuff, or if they

12   did, they have now forgotten, remember this.

13             You see, that's the problem they have.

14   E-mails don't forget.  Paper doesn't tell a lie.  It

15   says what it says.

16             Now, they get this, and here's what this

17   poster represents.  This poster represents all of these

18   individual Apple people who were copied on e-mails or

19   who were involved in the monitoring of Dr. G.'s

20   products, his website and, therefore, his patents.

21             And guess what?  You saw it in the

22   courtroom.

23             Dr. Tribble over there, who they told to

24   go check out all these e-mail people, he learned and he

25   told you that nobody remembered a thing.  Everybody had

1    amnesia.

2    You know, when I was a federal prosecutor

3    in this very courtroom a million years ago, we used to

4    call that courthouse amnesia.  And it's a very, very

5    common affliction that happens to people who don't want

6    to have to own up to what they have said before.

7    And that's what you've got in this case.  You've got

8    courthouse amnesia.

9    Now, why is that important?  Why is that

10   important that nobody can remember that day?

11   Well, the reason it's important, in my

12   opinion, is because it defies your common sense.  These

13   people claim to be the smartest technology company in

14   the world.  And we know that the top of the food chain

15   was interested in our patent and instructed his top

16   lieutenants to check it out and get a license.

17   And now nobody can remember anything.

18   Now, you think about that when you use

19   your common sense in determining who should win this

20   case, because it means who's telling you the truth.

21   Think about that.

22   One of the things that also you should

23   think about -- and remember this man, Lindsay, had a

24   meeting that he called, and you remember Mike Satow, who

25   came to Tyler from where Judge Davis' daughter got

1  married or in New York, come down here and testified

2  about that meeting and testified that patents were

3  discussed and licensing was discussed.  He testified

4  about all the expectations they had.  And yet one day,

5  they said we're not interested and how surprised he was.

6  And Dr. G. testified about that meeting and how

7  important it was to the little company and how much time

8  they spent in preparing for that meeting.  And then one

9  day they get this note back:  We're not interested.

10           But look what happened after they weren't

11  interested.  Look at this.  They continued to monitor

12  Dr. G. and his website.

13           Now, why is that important?

14           The website's got the patents on them.

15  And what happened during the period of this monitoring,

16  after they said they weren't interested?  What happened?

17  They develop the three products that are stealing our

18  intellectual property.

19           Why do I know that?

20           Let's go to PX110.

21           Now, you heard a lot about this Merlot

22  meeting.  Remember Merlot?  Merlot was this top-secret

23  meeting offsite.  You remember Mr. Tiene, who testified

24  the other day, and said it was a way to get all the

25  bigshots away from the phone so they could concentrate

1       on what they needed to concentrate.

2                    One of the things we know that was on the

3       list of what was discussed and suggested was -- look at

4       that -- Yale professor, David Gelernter.

5                    And what is he bringing to the table?

6                    New ways of finding information.

7                    That is the very meeting where they

8       finalized what they were going to do about one of the

9       important use of -- or products that includes the

10      accused features.

11                   That was one of the big cats.  Remember

12      the big cats, Tiger, Leopard, and Snow Leopard.  That

13      was one of the big-cat meetings.

14                   So what sense does it make, when in just

15      a little bit, the guy from Apple is going to stand up

16      here and tell you that we weren't interested in Dr. G.

17      His stuff wasn't any -- wouldn't work in our system.

18      And, by the way, it was on old news.

19                   Now, just think if any of that makes

20      sense, when you look at this timeline.

21                   When you look at this timeline, why were

22      they scoping out his Scopeware, if they really and truly

23      weren't interested?

24                   And by the way, you know what happens

25      right on the other side of this?

1          Another Jobs e-mail Jobs e-mail/delays

2    look into it; it might be worth a look.

3                    So think of that when you're listening to

4    Apple tell you why, number one, what we did was not new;

5    and, number two, that whatever they did was not new.

6                    Let me tell what you I mean by that.

7                    THE COURT:  Mr. Carroll, you didn't ask

8    for any warnings, but you have used 25 minutes.

9                    MR. CARROLL:  Thank you, Your Honor.  I'm

10   going to use five more, if the Court please.

11                   I'm grateful for that, Your Honor.

12                   But let me tell you -- I'm going to go

13   through one more thing, and then I'm going to go through

14   the verdict form.

15                   James, would you pull up the slide that

16   says:  To the world?

17                   Can you find that one?

18                   There we go.  Let's lift that out.

19                   Now, I want you to remember this when

20   Apple's talking to you.  You remember one of the things

21   that's plain, Jobs never bothered to come to Tyler.

22                   Now, Dr. Tribble says he had more

23   important stuff to do, and I suspect he does.  But you

24   know what?  We all teach our children that whatever

25   we're doing better be the most important thing we do, or

1  we should be doing something different, right?  That's
2  what we all got taught.

3              So we know that the level of importance
4  that Apple has attached to this lawsuit.  Because it's
5  important to us, we're here; Mike Satow, our CEO, who
6  used to be the CEO, he came down here.  And we didn't
7  even have to pay him.

8              But Mr. Jobs isn't here.  Mr. Serlet is
9  not here; the other sub-boss is not here.  And what we
10  know, I think, is the reason that Steve Jobs is not
11  here -- and hear me out on this and test it and see if
12  this makes sense to you.

13             You remember all of the videos you saw
14  from Jobs was Jobs bragging about how new and
15  revolutionary the products we have sued are.  You
16  remember that.  And all the clapping and the cheering
17  and the hoorah-ing and strutting around in his black
18  sweater.

19             Now, in Court, they're spinning a
20  different tale.  They brought all of these folks who are
21  still out there -- or most of them are still out there.
22  And none of them were on the e-mail string.

23             Well, Mr. Tiene was.  And they sat up
24  here and said, no, none of this stuff is new; we've been
25  doing it for years.

1    ask yourself, if Zhis had shown up and

2    sat on that witness stand and put his arm up like Dr. G.

3    did and swore to tell the truth, he would have had to

4    answer this one very simple question:

5                 Were you telling the truth then, when you

6    spun a yarn that this is brand new so you could make $72

7    billion, or are you spinning the yarn now, when you tell

8    this jury we can't infringe, because what we're doing is

9    not new?

10                I submit to you that's why it's more

11   important that he not be in Tyler, Texas.  And that's

12   why he's not in Tyler, Texas.

13                So let me go over the verdict form with

14   you.  The last thing I'm going to tell you, and I'll

15   talk to you more about it when I have my second chance

16   to talk, is why their invalidity defense is silly and

17   starts with a very simple proposition, and it was

18   confirmed over here by Dr. Tribble.

19                And that is that they cannot lay hands on

20   one piece of paper in their files of 30,000 employees to

21   support the claim that they make in this courtroom

22   before we sued them.  That is, there's not one piece of

23   paper anywhere in their files that contradict what their

24   employees were saying about how important and new and

25   innovative Dr. G.'s products were.  It's not there.

 1   It was created for the courtroom by folks who are not
 2   here still on the clock, who were paid to come and try
 3   to kill Dr. G.'s patents.
 4            You know, Dr. G.'s ideas attracted that
 5   guy who tried to kill him.  Well, it attracted Jobs at
 6   Apple, and they are trying to kill his idea.
 7            So let me go through the verdict form
 8   with you real quick.
 9            Is the ELMO on?
10            Okay.  So this is the verdict form.  This
11   is what I think.  What counts is what you think.
12            The first question the Judge wants you to
13   answer is, did they take our property?  Did they
14   infringe Dr. G.'s patent?
15            I think the answers are plainly yes.
16            Was it willful?
17            You've seen the proof of them telling us
18   one thing and doing another thing and telling you
19   something today in this courtroom that plainly is not
20   true.
21            If that's not proof of willful
22   infringement, then there's no willful infringement in
23   the world.
24            Now, this is really why we're here.  They
25   are terrified of Dr. G.'s patents.  They want to kill

1   them. They were shut it down.  And they didn't bring the

2   proof to you.

3                The Patent Office said they're good.  Two

4   of the people who showed up to testify in this case

5   about how old news Dr. G.'s patents were have patents

6   that were on the face of his patents and considered by

7   the Patent Office before they said this was new.

8                Why did they do that?  Why did they waste

9   your time that way?

10               Think about that.

11               Now, these are the damage numbers, and

12  I'll talk to you more about these, but you remember the

13  Judge told you that the -- the iPods are out; that's all

14  been resolved.

15               So what that means is that the numbers

16  that Mr. Bratic -- you remember I got him up at the very

17  last and I said, if you take the i's out, what do you

18  have, and he said about 50 percent.

19               These are the allocations that I thought

20  were appropriate based on what I heard Bratic say, but

21  in each instance, it's about 50 percent of that 6-1/4

22  that Bratic told you about during his testimony, and

23  that still means that they're making $25 million every

24  day.

25               MR. RANDALL:  Your Honor, I'm going to

1   objects side's knittigng enror with his comment that she
2   knows darn well that's not what his expert said.  He's
3   inviting error in this Court by doing that.
4              THE COURT:  Objection's overruled.  The
5   jury will disregard the objection.
6              MR. CARROLL:  So -- so you look at these.
7   And, again, you heard the objection.  That's what
8   they're worried about.  They're worried about their
9   pocketbook.  That's what they're squawking about.
10              But this is what they make off these
11  products, and this is less than 1 percent -- less than 1
12  percent.  Any one of those numbers, there is a number 99
13  times higher that they get to keep.
14              Now, I'm going to sit down now and let
15  Mr. Randall talk to you.  And then I'll have a few
16  minutes left to talk to you afterwards.
17              But think about those things that I
18  suggested to you that you question in your own mind,
19  when he's talking to you.
20              Thank you, Your Honor.
21              THE COURT:  All right.  Thank you,
22  Mr. Carroll.
23              The Court will now recognize Mr. Randall
24  for purposes of closing argument.
25              MR. RANDALL:  Thank you, Your Honor.

1        been my first thank you for your patience
2   in this case, and I know you took time from your lives
3   and your children.  And Apple appreciates it, and I
4   appreciate it.

5                I was a former prosecutor for a long
6   time.  Like a criminal -- I sat at that table and
7   watched criminal defense attorneys point fingers at you
8   all day long.

9                I have tried a lot of patent cases, but
10  I've never sat through a case like this where there's
11  two fundamentally different cases.  There's Mirror
12  Worlds' personal attacks, unnecessary, mean-spirited
13  attacks, and then there's a patent case.

14               Now, we're really here for this patent
15  case.  That's what this case is about.  The case is
16  about a patent case.  Mirror Worlds has patents owned by
17  some hedge funds.  David accused Apple of infringement.
18  And the evidence that's relevant to this case and
19  relevant for your consideration is, how do the Apple
20  products operate?

21               Do they infringe?

22               What does the prior art look like?

23               Was he the first inventor?

24               Does he deserve the patents?

25               Does Mirror Worlds deserve these patents,

1    or are they invalid?

2                Were they the first to invent this or

3    not?

4                That's the evidence.  Mirror Worlds spent

5    that entire time, 30 minutes, railing on Apple and me

6    and others.

7                But the point is, they never mentioned

8    any evidence of infringement, right?

9                They didn't do it.  They didn't go

10   through anything.  And this case was the same way,

11   right?

12               It was their opportunity to lay out all

13   their evidence about why -- how Apple's products operate

14   specifically, whether they infringe, and whether the

15   patents are valid.

16               Now, we sat there and took it, okay?  It

17   wasn't easy.  But what we did is we focused on the main

18   issues in this case.  And I'm not going to get into a

19   mud-slinging game, and I'm not going to call names.

20               I focused on the evidence, and I'd ask

21   you guys to focus on the evidence.  Focus on, how do

22   Apple's products operate?

23               Did they prove infringement?

24               Did they prove every single element?

25               Absolutely not.  In fact, we don't have

```
 1   to prove anything.  But we proved, conclusively,

 2   without any possible doubt, that we don't infringe these

 3   patents for multiple reasons.  And I'm going to get to

 4   that in a minute.

 5                   I want to deal with a couple of these

 6   issues that were raised, and they spent so much time on,

 7   because I just can't sit there and let it go unanswered.

 8                   They really focused on four events, and

 9   the four events really aren't in dispute, right?  Except

10   for the spin that they put on those four events is

11   enormous, right?

12                   They say these four events mean some huge

13   conspiracy, some huge plan to steal Mirror Worlds'

14   technology.  And it simply doesn't.

15                   Let's look at some of those issues.

16                   The first event is Steve Jobs saw a press

17   clipping.  He saw a press clipping regarding allegedly

18   new software to organize documents, and he wanted

19   someone to check out the software, okay?

20                   That's a fact.  It's not in dispute.

21   That's what happened.  He saw it and he said, okay, go

22   check it out.

23                   That's not surprising.  All tech --

24   high-tech companies do that.  They keep track of

25   technology.  Everybody does.  And if there's something
```

1 that comes along and there's a news article, there's now

2 there's a new way of organizing documents, go check it

3 out, that's common.

4            He's a hands-on CEO.  I think you saw

5 that.  They are committed to building better products.

6 I think you saw Greg (sic) Croll and Steve Joswiak in

7 Court, and you could tell they're excited about their

8 products.  You could tell Steve Jobs, when you see him,

9 he's excited and passionate about his products.

10            Apple's entered into a whole host of

11 licenses, and you heard evidence of that.  So the idea

12 of going out and checking out technology, if it's

13 appropriate, go ahead, license it, and just go check it

14 out.

15            Look at DX636, please.  That's the

16 Coverflow license.  That's exactly what happened in

17 that -- in this case.

18            Coverflow -- it's Exhibit 636.  There it

19 is.  May 25, 2006.

20            Can you scroll down?

21            It's the exclusive right to create

22 software application for music browsing to enable the

23 user to browse by flipping through album cover art.

24            You can take it down.

25            And so if you look at that, you'll see

1   that Apple did go check out a CoverFlow and decide to

2   take a technology license to it for $70,000, okay?

3              They don't -- they don't deal with that

4   too much.

5              So the idea that Steve Jobs would say go

6   check out that technology; if it's appropriate, take a

7   license, there's nothing wrong with that.  And yet they

8   make it sound like it's just the worst possible thing in

9   the world.

10             The second fact that they attempt to

11  distort is that former Apple employee, Don Lindsay, went

12  out and checked out the Mirror Worlds technology at a

13  conference call -- a web conference call with them.  And

14  he ultimately recommended not to pursue it.

15             Okay.  That's what happens.  If you -- if

16  you go out and check out technology, maybe you pursue

17  something; maybe you don't.  But it's interesting --

18  let's take a look at what he would have learned, right?

19  What he either did learn or would have learned from

20  that.

21             And let's look at the purpose of the

22  meeting.  There was a big discussion about what the

23  purpose of the meeting was.

24             Can you pull up 31, please?

25             All right.  So Michael Satow says:  Oh,

1   yeah, this was -- this was definitely a -- in a

2   meeting; that two people that were there, Satow and

3   Prager, Prager says:  I asked them if they were trying

4   to sell Lifestream applications, the software products,

5   and he says:  Yeah, that's all we were doing.  We were

6   just trying to sell a technology.

7                  That's the sole and exclusive purpose of

8   the call, okay?

9                  Now, if you recall that examination of

10  Mr. Prager, I asked him a whole host of questions about

11  the meeting, right?  I asked him about, you know, how

12  long did it last, how long was this presentation,

13  everything else.

14                 He didn't remember much.  He didn't.  And

15  that's okay, right?  He was at the meeting.  It was

16  supposed to be some important meeting for Mirror Worlds.

17  It was supposed to, according to Satow -- you can bring

18  that down -- some big meeting.

19                 And yet Mr. Prager doesn't really

20  remember much about it, and that's okay.  But Mirror

21  Worlds has just -- chastises and rails on Apple's

22  employees who weren't even at that meeting.

23                 Who was at the meeting?

24                 Don Lindsay.  And so they claim that all

25  these other guys that weren't at the meeting, and

1   somehow don't generally Mirror Worlds are Lifestreams are

2   either liars or thieves.  That's just not true, and it's

3   not right.

4                   Now, what else would Lindsay have seen at

5   this meeting?

6                   The answer -- and I think they put this

7   up earlier -- was Mirror Worlds had --  the -- the

8   question was, how do I find my stuff, right?

9                   That they came up with a new way of

10  finding your stuff.  Information is on the computer;

11  it's in folders; you can't find it.  How do I find my

12  stuff?  Apparently, there's a new way of doing it.

13                  When I asked Prager about that, how do

14  you do it, he said:  We use a third-party software.  The

15  search engine that we use is Verity.

16                  So this -- how did they solve the

17  where's-my-stuff problem?  Where's my stuff?

18                  They just walked over, got some

19  third-party software from Verity.  Satow said it was a

20  commodity.  Remember, he said it was commodity.  Oh,

21  yeah, it was available at that time.

22                  They got third-party software.  They put

23  it in their product.  And that was the technology

24  software that allowed them to find their stuff.

25                  So when Lindsay looks at it and he says,

1   what do you before show me your demonstration, what do

2   they show him?

3               They show him a Microsoft operating

4   system, which is a competitor to Apple.  It's not even

5   compatible.  And he says, well, we have this search

6   engine, Verity search engine, running on Microsoft.  How

7   would you like that, Apple?

8               What do you think Apple's going to say?

9   Well, thanks but no thanks, you know.  Thanks but no

10  thanks.

11              Slide 36, please.

12              The other thing about perhaps what was

13  said during this meeting, was Mirror Worlds has this new

14  way of organizing information in a chronological stream.

15              There are problems with that, if you

16  think about it.

17              Think about photographs, right?

18  Photographs come into your system over a period of two

19  or three years, and they're spread out chronologically

20  in a stream.

21              Okay.  Maybe it's better to put them all

22  in a folder labeled family photos or something like

23  that.  And that's what's being referenced here at --

24  this is DX690.  That's where Professor Gelernter is

25  describing one of the problems associated with

1   organizing everything chronologically instead of

2   logically in folders.

3                And I asked Randy Prager about this

4   e-mail, and I said:  What's the problems with the

5   implementation of the mainstream that Mr. Gelernter's

6   discussing here in this e-mail?

7                ANSWER:  It seems to me he's

8   contemplating the problem of showing the stream in a

9   time -- time series.  And he says that's a huge problem.

10  And it is.  It's a problem, because there's some things

11  perhaps you want to store chronologically, and there's

12  some things you want to store logically in folders.  And

13  it was a problem with their system, and even Dr.

14  Gelernter understood that.

15               I also asked Mr. Prager, if you recall,

16  questions about -- he said that they were having

17  problems, because corporate customers looked at Mirror

18  Worlds as having kind of a fancy user interface with a

19  search engine, and that was it.  And he said, yeah,

20  that's how people thought of us.

21               So when Don Lindsay went to meet with

22  them, he would see this system that was really a

23  Microsoft operating system using Verity's search engine.

24  And he looks at it and says, okay, thanks but no thanks.

25  And pretty much everybody else did, too.  I'm not going

1   Cascade on this issue, but it wasn't a commercial
2   success, right?  It wasn't.

3                  They invested $18 million in their
4   company to try to make this, and they came up with
5   Microsoft Office with a Verity search engine.  They
6   didn't even implement their invention.  They certainly
7   didn't.  And it wasn't a commercial success, okay?

8                  And so when Don Lindsay looks at it, he
9   says:  I think that we'll just continue on with our own
10  indexing and search capability.  Politely, he says that,
11  and I'll get to that in just a minute.

12                 DX661, please.

13                 Okay.  If we start at the bottom here,
14  this is -- this is Mr. Lindsay responding to Randy
15  Prager.  And he says:  We are going to continue to
16  refine our existing indexing and file searching
17  technologies and investigate how we might utilize some
18  of our existing patents and designs in our efforts to
19  further simplify the file management experience.  And he
20  says:  I appreciate your time.

21                 And the response from Randy Prager says:
22  Basically sounds good.  You know, Best, Randy.  He
23  doesn't -- he doesn't make a personal attack on him.  He
24  doesn't say:  Well, why don't you take a license to
25  these patents?

question about where are the e-mails.  Where are the

e-mails?  Where are all these e-mails about all these

patent licensing discussions?

                Now, there's also a comment about -- too

many comments about Steve Jobs.  He introduced -- and

this is an event that occurred certainly.  He introduced

Apple's new operating system in 2004, and he said that

many of its features were awesome and revolutionary.

                Well, he says that a lot, because he has

passion about his products.  He has passion about his

company.  And he believes firmly and sincerely and

righteously that his products are better than everybody

else's.  And I believe it, too.  I think most people do.

There's nothing wrong with that.

                Can you play those clips?

                Why don't you play CC01.  This is from

June 2004.

                (Video clip played.)

                MR. RANDALL:  How dare he have such

conviction and passion in his products that he spends a

lot of time and effort in his lifetime inventing and

coming up with.  Why don't we punish him?

                Now, the last event that they attempt to

distort is that eight years -- eight years after this

1    meetings -- it happened around 9/11 eight years after
2    the meeting, they depose a whole slew of Apple employees
3    who are on an e-mail string one or another, and they ask
4    them:  Well, what do you remember about a meeting with
5    Dr. Gelernter or Mirror Worlds, or what do you remember
6    about this meeting and what do you remember -- you know
7    what -- and they say:  I don't remember.  I don't
8    remember.
9                    Is that really criminal?
10                   Prager didn't remember it, and it was
11   supposed to be a really important meeting for these
12   guys.  And it's okay.  I don't blame them, and I think
13   that's natural.
14                   But how can you possibly punish and say
15   the things that were said about Apple employees because
16   they couldn't remember some meeting or some event that
17   they had little or no involvement with?  Eight years
18   later.
19                   These four events that I just talked to
20   you about, they spent their entire case putting on.
21   What about the patent case?  I mean, I thought we were
22   here to talk about the patent case.
23                   And I'm going to talk about it right now,
24   but I spent my time and I'm going to spend my time right
25   now talking about the patent case and explaining why we

1   don't infringe, and, uh, these patents are invalid.

2              But this other stuff -- there are four

3   events, and they're really not in any dispute.  What's

4   in dispute is the characterization and the spin that

5   they put on them; and it's improper, it's mean spirited,

6   and it's not appropriate.

7              Now, let me go through just a couple of

8   issues.  The -- one issue before I move on.  They claim

9   that there are all these e-mails and everything else,

10  and they claim -- I mean, their theory really is that

11  Apple went and they stole this technology in 2001.

12             And -- and then they -- what did they do?

13  Did they develop it?  I think that's what their

14  suggestion is.

15             If Apple had done that, there would be

16  thousands and thousands and thousands of e-mails and

17  development documents and research and development

18  documents, right?  Not just a few e-mails.  There would

19  be thousands and lots of development topics.

20             And why would Apple ever be interested in

21  going off and licensing and checking out Coverflow?

22             Apple has Coverflow.  They licensed it in

23  2006.  They licensed Coverflow in 2006, some five years

24  after they, apparently, stole the idea.

25             If they stole the idea and implemented

1    of these would be thousands of documents, and they
2    would never even need Coverflow.

3              You know, Apple is sitting here in this
4    case because they were sued for infringement.  There was
5    never ever any suggestion by these guys that Apple
6    infringed, right?

7              There was no evidence at all ever, from
8    any of the inventors, from Mirror Worlds, from
9    Plainfield, from Recognition Interface, no one ever
10   claimed that Apple infringed.

11             No one ever said:  Maybe you need a
12   license.  Maybe you infringe.  Maybe you, you know,
13   should talk to us about that ever.  The lawsuit was
14   filed, and that's the first notice of it.

15             Now -- can you go to Tab 1, please?

16             We went through this case, and we
17   presented evidence regarding the patent claims and what
18   they require, and the key concepts of each patent claim.

19             Now, that -- and the board is right here
20   in front of you.  Across the top shows all the claims
21   that are at issue in the case, and then those colored
22   summaries down on the left are, obviously, the key claim
23   elements that are in these claims.

24             Apple -- they, Mirror Worlds, has to show
25   and prove to you that Apple's operating systems perform

1   each and every one of these.  Apple doesn't have to do

2   this, but we have affirmatively proved we don't do any

3   of them.  There can't be infringement.

4           So the first one -- let's go to -- I'm

5   going to show you the claims briefly.

6           Let's go to Tab 2.

7           So each of the claims are at the back of

8   the patents, the asserted claims, and you can see what

9   we have done.  We've summarized stream.  And in yellow,

10  that's where the stream elements appear.  In purple,

11  that's the timestamp to identify.

12          Go to the next slide.

13          '427 claims, and these are, you know,

14  Claims 1, 8, 16, 18, and 25, all on this page, and

15  they're color coordinated with the elements, okay?  And

16  I'm going through this pretty quickly, but if you look

17  at them, that's where they are, okay?

18          And the same thing with the '313.

19          Now, if any of those are missing -- see,

20  they have to prove all of them.  If any are missing,

21  Apple doesn't infringe.

22          Let's go to 5.

23          Now, so the time-ordered stream, all of

24  the yellow items in the claims, they have to prove that,

25  and the Court has said that it's a time-ordered sequence

1   of document photo functions as a diary of an entity's

2   entity's electronic life.  And it has three main

3   portions:  Past, present, and future.

4                    Do you see that?

5                    Now, as we've said before, Macintosh has

6   a hierarchical file folder system.  It requires user

7   names, and those -- that is exactly what this whole idea

8   was attempted to avoid, right?  They are fundamentally

9   different.  I said that at opening, and I mean it, and I

10  proved it.

11                   Now, the Spotlight Store, it's not

12  time-ordered, right?  You heard that, and you had the

13  proof from the source code.

14                   John Hornkvist testified -- and he was --

15  there was really no challenge on that, right?  He said:

16  Listen, the source code is clear that we don't do it.

17  Spotlight Store is not time-ordered, period.

18                   What did they do to question him?  They

19  just avoided it.

20                   It's ordered by ID number, and merely

21  searching for documents and sorting them by date, that's

22  something that was well known before the Mirror Worlds'

23  patents.  That's not the invention.

24                   Now, the other issue, Spotlight is not a

25  diary of a person's electronic life.  It certainly

1    ~~isn't. They just avoided that completely. They really~~
2    didn't put any evidence on that.
3                    That it's a diary of a person's
4    electronic life, and Spotlight can't be sorted by future
5    date.  There just aren't future dates in Spotlight.
6                    And so Apple does not meet that
7    limitation.  They cannot infringe independently of
8    anything else.  And we don't have the burden to show
9    that.
10                   Next one.
11                   No mainstream.  And this one is a pretty
12   simple one.  The mainstream is inclusive of every data
13   unit, all right?  And Spotlight is not a mainstream, as
14   it does not have every document in the system.
15                   Now, do you remember the inventors told
16   the Patent Office:  You have to have every document in
17   the system?
18                   Let's go to the next slide.
19                   All right.  Mirror Worlds told the
20   office -- the Patent Office -- and they had to amend
21   their claims to get this patent out, and they said the
22   amended claims -- the invention, as recited does not
23   permit data units to be removed from the mainstream and
24   still remain in the computer system.  You can't do that.
25                   And then I asked Dr. Levy, their expert,

1   to conform, lined up, for instance, if any data unit or

2   documents in the computer are not maintained in this

3   mainstream, which as they say is Spotlight, as the Court

4   defined it, then the system does not infringe, right?

5             And he says:  Yeah.  We have to be sure

6   what a data unit is.

7             But we know what that is.  It's a piece

8   of information that's important to the user or has some

9   significance.

10            And he says:  But if you're looking at

11  the Court's data unit, that's correct, all right?

12            Now, we showed that our operating system,

13  Apple's operating system, has a privacy folder, right, a

14  privacy folder for you to put your important documents

15  in and take them out of the kind of public spotlight or

16  the ability to search those documents.

17            It's clear proof of non-infringement.  We

18  have a specifically designated spot to put your

19  important documents outside of Spotlight, so they can't

20  be viewed in searches by your kids or whomever,

21  colleagues.

22            Now let's go to the next slide.

23            This is Dr. Levy's opinion on that, and

24  he said:  I believe any document that the user

25  designates that he doesn't wish in the Spotlight Store

1   would fall into the category of non-infringement, the

2   user.

3                  How does he know that?  Does he -- does

4   it take a computer science degree to figure that one

5   out?  That when Apple says:  Here's a privacy folder;

6   you can put that which is important to you in there to

7   keep away from the spotlight, that right there is

8   non-infringement, plain and simple.

9                  And it's clear, and they didn't -- they

10  can't possibly avoid it.  And we showed it, and they

11  just haven't dealt with that issue at all.  They've

12  ignored it.

13                 Now -- let's go to the next slide.

14                 All right.  Timestamp to uniquely

15  identify.  This is another important one.

16                 Timestamp to identify means a date and

17  time value that uniquely identifies each document.

18  Spotlight does not use a date and time to uniquely

19  identify a document.  Spotlight uses the unique ID

20  numbers, remember?

21                 And I showed you, and we showed a number

22  of windows showing, that there's oftentimes the same

23  date in the system at Apple.  And Apple doesn't really

24  care because it uses the unique ID number.

25                 And when I asked Professor Lansdale, with

1   his time-ordered diary:  Does each document have a date

2   and timestamp, he said:  Well, of course it does.  You

3   have to have that date and timestamp to put it in order.

4              This makes sense.  They are two

5   fundamentally different systems; Apple's file folder

6   systems; this time-ordered sequence of documents.  If

7   you're going to have a time-ordered sequence of

8   documents, you better have a timestamp that you can use

9   to put them in time order.  That makes sense.  Apple

10  simply doesn't do that.

11             And the key here is that that date and

12  time value has to uniquely identify each document.  It

13  simply doesn't.  The fact that we have multiple

14  documents with the same date and time on it proves that.

15             And, again, we don't have to prove it,

16  but we proved non-infringement.

17             Next one.

18             Two operating systems.  There are two

19  operating systems that are required.  I didn't hear any

20  evidence on that.

21             Macintosh is an operating system.  It's

22  not a stream-based system.  And they didn't show how it

23  utilizes two operating systems.

24             Let's go to the next one.

25             Receding foreshortened stack.  We spent a

1    dot of time coming here.  And they're all never dealt

2    with this Cowart reference, right?

3                    I mean, you can't go to the Patent Office

4    on one hand and say:  We deserve the patent.

5                    The Patent Office shows them Cowart and

6    says:  I don't know.  You're not going to get this

7    patent.  Look at Cowart's prior art stream of documents.

8    I don't think you're going to get the patent.

9                    And they say:  No, no, no, no, that's not

10   our invention.  That's not our invention.  Our

11   invention -- see, in that -- in Cowart, the windows

12   don't get smaller towards the bottom of the stack.  The

13   important distinction highlights a key aspect of the

14   streams of the present invention, okay?

15                   They're pointing out to the Patent

16   Office, saying:  A really important part of our --

17   our -- our invention is that these document

18   representations get smaller as they go to the back.

19                   They recede, okay, and they get

20   foreshortened.

21                   And we simply don't do that, and we

22   proved it.

23                   Go to the next one.

24                   So this is a demonstration or a display

25   of Coverflow, and Coverflow is not receding, right?  We

1  heard that. They told the source code, and you heard it

2  from multiple people.  The source code dictates where

3  those images appear, and they appear in one flat plane,

4  okay?

5          They do not recede, and they don't get

6  smaller as they recede.  And that was a key, important

7  aspect of the invention.  That's what they told the

8  Patent Office in Cowart, okay?  And that's what those

9  red lines there are showing.

10          Now, remember Levy, when I asked him

11  about this?

12          Let's go to Slide 32 for a moment.

13          Levy was all over the map on this issue.

14  He had to revise his opinion on the Coverflow numerous

15  times.  So he first said that -- he testified that there

16  were two stacks in Coverflow.

17          Then he revised his opinion and said:

18  Well, I think I'm going to have to revise what I said

19  about the first in the stack.

20          And then he further revised his position:

21  I think I have to revise that again.

22          Remember, I asked him, I said:  You spent

23  two years on this case.

24          And he came for his deposition, and he

25  revised his opinion three times in the deposition.  And

1   he did it because he was trying to get information
2   he's trying to stretch these claims; he's trying to
3   manipulate and twist these claims.

4              The bottom line is, the claims require a
5   receding back into space and foreshortened, getting
6   smaller, and we don't do it.

7              We heard from our witnesses, multiple
8   witnesses, the source code dictates that those Coverflow
9   albums are flat, and they don't -- they don't go back
10  into space, and they don't get smaller.

11             And I asked Levy about lighting and
12  everything else, and he said:  Yeah, that's not in the
13  claim.  It's not in the patent.  You can look.  Lighting
14  and all of those other things, not in the patents.

15             Let's go to 13 -- the next.  Oh, I'm
16  sorry.  Yeah, 13.

17             Displaying of cursor without --
18  displaying a glance view in response to sliding the
19  cursor over the stack.

20             Again, when you slide the cursor without
21  clicking, it has to show the glance view, right?

22             Let's go to Clip 6.

23             (Video playing.)

24             (Video stopped.)

25             MR. RANDALL:  Now, watch that black

1    cursor's going across the albums, right?  Nothing's

2    happening.  Where's the glance view?  Nothing, okay?

3    We don't have to prove non-infringement, but that proves

4    it right there.  There is no glance view.  You slide

5    that thing across without clicking, the glance view

6    doesn't pop up, okay?  Nothing happens.

7                    Let's go to 14.

8                    I just went through all of these key

9    elements of their claims.  Apple doesn't do any one of

10   them, okay?  They have to prove -- it's their burden to

11   prove each and every one of those that Apple does.

12   Apple doesn't do any of them.  We don't infringe, and we

13   don't infringe for multiple reasons.  And while we don't

14   have the burden, we have affirmatively proved it.

15   15.

16                    Now, these are all prior inventions.  It

17   says:  Where's my stuff was solved before Mirror Worlds.

18   There was a suggestion that this whole idea about lots

19   of documents and folders and everything else in the

20   system was something that he first came up with.  Well,

21   look, a lot of people were thinking about this; a lot.

22   And you heard from them.  I mean, that is a fact.

23                    A lot of people were thinking about this

24   problem in the computer industry all over the world, and

25   you heard from these three individuals about how to find

1   your staff on computer systems well before 1996 when

2   Mirror Worlds filed for the patents, in June of '96.

3               Let's go to 16.

4               Here is the timeline of art.  And if you

5   look at the invalidity bar, that little red thing down

6   in the bottom right, that is the date -- the critical

7   date, okay?

8               So if there's prior art that was publicly

9   available before that date, and it discloses the

10  inventions, the patents are invalid, okay?

11              And so we're going to go through each one

12  of these categories of key prior art.

13              First of all -- flip -- can you flip --

14  okay.

15              This -- these are the visual

16  representations.  And I think Levy said:  Oh, I didn't

17  see any of these visual representations in the prior

18  art.

19              Well, look at -- look at the receding

20  foreshortened stack in Workspace; look at it in Lucas --

21  so right here in Lucas, receding foreshortened stack.

22              Okay.  I need that up.

23              Look at it right here in Workspace,

24  receding foreshortened stack.  Look at it right here,

25  same thing.  See, it gets smaller, goes back in space,

1    all of those.  Goes back into space and puts together
2    And they said that they were the first.  They weren't
3    the first.

4                Go to the next one, 18.

5                Okay.  Prior art:  Organizing in
6    chronological order.  Remember this great concept of
7    saying let's put it all in chronological order, like
8    your life, like a diary?  Okay.  It's been done before.
9    It has.

10                And I think there was suggestion:  Oh,
11    I -- there he goes again.  He was going to say that.  I
12    knew he was going to say it.

13                Well, of course, he knew I was going to
14    say it, because we've disclosed all this art to them,
15    and it's been our case for a long time that he didn't
16    come up with this stuff.

17                Do you remember MEMOIRS, Professor
18    Lansdale, saying:  It's a diary; it's an electronic
19    diary?  That was specifically what that system was
20    designed to do.  It had a timestamp.  It had
21    everything -- it organized all different types of data
22    in one time-organized diary, electronic diary, and they
23    did it well before 1989.

24                I'm running out of time in a hurry.

25                Let's go to the next slide, 20.  I'm

1   carry. Sort pop by date.

2                   Okay.  Here are other references -- much

3   of the same references showing sorting documents by

4   date, right?

5                   Remember Workscape?  It split all these

6   documents and sorted them by date.  Piles sorted them by

7   date.  Obviously, MEMOIRS sorted them by date.

8                   Go to the next slide.

9                   Now, prior art:  Sliding the cursor over

10  the stack to display glance view without clicking.

11                  Do you remember Gitta Salomon?  She came

12  in from -- she doesn't work at Apple anymore, but she

13  came in, and she showed her Piles demonstration.

14                  The video was played at the 1994 CHI

15  Conference -- or maybe it was '92, but it was well

16  before the '96 patent.  And she showed how you take the

17  cursor and scroll up and down and show the glance view.

18                  Also, in 1979 at MIT, you could slide

19  your finger along that -- that stack right there and

20  show glance views.  That idea was not new either.

21                  Let's go to the next slide.

22                  Now, what we showed, we showed each and

23  every one of the elements.  And so Workscape, along with

24  Piles, discloses every single element of these claims.

25                  Workscape with SDMS discloses every

1    single element of these claims, Workscape and MEMOIRS

2    and Piles discloses these.

3                   And so any combination of these shows all

4    of the components of the inventions, all of them.

5                   Let's go to the next slide.

6                   All right.  So here is Workscape plus

7    Piles, and you see that each of the components of the

8    claims are shown in -- in the combination of the two

9    references, and that is completely appropriate.

10                  That's what happens in the computer

11   industry.  You look at what's out there, and you say:

12   Okay.  I can put this system together.

13                  Let's go to the next one.

14                  Workscape plus SDMS.  SDMS was the MIT

15   work in '79, plus Dr. Lucas's work at Workscape, showing

16   you the combination of the two.

17                  All right.  Now, I just have a few

18   minutes left.  Let me -- let me talk about damages for a

19   minute.

20                  They came in here, and they claimed that

21   they're entitled to -- their expert first said they're

22   entitled to $625 million, and then right before the

23   close of the evidence, the expert said:  Well, it's only

24   half of that, okay?

25                  Remember?  Because some of the other

1    products are worth an issue?  So it's only half of what

2    all right.  So roughly $300 million.

3                 And then Mr. Carroll gets up there and

4    says:  Well, no.  Actually, for each one of those

5    patents, it's 322, 336, 320.  How did it go from half to

6    nearly a billion dollars?

7                 Also -- let's show 40.

8                 Now, you heard from our expert -- and I

9    asked their expert, I said:  Remember the cards?  They

10   first looked like one side were down and one side was

11   up, and I said:  Isn't it true that they're -- both

12   sides are up?  And the answer is yes.

13                So at the hypothetical negotiation, what

14   would occur, both parties have to have their cards up,

15   okay?

16                And what Apple would learn is that they

17   were running out of business.  At the time of the

18   hypothetical negotiation in 1990 -- in 2004 -- 2004,

19   Mirror Worlds was running out of business, and they were

20   going to sell their patents for $200,000, remember?

21                They didn't commercially -- they weren't

22   successful in commercializing.  They didn't achieve any

23   significant licensing partners.  They sold their patents

24   for $210,000.  And they had attempted to contact these

25   folks, Google, AOL, and Yahoo!, for some money or

1    licensing deals and were unsuccessful.

2              So they really didn't have much going on,

3    and they ultimately sold their patents for $210,000.

4              Let's go to 33.

5              Now, here's Frank Weil.  He made a sale

6    for $210,000.

7              And here's Plainfield.  They purchased

8    them for $5 million.  And that is during the period of

9    the hypothetical negotiation, right?

10             Between this time or right before this

11   time and this time (indicates), the hypothetical

12   negotiation would have taken place, and what their

13   expert says is it would have been a license.

14             No.  The patents were for sale, lock,

15   stock, and barrel, and they were for sale for 210,000

16   here and 5 million here (indicates), and both experts

17   say the hypothetical negotiation would have taken place.

18             So if there was a hypothetical

19   negotiation, and both sides had their cards up, what

20   would have happened?  And they wanted to strike a deal,

21   which is part of the deal -- part of the rules.

22             The entire patents would have been sold

23   for somewhere between that range likely, okay?

24             Somewhere between that range.  If it was

25   a license, it would be less, right?  Because you're not

1    buying everything.

2              Those are the facts.  We don't have to

3    make this up.  They say:  Let's play pretend; let's make

4    it up.  We really don't have to make it up, because it

5    happened.  And it wasn't a license.

6              It would be different -- if it was a

7    license here and a license here (indicates), we'd have a

8    little better facts.  But this is a sale.  So we know

9    it's less than the cost of all the patents, lock, stock,

10   and barrel.

11             So the hypothetical negotiation, you look

12   at this date; you look at that date; you say the

13   hypothetical negotiation would take place in between

14   there; and it would be less than the sale of the whole

15   patents because they say they would have been a lump-sum

16   license, so something less than that.  Those are the

17   facts.

18             THE COURT:  Mr. Randall, you have about

19   five minutes left.

20             MR. RANDALL:  Thank you, Your Honor.

21             Let's go to 41.

22             You remember our expert?  Common sense,

23   right?  He said:  It's like you're buying a house,

24   right?

25             Let's figure this out.  Let's figure out

1   that the cost would be -- $210,000 later -- Somebody comes
2   in here, the same house sold for 5 million, right?  That
3   was the Plainfield deal.  Plainfield deal.

4              So $210,000 in June of 2004, and then the
5   Plainfield deal is in 2007 for 5 million.  What would
6   the house sell for in between?  Are you kidding?

7              Well, actually, we should revise that,
8   because I think Mr. Carroll said that should be a
9   billion dollars.  That's nonsense.  You know, you've got
10  to look at the facts.

11             These were other licensing deals taken by
12  Apple around the same time, which our expert said
13  actually have more relevant technology, okay?

14             Somewhere in between $210,000 and 5
15  million, that's for buying the house, not renting the
16  house.  Renting the house would be less.

17             Now -- let's go to 34.

18             Now, we've heard throughout this case
19  that this case is about Dr. Gelernter and about, well,
20  Apple just doesn't care about this case.  They brought
21  this case.

22             They opened up a company -- this hedge
23  fund in New York opened up this company in Tyler, Texas,
24  and frankly, they didn't even know where Tyler, Texas,
25  was.  If you watch Peter (sic) Stone on that videotape,

1   he said, you know, where are you incorporated? And he

2   said:  Tyler, Texas?  He didn't even know where it was.

3   They didn't show up, right?  Where are they?  They're

4   the ones with their hand out, right?  Where is

5   Plainfield?  Where is Ed Stone?  Where are any one of

6   these folks?  Where's Frank Weil?  He gets 19 percent.

7   These guys get 74 percent.

8                   That's why we're here.  We're here

9   because there's a big investment hedge fund up in New

10  York, and a couple of them that bought these patents

11  want to make money off of them, okay?  That's why we're

12  here.  And that's a fact.

13                  Apple has spent its entire corporate life

14  dedicated to making better products for consumers.  They

15  are an amazing company, and they deserve better than

16  this.

17                  Thank you for your time.

18                  THE COURT:  All right.  Thank you,

19  Mr. Randall.

20                  The Court will recognize Mr. Carroll for

21  rebuttal closing argument.  You have 12 minutes left,

22  Mr. Carroll.

23                  MR. CARROLL:  Thank you, Your Honor.

24                  Let me thank you again.

25                  And they say, why is Apple here?  You

1  know, somebody said that's tragic as I guess affection
2  murdered by facts.  Let me show you how this is going to
3  murder his facts.

4            When you get Judge Davis's Charge, this
5  big thick instructions document that he read to you,
6  look at Page 25.  Write that down, if you would.  And
7  let me tell you why I'm suggesting that.

8            On Page 25, when Judge Davis is talking
9  about what you should and shouldn't consider in reaching
10  the damage issue, which is what this case is about,
11  here's what he says:  You must also bear in mind that
12  the hypothetical negotiation is deemed to be arm's
13  length, an arm's-length transaction, and any prior
14  royalty arrangement between a patent owner and a related
15  entity or non-competitor is not determinative when
16  analyzing the hypothetical negotiation.

17            Here's what that means.  You remember
18  Bratic, who's a certified public accountant, sat on that
19  witness stand and told you that none of those
20  transactions that Mr. Randall just pointed to were
21  arm's-length transactions.  They were brother-in-law
22  deals, the right pocket/left pocket.  The same people
23  were involved in both companies.

24            They don't even dispute that.  But they
25  want you to walk into that jury room and violate your

 1    oath that you took when you said you would do what the
 2    law says.

 3              And Judge Davis told you what the law
 4    says:  You can't use those kinds of things.  But their
 5    whole damage model is built on that house of cards.

 6              Go to Farmer Brown No. 3.

 7              Let me tell you what I'm talking about
 8    here.  Okay.  You remember our farmer here.  He's caught
 9    the oil company who's drilled a well on his property
10    without his permission.

11              Now, that's like patent infringement.
12    Remember, it's a trespass.

13              Now, the law says that he's entitled to
14    make the oil company pay up, just like the patent owners
15    here are entitled to make those trespassers pay up.

16              Here's what they're suggesting to you
17    that this guy would have done.  He would have gone to
18    British Petroleum here, and he would have said:  Okay.
19    What are you going to give me?

20              And British Petroleum would have said:
21    How about a thousand bucks?

22              And he would have said:  Okay.  That's
23    great.  Why a thousand?

24              Well, that's what we paid the people next
25    door for leasing their property.

1    and tensions up and down that make sense?

2    What would be the first question that that guy would

3    ask?  What have you found?  What's down there?  I'll

4    share with you.  If it's a little, I get a little, and

5    you get a little.  If it's a lot, we both get a lot.

6              That's the damage model we brought to

7    you, 'cause it makes sense.  What they're bringing to

8    you makes no sense.  Why would a patent owner ever do

9    that?  And the answer is, they wouldn't.  They wouldn't.

10             You know, their damage man, maybe in one

11   of the best Perry Mason moments of the trial when my

12   friend, Joe Diamante, over here was after him, he said:

13   Under your analysis, it wouldn't matter whether Apple

14   made a dollar or a billion dollars, you'd still give us

15   that same number?

16             And what was his answer?  That's right.

17             You know, we all remember that great

18   scene in Wizard of Oz when the little dog pulls the

19   curtain back, and there's the -- turns out the wizard is

20   nobody other than some old guy pulling levers, and he

21   makes the wizard voice say:  Pay no attention to the man

22   behind the curtain.

23             That's what they want you to do.  They

24   want you to ignore this ton of money they have made

25   selling the patents that we have the ideas behind.

 1                Let me guide you into more points about

 2      damages, and then I want to talk a little bit about what

 3      Mr. Randall said.

 4                And I guess I drew blood.  He bowed up

 5      pretty good.  But, you know, old Harry Truman says:  If

 6      you can't stand the heat, don't go in the kitchen.  And

 7      that means don't take other people's stuff and expect

 8      them to roll over just because you're who you say you

 9      are.

10                Number one, remember the testimony that

11      drew all the objections over here about this company

12      called Intellectual Ventures?  You remember that.

13      Intellectual Ventures, it turns out, is a company owned

14      by the big boys on the west coast, Intel, Microsoft, and

15      Apple.

16                And you remember the testimony is that

17      not once, but twice, Intellectual Ventures tried to buy

18      these patents; one time, before the suit, for 7 million

19      bucks, plus 20 percent carried interest; and another

20      time, after the suit, for 30 to $50 million, plus 10

21      percent.

22                They don't want you to remember that.

23      They don't want you to think about that.  They want you

24      to think about $200,000, which they spent more during

25      this trial, during this trial than they would pay this

1   can for his before work.  That's not right.  That's just

2   not right.

3           The second thing is, is that when Yale

4   bought into the little company, Mirror Worlds, you heard

5   Dr. G say, they evaluated the company way back then at

6   50 million bucks.

7           Now, did it make it?  No.  It failed.

8   But ask yourself this:  If Apple hadn't been infringing

9   and, in fact, had done what it should have done and

10  played fair and taken a license, that little company

11  wouldn't have failed.  Those people wouldn't have lost

12  their jobs.  That's why we're here.

13          Okay.  So that's -- that's one thing to

14  look at in that Court's Charge, and I think -- and by

15  the way, this whole business about triple dipping, look

16  at Judge Davis's questions that he asked you.  These are

17  his questions.

18          You know, if Mr. Randall has a fuss, he

19  ought to take it up with the Judge.  These are the

20  Judge's questions.  He wants damage numbers for each

21  separate patent.  That doesn't mean we're going to get a

22  billion dollars.  That just means the Judge wants to

23  know why you believe or if you believe what the value is

24  of the reasonable royalty for each patent.

25          The reason these numbers made sense to me

1   ~~is, they never could infringed at the same time. That~~

2   would have all been part of the same hypothetical

3   negotiation.

4            The numbers are a little different, based

5   on the different products; but that's up to you.  I

6   think they're all around 300, 300-and-a-quarter apiece,

7   if you believe that we were, in fact, the victim of

8   patent infringement.

9            So let me get to a couple of other

10  points.

11           Let's put up No. 1183.

12           Now, one of the things that you know by

13  now about this case is that there were a lot of hired

14  people who testified.

15           Now, blow that up.

16           There are two pieces of evidence in this

17  case that weren't paid for.  This is one of them.  This

18  is that article that Mike Satow sent his old Chairman of

19  the Board when he saw it in 2007, three years ago, from

20  this Information Week, this business technical

21  publication.

22           Look what it says:  It says:  Back in

23  2001, noted computer scientist, David Gelernter, started

24  a company called Scopeware that proposed a similar

25  scheme to view files in a timeline.  The market wasn't

 1  ready to rethink the desktop on back then.  Jobs and his

 2  team have refined Gelernter's vision, and this time it

 3  looks more promising.

 4                  You remember, I talked to Dr. Tribble

 5  about that, and I said:  They're accusing you in that

 6  article of patent infringement.

 7                  And he said:  Yeah, pretty much.  Pretty

 8  much.

 9                  That's nobody's paid testimony.  That's a

10  technical journal.  Think about that when you're trying

11  to decide which one of these paid witnesses to listen

12  to.

13                  Let me get you to pull up -- and the last

14  thing, before I forget about it.  You remember I talked

15  to Dr. Tribble about the one e-mail that we found where

16  he was asked to think about Dr. Gelernter?  You

17  remember, in 2004, the Navy wanted him to speak at a

18  conference?

19                  And the question was:  Rethinking the

20  Desktop Metaphor.  And the request of him was --

21                  And let's pull up 1995, James.

22                  And the question was:  Will you have --

23  lift that out, that second paragraph.

24                  Now, this is -- this is -- this is 2004.

25  After all of these prior art references have come and

 1      came shot through maybe Gelernter's patents invalid

 2      look what the Navy man was saying to him.

 3                  Gelernter argues the current desktop

 4      metaphor is dead and proposes Lifestream instead.  Is

 5      this a good proposal?  Are there others better?

 6                  Now, of course, Dr. Tribble can't

 7      remember, but if they really and truly thought and had

 8      evidence that this wasn't a new idea that he came up

 9      with when the Patent Office patented it, why wouldn't

10      Dr. Tribble say:  You know what?  As soon as I got that,

11      I wrote them back and said Gelernter's ideas are old

12      news.  There's nothing new there.  It's not a new

13      solution.  So forget about it.

14                  They didn't do that, because it's not

15      true.  It's just not true.  The Patent Office looked at

16      a lot of the stuff that they want you to focus on.

17                  Let's go to that one slide, James,

18      that --

19                  THE COURT:  You have about a

20      minute-and-a-half left.

21                  MR. CARROLL:  Thank you, Your Honor.

22                  The Apple's invalidity friends.

23                  Okay.  These are the folks they paid to

24      come to Tyler and try to kill Gelernter's patents.  And

25      you know what?  None of them had articles in the New

1  Rock Stars.  None of them were called rock stars, and

2  yet they all want to take a swing at it.

3                  And they're getting paid to do that, and

4  they're sitting right out there in the peanut gallery

5  today with the meter going.  Pretty good gig.

6                  So what is this really about, Ladies and

7  Gentlemen of the Jury?  This is about a mirror world,

8  and it's a mirror world, mirror world on the wall.

9                  And Apple looked into that mirror world

10 and wanted that mirror world to tell it that it was the

11 most revolutionary sexy rock star in the world of

12 computers, and the mirror world said:  No, you're not.

13 This guy is.

14                  And they didn't like that, and so they

15 decided they were going to come down to Tyler, after

16 having gotten caught taking his property, and kill his

17 ideas.  And all we've got to protect ourselves is you.

18                  They can get on us for teaming up with

19 the people that have a little money.  How do you think

20 we could have stayed in the game with these guys?  How

21 do you think we could fight these guys without a little

22 bit of backing on our side?

23                  So go into that jury room.  Think about

24 what they have said before and after.  Think about the

25 money they're making.  And the Judge said you're looking

1   for the truth.  You know what it is.  You say it in the

2   first day, and we're confident your verdict will say

3   that.

4                   Thank you.

5                   THE COURT:  Thank you, Mr. Carroll.

6                   MR. CARROLL:  Thank you, Your Honor.

7                   THE COURT:  All right.  Ladies and

8   Gentlemen of the Jury, that concludes the closing

9   arguments.  You've heard everything from opening

10  statements, all of the evidence, the Court's Charge, the

11  closing arguments, and it's now time for you to really

12  go to work on this case.

13                  And so I'm about to retire you to the

14  jury room, and my instruction about not to discuss this

15  case among yourselves no longer applies.  I'm

16  instructing you to discuss this case among yourselves

17  and to reach a verdict in the case.

18                  So there should be lunch waiting on you.

19  Select your foreperson, decide how you want to proceed,

20  and you're in the driver's seat now.  We'll be waiting

21  to hear back from you.

22                  The jury is excused at this time.

23                  COURT SECURITY OFFICER:  All rise for the

24  jury.

25                  (Jury out.)

THE COURT: All right. Please be seated.

1

2          Anything further from the Plaintiff?

3          MR. CARROLL: No, Your Honor.

4          THE COURT:  Anything further from the

5    Defendants?

6          MR. RANDALL:  No, Your Honor.

7          THE COURT: All right.  We'll be in

8    recess awaiting the jury's verdict.

9          COURT SECURITY OFFICER:  All rise.

10          (Recess – Jury deliberations.)

11          (Jury out.)

12          THE COURT:  Please be seated.

13          All right.  We have a note from the jury

14    that says:  Request for Dr. Feiner's testimony (sic) and

15    cross-examination.

16          Plaintiff have a position?

17          MR. CARROLL:  Your Honor, I think you

18    should tell them that they are to rely on their

19    memories.

20          THE COURT:  Defendants?

21          Would you like to go in the jury room and

22    just summarize it for them?

23          MR. RANDALL:  I would, Your Honor.  But I

24    wasn't sure, did it say cross or did it say direct and

25    cross?

1       THE COURT:   Both

2                   MR. RANDALL:  Yeah, my suggestion is,

3       perhaps, give them the transcript.

4                   THE COURT:  Well, my general practice is I

5       just don't get into that, or we will be here for forever

6       and then -- anyway, I plan to respond:  Witness

7       testimony is not available.  You will need to rely on

8       your recollection of the testimony.

9                   Any objection?

10                  MR. CARROLL:  Not by the plaintiff, Your

11      Honor.

12                  MR. RANDALL:  I would rather that they get

13      the transcript.

14                  THE COURT:  So is that --

15                  MR. RANDALL:  It is an objection.  I would

16      rather they get the transcript.

17                  THE COURT:  All right.  Objection is

18      overruled.

19                  In recess.

20                  COURT SECURITY OFFICER:  In recess.

21                  (Recess pending jury verdict.)

22                  (Jury out.)

23                  THE COURT:  Please be seated.

24                  All right.  The Court has been advised

25      that the jury has reached a verdict.

Is there anything before me prior to the
1
2  jury in?

3                      MR. CARROLL:  Not from the plaintiff,

4  Your Honor.

5                      MR. RANDALL:  No, Your Honor.

6                      THE COURT:  All right.  Please bring the

7  jury in.

8                      COURT SECURITY OFFICER:  All rise for the

9  jury.

10                     (Jury in.)

11                     THE COURT:  Please be seated.

12                     All right.  Members of the jury, I

13  understand you have reached a verdict.

14                     FOREPERSON:  (Nods.)

15                     THE COURT:  If you will, please hand your

16  verdict form to the Court Security Officer.

17                     (Verdict given to the Court.)

18                     THE COURT:  All right.  Ms. Ferguson, if

19  you will read the verdict, please.

20                     COURTROOM DEPUTY:  In Case No. 6:08cv88,

21  Mirror Worlds versus Apple, Verdict of the Jury.

22                     Answer as to Question 1A as to

23  infringement as to all patents, the '427, '227, and

24  '313, the answer is "yes."

25                     Under 1B willful infringement, the

1    answers are based on all three patents.

2                   Question No. 2, answers as to the '427,

3    '227, and '313 patent, all answers are "no."

4                   Under damages, under the '427 patent, the

5    answer is "208.5 million."

6                   Answer as to the '227 patent, "208.5

7    million."

8                   Answer as to the '313 patent, answer is

9    "208.5 million."

10                   Signed and dated on this day by the Jury

11   Foreperson.

12                   THE COURT:  Thank you, Ms. Ferguson.

13                   Is there any request to poll the jury?

14                   MR. CARROLL:  Not from the plaintiff,

15   Your Honor.

16                   MR. RANDALL:  No, Your Honor.

17                   THE COURT:  Okay.  Thank you.

18                   All right.  Members of the jury, I want

19   to thank you on behalf of the Court and the members of

20   both sides for your attendance here, all of your hard

21   work, your attention.

22                   You have worked very, very hard this week

23   to reach the verdict that you have, and I want to thank

24   you for that.

25                   Now, I have previously instructed you

1   that you are not to discuss the case with anyone, I now

2   relieve you from those instructions.  You are free to

3   discuss the case with anyone you wish.  But you are not

4   required to discuss the case with anyone.

5              If anyone should contact you and you

6   don't want to discuss the case with them, simply don't

7   discuss it with them and tell them so.

8              If anyone approaches you and you don't

9   want to be approached, just please let me know.  But

10  those are complete -- all of my instructions.

11             Any questions from any members of the

12  jury?

13             Okay.  Thank you very much for your

14  service.  You are excused to the jury room.  Someone

15  will be there in a moment to dismiss you.

16             COURT SECURITY OFFICER:  All rise for the

17  jury.

18             (Jury excused.)

19             THE COURT:  Please be seated.

20             All right.  Is there anything from the

21  plaintiff?

22             MR. CARROLL:  No, Your Honor.

23             THE COURT:  Anything from the defendant?

24             MR. RANDALL:  Briefly, Your Honor.

25             THE COURT:  Okay.

1

2   abundance of caution -- I don't think it is necessary;

3   but out of an abundance of caution, I renew our motion

4   for judgment as a matter of law that we brought after

5   the close of plaintiff's case and also after the close

6   of the case and before it went to the jury.

7                     I also intend to file a written motion

8   for judgment as a matter of law and, alternatively, a

9   request for new trial.

10                    And the last thing, Your Honor, is that I

11  would ask if the Court -- when the Court might give us a

12  schedule for our inequitable conduct phase of this case?

13                    THE COURT:  The inequitable conduct is

14  concluded.  It was part of this trial.

15                    MR. RANDALL:  I believe that there was a

16  motion in limine that excluded it from the presentation.

17                    THE COURT:  Well, it excluded it from the

18  presentation of the evidence in front of the jury, but

19  the practice is that if you have anything other than

20  what would otherwise come in in front of the jury, that

21  you present that to the Court as part of your time

22  afterhours or during breaks or at the conclusion of a

23  witness's testimony.

24                    MR. RANDALL:  All right.  Okay.  We will

25  file our motions within the time limits.

1                    THE COURT:  Okay.  Very well.

2                    I have been entering a briefing schedule,

3  but what I am going to start doing is just do it

4  according to the rules because I have had some people

5  that didn't like it that way.

6                    So the Court will enter final judgment in

7  accordance with the jury verdict.  I will receive your

8  motions, and then set a hearing on them as soon as we

9  get all of that in.

10                   Unless the parties wish to meet and

11 confer and agree on a tighter briefing schedule than

12 provided by the rules, we will be going by what is

13 provided by the rules.

14                   Okay.  Anything further?

15                   MR. RANDALL:  No, Your Honor.

16                   THE COURT:  All right.  Y'all have a good

17 weekend.

18                   We will be adjourned.

19                   (End of trial.)

20

21

22

23

24

25

1

2

3          I HEREBY CERTIFY that the foregoing is a

4   true and correct transcript from the stenographic notes

5   of the proceedings in the above-entitled matter to the

6   best of our abilities.

7

8

9   /s/_____
     SHEA SLOAN, CSR                Date
10  Official Court Reporter
     State of Texas No.:  3081
11  Expiration Date:  12/31/10

12

13
     /s/_____
14  JUDITH WERLINGER, CSR          Date
     Deputy Official Court Reporter
15  State of Texas No.:  731
     Expiration Date  12/31/10

16

17

18

19

20

21

22

23

24

25