```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
 2                         TYLER DIVISION

 3   MIRROR WORLDS, LLC          )
                                 )   DOCKET NO. 6:08cv88
 4                               )
          -vs-                   )
 5                               )   Tyler, Texas
                                 )   9:00 a.m.
 6   APPLE, INC.                 )   December 9, 2010

 7

            TRANSCRIPT OF POST-VERDICT MOTION HEARING
 8          BEFORE THE HONORABLE LEONARD DAVIS,
                 UNITED STATES DISTRICT JUDGE
 9

10                    A P P E A R A N C E S

11

12   FOR THE PLAINTIFF:     MR. JOSEPH DIAMANTE
                            MR. KENNETH L. STEIN
13                          MR. IAN DIBERNARDO
                            MR. ALEXANDER SOLO
14                          STROOCK & STROOCK & LAVAN
                            180 Maiden Lane
15                          New York, NY  10038-4982

16                          MR. OTIS CARROLL
                            MR. PATRICK KELLEY
17                          MS. DEBORAH RACE
                            IRELAND, CARROLL & KELLEY
18                          6101 S. Broadway; Ste. 500
                            Tyler, Texas  75703
19

20

21   COURT REPORTER:        MS. SHEA SLOAN
                            211 West Ferguson
22                          Tyler, Texas  75702

23

24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25
```

```
 1   FOR THE DEFENDANTS:     MR. JEFF G. RANDALL
                             PAUL HASTINGS
 2                           1117 S. California Ave.
                             Palo Alto, CA  94304-1106
 3
                             MR. KIM MOORE
 4                           PAUL HASTINGS
                             875 15th St., NW
 5                           Washington, DC  20005

 6
                             MR. S. CHRISTIAN PLATT
 7                           PAUL HASTINGS
                             4747 Executive Dr., 12th Floor
 8                           San Diego, CA  92121

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Please be seated.

 3              All right.  Ms. Ferguson, if you will call the

 4    case.

 5              THE CLERK:  Case No. 6:08cv88, Mirror Worlds v.

 6    Apple.

 7              MS. RACE:  Deborah Race on behalf of Mirror Worlds,

 8    and I have with me Ian DiBernardo, Ken Stein, Joe

 9    Diamante, and Alex Solo.

10              THE COURT:  Very good.

11              MR. RANDALL:  Your Honor, Jeff Randall with Paul

12    Hastings for Apple.  And with me are my colleagues Mr.

13    Christian Platt and Mr. Kim Moore.

14              THE COURT:  All right.  We are here for the hearing

15    on the post-verdict motions, and we completed the record with

16    regard to the inequitable conduct yesterday afternoon.

17              The subject matter came up of Apple asking for the

18    unredacted portions of I think it was Defendant's Exhibit 642,

19    which was a seven-page fax transmittal -- or on the front page

20    it says Pages 1 through 7 fax from Richard Milner to Chris

21    Hatchell, and then some pages have been redacted.  And I had

22    asked yesterday Mirror Worlds to provide me with the

23    unredacted copy, which I have received.

24              But I have not had a great deal of time to review

25    it.  It is quite lengthy.  It is 43 pages in length, and I
```

1    guess I would like to inquire how this document was --

2    generally what the 43 pages is, how it was dealt with as far

3    as privilege log, and what privileges were claimed.

4            MR. SOLO:  Your Honor --

5            THE COURT:  If you would please stand.

6            MR. SOLO:  Your Honor, I sent the document.  It

7    should have only been seven pages.  To the extent it was 42

8    pages, it is purely accidental.  It should have only been the

9    first seven pages.  That's how it was dealt with on the

10   privilege basis.

11           THE COURT:  What are the other 36 pages that I have

12   received in this?

13           MR. DIAMANTE:  Your Honor, do you mind if he

14   approaches the Bench so he might --

15           THE COURT:  Excuse me?

16           MR. DIAMANTE:  Do you mind if he approaches the

17   Bench to see what he sent you since he sent it late?

18           THE COURT:  Ms. Ferguson, let them take a look at

19   that.

20       (Pause in proceedings.)

21           THE COURT:  Okay.  Let me have that back, if you

22   would, please.  I have notes in there that --

23           Thank you, Ms. Ferguson.

24           THE CLERK:  We have a clean one, Judge.

25           MS. RACE:  Thank you.

1          (Pause in proceedings.)

2          MR. SOLO:  Your Honor, it should have been just the

3   first seven pages.  The rest were -- the boundaries were

4   different from when we did the production because this was in

5   our review database before all of the privilege analysis was

6   done.  The actual document when we did the privilege check was

7   just those seven pages of fax.

8          MR. DIAMANTE:  The first seven pages.

9          THE COURT:  I'm sorry?

10          MR. DIAMANTE:  Just the first seven pages were part

11   of that facsimile --

12          THE COURT:  So you are saying that the --

13          MR. SOLO:  The next 43 pages were not part of that

14   document -- or the next 36.

15          THE COURT:  Well, some of them seem to relate to the

16   same thing, and specifically what they -- well, let me ask you

17   if pages -- if the other 36 pages, what those pages relate to

18   if they don't relate to this document production?  And have

19   they been produced?

20          MR. SOLO:  The next pages do relate to this document

21   production.  They were checked for privilege.  And to the

22   extent they weren't, they would have been produced.  But we

23   have no way presently of knowing which ones were privilege and

24   which ones were not because this was produced out of a

25   different database.  So this was checked.  And to the extent

1    anything was not privileged, it was produced.

2            THE COURT:  Okay.  And to the extent anything was

3    privileged, were the documents specifically listed on your

4    privilege log?

5            MR. SOLO:  Yes, they were.  And they would have been

6    separate.  And the only seven pages that Apple mentioned would

7    be a single document.

8            THE COURT:  What I am going to ask you to do is take

9    the 43 pages that have been filed with the Court.  I want you

10   to go through those, file a detailed log listing all of those

11   documents, who they are from -- I mean, who they are from, who

12   they are to, the date, and the general subject matter, and

13   whatever privilege you are asserting so that Apple can review

14   that privilege log.  And to the extent any of these are not

15   privileged, produce them to Apple.  To the extent they are

16   privileged, have the privilege log to Apple -- can you do that

17   by noon today?

18           MR. DIAMANTE:  Yes, you should just leave.

19           THE COURT:  Do that by noon today.  Have the

20   privilege log to Apple, and then Apple have a chance to review

21   it.  And I will take up after lunch anything that -- any

22   further requests that Apple might wish to make.

23           MR. SOLO:  Thank you, Your Honor.

24           THE COURT:  All right.  Now, to the matter at hand,

25   I indicated yesterday that I would begin by taking up the

 1    damage issue first.  And I think to the extent that damage is

 2    part of plaintiff's motion for judgment, I will hear from

 3    plaintiff first on that.

 4              MR. DIBERNARDO:  Thank you, Your Honor.  We have

 5    prepared PowerPoint slides, if I may provide that to the

 6    Court.

 7              THE COURT:  All right.  Proceed.

 8              MR. DIBERNARDO:  Thank you.

 9              If we could go to the first slide.

10              Your Honor, the jury returned a verdict of 625.5

11    million, and that award should be entered based on three

12    primary factors.

13              First, the jury was instructed that it could award a

14    per-patent damage, and that is exactly what they did.  Also,

15    there were no objections to that instruction.  Apple has

16    waived their per-patent damage arguments.

17              Finally, if Your Honor finds that Apple has not

18    waived, there is substantial evidence in the record to support

19    the per-patent damage award.

20              Next slide.

21              The jury was instructed that the damages were to be

22    applied separately and individually for each patent and

23    instructed specifically with regard to the verdict form and

24    the damages question, the third question that the amount of

25    damages were to be provided for each patent.

1          Next slide.

2          And this is exactly what the jury did.  They

3    followed that instruction and provided a damage amount for

4    each patent, 208.5 million for each of the three patents for a

5    total award of 625.5 million.

6          Next slide.

7          Apple has argued that there is insufficient record

8    to support that 625 million per-patent damage award and that

9    the per-patent damage award represents an impermissible

10   duplicative recovery.  But Apple has waived those arguments.

11   Apple never objected to the instructions.  Apple never

12   objected to the verdict form.  And Apple's JMOL did not

13   address the per-patent award.

14         Next slide.

15         With regard to Apple's JMOL at trial, they argued

16   that their JMOL has preserved their arguments, but that is not

17   correct.  Apple made two JMOLs.  The first JMOL simply

18   provided that Mirror Worlds failed to prove that it is

19   entitled to either a lump sum, paid-up royalty, or running

20   royalty.  No reference whatsoever to the per-patent damages

21   issue, and it was not surprising since this JMOL was made

22   before Your Honor modified the verdict form and before the

23   issue came up.          With regard to Apple's renewed JMOL,

24   the second JMOL, that made no reference whatsoever to patent

25   issues.  Not only is it important what was not said in that

1    second JMOL, but the timing of that second JMOL is also

2    important.  That was made immediately following the Court's

3    modification of the verdict form.

4         The per-patent damage award issue was raised.  Yet

5    Apple remained silent.  In fact, it did more than remain

6    silent.  It actually objected to opening the record.  And that

7    second JMOL, even though the issue was raised and before the

8    Court, Apple remained silent and did not raise this per-patent

9    damage issue.

10        Next slide.

11        In our briefs we cite the Yeti case.  That is a case

12   on very similar facts we think.  In that case the Court

13   modified a verdict form to provide for separate damages for

14   each cause of action, each of five causes of action.

15        The defendant there did not object to the change in

16   the verdict form and attempted to raise a duplicative recovery

17   argument.  But that argument was found to have been waived.

18   In fact, I suggest that the situation here is worse than even

19   in Yeti since Apple actually objected to reopening the record

20   and then stayed silent upon its renewed JMOL.

21        Next slide, please.

22        Apple has relied on the Orion case to support there

23   has been no waiver.  But its reliance is misplaced.  This case

24   is very different than what happened in Orion.  In Orion a

25   cursory motion for JMOL was saved because it was made in the

1   context of detailed extended discussions of the evidence.  And

2   those detailed discussions basically advised the Court and the

3   nonmovant about the movant's position.  The issue was on the

4   table.  Here, however --

5            THE COURT:  Counsel, I am really not following your

6   waiver argument.  To me the plaintiff has the burden on

7   damages.  And what I really want to hear is what basis can you

8   put forward that I should award $600 million, which is what

9   you are asking me to do?  Because my recollection of this

10   trial was that the plaintiff was on the lip of the cusp of

11   getting JMOLed on two patents.  And -- but your damage case

12   that you had put on had just related -- you chose to not put

13   your evidence on on a per-patent basis.  You put it on on a

14   totality basis.  You said that this is the total of the

15   damages.

16            And then when I gave the plaintiff the opportunity

17   to salvage its case by putting on evidence relating to a

18   per-patent basis, you chose not to.  You did put on evidence

19   that with the other -- the first JMOL that I had already

20   granted and the iPad is out of the case, it be cut to 50

21   percent of the 600 million total that your expert had

22   testified to, which would be $300 million.

23            And then Mr. Carroll in his closing argument argues

24   to the jury that on any of these, it would be $200 million.

25   And I was quite surprised, frankly, when Mr. Randall got up

1    and was concerned that the jury -- that Mr. Carroll was asking

2    for a billion dollars because that is not what I understood

3    him to be asking for.

4         I understood him to be saying that your total

5    damages would be 208 million, where if I threw out the first

6    two patents you would still get 208 million.  If all three

7    were still in after JMOL, you would still have 208 million

8    because you got a finding on each one.  If any one of them

9    goes away, that much is there.  But now you are wanting me to

10   add them together.

11        And Mr. Carroll got back up in rebuttal argument and

12   told the jury we are not asking for a billion dollars, which

13   was consistent with what my understanding of the whole

14   proceedings was.  I want to hear what basis you can ask this

15   Court to now give you $600 million.

16        MR. DIBERNARDO:  Certainly.  I think we first have

17   to go back to the instructions to the jury which provide that

18   these damages are indeed added, and they are provided on a

19   per-patent basis.

20        If we could go to Slide 3.

21        So the instructions were that the damages were to be

22   determined separately and individually for each of the patents

23   found infringed.  Then that second bullet point relates

24   directly to the damages question, Question 3 on the verdict

25   form.  There, again, it is clear that the third question goes

1    to the amount of damages for each patent, each separate

2    patent.  And certainly --

3                If we go to the next slide.

4                There is nothing on the verdict form that is

5    inconsistent.  It is completely consistent.  Answer with the

6    amount for the '427, answer with the amount for the '227.

7                As to Mr. Carroll's statements, those arguments, as

8    instructed by the Court to the jury, was not evidence.  And,

9    in fact, Apple, Mr. Randall, came up and argued the opposite.

10   So it is true that the jury heard two separate takes on the

11   form.  It would be additive or not.  And the jury relying on

12   the instructions and the verdict form provided an additive

13   award.  Again, those arguments are not evidence, and that was

14   part of the jury instructions.

15               As to the support for the per-patent damage award --

16               If we go to Slide 9.

17               -- Mirror Worlds presented a damage theory based on

18   two hypothetical negotiations, or at least in part.  And each

19   of those separate hypothetical negotiations relate to separate

20   patents.

21               The first negotiation in 2005 provided a reasonable

22   royalty if only the '227 patent was infringed.  That

23   necessarily has to be the case on the record before us because

24   in 2005 only the '227 patent was infringed.  The products that

25   were accused of infringing the other two patents were not yet

 1   even released.

 2          With regard to the second hypothetical negotiation

 3   in 2006, that relates only to the '427 patent because in 2006

 4   only the '427 patent was infringed.

 5          Actually, I should clarify that.  In 2006 the second

 6   hypothetical negotiation, that hypothetical negotiation was

 7   presented assuming the '227 patent was not infringed.  Mr.

 8   Bratic presented a second hypothetical negotiation in case the

 9   '227 was taken out of the case.  That was the explicit purpose

10   for it.

11          And, again, in 2006 the time of the hypothetical

12   negotiation, only the '427 patent was infringed.  So that

13   second hypothetical negotiation and reasonable royalty, the

14   748 million, would apply only to that '427 patent.  And as

15   expressed in Mr. Bratic's report at the citations here, a

16   similar negotiation would apply just to the '313 patent.

17          MR. RANDALL:  I want to object, Your Honor.  He is

18   going through this demonstrative, and he is citing to

19   information that he claims is evidence that was presented at

20   trial and wasn't.  He is misstating the record.  The record is

21   very clear that Mr. Bratic simply said there may be two

22   hypothetical negotiations; one if the '227 was infringed, one

23   if the '227 was not infringed.  That is it.

24          THE COURT:  Okay.  Proceed.

25          MR. DIBERNARDO:  In response to that, Your Honor, I

1   think the record is clear.  In 2005 the '227 patent was the

2   only patent that was infringed.  The reasonable royalty at

3   that time applied only to the '227 patent.  In 2006 the second

4   hypothetical negotiation, which was presented --

5          THE COURT:  Counsel, I just think you are trying to

6   rewrite the record.

7          MR. DIBERNARDO:  These two hypothetical negotiations

8   were presented for a license at that particular time.  And,

9   perhaps, the record -- perhaps, the point was not emphasized

10  that there was only one infringing patent at each of those

11  times, but clearly the evidence is there.

12         THE COURT:  Okay.  Anything else?

13         MR. DIBERNARDO:  You asked also about the waiver

14  argument, and perhaps we will just touch on that again.

15         THE COURT:  I don't need to hear any more about the

16  waiver argument.  Where is Mr. Carroll today?

17         MS. RACE:  Your Honor, Mr. Carroll was set to pick a

18  jury in Judge Folsom's Court this morning.  And, as I

19  understand it, they settled last night.  Now the settlement

20  has fallen apart and Judge Folsom is calling the jury panel

21  back.

22         THE COURT:  I thought Judge Folsom was in trial in a

23  criminal case in Sherman.

24         MS. RACE:  It is my understanding he was in trial in

25  a pro se criminal case in Sherman, and that case was

1    originally set for earlier this week.  I am assuming he

2    finished.  He was set to pick that jury this morning.

3              THE COURT:  All right.

4              MR. KELLEY:  Your Honor, if I could clarify.  I

5    understand because the settlement was falling apart last night

6    Mr. Carroll was instructed to be available to talk to the

7    Magistrate who actually -- Judge Craven, who was actually

8    negotiating or acting as the mediator in connection with the

9    settlement; and that he was instructed to be available to talk

10   with regard to the parties.  That is where he is.  He is at

11   the office talking on the phone.  But if the Court wants, we

12   can obviously get him down here.

13             THE COURT:  It is up to you.

14             Go ahead, Counsel.

15             MR. DIBERNARDO:  Thank you.  I guess to touch on

16   that point, the last question, I do think the record is clear

17   that clearly there was a reason for two hypothetical

18   negotiations.  And Mr. Bratic made that reason clear.

19             THE COURT:  Counsel, that -- okay.  Anything

20   further?

21             MR. DIBERNARDO:  With regard to Apple's argument

22   that the award is duplicative, if Your Honor finds that there

23   is no waiver as to the duplicative argument, we don't believe

24   our award is duplicative.  There were three separate

25   infringements, different patents, and different products.

1    Mirror Worlds is entitled to a separate royalty for each of

2    those three patents.  The cases that Apple cites --

3              If we can go to Slide 10.

4              The cases Apple cites do not control here.  They are

5    all distinguishable.  In the cases cited by Apple, lost

6    profits were at issue.  For example, in the Aero case, a

7    duplicative award of lost profits on the same products were

8    awarded for both trademark infringement and patent

9    infringement.

10             In the Catalina Lighting case also relied upon by

11   Apple, again, lost profits were at issue.  In fact, Apple has

12   not cited any case where there are reasonable royalties on

13   multiple patents and where that has been found duplicative.

14             THE COURT:  Anything further?

15             MR. DIBERNARDO:  We are prepared to go on to address

16   the arguments regarding the comparable licenses and prior

17   sales, but on the 625 award --

18             THE COURT:  Okay.  Response.

19             MR. RANDALL:  Your Honor, there are two just brief

20   housekeeping matters I don't want to lose track of, and I will

21   get right to the interpretation of the jury verdict form that

22   you asked about.  One is there was a discussion yesterday

23   about the Internet Archive, Exhibit 1126, and I have a letter

24   brief that I could submit regarding that issue if the Court

25   wouldn't mind.

1            THE COURT:  All right.

2            MR. RANDALL:  The second issue, Your Honor, is that

3    Mirror Worlds has in its post-trial briefs liberally

4    referenced, relied upon, and argued from exhibits that were

5    not introduced into evidence in this case; and I would move to

6    strike the references and the argument on those exhibits that

7    were not introduced into evidence in this case.  And I would

8    like a blanket motion to strike that information.  I can read

9    in the record, if you would like, those exhibit numbers.

10            THE COURT:  Yes.

11            MR. RANDALL:  They are exhibit numbers, PX26, 38,

12   143, 222, 346, 1108, 1164, 1168, 1195, 1983.  That's all I

13   have on the list, Your Honor.

14            THE COURT:  All right.  Response?

15            MR. STEIN:  There were in connection with one of the

16   briefs a couple of exhibits that were cited that were actually

17   not admitted.  But as we pointed out in our responsive brief,

18   there were comparable exhibits that were admitted.  There

19   was -- and I am not sure what brief Mr. Randall is referring

20   to in connection to --

21            THE COURT:  Counsel, can you give me a line and page

22   as to each of these exhibits where they were admitted into

23   evidence that he has listed?

24            MR. STEIN:  Not without looking back at the briefs.

25            THE COURT:  Well, I will give you until noon today

1    to file any -- respond to the motion with specific references

2    to the record where these exhibits were admitted.  If you can

3    do that, they will be admitted.  Or if they can be, they will

4    be considered.  If not, then the motion will be striked to

5    that extent.  We will take that up after lunch as well.

6              MR. STEIN:  I do want to mention one thing.  In one

7    of the briefs, we had cited exhibits that were not admitted.

8    We filed a motion to file a corrective brief that struck those

9    exhibits.  To the extent that Mr. Randall was opining that it

10   was because -- that we were using exhibits that were not

11   admitted.

12             THE COURT:  All right.  Thank you.  You may proceed.

13             MR. RANDALL:  With respect to your specific

14   question, and I believe you asked for the parties to address

15   the interpretation of the jury verdict form without diving too

16   deep into our arguments about the lack of evidence that

17   support it.

18             THE COURT:  Right.

19             MR. RANDALL:  We don't believe, Your Honor, there is

20   any way to appropriately interpret that jury verdict form any

21   other way than one verdict for 208.5 million.  Now, we

22   obviously have arguments that we have made in this case about

23   why that is insufficient, inadequate, and legally

24   unsupportable; but I am not going to get into those right now.

25   I am just going to talk about the interpretation of the form.

```
 1              THE COURT:  All right.

 2              MR. RANDALL:  Your Honor, the three identical 208.5

 3    damage numbers are duplicative.  Mr. Bratic and Mirror Worlds,

 4    as you mentioned, argued for one lump sum damage figure for

 5    all three patents for the same sales of Apple's hardware and

 6    software, and that number was $625 million.

 7              The Court granted JMOL of noninfringement of all of

 8    Apple's mobile products.  Mr. Bratic got up late in the case

 9    and in a rather conclusory fashion said to the jury that

10    because of the elimination of the mobile products that that

11    single lump sum damage figure request would be cut

12    approximately in half.  And that was for infringement for all

13    three patents, to roughly a little over 300 million.

14              The Court then revised the jury verdict form when

15    the Court was considering dismissing from the case the '227,

16    and the '313 patents for noninfringement -- no direct

17    infringement.  And as the Court was considering that issue,

18    the Court revised the verdict form to a per-patent verdict

19    form.

20              Counsel for Mirror Worlds, as you mentioned, during

21    the argument filled in the jury verdict form and essentially

22    asked the jury and wrote in the numbers for Mirror Worlds'

23    total damage award of a little over 300 million.  He

24    identified -- and this is in the record -- numbers ranging

25    from 318 million, 320 million, 322 million.  He put those
```

1    numbers and wrote them each.  That is their total damage award

2    request in each of the three slots for the patents.

3         And I objected as inviting error.  That was on

4    October 1 at Pages 93 and 94.  And the error that invited

5    obviously is that there was no support in the evidence for

6    damages supporting their entire claim of damages for each

7    patent.  There was no support in the record for a request for

8    damages that did not account for the Court's dismissal of all

9    of the indirect infringement claims.

10        There was no support in the record that the '313 and

11   '227 patents, the direct infringement alleged by Mirror

12   Worlds, supported the entire 300 and some-odd million dollar

13   verdict award.  And there was simply no evidence, no evidence

14   by Bratic or Mirror Worlds or any of their witnesses about an

15   allocation of the damages per patent.

16        But nonetheless, Mr. Carroll -- I argued that he may

17   be attempting to get approximately a billion dollars adding up

18   the 300 some-odd figures, adding them up.  He got up and

19   countered on his argument, and he argued that -- and he

20   explained to the jury that the total damage request, as he

21   understood it, was approximately three hundred and a quarter.

22   That is what he said three hundred and a quarter that is the

23   total damage request.

24        And he said, now, that doesn't mean we are going to

25   get a billion dollars.  That is what he said on October 1 at

 1    Pages 132 and 133.  That does not mean we are going to get a

 2    billion dollars.  That was in response to my objection.  He

 3    says, we are not triple dipping.

 4         Now, the jury didn't accept Mirror Worlds' request

 5    for roughly half of -- the total lump sum damage request was

 6    half of 625, which is a little over 300 million; and that is

 7    what Mr. Carroll wrote in each of the patent numbers on the

 8    verdict form.  The jury did not accept that.  Mr. Carroll also

 9    wrote slightly different numbers on each one of those.  The

10    jury didn't accept that either.

11         What the jury did instead was wrote down

12    approximately one-third.  Instead of giving them one-half,

13    they wrote down one-third.  They wrote down identical numbers.

14    They rejected this differentiation because there is simply no

15    evidence for that.  And thus the maximum interpretation under

16    this case of that verdict form without regard to the other

17    arguments we have made in this case about the deficiencies, is

18    one total lump sum award of 208.5 million for infringement of

19    all three patents -- or roughly one-third of the original

20    request, as opposed to the request of one-half of the 300 and

21    some-odd million.

22              THE COURT:  Thank you.

23              Reply?

24              MR. RANDALL:  Your Honor -- I'm sorry.  If you would

25    like me to address this waiver argument, I certainly can.

```
 1              THE COURT:  You might as well, yeah.

 2              MR. RANDALL:  Okay.  Your Honor, we did not waive

 3    our objection on per-patent damage awards.  In fact, if I can

 4    state what the record does indicate is that we indicated all

 5    along that Mirror Worlds' damages were legally inadequate, and

 6    we moved for JMOL on damages.  And the record is clear.  As to

 7    damages at the close of Mirror Worlds' case, we specifically

 8    argued that Mirror Worlds failed to prove that it is entitled

 9    to either a lump sum paid-up royalty or running royalty.  That

10    was on the 29th in the afternoon at Page 95, Lines 8 through

11    16.  Apple preserved its damages challenge at that moment.

12              Then at the close of Apple's case and as the Court

13    was considering granting JMOL of noninfringement on the two

14    patents that he mentioned, the '313 and the '227, at that

15    point you asked specifically Mirror Worlds to address the

16    point, what if you dismissed those two patents?  And they

17    submitted a brief to Your Honor.  They stated, "The jury

18    currently does not have sufficient information before it to

19    determine the appropriate damages if the Court were to

20    eliminate the '227 and '313 patents."  That is at Docket No.

21    403 at Page 6.

22              Now, at that point, the Court had already told

23    Mirror Worlds you are considering dismissing these two

24    patents, what will that do to your damages?  Mirror Worlds

25    says the jury doesn't have sufficient information to determine
```

1    appropriate damages if you eliminate those.  And with that in

2    mind, Your Honor offered them the opportunity to reopen the

3    case and address the issue.  And they declined.

4         At that point I also indicated we don't know what

5    evidence they are going to put on.  There is no evidence they

6    could put on to allocate these damages.  We were pointing out

7    that they had a deficiency in the evidence, and they can't

8    satisfy it.  But, nonetheless, Your Honor gave them the

9    opportunity to reopen the record and address that deficiency

10   and they declined.

11        Now, we had already moved for JMOL.  We had already

12   noted the deficiency in the evidence.  We had already noted

13   that we didn't believe they could provide evidence to

14   allocate; and with that in mind and that issue squarely in

15   mind with the Court's offer to address the issue, they

16   declined.  The fault lies with Mirror Worlds, not Apple.  It

17   is not our burden to put on that evidence.

18        We put on our damages case, and our damages case was

19   clear that the maximum damage award could be, based on the

20   hypothetical negotiation, sales of the patents, no more than

21   $5 million.  We put that on, and we consistently indicated the

22   deficiency in Mirror Worlds' damages claims.

23        So, Your Honor, the issue was preserved.  And

24   certainly under Fifth Circuit law, as applied by the Federal

25   Circuit, motions for JMOL are liberally construed.  Just

1   recently the Federal Circuit ruled in Western Union that

2   cursory motion on JMOL is sufficient.  But in this case it

3   wasn't a cursory motion.  In this case the issue was squarely

4   presented to Mirror Worlds whether or not there is an ability

5   for them to put on evidence on a per-patent basis.

6           They hadn't done it in their case.  We pointed it

7   out that there is no evidence they could have put on.  Your

8   Honor gave them the opportunity to reopen the record, and they

9   declined.  That is their fault, and now we are moving for

10  judgment on that issue.

11          THE COURT:  All right.  Thank you.

12          Response?

13          MR. DIBERNARDO:  Thank you, Your Honor.  I will

14  first address Apple's reliance on the attorney argument.  They

15  routinely point to Counsel's statement, Mirror Worlds'

16  Counsel's statement regarding closing.  However, they

17  completely ignore their own statements.

18          Apple objected to the statements acknowledging that

19  they should be added.  They said, Your Honor, they are

20  basically asking for a billion dollars.  That is a recognition

21  that the jury --

22          THE COURT:  I think they were concerned about that.

23  But that is not what I thought they were asking for, and I

24  didn't think that was what Mr. Carroll thought they were

25  asking for.  But now you are asking for it.  And you are going

1    to hang your hat on their concern about it?

2           MR. DIBERNARDO:  Well, I think the jury, when faced

3    with the competing positions, went back, as they should, to

4    the jury instructions.  And these instructions made clear --

5           That is on Slide 3.

6           -- that the awards --

7           THE COURT:  Maybe it is just so confused we need a

8    new trial.  How about that?

9           MR. DIBERNARDO:  We don't believe that is necessary,

10    Your Honor, based on these clear instructions --

11           THE COURT:  That is going to be my decision.

12           Anything further?

13           MR. DIBERNARDO:  Again, Your Honor, we think these

14    instructions control.  And as to the waiver, it is not simply

15    an issue.  It is simply a matter of were they apprised of the

16    issue.  It is a question -- and this is the language from the

17    Federal Circuit in the Orion case.  It is a question of

18    whether or not the parties -- whether Mirror Worlds and the

19    Court needed to know more about the movant's position, Apple's

20    position.  And it was not put on the table by Apple that there

21    was a per-patent damage -- a failure of proof on the

22    per-patent damages award.

23           They simply objected to reopening the record, and in

24    that JMOL made after this issue arose, they remained

25    completely silent as to damages.  No reference to damages

1    whatsoever.  It was after that that Mirror Worlds decided not

2    to put on any additional evidence in reliance upon that

3    silence.

4              And going back to the proof, these two hypothetical

5    negotiations.  Again, it is clear from the record that the

6    first hypothetical negotiation was in 2005 when only the

7    single patent was infringed.  The other two patents, the '427

8    and '313 were not asserted against any product at that time.

9    We chose a conservative -- Mr. Bratic had a conservative

10   approach, but at that time the $625 million reasonable royalty

11   applied only to infringement of the '227.

12             The second hypothetical negotiation was explicitly

13   applied in a situation where the '227 was found not

14   infringed.  That was the whole reason for the second

15   hypothetical negotiation, and that hypothetical negotiation in

16   2006 covered infringement of just the '427.  The product that

17   was accused of infringing the '313 had not yet been released.

18   So that second hypothetical negotiation and the 748 million in

19   reasonable royalty applies only to the '427.

20             And this notion actually comes back later, Your

21   Honor, because that '427 patent has system claims.  So even if

22   we find that the method patents are out, this 748 million

23   reasonable royalty, the second hypothetical negotiation, still

24   applies.

25             THE COURT:  Okay.  Thank you, Counsel.

```
 1              All right.  Let's move to the JMOLs on infringement.
 2    Let me hear from Apple with regard to their JMOL.  We will
 3    take it one point at a time.  So make your presentation, I
 4    will hear a response, and let you move on to the next point.
 5              MR. RANDALL:  Thank you, Your Honor.  The first
 6    argument regarding JMOL of noninfringement, and as I mentioned
 7    before, I don't know that we will have time to get to all of
 8    them.  We feel equally strong about each of the arguments that
 9    were made in our brief.  But I will address the first one,
10    which is the motion that we were referring to earlier, which
11    is Apple is entitled to JMOL of all asserted claims of the
12    '227 and '313 patents because Mirror Worlds did not prove
13    direct infringement by Apple of those method claims.
14              Mirror Worlds' entire case, both damages and
15    liability with respect to those two patents, really rested on
16    their faulty premise about whether they could prove indirect
17    infringement.  They relied in terms of damages on sales of
18    hardware and software.  They relied on establishing
19    infringement through indirect infringement.  They relied on
20    their ability to, perhaps, prove that infringement under
21    271(a) was proven by the sale of these products, and they are
22    wrong factually and legally on all of those issues.
23              Number one, the Court granted JMOL of
24    noninfringement on indirect infringement, so those issues are
25    off the table.  That left Mirror Worlds with only one
```

 1    argument, which is could they prove that Apple directly

 2    infringed the method claims of the '227 and '313?  And they

 3    simply can't.

 4         First, it is, as a matter of law, infringement of

 5    the method claim requires performance of each step, and

 6    Apple's Mac OS sales cannot directly infringe those method

 7    claims.  Now, we have cited the Joy Techs case which states a

 8    method claim is not directly infringed by the sale of an

 9    apparatus even though it is capable of performing only the

10    patented method.  The sale of the apparatus is not a sale of

11    the method.  A method claim is directly infringed only by

12    practicing the patented method.

13         We went on to cite, Your Honor, the Ricoh case,

14    which is even closer to our situation.  That again, the

15    Federal Circuit in the Ricoh case held that a party that sells

16    or offers to sell software containing instructions to perform

17    the patented method, does not infringe the patent under

18    271(a).

19         In Ricoh, unlike the way that Mirror Worlds

20    characterizes it, the accused product was an optical disk

21    drive; it was an optical disk drive hardware as instructed by

22    and included with the software.  And so their distinction they

23    attempt to make with respect to Ricoh that is only addressed

24    to software, is simply wrong.

25         Your Honor, the Federal Circuit has never found a

1   viable claim of infringement of a method under the sale or

2   offer for sale prongs of 35 USC Section 271(a).  They noted in

3   the NTP/RIM case, that Congress has consistently expressed the

4   view that it understands infringement of method claims under

5   Section 271(a) to be limited to use.

6          They simply can't establish as a matter of law that

7   the sale of Apple's computers along with the software, given

8   that they have substantial noninfringing uses -- which, of

9   course, they do --  but they simply can't prove that the sale

10  of those computers and software constitutes infringement,

11  direct infringement under 271(a) of the method claims of those

12  two patents, and their argument has failed.

13         Your Honor, I will just note that the Federal

14  Circuit on this issue has somewhat put two stakes in the

15  ground in two cases.  Mirror Worlds in their surreply brief

16  cites the Lucent case.  The Lucent case involved whether or

17  not Microsoft sale of software and whether or not the jury

18  verdict of indirect infringement would be up held by the

19  Federal Circuit.  So the Federal Circuit was looking at

20  whether or not that indirect infringement finding could be

21  upheld on a JMOL motion.  Obviously, you have dismissed the

22  indirect infringement in this case.

23         But the Court went on to identify whether or not

24  there was sufficient evidence in the record of direct

25  infringement in the Microsoft case.  And in that case, Your

1    Honor -- and when I say the court has staked out this ground,

2    this case stands for the proposition that the direct

3    infringement evidence in that case was as close of a call I

4    think as the Federal Circuit is ever going to get and ever

5    going to opine on.  They said that the evidence was barely,

6    barely sufficient.

7         And, however, what they did rely on to find direct

8    infringement of the method claims, they relied on the fact

9    that the expert that testified -- this was at Page 1318 -- the

10   expert testified that he had performed all of the steps of the

11   method claim many, many times.  He also noted that his wife

12   had performed all of these steps as well.  And the Court noted

13   that, "Just as anticipation can be found by a single prior art

14   use, a finding of infringement can rest on as little as one

15   instance of a claim method being performed during the

16   pertinent time period."

17        So the court relied on the evidence presented of

18   direct infringement the many, many times that the method was

19   performed not only by the expert but by his wife.  And the

20   court indicated that Lucent's expert testified that it is hard

21   to imagine that we are the only two people that have done it.

22   But nonetheless, the case -- the court relied on that and

23   found that there was barely enough evidence to make the

24   finding of direct infringement.

25        The court then also distinguished the E-Pass case,

1   another Federal Circuit case.  And they distinguished the

2   E-Pass case, and they said that E-Pass does not compel the

3   overturning of the jury's verdict.  There the patentee tried

4   to rely on excerpts from the product manuals for various

5   accused devices.  All the court had before it, however, was

6   evidence showing at best, that the Palm defendants at best

7   taught their customers each step of the claim method in

8   isolation.  Thus, patentees failed to introduce even

9   circumstantial evidence of infringing acts.

10          So what the court has done has staked out two

11  grounds.  One, the Court has staked out in Lucent that the

12  barest possible evidence supporting a direct infringement

13  claim is when you have at least two people saying that they

14  have performed all of the steps many times.

15          Okay.  And then on the E-Pass case where all the

16  plaintiff is relying on is excerpts from product manuals for

17  various accused devices that teach at best how the customers

18  should perform each step of the claim method in isolation.  We

19  don't even have the E-Pass case, Your Honor.  They didn't

20  present the evidence to the jury about these manuals, about

21  these steps, about these instructions.  They never presented

22  that to the jury.

23          They certainly never presented any, any evidence of

24  direct infringement.  Not one person did they say has gone

25  through all of the steps of each of those method claims.  They

```
 1    have no evidence of direct infringement by any person

 2    performing all of the steps of those method claims.  None.

 3            With respect to their reliance on these manuals,

 4    they didn't even present that to the jury.  It is not in the

 5    record.  They didn't go through the manuals and say anything.

 6    But nonetheless even if they had, the E-Pass case indicates

 7    that is insufficient.

 8            THE COURT:  So what about Mr. Jobs' video?

 9            MR. RANDALL:  Your Honor, they cite to Mr. Jobs --

10    Your Honor, first Mr. Jobs --

11            If you can pull up J-9.

12            Mr. Bratic correctly points out that at the

13    conference on June 24th there is a question:

14            Q.  At the conference in June of 2004, Apple handed

15    out 3,000 copies of the accused infringing software, correct?

16            A.  (By Mr. Bratic) No, that's not true at all.

17    That software wasn't infringing.

18            Q.  That software wasn't infringing?

19            A.  It was not.

20            Q.  Okay.

21            And then he goes on to state:

22            A.  There is no evidence in this case that the 3,000

23    preview copies that Apple passed out at the Worldwide

24    Development Conference was infringing.  Because if you go to

25    Dr. Feiner's report he says it is his understanding that it
```

1    was a -- now that word says "complete."  But the record was

2    "incomplete."  Incomplete product, and he got that

3    understanding from Apple.  Nobody analyzed that product to

4    figure out if it was infringing or not.

5            Their expert pointed out, Your Honor, that there was

6    no evidence in the record that the demonstration software --

7    or presentation software included each and every step, and

8    also that the demonstration itself doesn't satisfy each and

9    every step of the method claims.

10           Your Honor, now Mirror Worlds relied on an exhibit

11   in their brief that was not admitted into evidence, which is

12   Exhibit 933.  That was an email from September 2004 regarding

13   a Walt demo.  In that email it indicates that based on this

14   demonstration of September 2004, Spotlight does not find all

15   attachments to emails.

16           There is no evidence that, number one, that software

17   that may have been utilized by Mr. Jobs was ever analyzed to

18   see if it satisfied each and every of the elements.  He never

19   practiced each and every step of the method claims in that

20   video, and there is no proof that it has a main stream

21   inclusive of all data units.  That is indicated by that

22   exhibit they relied on that isn't even in evidence.

23           THE COURT:  What was that exhibit number again that

24   you said was not part of the record?

25           MR. RANDALL:  I believe it is 933, Your Honor.

1          THE COURT:  That was not part of your motion to

2     strike that you made this morning.

3          MR. RANDALL:  All right.  Then I am mistaken.  It

4     should be included in it.

5          THE COURT:  All right.  Well, you can check on that.

6     Go ahead.

7          MR. RANDALL:  Now, as you recall, the reason why --

8     one of the reasons why Mr. Bratic pointed out that there is no

9     evidence whatsoever of infringement is because he wanted to

10    move the hypothetical negotiation.  He wanted to move the

11    hypothetical negotiation away from sales of the patents that

12    were not beneficial for their damages case.  So he indicated,

13    and Mirror Worlds took the position in the litigation, that

14    there was no infringement that occurred before June of 2004 --

15    I'm sorry, June of 2005.

16         So, Your Honor, Mirror Worlds is left with an

17    inability legally to show infringement under 271(a) by the

18    mere sale of hardware and software which they allege is

19    capable of performing the methods.

20         THE COURT:  All right.  Response?

21         MR. DIBERNARDO:  Your Honor, we have additional

22    PowerPoints on the infringement issue.

23         THE COURT:  I'm sorry?

24         MR. DIBERNARDO:  We have additional PowerPoints on

25    the infringement issue.

1          THE COURT:  All right.

2          MR. DIBERNARDO:  Thank you.

3          MR. STEIN:  Good morning, Your Honor.  There are

4  three bases under which Apple has directly infringed.  One, by

5  selling or offering to sell the infringing methods.  Two, by

6  Apple's own direct infringement by performing the infringing

7  methods.  And the third is with respect to Claim 13 of the

8  '227 patent that its product necessarily perform those

9  methods.

10          THE COURT:  I'm sorry, what was your third point?

11          MR. STEIN:  That with respect to Claim 13 of the

12  '227 patent Apple's computers automatically -- or necessarily

13  infringe those methods.

14          THE COURT:  I see.  Okay.

15          With respect to the first basis, selling and

16  offering to sell a method, the Federal Circuit has twice

17  addressed this issue; once in NTP and once in Ricoh.  And on

18  both occasions the Federal Circuit explicitly declined to rule

19  that the sale or offer for sale of a method cannot be

20  infringed under 271(a).  Both those cases are different than

21  our case.  In the NTP case it involved the sale -- that case

22  involved the sale of a device that did not perform all of the

23  steps of the patented method.

24          That is unlike this case where Apple is selling

25  computers that do perform all of the steps.  In fact, the jury

1    has already found that the accused Spotlight, Time Machine and

2    Cover Flow features infringe the claims of these patents.  So

3    there is no dispute at this point as to that jury -- as to the

4    jury verdict.  Using those three features will infringe the

5    claims of these patents.  So by selling computers that have

6    those features on it, Apple is selling all of the steps of the

7    method, which is unlike NTP.

8          In Ricoh that case involved just the point in that

9    case that was addressing the sale of the method was addressing

10   the sale of software alone.  Mr. Randall just mentioned that

11   that was not the case.  If the Court reads that case

12   carefully, it is quite clear that in Ricoh what the court held

13   was that the sale of a software -- of software alone, does not

14   infringe.  In that case the software was not sold together

15   with the hardware.  That is unlike this case where Apple is

16   selling the software loaded onto its computers.

17         The Joy Techs case, which Mr. Randall just

18   mentioned, was an injunction case -- the case dealt with the

19   scope of injunction, in particular whether or not the court

20   could enjoin the practice of a method that was going to occur

21   after the expiration of the patent term.  It was a completely

22   different situation than here.  In fact, that case never even

23   mentioned the issue of the sale or offer for sale of the

24   patented method.

25         Now, on several occasions district courts have

1   addressed this issue and have found liability for the sale or

2   offer for sale of the patented method.  And we cite those

3   cases in our briefs.  It happened on two occasions where the

4   court found that liability under those prongs was appropriate,

5   and we think that the application of that rule here is also

6   appropriate based on the facts of this case.

7          The facts of this case were not present in any of

8   the cases that Apple cites and it is not present in any of the

9   cases that we have found.  And the bottom line is that the

10  Federal Circuit has explicitly declined to rule on that issue.

11  So to the extent that Apple is now arguing that liability

12  cannot be found for selling or offering to sell a method, that

13  is just untrue under the current state of the law.

14         Now, Apple has plainly been selling or offering to

15  sell the method.  The have been promoting the Spotlight, Time

16  Machine, and Cover Flow feature.  They promote them as

17  revolutionary groundbreaking features, marquee features.  They

18  have been demonstrating those features at their trade shows

19  and conferences.  And the evidence, in fact, conclusively

20  establishes that Apple's customers, in fact, use those

21  infringing features.

22         If you could put up Slide 9.

23         This is an email regarding one survey that -- this

24  is an excerpt from the email, one survey that Apple had taken.

25  It says that Apple surveyed -- if you look at the top line --

1    recent buyers of CPU's (Tiger pre-installed.)  These are

2    actual users of Apple's products.  And it found that these

3    people do indeed use Spotlight, finding that 60 percent of the

4    total in this particular survey use it.

5          So there is really no question as to use by users.

6    They are out there promoting it as important features,

7    fundamental features of the operating system, and it is borne

8    out by the fact that their customers are, in fact, using those

9    features.

10          Now, the second basis for finding direct

11    infringement is Apple itself performed the patented method.

12    Now, we cite a case in our brief, and it is just common sense

13    that use of a patented method during research and development

14    may constitute infringement.  And the case that was cited as

15    an example was Ormco, the Ormco case.  Well, Apple actually

16    missed, and there is substantial evidence of record that Apple

17    developed the infringing features, albeit after seeing and

18    utilizing the ideas in Dr. Gelernter's inventions.  But they

19    developed these things.

20          There is evidence of record that Apple tested the

21    accused -- the infringing features, which only makes sense.

22    No company is going to release a product without first testing

23    the features.  And under the established law, that is evidence

24    sufficient to establish direct infringement by Apple.

25          In addition, Apple has also performed the accused

1    methods in promoting the inventions that -- both in their

2    marketing literature and at the conferences.  Mr. Randall

3    mentioned the conference in 2004 which he claims there wasn't

4    noninfringement, but there was also evidence of Mr. Jobs

5    demonstrating the accused features at Mac World 2005 at the

6    time that the accused features were released.

7            And, you know, the issue is presumably -- that he is

8    bringing up in 2004, does not apply to that.  But in any event

9    there is substantial evidence that Apple both developed,

10   tested, and promoted their accused features.  They certainly

11   used them.  I don't think there is -- any argument to the

12   contrary is disingenuous.

13           The third basis is that Apple's products necessarily

14   infringe Claim 13 of the '227 patent which relates to the

15   Spotlight feature.  That feature is at the core of Apple's

16   OS -- accused Mac OS X operating systems.  It is there.  The

17   operating system performs the steps of those features.  Apple

18   in its briefs argued that there are certain steps that are

19   initiated by the user and, therefore, not necessarily

20   performed.  But those steps are part of the basic operation of

21   the computer, and they will inevitably be performed by any of

22   Apple's users.  That is a separate, independent basis for

23   infringement; and we cite a case establishing that the Rambus

24   case says you can show direct infringement if the accused

25   device necessarily infringes the patent-in-suit.

1           Thank you.

2           THE COURT:  Any response?

3           MR. RANDALL:  Briefly, Your Honor, yes.

4           MR. RANDALL:  I would briefly point out to the Court

5    that the Ricoh case -- and it states right in the background

6    section, the patents directed to methods and apparatuses for

7    generating a particular pulse sequence for recording

8    information to a rewritable optical disk were invalid for

9    obviousness.  The accused devices do not practice the methods.

10   Under the holdings the accused devices did not practice the

11   methods of the asserted claims of the patent directed to

12   methods and apparatuses for formating rewritable optical

13   disks.

14           Throughout the patent under the background section,

15   the patents-in-suit are directed to various aspects of optical

16   disk driver technology.  And it goes on.  Throughout the case

17   it is clear that the methods were directed to both hardware

18   and software in that case.

19           Directing the Court to the argument that they made

20   that somehow the Apple products automatically infringe Claim

21   13 of the '227.  First, apparently they are not making that

22   argument as to any of the '313 claims nor to Claim 22 of the

23   '227.  They are not saying those automatically infringe.  We

24   don't have any argument about that, assuming the Court finds,

25   as we think the Court should, there is no sale of the methods

1   under 271(a).

2          But with respect to their argument on Claim 13, Your

3   Honor, it has a series of steps that must be performed by the

4   computer, for instance, searching.  And we included at Exhibit

5   3 of Docket 432 of our renewed JMOL motion, a chart showing

6   Dr. Levy's testimony about the user involvement that is

7   required to perform the steps of Claim 13 of the '227.  And it

8   is absolutely clear from the steps that are required, from Mr.

9   Levy's testimony that those steps are not automatically

10  performed by Apple's computer.

11         For instance, searching, you can use that computer

12  forever without ever doing searches within the computer.  The

13  other, receiving data units from other computers.  A lot of

14  people don't connect their computer to other computers to

15  receive data units.  So there is other things that can be

16  done, and you don't have to infringe.  So when they say you

17  simply turn on a computer and it automatically infringes, it

18  is wrong.  That is not what their expert testified.

19         There is no evidence in the record that suggests

20  that turning on a computer automatically performs all of the

21  steps.  In fact, their expert Levy testified to the contrary

22  that users have to perform searches; that they have to receive

23  data from other computers; and these steps are not performed

24  automatically.  And there is no evidence in the record to

25  suggest otherwise.

1          They simply don't have any evidence of a user

2     performing every single step of the method claims of those two

3     patents.  It seems like we have spent a week, we have spent

4     months, we have spent years on this case.  They should be able

5     to point to it.  Just say here it is.  Here is someone

6     performing all of the steps.  Here is our evidence, Judge.  It

7     is right here in the record multiple times.  They simply don't

8     have it.  They didn't do it.  They didn't put on the indirect

9     infringement case.  They haven't put on a direct infringement

10    case.  The law doesn't support them.  And there is simply no

11    evidence to prove it, Your Honor.

12          THE COURT:  Final word on that one?

13          MR. STEIN:  Well, we did show evidence of direct

14    infringement in many ways.  The survey results -- well, one,

15    stepping back, the jury found that the Spotlight, Time

16    Machine, and Cover Flow features infringe when used.  So that

17    is the jury's determination in this case.

18          So from that alone -- if Apple's position is that

19    none of the customers use those features, and we don't believe

20    that position is -- we believe that position is disingenuous.

21    They have been out there promoting those as marquee features

22    of their operating systems.  Mr. Jobs himself has had

23    conferences touting the importance of Spotlight, calling it a

24    revolutionary, groundbreaking feature; that Apple is

25    attempting to argue that no one has used those features, or

1    those features are somehow -- I guess -- well, not important

2    or something that people wouldn't be using.  It just doesn't

3    make sense.  They are there.  There is lots of reviews of

4    records.  There was the surveys of records showing actual use

5    by customers of Spotlight, Time Machine, and Cover Flow.

6          And again, I just don't think that that argument

7    carries any weight.  To the extent that Apple is arguing that

8    the devices don't necessarily infringe, their own surveys show

9    that the usage of these features by their customers and the

10   particular features that he is pointing to, loading a

11   document, that happens by getting an email or going to the

12   web.

13         And, again, I think the argument is disingenuous

14   that a customer of Apple's computers is not going to download

15   a document at some point or create a document.  The whole

16   purpose of an Apple computer is for people to do the things

17   that everybody does with computers every day.  And that

18   includes email, that includes web browsing, that includes

19   creating documents.  It is hard to imagine that any customer

20   of Apple would not be performing those features.  And I think

21   it was a reasonable inference for the jury to draw based on

22   the evidence presented, that those products would necessarily

23   infringe Claim 13 of the '227 patent.

24         THE COURT:  Thank you.

25         We are going to take about a 10-minute recess.

1          (Recess was taken.)

2          THE COURT:  Please be seated.

3          All right.  Mr. Randall, would you like to take your

4   next point?

5          MR. RANDALL:  Yes, Your Honor.  The next point, Your

6   Honor, is directed towards the claim element that requires

7   displaying a cursor or pointer and responding to --

8          Can you put the board up, by the way?  And can you

9   put up J-008?

10          And responding to the user controlled sliding

11   without clicking of the cursor over said displayed stack to

12   display a glance view.  There is no literal infringement of

13   this claim, and that has been established.

14          There also, Your Honor, with respect to the

15   operation of Mac OS X, the operation of our operating system

16   is substantially different than the claim requirements here.

17   And, therefore, under the doctrine of equivalents, Your Honor,

18   as a matter of law there can be no infringement.

19          Now, Your Honor already addressed this issue with

20   respect to the mobile products.  If you recall in ruling that

21   Mirror Worlds failed to establish under the doctrine of

22   equivalents this element as a matter of law with respect to

23   the mobile products, Mirror Worlds attempted to argue all of

24   the evidence that they submitted with respect to the operating

25   system.

1           So the evidence presented by Dr. Levy, the evidence

2     presented by Mirror Worlds to show that this element was

3     satisfied that they presented to Your Honor, was evidence

4     directed towards Mac's -- Macintosh operating system.  And

5     Your Honor considered that evidence and rejected it as legally

6     insufficient in finding that the mobile products did not

7     satisfy this claim element.  And we are renewing our motion,

8     and I will go through the argument as to why the operation of

9     the Mac OS X is substantially different than the requirements

10    of this claim element and, therefore, as a matter of law under

11    doctrine of equivalents there can be no infringement.

12           But also, as you recognized, Dr. Levy not only

13    didn't understand the appropriate doctrine of equivalents

14    analysis, he certainly never applied it.  He certainly never

15    identified any insubstantial differences between the operation

16    of Mac OS X and the requirements of this claim element, and

17    they simply couldn't because the operation of Mac OS X with

18    respect to these items required by the claims is significantly

19    different.

20           Can you go to Clip 6, please.

21           Now, this is a clip that we played throughout the

22    trial, Your Honor.  And it is at Docket 432, Exhibit 4.  And

23    what this shows is that when the cursor -- and this is

24    Mac OS X, when the cursor is displayed and moved over the

25    stack, the system doesn't respond in any way.  There is no

1    response.  So when the claim requires displaying a cursor or

2    pointer and responding to sliding without clicking of the

3    cursor over the said display stack to display a glance view,

4    there is no glance view that is displayed when the cursor is

5    slid across the stack without clicking.

6         There is no glance view displayed.  There is no

7    response by the system.  The system simply doesn't do

8    anything.  And when the cursor stops on a document image,

9    there is no glance view either that is presented.  So simply,

10   it doesn't -- there are substantial differences between the

11   way Mac OS operates with respect to its cursor and the claim

12   limitations, Your Honor.

13        Now, Levy admitted on cross that this black cursor

14   does not infringe.  And he testified that while it is one form

15   of cursor, it does not correlate with any action.  And that is

16   on the 29th in the morning -- September 29th in the morning at

17   Page 29 and again at Page 26.

18        In response to our motion, you invited Apple to file

19   a motion and address in writing why the mobile products do not

20   satisfy this element and why the Court should grant JMOL of no

21   doctrine of equivalents infringement as to the mobile

22   products.  We submitted our brief.  Mirror Worlds submitted

23   evidence by Dr. Levy that was directed towards the operating

24   system, and that is what you rejected when you found JMOL of

25   no doctrine of equivalents infringement on this issue.

1         And can we go to J-13.

2         So this is a demonstrative, Your Honor, showing that

3    Mirror Worlds cited almost exclusively the Mac OS X doctrine

4    of equivalents evidence in opposing the mobile products JMOL

5    which is at Docket 398 at Pages 2 through 7.  And these are

6    the references that they argued in opposition to our motion

7    that was rejected.

8         Can you go to J-14.

9         Now, Dr. Levy here repeatedly testified that instead

10   of having a moving pointer and a stationary stack, Cover Flow

11   and Mac OS X has a moving stack and essentially a stationary

12   pointer.  He went on to state that Cover Flow and Mac OS X

13   does not display a literal pointer, but I believe it has the

14   equivalent because the user is always looking at the center

15   where the glance view is going to pop up, and that is where

16   the cursor or pointer is by default.

17        He states there is another cursor on the Cover Flow

18   screen.  The cursor or pointer is in the area of the center of

19   that square which selects what comes under it.  So he

20   constantly claimed in his doctrine of equivalents analysis as

21   applied to Mac OS X, that there was a stationary pointer,

22   stationary sliding stack.  That is the exact same theory and

23   arguments that they presented unsuccessfully to Your Honor

24   with respect to the mobile products.

25        Go to 25-C.

1          So here, again, is his stationary stack sliding
2   pointer that was rejected previously by the Court where he is
3   indicating above, that as you move the pointer and the cursor
4   along the stack and it rests on a document image, it shows the
5   glance view.  That simply isn't done below.  There is no
6   cursor.  There is no cursor that moves over the stack.  There
7   is no glance view shown when the cursor stops on a document
8   image.  It is substantially different than the claim
9   requirements.  That is why they can't, as a matter of law,
10  prove doctrine of equivalents.
11         In addition to just simply failing as a matter of
12  law to prove it because there are substantial differences,
13  Your Honor, there is no way that they can come up with a
14  theory that that representation of OS 10 satisfies these
15  elements without vitiating the claim elements, which you also
16  found with respect to Mirror Worlds' arguments on the mobile
17  products.  You found that not only did Dr. Levy fail to
18  identify insubstantial differences, but also that he did not
19  apply a function, way, result test.
20         He simply didn't do it.  He didn't understand -- and
21  I crossed him on this -- he didn't understand what the
22  doctrine of equivalents was.  He never identified
23  insubstantial differences.  He never applied a function, way,
24  result test.  He never applied the doctrine of equivalents.
25  He has no opinion about it other than saying, oh, I think it

1    is equivalent, and that is insufficient.  But when you look at

2    it, the substantial differences render it, as a matter of law,

3    impossible to prove infringement.  Then the only way to get

4    there is by vitiating the claim elements and by just

5    completely ignoring them like responding.

6            The cursor has to respond to sliding without

7    clicking over the displayed stack to show a glance view when

8    the document representation is currently touched by the

9    cursor.  So they have now changed their theory completely.

10   There is no evidence in the record of this, but they have

11   changed their theory and said, well, it is that sliding scroll

12   bar at the bottom.  That must be the cursor.

13           Well, it doesn't matter.  It doesn't matter whether

14   it is the black cursor, which they already said wasn't the

15   cursor and simply doesn't respond, or if it is the scroll bar

16   at the bottom.  The scroll bar at the bottom does not satisfy

17   these claim elements and is substantially different from these

18   claim elements as well.  The scroll bar never touches a stack.

19   The scroll bar never touches a document image.

20           Your Honor, for these reasons Apple moves for JMOL

21   as a matter of law of no infringement under the doctrine of

22   equivalents for all claims of the '427 and '313, Your Honor.

23           THE COURT:  All right.  Response?

24           MR. STEIN:  Apple's argument is simply ignoring the

25   most significant difference between Cover Flow on the mobile

1    devices and Cover Flow on Mac OS X.  That difference is that a

2    Mac OS X, there actually is a displayed cursor used in

3    connection with Cover Flow.  And the basis for Apple's earlier

4    motion was that the displaying a cursor limitation was

5    vitiated, and the basis for the Court's earlier decision was

6    that the displaying a cursor limitation was vitiated.

7         And Apple made a litigation decision to pursue

8    doctrine of equivalents against the mobile devices only

9    because it lacked that limitation.  Mirror Worlds had always

10   argued that the cursor is used in connection with the Cover

11   Flow display -- the Cover Flow feature on Mac OS X.

12        The record, Dr. Levy's testimony establishes that he

13   goes through step by step describing how to drag the cursor

14   with the pointer, and there is other evidence of record, too.

15   In fact, there was a video displayed of --

16        THE COURT:  What is your response to his testimony

17   though that the black arrow is not the cursor?

18        MR. STEIN:  The black arrow is the cursor.

19        THE COURT:  Didn't they just have some testimony up

20   where he testified that it was not?

21        MR. STEIN:  The testimony he is referring to is that

22   he showed Dr. Levy -- he was moving the black cursor over the

23   top of the document images in the Cover Flow display, and Dr.

24   Levy testified I believe that --

25        THE COURT:  Can you put that slide back up?  Can you

1    put that slide back up with the testimony that you had of Dr.

2    Levy?

3         (Slide displayed.)

4              THE COURT:  Response?

5              MR. STEIN:  So he is saying that black cursor -- and

6    what he is not doing there does not demonstrate infringement,

7    that is correct because to demonstrate infringement under the

8    doctrine of equivalents you need to use the black cursor to

9    drag the scroll thumb on the bar beneath it --

10             THE COURT:  Now, Counsel, as I recall the testimony,

11   though, I don't remember Dr. Levy saying anything about the

12   black scroll bar at the bottom being the cursor sliding

13   without clicking over the displayed stack.  His whole argument

14   was that the center point of the screen was I guess an

15   imaginary cursor; and that when it hits that, that is what

16   satisfies the claim.

17             Now, can you point me -- maybe I am misrecollecting

18   the testimony, but can you point me to any of his testimony

19   that says that the scroll bar at the bottom is the cursor

20   sliding over the stack?

21             MR. STEIN:  He has testimony describing step by step

22   using that black cursor, and he is not saying that the scroll

23   thumb or the scroll bar is the cursor.  That -- that -- he is

24   saying that the cursor that is being displayed there is the

25   cursor within the claim.

```
 1            THE COURT:  By the cursor you are referring to the

 2   little black -- that is what we would call a traditional

 3   cursor the little black arrow; is that what you are referring

 4   to?

 5            MR. STEIN:  Right.  And there is testimony cited in

 6   the briefs -- I can pull it out and direct you to it -- where

 7   he describes that operation.

 8            Now, there is also, as the Court points out and as

 9   Mr. Randall, he was saying that there is a fixed cursor in the

10   middle.  But there is another cursor that is used in

11   connection with Mac OS X, which is that black cursor.  He is

12   not demonstrating infringement in that particular example, but

13   the cursor is there.

14            If you could show Slide 16.

15            So this is a slide image from a demonstration given

16   by Mr. Jobs when he was demonstrating Cover Flow.

17            And if you can go to the next slide where Mr. Jobs

18   is demonstrating Cover Flow.

19            Maybe the lights can come down.

20      (Demonstration video played.)

21            THE STEIN:  The other pointer was just from our

22   computer.  But Mr. Jobs in that example is using the black

23   cursor displayed on the screen to drag the scroll thumb or the

24   scroll bar which is serving as basically a proxy for the stack

25   above it.
```

```
 1        (Video replayed.)

 2            THE COURT:  But you acknowledge that he is not

 3   dragging and sliding the cursor over the display stack?  He is

 4   sliding it over the bar at the bottom?

 5            MR. STEIN:  If the bar at the bottom is serving as a

 6   proxy in this case for the display stack, it is the position

 7   on the bar is the same as the position on the stack.  Again,

 8   if every word was the same in this example as it was in the

 9   claim, then we wouldn't be relying on the doctrine of

10   equivalents; but he is sliding without clicking the cursor

11   over this proxy to display a glance view of the document that

12   is being pointed to.

13            So -- and he explained -- the testimony cited in the

14   brief has this explanation of this operation.  There would be

15   no reason for that testimony if we were relying on the -- if

16   we want to rely on that particular operation.  The very reason

17   why he gave that example during his testimony was because the

18   Mac OS X is different from the mobile devices and actually

19   uses a display cursor in the operation of the Cover Flow

20   display.

21            And notably Dr. Feiner never mentioned the doctrine

22   of equivalents at all at trial.  And so I think because to --

23   well, as the jury found, the jury found -- the issue was put

24   to the jury, and the jury saw this operation.  They saw --

25   they saw -- or heard Dr. Levy's testimony that the two were --
```

1    that the operation of Cover Flow and the claim limitation were

2    equivalent.  And they made that factual determination.  They

3    determined after hearing all of the evidence and looking at

4    these two things visually themselves made the determination

5    that there was equivalents here.

6            So what Apple is trying to do at this time is

7    reweigh the evidence.  There is not a vitiation of the claim

8    element as Apple argues.  He was linking the testimony for

9    this particular element to this particular operation.  You can

10   see as he steps through it that the language is present.  And

11   he also stated the principle for doctrine of equivalents that

12   he was applying in this testimony and he went ahead and

13   applied it.

14           And the jury heard all of the testimony and all of

15   the evidence at record including seeing these things in

16   operation for themselves, and concluded that they were

17   equivalent.  This is not the kind of thing that is -- that has

18   a lot of underlying, unseen technology that the jury needed to

19   understand.  It is a -- it is a user interface element that

20   the jury can look at and make its own determination as to

21   whether or not the operation of these two items are

22   equivalent.

23           THE COURT:  Okay.  Thank you.

24           MR. STEIN:  Well, I also want to make the point that

25   it is our position that Apple has waived the argument with

1    respect to the operating system.  Throughout this whole case

2    they have only asserted the doctrine of equivalents against --

3    or moved for noninfringement under the doctrine of equivalents

4    with respect to the mobile devices.  They moved earlier in the

5    case for summary judgment of noninfringement under the

6    doctrine of equivalents.  They limited that to the mobile

7    devices.

8          They limited their briefing -- when the Court asked

9    for briefing on the issue of the doctrine of equivalents, that

10   briefing was specific -- the Court asked for briefing without

11   limitation on the issue of the doctrine of equivalents.  Apple

12   only briefed the issue with respect to the mobile devices.

13         Apple also mentioned that there was a motion in

14   limine that touched on the doctrine of equivalents.  And,

15   again, they only mentioned their position that there was no

16   infringement under the doctrine of equivalents for the mobile

17   devices.  And the reason is -- I think it is clear is that in

18   the mobile devices there is not a displayed cursor used in the

19   operation of Cover Flow; whereas, in Mac OS X there is a

20   display cursor.

21         THE COURT:  All right.  Thank you.

22         Response?

23         MR. RANDALL:  Thank you, Your Honor.  There was some

24   comment about Dr. Levy explaining that procedure and

25   describing that procedure.  What Dr. Levy did not do is he

1    never ever said that the black cursor was the cursor that

2    satisfied the claim elements.  He never said that.  He

3    constantly used and exclusively used this stationary pointer

4    moving stack argument that was rejected by the Court on JMOL.

5    That is what he used.  And they can't point to where he said

6    something otherwise.

7            Now, with respect to whether or not the cursor as a

8    matter of law can satisfy the claim elements under the

9    doctrine of equivalents, it simply can't because that cursor,

10   if it touches the scroll bar and moves the scroll bar --

11   neither the scroll bar nor the cursor -- Dr. Levy didn't say

12   either one of them was the cursor to satisfy the claim

13   elements.  But neither one of them in looking at it can come

14   close to satisfying these claim elements.

15           It simply doesn't respond -- when the cursor goes

16   across the stack there is no response on the sliding without

17   clicking.  It doesn't show a glance view.  It doesn't show a

18   glance view when it stops on a document representation.  It

19   doesn't even do anything.  And the scroll bar never touches

20   the stack either.  I think Counsel indicated, well, it is the

21   same thing.  It is absolutely not the same thing.

22           If you think about the resolution that is required.

23   If you have -- for instance, if you had a stack of 50

24   documents and you wanted to show a glance view of one, the

25   best thing to do would be to take a pointer and point on

1    that -- rest on that document image and it pops up, right?

2    You have the resolution to do that.

3              In a system with a scroll bar and you are moving it,

4    you could flip several more.  You can't get the resolution

5    necessary to pick one exact document image.  You have this

6    error factor, if you will.  Same error factor if you were

7    watching a CD on a DVD player and you hit fastforward and it

8    scrolled a little faster than you want it to go forward.

9    Same thing here.  They are different.

10             But the bottom line is with respect to claim

11   language there are simply substantial differences between what

12   is required by the claim and the operation of the system.  It

13   is for the same reason that the Court rejected those

14   arguments --

15             THE COURT:  Well, counsel your precision argument,

16   though, about the bar not being as precise as sliding over the

17   stack, if you are sliding over a stack, it could just depend

18   upon how graphically tight the stack is stacked, isn't it, as

19   to how precise it would be?

20             MR. RANDALL:  It is.  If you have two documents in

21   the stack you would probably get more accuracy than if you

22   have 200.  But the point is, what is required by this claim

23   element?  And there are a number of requirements that are

24   required, and they all stem from this cursor moving over the

25   stack, the system responding to that.  And they simply didn't

 1    put on any evidence of that.  And there isn't any evidence

 2    from which a jury could find those differences are

 3    insubstantial.

 4         With respect -- and with respect to the cursor, he

 5    flat out said, Your Honor, at -- on the 29th, September 29 in

 6    the morning at Page 29, Lines 1 through 21 and at Page 26,

 7    Line 15 through 27, Line 12 he admitted that the black cursor

 8    does not infringe.  And while it is one form of cursor, it

 9    does not correlate with any action.  It simply doesn't.  They

10    never put on a theory of doctrine of equivalents infringement

11    regarding the software that wasn't rejected by the Court.

12         Your Honor, with respect to this waiver argument, we

13    moved before trial, we moved in limine to preclude all

14    evidence or argument under the doctrine of equivalents

15    regarding all products.  That is at Docket No. 323.

16         Before the verdict, we moved for JMOL under the

17    doctrine of equivalents as to all products.  We did that on

18    September 29 at page -- in the afternoon, Page 88.  We stated

19    a JMOL of noninfringement under the doctrine of equivalents

20    should be granted for all claims.  We went on to state that

21    Mirror Worlds has failed to establish any infringement under

22    the doctrine of equivalents because there is no evidence for a

23    reasonable jury to find the differences between the accused

24    products and Mirror Worlds' patents-in-suit are

25    insubstantial.

```
 1              We went on to cross Levy again on the doctrine of
 2     equivalents; that he didn't understand it, he didn't apply it,
 3     and he never applied an appropriate standard of reaching his
 4     opinions.  After the close of evidence on October 1, we
 5     renewed our prior JMOL.  We requested JMOL of noninfringement
 6     of claims that require a user sliding without clicking the
 7     cursor or pointer to display glance views.  That was at Page
 8     17, 22 through 24 and 19, 19 through 13.  So we raised this
 9     multiple times, Your Honor, and preserved our objection.
10              THE COURT:  Okay.  Final word.
11              MR. STEIN:  With respect to the last statements by
12     Mr. Randall, those are addressed in our briefs.  In fact,
13     throughout this case they have asserted noninfringement under
14     the doctrine of equivalents against -- with respect to -- with
15     respect to the mobile devices only, and all that is set out in
16     the briefs.
17              With respect to Mr. Randall's argument that there
18     was no evidence before the jury.  Well, we just saw the
19     evidence.  We saw Mr. Jobs.  We had the explanation of how
20     that operation occurs from Dr. Levy.  It was all right there
21     before the jury's eyes.  What Apple is asking the Court to do
22     now is to make its own determination.
23              In fact, if the Court looks back at its earlier
24     opinion on the doctrine of equivalents issue, the focus of
25     that is the lack of display of the cursor.  And that is just
```

1    not the case in the Mac OS X system.

2         And with respect to his comment about using the

3    cursor to control the Cover Flow display, Mr. Jobs himself

4    when he was displaying Cover Flow used the scroll bar -- used

5    the cursor to drag the scroll thumb.  That is the natural way

6    of operating Cover Flow.  So, you know, I think that

7    establishes that even when Apple is using it, it uses that

8    particular methodology of operating Cover Flow.

9         THE COURT:  Counsel, what is your response to their

10   argument that Dr. Levy did not do a function, way, result

11   analysis?

12        MR. STEIN:  He relied on insubstantial differences.

13   His testimony was that this operation and the operation of

14   Cover Flow and the operation of the patented device were not

15   substantially different.  I think that that was the test,

16   which is a perfectly valid test under the law for establishing

17   infringement under the doctrine of equivalents.

18        THE COURT:  Okay.  Anything further on that?

19        MR. RANDALL:  Yeah, just briefly, Your Honor.  On

20   Apple's preservation of the JMOL, the Texas Instruments v.

21   Cypress Semiconductor case at 90 F.3d 1558 at 1566, Note 6,

22   Federal Circuit 1996 case, states, and I quote:  "An oral

23   pre-verdict motion requesting a directed verdict on the issue

24   of noninfringement was sufficient to support a post-verdict

25   motion concerning the doctrine of equivalents."

 1           We actually made numerous times our JMOL motion

 2   specifically on doctrine of equivalents and on this point and

 3   preserved that point, number one.

 4           Number two, the expert Dr. Levy never opined with

 5   respect to Mac OS X that the cursor that satisfies these

 6   elements was anything other than the stationary pointer with

 7   the moving stack.  That is what he relied on.  That is all the

 8   evidence in the record.  That was rejected by Your Honor with

 9   respect to the mobile products' motion.

10           And, lastly, Your Honor, there was never any

11   testimony by Dr. Levy about insubstantial differences between

12   the operation of Mac OS X and these claim elements.

13           THE COURT:  All right.  Very well.

14           Let's move on --

15           Final word?

16           MR. STEIN:  With your permission there are a couple

17   of points that I would like to make with respect to the direct

18   infringement issue after looking at the Lucent case over the

19   the break.

20           THE COURT:  All right.

21           MR. STEIN:  The first is that in the Lucent case the

22   Court found that the testimony that -- of the expert, that he

23   and his wife used the patented method was enough to establish

24   infringement by itself.  The point being that it is hard to

25   believe that they were the only two people in the country --

1    or the only customers in this case that actually used the

2    patented features.  So the threshold is low to establish

3    direct infringement by use.

4         Here we have substantial evidence of direct use,

5    both by Apple and its customers as those surveys

6    demonstrated.  Here -- I put up the survey before that showed

7    that.  In that particular survey which didn't account for all

8    uses of Spotlight, if you look at the slide, it only accounted

9    for some of the uses of Spotlight.  There was a very high

10   percentage of use of actual customers using Spotlight.

11        So, you know, to the extent that Apple is relying on

12   Lucent it actually supports our argument regarding direct

13   infringement.

14        Also, I just want to emphasize the point that this

15   case, with respect to the offer for sale, is unlike any other

16   cases that Apple cites.  Here we have a company that is making

17   and selling computers that contain the software that, you

18   know -- that in combination performed the patented methods.

19   That is not like any of the other cases cited by Apple in this

20   case, and it is important to remember that courts when faced

21   with new fact situations as in the district court cases that

22   we have cited in our briefs, have found infringement due to

23   offers for sale of patented methods under particular fact

24   situations.

25        Two other quick points.  One, that there was a

1   demonstration of the patented technology at the Mac World

2   2005.  It is PX140.  And to the -- so Apple's point regarding

3   any demonstration in 2004 isn't really terribly significant

4   due to the fact that it was used in 2005.

5           Let's see -- well, a minor point but there was an

6   issue regarding whether or not PX933 was admitted.  It was

7   admitted.  We refer the Court to DI411-2.

8           THE COURT:  Response?

9           MR. RANDALL:  Yes.

10          THE COURT:  I think we are going backwards.  We are

11  retreating back to ones we have already covered.  It is not a

12  good sign, but --

13          MR. RANDALL:  First, in the Lucent case the Court

14  stated:  We agree with Microsoft that there was little, if

15  any, direct infringement evidence.  And they pointed

16  specifically to the expert stating that he performed all steps

17  of the claims many times.

18          When they say that Steve Jobs demonstrated Apple's

19  products at a convention in January of 2005, that is before

20  Mr. Bratic's statement.  Mr. Bratic stated there was no proof

21  of infringement prior to June of 2005, number one.  He said

22  there was no evidence of that.

23          Number two, there is no evidence in the record that

24  what Mr. Jobs demonstrated on that clip satisfies each and

25  every claim element of any of the method claims.  There is no

 1   evidence in the record.  They haven't supplied any.  They

 2   haven't directed the Court to any.  They just said Jobs just

 3   did it.

 4           They also say Spotlight -- users have used

 5   Spotlight.  Using Spotlight alone doesn't infringe the claims.

 6   They can't point to it.  There are a series of steps all of

 7   which have to be performed.  For instance, in Claim 13 of the

 8   '227, it requires receiving data from other computers.  They

 9   can't prove that.  They can't prove like the court did in

10   Lucent and rely on, this thin, thin read of evidence of direct

11   infringement of some person performing all steps of the

12   claims.  They can't prove it.  They haven't proved it.  There

13   is no evidence in it, and they have no case to rely on it.

14           THE COURT:  Let's move on to something new.  What is

15   next on your JMOL, Mr. Randall?

16       (Pause in proceedings.)

17           MR. RANDALL:  Your Honor, the next issue is Mac OS X

18   does not have a main stream inclusive of every data unit; and,

19   therefore, Apple is entitled to a JMOL of noninfringement as

20   to all claims of the '227 patent, 13 and 22, and Claims 2, 3,

21   and 11 of the '313 patent.

22           Your Honor, you construed a main stream as requiring

23   a stream that is inclusive of every data unit or document

24   received by or generated by the computer system.  And it is

25   undisputed from the evidence presented at trial that Mac OS X

1    includes a privacy feature that allows users to exclude any

2    and all data units from the Spotlight Store, which is what

3    they allege main stream was, and maintain those data units in

4    the computer system.

5              Can you put up JH-8.

6              This is the privacy feature that is included in Mac

7    OS X that Mr. Hornkvist testified about at -- on September 30

8    in the morning at Page 31.

9              Can you put up tab -- I'm sorry, CL-7.

10             Now, here is Mirror Worlds' statements to the Patent

11   Office.  And they state, "In contrast to other systems, the

12   present invention as recited" -- so they are defining the

13   present invention -- "in the amended claims, does not permit

14   data units to be removed from the main stream and still remain

15   in the computer system, because as recited in the amended

16   claims, a data unit of the computer system must be included in

17   the main stream."

18             So the privacy feature in Mac OS X allows users to

19   remove important information, and there was testimony from

20   multiple sources; Mr. Hornkvist, Mr. Tribble, and Mr. Feiner,

21   on that feature; that it would allow people to take, for

22   instance, confidential information either if you have a shared

23   computer with your kids or you have a shared computer with

24   your colleagues and put information in the privacy feature and

25   exclude that from the system.  And it is absolutely clear from

1    the file history that Mirror Worlds disclaimed the scope of

2    that claim.

3            So the evidence is clear that we, Mac OS X, has the

4    built-in feature that allows for the removal of data units

5    from what they consider to be the main stream; and, therefore,

6    we don't satisfy the Court's construction of that element,

7    Your Honor.

8            THE COURT:  Response?

9            MR. STEIN:  Put up Slide 19.

10           Apple here is basically relying on a disclaimer,

11   prosecution disclaimer argument, which is a claim construction

12   issue, which it has never raised before.  This is an issue

13   that should have been addressed during the Markman

14   proceedings.  And if it was, we think we would have prevailed

15   on it.  But it wasn't addressed at the time because Apple

16   didn't raise it.  So the most their argument amounts to is

17   that Apple has a way of turning off a stream, in essence; that

18   as sold, the Apple computers do not have the privacy feature

19   enabled and, therefore, Mac OS X infringes as sold.

20       Now, Apple can't wait until trial -- or after trial to raise

21   a disclaimer argument.  There was nothing in the Court's claim

22   construction, in the jury's instructions.  I believe

23   disclaimer wasn't even a part of the jury instructions.  So

24   there would be no way at this point for the jury to have

25   considered this issue.

1          Moreover, that the requirements for this prosecution

2    disclaimer are very strict and difficult to meet; and that in

3    this case they would not be met if this was an issue that was

4    properly before the Court at this time.

5          The requirements are on the slide, but it requires a

6    clear and unambiguous disavowal of claim scope.  And where the

7    specification expressly defines a claim term, which is the

8    case here, and remarks made to distinguish claims from the

9    prior art are broader than necessary to distinguish the prior

10   art, disclaimer doesn't apply.

11         Apple doesn't go through any of that analysis.  It

12   just points to one excerpt from the prosecution history, have

13   the Court rule on a new claim construction issue after trial,

14   and we think that is inappropriate.

15         THE COURT:  Response?

16         MR. RANDALL:  Your Honor, this is not a new claim

17   construction issue.  Your claim construction is correct, and

18   we are simply applying the evidence to your claim construction

19   as guided by the prosecution history.  The evidence that we

20   presented -- and I think they cite it in their brief, Your

21   Honor, the Enovsys/Nextel case and claim somehow we have

22   waived this.  That case involved Sprint, the defendant,

23   presented a new theory of a term's meaning post-trial after

24   the jury had returned a verdict.

25         In this case, Your Honor, we argued from the outset,

1    this issue.  We argued at trial and affirmatively offered

2    evidence confirming that Spotlight is not a main stream.  It

3    does not include every unit.  And we presented testimony from

4    Feiner, from Tribble, from Hornkvist, on the privacy feature

5    indicating that what they considered to be the main stream,

6    Spotlight Store, does not include every data unit.  And when

7    he suggests that it is not enabled when it is sent or shipped

8    or sold, is simply not true.

9           The privacy feature is a feature that is always on

10   and always capable of excluding units from the data -- from

11   what they considered to be the main stream, which is Spotlight

12   Store and, therefore, we simply don't infringe.

13          THE COURT:  All right.  Final word.

14          MR. STEIN:  The law is pretty -- very clear on the

15   point that you don't avoid infringement by having a

16   noninfringing mode of operation.  The Court ruled that a main

17   stream is a stream that includes each data unit generated by

18   the computer.  If there is a mode of operation in which that

19   is not the case, well, that mode, you know, may not infringe.

20   You have to look at it.  But here the -- here they are going

21   beyond that.

22          They are saying that not only might -- not only is

23   there this potentially noninfringing mode; that there is --

24   that mode is disclaimed in terms of you can't even provide

25   that operation.  You can't even provide that mode without --

1    and still infringe the patent.  And that is the disclaimer

2    argument.  They never made that argument before.  It is

3    something they raised -- first time.  They are taking issue

4    with it is not enabled by default.  The point is that there

5    are no data units that are excluded under the privacy feature

6    unless a user invokes it.

7              THE COURT:  All right.  What is next, Mr. Randall?

8              MR. RANDALL:  Your Honor, Apple identified and

9    briefed a number of other bases for JMOL of noninfringement.

10   Those are all set forth in our briefs.  I know the Court has

11   both limited time and patience for these arguments.  We have

12   set those forward.  We feel that those provide equal basis,

13   Your Honor, to grant JMOL of noninfringement.  I won't go

14   through each of them.

15             They are, however, Mac OS X does not have a

16   time-ordered main stream.  Mac OS X does not implement an

17   electronic diary.  Mac OS X does not have a stream with a

18   feature portion.  It does not include a time stamp to uniquely

19   identify.  It does not include source code -- I'm sorry, does

20   not include a receding foreshortened stack, and does not

21   include two operating systems.

22             And, Your Honor, we have briefed that and submitted

23   it.  I won't provide oral argument on it, but we do believe

24   those provide an equal basis for JMOL.

25             I will, however, Your Honor, talk briefly about the

1    JMOL of no willful infringement.  Your Honor, given the facts

2    of this Case, number one, Mirror Worlds never asserted

3    infringement against Apple until they filed this case.  Never.

4           Number two, there are a host of reasons, Your Honor,

5    why the first prong of Seagate is simply not satisfied.  And

6    they can't satisfy it as a matter of law.  Many of those

7    reasons were not presented and could not, based on your

8    rulings, be presented to the jury.  But I will go through a

9    few of them.

10          Your Honor, first of all, Your Honor found a number

11   of the asserted claims indefinite and, therefore, invalid

12   pretrial.  The Court found on JMOL no indirect infringement of

13   all claims.  The Court found no infringement, either literally

14   or under the doctrine of equivalents of all Apple mobile

15   products.

16          Mirror Worlds, after full discovery in the case,

17   dropped its allegations of infringement on the '999 patent.

18   The Court recognized, I believe, at the close of evidence what

19   a close question infringement -- direct infringement of the

20   '227 and '313 claims were.

21          The only remaining claims on the '427 patent are

22   allegations of doctrine of equivalents arguments that we

23   believe those same arguments were rejected by the Court in the

24   mobile products ruling, and the same basis would apply to the

25   '427 here.

```
 1            In reexam, Your Honor, the asserted claims of the
 2   '227 have been finally rejected.  There is -- and Apple for
 3   its noninfringement positions, Your Honor, utilized in large
 4   part the source code to establish noninfringement positions.
 5   So its own source code established noninfringement.  And if
 6   you recall, Dr. Levy and his colleagues spent 90 days, 90 days
 7   poring over Apple's source code to try to find some evidence
 8   of infringement, and they provided none to the Court.  Zero in
 9   this trial.
10            Your Honor, we submit under the facts of this case
11   that as a matter of law plaintiffs cannot establish the first
12   prong of Seagate.
13            THE COURT:  All right.  Response?
14            MR. STEIN:  Each of the items that Mr. Randall just
15   mentioned all involve post-litigation defenses.  And under the
16   i4i the proper time period for assessing the objective prong
17   under Seagate is the time that infringement occurs and not
18   litigation derived --
19            THE COURT:  I'm not familiar with this i4i.  Just
20   kidding.  Go ahead.
21            MR. STEIN:  That rule made sense because otherwise
22   an infringer can find out about a patent, willfully infringe
23   it and if years later comes up with some defenses that pass
24   the straight-face test, they can avoid a willful infringement
25   finding, even though at the time they acted completely
```

1    unreasonably as a competitor with respect to the patent

2    owner.

3            And in their briefing they often say that they

4    didn't know about the patent.  Well, the jury has ruled on

5    that issue.  We produced -- presented substantial evidence

6    that Apple, in fact, knew about Mirror Worlds' patents.  And

7    the jury in reaching its willful infringement finding

8    determined that Apple did, in fact, know about Mirror Worlds'

9    patents at the time that it started its infringement.

10           Two other points -- I guess, three.  One -- I would

11   like to address one with respect to the '999 patent, that

12   those -- that patent -- the one claim in that patent that was

13   dropped was simply for trial.  There is no implication that

14   can be derived from that, certainly.

15           With respect to the '227 patent the prosecution of

16   the patent during the reexam is ongoing.  There has been no

17   final ruling by the Patent Office on that.  And, by the way,

18   with respect to other patents, many of the claims in suit here

19   were confirmed by the Patent Office.  All of the reexamination

20   proceedings at this point are ongoing, and were not considered

21   by the jury because of their prejudicial effect and the

22   relevance to this action.

23           But the reexamination proceedings are ongoing.

24   Claims that are at issue here have been allowed.  Some stand

25   rejected, but there is still activity going on at the Patent

1   Office, and no final resolution has been reached.  I think

2   that's all.

3           THE COURT:  Okay.  Thank you.

4           What is next?

5           MR. RANDALL:  This Court -- do you need any more

6   argument on the JMOL -- I mean the no willfulness?

7           THE COURT:  That is up to you.

8           MR. RANDALL:  Well, I will just address a couple of

9   points.  He indicated that we knew about the patents.  The

10  evidence that they presented about communications between the

11  parties Apple and Mirror Worlds occurred before the '427 and

12  '313 were ever even issued.  So there is no evidence in the

13  record showing any knowledge or any possible knowledge

14  regarding those two patents.  Regarding the '227, there is no

15  evidence in the record that indicated that they specifically

16  identified that patent.

17          The indication that all of this evidence was

18  post-litigation is simply not true.  We have always had our

19  Piles system.  Gitta Salomon testified about that.  Piles has

20  been used to reject some of these claims.  The '227 asserted

21  claims were finally rejected by the PTO on reexam.  And we

22  also relied on our source code to prove noninfringement.

23  Those are the only points, Your Honor, with respect to a JMOL

24  of no willful infringement.

25          THE COURT:  All right.

1          MR. RANDALL:  The next issues would be to address a

2    few damage issues that we didn't cover before.

3          Your Honor, the first issue is that Mirror Worlds

4    did not produce and present any evidence on a per-patent

5    damages basis.  As the Court recognized previously, their

6    theory all along was that there was one damage number --

7          THE COURT:  Haven't we already been over this this

8    morning already, or is this something new?

9          MR. RANDALL:  Well, this is directed to the

10   insufficiency of the evidence on that issue; they simply

11   didn't present any.

12         THE COURT:  All right.

13         MR. RANDALL:  And Mirror Worlds admitted that to the

14   Court in the Docket No. 403 at Page 6 that the jury currently

15   doesn't have sufficient information before it to determine the

16   appropriate damages.  They simply didn't apportion any

17   damages.  They never claimed that the entire damage figure

18   that they were seeking could be attributed to or supported by

19   infringement of any particular claim, Your Honor.

20         And with respect to that issue, they did not

21   allocate their damages based on infringement.  So, for

22   instance, with respect to the '313 and '227 patents they never

23   tailored their damages case to whatever isolated direct

24   infringement claim they were going to make.  And they simply,

25   as we have mentioned, they haven't presented any direct

1    infringement; but they didn't tailor those damages to those

2    patents on just the direct infringement that was presented.

3            They also didn't tailor their damages, Your Honor,

4    to eliminate the damages that they originally sought for

5    indirect infringement.  So they continue to seek damages for

6    all of the patents, including the method claim patents for

7    sales of just software and for sales of hardware.  And they

8    simply -- they never limited those damage requests with

9    respect to those two patents to either the direct infringement

10   that they showed or to eliminate the indirect infringement

11   that the Court eliminated on JMOL.

12           Your Honor, the other point with respect to damages

13   is that they violated the entire market value rule in coming

14   up with their theories.  They never adjusted -- they never put

15   on any evidence at all to suggest that purchasers of the

16   hardware and software were driven by the inventions that were

17   asserted in this case.  They simply never provided that.  And

18   yet when they seek damages, they seek damages over the entire

19   royalty base.

20           And under the Lucent Gateway case, Your Honor, that

21   we cited, they have violated the entire market value rule in

22   doing that by failing to present any evidence that the

23   consumer demand was driven by the inventions for the purchase

24   of both the hardware and software.

25           They claim in their brief that they have satisfied

 1    and accommodated that concern by adjusting their royalty

 2    rates, and under the Cornell v. HP case at 609 F.Supp.2d 279,

 3    Judge Rader indicated that adjusting a royalty rate is not

 4    sufficient to address concerns about the entire market value.

 5    You have to adjust the royalty base.  And in this case they

 6    provided no evidence to allow them to use as a royalty base

 7    both hardware and software.

 8         And if you eliminate, Your Honor, just hardware, for

 9    instance, if you eliminate just hardware from their damage

10    calculations, even assuming their calculations were correct --

11    so you assume they have a 625 million verdict, which is

12    roughly cut in half because the mobile products are taken out,

13    to roughly 312 million, if you take out their hardware damages

14    because they didn't satisfy the entire market value rule, they

15    didn't satisfy with it in regard to hardware or software; but

16    if you take out their hardware, it drops their damages -- even

17    assuming all the figures are correct -- to $22 million.

18         Your Honor, we would move for JMOL on the damages

19    issue because they violated the entire market value rule with

20    respect to both hardware and software.

21         THE COURT:  And in your JMOL your position is they

22    are not entitled to any damages; is that correct?

23         MR. RANDALL:  Well, Your Honor, we did put on

24    evidence through our expert that the maximum damage award in

25    this case would be capped at five million dollars.

1          THE COURT:  All right.  Response?

2          MR. RANDALL:  And the reason for that is simply

3     this:  That both experts, both experts opined that the

4     hypothetical negotiations would take place between two sales,

5     entire sales of the patents; one for $210,000, one for $5

6     million.  And so between those two periods, both experts said

7     that there would be a hypothetical negotiation that would take

8     place, and Apple would take a license -- not purchase patents,

9     but just take a license.  And we believe that if you apply any

10    reason to those two full outright sales of the patents and the

11    hypothetical negotiation occurs in the middle of them, that

12    the damages cannot exceed the $5 million.

13          THE COURT:  All right.  Response?

14          MR. DIBERNARDO:  Thank you.  Apple addresses three

15    points.  The method claim issue as it relates to damages, the

16    entire market value rule, and the reliance on prior sales.  I

17    will address each of those in order.

18          If could have Slide 24.  Thank you.

19          So Apple argues that damages with regard to the

20    method patents, the '227 and the '313 should be limited based

21    on the proof of direct infringement.  However, the Federal

22    Circuit has said there is no such rigid rule.  In fact, there

23    can be good reasons why a licensee would pay not based on the

24    actual use by a consumer.  This comes from the Lucent case.

25          In fact, Lucent goes further -- and I can read a

1    portion from Lucent -- after explaining that there is no rigid

2    requirement that damages be limited to direct infringement,

3    the Fed Circuit goes on to say that a company licensing a

4    patented method often has strong reasons not to tie the

5    royalty amount strictly to usage.  Furthermore, with some

6    inventions, say, for example, a method of detecting fires, the

7    value is added simply by having a patented invention available

8    for use.  That is at 1334.

9            Certainly, here where there is overwhelming evidence

10   as to the importance of the inventions and the value placed on

11   them both by Apple and by their consumers, there would be

12   reason not to limit damages to the instances of proof of

13   direct infringement by the consumers.  These features were

14   available for use, they were, as we argued previously,

15   necessarily used.  And damages should not be limited.

16           If we could go to the next slide.

17           In the event Your Honor does believe damages should

18   be limited to exclude those method patents, we are left with

19   the '427 patent; and the damages with regard to the '427

20   patent are not affected by those claims.  There are system

21   claims in the '427 and those are infringed.  And this is

22   addressed by, as we mentioned earlier, the second hypothetical

23   negotiation explained by Mr. Bratic.  And that second

24   hypothetical negotiation resulted in a reasonable royalty of

25   $748 million which admittedly was later cut in half when the

1   portable devices were taken out of the case.  But, again, this

2   damage figure, the 748 is the basis for the damages award for

3   the '427 patent.

4           With regard to the entire market value rule --

5           And this is Slide 18.

6           -- is really somewhat of a red herring.  Mirror

7   Worlds did not use the entire market value, and I think

8   somewhat we played into Apple's arguments, but I think our

9   briefing ultimately makes it clear that there was no reliance

10  by Mirror Worlds or Mr. Bratic on the value of the entire

11  computer to increase royalty rates.  That just was not the

12  case.

13          The methodology used was to determine the royalty

14  rate attributable to just the patented features.  That led to

15  an $11.36 royalty on just the software; just the patented

16  features and just the software.  That same 11.36 was applied

17  to the average price of computers to come up with a royalty

18  rate.  That royalty rate reflects that 11.36.  It is the

19  functional equivalent of getting that same 11.36 per unit.  We

20  are not increasing the amount obtained for sale of the

21  hardware.

22          If we go to the next slide.

23          This type of methodology was specifically sanctioned

24  by the Federal Circuit in Lucent where it acknowledged that

25  you can use the price of the entire commercial embodiment so

1    long as the royalty rate is within an acceptable range.  Here

2    Mr. Bratic reduced the royalty rate based on the value of just

3    the patented features.  In the first hypothetical negotiation,

4    23 percent was attributed based on a customer survey

5    identifying the importance of Spotlight.

6            The same is true for the subsequent hypothetical

7    negotiations relying on the importance in surveys directed to

8    the other patented features that were infringed.

9            What Apple is essentially asking is for a double

10   reduction.  We have already reduced the royalty rate.  Now

11   Apple is asking us to reduce the royalty base.  That is just

12   not required by the case law.

13           If we go to the next slide.

14           I will go through these two quickly.  These are Mr.

15   Bratic's demonstratives used at trial and admitted.  The first

16   slide is an excerpt from that customer survey.  You can see at

17   the top that Spotlight users relied on Spotlight identified as

18   the most beneficial feature about 60 percent of the time.  Mr.

19   Bratic then performed a calculation and created a weighted

20   average based on all of the other features that were

21   identified and came up with a 23 percent weighted average.

22   That 23 percent --

23           If we go to the next slide

24           -- that 23 percent was used in arriving at the

25   royalty rate.

1              In that top box the price of the software upgrade,

2    $129 was used.  76 percent of the margin was used to identify

3    the profit in that upgrade.  And $98 of profit, and then Mr.

4    Bratic limited the amount of that profit to only 23 percent

5    based on weighted average for the purpose of Spotlight.  That

6    resulted in the $22 and change profit which would be billed to

7    Spotlight that was then split 50/50 between Mirror Worlds and

8    Apple, Mirror Worlds getting 11.36.

9              That same 11.36 was used as the royalty calculation

10   for the computers.  That is how Mr. Bratic arrived at the 0.81

11   percent royalty for computers.  And that 0.81 percent royalty

12   simply reflects for computers that were below average price,

13   got a little less than 11.36.  Computers that were higher than

14   the average price of the computer, it was a little more.  But

15   on the average it was the functional equivalent of getting

16   that same 11.36 royalty per unit.

17             If we could go to Slide 15, please.

18             Mr. Randall also addressed the notion of the prior

19   sales of the patents putting a cap on the damage award.

20             Here the jury was justified in not capping the award

21   at the value -- at the amount paid in those transactions

22   because as they were instructed by this Court, they are not to

23   look at sales and transactions between related entities or

24   noncompetitors.  You can see on this slide that each of these

25   three sales that Apple cites to were either between entities

 1   that were not competitors or were between related entities or

 2   involved consideration other than money.

 3          For example, in the Yale to Mirror Worlds technology

 4   transaction that involved stock, a recognition that there was

 5   value to the patents in addition to the money paid.  The same

 6   thing with regard to the Recognition Interface to Plainfield

 7   transaction.  There is a 19 percent back-end kicker, again the

 8   recognition that the money paid was not the sole value of the

 9   patents.

10          With regard to that second transaction, Mirror

11   Worlds Technology to Recognition Interface the Court heard

12   evidence that was a transaction between related entities and

13   that it was a distressed sale.  Apple points in their brief

14   that the $218,000 paid for the patents.  But the record is

15   clear that payment was simply to pay off the creditors of

16   Mirror Worlds Technology.  It was not a true recognition of

17   the value of those patents.

18          So 234 -- so in sum on that point we think the jury

19   properly relied on that instruction and relied instead on Mr.

20   Bratic's and Mirror Worlds' explanation of a hypothetical

21   negotiation and the reasonable royalty.  And, in fact, taking

22   a step back --

23          If we go to Slide 11.

24          -- there is a theme that runs through Apple's

25   papers, and that is, Apple presented uncontroverted evidence

1    that there was a lump sum that should have been granted and

2    they cap it at five million which represents about five hours

3    of infringing sales.

4              But really what Apple did is put all their eggs in

5    one basket.  They relied solely on these prior sales and

6    allegedly comparable licenses and Apple presented no evidence

7    of a reasonable royalty rate.  They ignored their sales of the

8    products with the patented features and the extent of the use

9    of the patented features.  We think the reason for this is

10   clear, they were just distancing themselves from the

11   overwhelming evidence of the importance and the pervasive use

12   of these infringing features.

13             These infringing features were in every product from

14   2005.  Every operating system and computer from 2005 resulting

15   in $32.8 billion.  So here Apple presented this lump sum

16   argument and basically gave the jury a choice.

17             If we can go to the next slide.

18             It wasn't uncontroverted evidence.  The jury was

19   presented with a choice between Apple's lump sum argument

20   based on these prior sales and Mirror Worlds' discussion of a

21   running royalty based on the hypothetical negotiation and the

22   importance of the features and Apple's extent of use of these

23   features.

24             And what did the jury do?  They did what they were

25   told.  They were instructed, and Apple agreed to this

1   instruction.  There was a discussion on the record actually

2   about modifying this instruction.  The jury was instructed

3   that they may award a running royalty, a lump sum, or

4   combination of the two.  The evidence was not uncontroverted.

5   The jury made a decision.  They weighed the evidence and

6   weighed the credibility and went with the running royalty

7   presented by Mirror Worlds.  And Apple's request essentially

8   that the Court reweigh the evidence and reweigh the

9   credibility, is improper.

10          In addition, there is evidence that Apple would have

11   entered into an agreement on something other than a lump sum;

12   on a running royalty.  And we cite those agreements here,

13   instances, even though there is not comparable technology,

14   instances where Apple did indeed agree to something other than

15   a lump sum, a running royalty.

16          That actually addresses the points that Mr. Randall

17   raised, but we do have some other points, though, if we can be

18   sure to save some time, it would be appreciated.

19          THE COURT:  All right.  Go ahead.

20          MR. DIBERNARDO:  I discussed the hypothetical

21   negotiation, for example, the 748 million that applied to the

22   '427 patent.  And Apple has argued that Mirror Worlds

23   requested 625 million; that the jury didn't acknowledge that

24   the portable devices were taken out of the case.  But the

25   answer to that is substantial evidence supports the jury's

1    $625 million award.  That the law and the evidence show that

2    the jury is free and had the justification to award more than

3    the figure presented by Mr. Bratic.

4              If we could go to Slide 16.

5              So awards greater than those requested, have been

6    sustained.  Apple mentions in their brief that we have no such

7    case.  But here are three examples.  For example, in the

8    FUJIFILM case the patentee requested a royalty of 40 cents and

9    no lump sum.  But the jury came back with a royalty of two

10   dollars per product plus a $2.5 million lump sum, and that was

11   upheld.  That $2.5 million lump sum reflects a 27 percent

12   increase over the royalty, and that was affirmed.

13             Actually, Your Honor, we have the underlying

14   decision from the district court in that FUJIFILM case which

15   justifies that 27 percent increase.  It was a little unclear

16   from the Federal Circuit decision since they lumped the

17   royalty together with pre-judgment interest.  But even taking

18   out that pre-judgment interest, it reflects a 27 percent

19   increase that was affirmed.

20             Shatterproof Glass, the jury awarded a 5 percent

21   royalty on gross sales instead of what was requested, the

22   lesser of 4 percent of net sales.

23             Then finally in the Williams case the jury awarded

24   35 percent as compared to the 25 percent asked for by the

25   plaintiff.  So that is the law.  The jury can award more than

1    requested.  They are not tied to any number requested by

2    either party.

3              If we go to the next slide, 17.

4              We will see that the jury had a sufficient basis to

5    do just that in this case.  They had the tools and the

6    evidence.  Mr. Bratic took a conservative approach giving

7    Mirror Worlds two haircuts in coming up with his reasonable

8    royalty.  He explained that the hotter the deal, the higher

9    the royalty rate.  And here there was overwhelming evidence as

10   to how hot a deal this was.

11             Both Apple, its customers, and independent third

12   parties view this patented technology as overwhelmingly

13   important and revolutionary.  And when you apply that evidence

14   and look at what the jury awarded, it really isn't that great

15   of an increase, certainly not as great as in some of the other

16   cases we have seen.  The jury effectively awarded 1.5 percent

17   on the hardware and 10.10 percent on the software as compared

18   to the .81 percent and the 8.8 percent requested originally by

19   Mr. Bratic.

20             So here the law said the jury can do it, and the

21   jury had the evidence and the tools to justify what they did.

22   Thank you, Your Honor.

23             THE COURT:  Response?

24             MR. RANDALL:  Briefly, Your Honor.  With respect to

25   those last points, I think he was rearguing the interpretation

1    of the jury verdict form.  And it was clear from our earlier

2    discussion, that Mr. Carroll, after my objection, made it

3    clear that Mirror Worlds was not seeking to triple or get a

4    duplicate recovery; and that the jury when they came back with

5    the identical lump sum number for all patents, came back with

6    a number that was one-third what they had asked for instead of

7    one-half.  They disregarded this slight differentiation in

8    numbers, and certainly those numbers should not be added

9    together now after what Mr. Carroll told the jury, unless, of

10   course, there is just a complete unreliability with respect to

11   what the jury did, in which case I think we are entitled to a

12   new trial.

13          With respect to the other issues that I raised, Your

14   Honor, he never really addressed the entire market value

15   rule.  They said that, well, they had a survey about

16   beneficial features.  They had no evidence, Mr. Bratic

17   presented no evidence that consumers purchased, for instance,

18   hardware.  Consumers purchased hardware because of the

19   patented features.  Never presented any evidence.  That is

20   number one.

21          Number two it is absolutely clear that when Bratic

22   was trying to come up with a number that Apple would have

23   agreed to at the hypothetical negotiation, he came up with a

24   royalty rate and he applied it to a royalty base.  The royalty

25   base that he applied it to was hardware and software.  There

1    is no question about that.  He can't rewrite the record.

2            So when he applied a royalty rate to hardware and

3    software, it was incumbent upon him to present evidence,

4    sufficient evidence to indicate that purchasers of both the

5    hardware and the software were driven to purchase by the

6    patented features, and they simply didn't do it and,

7    therefore, the entire market value rule is violated.

8            With respect to his discussion about the sales of

9    these patents, there were three sales, evidence of three

10   complete sales; one for 210,000, one for 598.  When he said

11   there was stock involved, 500,000 plus 98 in stock and 598,000

12   and then 5 million.  Those were complete sales.  When he said,

13   well, it wasn't an arm's length transaction one of those

14   deals.

15           Frank Weil, Frank Weil had a fiduciary

16   responsibility to his company; and in discharging that

17   fiduciary responsibility to his company, he got the most that

18   he could get for those patents.  And he said he got far more

19   than the value of the IP.  That was the 210, $218,000 deal.

20           So, Your Honor, specifically when you apply the

21   Georgia-Pacific factors and when an expert takes a stand and

22   attempts to figure out what Apple would have agreed to and

23   what Recognition Interface would have agreed to in a

24   hypothetical negotiation, in this case they had sandwiched

25   between that hypothetical negotiation -- we knew it was Apple

1    negotiating and we knew it was Recognition Interface

2    negotiating.

3              After this hypothetical negotiation, Recognition

4    Interface sold all of the patents for $5 million, and we

5    believe, Your Honor, that the fees -- or the damages should be

6    capped at a maximum of $5 million.

7              THE COURT:  All right.  Thank you.

8              Any further response to any of those points?

9              MR. DIBERNARDO:  With regard to the no evidence to

10   support the entire market value, there was indeed evidence

11   that these patented features were the most important features

12   in the product.  But as I mentioned earlier, we don't need to

13   get to that analysis because the methodology applied by Mr.

14   Bratic was sanctioned by Lucent.  It did not use the value of

15   the computer to increase the royalty.  It was simply getting

16   the same royalty per unit as for the software.

17             I guess Counsel had also mentioned the Cornell case,

18   and we have distinguished that in the briefs.  But there

19   Cornell dealt with -- and he mentioned Judge Rader, but that

20   was actually not a Fed Circuit case and actually is directly

21   contradicted by Lucent and Lucent's statement that you can use

22   the value of the entire computer so long as you adjust the

23   royalty rate.

24             So Cornell was not a Fed Circuit case.  In there the

25   plaintiff had offered evidence in direct contradiction to a

1    Daubert motion that had been granted, and the court says

2    basically that expert was trying to mislead the jury in

3    violation of that ruling.

4           And the facts in Cornell are distinguishable.  In

5    Cornell the patented feature related to one piece of a

6    computer processor.  That processor was used as part of a CPU

7    module, and those CPU modules were combined with more

8    components into what was called CPU bricks.  And then a set of

9    CPU bricks were then included in a board, and those boards

10   were included in servers.  And it was those servers that were

11   used as the basis, very many steps removed from the patented

12   invention.

13          In that case the plaintiff tried to use -- also

14   tried to use the value of the CPU bricks, but the Court said

15   that was improper because there was no market for CPU bricks.

16   The defendant never sold CPU bricks.  In this case Apple sells

17   both the software and the computer.

18          Thank you, Your Honor.

19          THE COURT:  Okay.  Thank you.

20          All right.  Anything further from defendant?

21          MR. RANDALL:  Well, Your Honor, the two additional

22   issues for oral argument that I would like to address are

23   inequitable conduct and invalidity.  And my estimate would be

24   about 20 minutes or so for inequitable conduct, maybe 25; and

25   about 10 or 15 minutes on invalidity.

1          THE COURT:  All right.  And what additional matters

2     does plaintiff have other than responding to those two

3     matters?

4          MR. DIBERNARDO:  That's it, Your Honor.

5          THE COURT:  Well, let me ask you this:  Have you

6     gotten their privilege log from -- has defendant received

7     plaintiff's privilege log from Defendant's Exhibit 642 that we

8     were discussing at the beginning of the hearing?

9          (Mr. Solo indicates in the affirmative.)

10          THE COURT:  Okay.  Have you had a chance to review

11    that yet?

12          MR. RANDALL:  No, Your Honor.

13          THE COURT:  All right.  What we are going to do is

14    take a lunch break until 1:00 o'clock.  If you will review

15    that, we will come back and I will hear any matters relating

16    to that if you wish to challenge.

17          Let me ask, are you producing some of the documents

18    to him or are you claiming privilege to the remaining 36

19    pages?

20          MR. SOLO:  They were all privilege documents with

21    the exception of the '427 patent, which is the patent --

22          THE COURT:  Well, y'all discuss it; and if the

23    defendant wishes to challenge any of the claims of privilege,

24    we will take that up first and then we will proceed to hear

25    argument on the inequitable conduct and on the invalidity.

 1          MR. RANDALL:  May I ask one thing, whether or not

 2     any of these documents other than the seven-page fax were

 3     previously identified as privileged on any privilege log, or

 4     is this just a new privilege log?

 5          MR. SOLO:  These would have been previously

 6     identified on the privilege log for Cooper & Dunham.

 7          THE COURT:  I'm sorry I couldn't hear you.  Why

 8     don't you step --

 9          MR. SOLO:  They would have previously been

10     identified on the privilege log for the production from the

11     attorney files of Cooper & Dunham.  I'm not precisely sure

12     which entries were -- on the privilege log today, but they

13     would have been previously identified.

14          MR. RANDALL:  That would certainly help if I could

15     just have -- if the Bate stamp numbers or the entries from the

16     original privilege log could be identified for these 12

17     documents, that would certainly help me.

18          THE COURT:  Can you do that, Counsel?

19          MR. SOLO:  I will do my best.

20          THE COURT:  Do the best to provide that.  I note on

21     the copy for in camera review there were no Bate stamp numbers

22     on those other pages.  I don't know whether they can be

23     identified or not.  Y'all visit about that, and I'll take up

24     any further matters when we come back at 1:00 o'clock.  We

25     will be in recess.

1        (Recess was taken.)

2             THE COURT:  Please be seated.

3             All right.  Mr. Randall, you may proceed.

4             MR. RANDALL:  Your Honor, during the break I had a

5    short conversation with Counsel for Mirror Worlds, and I also

6    had the opportunity to read the privilege log that was

7    provided.

8             I understand they are not able to at this time

9    identify the documents on this privilege log by the entries in

10   whatever privilege log was provided by their prosecuting

11   attorneys.  But, nonetheless, without that information, I

12   still have some issues just with the descriptions.  They

13   don't -- there is no page numbers.  There is no indication of

14   if anyone else was cc'd on this -- the last entry, Item No 12

15   has no description other than attorney administrative

16   documents.  It is not dated, no indication of who it was from

17   or who it was to.  It doesn't mention that it is

18   attorney/client privileged information.

19            The bigger issue with the documents -- I obviously

20   don't have them -- the bigger issue with the documents is they

21   appear to relate at least two of bases for inequitable conduct

22   that we are seeking in this case.  One is the statements made

23   to the Patent Office about TR-1070.  That statement was made

24   by Milner on March 19, 1998; and Gelernter was added as an

25   inventor February 23, '98.  So the time period, at least on

1    these documents that were submitted to the Court, looked like

2    they relate to possibly two of the inequitable conduct bases;

3    one inventorship and, two, TR-1070.

4          Mr. Hatchell -- I can't imagine he was involved with

5    inventorship issues, although he could have been but was more

6    likely involved with issues relating to the public

7    distribution of TR-1070 that could have contradicted the

8    statements made to the PTO; and what the evidence, at least in

9    the case as it stands now, indicates is that Milner when he

10   was questioned about his statements to the PTO, he said I was

11   just trying to give the Patent Office all of the information I

12   had available to me about the public distribution of TR-1070,

13   essentially claiming that he had an innocent state of mind and

14   that he was just a messenger, just delivering what information

15   he had available to him about the public dissemination of

16   TR-1070, giving it to the Patent Office and letting them deal

17   with the issue of whether they wanted to consider TR-1070 or

18   not.

19         I think that once we have identified and made the

20   allegation of inequitable conduct on the basis of that

21   statement to the PTO and the prosecuting attorney says I

22   simply gave all of the information I had available to me to

23   the Patent Office about that issue, I think he has waived

24   privilege on any communications and any information he has

25   about the public distribution of TR-1070.

 1          So to the extent that any of these documents relate

 2   to whether or not TR-1070 or any other technical reports were

 3   distributed or publicly available in some way, then I believe

 4   they have waived on that issue.  With respect to the

 5   inventorship issue -- so that may relate to Items 1, 3, 4, 6,

 6   8 and 10 and 11 on this chart.

 7          But with respect to inventorship, all of the

 8   inventors, both Freeman and Gelernter, testified in response

 9   to questions about why changes in the inventorship were made,

10   they all said I relied on advice of counsel.  Gelernter said

11   in trial those inventorship issues were made without deceptive

12   intent.  He volunteered that.  And I believe they have waived

13   on that issue as well.

14          So to the extent that these documents that were

15   provided for in camera review relate either to the public

16   distribution or availability of TR-1070 or relate to decisions

17   one way or the other regarding inventorship, I believe they

18   have waived on those issues.

19          THE COURT:  What is your response to the note made

20   at the top of this page that Christopher Hatchell was an

21   employee of Yale and that Yale was the owner of the patents at

22   that time?  Are you acknowledging that an attorney/client

23   privilege did exist between him in that capacity but simply

24   that it has been waived?  Or are you arguing that no

25   attorney/client privilege exists?

```
 1            MR. RANDALL:  Well, I will be honest with you, Your
 2   Honor, I don't know the exact relationship.  I do know that
 3   Mr. Hatchell was a Yale employee at the time.  He was working
 4   for Yale on behalf of Mr. Gelernter.  I also know that as of
 5   the date of February 23, Your Honor, February 23, '98, there
 6   was an assignment to Yale.
 7            So the -- there are certain documents that pre-date
 8   the assignment to Yale.  Other documents post-date it.  The
 9   pre-dated documents are the attorney notes, Item No. 2.
10   That -- so the statement at the top of the page is not true or
11   accurate as to that.  And then also Item No. 9, those attorney
12   notes.  And then I don't know about the undated documents.
13   But they occurred -- at least those two items that are
14   dated -- before the assignment, so there should be no -- so I
15   don't really know whether those attorney notes are related to
16   communications with Chris Hatchell.  But if they were, I don't
17   believe they are privileged at that time.
18            With respect to your broader question, Your Honor, I
19   don't have enough information to argue to you that there was
20   no attorney/client privilege other than to say that Mr. Milner
21   when he was deposed testified that he did not represent
22   Hatchell.  He did testify about that.
23            THE COURT:  Was it from your deposition of him and
24   your investigation, was he representing Yale or representing
25   Gelernter?
```

1          MR. RANDALL:  I don't know that, Your Honor.

2          THE COURT:  All right.  Response?

3          MR. STEIN:  As to the waiver, this issue has already

4   been brought in a motion by Apple.  It was considered by the

5   Court and denied.  Just because Apple brings a motion for

6   inequitable conduct, doesn't mean that Mirror Worlds has to

7   waive privilege.

8          The comments made during Dr. Gelernter's deposition

9   don't amount to waiver.  And he was deposed a year and a half

10  ago, and the first time they moved for on this waiver issue

11  was we believe during trial.  And we believe that that issue

12  has been waived.

13         With respect to the -- well, I guess with respect --

14  we don't believe there should be any waiver here, is the

15  bottom line.  And we don't believe we should have to waive

16  privilege based on Apple's unfounded allegations.

17         With respect to the other issues he raised that --

18  the Court has the documents.  I don't believe that their

19  arguments, once the Court reviews the documents, have merit.

20  I am hesitant to say more in open court for fear of waiving

21  privilege with regard to documents, but I think there is --

22  there is nothing inconsistent in those documents with the

23  position to the Court.

24         MR. RANDALL:  I'm just looking at the first item,

25  the description of the first item, which is this DX642.  It

1    says fax of draft prosecution document.  I know there were --

2    there was two documents attached to that that were copy

3    requests.  I know that there was -- the index that was

4    handwritten by Hatchell.  I don't know what else.  I don't

5    know if that was a draft prosecution document or not.  I don't

6    know the subject matter of these.  But I do believe that as to

7    those subject matters of inventorship and the public

8    availability or distribution of TR-1070, I believe they have

9    waived.

10           THE COURT:  And what is your basis for -- tell me

11   again for the waiver with regard to the 1070?

12           MR. RANDALL:  Mr. Milner, their attorney, when we

13   played his tape yesterday, claimed that he -- with respect to

14   his statement to the Patent Office about that TR-1070 was not

15   distributed outside Yale, he said I was just trying to provide

16   the Patent Office with all of the information regarding public

17   availability of TR-1070 and then essentially letting them deal

18   with it.  He answered that question, I believe, in response to

19   a question about why wasn't it listed on the IDS statement

20   Form 1449, why wasn't it listed.

21           He said, hey, I disclosed it and I provided all of

22   the information I had available to me about the public

23   distribution of that document and effectively saying I will

24   let them make their decision.  But if he is going to claim in

25   response to an allegation of inequitable conduct that he

 1    innocently and in good faith provided all of the information

 2    he had available to him to the Patent Office, then he ought to

 3    produce the documents relating to that subject.  You can't

 4    selectively disclose that -- I replied to everything and

 5    didn't withhold information.

 6            THE COURT:  Anything further on that issue?

 7            MR. STEIN:  I think if that amounts to a waiver,

 8    then a prosecuting attorney could say virtually nothing during

 9    a deposition.  He was just stating his basic policy of dealing

10    forthrightly with the Patent Office, and it amounts to nothing

11    more.  It is hard to imagine any statement that the

12    prosecuting attorney could have made during this deposition

13    under that theory that wouldn't have amounted to a waiver of

14    something.

15            MR. RANDALL:  The record is clear --

16            MR. STEIN:  By the way -- sorry, I don't mean to

17    interrupt.  But that deposition took place nine months ago or

18    a year ago.  Again, they didn't complain about it then, and

19    here they are now trying to reopen discovery filing a motion

20    that if they really had a true complaint about it they should

21    have filed well before the close of discovery.

22            MR. RANDALL:  The record is a little further

23    developed than I articulated.  Mr. Hatchell in response to

24    questioning basically said I have no idea where those

25    statements that were made to the PTO came from.  He disclaimed

 1    them.  He said that was not his understanding, and he does not

 2    understand how they could have been made.

 3             THE COURT:  Which statements are you referring to

 4    specifically?

 5             MR. RANDALL:  The statements that, to the best of

 6    Chris Hatchell's understanding, the index containing the

 7    technical reports was maintained in a locked cabinet in a

 8    locked office at Yale; and that TR-1070 was not disclosed

 9    outside of Yale.  And when those precise questions were asked

10    of him, he said, you know, that is not accurate.  I don't know

11    where that information came from.  He doesn't recall ever

12    saying that to anybody.

13             THE COURT:  Okay.  I am going to sustain the

14    privilege at this time, but I will allow Counsel to file a

15    very short three- or four-page motion articulating whatever

16    arguments and authority you have, and I will allow a short

17    response.  And I will look at this issue further.  But for now

18    I am going to keep the privilege.

19             I will point out, though, that to simplify things I

20    think Items 2 -- or, no, excuse me, the ones labeled

21    administrative documents, all those are are file labels.  I

22    don't hardly see how those could be considered communications

23    between -- privileged communications with the attorney, but

24    anyway -- go ahead.  We will get the motions in.  I will look

25    at it.

 1                 Let's go ahead with whichever one you want to argue

 2      first of the two remaining matters.

 3                 MR. RANDALL:  Your Honor, Apple would like to argue

 4      its inequitable conduct case.  Your Honor, there are three

 5      categories of inequitable conduct that we have asserted.  One,

 6      the false statements to the Patent and Trademark office

 7      regarding TR-1070 and the failure to correct those statements;

 8      the failure to provide known material prior art references to

 9      the Patent Office at the time the applications were filed and

10      during the pendency of the prosecution.

11                 THE COURT:  Okay.  Go ahead.

12                 MR. RANDALL:  And, three, repeatedly making false

13      statements to the Patent Office regarding inventorship.

14                 With respect to the first issue, Your Honor, that

15      the false statements regarding TR-1070 --

16                 Can you put up J-4?

17                 Your Honor, the statement made to the Patent Office

18      by Mr. Milner on March 19, 1998 in the IDS was this -- this is

19      one of them.  This technical report TR-1070 was not

20      distributed outside of the Department of Computer Science at

21      Yale University.  He did not list Form 1449 -- list TR-1070 on

22      Form 1449.

23                 He said that the only reason he did not believe it

24      was material was because he believed that it was not publicly

25      available more than a year before the critical date; and,

1    however, this board here shows that TR-1070 was authored prior

2    to the critical date of June 8, 1995.  It was submitted to

3    Technology Review, and that that shows right on the cover of

4    it.  And Hatchell, who he claims to have a number of

5    communications with, ordered ten copies of it on April 18,

6    '95.  He ordered another ten copies on 5-15-95.  And he

7    testified that he made those copies to distribute.

8            Now, at the time -- at the time that this

9    declaration that was provided March 19, 1998, Your Honor, the

10   applicants were already aware of the fact that their prior

11   work could be used against them to invalidate the patent.  The

12   applicants' first office action on the '227 the claims were

13   initially rejected in view of Dr. Gelernter's 1994

14   publication, The Cyber-Road Not Taken.  That is at DX4, Page

15   65 and 67.

16           Dr. Feiner, in addition to Mr. Milner's statements

17   that the only reason that he didn't submit it was that he

18   believed it wasn't public, Dr. Feiner testified that TR-1070

19   was among the highly material prior art he considered that

20   invalidates the patents-in-suit.  He did that on September 30,

21   2010 in the afternoon at Pages 118, 119, 122, 123, and 126 and

22   127.

23           Now, both Gelernter and Freeman understood that it

24   was submitted to Technology Review for publication.  That is

25   at DX414.

1            DX1126 is the Internet Archive, Your Honor, that we

2    went through yesterday.  And the Internet Archive shows that

3    on April 17, 1995 and through April 21, 1995, Freeman, the

4    sole inventor at that time, put TR-1070 on the Internet in

5    three formats.  He put it in the hypertext worldwide web

6    version, he put it in single-page version, and he put it in

7    this postscript version.  That indication is at DX1126, Page

8    118.

9            As I walked the Court through that exhibit, DX1126-E

10   at Page 99 shows that TR-1070, the hypertext version, nodes

11   1-11 that is each page, was last modified on April 17, 1995.

12   And included within that same Exhibit 1126-E at Page 117 it

13   shows that it was translated into the HTML format by Mr.

14   Freeman on April 17, 1995.

15           DX1126-C, which we also went through yesterday, at

16   Page 87 shows that TR-1070 life.ps was posted on the Internet

17   on April 18, 1995.  That is the Lifestreams postscript

18   document.

19           Then at DX1126-D it shows the Linda Group Technical

20   Reports are indexed, and it lists six pages of technical

21   reports available electronically, and those are starting at

22   1126 on Page 150.

23           At DX1126 at 123 and 137 it shows that Gelernter's

24   Linda Group began posting technical reports online and set up

25   a page for people to order them from Hatchell in February of

 1    1994.  You simply can't reconcile, and I certainly can't

 2    reconcile Dr. Gelernter's testimony nor the submission to the

 3    Patent Office that TR-1070 was not distributed outside Yale,

 4    and that statement was made again on March 19, 1998 when a

 5    snapshot of the Internet in May of '97 before that date shows

 6    widespread evidence to the contrary.  It can't be reconciled.

 7            Now, Chris Hatchell testified that he had a practice

 8    of making copies and distributing copies of TR reports.  He

 9    testified to that on September 30 in the Afternoon Session at

10    Page 46, Line 6 through Page 47, Line 5 and again at Page 56

11    Lines 5 through 15.

12            On April 18 he made copies of TR-1070.  That is at

13    DX42 Page 6.  And consistent with his policy after

14    distributing those, on May 15, '95 he made ten more copies of

15    TR-1070.

16            Nancy Silver testified that before the critical date

17    and actually before -- her testimony was before June 5 of '95

18    Nancy Silver had a copy of TR-1070, and she was using it to

19    write a research paper.  She said she knew that the date was

20    correct because her father had died, and she had a certain

21    schedule listed.  And she was sure that she would have done

22    all of her research before moving on to the next phase.  I

23    believe that schedule is at DX937, and her testimony was on

24    September 30 in the Afternoon section --  Session at 62, Line

25    19 through 64, Line 21.

1          Now, on October 25, '95, albeit after the critical

2     date, Hatchell sends -- at least there is a note -- and this

3     is in 642 that was not redacted -- there is a note that

4     indicates that he may have sent TR-1070 to a Mr. Wallace in

5     New York.  It just simply says sent, there is a date, 1070,

6     and a name and an address.

7          THE COURT:  That would have been after the critical

8     date?

9          MR. RANDALL:  That is correct, Your Honor, but

10    nonetheless before the statement made to the PTO.

11         On October 31, 1995 Gelernter cited TR-1070 as a

12    publication in DX931 at Page 7.  That is in contrast to his

13    testimony that it wasn't public -- or it wasn't publicly

14    distributed.  Let's put it that way.  And I went over in May

15    '97 the Internet snapshot.

16         Now, the Yale administrative assistants, Teodosio

17    Pellegrino, and Hatchell, they all testified consistently

18    about certain things.  And what they testified consistently

19    about was that the TR's, the technical reports were not

20    confidential, there were no restrictions on the distribution;

21    and if someone asked for a technical report, it would be sent.

22         Now, despite this knowledge, Your Honor, and after

23    the Internet Archive snapshot in May of '97, applicants filed

24    this IDS that TR-1070 was not distributed outside of the

25    Department of Computer Science at Yale.

1          Now, Milner says two things during his testimony.

2    He says on one hand he says I was just providing the Patent

3    Office everything that I had on the publication.  Well, I find

4    it hard to believe that he didn't know or ask whether or not

5    all this information was on the Internet, and it was certainly

6    on the Internet in a widespread fashion.

7          But he also testified a little bit later in the

8    deposition.  He said that his statement to the Patent Office

9    would still be true even if TR-1070 were public.  That is an

10   interesting note.  That is what he said.  What he is

11   suggesting, I believe, in that testimony is that since he was

12   providing Hatchell's knowledge to the Patent Office, he was

13   providing Hatchell's knowledge, if in fact it was public, his

14   statement would still be true; that because Hatchell perhaps

15   didn't know it was public.

16         Well, that is not discharging his obligation of

17   candor to the Patent Office.  If Milner knew that it was

18   public and knew it was on the Internet starting in '95 from

19   one of the applicants Freeman who put it on the Internet, he

20   should have disclosed it and not hidden behind Hatchell's

21   knowledge.

22         But, again, Hatchell testified that he doesn't have

23   any information where that came from.  So you have got

24   Hatchell saying it is not limited to Yale.  I do make copies

25   of it.  I do distribute it.  It is not confidential.  No one

 1    ever told me it was confidential.  You have got Freeman

 2    putting it on the Internet in '95 in three different formats.

 3    You have got a Yale Linda Group website that is latent with

 4    Lifestream documents and technical reports directly contrary

 5    to Dr. Gelernter's testimony.

 6              Would you show J-3.

 7              Now, this is a busy chart albeit, Your Honor.  Down

 8    the left-hand column is testimony.  It is the IDS statement to

 9    the Patent Office along with testimony by Mr. Gelernter about

10    TR-1070 and the technical reports.  Your Honor, can we hand up

11    copies of these because I know it is hard to read?

12              THE COURT:  Yes, you may.

13              MR. RANDALL:  Thank you, Your Honor.

14         (Documents given to the Court.)

15              MR. RANDALL:  So Dr. Gelernter testified -- the

16    second item down.  It is absolutely our policy that such

17    technical reports not be publicly available.  Next one down --

18    that was at Page 35.  It was not for public purposes.  It was

19    not disclosed.  And then testifies at Page 85, Hatchell was

20    aware of our understanding that these technical reports were

21    not for broadcast distribution, some fixed list, and not for

22    publication distribution.  He said there were many

23    conversations about that.

24              At Page 88, it is not to be distributed to the

25    public absolutely.  Page 96, not available to the public.

1    Then on 9-27 in the afternoon at Page 88 he says, it was the

2    intention of all of us that these documents not be for public

3    distribution.  And we have got the testimony from Chris

4    Hatchell, Julie Teodosio, and Nancy Pellegrino, all of whom

5    testify otherwise.

6              And you have got the conclusive evidence, the

7    Internet Archive, the snapshot in '97 showing that all of this

8    information, loads of technical reports, including TR-1070 was

9    put on the Internet starting right after it was written in

10   April of '95 by the applicant Mr. Freeman.  I can't square

11   that.

12             All of the witnesses, all of the documents suggest

13   strongly, clearly, convincingly, conclusively that TR-1070 was

14   publicly available starting in April of '95 and moving

15   forward.  And there is loads of evidence to that effect.  The

16   only contrary evidence comes from the testimony of Dr.

17   Gelernter and from the applicant's attorney who submitted the

18   false declaration to the Patent Office.  And it was never

19   corrected at any time during the prosecution.  Never.

20             Now, Mirror Worlds, against the weight of this

21   evidence, Mirror Worlds offered no evidence to rebut this.

22   They didn't offer any testimony from Gelernter, they didn't

23   offer any testimony from Freeman, they didn't offer any

24   testimony from Milner.  They have no explanation for this.

25   None.

```
 1              Your Honor, the second grounds for inequitable
 2    conduct is the failure to disclose material prior art, and the
 3    applicants were aware of numerous material prior art
 4    references and didn't disclose them and simply stuck their
 5    head in the sand, so to speak, saying whatever I would have
 6    had I would have given it to my attorney, and I'm going to
 7    wipe my hands clean of it.
 8              The problem is that we went through in this case
 9    material prior art that the applicants knew about but never
10    disclosed to the Patent Office.  So, for instance, the Piles
11    system, Your Honor, and specifically Piles system, the 724
12    patent was never disclosed in the '227 patent.  Never.
13              Now, Mirror Worlds pointed out that after the notice
14    of allowance in the '313 patent, that the Piles patent was
15    disclosed in that application, but it was never disclosed in
16    the original application, Your Honor, the '227.
17              And with respect to materiality, you heard the
18    testimony of Gitta Salomon going through all the elements of
19    the Piles system, the testimony of our expert Dr. Feiner, the
20    testimony that all asserted claims of the '227 patent were
21    rejected in reexam in view of Piles.
22              Now, Dr. Freeman -- or Mr. Freeman knew about Piles
23    in January of '96 in the interlibrary loan services discussing
24    the Computer Human Interface 1992 proceedings, wherein the
25    Pile metaphor, which is DX641 was discussed.  Also in May of
```

1   '97 in Freeman's dissertation he cites the Pile metaphor for

2   supporting organization of information by Gitta Salomon and

3   that is at DX789 at Page 160.

4            In a February 1998 fax that confirms the attorney's

5   knowledge of the Apple's Piles article, DX641 at Page 1, now

6   during the pendency at, prior to, or during the prosecution of

7   the '227, the Piles information was never disclosed to the

8   Patent Office.

9            With respect to the Lucas Workscape system, and that

10  was testified by Professor Peter Lucas, it was not disclosed

11  in any of the applications.  And Dr. Lucas described in detail

12  the system, and it was applied and opined on by Dr. Feiner.

13  And Dr. Gelernter attended the Computer Human Interface 1996

14  Conference where the Workscape system was discussed.  It was

15  also discussed and presented at the Computer Human Interface

16  Conference in 1994.  That is at DX511 and DX512, and DX922.

17           MEMOIRS -- and we heard Professor Lansdale testify

18  about the MEMOIRS time-based system.  That was not disclosed

19  either.  And Dr. Freeman in his dissertation at DX789, Page

20  160, Freeman cites to Lansdale's MEMOIRS system as "A system

21  that is closest in philosophy to Lifestreams."  Yet that

22  wasn't disclosed.

23           Now, what was disclosed is DX382.  It was a Lansdale

24  article regarding MEMOIRS discussing the overall problem and

25  the concept.  It did not describe the system.  Professor

1    Lansdale testified specifically about the distinction between

2    the two articles.  One was an overall concept discussing the

3    problems.  One was a detailed description of the system.  The

4    applicants did not disclose the detailed description of the

5    system at DX584 or the other articles at DX588 or DX589.

6            There is also the 1998 fax from Hatchell to the

7    attorney that confirms the attorney's knowledge of Lansdale's

8    work at DX641, Page 1.

9            MIT's Spatial Data Management System, or SDMS

10   system, it was not disclosed in any of the applications.  The

11   materiality was discussed by Dr. Feiner.  The applicants knew

12   about it.  On June 28, 1996 the inventors cited at DX4, Page

13   46 to how do people organize their desks, implications for the

14   design of office information systems by Malone which discusses

15   the SDMS system.

16           They also -- inventors cite at DX4, Page 46 another

17   article which also, the Lansdale article, DX382, which also

18   discusses SDMS.  The inventors cited the Wired Magazine

19   article from 1997.  It is at DX377 also describing the SDMS

20   system.

21           Lotus Magellan was discussed by Ed Belove here in

22   court, and he described that system.  It was not disclosed in

23   any of the allegations either.

24           Dr. Feiner testified about the materiality of it.

25   The applicants knew about it.  In March '95 there is an email

1  that compares Lotus notes in detail to Lifestreams as "a

2  system that comes closest as a whole."  That is at DX790-1.

3          In April of '95 the TR-1070 document that we have

4  been discussing written by the applicants, it discusses Lotus

5  notes.  And in May of '97 Freeman discusses Lotus notes in his

6  dissertation at DX789, Page 159.

7          Again, Your Honor, these are material prior art

8  references known by the applicants.  We had witnesses testify

9  about them.  We have presented the documents into evidence.

10  And there is no explanation provided by either the applicants

11  or the applicants' attorney about the failure to disclose

12  those material references that were known to the witnesses.

13          The last issue and basis, Your Honor, for

14  inequitable conduct is the false statements to the Patent

15  Office regarding inventorship.  Now, misrepresentations

16  regarding inventorship are material, regardless of whether the

17  inventorship was ultimately cured.  That is provided by the

18  PerSeptive Biosystems case at 225 F.3d 1315 at 1321, a 2000

19  Federal Circuit decision.

20          Inventorship is per se material because proper

21  inventorship is a requirement for a patent.  That is the Eli

22  Lilly case, a Federal Circuit 2004 case at 376 F.3d 1352 at

23  1358 through 1359.

24          Your Honor, there were a number of reasons why the

25  inventors may have made these false statements to the Patent

1   Office.  Shortly after -- Gelernter testified that he was

2   involved with the prosecution of the '227 and the decision to

3   file it.  Chris Jones said the same thing.  And Freeman said

4   the same thing, so those three folks got together, discussed

5   the issue of patenting.  Chris Jones testified that he told

6   Gelernter before the patent was filed, before they started the

7   company that there was a policy at Yale about patents, and

8   Gelernter apparently said I'll resolve any issues of claims of

9   ownership about that with respect to Yale.

10          That is what Chris Jones testified to.  And

11   Gelernter testified that he was involved in this process.

12   What happened was they decided that the student, Freeman,

13   would be the sole inventor.  They would start the company

14   which they started.  They started Lifestreams.  Then after

15   they started Lifestreams, they filed this patent application.

16   The sole inventor is the student Freeman.  And Freeman then

17   immediately assigns the patent to the company owned by Jones,

18   Gelernter, and Freeman.

19          At DX790, Page 5 there is a description of this

20   issue about the Yale debacle because apparently Yale did find

21   out about this.  The applicant submitted two false

22   declarations.  The first one was the sole inventorship of

23   Freeman concealing Dr. Gelernter's inventorship, even though

24   he was heavily involved with it.  And that is at DX4 at Pages

25   56 and 57.

1          The examiner caught this first declaration and

2    rejected all 12 claims.  The examiner rejected all claims at

3    DX4, Pages 65 through 68.  Then there was an amendment to add

4    Gelernter.  And in the second declaration the applicant stated

5    that inventorship correction is necessitated by amendment of

6    the claims.  That is at DX4, Pages 371 through 377.

7          However, there was no amendment of the claims that

8    required a change of inventorship.  None.  So that statement

9    that the inventorship was necessitated by an amendment of

10   claims is false.  No one has explained that.  Gelernter

11   refused to explain the second declaration.  That was on

12   September 27 in the afternoon at Page 144 through 146.  He

13   testified, however, in a conclusory manner that it was done

14   without deceptive intent.

15         Milner refused to explain or confirm the

16   truthfulness of that second declaration.  That is at Milner

17   deposition, Page 67, Line 6 through 68 through 3.  If you

18   recall he said I'm not going to testify about what the error

19   was, I'm not going to testify about whether it was required by

20   an amendment.

21         With respect to the '999 patent, again, the

22   examiners kept the inventorship in the '999 from anyone

23   associated with Yale.  And you heard the testimony of Sparago

24   and Prager that they claimed that they were the original, sole

25   joint inventors of the '999 patent and then claimed that,

1   well, we are going to add Gelernter and Freeman.  They added

2   Gelernter and Freeman to get around the rejection in the

3   reexam.  So in the reexam the claims of the '999 were rejected

4   in light of the '227.  And in order to get around the

5   rejection, they simply added Gelernter and Freeman.

6          I think I mentioned "claims."  There is only one

7   claim in the '999.  I have been corrected.

8          Your Honor, now in terms of this inequitable conduct

9   and in terms of intent, we have cited a pattern of a disregard

10  for the duty of candor with the Patent Office, disregard on

11  the part of the applicants, disregard on the part of the

12  attorney in terms of disclosing known material art, in terms

13  of stating whether or not TR-1070 is publicly available

14  outside of Yale or not, and in deciding who will be inventors.

15  Is it Freeman?  Is it Freeman plus Gelernter, Sparago and

16  Prager?  They simply don't respect -- and don't satisfy their

17  obligations with respect to their duty of candor to the Patent

18  Office.

19         And, perhaps, any one of these patents doesn't rise

20  to the level of inequitable conduct or doesn't rise to the

21  level of clear and convincing evidence of intent to deceive.

22  But the overall pattern and totality of circumstances

23  certainly do.

24         Your Honor, we would ask that the Court render the

25  asserted patents unenforceable due to inequitable conduct.

1          THE COURT:  All right.  Thank you.

2          Response?

3          MR. DIAMANTE:  Yes, Your Honor.  I don't want to be

4     outdone, we actually did some slides.

5          Good afternoon, Your Honor.  Before I get into the

6     substance, given the lateness and everybody is a little tired,

7     I'd like to give you just a quick story which kind of bears on

8     the issue.  For several years, I've gave some lectures to a

9     bunch of law firms in Kentucky.  For some reason I have a lot

10    of friends there.  And most of these partners are actually

11    ex-U.S.-Attorneys.

12         So when I was talking once about inequitable conduct

13    and the idea of scienter and fraud, they all got excited about

14    it.  And I wanted to tone them down about it.  And I knew most

15    of them as friends and they were avid hunters and they spent a

16    lot of time in the woods.  And I hear some great stories about

17    what they see in the woods, and some have some very bizarre

18    stories about what they see.

19         We have some strange creatures, they tell me.

20    Actually one person told me he actually saw Big Foot.  So I

21    said to them, gentlemen, let me compare inequitable conduct to

22    you sightings of strange creatures.  Now, most defendants

23    claim they see inequitable conduct, they have proof of

24    inequitable conduct.  When it comes down to it, there is

25    nothing, no evidence.

1       So with that background to delve into -- I'm not

2    trying to make light of the subject because it is a very

3    serious allegation, but the bottom line, Your Honor, you gave

4    these people a tremendous amount of evidence -- patience.

5    You allowed them to put on evidence to show bad faith.  There

6    is not a shred of evidence showing there is intent to deceive

7    the Patent Office or willful misrepresentations.

8       The theory starts with the accused.  Like any

9    prosecutor the accused --

10       Can we turn to Slide 3.

11       And the three people who are excused are actually

12    very prominent individuals; Dr. Gelernter -- I won't go into

13    him.  You have heard all about him.  Dr. Freeman, we hear a

14    lot about Dr. Freeman in oral argument, but one thing we don't

15    hear about, Your Honor -- and please make note of this -- is

16    that they never read one shred of deposition testimony of his

17    in this trial.

18       They claim that Dr. Freeman knew about the

19    archive.org and he put it on.  They said he knew it was prior

20    art.  They didn't put one word of his testimony in this

21    record.  And these individuals Messrs. Dr. Gelernter and

22    Freeman they are exceptional scientists -- there is no

23    questions about that -- but they are not experts in patent

24    law.  They have talked on and on.  Dr. Gelernter testified

25    about that.

1           But it is not contested that this patent, the '227

2    was the first application they both filed.  They both believed

3    the application was based primarily on Dr. Freeman's

4    dissertation and they relied on the counsel of Mr. Milner.

5           Who is Mr. Milner?  He is another person involved in

6    this conspiracy.  He is a partner at Cooper & Dunham, a law

7    firm that has been around for a hundred years.  He has been

8    practicing patent law for over 20 years.  He has filed

9    hundreds of applications, never accused of inequitable

10   conduct.

11          As a footnote to all that I want to say, in our

12   practice of law very usually we get people to be deposed, put

13   their hands on the Bible and we ask them what happened 15

14   years ago.  And if they make any little inconsistency, ten

15   years later we pick up on it, we highlight it, and say, my

16   God, there must be something going on.

17          And a lot of the events that these people will be

18   deposed about happened in 1995 -- 1995.  But Apple has picked

19   up some occasionally misstatements or inconsistencies which

20   are not material, and that is what they base their whole case

21   on.

22          There is not a shred of evidence that Mr. Milner

23   willingly misled the Patent Office in any way.  What he simply

24   said was that I got my information from Yale, and I put in the

25   application.

1          What is the essence of what they are accusing Mirror

2    Worlds of doing?

3          Slide 4, please.

4          They are saying all these respectable gentlemen got

5    together and decided to lie to the PTO about 1070.  But to do

6    so they have to do it through the clear testimony of Dr.

7    Gelernter on this and ignore common sense.  Gelernter

8    consistently stated in his deposition and here at trial that

9    he didn't publicly distribute it.  Not one word was contrary

10   to that.  Mr. Milner said he simply was told by Yale records,

11   by Yale -- I believe he said this -- that 1070 was not

12   publicly distributed.  That's all that is about.

13         So what does Apple do in its papers?  They do a

14   hatchet job on Hatchell.  They turn to Mr. Hatchell -- he is

15   a secretary -- and say, well, Mr. Hatchell must be playing

16   games here because he is misstating the record.  What Mr.

17   Hatchell said unequivocally at his trial deposition, he says,

18   I believe -- I know for certainty that 1070 wasn't distributed

19   outside of Yale.  How did he know that?  It wasn't 15 years of

20   memory.  And I can tell you I can't remember what I did two

21   weeks ago.  It was based on his log.

22         If you look at his transcript page, which is -- I am

23   getting ahead of myself.

24         Slide 7.

25         He had his log with him.  So he could see from his

1   log that it was never checked out.  That is why he had such a

2   clear and concise statement to this very important issue.  The

3   power of contemporaneous records, you can't -- no matter what

4   type of case you are involved in, contemporaneous records mean

5   everything.  Here we have this gentleman looking at his

6   contemporaneous log and saying I know based on this log no one

7   checked it out.

8          So what does Apple do?  Like any good conspirist,

9   they look for other things.  Wait a second, he is -- the IDS

10  said it was in a locked cabinet.  But Hatchell said it was in

11  a locked room.  Someone is lying there, right?  We have to

12  check this out.  First, let me tell you about the index.  What

13  is in the index?  The index just states the names of people

14  that helped write the report.  It doesn't disclose the

15  contents of the report.  Just the index.

16         So what do we do because Apple is saying there has

17  got to be a cover-up here, these people with their lawyer,

18  they are working together.  We found this nice lady Ms.

19  Teodosio and her riveting testimony was played yesterday, and

20  what did she say?

21         Well, she was the person that sat on the desk where

22  these indexes were kept.  She had actual knowledge what

23  happened.  She had the key on her person.  She said

24  unequivocally that 1070 was kept in a locked cabinet.  So the

25  mystery is solved of the index, you would think.

1          What has Apple done today?  They have taken --

2          Slide 5.

3          They have taken 14 hours of deposition testimony of

4    Dr. Gelernter.  Seven hours of Eric Freeman, not one second

5    has been played in this courtroom.  And, obviously, there is a

6    reason, because he doesn't help them in any way.  Five hours

7    of Milner.  In trial two more hours of Mr. Gelernter.  I don't

8    know how many times they asked him about 1070 and

9    inventorship.

10          They flew in Mr. Baecker who had no knowledge of

11   1070.  Ms. Silver same.  Nice lady.  She couldn't remember

12   exactly when she got 1070 because she had no contemporaneous

13   records.  She said she could have gotten it later.  She had no

14   idea when she really got it.  She wasn't certain.

15          And most importantly the jury heard all this.  I

16   mean 1070 came out.  And they found the patent to be valid.

17   But the best proof that 1070 doesn't exist comes from Apple.

18   Do you know why?  After all this, two years of deposition,

19   discovery, hearings, they are still asking, begging for more

20   discovery because they know the evidence doesn't exist.

21          Now, Piles, you hear so much about Piles in this

22   lawsuit.  There is no evidence of intent to deceive anyone.

23   Mr. Gelernter testified very clear that he didn't really pay

24   any attention to it.  It was cited in a footnote in a paper

25   that he and Mr. Freeman wrote.  Mr. Freeman's testimony

1    collaborates with Mr. Gelernter.  Mr. Gelernter said, because

2    I read it into the record, and most importantly the jury heard

3    about Piles and still held the patents to be valid.

4         You also heard Mr. Randall state about he said in

5    passing something about the '724 patent was related to the, I

6    guess, Piles.  There was no evidence that Gelernter or anyone

7    ever knew about the '724 at the time they filed the

8    application.

9         Now, the other bases I guess of their inequitable

10   conduct conspiracy theory is --

11        Slide 12, please.

12        -- that somehow Mr. Feiner, excuse me, Mr.

13   Gelernter -- Dr. Gelernter, Dr. Freeman got into a locked

14   room, some room with Mr. Milner and said, oh, we are going to

15   defraud Yale today.  We are going to get together and file a

16   patent application, keep it in Eric Freeman's name, and then

17   later on we will reap the benefits.  It sounds like a good

18   mystery story, but there is no proof for it.

19        Why would Mr. Milner, a distinguished lawyer with a

20   well-known law firm, get involved in something like this?  It

21   is ridiculous.  There is no support for it.  The basic record,

22   the record says clearly that Freeman and Gelernter had no

23   experience filing patent applications.  This was their first.

24   Dr. Gelernter was a great scientist.  Frankly, not a good

25   businessman.  In the past he had great ideas for Linda.  He

 1    never filed an application.  This was his first chance at

 2    getting this process.  I guess it has been a mixed bag.

 3              More importantly, Your Honor, this hiding, this

 4    hiding, this stuff right in front of us that just destroys it.

 5    The specification application refers directly to Gelernter's

 6    article The Cyber-Road Not Taken.  It is in the spec.  They

 7    are talking about Gelernter in the spec.  What are they hiding

 8    from the Patent Office?

 9              More importantly, you don't hear anyone from Yale

10    coming and saying, you know, we were misled.  We were angry.

11    Because it didn't occur.  What happened is when they found out

12    there was a policy, they contacted Yale to elicit testimony.

13    And Yale said, okay, no problem, we will give your license

14    back.

15              And you heard Dr. Gelernter's testimony, he has a

16    great relationship with Yale.  He has regular contact.  He

17    said on and on that he was proud of his Lifestreams work.  He

18    was so proud of it he told everybody at Yale about it.  There

19    was no hiding.  And ultimately Yale sold its rights to Mirror

20    Worlds.  So this idea, this conspiracy theory is nonsense.

21              Now, I am happy to say what I told you yesterday was

22    right.  I mentioned about archive.org.  I mentioned that I

23    believe that their website states that you cannot use

24    archive.org to substantiate dates.  So I want to read for

25    you -- this is my response to their bench memo.  This is from

1    the legal section of Internet -- of archive.org.  I will read

2    it into the record.  I think I have a slide on this one, too.

3            Slide 19.

4            It is hard to read.  I will read it.  It says, "Does

5    the Internet Archives affidavit mean that the printout was

6    actually the page posted on the web at the recorded time?  It

7    says the Internet Archives affidavit only affirms that the

8    printed document is a true and correct copy of our records.

9    It remains your burden to convince the finder of fact what

10   pages were up.  And I will pass this out later, Your Honor.

11           You can't use those pages to show when something was

12   placed on the archive.  That is not exactly.  That is

13   completely misleading.  There is no testimony Mr. Freeman put

14   this on the Internet.  It is not there.  I know it is not

15   true.  That is why his testimony wasn't read into the record.

16           And, moreover, the riveting testimony yesterday from

17   Ms. Teodosio said in '95 when you she was overseeing these

18   reports that there was no web page for this report.  Ms.

19   Pellegrino they brought, nice lady; but she was around 1998,

20   three years after the relevant date.  Who cares?

21           Let me move again -- I am almost done here, Your

22   Honor.  I know it has been a long day.  This whole '999

23   business.  Like everything, I have a slide.

24           Slide 21, please.

25           You know, I don't know the expression, the pink

1    elephant in the room, the white elephant in the room,

2    something like that.  But the expression says it is so obvious

3    what you are missing.  The specification says it was a

4    continuation of '227 and '313 and claiming prior art over it.

5    They told that to the Patent Office right off.  I am not a

6    patent prosecutor, and I have nothing against them; but once

7    you tell that to the Patent Office in the spec you are telling

8    them there is common inventorship right on its face.  So what

9    are we talking about because that wasn't mentioned yesterday?

10           Mr. Sarago was a nice man.  He understood that the

11   Invention really was directed toward his ideas of enterprise

12   system, but he had no problem amending the claims because he

13   knew he was borrowing from David's idea of a stream.  Where is

14   the bad faith?  And most importantly failed to tell you the

15   punch line, which I think is Slide 24.  The punch line is the

16   PTO granted the changed inventorship, and it is our Exhibit

17   PX1998.

18           Finally, there is some case law on this, and it is

19   Baxter Intern., which is cited at 149 F.3d, which basically

20   says that -- well, it says right there about the infection of

21   the unenforceability doctrine is only applicable if the

22   infected claim is an antecedent of the claim in question.  And

23   that doesn't apply in this case.

24           And, moreover, this application was filed in 2001,

25   five years after this.  And I think Counsel said this was also

1   part of the whole conspiracy to defraud -- I'm positive.  I

2   know I am pretty tired.  I believe he said that.  That is

3   impossible.  In 1999 Yale sold its rights to Mirror Worlds.

4   How could they be defrauding Yale again?  It makes no sense.

5        So at the end of the day, Your Honor, with all due

6   respect, the Court has been more than fair to Apple, shown

7   great patience in this case, and particularly on this issue.

8   There is actually no claim of Big Foot here.  A lot of smoke

9   and mirrors.  But you cannot ignore what people say.  Evidence

10  counts.  Legal argument is legal argument.  There is no intent

11  to deceive or mislead the PTO in this case.

12       Thank you, Your Honor.

13       THE COURT:  All right.  Anything further on the

14  inequitable conduct?

15       MR. RANDALL:  I will be really brief.

16       THE COURT:  All right.

17       MR. RANDALL:  Your Honor, Mirror Worlds' Counsel

18  mentioned Mr. Hatchell saying there was nothing in the file;

19  therefore, he knew that TR-1070 wasn't disclosed outside of

20  Yale.  He testified at his deposition that was played in court

21  that the reason he said that and the only reason he said that

22  was because when we looked at the TR-1070 folder, it was

23  empty.

24       Now, we don't know where those file contents went

25  to, but I understand from the privilege log of Mr. Milner that

1   there is some 1300 documents on that privilege log.  And I

2   don't know whether those materials weren't sent to the

3   prosecuting attorney.  The point is, though, with respect to

4   Mr. Hatchell's testimony is he clearly testified, as is

5   provided here on the summary of testimony that was presented

6   at demonstrative J-3, he clearly testified that it wasn't

7   confidential, no one told him it was confidential, and he

8   routinely made copies of the technical reports and sent them

9   out.

10          With respect to Ms. Silver, there was a comment that

11  she wasn't sure about the date.  She was absolutely sure about

12  the date.  She testified.  She made it very clear that her

13  father had died.  She had an agenda for preparing her research

14  paper, and she testified that she was certain that she had

15  completed her research, obtained the TR-1070 document before

16  the critical date.  In fact, that date that she received it

17  before was June 5, 1995.

18          With respect to Exhibit 1126 that we went through.

19  Exhibit 1126, the Internet Archive, it is correct that you

20  can't tell when a document was originally placed on it.  What

21  you can tell is when a snapshot is made of the Internet

22  Archive, you know that as of that date, everything that is on

23  that Internet was on the website.

24          So the Internet Archive was -- a snapshot was made

25  on May of '97 and everything that is in 1126 that has a date

128

1    of '97, the snapshot was taken at that point, all those

2    documents were there, and that was before Milner submits his

3    declaration or statement to the PTO saying that 1070 is not

4    distributed outside of Yale.  But at the time it was, in fact,

5    on the Internet.

6            The other thing you can tell about the Internet

7    Archives is you can tell when documents were last modified.

8    And clearly there are numerous instances showing when Freeman

9    translated documents into the three different formats 1070 and

10   placed them on the Internet.

11           Now, we know he translated them at that date.  We

12   know that.  We know that -- the last modified dates of the

13   files, which we went through yesterday.  So it is clear that

14   those files were on the Internet as of April of '95.  And that

15   testimony 1126 Freeman placing TR-1070 in three different

16   formats on the Internet in 1995, the fact that all that

17   information was on the Internet by '97, indicates that the

18   statement that Milner made to the PTO was false, indicates

19   that TR-1070 was publicly available before the critical date,

20   and there is no explanation at all, none, provided for either

21   that information or the testimony from Dr. Gelernter.

22           THE COURT:  Okay.  Thank you.

23           All right --

24           MR. DIAMANTE:  Your Honor, can I just pass up this

25   from the archives?

```
 1              THE COURT:  All right.

 2              MR. DIAMANTE:  Thank you.  We call it Plaintiff's

 3   Post-verdict Exhibit A.

 4              THE COURT:  Is there any objection?

 5              MR. RANDALL:  No, Your Honor.

 6              THE COURT:  Be admitted.

 7              MR. RANDALL:  Your Honor, may I address the last

 8   issue, I would like to address orally --

 9              THE COURT:  Yes.

10              MR. RANDALL:  -- is invalidity.

11              Your Honor, first, Apple did present clear and

12   convincing evidence of invalidity, but we also preserved our

13   argument that the preponderance of the evidence standard

14   should certainly apply to prior art that was not considered by

15   the Patent Office.

16              THE COURT:  And I think maybe the Supreme Court will

17   decide whether that is a good argument or not.

18              MR. RANDALL:  I think they will.  The other issue on

19   that subject is I am going to point out to the Court that I

20   also believe that not just art that wasn't considered by the

21   Patent Office ought to have the preponderance of the evidence

22   standard applied to it, but more importantly, more worthy is

23   art that was known by the applicants and not disclosed.  So

24   apparently it is art known by the applicants, and implicitly

25   that means apparently it is not material for some reason.
```

 1    They shouldn't get the benefit of failing to disclose that.

 2          If they failed to disclose it, then they are at

 3    least now, there is a clear and convincing evidence standard

 4    applied to it.  If they disclose it, there is a preponderance

 5    of the evidence standard applied to it, and it gives them a

 6    slight incentive not to disclose it.

 7          In this case what we relied on nearly exclusively is

 8    art that wasn't considered by the Patent Office, and much of

 9    the art that wasn't considered by the Patent Office was also

10    known by the applicants.

11          A recent case that just came down last week, Your

12    Honor, was Western Union v. MoneyGram came down December 7th,

13    2010 by the Federal Circuit.  It is Case No. 210-1080.  That

14    restates that obviousness is a question of law based on

15    findings of fact.  In that case the Federal Circuit reversed

16    the denial of JMOL on obviousness grounds.

17          Apple believes that while the preponderance of the

18    evidence standard should be applied, even with a clear and

19    convincing evidence standard applied, Apple has satisfied that

20    burden showing invalidity  of the patents that were asserted

21    against Apple and specifically, Your Honor, what we would like

22    to show -- we provided Exhibits 8 through 10 in our renewed

23    motion for JMOL showing a summary of the evidence that has

24    been submitted and the application of that to the claims.  We

25    also played and provided deposition --

1          Strike that.

2          We provided live testimony from Peter Lucas, Gitta

3    Salomon, Mark Lansdale, Ed Belove, Nancy Silver, all

4    testifying about exactly the prior art that we applied to the

5    claims.  And I would like to play, for instance, just two

6    short clips, Your Honor.  DX125 (sic), which is the Workscape

7    200 Points of Light video.

8        (Video played – DX135.)

9              This hypercard stack written in 1990 and known

10        as 200 Points of Light, was the first embodiment of the

11        interface concept.  Documents, here represented as tiny

12        rectangles off in the distance, can be interactively

13        arranged in free space either by direct manipulation or

14        by using scripted tools.

15             In this demonstration the documents are first

16        sorted in the depth dimension by date with the newest

17        documents moving forward towards the viewer.

18             Next, the documents are sorted in the X

19         dimension by type with, for example, email messages in

20         one column, scanned documents in another, and so on.

21         Other tools can be used to form interactive searches of

22         documents along various dimensions.

23             For instance, this date slider can be used to

24         restrict the field of view to documents which were

25         created within a specified range of dates.

1              These simple techniques form the basis of a

2        powerful and intuitive method of locating and organizing

3        online documents of all types.

4        (End of clip.)

5              MR. RANDALL:  Your Honor, Apple presented not just

6   this; the other documents supporting the Workscape system and

7   the testimony of Dr. Peter Lucas to invalidate the claims.

8   And as you can see, those are time-ordered documents that show

9   the visual representation in the same manner as the patents.

10  They create substreams.  It is a powerful piece of art that

11  was never disclosed to the Patent Office.

12              Could you play DX291.

13              This is, Your Honor, the Piles system that Gitta

14  Salomon testified about.

15        (Video clip played.)

16              In this first part of the demonstration I will

17        show you how you would basically work with a pile on your

18        desktop.  Here is the high-end computing desktop of the

19        future.  As you can see, there are a number of piles on

20        it, and there is an annotation over here on the

21        right-hand side.

22              What I want to do first is add this document to

23        the pile in the center, so I am just going to drag it

24        over.  The pile highlights, I drop it on top, and it

25        falls into that pile.

1               Now I can browse up and down with my mouse and

2       look at small versions of each of the documents.  If I

3       think this is the document that I want to extract from

4       the pile, I can flip through its pages by using the

5       cursor keys.

6               At this point I might recognize, oh, yeah, this

7       is the third page, this is the document I want, click

8       down, and remove it from the pile.

9       (End of clip.)

10      MR. RANDALL:  Can you put up CL-16?  Your Honor,

11  here is a demonstrative of the timeline of key prior art that

12  we presented.  The MIT spatial data management system that

13  allows an individual to use their finger, scroll along the

14  spine of that stack of documents, and rest and then have a

15  glance view appear.

16              The MEMOIRS time-based diary from 1989, Professor

17  Lansdale testified by deposition on that and provided

18  extensive testimony about the application of that prior art to

19  the claims.  Ed Belove testified about both Lotus Magellan and

20  On Location regarding their extensive indexing and searching

21  of documents on the system.

22              Gitta Salomon testified about the Apple Piles system

23  and her patents.  Peter Lucas testified about the Workscape

24  system in 1994, including his patents.  And all of the

25  exhibits are listed below.

```
 1              The Retrospect Archiving applies archiving
 2    capability to these combinations as well, Your Honor.  And
 3    then we have got TR-1070 listed.  And well after that we have
 4    got the patent that was at issue in this case, the '227 filed.
 5              Your Honor, Apple provided clear and convincing
 6    evidence of the invalidity of the patents that were asserted
 7    against it based on live, credible witnesses testifying with
 8    percipient knowledge about their system and their capabilities
 9    and also by deposition.  We also presented the documents and
10    the videos.  And we submitted, Your Honor, on JMOL that the
11    Court ought to declare the patents invalid for both
12    obviousness and anticipation.
13              THE COURT:  Okay.  Response?
14              MR. STEIN:  Apple's invalidity argument was
15    basically premised on an overly broad interpretation of the
16    claims in suit.  Its expert admitted that it applied -- that
17    he applied an overly broad construction of the claims in suit,
18    and it fit in with Apple's theme during the trial that it was
19    basically doing whatever was in conventional operating
20    systems, and so it was trying to distance itself from the fact
21    that Spotlight was a revolutionary paradigm shifting
22    technology, which is what they were telling the rest of the
23    world.
24              Here they were just saying they were doing the same
25    old, same old.  But before this litigation they were
```

1   describing Spotlight as something quite different, something

2   new, and something that was really significant in terms of

3   operating systems.

4         The result of their change in view when it came to

5   assessing the invalidity and overly broad construction, is

6   they basically captured things that were known and were not

7   the things that was being claimed in the patent.  So in light

8   of the prior art that he was mentioning, there was no main

9   stream disclosed.  There was no -- there were no substreams

10  disclosed.  Many elements were missing from those -- from that

11  prior art.

12        And here -- the jury heard all of the evidence,

13  heard the witnesses, heard Dr. Feiner testify, and testified

14  that he was applying an overly broad construction of the claim

15  when he was assessing invalidity yet a narrow construction of

16  the claim when he was trying to avoid infringement by Apple's

17  products.  And they concluded based on that testimony and all

18  of the evidence presented, that the Mirror Worlds' claims

19  were, in fact, valid over this prior art.

20        So here Apple is just once again asking the Court to

21  substitute its judgment and its weighing of the evidence --

22  and substitute that for what the jury found, and that is

23  improper.  Apple failed to carry its burden of proof regarding

24  invalidity by such a wide margin here that actually no matter

25  how the jury was instructed it could not find invalidity based

1   on the evidence presented.

2          In fact, Apple's expert did not step through a

3   single claim of any of the patents and state where that

4   claim -- where that claim language -- where those claim

5   requirements were found in a single piece of prior art.  They

6   used these broad categories that didn't capture all of the

7   claim language.  It was in a category for persistent

8   substream, for example.  There were many other claim

9   limitations and claim language not captured and not discussed

10  at all by Mr. Feiner.  So the evidence before the jury was

11  wholly lacking for invalidity.

12         Another important thing is that Apple's invalidity

13  analysis failed to acknowledge at all important substantial

14  secondary considerations of nonobviousness, including the

15  praise for the invention when it came out.  There was evidence

16  to that effect.  There were documents and testimony, Apple's

17  copying of the technology, and there was substantial testimony

18  of how Apple tracked Dr. Gelernter's work, was monitoring it.

19  There were emails internally circulated to more than 40

20  people.  His technology was discussed at the MERLOT offsite

21  conference at which the features of the Spotlight and the

22  first infringing operating system, Tiger, were being decided.

23         And Apple ignores the substantial commercial success

24  that was garnered by Apple through the -- through their

25  infringement of Mirror Worlds' patents.  And, again, the jury

137

1   ruled that Apple infringed, and there is substantial testimony

2   and evidence as to how it was -- these features were perceived

3   by the world as marquee features, revolutionary,

4   groundbreaking, they were all terms being used for these

5   features when they were being introduced.  And, you know, it

6   was in sharp contrast to Apple's trial strategy of just saying

7   they were doing the same old stuff.

8           Now, Apple's Counsel showed a couple of videos.  For

9   example, the Workscape 200 Points of Light video to show

10  there is no description in there of a main stream or glance

11  views or substreams.  The same with the Piles testimony that

12  he referred to.  There is no main stream or substream or

13  receding foreshortened stack.  And for each case they just

14  used this broad-brush argument.  When it comes down to brass

15  tacks, when it comes down to actually comparing the claim

16  language against the prior art, the prior art is found

17  lacking.

18          And Dr. Levy went through the prior art.  He

19  identified elements that were missing from the prior art in

20  each case.  He presented demonstratives.  You can refer to his

21  rebuttal slides -- I believe they are in evidence -- where he

22  stepped through the prior art.

23          I guess I should say one word about their Exhibits 8

24  through 10.  I mean, the Court set page limits for the briefs.

25  They put close to 200 pages of these claim charts, which, if

1   reviewed, the Court can see they contain substantial attorney

2   argument in them.

3           THE COURT:  I can assure you they all won't be

4   read.

5           MR. STEIN:  But at the end of the day looking at

6   that you will see that they rely on attorney argument,

7   evidence that wasn't presented to the jury, and the jury

8   looked at all the evidence, heard the evidence on our side and

9   decided that Apple did not meet its burden.

10          I guess one more thing should be mentioned.  When it

11  comes to TR-1070, which is one of the references that Apple

12  included in its motion, Dr. Feiner completely failed to even

13  discuss the contents of TR-1070 and how that particular

14  reference would invalidate -- or supposedly invalidate the

15  claims that have been asserted here.

16          Thank you.

17          THE COURT:  Thank you.

18          Any response?  And so the record is clear, your

19  briefs will be read but not all of your claim charts will be

20  read.

21          MR. RANDALL:  Just the invalidating ones will be

22  helpful, Your Honor.

23          I will be brief.  First of all, the last point that

24  was made by Counsel was that somehow there was information

25  provided by Apple in those claim charts that was not presented

1    to the jury.  That is not true.

2            Number one, Apple presented the documents, the

3    evidence to the jury, had percipient typically live witnesses

4    testify about their systems, and provide that evidence to the

5    jury.

6            Now, in contrast, Mirror Worlds in their surreply

7    regarding JMOL, all of the evidence that they cite was neither

8    admitted -- it was either not admitted as an exhibit or it was

9    not shown to the jury.  And what I have, Your Honor, is a

10   handout that I would like to hand up to the Court and have

11   permission to file, which lists the evidence that evidence --

12   and I say that loosely -- that Mirror Worlds relied upon in

13   opposition to our JMOL that either was not admitted or was not

14   shown to the jury.

15           And as you know, we had to pre-admit a host of

16   exhibits in this case.  And there were a lot of exhibits that

17   were pre-admitted.  But the direct infringement evidence and

18   all these manuals and all this other information that Mirror

19   Worlds now relies upon for opposing our JMOL, nearly all of it

20   was either not admitted as an exhibit or was never shown to

21   the jury.  And that is what I have here is a listing.  It is a

22   listing by exhibit number.  It is a listing by where it

23   appears in their brief.  And it is a description of the

24   exhibit.

25           THE COURT:  All right.  If you will hand that up,

1  please.  Do you want to mark this as an exhibit?

2       MR. RANDALL:  Yes, please.

3    (Document given to the Court.)

4       MR. RANDALL:  So, please, in evaluating the briefs

5  and the post-trial briefs, I would ask the Court to please

6  take into consideration the fact that nearly all of the

7  evidence relied upon by Mirror Worlds in opposing our JMOL,

8  particularly with respect to noninfringement, was never

9  presented to the jury.

10       Now, with respect to the arguments on --

11       THE COURT:  Are you saying -- when you are saying

12  never presented to the jury, do you mean it was not admitted

13  into evidence, or was simply not discussed here in court?

14       MR. RANDALL:  Either one.  So that listing --

15       THE COURT:  Both.

16       MR. RANDALL:  -- identifies -- it does identify

17  those exhibits that were not admitted.  As to those other

18  exhibits that are listed, they were never shown or discussed

19  to the jury.

20       THE COURT:  All right.  Any objection to that

21  exhibit?

22       MR. STEIN:  Well, I do --

23       THE COURT:  I know you disagree with it.

24       MR. STEIN:  I do have an objection to it because

25  we -- just glancing at it, and this is the first time I have

1    seen it.  There are a number of cites to Mirror Worlds'

2    opposition brief to the JMOL which was filed some time ago.

3    It doesn't seem like this is something that needed to wait

4    until now to bring up, if this was an issue.

5           But my more substantial objection is that there were

6    a handful -- and we will go through that later perhaps of

7    exhibits that were inadvertently cited in this one brief.  Not

8    that many.  But we have filed a motion to correct that brief.

9    And Apple knows that, and the motion hasn't been granted.  But

10   to represent to the Court that we were trying to base our

11   arguments on exhibits that were not admitted --

12          THE COURT:  All right.  Your objection is

13   sustained.  This is not admitted.  Counsel, you can -- Counsel

14   you have provide it to Counsel now.  You can put it in a

15   post-hearing filing just as part of additional briefing.  And

16   then you can have a right to respond to it.  Okay?

17          MR. STEIN:  Thank you.

18          THE COURT:  All right.  What else?

19          MR. RANDALL:  Your Honor, with respect to the

20   invalidity case, the one issue that was left after the

21   trial -- a number of them were -- but what is the advancement

22   in the art by these patents?  How do they advance the art?

23   What we have shown through a number of live witnesses,

24   testimony, and documents is that their system basically put

25   all documents in the system, they time stamped them, they put

 1   them all in time order, and then you could search them and

 2   archive them.

 3           That is exactly what the evidence is that we have

 4   put on with respect to invalidity.  They also have a visual

 5   display, and you have got the MEMOIRS system that time stamps

 6   every document, puts all of them in order, allows subsequent

 7   streams to be created.  You have got glance views supplied by

 8   the SDMS system, and you have got a Workscape that also -- he

 9   said there are no substreams.  We just went through a whole

10   series of substreams with respect to Workscape, and the same

11   thing with the Piles system.

12           What we did is we identified and presented clear and

13   convincing evidence of all of the prior art that pre-dates the

14   inventions and has the same capability.

15           Your Honor, we would ask that the Court grant JMOL

16   of invalidity on all claims.

17           THE COURT:  Anything further?

18           MR. STEIN:  Well, just one point; that Mr. Randall

19   is apparently again downplaying the significance of Spotlight,

20   Time Machine, and Cover Flow, which were found to infringe the

21   Mirror Worlds patents.  Before this case they were touting

22   them as revolutionary features.  Now they have been held to

23   embody the patented invention, and now they are claiming they

24   were not an advancement in art.  I think that the jury

25   correctly rejected that argument.

```
 1              THE COURT:  All right.  Anything further?

 2              MR. RANDALL:  No, Your Honor.

 3              THE COURT:  Anything further from the plaintiff?

 4              MR. DIAMANTE:  No, Your Honor.

 5              MR. CARROLL:  One thing, Your Honor.  With the

 6   Court's permission, I would like to apologize for being late

 7   to court this morning without the Court's permission.

 8              THE COURT:  Okay.  Thank you, Mr. Carroll.

 9              All right --

10              MR. STEIN:  There was the issue of the exhibits.  I

11   don't know if you want to go through that.

12              THE COURT:  The issue of what?

13              MR. STEIN:  There were exhibits that Apple asked to

14   strike earlier this morning, and that has not been resolved.

15              THE COURT:  Right.  That is that list of 26, 38,

16   143, 222; is that correct?

17              MR. STEIN:  Right.

18              THE COURT:  Would you like to respond a minute?

19              MR. STEIN:  The following exhibits were, as I

20   explained, exhibits that were inadvertently cited in our

21   opposition to Apple's motion for JMOL.  And we have attempted

22   to file a corrected brief that eliminated them, but the

23   following exhibits fall into that category, and we agree they

24   should not be considered.  It is 22, 222, 346, 1108, 1168,

25   1983.  They identified PX1195.  That was a typo.  It should
```

1    have been PX1995.

2            Apple could have mentioned that exhibit was not

3    admitted in connection with the briefing and we could have

4    corrected it during our subsequent brief, but they didn't.  So

5    I requested that the correction be made instead of eliminating

6    the evidence.  PX1195 should be PX1995.

7            PX38 and 143 Apple raised the issue that they were

8    not admitted in their motion to strike Mr. Bratic's

9    declaration.  We responded in our opposition that those

10   exhibits are basically the same as PX43 and PX933,

11   respectively.

12           THE COURT:  Same as 43 and what?

13           MR. STEIN:  PX933, respectively.  That is in our --

14   I think it is in our opposition to their motion to strike.

15           And then the last exhibit is PX1164, which is in

16   Mirror Worlds' surreply to the JMOL motion.  That was

17   inadvertent.  It is actually the same as DX154, which was

18   admitted.

19           THE COURT:  Which what?

20           MR. STEIN:  DX154.

21           THE COURT:  Which was admitted?

22           MR. STEIN:  Yes.

23           THE COURT:  All right.  So you agree 222, 346, 1108,

24   1168, and 1983 are not.

25           MR. STEIN:  Right.  It was 22 and I believe it was

1    222.

2              THE COURT:  222; is that right?

3              MR. STEIN:  Yes.

4              THE COURT:  Those should have not have been cited

5    and are not part of the record.  You have given references to

6    38, 143, 1164 and 1195, which you have either renumbered them

7    or said that they are also listed as other exhibit numbers,

8    right?

9              MR. STEIN:  Yes.

10             THE COURT:  So we will just substitute those numbers

11   for that and go from there.  What about PX26?  Did I write

12   that down wrong, or was it 22?

13             MR. STEIN:  I do see PX26 on my list.

14             THE COURT:  I may have written that down.  It was

15   the first one.

16             MR. STEIN:  I transcribed it incorrectly.  Yes, it

17   is PX26 -- the first list should not have been 22 and 222.  It

18   should have been 26.  Yes, that falls in the first category.

19             THE COURT:  So that one is not considered.

20             Okay.  Does that clarify everything?  Sort of?

21             MR. STEIN:  Sort of.

22             MR. RANDALL:  Your Honor, the only other thing I

23   have is to hand up the demonstratives that we utilized for the

24   Court's convenience.

25             THE COURT:  All right.

1     (Documents given to the Court.)

2         THE COURT:  Okay.  So with regard to the motion to

3    strike that was made earlier this morning, it is granted as to

4    Exhibits 26, 222, 346, 1108, 1168, and 1983.  Strike those

5    references as those exhibits were not admitted into evidence.

6    And in all other respects it is denied.

7         Anything further?

8         MR. STEIN:  No, Your Honor.

9         THE COURT:  Anything further from the defendant?

10        MR. RANDALL:  No, Your Honor.

11        THE COURT:  Thank y'all very much for your

12   arguments.  We will go to work on this and get you a decision

13   when we can.

14     (End of hearing.)

15

16              C E R T I F I C A T I O N

17

18   I certify that the foregoing is a correct transcript from the

19   record of proceedings in the above-entitled matter.

20

21

22   /s/ Shea Sloan

23   SHEA SLOAN, CSR, RPR
     OFFICIAL COURT REPORTER
24   STATE OF TEXAS NO. 3081

25